UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE PIO, Individually and on Behalf of
All Other Persons Similarly Situated,

        Plaintiff,

v.                                   Civil Case No. 14-11191
                                      Honorable Linda V. Parker

GENERAL MOTORS COMPANY,
MARY T. BARRA, DANIEL AMMANN,
ALAN S. BATEY, JAMES B. DELUCA,
and DANIEL F. AKERSON,

        Defendants.
_____/

## OPINION AND ORDER REGARDING MOVANTS' MOTIONS FOR LEAD PLAINTIFF AND LEAD COUNSEL APPOINTMENT

Plaintiff George Pio filed this putative class action lawsuit on behalf of investors who purchased securities in General Motors Company ("GM") between November 17, 2010 and March 10, 2014 (inclusive of both dates), claiming that Defendants' fraud in connection with faulty ignition switches in GM vehicles caused loss to the value of their investments. Presently before the Court are timely motions for appointment as lead plaintiff and for approval of lead counsel filed by four movants: (1) KBC Asset Management NV ("KBC"); (2) Arkansas Teacher Retirement System ("Arkansas Teacher"); (3) New York State Teachers' Retirement System ("New York Teachers"); and (4) Menora Mivtachim Insurance

Limited and Menora Mivtachim Pensions and Gemel Limited (collectively "Menora").  KBC and Arkansas Teacher have each filed a statement of non-opposition to the competing motions, conceding that they do not have the largest financial interest in the relief sought to warrant their appointment as lead plaintiff under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B).  The Court held a hearing with respect to the appointment of lead plaintiff and lead counsel on August 20, 2014.

## I.    Factual and Procedural Background

The Complaint alleges that Defendants touted the safety, quality, and reliability of GM vehicles from November 17, 2010 through March 10, 2014 ("Class Period"), despite their knowledge that millions of GM vehicles were plagued with faulty ignition switches.  The faulty ignition switches were extremely susceptible to becoming jarred in routine driving situations, thereby shutting off the vehicle and disabling essential safety features such as airbags, power brakes, and power steering.  (Compl. ¶ 9, ECF No. 1.)  The faulty switches led to at least twelve deaths, countless injuries and property damage, and have exposed GM to civil and criminal liability.  (*Id*. ¶¶ 8, 19.)

Throughout the Class Period, Defendants made allegedly false and/or misleading statements, and failed to disclose materially adverse facts related to the

2

quality and safety of GM vehicles and defects in those vehicles.  (*Id*. ¶ 19.)

According to the Complaint, disclosures concerning the defects through GM's

recall of affected vehicles and subsequent reports of government criminal and civil

investigations into the company triggered a sharp decline in the share price of GM

securities, wiping out billions in shareholder value.  (*Id*. ¶ 11.)  The Complaint

alleges that the first disclosure occurred on February 7, 2014, when GM notified

the National Highway Traffic Safety Administration ("NHTSA") of GM's decision

to recall certain vehicles.  (*Id*. ¶ 12.)  In response, the Company's shares fell $1.21

per share or over 3% to close at $34.90 per share on February 10, 2014.  (*Id*. ¶ 13.)

GM expanded the recall to include more GM vehicles on February 24, 2014,

causing further decline in the value of its shares.  (*Id*. ¶ 14.)  On March 11, 2014,

GM sent a letter to NHTSA detailing the issues with the ignition switches and the

company's discovery of the defect.  (*Id*. ¶ 15.)  This news led to a $1.91 decline in

GM's shares, with a closing price of $35.18 per share on March 11, 2014.  (*Id*.

¶ 16.)  Following reports of a criminal investigation of GM on March 11, 2013,

after trading hours, its stock price fell a further $1.09 to close at $34.09 on March

13, 2014.  (*Id*. ¶ 17.)

Plaintiff George Pio (hereafter "Pio")– who alleges that he purchased GM

securities at artificially inflated prices during the Class Period– filed this putative

class action lawsuit on March 21, 2014.  The matter originally was assigned to the Honorable Robert H. Cleland.  In his Complaint, Pio alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the Security Exchange Commission.  Pursuant to the requirements of the PSLRA, 15 U.S.C. § 78u-4(a)(3)(A)(i), Pio published a notice on the Globe Newswire within twenty days of filing suit, informing potential class members of their right to file a motion seeking lead plaintiff status on or before May 20, 2014.  (KBC Mot., Ex. A, ECF No. 10-1.)

On May 20, 2014, KBC, Arkansas Teacher, New York Teachers, and Menora filed motions seeking their appointment as lead plaintiff and their chosen counsel's appointment as lead counsel.  (ECF Nos. 10, 13-15, respectively.)  On May 28, 2014, Judge Cleland reassigned this matter to the undersigned pursuant to Administrative Order 14-AO-030.  (ECF No. 18.)  Subsequently, KBC and Arkansas Teacher filed notices of non-opposition to the competing motions, conceding that they do not satisfy the requirements to serve as lead plaintiff under the PSLRA.  Menora and New York Teachers filed further briefs in support of their motions and in opposition to the other's motion (ECF Nos. 22, 23, respectively), as well as reply briefs.  (ECF Nos. 29, 30.)

As indicated, the Court held a motion with respect to Menora's and New

York Teachers' motions on August 20, 2014.  At the hearing, the Court granted the movants' requests to submit supplemental briefs and those briefs were filed on August 25, 2014.  (ECF Nos. 42, 43.)

## II.    Applicable Law

The PSLRA requires a court to consider any motion filed by a class member seeking to be appointed as lead plaintiff and to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members."  15 U.S.C. § 78u-4(a)(3)(B)(i).  The statute contemplates that the court will appoint a lead plaintiff within ninety days of the date on which notice of the lawsuit is published by the named plaintiff.  *Id*.  The PSLRA creates a rebuttable presumption that the most adequate plaintiff is the person who:

> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  The statute does not provide a methodology for determining which person has "the largest financial interest" in the litigation.

5

In making this determination, however, courts have adopted the four factors outlined by the District Court for the Northern District of Illinois in *Lax v. First Merchants Acceptance Corp.*, No. 97-cv-02715, 1997 WL 461036, at *5 (Aug. 11, 1997). *See, e.g., In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998) (citing *Lax*); *In re The Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03-cv-2166, 2004 WL 3314943, at *3 (N.D. Ohio May 12, 2004) (citing cases recognizing the four-factor inquiry outlined in *Lax*). The *Lax* factors are: (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period (i.e., shares purchased during and retained at the end of the class period); (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period. *Lax*, 1997 WL 461036, at *5.

With respect to the last factor, the court has the discretion to choose the method for calculating the losses suffered by a class member during the class period, provided the chosen method is "both rational and consistently applied." *In re Regions Morgan Keegan Closed-End Fund Litig*. No. 07-02830, 2010 WL 5173851, at *4 (W.D. Tenn. Dec. 5, 2010) (citing *Plumbers & Pipefitters Local 562 v. MGIC Inv. Corp.*, 256 F.R.D. 620, 623-24 (E.D. Wis. 2009) and *In re Cavanaugh*, 306 F. 3d 726, 730 n.4 (9th Cir. 2002)). Courts have used a variety of

methods to make this determination and "there does not appear to be any

consensus among courts as to which method is best." *Plumbers & Pipefitters*, 256

F.R.D. at 623 & n.4 (citing Manual for Complex Litigation (Fourth) at § 31.31

(2004)).  Since the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v.*

*Broudo*, 544 U.S. 336 (2005), however, most courts have modified their

calculations to consider only those securities affected by the defendant's alleged

misconduct.[1]  *See, e.g., Eichenholtz v. Verifone Holdings, Inc.*, No. C 07-06140,

2008 WL 3925289, at *3 (N.D. Cal. Aug. 22, 2008) (holding that losses incurred

before the first fraud-correcting disclosure alleged in an action must be excluded

pursuant to *Dura*); *In re Converse Tech., Inc. Sec. Litig.*, No. 06-cv-1825, 2007

WL 680779 (E.D.N.Y. Mar. 2, 2007) (holding that "under *Dura* and its progeny,

any losses that [a class member] may have incurred before [the defendant]'s

misconduct was ever disclosed to the public are not recoverable, because those

losses cannot be proximately linked to the misconduct at issue in this litigation");

*In re The Goodyear Tire & Rubber Co. Sec. Litig.*, 2004 WL 3314943, at 4

---

[1]In *Dura*, the Supreme Court held that, to prove loss causation, a plaintiff
must show that the defendant's misconduct artificially inflated the price of the
target company's stock on the date the plaintiff purchased its shares *and* that the
stock price later declined (and thus caused the plaintiff's shares to be worth less)
immediately following a disclosure of the alleged misconduct to the public.  544
U.S. at 344-47.

7

(rejecting movant as the lead plaintiff because it sold all of its shares of the

defendant's stock prior to the disclosure of the alleged fraud and thus its losses

were not caused by the alleged fraud) (citing cases).  Nevertheless, all factors that

may impact whether class members' securities were affected by the defendant's

alleged misconduct may not yet be known early in the litigation when the lead

plaintiff determination must be made.  *See In re Watchguard Sec. Litig.*, No. C05-

678, 2005 U.S. Dist. LEXIS 40923, at *14-16 & n.6 (W.D. Wash. July 13, 2005).

Finally, as indicated, the class member seeking lead plaintiff status must also

satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure.  Rule

23 provides:

> One or more members of a class may sue or be sued as representative
> parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is
> impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of
> the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. P. 23(a).  Courts deciding which investor to appoint as lead plaintiff

focus on the third and fourth factors, delaying a more rigorous analysis of the first

two factors for its decision on whether to certify the matter as a class action.  *See, e.g. In re The Goodyear Tire & Rubber Co. Sec. Litig.*, 2004 WL 3314943, at *6 (citing cases); *Lax*, 1997 WL 461036, at *6 (citation omitted).

Rule 23's "typicality" requirement is met if the plaintiff's claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996).  The rule's "adequacy" requirement is satisfied where the representative "ha[s] common interests with those of unnamed class representatives" and is "capable of vigorously prosecuting the action with the assistance of qualified counsel."  *Id.*

## III.   Analysis

There can be no dispute that the first three *Lax* factors favor the appointment of New York Teachers as lead plaintiff:

| Movant | Shares Purchased | Net Shares Purchased | Net Funds Expended |
|---|---|---|---|
| New York Teachers (GM Common Stock) | 2,844,444 | 2,701,084[2] | $96,296,181.45 |
| New York Teachers (Notes) | 1,695,000 | 1,695,000 | $1,716,843.75 |
| **New York Teachers' Total** | **4,539,444** | **4,396,084** | **$98,013,025.20** |
| Menora Mivtachim Pensions & Gemel Ltd. | 784,500 | 784,500 | $31,334,980.00 |
| Menora Mivtachim Ins. Ltd. | 185,000 | 185,000 | $7,377,657.00 |
| **Menora Total** | **969,500** | **969,500** | **$38,712,637** |

(ECF Nos. 14-4, 15-4, 22-7.)  Menora urges the Court to disregard this finding,
pointing to decisions within the Sixth Circuit and elsewhere where courts found the
first three *Lax* factors less significant than the last (i.e., approximate losses
suffered) when evaluating which movant has the "largest financial interest" under
the PSLRA.  (ECF No. 22 at Pg ID 475-76, citing cases.)

The Court declines the invitation to ignore all but the fourth *Lax* factor in
deciding which movant has the largest financial interest in this litigation.  First, and
as will be more evident in the discussion that follows, the first three factors provide
the most objective measurement of a movant's stake in the litigation because the

---

[2]This figure represents the shares retained at the end of the Class Period on
March 10, 2014 (2,683,667), plus 17,417 shares sold within ninety days after the
end of the Class Period.

fourth factor is heavily dependent on the method applied and numbers chosen to calculate losses.  Further, some courts have found the second factor– retained shares– to be the most determinative factor in approximating an investor's potential recovery.  *See, e.g., In re Network Assocs., Inc. Sec. Litig.*,76 F. Supp. 2d 1017, 1027 (N.D. Cal. 1999) (concluding net shares purchased should be used to determine financial interest as "the candidate with the most net shares purchased will normally have the largest potential damage recovery"); *In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1108 (N.D. Cal. 2001) (finding net shares purchased "determinative" of financial interest); *In re Cable & Wireless PLC Sec. Litig.*, 217 F.R.D. 372, 375 n.4 (E.D. Va. Apr. 21, 2003) (considering net shares purchased in assessing financial interest and appointing movant with largest net funds expended).  KBC and Arkansas Teacher in fact contend that New York Teachers' recoverable loss is likely to be the largest among the movants "because of the substantially greater number of net shares it retained through the alleged disclosures."  (*See* ECF Nos. 20 at Pg ID 455; *see also* ECF No. 21 at Pg ID 460.)

With respect to the final *Lax* factor, Menora and New York Teachers each claim to have incurred the largest losses during the Class Period.  Not only do both

11

movants employ different methodologies from each other to calculate their losses,[3] but they each use different methods from brief to brief– offering the Court varying estimations of their losses.  In its initial motion, New York Teachers claims losses of $3,456,904 from its Class Period transactions in GM common stock, and $3,437,255 when considering New York Teachers' Class Period transactions in all GM securities.  (ECF No. 14 at Pg ID 288.)  New York Teachers does not identify the method it used to calculate its losses.  According to the loss chart attached to the motion, it apparently applied first-in, first-out ("FIFO") and last-in, first-out ("LIFO") estimates and multiplied its retained shares by a share price of $34.36767[4] to assess the decreased value of the shares at the end of the Class Period.  (*Id*., Ex. C.)

In New York Teachers' subsequent brief submitted in support of its motion, it encourages the Court to use an alternative loss methodology to assess each

_____

[3]At the motion hearing, in response to the Court's questioning, counsel for Menora and New York Teachers indicated that they used the same methodologies to calculate the losses set forth in their initial motions.  While they may have each used first-in, first-out ("FIFO") and last-in, first-out ("LIFO"), they certainly did not use the same share price to calculate the decreased value of the shares at the end of the class period.  (*Compare* ECF No. 14-4 *with* ECF No. 15-4.)  The Court is not confident that other differences in their application of these methods renders their numbers incommensurable.

[4]This share price represents the average daily closing price of GM stock during the ninety-day look-back period.

12

movant's approximate losses during the Class Period: the "retained shares" methodology outlined in *Eichenholtz*. 2008 WL 3925289, at *4.[5]  New York Teachers contends that this methodology more closely approximates each movant's "recoverable losses" where, as here, the alleged fraud was disclosed only at the end of the Class Period and therefore variations in share price during the Class Period are the result of other factors.  (ECF No. 23 at Pg ID 612-13.)

---

[5]As described by the *Eichenoltz* court, under the retained shares methodology, a court calculates financial interest by first multiplying the number of net shares purchased during the class period (i.e. "retained shares") by the assessed cost of those shares.  2008 WL 3925289, at *4. The court described two potential methods for determining "assessed cost":

> Under the first method, the purchase price of the retained shares is calculated according to the shares purchased most recently, but within the class period. Under the second method, the purchase price of the retained shares is calculated according to the shares purchased at the beginning of the class period.

*Id*. Next the court calculates the losses on the retained shares by applying the following formula:

> [I]f a share was not sold within 90 days subsequent to [the date the fraud was disclosed to the public], the loss is to be measured using an average of the daily closing price of [the target company's] stock during the 90-day period beginning [on the disclosure date]. If a share was sold within 90 days subsequent to [the disclosure date], the loss is to be measured using the higher of the actual sale price or an average of the daily closing price from [the disclosure date] to the date of sale.

*Id*.

13

Purportedly applying this methodology, New York Teachers estimates its suffered losses to be $6,231,081.99, and Menora's to be $6,119,279.80.[6]  (ECF No. 23 at Pg ID 624; ECF No. 23-12.)

In its opening brief, Menora claims total losses of $5,367,558.  (ECF No. 15 at Pg ID 374.)  Exhibit C to Menora's motion reflects that this total was derived by subtracting from the actual purchase cost of its 969,500 shares (all of which were retained at the end of the Class Period), the product of the number of retained shares and $34.3941.  (*Id.*, Ex. C.)  According to Menora, $34.3941 represents the average closing price of GM stock during the seventy days after the end of the Class Period (i.e. from March 11, 2014 to May 19, 2014).  (*Id.*)

Menora adjusts its estimated losses slightly upwards to $5,393,249 in its supplemental brief.  (ECF No. 22 at Pg ID 472, 476.)  Exhibit F to this pleading reflects that this loss was calculated by multiplying the shares purchased (969,500) by the difference between Menora's calculated "average purchase price"[7]

---

[6]Menora contends in its supplemental brief that New York Teachers and its expert did not correctly apply the *Eichenholtz* methodology.  (ECF No. 43 at Pg ID 1219-20.)  This argument is addressed– albeit indirectly– at pages 17-18 of this decision.

[7]Menora's "average purchase price" actually represents an average of an average, as it first calculates an average purchase price for each group of shares that it purchased and then calculates an average of that average.  (*See* ECF Nos. 15-

(continued...)

($39.905) and $34.3676.  (*Id.*, Ex. F.)  Using the same formula and applying an

average purchase price of $35.6883 to New York Teachers' 2,683,667 retained

shares, Menora calculates New York Teachers' estimated losses to be $3,437,255.

(*Id.*)

New York Teachers sets forth at least two reasons why it believes the Court

should not rely on Menora's estimated losses.  First New York Teachers points out

that, although Menora agrees that the Court should estimate losses by focusing on

the shares retained at the end of the Class Period, it ignores the retained shares

methodology applied by previous courts and advances a new unprecedented

methodology.  (ECF No. 7 at Pg ID 1111.)  New York Teachers further argues that

Menora's financial losses cannot be verified because it refuses to disclose related

entities' transactions in GM stock.

Specifically as to this last point, New York Teachers contends that "[t]he

Menora Group, which is part of a self-described $15 billion 'insurance and

financial services conglomerate,' has now admitted that other Menora entities

traded GM securities during the Class Period – and thus could have actually

profited from the fraud."  (ECF No. 23 at Pg ID 627.)  New York Teachers claims

---

[7](...continued)
4, 22-7.)

that Menora Holdings Limited– the parent of the Menora movants– "filed several Forms 13F with the SEC on behalf of Menora Insurance and Menora Gemel that reflect transactions in GM securities during the Class Period that were not reflected on the sworn certifications that the Menora Group submitted with its opening motion." (*Id*. at Pg ID 628.) Menora contends in response, however, that "[t]he members of Menora Group, under Israeli law, are wholly distinct legal entities from other affiliates related to Menora Holdings." (ECF No. 29 at Pg ID 1048.) As such, each entity's profits or losses benefit distinct beneficiaries. (*Id*.) Menora argues that its losses, therefore, should not be offset by the gains of any other entity related to the parent company. (*Id*.)

This Court has spent considerable time making sense of the "recoverable loss" calculations submitted by Menora and New York Teachers– in its attempt to understand the formulas used by the movants, uncovering the source of their numbers, and weighing the competing arguments for rejecting the opposing movant's calculations. Such efforts seem contrary to one of the main reasons courts favor the use of the four *Lax* factors: "because they look to relatively objective indicators, such as number of shares purchased or sold, rather than to the ultimate question of damages." *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1158 (N.D. Cal. 1999). Like the movants in *Aronson*, Menora and New

16

York Teachers "have not framed their arguments in these terms, instead presenting a dizzying array of damages calculations in their briefs and declarations." *Id.* This appears to be common among movants seeking lead plaintiff appointment under the PSLRA, as another judge found the submissions in the case before him "confusing and laced with errors and unspoken assumptions", requiring the court to "reverse engineer the numbers", and demanding "accounting gymnastics." *In re Network Assoc., Inc. Sec. Litig.*, 76 F. Supp. 2d at 1028.

It is worth emphasizing at this juncture that the fourth *Lax* factor is intended to be only an *approximation* of the losses suffered during the class period by the prospective lead plaintiffs. *See Lax*, 1997 WL 461036, at *5; *see also Eichenholtz*, 2008 WL 3925289, at *4 (stressing that, at this stage in the proceedings, the court's goal is not to calculate actual damages but to approximate the competing parties' financial losses). The district court's calculations for purposes of choosing a lead plaintiff are not a final decision on loss calculations or loss causation.[8] *See In re McKesson*, 97 F. Supp. 2d 993, 996 (N.D. Cal. 1999) ("[T]his discussion is limited to the resolution of the lead plaintiff motions, not to ultimate questions of liability

_____

[8]For that reason, the Court finds little merit to Menora's argument that New York Teachers is not an adequate lead plaintiff to represent the Class because its expert excluded two stock price declines for purposes of approximating losses under the fourth *Lax* factor, only. (*See* ECF No. 43 at Pg ID 1220-21.)

or damages.").

The narrow window Congress provided district courts to resolve competing motions for lead plaintiff appointment is not the time for conducting a precise calculation of each movant's actual damages, which in a securities fraud case generally "is a highly technical task that usually involves a battle of experts." *Perlmutter v. Intuitive Surgical, Inc.*, No. 10-CV-03451, 2011 WL 566814, at *5 (N.D. Cal. Feb. 15, 2011); *see also In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004) (quoting *Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 365 (S.D.N.Y. 2002) ("Calculation of damages is a 'complicated and uncertain process, typically involving conflicting expert opinion' about the difference between the purchase price and the stock's 'true' value absent the alleged fraud."). At this early stage of the litigation, the court should not be wading through complex or fact-dependent arguments relative to the parties' calculations, nor should it be combing through competing expert reports or analyzing and resolving which attacks to credit by a party or its expert on the loss calculations of the opposing party.  As one district court has suggested, Congress did not intend for courts to engage in such an exercise when it enacted the lead plaintiff provisions of the PSLRA:

[W]here . . . all movants are sophisticated institutional investors that

18

have suffered losses that would be described as large under any standard, there is no particular reason to favor one method of computation over another. As noted, the purpose of the lead plaintiff provisions of the PSLRA is to discourage lawyer-driven lawsuits filed on behalf of parties with only nominal interests in the matter, and to favor suits by institutional investors that have suffered large losses. *See* [H.R. Conf. Rep. No. 104-369, at 34 (1994), *reprinted in* 1995 U.S.C.C.A.N. 730] ("The Conference Committee seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the 'most adequate plaintiff.' "). Where all movants are institutional investors that have suffered large losses rather than professional plaintiffs, judicial resources are not well-spent on finely-calibrated inquiries into which plaintiff has the largest financial interest. Indeed, by not specifying a method for determining the largest financial interest and stating instead that the determination is the court's, the PSLRA appears to discourage any such inquiry and prefer that the court make the determination based on whatever factors seem most appropriate under the facts of the case before it.

*Plumbers & Pipefitters*, 256 F.R.D. at 623-24.

With that being said, New York Teachers has sufficiently adhered to the methodology outlined in *Eichonholtz* to calculate its and Menora's losses on their retained shares for the Court to accept those calculations for purposes, only, of assessing the final *Lax* factor. Menora, in comparison, has devised its own methodology, taking into consideration particular nuances of the parties' transactions in this case. The Court declines to wade through these nuances, however, in deciding which movant to appoint lead plaintiff.

19

There are a multitude of factors that might be relevant if the Court were attempting to calculate an exact loss suffered by the movants as a result of Defendants' alleged fraud.  Undoubtedly there would not be consensus among the movants as to which factors should be considered.  If courts were expected to resolve such issues, the determination of who to appoint lead plaintiff easily would develop into satellite litigation between competing movants, requiring significant judicial resources and derailing the class action lawsuit itself.  In short, the Court finds that the fourth *Lax* factor, like the first three factors, favors New York Teachers.

Thus the Court concludes that New York Teachers has the "largest financial interest in the relief sought by the class."  15 U.S.C. 78u-4(a)(3)(B)(iii)(I)(bb). New York Teachers also demonstrates that it satisfies the typicality and adequacy requirements of Rule 23.  This movant therefore is presumed to be the most adequate plaintiff to serve as lead plaintiff.  The presumption is rebuttable, but the Court has not been presented with evidence or arguments suggesting that New York Teachers "will not fairly and adequately protect the interests of the class . . . [or] is subject to unique defenses that render [it] incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa), (bb).

The PSLRA provides that the "most adequate plaintiff shall, subject to the

20

approval of the court, select and retain counsel to represent the class." 15 U.S.C.

§ 78u-4(a)(3)(B)(iv).  New York Teachers has selected Bernstein Litowitz Berger

& Grossman LLP as its counsel.  New York Teachers' submissions demonstrate

that its chosen counsel is competent, experienced, and qualified to represent the

interests of the plaintiff class.

Accordingly, the Court **GRANTS** New York Teachers' Retirement

Systems' motion seeking its appointment as lead plaintiff in this litigation and

Bernstein Litowitz Berger & Grossman LLP's appointment as lead counsel in this

matter (ECF No. 14).  The remaining movants' motions (ECF Nos. 10, 13, and 15)

are therefore **DENIED**.

**IT IS SO ORDERED**.

S/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: October 24, 2014

I hereby certify that a copy of the foregoing document was mailed to counsel of
record and/or pro se parties on this date, October 24, 2014, by electronic and/or
U.S. First Class mail.

S/ Richard Loury
Case Manager

21