# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| NEW YORK STATE TEACHERS' RETIREMENT SYSTEM, Individually and on Behalf of All Other Persons Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL MOTORS COMPANY, DANIEL F. AKERSON, NICHOLAS S. CYPRUS, CHRISTOPHER P. LIDDELL, DANIEL AMMANN, CHARLES K. STEVENS, III, MARY T. BARRA, THOMAS S. TIMKO, and GAY KENT,<br><br>Defendants. | Civil Case No.  14-cv-11191<br><br>Honorable Linda V. Parker<br><br>**Jury Trial Demanded** |

# CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    NATURE AND SUMMARY OF THE ACTION ........................................2

II.   JURISDICTION AND VENUE ...................................................10

III.  THE PARTIES ...............................................................11

   A.    Lead Plaintiff.....................................................11

   B.    Defendants.........................................................12

      1.    Corporate Defendant.............................................12

      2.    Individual Defendants ..........................................12

IV.  BACKGROUND ............................................................19

   A.    History Of GM .....................................................19

   B.    GM's Initial Public Offering .................................21

   C.    Moving Shutdowns Are A Serious Safety Defect ..............26

      1.    GM's Obligation To Identify Safety-Related Defects And Conduct Recalls ..........................................28

      2.    Defects Under The Safety Act Defined By Prior Litigation Involving GM And Other Manufacturers ..................30

      3.    The Obvious Danger Of Moving Shutdowns ..........................36

      4.    The Valukas Report's Flawed Conclusions..........................87

      5.    GM And NHTSA Recognize Moving Shutdowns As A Safety Defect In 2004-2005 ......................................93

      6.    The Auto Industry As A Whole Routinely Recognizes Moving Shutdowns Are A Safety Defect ..............103

      7.    GM Recognizes Loss of Power Steering Alone As A Safety Defect In 2010 ......................................106

i

        8.     Limitations At NHTSA Exacerbate GM's Cover-Up ............112

   D.    GM's Obligation And Failure To Investigate And Accurately Report Liabilities To Its Shareholders And Maintain Effective Internal Controls...................................................................126

        1.     GM's Obligation To Investigate And Accurately Report Liabilities ...............................................................127

        2.     GM's Obligation To Maintain Effective Internal Controls Over Financial Reporting.........................................137

        3.     GM's Primary Enforcement Mechanism:  The Audit Committee...............................................................139

        4.     GM's Consistent Failure To Adequately Investigate Liabilities And Maintain Effective Internal Controls.............141

V.    DEFENDANTS' FRAUDULENT SCHEME............................................165

   A.    GM Loses Focus On Safety .............................................165

   B.    Mid-2000s:  GM Launches New Small Car Brands In The Midst Of Massive Cost Cutting Efforts.......................................181

   C.    GM Develops And Installs Defective Ignition Switches In Millions Of Its Vehicles ....................................................185

   D.    GM Launches The Ion And Cobalt Car Brands, Markets Them To Very Young Drivers, And Sells Them To Rental Car Companies – Two Demographics Whose Drivers Would Be Inexperienced With The Vehicles In Emergency Situations ...........195

   E.    GM Becomes Aware Of The Tendency Of Its Cars To Shut Down From Numerous Sources, But Knowingly Or Recklessly Fails To Recall Its Cars Or Record A Sufficient Financial Reserve For Over 9 Years, Exposing The Corporation To Massive Liabilities And Criminal Investigation Exposure...............199

        1.     GM Receives Hundreds Of Complaints About The Ion's Defective Ignition Switch And Ergonomic Placement...........200

        2.     GM Launches The Cobalt And Immediately Learns Of

Moving Shutdowns Tied To Its Defective Ignition Switch....203

3.  Winter 2004 Through March 2005:  While More Reports
    Of Cobalt Shutdowns Mount, GM Closes The November
    2004 PRTS With No Solution..................................................206

4.  Spring 2005:  GM Receives Requests From Consumers
    That The Company Buy Back Their Defective Vehicles .......211

5.  The June 14, 2005 VAPIR Meeting.........................................214

6.  June 17, 2005 Ignition Switch Experiments at GM's
    Milford Proving Grounds.........................................................216

7.  June 19, 2005:  GM Receives Negative Media Coverage
    From The New York Times, But GM Publicly Denies Any
    Safety Concern........................................................................218

8.  GM Continues To Receive Customer Complaints During
    2005, And A GM Design Engineer And Two Other GM
    Executives Each Personally Experience The Problem ..........221

9.  August And September 2005:  GM Takes Steps To Close
    The May 17, 2005 PRTS And Internally Acknowledges
    "Inadvertent Ignition Shutoffs"...............................................223

10. GM Fails To Address Its Own Executives' Experiences
    And Continues To Place Short Term Revenue And Costs
    Concerns Over Customer Safety And Long Term
    Financial Impact......................................................................226

11. GM Issues Technical Service Bulletins To Dealers
    Regarding "Information on Inadvertent Turning of Key
    Cylinder, Loss of Electric System and No DTCs" .................227

12. GM Abandons The "Band-Aid" Fix To The Key And
    Then Issues Updated Technical Service Bulletins..................230

13. 2006: GM Learns Of Crashes And Airbag Non-
    Deployments In GM Vehicles Used In Rental Car
    Company Fleets.......................................................................232

14. May 27, 2006:  GM Makes Surreptitious Changes To Its Ignition Switch Design For At Least The Second Time.........235

15. August 2007:  GM And Delphi Settle Claims Concerning The Defective Ignition Switches In Resolving Delphi's Bankruptcy Liabilities To GM..................................................237

16. March 2009:  GM's CEO Wagoner Reviews Information Reflecting High Cobalt Warranty Expenses That Motivate GM To Belatedly Change The Cobalt Key Design, Returning To The "Band-aid" Solution ..................................238

F. As A Result Of Litigation Against The Company, By 2005 Senior GM Lawyers And Engineers Knew That Turning A Vehicle To Accessory Or Off Also Turned Off Its Airbags, Increasing Safety Concerns ............................................................244

1. The Connection Between Airbag Failures And The Ignition Switch Is Discovered By Others Outside Of GM .....247

2. Numerous Accidents Involving Airbag Non-Deployments Result From The Ignition Switch Defects .............................252

3. GM Is Warned In October 2010 That The Ignition Switch Defects Could Result In Punitive Damages............................255

4. July 2011:  Senior GM Executives Meet And Acknowledge That The Ignition Switch Problems Are The "Root Cause" Of The Cobalt Airbag Non-Deployments .......256

G. From Late 2011 Into 2012, GM Continues To Accumulate More Information And Acknowledges The Problem But Still Fails To Take Any Action ..............................................................................260

H. In 2012, GM Confirms The Obvious Connection Between The Ignition Defect And Airbag Failures, But More Delays Follow ......261

I. In The Fall Of 2012 And 2013, GM Receives Additional Evidence That The Defective Ignition Switches Pose Serious Safety Risks......................................................................................271

iv

J.    Defendant Akerson "Retires" Under Suspicious Circumstances And Defendant Ammann Is Effectively Removed From His Role As CFO .............................................................................. 277

K.    GM Urgently Orders 500,000 Replacement Ignition Switches On A Rush Basis Almost Two Months Before Publicly Announcing Its First Recall ................................................................... 280

L.    Numerous Deaths And Mounting Litigation Pressure Must Occur Before GM Finally Announced The Recalls And Increased Its Reported Liabilities ....................................... 293

VI.   GM'S IGNITION SWITCH DEFECTS, RECKLESS DISREGARD OF CONSUMER SAFETY, INTERNAL CONTROL DEFICIENCIES AND SUBSTANTIAL LIABILITY EXPOSURES ARE SLOWLY REVEALED ............................................................................. 301

A.    In February 2014, The First Recall Wave Begins And GM's Past Conduct Comes Into Question .......................................... 302

B.    From March 10-11, 2014, GM Comes Under Close Scrutiny From NHTSA, Congress And The DOJ ............................................ 307

C.    As Media and Governmental Scrutiny Intensify During March 2014, The Scope And Impact Of The First Recall Wave Expands .............................................................................. 313

D.    On March 31 and April 1, 2014, Governmental Pressure Increases Further And GM Updates Its Estimated Recall Costs ...... 315

E.    On April 9 and 11, 2014, NHTSA Imposes Its Maximum Fine On GM And GM's Recall Charges Increase To $1.3 Billion .......... 320

F.    From April Through June 2014, GM Slowly Attempts To Clean Up Its Mess – Firings, Admissions, Fines, The Valukas Report And Compensation For Some Victims ...................................... 324

G.    The Second Recall Wave Begins On June 13, 2014 ...................... 336

H.    As The Second Recall Wave Expands, Congress Holds Further Hearings On The GM Ignition Switch Recalls ............................... 337

I.    July 24, 2014: GM Discloses An Additional $400-$600 Million

v

Charge For Victim Compensation, Another Increase In Its Recall Reserve, And A Change To Its Accounting Practices For Future Recall Reserves ..................................................................................345

VII.    POST-CLASS PERIOD DEVELOPMENTS ............................................349

A.    GM Senior Executives Further Admit To Failures In The Company's Internal Controls During The Class Period, And GM Conducts Additional Ignition Switch Recalls ...................................349

VIII.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .........................................354

A.    The Fourth Quarter Of 2010 And Full Year 2010 ...........................354

1.    Adequacy Of Reserves For Product Warranties And Recalls...................................................................................354

2.    Effectiveness Of Internal Controls .........................................366

3.    Commitment To Safety...........................................................373

B.    The First Quarter Of 2011 ................................................................376

1.    Adequacy Of Reserves For Product Warranties And Recalls...................................................................................376

2.    Effectiveness Of Internal Controls .........................................378

3.    Commitment To Safety...........................................................380

C.    The Second Quarter Of 2011 ............................................................381

1.    Adequacy Of Reserves For Product Warranties And Recalls...................................................................................381

2.    Effectiveness Of Internal Controls .........................................382

3.    Commitment To Safety...........................................................385

D.    The Third Quarter Of 2011 ...............................................................385

1.    Adequacy Of Reserves For Product Warranties And Recalls...................................................................................385

2.    Effectiveness Of Internal Controls .........................................387

3.    Commitment To Safety.............................................................389

E.    The Fourth Quarter Of 2011 And Full Year 2011 ...........................391

1.    Adequacy Of Reserves For Product Warranties And Recalls ....................................................................................391

2.    Effectiveness Of Internal Controls .........................................396

3.    Commitment To Safety.............................................................399

F.    The First Quarter Of 2012 ..................................................................402

1.    Adequacy Of Reserves For Product Warranties And Recalls ....................................................................................402

2.    Effectiveness Of Internal Controls .........................................404

3.    Commitment To Safety.............................................................406

G.    The Second Quarter Of 2012 ............................................................408

1.    Adequacy Of Reserves For Product Warranties And Recalls ....................................................................................408

2.    Effectiveness Of Internal Controls .........................................409

H.    The Third Quarter Of 2012 ...............................................................412

1.    Adequacy Of Reserves For Product Warranties And Recalls ....................................................................................412

2.    Effectiveness Of Internal Controls .........................................413

I.    The Fourth Quarter Of 2012 And Full Year 2012 ...........................416

1.    Adequacy Of Reserves For Product Warranties And Recalls ....................................................................................416

2.    Effectiveness Of Internal Controls .........................................419

3.    Commitment To Safety.............................................................422

J.    The First Quarter Of 2013 ...................................................424

    1.    Adequacy Of Reserves For Product Warranties And Recalls ...................................................................424

    2.    Effectiveness Of Internal Controls ........................425

    3.    Commitment To Safety..........................................427

K.    The Second Quarter Of 2013 .........................................429

    1.    Adequacy Of Reserves For Product Warranties And Recalls ...................................................................429

    2.    Effectiveness Of Internal Controls ........................431

L.    The Third Quarter Of 2013 ...........................................433

    1.    Adequacy Of Reserves For Product Warranties And Recalls ...................................................................433

    2.    Effectiveness Of Internal Controls ........................435

    3.    Commitment To Safety..........................................437

M.    The Fourth Quarter Of 2013 And Full Year 2013 ...........438

    1.    Adequacy Of Reserves For Product Warranties And Recalls ...................................................................438

    2.    Effectiveness Of Internal Controls ........................442

    3.    Commitment To Safety..........................................445

IX.    LOSS CAUSATION ..................................................................455

X.    SUMMARY OF SCIENTER ALLEGATIONS ........................464

XI.    PRESUMPTION OF RELIANCE .............................................515

XII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE......................................517

XIII.    CLASS ACTION ALLEGATIONS...........................................518

XIV.   CLAIMS FOR RELIEF ...............................................................................521

XV.    PRAYER FOR RELIEF ...............................................................................543

XVI.  JURY DEMAND..........................................................................................543

1.      Court appointed Lead Plaintiff, the New York State Teachers'
Retirement System, by its undersigned counsel, alleges the following upon personal
knowledge as to itself and its own acts, and upon information and belief as to all
other matters.  Lead Plaintiff's information and belief as to allegations concerning
matters other than itself and its own acts are based upon, among other things: (1)
review and analysis of documents filed publicly by Defendant General Motors
Company ("GM")[1] with the Securities and Exchange Commission (the "SEC"); (2)
GM press releases and other public statements; (3) transcripts of GM investor
conference calls; (4) research reports concerning GM by financial analysts;
(5) publicly available information from other legal actions arising out of the issues
giving rise or related to this action; (6) prior automotive safety litigation concerning
car safety with GM and other automobile manufacturers and the National Highway
Traffic Safety Administration ("NHTSA"); (7) facts revealed by the Report to Board
of Directors of General Motors Company Regarding Ignition Switch Recalls by
Anton R. Valukas, dated May 29, 2014 (the "Valukas Report"); (8) documents and
information obtained by Lead Counsel from former GM employees and other
knowledgeable persons throughout the course of counsel's investigation; and (9)

---

[1] Due to the amount of GM terminology, and the number of relevant individuals
mentioned in this Complaint, for ease of reference, Lead Plaintiff has appended to
the back of this Complaint a Glossary of Certain Terms and Abbreviations and a
Glossary of Certain Relevant Individuals.

other publicly available sources described below.  Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.  NATURE AND SUMMARY OF THE ACTION

2.     This is a federal securities investor class action brought by Lead Plaintiff, The New York State Teachers' Retirement System, individually and on behalf of a proposed class of all persons and entities who purchased or otherwise acquired GM common stock between November 17, 2010 and July 24, 2014, inclusive (the "Class Period").

3.     This action involves a series of material misstatements and omissions about GM's liabilities, internal controls and purported commitment to safety.  It concerns millions of GM cars, spread over more than 20 different GM models and over many different model years, with dangerous, and in dozens of instances, fatal ignition switch safety defects that cause the vehicles to suddenly shutdown and become difficult to control without warning, including at highway speed.  GM's long belated recall of these dangerously unsafe cars has now led to the loss of billions of dollars of market value for GM investors; over $1 billion in belatedly recognized

expenses; the maximum financial penalty that NHTSA may legally impose on a car manufacturer; Congressional, regulatory and criminal investigations; and a special civil liability claims process involving thousands of claims, to be administered by Kenneth R. Feinberg ("Feinberg").

4.      After GM's predecessor filed for Chapter 11 bankruptcy protection in 2009, the "new" GM emerged as a publicly traded corporation on November 17, 2010, the first day of the Class Period.[2]  Throughout the Class Period that followed, GM and its senior executives named as additional individual defendants, repeatedly asserted to investors that GM's product warranty and recall liabilities (publicly reported at the end of each quarterly financial reporting period as a "critical" financial reporting metric) were accurately stated under Generally Accepted Accounting Principles ("GAAP"); that GM's internal controls over financial reporting were effective; and that GM was a company that was committed to customer safety.

5.      Among other public statements and assurances during the Class Period, GM stated that "[k]eeping drivers and passengers safe in and around vehicles is a

---

[2]  As set forth below, many of the facts concerning the "old" General Motors Corporation's knowledge or recklessness are fully relevant and probative of the "new" GM's knowing or reckless behavior, as the Company re-merged from bankruptcy with the same employees and knowledge base as before it filed for Chapter 11 protection and this Complaint accordingly refers to both the "old" and "new" GM collectively herein as "GM" or the "Company" unless there is a need to distinguish between the two for any reason.

*top priority* for our company;" "[o]ur customers' peace of mind is **the most important thing;**" "**it's their safety that we have in mind**;" GM's approach to "safety and occupant protection is one of **the most comprehensive** in the industry;" and that "[h]ow a vehicle performs in the real world is **an important source** of information for driving continuous improvement and innovation in vehicle safety."[3]

6.      As investors in GM would come to learn in a series of corrective disclosures beginning in 2014, however, GM knew of or recklessly disregarded dangerous safety defects in the ignition switches contained in **millions of its cars** that should have led to a recall **many years** earlier, and well before the start of the Class Period.  These corrective disclosures, ending on July 24, 2014, the last day of the Class Period, each had a statistically significant adverse impact on the price of GM stock, causing the New York Teachers' Retirement System and other members of the Class to suffer significant damages as the true, previously undisclosed facts of GM's egregious misconduct finally came to light.

7.      The evidence of GM's knowledge or deliberate recklessness is vividly demonstrated by numerous facts detailed below.  From the time GM's dangerously defective ignition switches were first included in the millions of cars at issue, or **over ten years** before they were finally recalled, GM received numerous complaints about the cars suddenly shutting down while driving, including from customers, the media

---

[3] Unless otherwise indicated, all emphasis in quotations has been added.

and GM's own employees.  These moving shutdowns, triggered by a bump in the road or a mere "graze of the knee" against the defectively loose ignition switches, would cause the GM cars to suddenly shutdown and become unresponsive without any warning.  The shutdowns occurred even at highway speed, and power brakes and power steering would no longer function, making the cars dangerously unsafe to control.  The dangers of such moving shutdowns were even more pronounced for young, inexperienced drivers, the primary target market for the cars, and those with less upper body strength to be able to wrestle control of a moving car without power steering or power brakes with enough force to avoid the tragic accidents that many suffered.  Indeed, as detailed below, the resulting deaths were concentrated among teenagers and women.

8.     As soon as these cars hit the market, hundreds of customer complaints began to pour into GM, dozens of which are detailed below, leaving no doubt within the Company that the defective ignition switches raised very serious safety issues. Among other things, GM's customers told the Company that their cars suddenly shut down while driving, including at highway speed, because of the defective ignition switches, causing them to crash or barely avoid crashing, drive off the road, and suffer great fear.

9.     Starting in 2005, or ***nearly a decade*** before the millions of cars containing the defective ignition switches were finally recalled, customers told GM

5

their personal experiences in disturbing detail and they consistently concluded with a statement that they:  did not "*feel safe*"; were "*terrified*" and "*completely afraid*"; or had the "*fear of God*" while driving one of GM's cars containing the defective ignition switches.

10.    As one customer (of the many customers quoted below) stated on June 29, 2005, *more than eight years* before the cars were belatedly recalled, "*This is a safety/recall issue if ever there was one* . . .  I don't have to list to you the safety problems that may happen, besides an accident or death, a car turning off while doing a high speed . . ."  On September 24, 2005, another "*fearful*" customer asked:  "*How many people need to die for this issue to be a recall*?"  Another "*afraid*" customer warned on March 14, 2006, "*its unsafe and its going to kill someone*."  On May 22, 2006, another stated: "*This is a huge problem and very dangerous*."  And, on April 13, 2007, another outraged customer demanded: "*I want this documented so that GM knows that this is a concern with the Cobalt.  This is a safety issue, and I don't want someone to get killed or seriously hurt*."

11.    Similarly, upon the initial release of the Cobalt in 2004, one of the GM cars containing the defective ignition switches, the media immediately reported on the defective ignition switches.  In fact, the first reports happened at press events in 2004 associated with the initial launch of GM's Cobalt brand.  Thereafter, on June 19, 2005, a *New York Times* journalist reported that his own wife had knocked a

6

Cobalt's steering column with her knee while driving on the freeway, and the engine "*just went dead*."  Another reporter from the *Sunbury Daily Item* reported in 2005: "*I never encountered anything like this in 37 years of driving and I hope I never do again*."

12.     Of course, GM, one of the world's largest automobile manufacturers, did not need lay customers or even the media to advise it on safety.  GM had heavily litigated the legal standards for car recalls in fighting numerous prior automotive safety recalls and, in the process, created the controlling legal standards for when a car has a safety related defect that should lead to a recall.  As set forth below, when a defect results in a loss of control over steering or a sudden shutdown at highway speed it is unquestionably a safety defect that should lead to an immediate recall, regardless of whether or not the company has identified its "root cause."

13.     As the former head of GM's corporate quality audit responsible for car safety and a 34-year GM employee, William McAleer ("McAleer"), confirms, "moving stalls are extremely dangerous, stalling when the car is in movement is clearly a safety concern."  As McAleer quite simply explains, anyone who doubts this is a safety issue should consider turning off their car ignition while driving at 70 miles per hour on the highway.  No one is encouraged to engage in such a dangerous, and possibly criminal, act.  The mere suggestion immediately reveals the dangerous safety issues with the GM cars containing the defective ignition switches that could

be suddenly turned off with a mere "graze of the knee" or bump on the road.

14.    Shockingly, GM's own employees also were reporting this serious safety issue to GM at the time these cars were on the road, to no avail.  For example, in August 2005, again, *more than eight years* before the cars were finally recalled, a GM Design Engineer sent an email describing her own experience "driving at 45 mph" when she experienced a moving shutdown caused by the defective ignition switch shutting off her GM car after hitting a pothole.  The moving shutdown caused the car behind her to "swerve[] around" her.  As set forth below, her August 30, 2005 email to her fellow GM employees plainly stated:  "*I think this is a serious safety problem*, especially if this switch is on multiple programs.  *I'm thinking big recall*."  As an experienced car design engineer, she added a precise identification of the defective ignition switch causing the safety issue as well as the way to remedy the problem:  "I don't like to imagine a customer driving with their kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic.  *I think you should seriously consider changing this part to a switch with a stronger detent*."

15.    Rather than alerting the public to this serious safety risk and seeking a recall of the millions of cars at issue, GM's senior in-house attorney Bill Kemp ("Kemp") (who was principally responsible for safety issues) focused instead on the importance of "do[ing] enough to defend a brand new launch" of the Cobalt, and senior GM corporate spokesperson Alan Adler ("Adler") told the media in 2005 that

8

the moving stalls were not a safety concern.  Faced with the choice of disclosing and addressing the problem, GM defended the "brand" and denied the safety issues for years.

16.    Instead, GM issued officially-authorized communications to its dealers (but not to its customers), in 2005 and 2006, advising the dealers to tell customers who complained about experiencing a moving shutdown in the defective vehicles to avoid heavy key rings.  However, GM's 2005 and 2006 communications to dealers intentionally omitted the word "stall" as GM knew that was a "hot" word that might raise concerns with NHTSA about vehicle safety.  Thereafter, in 2009, GM created a "band-aid" fix that was completely ineffective.  It simply changed the key hole design in an attempt to reduce growing warranty costs being caused by dealers having to respond to customers complaining of the problems they were suffering as a result of the defective ignition switches.  When it did so, a GM employee internally noted: "This issue has been around since man first lumbered out of [the] sea and stood on two feet."

17.    GM took these completely insufficient steps notwithstanding that a recall was required according to either GM's or NHTSA's safety analysis framework concerning this exact issue, both of which included an assessment as to whether or not the stall occurred when the vehicle was moving; whether the driver retained control over power steering and brakes; and whether the driver received any warning

signs before the stall occurred.  Moreover, GM failed to recall its millions of dangerously unsafe cars at issue in this case, even though it had engaged in (smaller) safety recalls of other stalling cars in 2004, 2005 and 2010, as did all of GM's major competitors over the same time period.  As set forth below, Chrysler, Honda, Ford, Volkswagen, BMW and Toyota all have recalled cars that were at risk of stalling without warning in the past, given the increased risk of a crash and serious injury.

18.    The tragic fact that it took numerous deaths, mostly of very young people as detailed herein, to cause GM to finally recall the millions of its defective cars with the dangerous ignition switches, and after such a shockingly long period of time, reveals the core wrongdoing alleged in this case.  The "new" GM repeatedly told its investors, starting on the first day and throughout the Class Period, that it had properly disclosed its warranty and recall liabilities under GAAP; that GM's internal controls for reporting such a "critical" financial metric each quarter were effective; and that GM prioritized customer safety and looked to its customers as an important source of safety information.  As investors learned beginning in 2014, when the true facts began to emerge, none of these repeated assertions were true.

## II.    <u>JURISDICTION AND VENUE</u>

19.    The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

21.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act, 15 U.S.C. §78aa.  Defendant GM is headquartered in this District and many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

22.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.   THE PARTIES

### A.   Lead Plaintiff

23.     Lead Plaintiff New York State Teachers' Retirement System ("Lead Plaintiff" or "New York Teachers") is a public retirement system that provides retirement, disability and death benefits to eligible New York State public school teachers and administrators.  New York Teachers is one of the ten largest public retirement systems in the nation based on portfolio size and total membership, serving more than 426,000 active members, retirees and beneficiaries.  New York Teachers was established in 1921 by the New York State Legislature and, as of June

30, 2014, had net assets of over $108 billion available for current and future pension benefits.   As set forth in the accompanying certification, New York Teachers purchased GM common stock during the Class Period and suffered damages as a result of the conduct complained of herein.   On October 24, 2014, this Court appointed New York Teachers as Lead Plaintiff for this litigation.

### B.   Defendants

#### 1.   Corporate Defendant

24.   Defendant General Motors Company ("GM" or the "Company") is a Delaware corporation based in Detroit, Michigan that designs, builds and sells cars, trucks and automobile parts worldwide.   GM has four different automotive segments:   GM North America ("GMNA"), GM Europe, GM International Operations and GM South America.   GM's North America subsidiary, GMNA, offers four main brands to consumers in the U.S., Canada and Mexico:  Chevrolet, Cadillac, Buick and GMC.   Previous GM vehicle brands that are also at issue in this case are Oldsmobile (which GM discontinued in 2004), Pontiac (which GM discontinued in 2009) and Saturn (which GM discontinued in 2009).   GM common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "GM."

#### 2.   Individual Defendants

25.   Defendant Daniel F. Akerson ("Akerson") is the former Chairman and Chief Executive Officer ("CEO") of GM.   In September 2010, Akerson succeeded

Edward Whitacre, Jr. as CEO of GM and assumed the position of Chairman of GM's Board in January 2011.  During his tenure with GM, which ended on January 15, 2014, when Akerson was succeeded by Defendant Barra, Akerson signed GM's materially false and misleading Form S-1 Registration Statement, filed with the SEC on November 17, 2010; public filings on Form 10-K for the years ended December 31, 2010, December 31, 2011 and December 31, 2012; and Certifications that accompanied GM's Form 10-Ks and 10-Qs, issued beginning in the fourth quarter of 2010 and through the third quarter of 2013.  Moreover, Akerson signed GM's materially false and misleading Annual Reports dated March 1, 2011, February 27, 2012, and April 25, 2013, and made materially false and misleading statements during GM's Second Annual Business Conference, held on August 9, 2011 and during Deutsche Bank Securities' 2012 Global Auto Industry Conference, held on January 10, 2012.[4]

26.    Defendant Nicholas S. Cyprus ("Cyprus") was named GM Chief Accounting Officer and Controller on December 1, 2006, and on August 4, 2009, was appointed Vice President, Chief Accounting Officer and Controller, and served in those roles until his retirement on March 18, 2013.  As Vice President, Controller and Chief Accounting Officer, Cyprus' core responsibilities included reporting the

---

[4] Each Individual Defendant in this action is sued only for statements they personally made or signed during the Class Period and as a control person over GM during their senior executive positions at the Company.

Company's financial results to the CEO, Chief Financial Officer ("CFO") and Audit Committee of the Board, and leading GM's purported compliance with Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX"), which requires GM to assess its internal controls over financial reporting. Cyprus also oversaw external financial reporting and the development of accounting policies. Cyprus served as Chief Accounting Officer and Controller from December 2006 (then "Old GM") until his promotion in August 2009. During the Class Period until his retirement, Cyprus signed GM's materially false and misleading Form S-1 Registration Statement, filed with the SEC on November 17, 2010; public filings on Form 10-K for the years ended December 31, 2010, December 31, 2011 and December 31, 2012; and quarterly filings on Form 10-Q and the bulk of the Company's Form 8-Ks, issued beginning in the first quarter of 2011 and through the third quarter of 2012. Moreover, Defendant Cyprus made statements in and was directly responsible for materially false and misleading statements made in GM press releases filed with the SEC as attachments to Form 8-Ks on February 3, 2011, March 3, 2011, April 6, 2011, May 6, 2011, June 6, 2011, July 7, 2011, and August 4, 2011.

27.  Defendant Christopher P. Liddell ("Liddell") served as GM Vice Chairman and CFO from January 2010 until April 1, 2011, and led the Company's global financial operations. During the Class Period, Defendant Liddell signed GM's materially false and misleading Form S-1 Registration Statement, filed with

14

the SEC on November 17, 2010; public filings on Form 10-K for the year ended December 31, 2010; and the Certifications that accompanied GM's 2010 Form 10-K. Moreover, Defendant Liddell made materially false and misleading statements during a GM earnings conference call with investors held on February 24, 2011.

28.     Defendant Daniel Ammann ("Ammann") has been the President of GM since January 2014. Ammann joined GM on April 1, 2010 as Vice President, Finance and Treasurer. Ammann then served as GM Senior Vice President and CFO beginning in April 2011, in which role he was responsible for overseeing GM's financial operations. Before joining GM, Ammann was managing director and head of Industrial Investment Banking for Morgan Stanley where he advised GM during its 2009 restructuring. During the Class Period, Ammann signed GM's materially false and misleading public filings on Form 10-K for the years ended December 31, 2011 and December 31, 2012, and each and every Certification that accompanied GM's Form 10-Ks and 10-Qs, from the beginning of the first quarter of 2011 through the third quarter of 2013. Additionally, Defendant Ammann made materially false and misleading statements during the Deutsche Bank Global Auto Industry Conference, held on January 15, 2014.

29.     Defendant Charles K. Stevens, III ("Stevens") was named GM Executive Vice President and CFO on January 15, 2014, replacing Defendant Ammann. Prior to serving as Vice President and CFO, Stevens served as Interim

CFO, GM South America from 2011 to 2014.  From 2010 to January 2014, Stevens served as CFO, GMNA, and from 2008 to 2010 he served as Executive Director, Finance, GM de Mexico.  During the Class Period, Stevens signed GM's materially false and misleading Form 10-K for the year ended December 31, 2013 and the Certifications that accompanied GM's 2013 Form 10-K.

30.    Defendant Mary T. Barra ("Barra") is currently GM's CEO, a position she assumed on January 15, 2014, when she also became a member of the GM Board of Directors (the "Board").  For over 33 years, Barra has worked for or been affiliated with GM and has accordingly been described as a GM "lifer."[5]  Barra began her career with GM in 1980 as a General Motors Institute co-op student at the Pontiac Motor Division.   In 1990, Barra graduated with a Masters in Business Administration from the Stanford Graduate School of Business after receiving a GM fellowship in 1988.  After graduating from business school, Barra returned to GM and served in various roles.  By 2004, as GM was preparing to launch the 2005 Chevrolet Cobalt, Barra was plant manager of the Company's Detroit-Hamtramck assembly plant, which made Cadillacs, Buicks and Pontiacs.  Then, as Executive Director, and later Vice President, of Manufacturing Engineering from 2004 to 2009, Barra worked to overhaul and streamline GM's production plants and processes in

---

[5] Paul Lienert & Ben Klayman, *New CEO Barra a GM 'lifer' bent on tearing down walls,* REUTERS, Jan. 12, 2014, http://www.reuters.com/article/2014/ 01/12/us-autoshow-gm-barra-idUSBREA0B0I920140112.

16

order to "trim development costs and move products to market quicker."[6]  Barra then served as Senior Vice President, Global Product Development from 2011 to 2013, and then Executive Vice President, Global Product Development, Purchasing & Supply Chain from August 2013 until her January 15, 2014 appointment as CEO. The executives in both of these positions are referred to as GM's "Product Chief," and in that role, Barra was responsible for the design, engineering, program management and quality of GM vehicles around the world.  During the Class Period, Barra signed GM's materially false and misleading Form 10-K for the year ended December 31, 2013 and the Certifications that accompanied GM's 2013 Form 10-K.

31.    Defendant Thomas S. Timko ("Timko") became GM's current Vice President, Controller and Chief Accounting Officer after replacing Defendant Cyprus in those roles in March 2013.  As Vice President, Controller and Chief Accounting Officer, Timko is "responsible for reporting financial results to the CEO, CFO and the Audit Committee of the Board, global leadership and oversight of external reporting, technical accounting matters, development of accounting policies, internal controls and the consolidation process [i.e., the process of combining financial results within a corporation into the corporation's combined

---

[6] *Id.*

17

financial results]."[7]  Before joining GM, Timko served as Chief Accounting Officer and Controller at Delphi Automotive, the manufacturer of the defective ignition switches at issue in this case.  During the Class Period, Timko signed GM's materially false and misleading Form 10-K for the year ended December 31, 2013 and the quarterly filings on Form 10-Q from the first quarter of 2013 and through the third quarter of 2013.

32.  Defendant Gay Kent ("Kent") served as GM's General Director/Director of Safety and Vehicle Programs and Crashworthiness from June 2010 through June 2014, at which time she was terminated by GM.  Defendant Kent started at GM in 1980, and served as Engineering Group Manager, Program Manager and Engineer from October 1980 through October 1997; as Executive Technical Assistant in GM's Truck Group from October 1997 through August 1999; as Director of Restraints and Interior Components from August 1999 through December 2003; and as GM's Director of Product Investigations from January 2004 through May 2010.  During the Class Period, Kent made materially false and misleading claims about the safety of GM's vehicles on GM's website and to the media on or about December 27, 2011, December 28, 2011, January 31, 2013, September 23, 2013 and January 24, 2014.

---

[7] Gen. Motors. Co., About GM: Thomas S. Timko, http://www.gm.com/content/gmcom/home/company/aboutGM/GM_Corporate_Officers/thomas_s_timko.html (last visited Jan. 15, 2015).

33.     Defendants Akerson, Cyprus, Liddell, Ammann, Stevens, Barra, Timko, and Kent are collectively referred to herein as the "Individual Defendants" and, together with GM, as the "Defendants." During their identified senior executive tenures at the Company, the Individual Defendants directly participated in the management of GM's operations, including its accounting and reporting functions, had the ability to and did control GM's financial reporting, and were privy to confidential information concerning GM and its business, operations and financial statements, as alleged herein. The Individual Defendants were also involved in drafting, reviewing, publishing and/or disseminating the false and misleading financial statements and information alleged herein (including GM's materially understated liabilities); were aware, or recklessly disregarded, that the false and misleading statements at issue in this case were being made; and approved or ratified these misstatements in violation of the federal securities laws.

## IV.    BACKGROUND

### A.     History Of GM

34.     GM is a Detroit, Michigan based automobile manufacturer that designs and engineers vehicles. GM currently produces, sells and services its vehicles, through its numerous brands in more than 120 countries around the world, including: Chevrolet, Buick, GMC, and Cadillac. GM added the Chevrolet brand in 1917. Ever since, Chevrolet has been an integral part of the Company and today remains its

bestselling brand.

35.    GM was founded in 1908 and dominated the U.S. automobile market in the post-World War II era.[8]  However, despite a history of innovation and success in the 1970s and 1980s, GM faced significant competition from Germany and Japan, losing market share to foreign cars that were more fuel-efficient.  GM rushed to develop smaller vehicles but it had become too large and decentralized to change quickly, and its market dominance began to erode. GM's massive restructuring attempt in 1984 left it paralyzed for two years.[9]  Continuing through the 1980s and the 1990s, GM continued to add joint ventures in China and India and added the Saab and HUMMER brands to its umbrella.  However, by the end of the 1990s, GM had been underperforming the market by approximately 70% for the past decade.[10]  Though GM continued to create smaller cars and benefited from a truck boom in the U.S. resulting from the adoption of the SUV as the family vehicle, competition from Japanese, German and Korean manufacturers, poor labor relationships and legacy costs from earlier years burdened the Company.

36.    As a result, and as discussed further below, GM entered the new

---

[8] Todd Lassa, *U.S. Market Share of the Top Five Automakers*, MOTOR TREND, Feb. 2012, http://www.motortrend.com/features/auto_news/2011/1202_u_s_markets_share_for_the_top_five_automakers/.

[9] *The Decline and Fall of General Motors*, THE ECONOMIST, Oct. 8, 1998, http://www.economist.com/node/167984.

[10] *Id.*

millennium as a large and inefficient company and began to suffer a period of financial distress.  By 2001, GM's U.S. market share had fallen to approximately 20%.[11]  GM began the difficult process to again restructure its U.S. operations and attempted to innovate.  Nevertheless, global competitors, as well as the recession and credit crisis in 2008, contributed to the Company's increasingly critical cash flow problems.

37.    On June 1, 2009, General Motors Corporation filed for bankruptcy.  It had plans to shed brands and emerge smaller and leaner.  On July 10, 2009, General Motors Company LLC emerged from bankruptcy protection with formal assistance by the U.S. government, which made a substantial capital investment in the Company.  The new General Motors Company acquired many of "Old" GM's key assets, including the four core U.S. brands:  Chevrolet, Buick, GMC, and Cadillac.

### B.    GM's Initial Public Offering

38.    Following the bankruptcy of Old GM, on November 17, 2010, its successor entity, GM, or New GM, began the world's largest initial public offering ("IPO"), offering to investors $15.77 billion worth of common stock in the newly-formed corporation,[12] and by December 2013, the U.S. government had completely

---

[11] *Id.*

[12] Clare Baldwin & Soyoung Kim, *GM IPO Raises $20.1 Billion*, REUTERS, Nov. 17, 2010, http://www.reuters.com/article/2010/11/17/us-gm-ipo-idUSTRE6AB43H 20101117.

divested itself of its GM holdings, at a reported loss of $10.5 billion.[13]  Thereafter, GM claimed that it emerged from its bankruptcy and IPO as a "New" GM that had shed its prior cultural failings, internal control deficiencies, and accounting irregularities.  For instance, and as detailed below, in the Company's 2005 Annual Report filed with the SEC on Form 10-K on March 28, 2006, Old GM admitted that its internal controls failed.[14]  Those material internal control weaknesses persisted for years.  By contrast, after the bankruptcy and GM's IPO, the Company claimed that its internal controls were effective and that it had emerged as a new and improved organization.  For instance, in the Company's 2010 Annual Report, dated March 1, 2011 and signed by Defendant Akerson, the Company assured investors that its culture had changed entirely and claimed:

> We truly are building a new GM, from the inside out.  Our vision is clear:  to design, build and sell the world's best vehicles, and we have a new business model to bring that vision to life.  We have a lower cost structure, a stronger balance sheet, and a dramatically lower risk profile. We have a new leadership team – a strong mix of executive talent from outside the industry and automotive veterans – and a passionate, rejuvenated workforce.

39.    In the same 2010 Annual Report, GM specifically claimed that it had a

---

[13] Tim Higgins, Ian Katz and Kasia Klimansinska, *GM Bailout Ends as U.S. Sells Last of 'Government Motors'*, BLOOMBERG, Dec. 10, 2013, http://www.bloomberg.com/news/2013-12-09/gm-bailout-ends-as-u-s-sells-last-of-government-motors-.html.

[14] Gen. Motors Co., Annual Report (Form 10-K) (Feb. 28, 2008).

new "culture" and a "new attitude," touting that:

> We are making major strides in becoming a GM that works smart, thinks big and moves fast. The GM culture values simplicity, agility and action – making and implementing decisions faster, pushing accountability deeper into the organization and demanding results from everyone.

40.     As set forth below, despite these claims, with respect to Lead Plaintiff's allegations in this action, very little changed at the Company over the course of GM's bankruptcy and IPO. And, as detailed below, with respect to the issue of scienter, many of GM's responsible engineers, attorneys and senior executives have been with the Company for decades. As a result, the employees of "New GM" are largely the same as the employees of Old GM, and what the Company's employees knew or recklessly disregarded about the Company's defective ignition switches from before Old GM's bankruptcy still persisted and, in fact, strengthened during the Class Period.

41.     As reported by the media, a number of the 15 high-level executives that GM dismissed in June 2014 in the wake of the Company's vehicle recalls for the defective ignition switches worked for GM long before the bankruptcy and continued to work for GM for years thereafter. Many worked in the same or similar capacities before and after the bankruptcy. At the time the executives left the Company in June 2014:

- Defendant Gay Kent, General Director of Safety and Vehicle Crashworthiness, had been with GM since 1980;

23

- Jennifer Sevigny, an attorney who led GM's field product assessment group, had been with GM since 1983;

- William Kemp, Counsel for Global Engineering Organization and principal safety counsel, had been with GM for 30 years;

- Michael Robinson, an attorney and Vice President of Sustainability and Global Regulatory Affairs, had been with the Company since 1984;

- Ron Porter, an attorney in the Company's legal department, had been with GM since 1984; and

- Lawrence S. Buonomo ("Buonomo"), an attorney who served as Practice Area Manager, Global Process & Litigation, had chaired GM's Roundtable Committee and Settlement Review Committee since March 2012, had been with GM since 1994.[15]

42.    Furthermore, three high-level GM officers connected to the ignition switch defects who abruptly resigned during 2014 were also long-serving veterans of GM:

- Michael Millikin, General Counsel of GM, had been with the Company for more than 40 years;

- Jim Federico, Chief Engineer of Global Compact Cars, had been with the Company for nearly 36 years; and

- John Calabrese, VP of Global Vehicle Engineering, had been with the

---

[15] Anton R. Valukas, Report To Board Of Directors Of General Motors Company Regarding Ignition Switch Recalls at 104-107, May 29, 2014; James R. Healey, *GM CEO axes 15 over switches, says 'no conspiracy,'* U.S.A. TODAY, June 5, 2014, http://www.usatoday.com/story/money/cars/2014/06/05/gm-barra-report-valukas-failure/9985709/; Bill Vlasic, *G.M. Lawyers Hid Fatal Flaw, From Critics and One Another,* N.Y. TIMES, June 6, 2014, http://www.nytimes.com/2014/06/07/business/gm-lawyers-hid-fatal-flaw-from-critics-and-one-another.html?hpw&rref=business&_r=1&referrer; Sharon Silke Carty, *2 more fired GM execs who failed to push for ignition-switch recall named*, AUTOBLOG (June 7, 2014, 10:00 AM), http://www.autoblog.com/2014/06/07/2-more-fired-gm-execs-named-recall/.

Company more than 34 years.[16]

43.     In addition, with respect to the allegedly materially false and misleading statements made by Defendants during the Class Period, all such statements were made after GM's bankruptcy and, as such, the "New" GM has no defense concerning its liability in this case as a result of the bankruptcy of its predecessor.

44.     For the personal injury liability that GM incurred as a result of the defective ignition switches in its vehicles, GM is at a minimum liable for any injuries or deaths that occurred after July 2009.  In addition, as a matter of commercial reality, GM was required to assume the costs for compensating victims for their injuries and deaths in crashes that occurred prior to July 2009, for several reasons.  First, "[c]onsumers view Old GM and New GM as the same company,"[17] and in order for it to survive as an ongoing, commercially-viable entity, GM had no real option but to accept all personal injury liability for the defective ignition switches once it disclosed the defect for the first time.  In the words of a Guggenheim

---

[16] Press Release, Gen. Motors Co., *Millikin to Retire as GM General Counsel* (Oct. 17, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/ Pages/news/us/en/2014/Oct/1017-millikin.html; Press Release, Gen. Motors Co., *GM Restructures Global Engineering for Cross-System Integration* (Apr. 22, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2 014/Apr/0422-global-eng.html; Chris Bruce, *Former GM Engineer Jim Federico Lands at Harley-Davidson,* AUTOBLOG (May 12, 2014, 7:15 PM), http://www.autoblog.com/2014/05/12/former-gm-engineer-jim-federico-lands-harley-davidson/.
[17] Rick Tauber, *More to GM than the Recall Headlines,* Morningstar Analyst Report, Apr. 1, 2014.

Securities analyst report dated March 13, 2014: "[t]he commercial reality is that GM will have to honor the resolution of all of these vehicles."[18]   Analysts have reported that GM's response is an indication that it understands its reputation and viability as "New GM" is at stake.  For example, a UBS analyst observed that, "[a]s long as new management addresses the situation quickly and candidly, we see limited near and long term reputational risk."[19]

45.   As the mother of Natasha Weigel (who died in a 2006 Cobalt driven by her friend, Megan Phillips) said during an interview on April 1, 2014, "Whether it's new GM, old GM, it's still GM."[20]   And, as Natasha's father told Neil Cavuto on April 2, 2014, "this new GM, old GM – that's not acceptable.  Unless they hired and fired some people [between "new GM" and "old GM"], there's no such thing as a new and old GM."[21]

**C.    Moving Shutdowns Are A Serious Safety Defect**

46.   This case concerns GM's failure to address or disclose a serious safety

---

[18]  Matthew Stover, *GM-NEUTRAL-Putting GM's Recall Into Perspective,* Guggenheim Securities Analyst Report, Mar. 13, 2014.

[19] Colin Langan, *DOJ raises recall cost, but see buying opportunity*, UBS Analyst Report, March 13, 2014.

[20] Gabe Nelson, *Victims' families meet with Barra, call for legislation,* AUTOMOTIVE NEWS, Apr. 1, 2014, http://www.autonews.com/article/20140401/OEM11/140409990/victims-families-meet-with-barra-call-for-legislation.

[21]  Neil Cavuto, FOX BUSINESS, *GM in Big Trouble*, Apr. 2, 2014, http://news.advisen.com/documents/AMX/20140402/11/201404021100VOXANT __TSCRIPTS_ff865e1a39764cceb69fad631004b77c.xml.

issue caused by defective ignition switches in millions of vehicles.  The ignition switch defects caused those vehicles to experience, without warning, moving shutdowns, often at highway speed, as well as a loss of power steering and power brakes.  The moving shutdowns further prevented the vehicles' airbags from being able to deploy.  As a result of these defects, thousands of people have been injured and dozens have died.  GM failed to recall millions of its vehicles with these defective ignition switches for many years until 2014.

47.    GM knew for a decade that the vehicles at issue were experiencing moving shutdowns – an event that occurs when a car is moving or driving along the road, and the engine suddenly shuts off.[22]  While GM was obligated under federal law to designate this issue as a safety-related defect and conduct a recall, it failed to do so, sacrificing the safety of its customers in order to avoid incurring additional costs.  This background section addresses GM's obligation to promptly identify safety-related defects and conduct recalls, GM's failure to designate the moving shutdowns at issue as safety defects, and how systemic limitations at the federal level exacerbated GM's cover-up.

---

[22] While GM has attempted to downplay the risks of a moving shutdown by referring to this life-threatening event as a "stall," this misleadingly evokes an image of a person calmly attempting and failing to start their car while it is parked in a safe place.  The facts here concern a far different and dire event.  Accordingly, Lead Plaintiff consistently uses the phrase "moving shutdown" herein.

## 1.   GM's Obligation To Identify Safety-Related Defects And Conduct Recalls

48.     NHTSA is a federal agency charged with ensuring that manufacturers of motor vehicles comply with the safety standards contained in the National Traffic and Motor Vehicle Safety Act of 1966, codified at 49 U.S. Code Chapter 31 (the "Safety Act").  The Safety Act includes the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD"), which was passed by Congress in 2000.

49.     The Safety Act requires a motor vehicle manufacturer to notify NHTSA, and vehicle owners, purchasers and dealers if it "(1) learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety; or (2) decides in good faith that the vehicle or equipment does not comply with an applicable motor vehicle safety standard …."[23]

50.     The Safety Act further defines "motor vehicle safety" as:

the performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident, and includes nonoperational safety of a motor vehicle.[24]

51.     If the manufacturer identifies a "defect related to motor vehicle safety," the Safety Act further requires manufacturers to implement a remedy, which

---

[23] 49 U.S.C. §30118(c).

[24] 49 U.S.C. §30102(a)(8).

typically occurs through a recall.[25]  Manufacturers are also required, under NHTSA's implementing regulations, to "furnish a report to the NHTSA for each defect in [the manufacturer's] vehicles or in [the manufacturer's] items of original or replacement equipment that [the manufacturer] or the Administrator determines to be related to motor vehicle safety."[26]  This is commonly referred to as a "573 Report."  NHTSA further requires all such reports to be submitted "not more than 5 working days after a defect in a vehicle or item of equipment has been determined to be safety related."[27]

52.    The TREAD Act imposes additional reporting obligations on auto manufacturers, including GM.  Specifically, the TREAD Act mandates that manufacturers submit quarterly reports to NHTSA called "Early Warning Reports" ("EWRs").[28]  As relevant here, EWRs must include warranty reports; consumer complaints; property damage claims; and field reports broken down by make, model, and model year and problem category.[29]  Manufacturers are also required to submit to NHTSA summaries of each death or injury claim against the manufacturer that concerns a safety-related defect.[30]  Moreover, NHTSA's early warning data tracks the number of cases where warranty services are provided on a vehicle, and the part

---

[25] 49 U.S.C. §30118(c); *see also* 49 U.S.C. §30119(d) (notification procedures); 49 U.S.C. §30120(a) (remedy specifications).
[26] 49 C.F.R. §573.6(a).
[27] 49 C.F.R. §573.5(b).
[28] 49 C.F.R. §573.7.
[29] 49 U.S.C. §30166(m)(3)(A)(i); 49 C.F.R. §573.6(c)(2)-(8).
[30] 49 U.S.C. §30166(m)(3)(A)(i).

of the vehicle that is associated with the warranty service.[31]  However, as NHTSA

Acting Administrator David Friedman explained during his testimony before the

House Energy and Commerce Committee on April 2, 2014, "General Motors reports

to us [NHTSA] the counts of complaints, but they do not provide to us the – the

detailed complaints themselves."[32]

53.    NHTSA's Office of Defects Investigation ("ODI") is charged with

administering TREAD Act requirements and investigating defects brought to

NHTSA's attention by either manufacturers or customers and other members of the

public.[33]  However, NHTSA as a whole, and the ODI in particular, suffers from a

lack of adequate staffing and funding which makes it impossible for NHTSA to carry

out these duties effectively, as detailed at ¶¶222-46 below.  Rather, the responsibility

is on auto manufacturers like GM to affirmatively report problems and resolve them.

### 2.    Defects Under The Safety Act Defined By Prior Litigation Involving GM And Other Manufacturers

54.    The issue of when a problem creates an "unreasonable risk" and rises

to the level of a "safety-related defect" under the Safety Act has been heavily

---

[31] *Examining the GM Recall and NHTSA's Defect Investigation Process: Hearing Before S. Subcomm. Consumer Protection, Product Safety, & Insurance of the S. Committee on Commerce, Sci., & Transp., 113th Cong., Sess. 2* (Apr. 2, 2014) (Statement of David Friedman, Acting Adm'r for NHTSA).
[32] *Id.*
[33] *See* description of ODI, https://www-odi.nhtsa.dot.gov/ivoq/ (last visited Jan. 15, 2015).

litigated by GM.   In the seminal case of *United States v. General Motors Corporation*, 518 F.2d 420 (D.C. Cir. 1975) ("*Wheels* Case"), the Court of Appeals of the District of Columbia addressed the meaning of a "defect" under the Safety Act.   The issue before the Court was GM's failure to notify purchasers that the wheels of certain pick-up trucks were routinely breaking.   The Government filed an action in the U.S. District Court for the District of Columbia seeking a declaration that GM had violated the Safety Act by failing to issue the notice.   The District Court granted the Government's motion for summary judgment and ordered GM to issue the requisite defect notifications.   GM appealed, asserting that the problem did not rise to the level of a "defect" under the Safety Act.

55.    The Court of Appeals in the *Wheels* Case addressed the meaning of "defect" under the Safety Act, holding:

> We find that a vehicle or component "contains a defect" if it is subject to a significant number of failures in normal operation, including failures either occurring during specified use or resulting from owner abuse (including inadequate maintenance) that is reasonably foreseeable (ordinary abuse), but excluding failures attributable to normal deterioration of a component as a result of age and wear.[34]

The Court explained:  "We use the term 'significant' to indicate that there must be a non-de minimus [sic] number of failures."[35]   However, a "significant number" of failures "normally will not be a substantial percentage of the total number of

---

[34] *Wheels* Case, 518 F.2d at 427.
[35] *Id.* at n.84.

components produced."[36]   Whether a significant number of failures has occurred "must be answered in terms of the facts and circumstances of each particular case."[37]

56.    The Court further concluded that the Safety Act's "provisions indicate that a determination of 'defect' does not require any predicate of a finding identifying engineering, metallurgical, or manufacturing failures.  A determination of 'defect' may be based exclusively on the performance of the vehicle or component."[38]  As such, this is an effect-based test.  If a design or manufacturing issue results in a problem that causes a car to operate in an unsafe manner regardless of whether or not the company has identified its "root cause," it is a safety defect. In addition, the Court emphasized the importance of "[t]he reality of day-to-day operation" and "common sense" in evaluating vehicle performance.[39]

57.    Having litigated the issue of when a problem rises to the level of a "defect" under the Safety Act, the next issue the Government presented to the courts was under what conditions a defect was "safety-related," thereby warranting a recall under the Safety Act.   Again, the auto manufacturer resisting recall was GM. Specifically, in *United States v. General Motors Corporation*, 561 F.2d 923 (D.C. Cir. 1977) ("*Pitman Arms* Case"), the Court rejected GM's contention that a steering

---

[36] *Id.*
[37] *Id.*
[38] *Id.* at 432.
[39] *Id.* at 435.

failure at low speed was not "safety-related" because it did not constitute an "unreasonable risk."  The Court held, *inter alia*, that because (i) GM had sold a large number of replacement parts in the models at issue, (ii) the "[failure at issue] [] occurred while these models were being driven"; and (iii) ***"when the [steering failure occurs] the driver loses control of the car,"*** the steering issue was a ***"defect related to motor vehicle safety"*** that resulted in an "unreasonable risk of accidents."[40]

58.    Many cases followed the *Wheels* Case and the *Pitman Arms* Case in assessing whether a problem with vehicle performance constituted a safety-related defect.  For example, in *United States v. General Motors Corporation*, 565 F.2d 754 (D.C. Cir. 1977), *aff'g in part,* 417 F. Supp. 933 (D.D.C. 1976) ("*Carburetors* Case"), GM argued that a defect related to the fuel inlet plug of a carburetor was not "safety-related."  The District Court rejected GM's theory holding, *inter alia*, that the fact that "once the plug fails, ***the car 'will stop running'"*** was an "obvious and ***undeniable safety hazard."***[41]  *See also United States v. Ford Motor Co.*, 421 F. Supp. 1239 (D.D.C. 1976), *aff'd in part*, *appeal dismissed in part as moot*, 574 F.2d 534 (D.C. Cir. 1978) (***"momentary loss of control" is a safety-related defect***).[42]

---

[40] *Pitman Arms* Case, 561 F.2d at 924.

[41] *Carburetors* Case, 565 F.2d at 938-39.

[42] *Compare Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980, 991 (N.D. Cal. 2010) (no safety defect where "[p]laintiffs offer no evidence that the ***ignition-lock defect***

59.     Similarly, in *United States v. Ford Motor Company*, 453 F. Supp. 1240, 1250 (D.C. Cir. 1978) ("*Wipers* Case"), the Court held that drivers being "forced to reduce the speed of their vehicles below the prevailing speed of other traffic" constituted a safety-related defect that presents an unreasonable risk under the Safety Act.  The Court held:

> ***Even if drivers pull to the side of the road and bring their vehicles to a stop on the shoulder they are still exposed to the risk of being struck from behind by a moving vehicle.*** Some drivers, unable to proceed because of loss of forward visibility, have even brought their vehicles to a stop in the middle of lanes intended for moving traffic. Having brought their vehicles to a stop, drivers imperiled by the windshield wiper failure have exited their vehicles in order to extricate themselves from the unsafe circumstances into which they have involuntarily been thrust. This too exposes them to the further risk of being struck by a moving vehicle.[43]

60.     NHTSA Chief Counsel Frank Berndt further reiterated in 1978 that loss of control constituted a safety-related defect in a memorandum regarding the litigation discussed above:

> If a defect causes failure of a critical vehicle component or of a major vehicle control system, it is safety related. . . . ***[A]ny defect which disables a vehicle causing it to park along the roadside presents an unreasonable risk to safety because of the hazards attendant to such parked vehicles.***[44]

---

*causes engines to shut off unexpectedly or causes individuals to stop their vehicles under dangerous conditions*").

[43] *Wipers* Case, 453 F. Supp. at 1250.

[44]  *Enforcement Litigation Memo*, Center for Auto Safety, http://www.auto safety.org/sites/default/files/imce_staff_uploads/BerndtMemo.pdf.

61.   With respect to a manufacturer's obligation to identify and report a safety-related defect, prior litigation against GM also has made clear that a manufacturer cannot avoid that obligation by simply refusing to recognize the problem as a defect.  For example, in *United States v. General Motors Corporation*, 574 F. Supp. 1047, 1050 (D.D.C. 1983), the Court held that a manufacturer cannot evade its statutory obligations "to notify of and remedy safety-related defects even in the absence of an agency order to do so … by the expedient declining … to reach its own conclusion as to the relationship between a defect in its vehicles and the safety of the travelling public."  *See United States v. General Motors Corp.*, 656 F. Supp. 1555, n.5 (D.D.C. 1987) (same).[45]

62.   Against this backdrop and in light of its own experience, including the prior litigation detailed above at ¶¶54-61, GM was charged with determining whether and when the moving shutdowns at issue in this action constituted a "safety-related defect," necessitating a recall.

63.   The moving shutdown problem described below was unquestionably a

---

[45] *See also Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 537-38 (D. Md. 2011) (duty to report where Ford received "customer complaints filed directly with Ford, Ford's authorized dealerships, NHTSA, internet websites, and other public venues"); *In re Porsche Cars North America, Inc.*, 880 F. Supp. 2d 801, 816-17 (S.D. Ohio 2012) (same); *Great Western Casualty Co. v. Volvo Trucks North America*, 2010 WL 4222924, at *2 (N.D. Ill. Oct. 20, 2010) (plaintiff sufficiently alleged that Volvo "knew th[e truck at issue] was defective … because it had received several fire-related liability claims and warranty claims….").

very serious safety defect that required prompt recall and remediation. Notwithstanding that knowledge of the ignition problem was widespread within GM, the Company failed to cause a recall or account for the defect in its disclosures to shareholders. As a result of that cover-up, Defendants failed to take the required actions under the Safety Act and provide truthful and complete information and accurate financial disclosures to the Class.

### 3.    The Obvious Danger Of Moving Shutdowns

64.    As noted above, if a motor vehicle is on the road or moving and the engine suddenly shuts off, this is referred to as a "moving shutdown." When a moving shutdown occurs, the power brakes and power steering features of a car immediately stop working. This often comes as a complete shock to the driver, who does not know why the engine has cut out, why the steering feels stiff or locked up, and why the brakes do not seem to function. If the driver presses the gas, the car will not accelerate. If the driver tries to steer, the driver cannot move the wheel without exerting a significant amount of physical strength at a time when the car cannot accelerate. If the driver attempts to pump the breaks, this actually ***depletes*** the power steering reserve. In this life-threatening, panicked situation, the driver must figure out a way to stop the car, get it off the road, and remove it from harm's way without injuring him or herself, the other passengers in the car, or any other drivers on the road. This is often quite difficult to accomplish.

65.     As a result, moving shutdowns are extremely dangerous and create a serious safety hazard to the driver and passengers in the car, as well as other vehicles on the road.  The danger is exacerbated if the shutdown occurs when the car is moving at a high speed, if the car is in a place where the driver needs to accelerate or maintain speed to escape danger, or if the driver is inexperienced or possesses less physical strength to manage a moving car that has no power.

66.     The statistics released in connection with the GM Ignition Compensation Claims Resolution Facility Final Protocol for Compensation of Certain Death and Physical Injury Claims Pertaining to the GM Ignition Switch Recall ("the Compensation Facility" and "Compensation Facility Protocol") discussed further below make clear that the moving shutdowns concerning this litigation presented a grave danger to all drivers.  As of January 9, 2015, the Compensation Facility had received *2,710 claims* from or on behalf of individuals who were injured or killed by moving shutdowns resulting from the ignition switch failure at issue in this action.  *303* of those claims are *for deaths*, *202* are *for catastrophic injuries*, and an additional *2,205* are *for other injuries requiring hospitalization.*

67.     As McAleer, the former head of GM's corporate quality audit department responsible for evaluating GM cars and trucks for safety issues after they had been shipped for sale from 1988 through 1998, and a GM employee for over 34

37

years, explained: ***"Moving stalls are extremely dangerous. … Stalling when the car is in movement is clearly a safety concern."*** Indeed, according to McAleer, the failure of an airbag to deploy "is the least of your problems when you stall…." Rather, the problem is losing control of the car, including the loss of power steering.

68.     McAleer further pointed out that the fact that a moving shutdown is a safety issue is so obvious that anyone who doubted the risk should simply turn their car off at 70 miles per hour on the highway and see whether they were concerned for their safety.

69.     The grave severity of moving shutdowns is also vividly set forth in the numerous accounts of people who experienced this problem while driving one of the GM cars at issue in this case.  Indeed, first-hand accounts from the owners of the recalled cars at issue here make clear the fear for their lives that drivers felt when experiencing a moving shutdown.  Those very fears are realized in the tragic deaths and injuries suffered by others, extremely unfortunate but even more obvious evidence, proving that moving shutdowns are a safety issue.

70.     For example, Brooke Melton died when her 2005 Cobalt shut down on the highway due to the ignition switch turning from Run to Accessory mode.  Her car slid into another vehicle on the highway, and she did not survive the injuries that

she sustained in the crash.[46]

71.    15-year-old Amy Rademaker and two of her friends took her 2005 Chevrolet Cobalt out on the road on October 24, 2006.  Out of nowhere, the ignition switched off, and the car slid off the road and crashed into trees.  Only one of the three teenage passengers survived the crash.[47]

72.    Shara Lynn Towne, a mother of five children, similarly took her 2004 Saturn Ion out for a drive on July 4, 2004.  Her Ion ignition switch failed, her car veered off the road and crashed into a utility pole.  Ms. Towne did not survive the crash.[48]

73.    Detailed complaints filed with GM by Cobalt owners over the course of **_nearly ten years_** (and now revealed through litigation) detail the panic and fear experienced by drivers when a moving shutdown occurs.  Some of these owners complained strongly enough to get GM to repurchase their vehicles, while millions of other defective cars remained on the road.  Indeed, according to McAleer, buying back cars was one way GM sought to keep its car problems quiet and out of the

---

[46] _Melton Family Commends NHTSA Probe Into GM Cobalt Recall_, PR NEWSWIRE, Feb. 27, 2014, http://www.prnewswire.com/news-releases/melton-family-commends-nhtsa-probe-into-gm-cobalt-recall-247534951.html.

[47] _Of 2 Deaths, Just 1 Is Counted_, N.Y. TIMES, Oct. 24, 2005, http://www.nytimes.com/interactive/2014/05/26/business/100000002902902.embedded.html.

[48] Gary Kazanijan, _Earliest Link To Defect_, N.Y. TIMES, July 4, 2004, http://www.nytimes.com/interactive/2014/05/26/business/100000002902902.mobile.html?slide=GMVICTIMS_TOWNE-SS-slide-6Y11&name=ssvictim1.

public eye.  All of these complaints vividly demonstrate the safety issues caused by the ignition switch defects, leading to dangerous moving shutdowns.

74.    For example, on March 8, 2005, Rebecca Bowden, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer states just leaving dealer with her 2005 Cobalt. Bought it new February 14, had it 25 [days,] less than a month, and now has about 1,500 miles on vehicle.  Customer received bulletin from dealer stating Cobalts may experience engine stalls, loss of electrical systems, and no DTC.  ***Customer engine has already stalled once in a snowstorm making her steering column lock up and vehicle spun out of control. No one hurt, but customer terrified of vehicle.*** Doesn't want it anymore.  Customer ready to trade it in for a Honda or something if can't get a new, safe Chevrolet.  Customer states bulletin claims engine may stall if driver is short and has a large key chain.  ***Customer 5' 4", has a five-year-old, and is five months pregnant.  Doesn't feel safe driving the vehicle, and dealer states that they can't do anything about it.***[49]

75.    On March 11, 2005, Alfred Prisco, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer states purchased a new 2005 Chevy Cobalt for their 19-year-old son with around 700 miles on it. The first week son had the vehicle, the vehicle started stalling every day. Took it to the dealer. Dealer states the computer inside the car died. Dealer gave customer a new Cobalt. The new vehicle started doing the same thing. Informed dealer. ***Customer's son was driving home from work one evening.  He was driving around 70 miles per hour on E470 Highway.  He was getting off the off ramp where the vehicle stalled.  The vehicle stalled. It locked up where the driver had no control over the vehicle and vehicle***

---

[49] Transcript of Record, Victor Hakim, at 9:09 – 10:16, Melton v. Gen. Motors Co., Civil Action 2011-A-2652 (Cobb Cnty. Ct. of Georgia) June 11, 2013.

***went into ditch.***[50]

76.     On April 7, 2005, Jessica Justice, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Vehicle will stall while driving. ***Has happened once while vehicle was
> in drive driving down the street***.  States on other occasion the vehicle
> has stalled out.  Brought car home from service today.  States vehicle
> has been at the dealer twice in one week regarding same concern, and
> when bring vehicle home, the concern is still present.  States received
> bulletin from dealer stating that vehicle concern cannot be fixed at this
> time, stating that the vehicle can stall if the driver hits the key, stating
> it can happen to a driver who is of short stature, if a driver has too much
> weight pulling on the ignition.  Customer states vehicle is only two
> months and two weeks old.  Spoke to service manager Mike Toth.
> States did diagnosis of vehicle. States there is a loss of communication
> in ignition switch when it is hit.  States it is an ongoing problem within
> the Chevy Cobalt.  States the ignition cylinder is very sensitive.  It
> doesn't have to be hit hard to make the vehicle stall.  States, based on a
> PI technical assistance bulletin, there is no current repair that can fix
> the problem.  Service manager states the customer keys didn't appear
> to be too heavy for the ignition.  Customer states to resolve the issue
> should take keys off the ring while in ignition. If she touches the
> ignition, the vehicle dies. Cannot be fixed. TSB bulletin. ***Customer
> states that it is a safety concern***. ***Customer states she does not like the
> thought of having to be concerned with driving.***  Third party seeks to
> know why GM keeps selling this vehicle if more and more people are
> complaining.  CRM [GM's Customer Relations Manager] advised the
> third party that she could not advise on this issue until further research
> was done.  CRM seeks to have the customer call the CRM tomorrow.

GM subsequently repurchased the vehicle from Ms. Justice.[51]

77.     On April 12, 2005, Mary Civardi, the owner of a 2005 Chevrolet

---

[50] *Id.* at 11:10 – 12:16.
[51] *Id.* at 12:21 – 17:07.

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Approximate mileage, 600. Right after the vehicle was purchased, the vehicle died. I took it back to the dealership again, and they completely checked the vehicle. ***I am very afraid of this vehicle.  Vehicle died on highway four times.*** The dealership gave us a loaner. March 23rd of this year is when vehicle was bought. Dealership states that they called the engineers…  Tom Purdy (service manager).  Concern – She says she has a stalling issue that seems to do on the right-hand turns.  We are about to get into the vehicle to find a repair.  Haven't had an opportunity to do though yet…  Rich states: ***This woman is scared to death of this vehicle. She takes care of her grandchildren, and she is afraid one day she is going to be riding around with them and kill them.  She has the fear of God in her about this car***….[52]

78.    Also on April 12, 2005, Ms. Civardi wrote a letter to Kathleen Coelho

of GM.  The letter stated, in relevant part:

> As we discussed, this letter will confirm our telephone conversation today in which ***I notified you of a persistent and very serious stalling problem with my new '05 Chevy/Cobalt*** (purchase date March 23, 2005) – purchased at a New Jersey dealership.  General Manager Richard Yearwood was the manager of the dealership.  I informed you the car has inexplicably stalled several times within the last week while traveling at various speeds, including highway speeds.   Upon noticing the aggravated nature of the problem this past weekend, I immediately brought the car to the dealer yesterday; Monday, April 11. After conducting a morning long observation and inspection of the car, including contacting GM engineering for diagnostic instruction, the dealer was unable to determine the cause of the problem and told me that the car was performing appropriately.  ***This morning while I was driving on a local highway with lots of traffic, the car died again and I came very close to being rear-ended by the vehicles traveling behind me.***  Fortunately, the car restarted immediately, but as you might expect, ***I have now lost trust and confidence in the vehicle.*** I immediately returned the car to the dealership after this incident. The service department has informed me that they are going to perform a

---

[52] *Id.* at 17:08 – 18:25.

week long diagnostic to see if their technicians can determine the cause of ***this very hazardous condition***. However, the [manager of the] GM [dealership], Mr. Yearwood, also advised that the dealership is not in a position to take a return of the vehicle and that I should contact GM directly. ***I am a grandmother who frequently travels with my young grandchildren in the car … I am afraid to drive this car***.[53]

GM subsequently repurchased the vehicle from Ms. Civardi.[54]

79.    On May 2, 2005, Markeese Hampton, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

Vehicle stalls out while driving.  Twice while on the freeway.  Took to dealer.  Dealer said couldn't duplicate and customer should come back when it happens again. ***Customer states they are losing confidence in vehicle and believes it is a safety concern.  Cobalt one month after purchase vehicle cuts off with a tractor-trailer behind him and it almost killed them.  His wife was also in a similar situation where vehicle stalled while she was driving.***

GM subsequently repurchased the vehicle from Mr. Hampton.[55]

80.    On May 3, 2005, Michael Smith, the owner of a 2005 Chevrolet Cobalt,

filed a claim with GM.  The claim stated, in relevant part:

Customer states that his brand new car keeps having continuous stalling problems while vehicle is moving and while in a stopped position. ***Customer is very concerned on a safety aspect that the vehicle will stall at a bad time … Customer states that he is very concerned with the safety of his vehicle.*** Customer states that problem usually happens at a stoplight with foot on brake.  Customer states when he steps on gas to accelerate, vehicle will sometimes stall as it begins to move. ***Customer states that the problem is that the vehicle has a hard time turning over and other vehicles are having to hit their brakes and sometimes almost hit him*** … Customer states that he wants dealer to

---

[53] *Id.* at 23:07 – 25:14.
[54] *Id.* at 17:08 – 18:25.
[55] *Id.* at 27:06 – 28:13.

repurchase vehicle.[56]

81.     On May 19, 2005, Maryellen Biddle, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part: "Customer calls. Customer states she just bought a new Cobalt for her daughter April 30th, 2005.  ***The vehicle has stalled out three times now.  This is a safety issue.***  G.M. attached the technical service bulletin to the claim."  GM subsequently repurchased the vehicle from Ms. Biddle.[57]

82.     On June 8, 2005, Raymond Arjona, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer states has had the vehicle stall in the middle of use four times. Customer states that she has had the vehicle taken to the vehicle dealer twice. Customer states after the first visit the customer was advised the concern had been corrected and to pick the vehicle up. Customer advised the same day of receiving the vehicle the problem occurred again. Customer states she took the vehicle back to the dealer and is now being told there is no fix for the concern. ***However, dealer advised of a bulletin advising that if there are an excessive amount of keys or if the driver knee hits the ignition, the vehicle can stall.  Customer seeks a better type of resolution than to adjust her daughter's driving habits who is the driver of the vehicle.  Customer states she will not pick the vehicle up until a better resolution is reached***.[58]

83.     On June 9, 2005, Audrey Naguina, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> ***Numerous concerns.***  Customer states has taken in numerous times.

---

[56] *Id.* at 29:04 – 30:20.
[57] *Id.* at 35:16 – 36:06.
[58] *Id.* at 39:02 – 40:01.

Died again yesterday.  Dealer states concern cannot be duplicated. ***States almost had an accident while trying to start vehicle again.*** States brand new car should not have so many concerns. Is getting frustrated with vehicle.[59]

84.    On June 10, 2005, Nathaniel Long, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer states just purchased a vehicle less than 90 days. '05 Chevy Cobalt Now has concern, happened two times, and hit a bump in the street, and the whole car cut off. ***Car shut off yesterday when coming down a hill and engine shut off and could not turn.*** Car is being serviced this morning.  Not happy with vehicle now.  Vehicle is at Lakeshore Chevrolet has told service about the concern.  ***Customer states she is not getting back in that car.***[60]

85.    On June 27, 2005, Elsie Garrison, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> CRM [GM's Customer Relations Manager] states that the customer claims that her vehicle stalls for no reason at no specific time … ***Customer states at various intervals the vehicle dies for no reason.*** When the engine stops running, no lights will come on.  ***The steering locks and it's hard to brake.*** She took vehicle to the dealer in May, and the vehicle has done this twice since then.[61]

> Customer states that her Chevy Cobalt went into the shop on July 9th, '05 for the vehicle just turning off on her. Customer states at the time the dealer told her they let the vehicle run for one hour and then drove it for 13 miles, and the car did not duplicate the concern. ***Customer states that she feels it is a safety issue*** … Having issue again. Customer states the day before yesterday the car died again. Key ring didn't resolve the issue. ***Was almost in car accident.  Car behind her almost***

---

[59] *Id.* at 40:05 – 40:18.
[60] *Id.* at 41:07 – 42:12.
[61] *Id.* at 42:13 – 43:13.

*hit her.*[62]

86.     On June 27, 2005, Glen Witt, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:  "Friday customer's wife was in the vehicle on the way home when ***the vehicle stalled in the middle of the intersection***. Customer feels that she was ***nearly hit in the intersection***."[63]

87.     On July 7, 2005, Lisa Funk, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer states speaking with customer's mother, Rhonda. Daughter purchased a 2005 Chevy Cobalt. … ***Customer states her daughter has had it stall three times***.  ***States her daughter does not feel safe*** … Customer seeks repurchase due to intermittent stall issue.  Dealer unable to diagnose or duplicate.  AVM advised no repurchase.[64]

88.     On August 10, 2005, Raymond Gilbert, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer complains about vehicle.  Customer states bought vehicle new. Several times now the engine has cut off on the highway.  The last time it happened, the customer hit a bump in the road, and the entire vehicle turned off.  ***Customer wasn't able to turn the vehicle on while in neutral.  Had to pull off the road and restart the vehicle*** … ***Customer concerned about safety of family with current vehicle. Customer states feels unsafe in vehicle because the vehicle has cut out at least five times before and dealer wasn't able to duplicate the problem*** … ***Customer states that this issue is big safety concern and does not want wife driving vehicle anymore***.  Engine died again this morning when he was driving on freeway through construction zone at about 60 miles per hour after hitting bump in the road … Customer

---

[62] *Id.* at 43:20 – 45:13.
[63] *Id.* at 47:22 – 48:09.
[64] *Id.* at 53:21 – 54:09.

called. ***Customer states that wife doesn't feel safe in vehicle because vehicle stopped inside the service bay at dealership with the weight of the keys. Customer states that wife is scared in that the vehicle would turn off when the vehicle is on the freeway and be caught in an accident*** … Customer seeks repurchase of their vehicle. CRM advised that the weight of the keys will make the vehicle tum off.

GM subsequently repurchased the vehicle from Mr. Gilbert.[65]

89.    On August 11, 2005, Evelyn Ledoux, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM. The claim stated, in relevant part: "Vehicle customer states refusing to replace the ignition switch and president of the company told them to do it. ***I have been in near accident because of the car shutting off while I was driving down the street … So many problems with this vehicle, I just don't feel safe in it***…."[66]

90.    On August 12, 2005, Bonnie Robustelli, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM. The claim stated, in relevant part: "Repurchase. Bonnie Robustelli. Customer states that she has had her vehicle in the shop on several occasions for the same stalling concern, and it had to be towed there this time."[67]

91.    On August 15, 2005, Jennifer Cruz filed a claim with GM regarding a 2005 Chevrolet Cobalt owned by Marcos Cruz. The claim stated, in relevant part:

***Jennifer Cruz, customer states that vehicle shut off on the interstate.***

---

[65] *Id.* at 56:17 – 59:14.
[66] *Id*. at 59:24 – 60:16.
[67] *Id.* at 70:14 – 70:25.

47

*Concern for safety for children*.  Customer seeks for vehicle to be replaced.  Acknowledges that she was provided with extended service contract, plus one month car payment.  Customer seeks for vehicle to be replaced. *Does not feel safe in vehicle.*[68]

92.    On August 22, 2005, Howard Gelman, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

Customer seeks repurchase … *Does not feel safe in vehicle.  Customer states there are no warning, no light, vehicle just shuts off.* Customer just picked up vehicle from dealer today for same concern. Today they gave him a paper about stalling and a problem with the electrical system, ID number 1683813, but customer does not see how it pertains to him….[69]

93.    On August 25, 2005, Margaret Hamm, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:  "Customer states that she was driving down the highway and her knee hit under the steering wheel and the engine dies … *CRM 24 [GM Customer Relations Manager] advised since this is a safety issue to customer, she should get the vehicle in as soon as possible.*"[70]

94.    On August 25, 2005, Timothy Forck, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

My '05 Cobalt has had issues since I bought it from the dealer four months ago. At times when I drive, the traction control light comes on, as does the power steering light. The ABS and brake light blink on and off. *The power steering assist shuts down. The car shifts at the wrong*

---

[68] *Id.* at 60:24 – 61:13.
[69] *Id.* at 61:14 – 62:11.
[70] *Id.* at 62:12 – 63:3.

*times and stalls when the brakes are applied.* I have researched this online and have found that a faulty body control module might be the issue, but when I mentioned it to the dealer, they blew me off …***This issue is dangerous, and I would like to have it fixed.*** I didn't expect this when buying a fairly new car from a GM certified location.[71]

95.     On September 2, 2005, Grant Smith, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:  "Still losing engine power, *feels unsafe*, *and doesn't want to travel in it*. Customer *doesn't want the car* and have loan revoked."  GM subsequently repurchased the vehicle from Mr. Smith.[72]

96.     On September 10, 2005, Arthur Ledoux, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer states that he was going up on ramp and the key light (brake light) was bright red.  Customer states he has taken the vehicle to the dealer for the issue in the past and that he is not taking the vehicle to a GM dealer again unless he is dropping off the vehicle …

The "Vehicle Repair History" further noted on August 5, 2005, "Could not duplicate stall concern."  On August 12, 2005, the "Vehicle Repair History" stated, "Replaced ignition switch housing."  On September 15, 2005, the "Vehicle Repair History" further stated, "Customer states vehicle shuts off when driving…."  GM subsequently repurchased the vehicle from Mr. Ledoux.[73]

---

[71] *Id.* at 142:9 – 143:6.

[72] *Id.* at 63:4 – 63:20.

[73] *Id.* at 63:21 – 65:15.

49

97.    On September 12, 2005, Antoinett Vamos, the owner of a 2005

Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer states vehicle has shut off on her three times.  Customer states
> when her knee hits something under the steering column, vehicle will
> shut off … Customer states the dealership told her she shouldn't sit too
> close to the steering wheel to avoid accidentally turning off the vehicle.
> ***Customer believes she was sold something that is defective***.  Customer
> would like vehicle fixed or a new vehicle without the concern and
> replace it … The ignition cylinder is a low-effort cylinder. The part
> can't be replaced or repaired. It is a design problem that can't be
> resolved with the current parts. ***Customer feels unsafe in the vehicle
> knowing it could turn off … while driving, like when pulling out into
> traffic***.  Customer would like to have the concern resolved or be put in
> a different vehicle without any concern. Please let me know what we
> can do for the customer's vehicle to operate like any other vehicle or if
> repurchase is an option. ***[The Area Vehicle Manager] states [t]his is a
> known vehicle concern at this time.  Has no suggested fix… Customer
> states she will have to pursue an answer via other means then, such
> as attorney***.[74]

98.    On September 15, 2005, Andres Filippidies, the owner of a 2005

Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer states purchased new. It wouldn't start for me twice. Had it
> towed to Bay Chevrolet by roadside both times, and they said they had
> fixed it both times and they didn't. Yesterday the ***vehicle died going 60
> miles an hour on the highway***. Put i[t] into neutral, rolled it to the side
> of the road, and it started up. Went to the sales department at the selling
> dealership, and they said they can't do anything about it. ***Almost killed
> their family***.  ***Does not want the car. It's defective.***[75]

99.    On September 23, 2005, John Papa, the owner of a 2005 Chevrolet

---

[74] *Id.* at 65:16 – 70:13.
[75] *Id.* at 71:01 – 71:22.

50

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Vehicle customer states Cobalt has been in three times.  **Shuts off**.
> They have it right now.  A week after purchase she was driving home
> about 35 miles per hour. Once it sits and she waits five minutes, it starts
> up again.  The SVM has driven the vehicle home and was unable to
> duplicate the concern.  **Almost was rear-ended**.

GM subsequently repurchased the vehicle from Mr. Papa.[76]

100.    On September 24, 2005, Amy Fiorilli, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer states vehicle has been stalling two to three times a week.
> Took vehicle in to the dealer and was advised that if steering column is
> bumped, engine will cut off.  Yesterday evening engine cut off again.
> Customer called the dealer and advised concern, and dealer advised that
> if she wants out of the vehicle, she could call GMAC … Customer
> states vehicle stalling when son's knee hits ignition … **Customer is
> fearful for her son's life.**  Dealer states it is a known issue and tells
> customer to have son not bump the ignition.  **Does not even want to
> take vehicle off dealer's lot for fear of something horrible happening**.
> Just wants GM to take the vehicle back.  **How many people need to die
> for this issue to be a recall?**[77]

101.    On September 27, 2005, Preston Delph, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer states the first time engine shut down, daughter was driving
> it. Age 18, drives to work.  She was driving down the road around 35
> miles per hour. When it stopped the first time, **the steering column
> locked up, speedometer went down to zero, and brakes locked up**. Got
> over to the side of the road and tried to start again and it did.  Customer
> states this is the third time with mother.  **Customer states daughter was
> driving down a hill when stalled out.  AC died.  All lights on dash went**

---

[76] *Id.* at 71:23 – 72:16.

[77] *Id.* at 73:10 – 75:18.

*dead and shut off.* Customer states daughter got it under control. *No control of brakes or anything.* Got it stopped, turned off, and it started right up again. Customer states last time daughter was pulling out of the parking onto the road with green light, and vehicle died in the middle of the road. Almost went up on the curb and daughter put in park, then restarted it … *Customer states vehicle is not safe to drive. Will not let her daughter drive.*

GM subsequently repurchased the vehicle from Ms. Delph.[78]

102.   On October 3, 2005, Rosalie Schenker, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM. The claim stated, in relevant part:

Customer states when her husband was driving the vehicle and was adjusting himself, he hit the keys. The ignition cut off…. Customer states that *she feels that this is dangerous. Customer states that she is afraid to drive the vehicle.* Customer states that she went to the dealer and they have not come up with a good solution. Dealer put a rubber tiny insert in keyhole. Customer states that the ignition key turns off very easily. Customer states that dealer told him that GM engineering told him that the rubber insert is the fix … Customer states that dealer told her that she needs to adapt. *Customer states that she feels that it is a safety issue and that it is defective.* CRM [GM's Customer Relations Manager] advises customer that concern has been escalated and repurchase has been denied due to the fact that it is not a mechanical issue but an issue with the customer's driving habits.[79]

103.   On November 3, 2005, Christy Grace, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM. The claim stated, in relevant part:

Customer states husband was driving vehicle. Let foot off gas to get off ramp. There was no steering so he hit the brake and it did not work and slid down the ramp and landed in some bushes. Vehicle was dead so he turned vehicle off and it started up. *Customer states husband walked three miles home after incident because he was shaken up* … There

---

[78] *Id.* at 75:21 – 77:05.

[79] *Id.* at 77:06 – 79:11.

had been no problems with the car until September 24th, '05. The car stalled once in the morning and then completely shut down without warning. No warning lights came on. My husband was not able to steer the car, the brakes locked up, the brake pedal went mushy, and the engine system shut down. Thank goodness there were no cars around him….[80]

104. On November 3, 2005, Anatoleu Bekrev, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM. The claim stated, in relevant part:

Customer states bought the vehicle brand new. Vehicle has had problems since day one. Major concern now is that the vehicle engine stalls. Engine cuts off sporadically. Driving or sitting at stop lights or stop signs. *Vehicle has stalled at 80 miles per hour. Customer lost control of vehicle and almost hit tree.*[81]

105. On November 16, 2005, Becki Williams, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM. The claim stated, in relevant part:

*Third party states vehicle stalled in the middle of highway. Third party states that daughter could have been killed if there – they wasn't [sic] on the side of the road.* Third party states took vehicle to dealer and dealer replaced the throttle body. *Third party states now daughter is afraid to drive because vehicle stalled.*[82]

106. On November 28, 2005, Krystal Davis, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM. The claim stated, in relevant part:

Customer states vehicle continuing to stall. Was driving vehicle in snow and stalled again and spun out into a field. Did not hit anything. No one was hurt … Customer issue, has recurrent concerns with vehicle stalling. Last time it happened customer lost control of vehicle and spun out into ditch. *Customer and family are very afraid of vehicle and will*

---

[80] *Id.* at 80:21-83:12.
[81] *Id.* at 84:4-16.
[82] *Id.* at 86:19 – 87:6.

*not drive it again*.

GM subsequently repurchased the vehicle from Ms. Davis.[83]

107.   On December 13, 2005, Christopher Whitt, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> *I'm worried about when my vehicle stalls. I have an 11-month-old baby that rides in this car. When the vehicle quits, I have no steering, brakes, and was about [sic] involved in an accident.* When take the car to the shop, it is always can't find anything wrong. ***Something needs to be done before we get hurt … Vehicle quits while driving regardless of speed. Once happened when slowing and rest time while driving two times highway speed and other three times it was in town.***[84]

108.   On December 27, 2005, Emmy Anderson, the owner of a 2006 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> *Customer states was driving vehicle last night when car shut down and customer lost control, causing her to drive into a ditch …. Customer states she was driving about 20 miles per hour in a construction zone. Customer states she had just taken off from a red light, switching to second gear, when the vehicle stalled. Customer could not steer.  Customer then pumped the clutch to start the vehicle, but it did not. Customer states the road curves to the left a little so it caused customer to go off to the side of the road and into a grassy median.  Customer states the left rear bumper has a hole in it.* Customer states the vehicle would die five to ten times a day and only takes a few minutes after starting the vehicle it shuts off. Customer states she takes her kids to school, which is only 15-to-20-minute drive, and the vehicle would die.  Customer states the vehicle would die on her and other mechanics but never for the dealership.[85]

109.   On December 29, 2005, Judith Russell, the owner of a 2005 Chevrolet

---

[83] *Id.* at 87:14 – 88:16.
[84] *Id.* at 88:17 – 89:15.
[85] *Id.* at 89:23 – 91:6.

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Complaint, vehicle engine stall. Husband Robert customer states when going through a curve and step on brakes, engine would die. Dealer could not duplicate. ***Customer feels safety issue.*** Dealer tried driving home and back to dealership to try to duplicate and could not duplicate. ***Customer only taken into dealership one time for concern. Concern occurred two times to Robert and one time to father. Customer states does not want vehicle. Lost confidence in vehicle***.[86]

110.   On January 3, 2006, Francis Strickland, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> New vehicle with multiple concerns. ***No longer feels safe in the vehicle.*** '05 Cobalt has been in the shop numerous times. ***Does not feel safe in vehicle.  Vehicle stalls intermittently.*** Check engine light comes on and sometimes fails to accelerate when pressing the gas pedal … States they would like GM to exchange the vehicle.[87]

111.   On January 5, 2006, Shelley Hill, the owner of a 2005 Chevrolet Cobalt,

filed a claim with GM.  The claim stated, in relevant part:

> Customer seeks repurchase. Customer states her vehicle has cut off since she purchased vehicle. Customer states the dealer has attempted to repair several times … Customer states she has a ton of invoices that document that she has been to the dealer more than once. ***Customer states she shouldn't have to go to dealer six times now with new vehicle. Customer states this is a safety concern. Customer states the vehicle has shut off while coasting through an intersection.*** Customer states the dealer has tried telling her different stories. Customer states dealer advised too many keys on the ring, different type of gas, ignition switch, et cetera … ***Customer states she is not the only person with a cutting-off concern***.[88]

---

[86] *Id.* at 91:12 – 92:3.
[87] *Id.* at 92:16 – 93:6.
[88] *Id.* at 104:9 – 105:14.

112.   On January 16, 2006, Lisa Sanford, the owner of a 2006 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Please be aware that the 2006 Chevrolet Cobalt has a serious defect that is not being addressed by General Motors. ***The car stalls and the steering wheel locks up while it is being driven.*** This is a random occurrence and not associated with any particular driving situation. ***Why is it so dangerous? My Cobalt stopped completely in traffic with my child in the back seat. When the car dies, the steering wheel locks up and the vehicle cannot be controlled. Had the driver behind me not been more alert, I would have been rear-ended at the time.*** I had to stop, put on my flashers, and restart the vehicle in order to proceed. It had stopped on other occasions prior to this, and I should have immediately brought it in, but I thought perhaps there was air in the line or some other innocuous problem. ***Until the instance above I had not realized how dangerous it was.*** The Cobalt has done this about ten times since we purchased it about a month ago … ***Although the mechanical department at the dealership has a bulletin alerting them of this problem, the Cobalt is still being sold to unsuspecting consumers. They are not being told of this potentially dangerous defect ….***[89]

113.   On January 18, 2006, Ronald Heaster, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer was concerned with the ignition switch on his daughter's '05 Cobalt. The vehicle was just serviced in the shop about one week from today concerning the key coming out of the ignition and the vehicle still running. The vehicle is also having problems with completely shutting off in mid driving for no reason. ***Customer is concerned about their daughter's safety. They were told by someone in the dealership that this was a normal occurrence on Cobalts.*** CRM [GM's Customer Relations Manager] will investigate … CRM called the dealership and was told that this was not a normal feature … ***Customer states they are concerned with safety.*** Customer states vehicle stalled three times

---

[89] *Id.* at 93:12 – 94:11.

before Christmas.

GM subsequently repurchased the vehicle from Mr. Heaster.[90]

114.   On February 3, 2006, Salomon Maldonado, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> The vehicle stops just in the middle of the road, and this last time *I almost got hit in the rear because the vehicle behind me was not expecting me to just stop in the middle of the road.* The vehicle stopped in the middle of the road on me three times: One, I was going over a bump; two, I was going up a hill; and 3 is when I was making a turn to another street.[91]

115.   On February 10, 2006, Nicholas Skias, the owner of a 2006 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> I have two problems concerning my Cobalt SS.  First, as I am driving down the road, *my engine just shuts off out of nowhere*. This incident has happened twice, once traveling at about 55 miles per hour, and another at around 40. After this happened, the car would not fire back up until approximately five minutes later. I did not spend $22,000 for a car to have these problems. *Also, I just got into an automobile accident, and the problem with that is my airbags did not deploy*. The impact was definitely fast and hard enough to where they should have. I want something done about these items. *If no actions are taken about the problems, I'm going to be forced to file a lawsuit because these are some big safety issues.*[92]

116.   On March 14, 2006, Brian Williams, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Car shutting down while driving. Customer states vehicle has four times shut down while driving. Loses power steering. *Dangerous.*

---

[90] *Id.* at 95:8 – 96:12.
[91] *Id.* at 96:19 – 97:8.
[92] *Id.* at 98:3 – 24.

> *Afraid to drive car and it has sat mostly for two months.* Wife had car today, and again, it just shut right down. Had bad words with dealership … *Customer states vehicle is not safe and wants GM to fix it before him, his wife, or someone else gets killed.* Doesn't want to hear it can't be duplicated. It's done it four times in 5,000 miles … *Customer states his wife will no longer drive the vehicle after the last incident on Friday evening when she just missed running into the back of a vehicle.* Customer states he talked with Rob at the dealership who he told they would not drive the car anymore or make payments. They like the car, but *it's unsafe and it's going to kill someone.*

GM subsequently repurchased the vehicle from Mr. Williams.[93]

117.   On May 5, 2006, Kathryn Shaffer, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:  "Customer states now the car shut off on daughter at 55 miles per hour yesterday. ***Customer states now scared to put her daughter in the car.  Customer states again now we are getting into danger.***"[94]

118.   On May 22, 2006, Cindy Wind, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> My husband and I purchased an '05 Chevy Cobalt last Saturday, May 13th, '06, and on several occasions the car has just quit while it was being driven. We took the car to the Chevrolet shop in Siloam Springs and they can't pinpoint the problem. ***This is a huge problem and very dangerous.*** Could someone please help? Thank you.[95]

119.   On May 23, 2006, Michael Saternitzky, the owner of a 2006 Chevrolet

---

[93] *Id.* at 100:4 – 101:20.
[94] *Id.* at 102:2 – 13.
[95] *Id.* at.102:22 – 103:9.

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> ***Customer states ignition has gone out twice on the vehicle and customer does not feel safe and secure while driving it.*** Is hoping GM will take the vehicle back … Customer has vehicle for about two weeks before the steering locked up and the ignition quit working. The dealer fixed it. Now, about two weeks later, customer's wife was driving it and it happened again….[96]

120.   On May 31, 2006, Stacey Mallett, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer states the vehicle has stopped two times in the middle of the road. Customer states when the vehicle starts to act up, if you turn the vehicle off and turn it back on, the vehicle goes back to normal. ***Customer states the vehicle is very dangerous to drive.*** Customer states she is seeking a repurchase of the vehicle.[97]

121.   On June 21, 2006, Eric Olsen, the owner of a 2006 Cobalt, filed a claim with GM.  The claim stated, in relevant part:  "Second time repairs have been done for the same problem. The car shut off. It was repaired, running perfect. 27 days later car shut off in middle of intersection … Customer begging for a new car. ***She is too afraid for car will do it again while her daughter drives it.***"[98]

122.   On June 28, 2006, Jamie Bella, the owner of a 2006 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer owned the vehicle for eight months. In those eight months, the vehicle has been in the dealership eight times for service problems.… The car completely shut down on a busy highway. She has

---

[96] *Id.* at 103:14 – 104:4.
[97] *Id.* at 105:19 – 106:8.
[98] *Id.* at 106:14 – 107:3.

been working with the dealership for a long time to try and correct the problems she is having with this vehicle. The car will completely die in the middle of the highway. ***She doesn't feel safe in this vehicle anymore.*** She has been in a rental vehicle for the past two weeks.[99]

123.   On August 22, 2006, Patricia Manoy, the owner of a 2006 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Vehicle involved in a collision. Customer states: Customer called in once to file product allegation report. States this shouldn't happen on a brand-new vehicle. ***Son was driving the car and picked up his friend on their street when the vehicle suddenly stalled. He decided to pull over but he slammed into a curb***. Dealer states the engine blew and it's a $3,300 repair for the parts damaged.[100]

124.   On September 13, 2006, Tosha Moss, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> ***Customer doesn't feel safe in vehicle that has turned off on her three times. Customer states the first week of August customer was driving in vehicle and vehicle lost power steering.*** Customer took vehicle to dealer for a diagnosis, but dealer was unable to find any problem with the vehicle. ***Customer again was driving on the streets and the vehicle again lost power steering.*** Customer then again took the vehicle to the dealer and again the dealer couldn't find anything wrong.[101]

125.   On November 11, 2006, Harmony Wade, the owner of a 2006

Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer states the vehicle shut down causing no control over the vehicle. The vehicle was unresponsive, causing a collision. Customer seeks reimbursement for rental vehicle and wants money back.  The car is a lemon, ***I don't want that car ever again in life***.  I keep saying I'm going to go and get it and I just haven't … ***the problem I have with my***

---

[99] *Id.* at 107:8 – 24.
[100] *Id.* at.108:6 – 19.
[101] *Id.* at 109:1 – 19.

*car is a scary one. My car is currently at Heritage Auto Plaza. It is there because I was in a car accident when the power in my car completely shut off while I was driving it. The steering wheel did not work, the brakes were unresponsive, and everything in the cockpit went to zero. Only the headlights and the radio continued to work. This is the second time this has happened.* The first time I was able to move the car off the road … I took my car to Rosenthal Chevrolet. They told me nothing was wrong, it was a fluke and would never happen again. *I'm now completely afraid of my car.* Again they have said there is no problem. I have since learned some things about how the Cobalt is made. *It is very disturbing. I do not want the car.* Can someone please contact me so we can discuss how to resolve this?[102]

126.   On November 20, 2006, Nancy Engle, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Recurring engine problem. Customer states engine keeps shutting off. Happened six times.  Wheel would lock. Brought it to a GM dealership, but dealer could not duplicate concern … Her daughter has a 2005 Cobalt. She is the second owner and she is still in warranty. She purchased the vehicle approximately a month and a half ago, beginning of October, and since then, when she is driving on the road, the engine would stop working and the steering locks. They have b[r]ought it into the dealership, and they have been unable to duplicate the problem, as it happened approximately six times and they cannot seem to find out what is wrong with it.  *Ms. Engle is extremely worried that the engine will go out at the wrong time and there will be a serious accident.*[103]

127.   On December 30, 2006, Virginia Aranda, the owner of a 2006 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> *The car keeps dying on her. Customer states owns Chevy Cobalt 2006. It keeps dying on her.  It happened five times this last week. Customer is afraid something might happen to her since she is elderly.* Customer took the vehicle to the dealership and they said they can't find anything

---

[102] *Id.* at 109:24 – 111:21.

[103] *Id.* at.112:8 – 113:8.

… ***Could have got killed twice because it stalled on her twice.*** Luckily the Lord blessed her and it just floated to the side of the road. Started after that. Five times it stalled on her last week. ***Terrified to go anywhere because she is scared it will stall on her.*** She has never had to drive in the slow lanes.[104]

128.   On January 18, 2007, Dale Johnson, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM. The claim stated, in relevant part: "Customer states has had numerous problems with this car. ***Many warning lights keep coming on, engine stalls, power steering locks up, and this almost causes daughter to have an accident.***"[105]

129.   On January 22, 2007, Tim Edwards, a GM employee and the owner of a 2006 Chevrolet Cobalt, filed a claim with GM. The claim stated, in relevant part:

> Customer states been in and out of dealership for five times. Dealer cannot duplicate the problem on the vehicle. ***Customer states that sometimes when he is driving, the vehicle dies out, and there is something wrong with the transmission.*** He does not enjoy to drive it anymore. He is a GM employee. Wants to speak to us so that he won't file a lemon case.

GM subsequently repurchased the vehicle from Mr. Edwards.[106]

130.   On February 22, 2007, Danielle Fee, the owner of a 2005 Chevrolet Cobalt filed a claim with GM. The claim stated, in relevant part:

> Car shutting off while driving. Lauri Dukette, mother, calling in for daughter. Customer states daughter is traveling distance of one hour and 15 every day to school. Second time this has happened. ***Car shut***

---

[104] *Id.* at 113:25 – 114:25.
[105] *Id.* at 115:3 – 13.
[106] *Id.* at 116:1 – 14.

*off going 55 miles an hour and the car shut off, everything went black, steering locked, which she then had no control. She went into a spin and then came to a stop on the side of the road. Came to a stop in a snowbank.* Called dealership once again this morning. She was not hurt, no damage done, but *mother very afraid something terrible will happen.* Vehicle has been in before, and they could not find anything.[107]

131.   On March 15, 2007, Richard Cline, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

I purchased a Cobalt for my wife nearly two years ago. We have had it in the shop several times and we have had nothing but problems with it. Each month it is something new and she barely drives it. I'm beyond furious because each time we take it to the shop, they mysteriously find nothing wrong with it. The engine stalls, the steering wheel ignition locks up, it leaks, it rattles. The AC surges and locks up. This is ridiculous. *I want something done for the safety of my wife and children before the car breaks down on the side of the road.* Can someone contact me and get this resolved? Apparently no one locally is competent enough to handle the situation.  I would either like to have the car completely repaired, or I feel that her car should be replaced immediately. Please contact me.[108]

132.   On March 19, 2007, Bradley Zinn, the owner of a 2006 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

Vehicle customer states they just got the vehicle back, but they have taken the vehicle to the dealer about four times *and he feels unsafe having his sons in the vehicle because the vehicle has been shutting off* … He is a big man. Jason Nairn at the dealer says that he was going to personally drive it, but he is not sure if he really did that. But *it is not safe to be driving.*  Dealer says that they would call GM. I guess they did call GM, *but he is afraid that it will stall on their boys and put an engine switch on the vehicle. But when you are pulling over, you*

---

[107] *Id.* at 116:19 – 117:12.
[108] *Id.* at 117:17 – 118:12.

***don't have time to be pushing the button***….[109]

133.    On April 13, 2007, Christine Rafool, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Customer states engine stalling. Customer states was purchased for the
> daughter and it stalled. ***Today turning onto the side street and it stalled
> on the daughter while she was driving it.*** Customer states that she has
> filed a lemon law. We do not have a lawyer yet, but we have filed the
> papers. Someone at the place where I filed the lemon law papers told
> me to contact the customer assistance center. ***Having the lights come
> on is not major, but having a car stall while driving is pretty major.
> This car shutting down as my daughter is driving and I want this
> documented so that GM knows that this is a concern with the Cobalt.
> This is a safety issue, and I don't want someone to get killed or
> seriously hurt.*** Customer seeks [to] let GM know what this vehicle is
> doing.[110]

134.    On April 21, 2007, Tyrice Goodwin, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Two-year-old vehicle. Dealer could not find anything wrong. ***Every
> time she hits a bump, the vehicle cuts off.  Almost caused five
> accidents.***  Brought the vehicle to the dealership. Dealer would test
> drive it and still could not duplicate it. Last time customer took the
> vehicle to dealer is April 6, 2007. Service advisor was Jonathan Luther.
> Customer is on the road right now when the concern happened again.[111]

135.    On April 22, 2007, Aaron Loring, the owner of a 2005 Cobalt, filed a

claim with GM.  The claim stated, in relevant part:  "Customer calling about stalling

problem.  ***Customer states the vehicle will lose power when driving and sometimes***

---

[109] *Id.* at 118:17 – 119:22.
[110] *Id.* at 120:7 – 121:9.
[111] *Id.* at 121:12 – 122:1.

***it will turn off.*** Have taken the vehicle into the dealer three times. Was advised that vehicle is fine and they cannot duplicate the problem. ***Customer is afraid to drive it.***"[112]

136.   On May 23, 2007, Trixsy Rivera, the owner of a 2006 Cobalt, filed a claim with GM.  The claim stated, in relevant part:  "Customer states the vehicle already died down on me twice. One was on the highway and the other one was in the road. I almost had an accident because of this, and I want to file a lemon law."[113]

137.   On June 5, 2007, John Ptashnik, the owner of a 2005 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> Car keeps stalling. Customer states that he is very frustrated with this whole situation. My vehicle has been causing a lot of trouble, keeps stalling out when you go over bumps. ***And now, when I go to visit my daughter, we have to cross railroad tracks, and it keeps stalling when we go across. I feel that it is a safety hazard.***[114]

138.   On July 26, 2007, Diana De Jesus, the owner of a 2006 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> ***We had an experience where the vehicle died on us and we put it in neutral and got start [sic].***   Dealer advised that they took car back in May, dealing with Mark, business manager, he vent[s], and tells us all the issues that are going on and the dealer and not giving us the proper treatment. The service manager spoke to this past Wednesday and scheduled appointment for Saturday, and they [are] going to keep me in car and see what they can do.  Problems are just increasing with the car. Vehicle is financed. ***I fear for my safety of myself and my***

---

[112] *Id.* at.122:4 – 14.
[113] *Id.* at 123:6 – 16.
[114] *Id.* at 127:15 – 128:5.

*family.*[115]

139.    On September 5, 2007, Nicole Bradley, the owner of a 2005 Cobalt,

filed a claim with GM.  The claim stated, in relevant part:

> Customer called in having a problem with the vehicle. Customer said
> that the vehicle has been having the same problem for the last two years.
> Customer says – said that the vehicle always loses power. Customer
> said that, while she is driving, the vehicle suddenly jerks and stops.
> Customer said that she already took it to the dealership and all they do
> is reprogram the sensors, but it is still not fixing the problem
> …Customer states I purchased my vehicle in 6 July of 2005. Come
> November or December, I started experiencing issues. ***The vehicle
> would shut off in the middle of the street while I'm driving.*** I have
> been back and forth to the dealership for approximately – ten times
> approximately. Every time I go back to the dealership, they reprogram
> the sensors. ***Before the vehicle would stop, no warning lights will come
> on, except the vehicle will start making funny noises***. The dealership
> have test driver it but have found nothing, this is because it only
> happens sporadically. ***I feel unsafe in the vehicle and do not want to
> be in it anymore.***[116]

140.    On September 10, 2007, Tracy Ashman, the owner of a 2006 Cobalt,

filed a claim with GM.  The claim stated, in relevant part:

> We don't want this vehicle anymore. We have had this issue since we
> bought it. ***The dealer hasn't been able to fix it, and now my daughter
> is hurt and she could have been killed. Was driving on Highway 80
> in Pennsylvania near Lockhaven, driving around 80 miles per hour,
> when the vehicle completely shut off in the middle of the highway. No
> emergency lights, no power, no engine, just dead. Thank God she
> wasn't hit by anything, but she could have. They sent an ambulance
> and police, so I don't know what is happening yet, but this is unsafe***.
> How do I enact the lemon law? … Just wanted to advise you of a vehicle
> being brought into your dealership. Possible PAR case. ***Ongoing issue.***

---

[115] *Id.* at 125:11 – 126:3.

[116] *Id.* at 128:13 – 129:18.

***Vehicle shuts down completely at random, all systems, including electrical. Happened today on highway traveling nearly 80 miles per hour … Customer states what now? I don't want this vehicle. It almost killed her.*** It's a total lemon. The dealer should never have given it back with such a problem if they didn't know how to fix it.  The semi driver nearly plowed her over … ***Vehicle lost all power, completely shut down, all systems, including electrical, while driving nearly 80 miles per hour. Driver injured … Customer has brought to dealer many times regarding random shutdown of vehicle.*** Says unable to duplicate. No repair completed ... ***[S]he was hurt because she is a small woman and hit the steering wheel when the vehicle suddenly stopped because of this problem you can't fix***.[117]

141.  On September 10, 2007, Grace Worth, the owner of a 2005 Chevrolet Cobalt filed a claim with GM.  The claim stated, in relevant part:  "Vehicle shuts off while driving. It shut off yesterday in Boone, North Carolina. Has stalled about eight times, but has been to dealership about three or four times. ***Is concerned because they are in the mountains, and if the vehicle stalls, they could have an accident.***"[118]

142.  On October 29, 2007, Jennifer Barr, the owner of a 2006 Chevrolet Cobalt, filed a claim with GM.  The claim stated, in relevant part:  "Vehicle stalls for no reason, customer states. Third time to dealer. It just keeps stalling. Of[f] the record someone told me it is a manufacturer's defect. ***I'm not putting my child in the car anymore.***"[119]

143.  On November 8, 2007, Jessica Baker, the owner of a 2006 Chevrolet

---

[117] *Id.* at 129:23 – 133:12.
[118] *Id.* at 133:22 – 134:4.
[119] *Id.* at 134:9 – 134:19.

Cobalt, filed a claim with GM. The claim stated, in relevant part: "Vehicle shuts

off completely when driving. Customer states it shuts off when I'm driving, and *I*

*have a 14-month-old. It is not safe because another car almost ran into me because*

*it just [shut] off in the middle of the road.*"[120]

144. On January 1, 2008, Angel Hoyt, the owner of a 2005 Chevrolet Cobalt,

filed a claim with GM. The claim stated, in relevant part:

> Customer states the ignition and the shifter and the wheel locks up and
> car shuts off. One week ago I wrecked the vehicle and it is going to
> cost $5,000, that is how much damage, but I do not have a deductible
> for my insurance. The dealership didn't want to touch it until you said
> we are going to do it, and even when I wrecked the car, the airbags
> didn't deploy. Dealer said that it was in cruise control and there was a
> bad sensor which caused everything to lock up. *My two wrists are*
> *bruised and I hit my head, but I have been back and forth to the*
> *hospital,* and I have insurance for all of that … Customer states I've
> had it for five months and I've had it in the shop three times now re: the
> same problem. Shifter in the ignition keeps going – keeps going bad,
> steering wheel would lock up, and vehicle would shut off. … It
> happened again a week ago … *Driving down the road, the car shut off*
> *and the wheel locked up and I was making a right turn and the vehicle*
> *threw me into the ditch on the right side of the road.*[121]

145. On May 9, 2008, James Gonzales, the owner of a 2006 Cobalt, filed a

claim with GM. The claim stated, in relevant part:

> I would like Chevy to buy back my Cobalt due to continuing excessive
> – continuing excessive defective major parts. *I fear for my family and*
> *myself safety because the Cobalt has died many times while we were*
> *driving on a major road interstate. I fear the next time will cause a*

---

[120] *Id.* at 135:2 – 135:14.
[121] *Id.* at 135:19 – 137:5.

*major accident.* Every month is a new problem.[122]

146.   On July 18, 2008, Andrea Woods, the owner of a 2005 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:

> *Customer states that he is calling on behalf of his daughter. She has a car with major concerns that are life threatening at this point. The vehicle just stops in the middle of highway.* The vehicle is having power steering concerns, fuel injector concerns, CD players, and the key won't fit the ignition correctly. *His daughter is very upset.* She has been working with someone before and the dealer has not – and not getting anywhere regarding the concerns.[123]

147.   On March 12, 2009, Thomas Sperling, the owner of a 2007 Chevrolet

Cobalt, filed a claim with GM.  The claim stated, in relevant part:  "*Son got into an*

*accident this morning and found a TSB about this. What happened was that the*

*vehicle stalled and customer tried to start the vehicle and it did, but it lunged and*

*hit another vehicle.*"[124]

148.   On April 14, 2009, Floyd Yenna, the owner of a 2006 Chevrolet Cobalt,

filed a claim with GM.  The claim stated, in relevant part:

> *Customer can't control vehicle. No steer.  No brake. Customer states we have a 2006 Cobalt. The vehicle encountered an accident.* The dealer said there was nothing wrong with the car. From there, it started quitting. *When it was involved with a second accident early this year. Car was seriously damaged. Vehicle quits and my daughter was driving the car, hit another vehicle.* No one got injured. We brought it to the same dealer, and dealer can't find anything.  It was at the dealer four or five times, twice for the accident. I want the vehicle fixed. The

---

[122] *Id.* at 139:24 – 140:10.
[123] *Id.* at.141:11 – 142:1.
[124] *Id.* at 143:11 – 23.

dealer keeps telling me that they fixed it, but it quits. There was a police report in both accidents … Customer states daughter was at work beginning of January and the car quit on her. We took the car to Bowman Chevrolet for repair. The vehicle was in there for three weeks and she got the car back. When she got it back, she noticed when driving two days after getting it back that it stalled on her. She called the dealer and they said there was something wrong with the power, so they went and got the car. They called her after a couple of days to pick up the vehicle. When a lady called her, she said there was a code on the computer, but she didn't know what it was.  The service tech said he just had to reset it, and she got it back, and the car quit on her three more times, and each time she called the dealer and they would tell her that there was nothing wrong with the car.  ***The last time she was driving down the road when it was snowy and the car died on her while she was driving. She couldn't control the vehicle, and she ended up hitting another vehicle.*** The dealership has been looking at it and they still haven't been able to find anything wrong with the car. All I want is the vehicle to be repaired.[125]

149.   The complaints detailed above were either reported to GM directly, or through a GM dealer.  As noted, many of these complaints were reported directly to a GM employee, called a Customer Relations Manager ("CRM").  Depending on the type and extent of the problem, the CRM representative may raise the issue with another GM employee, called an Area Vehicle Manager ("AVM"), for the purpose of responding to the customer.  The GM departments containing CRMs and AVMs oversee the GM dealerships.  GM also has a Technical Assistance Center ("TAC"), which dealerships can call for assistance with issues, including questions arising from Technical Service Bulletins ("TSB").  A TSB is a message issued by GM to

---

[125] *Id.* at 144:11 – 146:8.

dealers, as opposed to consumers directly, which generally contains information regarding a problem, and a proposed solution.[126]   As detailed further below, in December 2005, GM issued a completely ineffective and insufficient TSB to dealers (but not to customers directly) regarding the ignition switch defects, which instructed dealers to tell drivers to lighten their key rings.

150.   GM consumers also would report complaints directly to GM dealers. These complaints were filed in GM's internal warranty claims database.[127]   In connection with its accounting for product warranties and consistent with its internal accounting policies, GM regularly reviewed these warranty claims.

151.   By way of background, GM vehicle warranties provide that GM will cover the costs of customers' vehicle repairs within the time period and scope of repairs described by each warranty.   As the number of repairs that GM vehicles require under the terms of GM's warranties increases, so does the cost to GM.   As a former GM employee who worked in GM's warranty division wrote concerning GM's warranty system (the "Warranty Paper"):   "Warranty costs take money directly away from corporations' bottom line[s]."[128]   As discussed below, during the

---

[126] Valukas, *supra* note 15, at 91.

[127] *GM Warranty Claims for Ignition Switch Defects on Recalled Vehicles Before the Subcomm. On Oversight and Investigations Democratic Members and Staff, 113th Cong.* (Apr. 1, 2014) (Supp. Mem. of Comm. on Energy and Commerce Democratic Staff).

[128] Jelani H. Ellington, *The Optimization of General Motors' Warranty System by Reducing Mean Time to Discover Failure*, M.I.T. (June 2005) at 3.

Class Period, GM recognized at least $3.1 to $3.4 billion in warranty costs and liabilities annually.

152.   Given the significant associated expenses, the Company closely analyzed warranty costs by vehicle platform and tied GM executives' compensation directly to warranty costs.  According to the Warranty Paper:

> The vehicle line executive's yearly bonus is tied to the success of the vehicle line products.  As sales increase so does his [or her] bonus, conversely, *as warranty cost[s] increase, the vehicle line executive's bonus decreases*.  It is therefore in the interest of the vehicle line executive to make sure that he [or she] minimizes his [or her] warranty costs.[129]

153.   As a result of these financial incentives, GM executives closely monitored and analyzed the cost and frequency of vehicle repairs through the Company's warranty database.  GM's warranty database contained information about vehicle failures and repairs from at least two sources:  (i) GM's QWIK (Quality with Information and Knowledge) database; and (ii) GM's PRTS (Problem Resolution Tracking System) database.[130]

154.   The QWIK database collects information from GM dealerships about GM vehicle repairs.  Service technicians at the dealerships enter information into the QWIK database about each repair, including the vehicle failure's root cause (if known), a labor code based on the location in the vehicle where the failure occurred,

---

[129] *Id.* at 34.

[130] *Id.* at 26-27.

and other facts "verbatim from the customer complaint and the mechanic's root cause analysis."[131]   The QWIK database also contains service bulletins and instructions on repair methods.[132]

155.   GM's PRTS database contains information that GM's engineers enter into the database regarding vehicle failures the engineers have detected.[133]   The PRTS database is another method that GM "uses to track warranty issues and their resolution."[134]

156.   After GM collects this information in the warranty database, the Company uses the database to generate reports, including reports to GM management, as reflected in the flow chart below from the Warranty Paper: [135]



---

[131] *Id*. at 20.
[132] *Id*. at 27.
[133] *Id*. at 26-27.
[134] *Id*. at 24.
[135] *Id*. at 27.

157.   The reports for GM management include charts showing the cost and frequency of vehicle failures.  According to the Warranty Paper:

> Engineers at GM pull data from the warranty database to see failure trends.  This warranty [data] is segregated by vehicle line.  The warranty data is further segregated via labor codes.  The data is then placed in two Pareto charts.[136]  One chart is based upon cost per vehicle (CPV) while the other chart is based upon incidents per thousand vehicles (IPTV).[137]

158.   The contents of GM's warranty claims database are not accessible to the public or to NHTSA.[138]  As described below, dealers also would charge costs associated with these customer claims to GM, providing GM further information.

159.   In 2014, the minority staff of the House Committee of Energy and Commerce conducted an investigation into the extent to which GM knew about the ignition switch defects, and whether GM had appropriately reported that information to regulators.[139]  Specifically, to assess what GM knew, the House Committee of Energy and Commerce minority staff analyzed GM's internal warranty database for the 2.6 million vehicles subject to the First Recall Wave (defined below), which were

---

[136] A Pareto chart "contains both bars and a line graph, where individual values are represented in descending order by bars, and the cumulative total is represented by the line.  The left vertical axis is the frequency of occurrence, but it can alternatively represent cost or another important unit of measure.  The right vertical axis is the cumulative percentage of the total number of occurrences, total cost, or total of the particular unit of measure."  http://en.wikipedia.org/wiki/Pareto_chart.

[137] Jelani H. Ellington, *The Optimization of General Motors' Warranty System by Reducing Mean Time to Discover Failure*, M.I.T. (June 2005) at 21-22.

[138] *Id.*

[139] *Id.*

recalled due to the ignition switch defects.[140]   That investigation identified 133

reported cases, dated from June 2003 through June 2012, related to moving

shutdowns caused by the ignition switch defect.[141]   Specifically, the complaints

detailed "consumers raising concerns directly to GM dealers about vehicles that

were unexpectedly stalling or turning off when going over bumps or when the key

was bumped."[142]   The House Committee of Energy and Commerce concluded that

GM knew about the ignition switch defects and the fact that they caused moving

shutdowns, but did not disclose this information to consumers, the investing public,

or to regulators.   The House Committee concluded:

> In many of these warranty claims, the comments from consumers and
> GM technicians indicate that they had identified the ignition switch as
> the likely cause of the problem.   ***Yet at the same time that GM was
> receiving these consumer complaints, the company continued to deny
> any defect.***   To this day, GM has not reported the vast majority of these
> incidents to National Highway Traffic Safety Administration (NHTSA)
> or revealed them to the public.[143]

    160.   The warranty claims reviewed by the House Committee of Energy and

---

[140] *Id.*

[141] *Id.*; *see* Exhibit A (Table of 133 Warranty Claims for Defective Ignition Switches,
attached as an Exhibit to the *GM Warranty Claims for Ignition Switch Defects on
Recalled Vehicles Before the Subcomm. On Oversight and Investigations
Democratic Members and Staff, 113th Cong., Sess. 2* (Apr. 1, 2014) (Supp. Mem. of
Comm. on Energy and Commerce Democratic Staff).

[142] *GM Warranty Claims for Ignition Switch Defects on Recalled Vehicles Before
the Subcomm. On Oversight and Investigations Democratic Members and Staff,
113th Cong., Sess. 2* (Apr. 1, 2014) (Supp. Mem. of Comm. on Energy and
Commerce Democratic Staff)).

[143] *Id.*

Commerce make clear that Saturn Ion, Pontiac G5, and Chevrolet HHR owners were reporting the same types of ignition switch defect-related issues over and over again, including experiencing moving shutdowns at highway speed, as the drivers of Cobalts in the victim accounts detailed above. For example, the House Committee provided examples of comments in the warranty claims that they reviewed, which detailed the following problems:

- "customer states sometimes when bumping ignition switch area vehicle will shut off";

- "vehicle stalls out when hitting bump/pothole in road, noticed at 50 MPH";

- "customer states when driving vehicle died *at highway speeds*";

- "engine cuts out after hitting bumps";

- "vehicle quit running while driving about *70 MPH* after hitting bump in the highway";

- "most likely cause was key turning to off position when hitting bumps";

- "ignition key turns off when going over bumps";

- "vehicle will shut off if key is bumped – tech verified concern";

- "vehicle shuts off intermittently ... caused by bumping ignition with knee while driving";

- "tech noted there is a potential for driver to inadvertently turn off the ignition"; and

- "key ring heavy and shutting off ignition."[144]

The House Committee provided a number of additional examples of the comments in the warranty claims that they reviewed, all of which revealed that GM knew about the ignition switch defects, the safety concern that they presented to drivers, and that the ignition switch defects were the cause of the moving shutdowns detailed in those complaints.[145]

---

[144] *Id.* (citing Gen. Motors Co., *Warranty Claim from Chevrolet Cobalt Owner,* Sept. 29, 2010; Gen. Motors Co., *Warranty Claim from 2006 Chevrolet Cobalt Owner*, Sept. 8, 2010; Gen. Motors Co., *Warranty Claim from 2007 Pontiac G5 Owner*, July 28, 2010; Gen. Motors Co., *Warranty Claim from 2006 Chevrolet HHR Owner*, Aug. 6, 2010; Gen. Motors Co., *Warranty Claim from 2006 Saturn Ion Owner,* July 21, 2009; Gen. Motors Co., *Warranty Claim from 2006 Chevrolet HHR Owner*, Feb. 28, 2008; Gen. Motors Co., *Warranty Claim from 2006 Saturn Ion Owner*, Feb. 25, 2008; Gen. Motors Co., *Warranty Claim from 2006 Saturn Ion Owner*, Jan. 17, 2008; Gen. Motors Co., *Warranty Claim from 2006 Saturn Ion Owner*, Aug. 29, 2007; Gen. Motors Co., *Warranty Claim from 2006 Saturn Ion Owner*, Aug. 10, 2007).

[145] *See GM Warranty Claims for Ignition Switch Defects on Recalled Vehicles Before the Subcomm. On Oversight and Investigations Democratic Members and Staff, 113th Cong., Sess. 2* (Apr. 1, 2014) (Supp. Mem. of Comm. on Energy and Commerce Democratic Staff) ("car dies while driving … tech test drove found that ignition turn[s] really easy [and] when you hit a bump the switch rolls back" (citing Gen. Motors Co., *Warranty Claim from Ion Owner*, July 2, 2007)); ("car dies out at times when hitting a bump. Looks like ignition turns off. Tech road tested. Found weak spring in ignition switch as cause" (citing Gen. Motors Co., *Warranty Claim from Ion Owner*, Jan. 16, 2007)); ("when hitting bumps in road vehicle has died four times" (citing Gen. Motors Co., *Warranty Claim from Ion Owner*, July 26, 2006)); ("3x when going over bumps the car died" (citing Gen. Motors Co., *Warranty Claim from Ion Owner*, June 29, 2005)); ("ignition turning itself off when hitting bump" (citing Gen. Motors Co., *Warranty Claim from Ion Owner*, Sept. 21, 2004)); ("technician found vehicle stalling due to too heavy of a key chain causing ignition to rotate to 'off' position when hitting bump" (citing Gen. Motors Co., *Warranty*

161.   Indeed, in connection with his testimony before the Senate Committee on Commerce, Science and Transportation on July 14, 2014, Rodney O'Neal, President and CEO of Delphi Automotive stated:   "At GM's direction, in approximately January 2006, Delphi submitted a revised ignition switch with several changes that we understood were ***intended to address warranty concerns***."[146]

162.   In addition to the complaints described above, consumers also reported complaints directly to NHTSA.  As reported by *The New York Times* on September 14, 2014, NHTSA received over ***5,000*** complaints regarding the vehicles subject to the ignition switch recalls, ***2,000*** of which concerned moving shutdowns.[147]  The complaints that NHTSA received concerning the ignition switch defects and resultant moving shutdowns at issue in the vehicles subject to the Second Recall Wave (defined below) are set forth in the attached Exhibit B.  Consistent with the above complaints to GM, the comments in the complaints below to NHTSA, all of which relate to the vehicles subject to the Second Recall Wave (defined below),

---

*Claim from Ion Owner*, Apr. 22, 2004)); ("customer bumped key and car shut off … tech duplicated concern [and] found key not returning to proper spec after starting causing key to easily turn and shut off (citing Gen. Motors. Co., *Warranty Claim from Ion Owner*, June 6, 2003)).

[146] *Examining Accountability and Corporate Culture in the Wake of the GM Recalls: Hearing Before S. Comm. On Commerce, Sci. & Transp., Subcomm. On Consumer Protection, Product Safety & Insurance*, Cong. 113th (July 17, 2014) (Opening Statement of Rodney O'Neal, President and CEO of Delphi Automotive).

[147] Hilary Stout, Danielle Ivory & Rebecca R. Ruiz, *Regulator Slow to Respond to Deadly Vehicle Defects*, N.Y. TIMES, Sept. 14, 2014, http://www.nytimes.com /2014/09/15/business/regulator-slow-to-respond-to-deadly-vehicle-defects.html.

state:

- My 2001 Oldsmobile Alero has been intermittently stalling since April 2006.  I have had my car diagnosed by 3 mechanics all of which can find nothing wrong via their diagnostic machines. Before taking it to GM.  GM hooked the car up to their diagnostics machine and drove it for 20 miles overnight and said they could not find the problem.  ***This is very dangerous because I do not know when the car is going to stall.***  Unfortunately I am ***unable to drive the car on the highway*** for these reasons, it could stall and I ***could be killed*** by someone going fast and running into the back of me.  I only drive the car locally in the city in which I live.[148]

- ***Car dies without any warning.***  Car consistently misfires, hesitates. Occurs quite often.  ***Especially dangerous on the highway and hills***… Asked GM to assist since there have been so many complaints concerning the same issue.  To me this is a manufacturer defect, not a maintenance issue.  Too many people have had this same complaint, some at the purchase of the vehicle new, some like me, bought it used.  ***GM needs to accept this responsibility, before someone is seriously injured or worse dead… [My children's lives] should not be jeopardized because of a car's malfunction***, nor should anyone else's.  ***I can't get rid of this car in good conscience, knowing another person may buy this vehicle and could lose their life or someone else's***… ***This is a safety issue***….[149]

- ***A couple months ago it stalled, while my 17 year old daughter was driving it. There were no engine lights on. This happened to me a couple times and to my husband*** … My husband took it to the GM dealer and we were told it was the battery. We bought brand new battery and installed it. Same day the car would stall.… ***When the car stalls at 20 mph or 55 mph, you have no control of the vehicle. GM won't do anything until there is a diagnosis … It is very dangerous, especially if no warning lights come on. I don't dare to drive it*** ... I can't afford a new car. I also can't afford to keep buying parts that don't fix the

---

[148] NHSTA, *Complaint ID Number 10170384 filed by the owner of a 2001 Oldsmobile Alero* (Oct. 10, 2006).
[149] NHSTA, *Complaint ID Number 10280753 filed by the owner of an Oldsmobile Alero* (Aug. 17, 2009).

problem.  My car is paid off.  I am disabled and can't work … I am unable to drive my car that is registered and insured and GM will not help me.  *I think it is dangerous to tell us to drive the car until a [sic] engine light comes on.*  Any resolutions?[150]

- *While driving north on Alternate 69 Highway at 65 mph at 5:00 p.m., my vehicle abruptly loss power even though I tried to accelerate.  The engine shut off suddenly and without warning.*  Vehicle slowed to a complete stop.  I was driving in the middle lane and was unable to get in the shoulder lane because I had no pickup (unable to give gas to accelerate) so *my husband and I were caught in five 5:00 traffic with cars whipping around us on both sides and many exceeding 65 mph.*  I put on my emergency lights and immediately called On-Star.  I was unable to restart the engine. Thank God for On-Star because from that point on, *I was in terror witnessing cars coming upon us not slowing until they realized I was at a stand still with lights flashing.  The cars would swerve to keep from hitting us.  It took the highway patrol and police 15 minutes to get to us but during that time, I relived visions of us being killed on the highway.  I can't describe the horror, looking out my rear view mirror, witnessing our demise time after time.*  Those 15 minutes seemed like an eternity. When the highway patrol arrived they closed lanes and assisted in pushing car out of the highly traffic lanes.  It took my husband and I both to turn the steering while in neutral … if I could afford to purchase another car I would because *I don't feel safe any longer in this car. Emotionally I am still suffering from the trauma.*[151]

- While driving at 55-60 mph in 5:00 p.m. Baton Rouge, LA traffic on Joor Road, I heard the doors automatically lock, then the engine died*, I lost power including steering, brakes, and almost caused a terrible pile-up as my car stopped in heavy traffic. I had no ability to steer, brake, no power.  I was at the mercy of God and this dead car, praying that no one was killed.*  I eventually was able to coast to a stop.  Other vehicles were able to move to other lanes, abandoning me to the right hand lane of traffic*.  I called Onstar [a subsidiary of GM] and they*

---

[150] NHSTA, *Complaint ID Number 10448559 filed by the owner of a 2005 Buick LaCrosse* (Feb. 20, 2012).
[151] NHSTA, *Complaint ID Number 1066120 filed by the owner of a 2008 Buick LaCrosse* (July 24, 2014).

> ***should have the recording of the conversation, the terror I was in, and their instructions.*** I have 4 recorded incidences of the repetitive nature of this vehicle malfunction…. My experiences with GM management was horrific.[152]

163. As reported by *The New York Times* on September 14, 2014, Jessica Cruickshank similarly experienced terror resulting from moving shutdowns in her 2004 Pontiac Grand Prix:

> During the summer of 2005, it was pitch black on an interstate highway in rural West Virginia when Ms. Cruickshank's car shut off and she had to wrestle the wheel to bring it to the side of the road. Trucks whizzed by in the dark, and her 2004 Pontiac Grand Prix shook as they did. In the back seat of the car, her youngest daughter began to cry. ***"You can see how a young child would be frightened,"*** Ms. Cruickshank said in an interview. ***"I was afraid too."***[153]

While NHTSA declined to open a safety defect investigation into the incident, GM's subsidiary, OnStar, concluded after performing a diagnostic test that there was "a distinct probability that the air bags would either not deploy or misfire in the event of a front-impact collision."[154] GM repurchased the vehicle from Ms. Cruickshank.[155]

164. Moreover, according to *The New York Times*, by the time the Impala

---

[152] NHSTA, *Complaint ID Number 10577199 filed by the owner of a 2007 Buick Lucerne* (Apr. 3, 2013).

[153] Hilary Stout, Danielle Ivory & Rebecca R. Ruiz, *Regulator Slow to Respond to Deadly Vehicle Defects*, N.Y. TIMES, Sept. 14, 2014, http://www.nytimes.com/2014/09/15/business/regulator-slow-to-respond-to-deadly-vehicle-defects.html.

[154] *Id.*

[155] *Id.*

was recalled in June 2014, NHTSA had received over *1,000* complaints related to ignition switch defects in those vehicles.[156]  In addition, Stephanie Rogers wrote to NHTSA in October 2007 concerning a number of complaints regarding moving shutdowns that she had collected from the internet.  She wrote, ***"This is an extremely dangerous problem, and since I am not the only one dealing with this issue I am wondering why no letters are being sent."***[157]

165.  First-hand accounts from Cobalt owners in complaints filed with NHTSA similarly detail the shock and horror that occurs during a sudden moving shutdown.  For example, a Cobalt owner reported in July of 2013: ***"This is really scary when I pull out in busy traffic! I was almost T boned one day …."***[158] Another Cobalt driver similarly reported: "***This has almost cause[d] driver behind me to rear end my car.***  Thank goodness, I nor my children have been injured due to this malfunction."[159]

166.   As another example, in 2004, journalist Scott Oldham took a Cobalt for a test drive at an industry event for journalists and analysts in connection with the Cobalt's initial launch.  Oldham recounted:

> And I remember coming up to a curve, and I moved my foot, and as I moved my foot, my knee kind of pinned this key fob between my knee

---

[156] *Id.*

[157] *Id.*

[158] NHSTA, Claim Number 10524200 (July 10, 2013).

[159] NHSTA, Claim Number 10345421 *filed by owner of a 2006 Chevy Cobalt* (July 26, 2010).

and the steering column.  And when I hit the brake, my leg moved down.  And it basically pulled the key down and shut the car off.  ***There was this moment of panic where I said, "Oh my God, the steering isn't working…."***[160]

167.   As noted above, GM was also required under TREAD to submit EWR reports to NHTSA.  GM filed 2,039 Death and Injury reports with NHTSA on the vehicles subject to the ignition switch recalls at issue in this case.[161]  From 2004 through 2007, GM sent NHTSA 19 summary EWR death reports on issues likely to be related to the ignition switch defect.  In response to NHTSA's requests for more information about the cause of the accidents, referred to as "Death Inquiries," GM sent to NHTSA the underlying records behind 17 of the 19 reports, including Wisconsin State Trooper Keith Young of the Technical Reconstruction Unit's ("Trooper Young") 2007 report on the ignition switch defect, described below.[162]  GM's own submissions to NHTSA concerning deaths and injuries make clear that GM knew the true and obvious danger presented by moving shutdowns.

168.   Tragically, the danger of moving shutdowns is increased if the driver of the car is young and inexperienced.  According to safety experts interviewed by

---

[160] Sonari Glinton, *The Long  Road to GM's Ignition Switch Recall*, NPR, Mar. 31, 2014, http://www.npr.org/2014/03/31/297312252/the-long-road-to-gms-ignition-switch-recall.

[161] Letter from Clarence Ditlow, Exec. Dir., Center for Auto Safety, to Anton R. Valukas, Jenner & Block (June 17, 2014), http://www.autosafety.org/sites/default/files/imce_staff_uploads/Valukas%20Letter%206-17-14.pdf.

[162] *Id.*

*The Associated Press* in connection with an article entitled "GM Recall: Many Victims Were Young Drivers," dated April 1, 2014, in the event of a moving shutdown, "inexperienced drivers are more likely to panic and be overwhelmed by the extra effort to control the car." This is compounded by the fact that, as discussed below, many of the vehicles subject to GM's belated 2014 recalls were directly marketed to young drivers.

169. Indeed, safety experts reported to *The Associated Press* that younger drivers have no experience driving without power steering, rendering them more likely to panic and have difficulty maneuvering a car that has shut down to safety. This is because the loss of power steering makes it physically much more difficult to steer the car. As young driver Kelly Bard reported to *The Associated Press* when her 2004 Ion experienced a moving shutdown on the highway: ***"It went from being able to steer with two fingers to using all of my ability to pull off and keep away from the intersection and get out of oncoming traffic."***[163] In another instance when Ms. Bard's Ion shut down without warning, she recounted: ***"I thought I was going to get T-boned by [a] bus."***[164]

170. Heather Heaster, a 16-year-old owner of a 2005 Cobalt, similarly

---

[163] Tom Krisher, *GM recall: Many Victims Were Young Drivers,* ASSOCIATED PRESS, Apr. 1, 2014, http://bigstory.ap.org/article/gm-recall-many-victims-were-young-drivers.
[164] *Id.*

recounted her own experience of a moving shutdown on the highway and her loss of power steering and power brakes: "You saw the speedometer and the fuel gauge and they all just went to zero. *I couldn't turn my wheel because the power steering cut out. And the brakes, I went to stop, and you couldn't push them in.*"[165]

171.   Bill Visnic, Senior Editor at Edmunds.com and a driver of test vehicles for over 20 years, similarly confirmed with respect to the Cobalts, Saturn Ions, and other cars recalled by GM due to the ignition switch failure:  "It's a young person's car.  When you turn the ignition and you lose power steering, especially, it's a very panicky feeling."[166]

172.   Indeed, according to Bill Van Tassel, Manager of Driver Education for the American Automobile Association who was also interviewed by *The Associated Press*, many drivers' education programs cover shutdowns only in the classroom, leaving young drivers with no practice in handling vehicle shutdowns while on the road.  As Anne McCartt, Senior Vice-President of Research for the Insurance Institute for Highway Safety put it, "I think emergency situations bring out [inexperience and immaturity in young drivers].  They're kids.  They're young.

---

[165] Jeff Green & Patrick G. Lee, *Grieving Parents Wonder if GM Recall Connected to Kids' Final Drives*, POSTMEDIA BREAKING NEWS, Mar. 28, 2014, at 3.
[166] *Id.*

They may not have as much cool, or presence of mind as an adult might have."[167]

173.   In addition to the increased risk to young people and inexperienced drivers in the event of a moving shutdown, there is also an increased risk to drivers lacking significant upper body physical strength, due to the demanding physical effort required to control a car that has shut down.  Many of the victims in these crashes "were women, who safety experts say are less likely to have the upper body strength to wrestle a stalled car safely to the side of the road."[168]  In addition, as detailed below in ¶387, many of the victims of the vehicles with defective ignition switches had rented those cars, and therefore did not have any experience driving the vehicles at issue prior to being thrust into the risky and potentially life-threatening event of a moving shutdown.  Moreover, with respect to those individuals that are more prone to panic or lack the strength to control a car experiencing a moving shutdown, there is an increased risk that the impact of the shutdown will push those individuals into the steering wheel, causing additional injury, as detailed in the account of victim Ms. Ashman at ¶140 above.  As noted, however, the risks stemming from moving shutdowns are not limited to these groups. Moving shutdowns present a serious safety hazard to even the most experienced

---

[167] Tom Krisher, *GM recall: Many Victims Were Young Drivers,* ASSOCIATED PRESS, Apr. 1, 2014, http://bigstory.ap.org/article/gm-recall-many-victims-were-young-drivers.
[168] *Id.*

drivers, as detailed above at ¶¶64-148, 160, 162-66 and Exhibit B hereto.

174.   In sum, as the above first-hand victim accounts make clear, moving shutdowns, including specifically those at issue in this case given the faulty ignition switches described below, present a serious safety hazard that puts lives at risk, causes panic and fear in the drivers of the vehicles, and renders those that survive the incident afraid to get behind the wheel again.  Indeed, in her testimony before the House Committee on Energy and Commerce in April 1, 2014, GM's CEO Mary Barra ("Barra") *finally admitted that moving shutdowns are a safety defect*:

> Congressman Gregg Harper:   "When your engine suddenly cuts off when you are driving on the highway, would you consider this a safety issue?"
>
> Ms. Barra:  *"Yes."*

175.   Ms. Barra further testified before the House Committee on Energy and Commerce on April 1, 2014, "What I can tell you is that any time a vehicle stalls now, we consider it to be a safety issue."

### 4.   The Valukas Report's Flawed Conclusions

176.   Critically, nearly all of the first-hand complaints described above that make clear the serious safety risks of a moving shutdown were omitted from the Valukas Report, commissioned by GM to investigate its conduct regarding the long delayed recalls discussed below.  While Lead Plaintiff cites specific relevant facts from the Valukas Report in this Complaint, Lead Plaintiff does not accept or

incorporate any of Valukas' conclusions, including that a moving shutdown could be dismissed as a mere customer convenience or satisfaction issue.  Indeed, Lead Plaintiff has serious objections to the pro-GM conclusions of the Valukas Report commissioned and paid for by GM, and those conclusions are not incorporated into this Complaint.  There are numerous bases for Lead Plaintiff's objections.

177.  **First**, Valukas admits that he was rushed, and that his review of relevant documents was ongoing and incomplete at the time he issued the Report.[169]

178.  **Second**, as noted above, the Valukas Report itself makes clear that there are vast amounts of key relevant data that Valukas did not take into consideration when preparing the Report.  For example, Valukas states on page 279 of the Report that he did not take EWRs (Early Warning Reports) into consideration.[170]  As the Center for Auto Safety and others have observed, the lack of review of EWRs is a glaring omission.  Indeed, according to the Center for Auto Safety, "the 2,039 Death and Injury Reports filed under EWR by GM with NHTSA on the recalled vehicles are the single biggest repository of information on real world ignition switch related

---

[169] *See* Valukas, *supra* note 15, at 5 ("Jenner was asked to complete this task on a very expedited time table"); *id.* n.3 ("As part of this investigation, review of documents (discussed in greater detail below) continues on a daily basis.  To the extent that review yields additional relevant documents that materially change the contents of this report, such information will be provided to the Board").

[170] *See id.* at 279 ("We do not understand that GM is alleged to have violated its obligation to submit these EWRs, and such routine reporting is not the focus of this investigation.").

deaths, injuries and crashes at GM. Yet, the Report doesn't address these files, who received them at GM, how they are analyzed and sent to NHTSA."[171]

179. In addition, at the time that Valukas prepared the Report, he did not have access to vast amounts of relevant documents and correspondence from GM's ignition switch manufacturer, Delphi Mechatronics ("Delphi").[172] Valukas also conceded that he did not review Board correspondence prior to 2003. As a result, he did not review the 2002 letter from former Head of General Motors corporate quality audit, McAleer, to GM's Board of Directors, in which McAleer detailed serious quality problems at GM, and called upon the Company to "stop the continued shipments of unsafe vehicles"; "recall suspected vehicles already in customers' hands"; and "replace the current quality flow chart to make that organization independent of corporate politics and cost-cutting concerns," as detailed below at ¶345.

180. **Third**, the Valukas Report omits any discussion of key relevant events. For example, the Valukas Report says nothing of GM Recall 04V-289, in which GM's top committees determined to recall certain 2002 model year Oldsmobile Bravada and GMC Envoy vehicles for engine shutdowns pursuant to a GM 573

---

[171] Letter from Clarence Ditlow, Exec. Dir., Center for Auto Safety, to Anton R. Valukas, Jenner & Block (June 17, 2014), http://www.autosafety.org/ sites/default/files/imce_staff_uploads/Valukas%20Letter%206-17-14.pdf.

[172] Valukas, *supra* note 15, at 13.

Report signed by Defendant Kent, an issue which GM classified as a safety-related defect. Nor does the Valukas Report reference two additional recalls for engine shutdowns that GM conducted in 2005, or its admission in connection with those recalls that "General Motors recognizes that vehicle stalling may introduce additional risk to motor vehicle safety," as detailed below at ¶¶196-98. Nor does the Valukas Report even acknowledge that on June 30, 2014, GM recalled an *additional 7.6 million vehicles due to a virtually identical defect with a different ignition switch*, as detailed below at ¶¶548-49, 621, and 623. Significantly, as detailed below, GM also did not change the part number when it determined – years before that recall – to replace that defective ignition switch.

181. *Fourth*, recently uncovered facts suggest that the Valukas Report contains significant factual errors. For example, on November 10, 2014, *The Wall Street Journal* reported that emails between Delphi and GM revealed that GM ordered half a million replacement ignition switches on a rush basis two months before it disclosed this safety problem to NHTSA. The Valukas Report does not mention the rush replacement order, and indeed, states in error that GM had not decided on a recall in mid-December 2013 when the parts were ordered, but had instead not decided on a recall until January 31, 2014.[173]

182. *Fifth*, Valukas has a prior history of involvement in investigations into

---

[173] *Id.* at 221-24.

alleged misconduct at GM that result in no findings of fraud.  Specifically, Valukas served as lead counsel for "old" GM in an SEC investigation, spanning four years, which focused on GM's pension accounting.  As Valukas promotes in his own personal biography to prospective clients, this investigation "concluded with no allegations of fraud or intentional misconduct against the client."[174]

183.  **Sixth**, Jenner & Block has very close ties to GM, including involvement with respect to a "variety of matters" concerning the ignition switch defect recalls, as well as involvement with the issuance of the securities at issue in this litigation during the Class Period, which call into question Jenner & Block's ability to conduct an objective investigation free of GM's manipulation and influence.  Significantly, "New GM retained the law firm of Jenner & Block ("Jenner") and its Chairman, Anton R. Valukas, to represent New GM's interests and to provide legal advice to New GM in a variety of matters relating to the recalls, ***including the DOJ investigation*** and other anticipated government investigations and civil litigation." Declaration of Michael P. Millikin, dated November 25, 2014, ¶4; *In re: General Motors LLC Ignition Switch Litigation*, 14-MD-2543 (JMF) (ECF No.437-2) (the "Millikin Declaration"); *see also* Declaration of Anton R. Valukas, dated November 25, 2014, ¶2; *In re: General Motors LLC Ignition Switch Litigation*, 14-MD-2543

---

[174] Jenner & Block, *Our People, Anton R. Valukas*, http://jenner.com/people/AntonValukas (last visited Jan. 15, 2015).

(JMF) (ECF No. 437-1) ("In late February 2014, the United States Department of Justice opened a criminal investigation relating to certain recalls. New GM retained Jenner to represent New GM's interests and to provide legal advice to New GM in a variety of matters relating to the recalls, including the DOJ investigation and other anticipated government investigations and civil litigation."). Moreover, Jenner & Block served as counsel to GM in all of GM's stock offerings during the Class Period of this case, including GM's November 2010 IPO and July 2013 secondary offering, as well as a secondary offering in August 2013, a private debt offering in September 2013, and a public debt offering of $2.5 billion in senior notes in November 2014.[175] In addition, former GM General Counsel Robert Osborne is employed by and holds the position of "of counsel" at Jenner & Block.[176]

184.   Notwithstanding Lead Plaintiffs' objections that the conclusions of the Valukas Report are flawed and improperly biased toward GM, even the Valukas Report cannot escape the conclusion that "throughout the entire 11-year odyssey,

---

[175] *See* Press Release, Gen. Motors Co., *General Motors Company Commences $13 Billion Public Offering* (Nov. 3, 2010), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2010/Nov/1103_134.html; Press Release, Gen. Motors Co., *General Motors Announces Increase in Size of Public Offering of Common Stock* (Nov. 17, 2010), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/global/en/2010/1117_amendment.html; Press Release, Gen. Motors Co., *GM Prices $4.5 Billion of Senior Unsecured Notes* (Sept. 24, 2013), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2013/Sep/0924-unsecured-notes.html.
[176] *See* Valukas, *supra* note 15, at 14.

there was no demonstrated sense of urgency, right to the very end." Yet, Lead Plaintiff seeks to rely herein, as discussed below, only on facts reported by the Valukas Report, and none of its flawed and improper conclusions.

### 5. GM And NHTSA Recognize Moving Shutdowns As A Safety Defect In 2004-2005

185. GM's prior experience with moving shutdowns and responses to NHTSA in 2004 – 2005 further demonstrate GM's awareness of the safety issues raised by moving shutdowns. According to the Valukas Report, in 2004, NHTSA was focused on moving shutdowns across the automotive industry and several recalls related to vehicle shutdowns (not concerning the cars at issue in this case) occurred in this time frame.[177] Defendant Kent, the former Director of Product Investigations at GM who was interviewed by Jenner & Block, reported to Valukas that in 2004, NHTSA was focused on establishing a protocol that would be used to assess incidents of vehicle shutdowns.[178] During this same time frame, GM was attempting to avoid recalling certain 2002 Oldsmobile Bravada and GMC Envoy model vehicles due to a defect in the Electronically Controlled Air Suspension (ECAS) system which caused these vehicles to inadvertently shut down.[179]

---

[177] *Id.* at 72.

[178] *Id.*

[179] Letter from Clarence Ditlow, Exec. Dir., Center for Auto Safety, to Anton R. Valukas, Jenner & Block (June 17, 2014); Letter from Gay P. Kent, Dir. Prod. Investigations, Gen. Motors, Co. to K.N. Weinstein, Assoc. Adm'r, NHTSA (June 4, 2004).

186.   On January 3, 2003, NHTSA opened a preliminary defect investigation into the shutdown issue with the 2002 Oldsmobile Bravada and Envoy vehicles, and on May 6, 2003, that investigation was upgraded to an "Engineering Analysis."[180] On April 27, 2004, NHTSA informed GM that it was going to convene a panel "to confirm there is sufficient evidence of a safety defect to request GM to recall the subject vehicles."[181]

187.   In connection with NHTSA's announcement, NHTSA and GM held a series of meetings in May 2004 at GM's request during which GM attempted to convince NHTSA that the vehicle shutdowns at issue did not rise to the level of a per se safety defect under the Safety Act.[182]   Specifically, on May 4, 2004, representatives from NHTSA's ODI met with representatives from GM to discuss the investigation.  At the meeting, NHTSA presented the results of phone interviews

---

[180] Letter from Gay P. Kent, Dir. Prod. Investigations, Gen. Motors Co., to K.N. Weinstein, Assoc. Adm'r. For Safety Assurance, NHTSA (June 4, 2004).

[181] *Id.*

[182] *See* Letter from Clarence Ditlow, Exec. Dir., Center for Auto Safety, to Anton R. Valukas, Jenner & Block (June 17, 2014), http://www.autosafety.org/sites/ default/files/imce_staff_uploads/Valukas%20Letter%206-17-14.pdf.  The "per se" safety defect category was a framework developed by NHTSA to facilitate manufacturers' identification and elevation of safety-related defects to the agency. The "per se" safety-related defect framework was never intended to be an exhaustive or exclusive accounting of all safety-related defects.  There is no requirement under federal regulations that a safety-related defect must be "per se" in order to be subject to a recall.  On the contrary, the law is clear that a "defect related to motor vehicle safety" creates an unreasonable risk and requires remedial action, as detailed above at ¶¶49-51.

that its ODI staff had conducted with owners of the subject vehicles who had filed

warranty claims due to vehicle shutdowns.[183]  72 interviewees reported that they had

experienced an *"engine cut-off/stall,"* and all 72 of those interviewees further

reported a *"concern for safety."*[184]

188.    In connection with the same defect investigation, on May 17, 2004, five

individuals from NHTSA's ODI visited GM's Milford Proving Grounds, which is a

GM engineering facility in Milford, Michigan that GM uses for vehicle research and

development, and testing.[185]  The purpose of NHSTA's visit was, again, for GM to

convince NHTSA that the moving shutdowns at issue were not a *per se* safety-

related defect by having NHTSA participate in "a ride and drive evaluation of

stalling in the 2002 Envoy, 2004 Saab, and 2004 Malibu."[186]

189.    GM's presentation did not convince NHTSA that the subject vehicles

were safe.[187]  Rather, on May 20, 2004, NHTSA convened its internal panel and

---

[183] Memorandum from Tom Cooper, NHTSA, to file for EA03-007 (May 7, 2004), http://www.autosafety.org/sites/default/files/imce_staff_uploads/EA03-007%20Survey%20of%20GM%20Owners%2076-0%20thought%20stall%20was%20safety%205-4-04%20GM-ODI%20Meeting.pdf; s*ee also* Valukas*, supra* note 15, at 73.
[184] *Id.*
[185] Memorandum from Cynthia Glass, Investigator, NHTSA, to file for EA03-007 (May 17, 2004), http://www.autosafety.org/sites/default/files/imce_staff_uploads/ EA03-007%20May%2017,%202004%20Milford%20Proving%20Grounds%20 Stalling%20Meeting.pdf; s*ee* Valukas*, supra* note 15, at 73.
[186] *Id.*
[187] "This is so notwithstanding the fact that ODI's complaint records for those cars reflect only "one crash and one injury resulting from a stalling incident." *See*

95

confirmed that a recall was warranted.  Six days later, on May 26, 2004, GM's Executive Field Action Decision Committee ("EFADC"), a committee made up of three GM vice presidents including GM's Chief Engineer which is charged with determining when to conduct recalls, decided that a safety recall was necessary.[188]

190.   On June 3, 2004, GM and NHTSA held another meeting regarding engine shutdowns.  According to the Valukas Report, at this meeting, ***GM admitted that shutdowns "occurring on acceleration require more rigorous review."***[189]  In this case, many of the moving shutdowns caused by the defective ignition switches occurred while the cars were in motion, and many at high speeds, as detailed further above at ¶¶64-148, 160, and 162-66.  *See* Exhibit B.  GM also told NHTSA at the meeting that it took "severity, incident rate, and warning to the driver" into account when evaluating whether a shutdown was a safety-related defect.[190]  Here, as detailed above at ¶¶64-148, 160, and 162-66, there was no warning to the driver whatsoever, drivers experienced the problem repeatedly, and many of the accidents caused by the moving shutdowns that were triggered by the defective ignition switches resulted

---

NHTSA, *Defect Investigation Results*, EA03007 (Dec. 29, 2014), http://www-odi.nhtsa.dot.gov/cars/problems/defect/results.cfm?action_number=EA03007&SearchType=QuickSearch&summary=true.

[188] Letter from Gay P. Kent, Dir. Prod. Investigations, Gen. Motors Co., to K.N. Weinstein, Assoc. Adm'r. For Safety Assurance, NHTSA (June 4, 2004); Valukas, *supra* note 15, at 11 (Field Action Decision Committee).

[189] Valukas, *supra* note 15, at 73.

[190] *Id.*

in deaths or critical injury.  Moreover, NHTSA told GM during their June 3, 2004 meeting that a failure to satisfy even GM's articulated factors "did not necessarily 'immunize' a manufacturer from conducting a safety recall."[191]

191.   On June 4, 2004, GM submitted its 573 Report to NHTSA for the (prior and unrelated) Oldsmobile/GMC recall.  In the Report, signed by Defendant Kent, GM admitted that as a result of the possibility of a moving shutdown, it had identified "a safety defect involving certain 2002 Oldsmobile Bravada and GMC Envoy model vehicles."  Specifically, GM explained:

> Some of these vehicles have a condition in which the ECAS may produce a brief electrical spike while the vehicle is operating.  This electrical spike can disrupt the powertrain control module (PCM) *causing the vehicle to stall.*  If the spike damages the PCM, the vehicle may not restart.  *If this happens while the vehicle is moving, a crash could occur without warning.*[192]

192.   Similarly, with respect to the moving shutdowns at issue in this action and covered by the much delayed 2014 recalls, the ignition switch defects caused those vehicles to shut down, and this often occurred when the vehicle was moving, including at highway speeds, as detailed above at ¶¶64-148, 160, and 162-66. Moreover, attempting to restart a vehicle when it is traveling down the highway is extremely disorienting and distracting, and many drivers would not know how to

---

[191] *Id.*

[192] Letter from Gay P. Kent, Dir. Prod. Investigations, Gen. Motors Co., to K.N. Weinstein, Assoc. Adm'r. For Safety Assurance, NHTSA (June 4, 2004).

restart a vehicle in motion or have the presence of mind in the emergency situation to do so, as the candid accounts of the victims detailed above make clear.

193.   On June 11, 2004, Defendant Kent sent a letter to NHTSA addressing the questions NHTSA had raised with GM during GM's June 3, 2004 meeting with NHTSA.[193]  The letter conceded that in the past 20 years, GM had conducted three safety recalls and instituted 17 other field actions for engine shutdowns.[194]  Again, these actions confirm GM's recognition of moving shutdowns as a safety hazard.

194.   GM was compelled to recognize a moving shutdown as a safety-related defect yet again in July 2004, when NHTSA imposed a $1 million fine on GM for GM's failure to conduct a timely recall of defective windshield wipers on 600,000 SUVs and *"certain stalling issues involving recent model Saabs."*[195]

195.   In sum, GM and NHTSA determined on multiple occasions in 2004 (ten years before the defective cars at issue in this case were finally recalled) that an engine shutdown, and particularly a moving shutdown, was a safety defect, creating an unreasonable risk under the Safety Act, and warranting a recall.  This decision is consistent with the precedent created by GM's extensive litigation with the Government in the 1970's and 1980's detailed above at ¶¶54-61.

196.   GM and NHTSA's view that an engine shutdown is a safety-related

---

[193] Valukas, *supra* note 15, at 73.
[194] *Id.* at 73-74.
[195] *Id.* at 239 (quoting GM Board of Directors Report, dated Aug. 3, 2004).

defect was further confirmed by ***two subsequent and unrelated GM recalls for engine shutdowns in 2005.***    Specifically, on April 7, 2005, after a year-long investigation prompted by a NHTSA probe that had advanced to the Engineering Analysis stage, GM's Field Action Decision Committee determined to recall certain 2000-2001 MY 1500 series Chevrolet Suburban and GM Yukon XL vehicles due to a fuel pump safety defect that could ***"caus[e] an engine stall."***[196]

197.   Eight days later, GM's EFADC determined to conduct yet another safety recall for certain 2004 MY Pontiac Aztek and Buick Rendezvous vehicles. The Company then described the ***"safety defect"*** as follows:

> Silica contamination on ignition relay contacts can cause high resistance.  This can affect signals to the powertrain control module and, in some cases, ***cause intermittent vehicle stalls*** under a variety of driving conditions.[197]

198.   In connection with this recall, GM further admitted in a response to a NHTSA Information Request that "General Motors recognizes that vehicle stalling may introduce additional risk to motor vehicle safety."[198]

199.   Throughout 2005 and the years before the start of the Class Period in

---

[196] Letter from Gay P. Kent, Dir. Prod. Investigations, Gen. Motors Co., to Ronald Medford, Senior Assoc. Adm'r, Vehicle Safety, NHSTA (Apr. 14, 2005).

[197] Letter from Gay P. Kent, Dir. Prod. Investigations, Gen. Motors Co., to Ronald Medford, Senior Assoc. Adm'r, Vehicle Safety, NHSTA (Apr. 19, 2005).

[198] Letter from Gay P. Kent, Dir. Prod. Investigations, Gen. Motors. Co., to Jeffrey Quandt, Chief Vehicle Control Division Office of Defects Investigation (Feb. 7, 2005) (GM Response to PE04-075), http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/ACM5056300/INRL-PE04075-20200P.pdf.

this action, both GM and NHTSA continued to develop frameworks for assessing the danger and risk stemming from engine shutdowns. GM offered exceedingly lax standards for moving shutdowns, and was on notice from the Government that NHTSA had rejected them. Specifically, in March 2005, GM's Product Investigations group offered a multi-factor framework called "Applying Stalling Assessment Framework" addressing this exact issue.[199] According to the Valukas Report:

> Factors relevant to the framework included whether a vehicle could be restarted after a stall, whether the ***stall occurred when the vehicle was moving*** or parked, whether the ***driver retained control over power steering and brakes***, and whether the driver received any ***warning signs*** before the stall occurred.[200]

200. The framework also included GM's guiding metric that 20-30 engine shutdowns per thousand vehicles ("IPTV") over the course of three years was acceptable.[201] NHTSA did not accept this guideline as a reasonable assessment of risk. Specifically, in the summer of 2013, Carmen Benavides ("Benavides"), Director of Product Investigations, Safety Regulations, Field Performance Assessment, and TREAD, told NHTSA about GM's 20 IPTV guideline and NHTSA "beat [her] up about it."[202] Indeed, Benavides wrote in an internal GM email dated

---

[199] Valukas, *supra* note 15, at 74 & n.294.
[200] *Id.* at 74.
[201] *Id.* at 74.
[202] *Id.* at 75 n. 301.

August 20, 2013, that when she "visited NHTSA a few weeks back they were clear [] to point out to me that ***they do not prescribe to a 20 IPTV in 3 years***."[203]

201.    NHTSA was simultaneously developing its own framework for assessing when engine shutdowns rose to the level of a "safety-related defect." Specifically, in a petition dated December 28, 2007 related to a shutdown in a Ford Taurus, NHTSA identified the following factors relevant to that determination:

- The ***rate at which stalling occurs*** in the whole population of subject vehicles (often expressed as the number of vehicles that have experienced the phenomenon per hundred thousand);

- the ***speeds*** at which stalling occurs;

- the ***type of operation*** during which stalling occurs (e.g., when starting, accelerating, decelerating, or cruising);

- whether the vehicle can quickly be restarted after stalling;

- whether the stalling affects ***steering functions***;

- whether the stalling affects ***braking functions***; and

- any ***crashes or other unsafe events*** that may have resulted from the stalling.[204]

202.    There is no question that under either GM's own or NHTSA's framework for evaluating the risks stemming from moving shutdowns, especially in combination with the precedent concerning the meaning of a "safety-related defect"

---

[203] *Id.* at 75 n.301.
[204] NHSTA, *Denial of a Petition for a Defect Investigation*, 72 FR 73973-01 (Dec. 28, 2007).

established through NHTSA and GM's litigation in the 1970s and 1980s, the moving shutdowns caused by the defective ignition switches at issue in this case constituted a safety-related defect that should have led to a recall and disclosure to investors before the start of the Class Period.

203.  Indeed, in his September 16, 2014 testimony before the Senate Committee on Commerce, Science and Transportation, Subcommittee on Consumer Protection, Product Safety and Insurance, Acting NHTSA Administrator Friedman testified that there was "no doubt" that moving shutdowns are a safety issue separate and apart from airbag non-deployment:

> SENATOR ED MARKEY: But again, but it has – safety bags not deploying is a safety issue but a car's ignition not working and shutting off the car automatically is a separate safety issue.  So, even if you had no airbags and you were driving in the car, I don't think the American public would feel safe if the car automatically was turning off because there's an ignition problem.  And again, I keep waiting for you to close this gap so that you admit there were two safety issues here.  One was airbags but and the other was the ignition shutting off and the car[] just stalling out perhaps on the highway.
>
> You do agree that's a separate issue and that that was something that the public should have been warned about, do you not?
>
> FRIEDMAN:  ***There is no doubt that stalling can be a serious safety issue.  No doubt***.[205]

---

[205] *Oversight of and Policy considerations for the National Highway Traffic Safety Administration: Hearing Before S. Comm. on Commerce, Sci., & Transp., Subcomm. on Consumer Protection, Product Safety, & Insurance, 113th Cong.* (Sept. 16, 2014) (Statement of David Friedman, NHTSA Deputy Administrator).

204.   Moreover, as detailed below at ¶¶389-432, GM knew by at least 2004-2005 that the moving shutdowns, experienced by primarily young, inexperienced Cobalt and Ion drivers, presented an unreasonable risk and warranted a recall under the Safety Act.  Yet, GM took no action and continued to misrepresent and omit this risk to investors, as detailed below at ¶¶433-34.

### 6.   The Auto Industry As A Whole Routinely Recognizes Moving Shutdowns Are A Safety Defect

205.   GM is not alone in its determination that shutdowns, and particularly moving shutdowns, constitute a safety-related defect that necessitates a recall under the Safety Act.  To the contrary, there have been over ***400 safety recalls for issues related to engine shutdowns over the past 35 years***.

206.   Significantly, as reported by *Automotive News*, over the past 10 years alone, GM's competitors issued 90 recalls for moving shutdown issues, and NHTSA opened 42 investigations into shutdown complaints, which resulted in 31 recalls of over 5.1 million vehicles.[206]   The remaining 60 recalls for shutdowns occurred without the need for any NHTSA investigation.[207]

207. For example, over the past decade, the following top auto manufacturers issued recalls for engine shutdowns:

---

[206] Nick Bunkley, *Why Didn't Stalling Alone Trigger GM Recall?*, AUTOMOTIVE NEWS, May 26, 2014, http://www.autonews.com/article/20140526/OEM11/140529905/why-didnt-stalling-alone-trigger-gm-recall?
[207] *Id.*

- **Honda (2002):** "Worn-out ignition contacts could cause the engine to stall without warning. ***Although the engine will restart in most cases, a vehicle that stalls while driving increases the risk of a crash.***"

- **Ford (2004):** "The filter may become sufficiently blocked to cause the engine to stall, ***which could result in a crash***."

- **Volkswagen (2006):** "The vehicle could stall without warning and ***thus present a potential risk of crash***."

- **BMW (2007):** "If stalling were to occur, the driver may not be able to maintain vehicle speed or acceleration, and the power steering could fail."

- **Toyota (2013):** "It is possible that the hybrid system will shut down while the vehicle is being driven, causing the vehicle to stall unexpectedly, ***increasing the risk of a crash***."[208]

208.   In addition, Honda recalled another 167,000 vehicles in 2007 on the basis that ***"[t]he engine could stall without warning and a crash could occur."***[209] Similarly, in 2010, Nissan recalled over 747,000 SUVs and pick-up trucks, stating: ***"This could cause engine stalling, increasing the risk of a crash."***[210]   As another example, in 2011, Chrysler recalled 250,000 vehicles on the basis that ***"Engine shutoff while driving could increase the risk of a crash."***[211]

209.   The Chrysler 2011 recall is of particular significance here because the shutdowns at issue were caused by ***"inadvertent ignition key [] displacement from***

---

[208] *Id.*

[209] *Id.*

[210] *Id.*

[211] *Id.*

*the run to accessory position while driving causing the engine to shut off.*"[212] Specifically, Chrysler found that "Harsh roadway conditions or driver interaction with the key [fob] can cause the key [fob] position to move to either the ON or ACC detent position. Movement to the ACC (or Accessory) detent position will shut down engine power."[213]

210.   In 2011, Volkswagen also determined to conduct a safety recall based on defects that are virtually identical to the GM ignition switch failure at issue in this action. Specifically, Volkswagen determined, "Some vehicles may experience *inadvertent ignition key* [] *displacement from the run to accessory position while driving causing the engine to shut off increasing the risk of a crash.*"[214]

211.   Accordingly, despite the fact that GM's peers routinely conducted safety recalls for moving shutdowns alone, including two (smaller) recalls in 2011 for the exact same issue that affected the subject cars in GM's 2014 ignition switch recalls, and the auto industry as a whole recognized the issue of moving shutdowns for the safety hazard that it is, GM failed to take action in response to moving shutdowns with respect to its millions of vehicles at issue in this case and continued

---

[212] Letter from David D. Dillon, Chrysler, to Claude Harris, NHTSA (Mar. 1. 2011) (attaching 49 CFR Part 573, Defect and Noncompliance Reports, detailing "safety related defect" and announcing voluntary recall).

[213] *Id.*

[214] Letter from Christopher T. Sandvig, General Manager-Compliance/TREAD Service & Quality, to Daniel Smith, Assoc. Adm'r for Enforcement, NHTSA (Mar. 1, 2011).

to mislead investors regarding the associated risks, as detailed below at ¶¶398-560.

### 7.   GM Recognizes Loss of Power Steering Alone As A Safety Defect In 2010

212.   As another example of GM's inconsistent recognition of safety defects, and in stark contrast to its treatment of the ignition switch defects at issue here which involved a loss of power steering, power brakes, and airbags, GM issued a safety recall of certain Cobalts in March 2010 for power-steering loss alone and admitted that such a defect was a safety issue.[215]   At the time of this recall, GM was worried that if it did not act fast in response to queries from NHTSA regarding the issue, it would be "dragged in" to upcoming Congressional hearings about a recent Toyota recall.   Moreover, consistent with its long history of avoiding recalls and refusing to recognize safety hazards as defects under the Safety Act, GM recalled only some of the affected vehicles, and internally had previously mischaracterized the loss of power steering as a mere "customer satisfaction" issue, as detailed below.

213.   The power steering defect at issue in the March 2010 recall consisted of a sudden loss of electric power steering while driving, which as detailed above, requires the driver to exert an excessive amount of force to maneuver the car.[216]   In January 2009, then-CEO Rick Wagoner personally received a letter from a Cobalt

---

[215] *See* Letter from Gay P. Kent, Dir. of Prod. Investigations and Safety Regulations, Gen. Motors Co., to Daniel C. Smith, Assoc. Adm'r for Enforcement, NHTSA (Mar. 1, 2010).
[216] *Id.*

owner describing the power-steering problem.[217]   Mr. Wagoner circulated the complaint internally at GM,[218] and in January 27, 2009, GM launched an investigation.[219]

214.   On June 9, 2009, "due to a low rate of warranty claims in relation to similar issues and the lack of an identified root cause," GM downgraded the investigation to "monitor status."[220]  According to McAleer, GM executives focused on warranty expenses and often used "low" warranty rates to deny that serious problems and safety defects existed, even though they were being reported to GM. In July 2009, GM identified the root cause of the issue as a problem with the electric power steering (EPS) motor in the vehicles.[221]  A few months later, in October 2009, due in part to "an increase in warranty claims," the investigation was "moved back to active status."[222]  However, nothing in GM's later-filed 573 Report or other public information indicates that a recall was internally contemplated at that time.

215.   On February 16, 2010, NHTSA sent a letter to Defendant Kent, GM's

---

[217] Neil E. Boudette and Andrea Fuller, *General Motors Recall: A Burden of Proof,* WALL ST. J., June 22, 2014, http://www.wsj.com/articles/general-motors-recall-a-burden-of-proof-1403478781.
[218] *Id.*
[219] Letter from Gay P. Kent, Dir. of Prod. Investigations and Safety Regulations, Gen. Motors Co., to Daniel C. Smith, Assoc. Adm'r for Enforcement, NHTSA (Mar. 1, 2010) (PE10-05 Form 573).
[220] *Id.*
[221] *Id.*
[222] *Id.*

then-Director of Product Investigations and Safety Investigations, stating that NHTSA had opened a "Preliminary Evaluation" into the power-steering problem, and specifically, that ODI was going to "investigate allegations of electric power steering (EPS) system failure in … 2005 through 2009 Chevrolet Cobalt vehicles."[223] The letter explained:

> This office [ODI] has received 1,148 reports alleging incidents of failure of the EPS system, ***resulting in sudden and unexpected increases in steering effort***. In approximately 10 percent of the complaints, the driver stated that the EPS failed with ***little or no warning and resulted in some effect on vehicle control.*** Eleven complaints allege that EPS failure caused a crash, with 1 alleging that an injury resulted.[224]

216. Uncharacteristically, GM sprang into action given Toyota's then adverse press and the ongoing Senate investigation concerning Toyota. Less than a month after receiving the Preliminary Evaluation letter, GM convened a meeting of the EFADC and determined to conduct a safety recall of certain 2005-2010 Cobalts and 2007-2010 Pontiacs impacted by the problem.[225] On March 1, 2010, GM issued a 573 Report announcing the recall, signed by Defendant Kent. GM's 573 Report ***admitted***:

General Motors has decided that ***a defect, which relates to motor***

---

[223] Letter from Jeffrey L. Quandt, Chief, Vehicle Control Div., ODI, to Gay P. Kent, Dir. of Prod. Investigations, Gen. Motors, Co. (Feb. 16, 2010).

[224] *Id.*

[225] Letter from Gay P. Kent, Dir., Prod. Investigations and Safety Regulations, Gen. Motors Co., to Daniel C. Smith, Assoc. Adm'r for Enforcement, NHTSA (Mar. 1, 2010) (PE10-05 Form 573).

*vehicle safety, exists* in certain 2005-2010 model year Chevrolet Cobalt and 2007-2010 model year Pontiac G5 vehicles. ***Certain vehicles equipped with electric power steering may experience a sudden loss of power steering assist that could occur at any time while driving.*** If the power steering assist is lost, a message is displayed on the Driver Information Center and a chime sounds to inform the driver. ***Steering control can be maintained, as the vehicle will revert to a manual steering mode, but would require greater driver effort at low vehicle speeds.***[226]

217.   According to the Valukas Report, the only reason that GM took action with respect to the power-steering issue in March 2010 was the concern that if the Company did not act promptly in response to NHTSA's queries, GM might be mentioned in upcoming Congressional hearings regarding Toyota's unintended acceleration recalls.[227]   Internal documents reviewed by Valukas revealed that the power-steering issue: "'was handled in a different manner based on GM's desire to obtain quick resolution and closure of the government investigation.'"[228]

218.   Moreover, Adler, GM's spokesman and manager for safety communications  and the same individual who repeatedly denied publicly that the ignition switch defects were a safety problem as detailed below at ¶419, similarly "remembered that GM had initially been planning to categorize the electric power-

---

[226] *Id.*

[227] Valukas, *supra* note 15, at 140.  At the end of 2009 and early 2010, Toyota instituted a series of recalls for unintended acceleration, meaning that the affected vehicles would suddenly accelerate while in motion.  The Senate Committee on Commerce, Science and Transportation held hearings regarding these recalls, beginning on March 2, 2010.

[228] *Id.* at 140.

steering issue as a customer satisfaction issue, but as a result of the congressional scrutiny of Toyota and the unintended acceleration issues, it was agreed that GM should issue a safety recall before the hearings so that '*we would not get mentioned or dragged in to the Senate.*'"[229]

219.   However, consistent with GM's history of avoiding recalls and failing to recognize safety defects indicative of an anti-recall company culture, GM limited the scope of the March 2010 recalls to exclude the Saturn Ion, even though that vehicle had the same exact steering motor as the Cobalt and Pontiac vehicles that were subject to the recalls.[230]  As later reported by *The Wall Street Journal* based on its review of government records, Saturn Ion "[o]wners began to complain about the steering soon after the vehicles were released."[231]   Yet, as noted above, "GM characterized the problem as a customer satisfaction issue."[232]  This was the case despite the fact that GM had received numerous complaints regarding the steering issue in the Ion and the other seven models that GM eventually recalled for power-steering problems from 2004 to 2014.[233]

220.   Nonetheless, instead of including the Saturn Ion in the power-steering

---

[229] *Id*.

[230] Neil E. Boudette & Andrea Fuller, *General Motors Recall: A Burden of Proof,* WALL ST. J., June 22, 2014, http://www.wsj.com/articles/general-motors-recall-a-burden-of-proof-1403478781.

[231] *Id*.

[232] *Id*.

[233] *Id*.

recall which would, of course, have resulted in more bad publicity and increased costs, GM determined to "extend[] the warranty for the Ion." Specifically, "[o]wners who had steering problems could get the electric motors replaced free – as long as they complained to dealers about the problem and had less than 100,000 miles on their cars."[234]

221. GM further assured NHTSA that no recall of the Ion was necessary because "its owners had complained less frequently than Cobalt and [Pontiac] G5 owners did."[235] A year later, NHTSA conducted its own test of the Ion's power-steering problem. Specifically, NHTSA had 15 Ion drivers drive through a test course, during which NHTSA investigators cut power-steering. Without power-steering, NHTSA determined that drivers ***"needed four or five times more force to turn the wheel."*** Moreover, ***11 out of 15*** participants in the study reported feeling ***unsafe.***[236] Nonetheless, NHTSA officials effectively abandoned the investigation, concluding that they needed more data, and the investigation remained open until March 31, 2014, after which GM included the Ions impacted by the power-steering issue in the series of recalls that GM announced in the spring of 2014.[237] This is but one example of NHTSA's limitations and continued deference to pressures from

---

[234] *Id.*

[235] *Id.*

[236] *Id.*

[237] *Id.*

auto manufacturers, including GM, as detailed below.

**8.    Limitations At NHTSA Exacerbate GM's Cover-Up**

222.    As noted above, in addition to a motor vehicle manufacturer's independent obligations to report safety defects and recall unsafe vehicles, NHTSA is empowered under the Safety Act to independently investigate defects in order to determine whether they are safety-related and to require manufacturers to conduct recalls.    Unfortunately, NHTSA suffers from severe systemic limitations which prevent it from being able to execute these powers effectively.    Indeed, since the agency was established in 1970, NHTSA has ordered only seven recalls in total, and all recalls since 2000 have been voluntarily conducted by the auto manufacturers themselves.[238]    Notably, NHTSA did not order any of the recalls at issue in this action.

223.    Recalls also can be "influenced" by NHTSA, meaning that they are conducted in response to NHTSA's defect investigations.    However, the vast majority of recalls are completely "uninfluenced" by NHTSA, as set forth in the chart below:[239]

---

[238]    U. S. GOV'T ACCOUNTABILITY OFFICE, GOA-11-603, REPORT TO CONGRESSIONAL REQUESTERS, AUTO SAFETY: NHTSA HAS OPTIONS TO IMPROVE THE SAFETY DEFECT RECALL PROCESS (2011).
[239] *Id.* at 8.



Figure 2: Total Voluntary and Influenced Safety Defect Recalls for Motor Vehicles, 2000-2009

224.   The primary systemic problems facing NHTSA are its lack of resources and its failure to use the limited resources that it does have effectively.  The agency is chronically under-funded and under-staffed.[240]   For example, the budget for NHTSA's enforcement sector, ODI, has been continually decreasing since 2006.  Specifically, the ODI's budget decreased from $10.472 million in 2006[241] to $10.429

---

[240] *See* Sean E. Kane, *What Doesn't NHTSA Want You To Know About Auto Safety*, Product Safety & Liability Reporter (Apr. 23, 2012), http://www.autosafety.org/ sites/default/files/imce_staff_uploads/KaneNHTSASafety.pdf. imce_staff_uploads/KaneNHTSASafety.pdf.

[241] Natl. Hwy. Traffic Safety Admin., Budget Fiscal Year 2006.

million in 2007.[242]  By 2010, the ODI budget was down to $9.829 million.[243]  In 2011,

and despite the House Appropriations Committee's recommendation to increase

ODI funding, the ODI's 2011 budget was further cut to $9.81 million.[244]  Although

the budget was increased slightly in 2012 to $10.611 million, by 2013 it was back

down to $10.06 million.[245]  In fact, NHTSA's resources are no real match to the

resources of the private auto industry.   As *The New York Times* reported on

September 14, 2014, NHTSA's entire budget for industry-wide safety defects

investigation of $10.6 million for 2014 is less than the $14.4 million total

compensation package that Defendant Barra stands to earn in 2014 at

GM.[246]  Moreover, as Jacqueline S. Gillian (the President of Advocates for Highway

and Auto Safety) stated in her prepared remarks for the September 16, 2014 Senate

hearing on NHTSA:

> When accounting for inflation over . . . [the past decade], ***NHTSA has effectively experienced a 9 percent decrease in funding for operations and research activities***.[247] The agency's operations and research budget

---

[242] Natl. Hwy. Traffic Safety Admin., Budget Fiscal Year 2008.

[243] Natl. Hwy. Traffic Safety Admin., Budget in Brief Fiscal Year 2010.

[244] Natl. Hwy. Traffic Safety Admin., Budget in Brief Fiscal Year 2011.

[245] Natl. Hwy. Traffic Safety Admin., Budget in Brief Fiscal Year 2013.

[246] Hilary Stout, Danielle Ivory & Rebecca Ruiz, *Regulator Slow to Respond to Deadly Vehicle Defects*, N.Y. TIMES, Sept. 14, 2014, http://www.nytimes.com/ 2014/09/15/business/regulator-slow-to-respond-to-deadly-vehicle-defects.html.

[247] *Oversight of the Policy Considerations for the National Highway Traffic Safety Administration: Hearing Before S. Subcomm. Consumer Protection, Product Safety, & Insurance of the S. Committee on Commerce, Sci. & Transp., 113th Cong*. (2014) (Statement of Jacqueline S. Gillian, President of Advocates for Highway and Auto

of $248 million equates to ***NHTSA receiving less than a dollar for each of the 266 million registered vehicles on the road in the U.S. (94 cents to be exact).*** [248]

225. Moreover, ODI also suffers from inadequate staffing. While NHTSA claims to receive more than ***45,000 complaints annually***, each of which is reviewed by a member of the NHTSA staff,[249] there are currently ***only 51 ODI staff members***.[250] Worse still, only a small number of those individuals have the requisite training to screen incoming information in order to determine whether a safety defect exists.[251]

226. In addition, NHTSA suffers from inadequate and inconsistent processes with respect to investigations, data collections, and recalls.[252] For example, NHTSA's processes suffer from the following systemic problems:

- "NHTSA uses an unstructured process for determining defects and inconsistent or nonexistent criteria for initiating defect investigations."

- "NHTSA makes poor use of available data and refuses to consider

---

Safety), http://saferoads.org/files/GILLAN%20Testimony%209-16-14%20with%20attachments.pdf.

[248] *Id.*

[249] *Examining the GM Recall and NHTSA's Defect Investigation Process: Hearing Before S. Subcomm. Consumer Protection, Product Safety, & Insurance of the S. Committee on Commerce, Sci. & Transp., 113th Cong*. (Apr. 2, 2014) (Statement of David Friedman, Acting Adm'r for NHTSA), http://www.nhtsa.gov/staticfiles/administration/pdf/congressional_testimony/DF_Senate_Testimony_04022014.pdf.

[250] *Id.*

[251] *Id.*

[252] Letter from Sean Kane, Safety Research & Strategies, Inc., to David J. Friedman, Acting Adm'r, NHTSA (Feb. 24, 2014).

information from sources outside the agency or the manufacturer."

- "NHTSA focuses on defects that are easily and inexpensively remedied, frequently ignoring more complicated and dangerous defects."

- "NHTSA has no mechanism to determine the adequacy and scope of a recall and is slow to analyze recall data to determine if defects are being repaired."[253]

227.   Moreover, as reflected in a 2011 report by the U.S. Government Accountability Office ("GAO"), "NHTSA is not consistently using the data it collects from manufacturers to improve completion rates of recall campaigns."[254] While NHTSA claims that about 70 percent of all vehicles subject to a recall are repaired within the 18-month period during which manufacturers provide recall completion data to the agency, the GAO's findings revealed that this is far from the case.[255]   Specifically, GAO found that annual recall completion rates can be as low as 55 percent and, within any given year, some manufacturers have defect recall completion rates as low as 23 percent.[256]   Recall completion rates for safety-related issues, including airbags and vehicle speed control, both at issue here, resulted in some of the lower completion rates at 60 percent and 46 percent, respectively.[257]

---

[253] *Id.*

[254] U.S. Gov't Accountability Office, GAO-11-603, Report to Congressional Requesters, Auto Safety: NHTSA Has Options to Improve the Safety Defect Recall Process (2011) at 24.

[255] *Id.*

[256] *Id.* at 25.

[257] *Id.* at 26.

Based on these findings, GAO recommended that NHTSA use the data available to it more effectively in order to better identify risk factors that might be associated with these low recall completion rates, and take additional steps to monitor ongoing recall campaigns.[258]

228.   The Office of the Inspector General ("OIG") similarly concluded on October 6, 2011 after conducting an audit of NHTSA's ODI, that "ODI needed to improve its processes for identifying vehicle safety defects."[259]   Among other problems, the OIG concluded that (i) NHTSA "lacked adequate processes for recommending investigations of potential safety defects"; (ii) NHTSA "lacked a systematic process for determining when to involve third-party assistance"; (iii) "ODI did not properly document investigations"; and (iv) NHTSA "lacked processes for ensuring an adequate and well-trained investigative workforce." [260]

229.   Recently, the U.S. House of Representatives Committee on Energy and Commerce conducted an investigation into NHTSA's practices in connection with

---

[258] *Id*. at 34.

[259] *Identifying and Investigating Vehicle Safety Defects: Hearing Before the U.S. S. Comm. on Commerce, Sci., and Transp. Subcomm. on Consumer Protection, Product Safety, and Insurance, 113th Cong*. (Apr. 2, 2014) (Statement of the Honorable Calvin L. Scovel III, Inspector General, U.S. Department of Transportation).

[260] *Id*.

the 2014 GM ignition switch recalls at issue in this action.[261]  The House Energy and

Commerce Committee found that NHTSA had repeatedly failed to utilize

information available to it that would have enabled the agency to recognize a safety-

related defect concerning the cars at issue in this action by as early as 2007.

Specifically, the Committee concluded that, among other failures:

- NHTSA failed to consider "consumer complaints and other information received by NHTSA [under the TREAD Act]" and "multiple reports – including a police report and agency-commissioned crash investigations" provided to the agency, instead relying upon "a generalized trend analysis of consumer complaints to assess the potential for a defect";

- NHTSA's investigators did not discuss the agency-commissioned reports or other reports received by the agency, or analyze the details of those reports;

- NHTSA's investigators "failed to track or identify similarities" in reports of three different investigations it had commissioned; and

- "NHTSA's failure to follow-up on information provided to the agency was compounded by a lack of understanding of the vehicle systems and functions implemented in response to the agency's own standards."[262]

230.   As the above indicates, NHTSA lacks the resources necessary to ensure

that the vehicles on the road are safe.  For example, the agency has been criticized

by the Insurance Institute for Highway Safety for issuing partial or incomplete safety

---

[261] *Oversight of and Policy Considerations for the National Highway Traffic Safety Administration: Hearing Before S. Comm. on Commerce, Sci. & Transp.*, Panel 2 (Sept. 16, 2014).
[262] *Id.* at 2-3.

standards.[263]  As another example, NHTSA's compliance testing department ignored its investigators' crash test data when setting priorities for testing based on prior test results.[264]

231.  Similarly, during a Senate hearing in connection with the recall of certain Firestone tires in 2000, Senator Bill Frist stated, "it seems clear to me that NHTSA's biggest challenge, or problem, or deficiency, something that must be addressed, is *a lack of … ability*."[265]

232.  Congressman Charles Gonzalez similarly stated in connection with the Toyota unintended acceleration recalls in 2009 and 2010:  "It appears … that NHTSA lacks the expertise, hampering the ability of … ODI … to examine possible electronic defects in vehicles….  [NHTSA] officials told the committee staff that the agency has no electrical engineers or software engineers on staff."[266]

233.  The National Academies of Science also concluded in a report regarding the Toyota recalls:  "[T]he committee recommends that NHTSA become more familiar with and engage in standard-setting and other efforts involving

---

[263] Ralph W. Hoar, Jr., *Highway Loss Reduction Status Report*, *NHTSA Compliance Test Program Criticized*, Insurance Institute for Highway Safety, Vol. 8, No. 10 (May 7, 1973), http://www.iihs.org/externaldata/srdata/docs/sr0810.pdf.
[264] *Id.*
[265] *On Firestone Tire Defect and Ford Explorer Rollovers: Hearing Before the Comm. On Commerce, Sci. & Transp.*, 106th Cong. (Sept. 12, 2000).
[266] *Response by Toyota and NHTSA to Incidents of Sudden Unintended Acceleration Before the Subcomm. on Oversight and Investigations Comm. on Energy and Commerce*, 111th Cong. (Feb. 23, 2010).

industry … by which manufacturers ensure the safe performance of their automotive electronics systems."[267]

234.   NHTSA's lack of resources and technical expertise, in combination with its inadequate processes, are exploited by vehicle manufacturers, who constantly pressure the agency – through lobbyists and company employees – to minimize the occurrence and scope of recalls and to keep safety problems hidden from the public.  According to Clarence Ditlow, Executive Director of the Center for Auto Safety:

> The agency doesn't have the resources it could and should have.  ***If you look at the opposition from the auto manufacturers, which is much more intense, it's easier for the agency to go along with manufacturers and see if anyone makes a fuss on the public side.***  The manufacturers have people whose sole responsibility is to manage NHTSA and contain the scope of recalls.[268]

235.   This pressure from manufacturers has resulted in NHTSA's failure to identify and address critical risks to public safety, as well as a systemic lack of transparency.   For example, NHTSA "routinely conducts secret, unofficial investigations"; "employs diverse strategies to keep the public from seeing the factual underpinnings of its actions and decisions"; and "abuses the Freedom of

---

[267] The National Academy of Sciences, TRB Special Report 308: The Safety Challenge and Promise of Automotive Electronics: Insights from Unintended Acceleration (2012).

[268] Sean E. Kane, *What Doesn't NHTSA Want You To Know About Auto Safety*, 40 PSLR 485 (Apr. 23, 2012), http://www.autosafety.org/sites/default/files/imce_staff_uploads/KaneNHTSASafety.pdf.

Information Act Process."[269]

236.   Indeed, in the rare case when the agency does impose a punishment on a manufacturer, NHTSA often agrees to minimize public disclosure.  For example, as detailed above, in July 2004, NHTSA imposed a fine of one million dollars on GM for GM's failure to conduct a timely recall of defective windshield wipers on 600,000 SUVs.  GM discovered the problem in late 2002, but failed to conduct the recall until early 2004.  The public learned of the fine for the first time in January 2005, and only because the Center for Auto Safety was able to obtain revelatory documents through a Freedom of Information Act request.[270]  This is because, as detailed in a report presented to GM's Board of Directors in August 2004, *NHTSA had "agreed to downplay the penalty and forego any press release."*[271]

237. NHTSA is also vulnerable to overt manipulation by auto manufacturers.  For example, in the late 1980s and 1990s, Ford successfully avoided a recall of vehicles subject to a thick film ignition module defect by allegedly lying to the agency about the causes of the shutdowns at issue, and hiding and withholding

---

[269] Letter from Sean Kane, Safety Research & Strategies, Inc., to David J. Friedman, Acting Adm'r, NHTSA (Feb. 24, 2014).

[270] Sean E. Kane, *What Doesn't NHTSA Want You To Know About Auto Safety*, 40 PSLR 485 (Apr. 23, 2012), http://www.autosafety.org/sites/default/files/ imce_staff_uploads/KaneNHTSASafety.pdf.

[271] Valukas, *supra* note 15, at 239.

relevant documents from the agency.[272]  The problem at issue in that case was that the thick film ignition module was part of a heat-sensitive electronic system located under the hood of the affected vehicles.  When the temperature under the hood exceeded 125 degrees Celsius, the ignition module would cut out, causing the vehicles to experience moving shutdowns at highway speed.[273]

238.   NHTSA launched five investigations into this issue, but was not able to identify a cause of the shutdown, in part because Ford allegedly withheld relevant documents.  Ford's alleged tactics, combined with the agency's general ineffectiveness and lack of resources, resulted in the agency repeatedly closing its investigations, and erroneously concluding that there was no safety-related defect.[274] Only after a plaintiff filed a class action lawsuit against Ford in 1997, did NHTSA open a sixth investigation and finally realize that Ford had failed to produce key documents to the agency.  By then, the statute of limitations on recalls had passed,

---

[272] *See* Statement of Decision, *Howard v. Ford Motor Co*., No. 763785-2, Alameda Cnty., Cal. Super Ct. 12 (Oct. 11, 2000).

[273] Dawn A. Thomas et al., *The ''Trouble Not Identified'' Phenomenon In Automotive Electronics,* Microelectronics Reliability 42, 641–651(2002).

[274] *See* NHTSA, *Engineering Analysis Closing Report*, EA84-029 (Dec. 4, 1986); NHSTA, *Investigation Subject: STALLING Opened*, PE87-028 (May 1, 1987), http://www-odi.nhtsa.dot.gov/owners/SearchResults;   NHSTA,   *Investigation Subject:   STALLING   Closed*   PE87-028   (Jan.   21,   1988),   http://www-odi.nhtsa.dot.gov/owners/SearchResults; Opening Trial Brief, *Howard v. Ford Motor Co*., No. 763785-2, Alameda Cnty., Cal. Super Ct. 12 (Oct. 11, 2000); NHSTA, *Investigation Subject: Power Loss Opened,* PE89-011 (Nov. 03, 1988); NHSTA, *Investigation Subject: Power Loss Closed,* PE89-011 (Apr. 19, 1989).

and the agency's authority was significantly diminished.[275]    A California judge ultimately mandated a judicially ordered recall of the affected vehicles, and in 2003, Ford settled the class action.

239.    The combination of NHTSA's ineffectiveness, lack of resources, and manufacturer pressure means that it is incumbent upon an auto manufacturer, such as GM, to determine when a "safety-related defect" exists under the Safety Act.  GM, however, as described above, has a decades-long history of resisting recalls in the face of severe and obvious safety hazards. [276]

240.    During the Class Period, NHTSA also did not exercise its full power to investigate the causes of vehicle crashes, and GM was not forthcoming when NHTSA asked GM what caused particular vehicles crashes.    During that time, automakers' responses to NHTSA death inquiries into the causes of particular crashes were *optional*.  As *The New York Times* reported on July 15, 2014, GM:

> repeatedly found a way not to answer the simple question from regulators of what led to a crash.  In at least three cases of fatal crashes . . ., G.M. said that it had not assessed the cause.  In another fatal crash, G.M. said that attorney-client privilege may have prevented it from answering.  And in other cases, the automaker was more blunt, writing,

---

[275] Tim Golden, *Lawsuit Asserts Ford Knowingly Installed Defective Mechanism in Millions of Vehicles*, N. Y. TIMES, Sept. 6, 1997, http://www.nytimes.com/ 1997/09/06/us/lawsuit-asserts-ford-knowingly-installed-defective-mechanism-millions-vehicles.html.

[276] Sean E. Kane, *What Doesn't NHTSA Want You To Know About Auto Safety*, 40 PSLR    485    (Apr.    23,    2012),    http://www.autosafety.org/sites/default/files/ imce_staff_uploads/KaneNHTSASafety.pdf.

"G.M. opts not to respond."  The responses came even though G.M. had for years been aware of sudden power loss in the models involved in the accidents.[277]

241.   As *The New York Times* further reported on September 14, 2014: "The Times reviewed nearly 100 death inquiries obtained under the Freedom of Information Act — including all inquiries made of General Motors, Chrysler and Ford in one quarter of 2012 — and ***found only four cases in which a manufacturer responded to the question***, and none in which a defect in the vehicle was identified." [278]

242.   NHTSA recently changed this policy and practice, in apparent response to the increased scrutiny of it from *The New York Times*, writing to *The Times* that, "All inquiries ***now*** require manufacturers to provide this information" about the cause of a crash.[279]

243.   *The New York Times* also reported on September 14, 2014, its finding that NHTSA "frequently has been slow to identify problems, tentative to act and reluctant to employ its full legal powers against companies."[280]  Indeed, *The New*

---

[277] Rebecca R. Ruiz & Daniel Ivory, *Documents Show General Motors Kept Silent on Fatal Crashes*, N.Y. TIMES, July 15, 2014, http://www.nytimes.com/2014/07/16/business/documents-show-general-motors-kept-silent-on-fatal-crashes.html?_r=0.
[278] Hilary Stout, Danielle Ivory & Rebecca R. Ruiz, *Regulator Slow to Respond to Deadly Vehicle Defects*, N.Y. TIMES, Sept. 14, 2014, http://www.nytimes.com/2014/09/15/business/regulator-slow-to-respond-to-deadly-vehicle-defects.html.
[279] *Id.*
[280] *Id.*

*York Times* reported, even following the passage of the TREAD Act in 2000, "the agency has continued to show sluggishness in its investigations, feeding a perception that it does not stand up to the politically influential, multibillion-dollar automobile industry until it is forced to do so by outside pressure."[281]   Moreover, NHTSA has "not made full use of its legal powers in investigating automakers, which include an ability to force the recall of vehicles and to issue subpoenas to obtain information and documents.  In congressional testimony this spring [of 2014], Mr. Friedman, the agency's acting head, appeared to have limited knowledge of some of the agency's legal powers and its history of exercising them.  Under questioning by senators, Mr. Friedman indicated he did not realize the agency could issue subpoenas."[282]

244.   On October 16, 2014, the leaders of the House Energy and Commerce Committee requested that the GAO conduct a review of NHTSA in the aftermath of the ignition switch recalls.[283]   In its press release announcing the request, the House Energy and Commerce Committee stated:

> … our committee, safety experts, and other industry officials have questioned why NHTSA did not act more quickly to mandate recalls before the auto companies voluntarily did so.  An investigation of the GM recalls by the committee revealed NHTSA lacked a comprehensive understanding of vehicle systems the agency is responsible for

---

[281] *Id.*

[282] *Id.*

[283] Press Release, House Energy & Commerce Committee, *Bipartisan Committee Leaders Seek Government Watchdog Review of NHTSA* (Oct. 29, 2014), http://energycommerce.house.gov/press-release/bipartisan-committee-leaders-seek-government-watchdog-review-nhtsa.

regulating, contributing to the inaction on this defect. As vehicle functions and safety systems become more complex, these findings raise concerns about NHTSA's process for obtaining data and investigating vehicle defects and the agency's broader framework and readiness for adapting to technological advanced in the industries it oversees. [284]

245. On January 8, 2015, *The New York Times* reported that Mark Rosekind, the new head of NHTSA, was concerned about the agency's limitations and inadequate resources, stating:

> This week, Mr. Rosekind said that the safety regulator was overhauling its recall infrastructure to see how it could be improved and said he wanted more resources, including additional workers, for the agency.
>
> ***"This is an agency that's so under-resourced," he said. "It's more severe than I realized from the outside."***[285]

246. In sum, given its limited resources, NHTSA's failure to require a recall of the cars at issue in this litigation cannot serve to excuse GM's failure to meet its own safety obligations sooner.

## D. GM's Obligation And Failure To Investigate And Accurately Report Liabilities To Its Shareholders And Maintain Effective Internal Controls

247. During the Class Period, quarter after quarter, GM materially understated and failed to disclose, the Company's true "Liabilities, Costs and

---

[284] *Id.*

[285] Danielle Ivory, *Honda Fined $70 Million for Underreporting Safety Issues to Government*, N.Y. TIMES, Jan. 8, 2015, http://www.nytimes.com/2015/01/09/business/honda-fined-70-million-in-underreporting-safety-issues-to government. html?smprod=nytcore-iphone&smid=nytcore-iphone-share&_r=0.

Contingencies," which are defined to include the following liabilities, costs and contingencies of GM: (1) Policy, product warranty and recall campaigns for the defective vehicles, which include claims against GM to buy back defective vehicles; (2) Commitments and contingencies, which include personal injury claims against the Company such as those paid for by the Compensation Facility Protocol; and (3) Litigation and any other costs GM has incurred or reasonably expected to incur as a result of its manufacture and sale of the defective vehicles.

248. GM's failure to accurately report and disclose these Liabilities, Costs, and Contingencies was in direct violation of its obligations under the applicable accounting rules and guidance to properly account for and disclose those risks and costs. GM also violated its independent obligation under federal law to maintain effective internal controls over financial reporting, and to disclose any material weaknesses with respect to those deficient controls. This section describes GM's obligations to investigate and accurately report the Company's true Liabilities, Costs and Contingencies, its historic failure to do so, the false assurances it provided to investors regarding the accuracy and sufficiency of its reporting and controls at the start of the Class Period, and subsequent admissions by GM insiders that the Company's processes and controls were patently inadequate.

### 1. GM's Obligation To Investigate And Accurately Report Liabilities

249. As noted, GM is obligated under the applicable accounting rules and

guidance to properly account for and disclose the risk of loss resulting from its product warranty and recall obligations, claims arising from injuries or damage caused by products sold, and the adverse outcome of litigation and GM purported to do so during every quarter of the Class Period.  This mandate included GM's obligation to accurately account for and disclose the Liabilities, Costs, and Contingencies.  However, GM did not do so.  Rather, at every turn, GM sought to cover up and hide from investors the true costs and risks arising from the ignition switch defects.  GM consistently and repeatedly failed to adequately account for and disclose these costs and risks in its financial disclosures, including by understating the Liabilities, Costs, and Contingencies, as detailed below.

(a)     **Relevant GAAP And Accounting Provisions And Guidance**

250.   GAAP refers to the framework of guidelines for financial accounting used by accountants to prepare financial statements.  The SEC has the statutory authority to codify GAAP, and has delegated that authority to the Financial Accounting Standards Board ("FASB").  SEC Regulation S-X states that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  During the Class Period, GM represented that its financial statements were presented in conformity with GAAP, as relevant to the allegations set forth in this Complaint.

251.   GAAP provides a series of rules for how and when to set Liabilities,

Costs, and Contingencies.  Chief among these is FASB's Accounting Standards Codification ("ASC") Topic 450, formerly known as Statement of Financial Accounting Standards No. 5 ("FAS 5").[286]

252.  ASC Topic 450 (formerly, FAS 5) governs when companies such as GM are required to recognize loss contingencies, including those resulting from product warranty and recall obligations, claims arising from injuries or damage caused by products sold, and the adverse outcome of litigation.  Specifically, GM is required to record and disclose a loss contingency when two criteria are met: (i) based on information available prior to the issuance of the financial statements, it is probable that the loss will occur, and (ii) the amount of the loss can be reasonably estimated based on GM's experience or reference to that of other entities in the same business as GM.[287]

253.  This first prong – ***probability of impairment*** – occurs with respect to warranties when, based on current information and events, it is probable or likely

---

[286] In June 2009, the FASB issued Statement of Financial Accounting Standards No. 168, which announced the launch of its Accounting Standards Codification ("ASC" or the "Codification"), declaring it "the single source of authoritative nongovernmental U.S. generally accepted accounting principles."  The Codification, effective as of September 2009, organizes the many existing pronouncements that constituted U.S. GAAP at the time into a consistent, searchable format organized by Topics.  The standards are referenced herein under both their original designations and as referred to under the Codification.

[287] ASC Topic 450 further provides that companies must disclose contingent losses that are "reasonably possible," which is defined as any event in which the likelihood is greater than slight, but less than probable.

that customers will make warranty claims on vehicles they purchased.  Guidance regarding ASC Topic 450 further provides that accruals for product warranties should be made at the time of sale, and not as the warranty claims are presented.[288]

254.   Similar to warranties, "automotive manufacturers typically accrue for recall claims when a vehicle is sold."[289]  During the Class Period, GM's policy was to accrue for recall claims when "it is determined a specific recall campaign is needed and announced," as detailed below at ¶264.[290]

255.   With respect to injury or damage caused by products sold, ASC Topic 450 guidance provides that such a contingent loss is "probable" when (1) a product poses a known health or safety hazard, or caused physical injury, and (2) it is likely that the condition or injury has resulted in a liability to the company.

256.   ASC Topic 450 also contains guidance regarding pending or threatened litigation.  Specifically, ASC Topic 450 provides that the following factors must be taken into account in determining when the litigation loss is "probable."  These factors are: (a) the nature of the litigation, claim or assessment; (b) the progress of

---

[288] CHH Accounting Research Manager, *Warranties and Other Obligations (U.S. GAAP)*.

[289] Chris Walker & Scott Cederburg, *Addressing Common Business Challenges Associated with Manufacturer Warranties*, WARRANTY WEEK, Jan. 31, 2013, http://www.warrantyweek.com/archive/ww20130131.html; *see, e.g.*, Toyota Motor Corp., Annual Report (Form 20-F) (June 24, 2014), at 81; Ford Motor Co., Annual Report (Form 10-K) (Feb. 18, 2014), at 78.

[290] Gen. Motors Co., Quarterly Report (Form 10-Q) (July 24, 2014), at 6.

the case (including progress after the date of the financial statements but before those statements are issued); (c) the opinions or views of legal counsel and other advisors (although, the fact that legal counsel is unable to express an opinion that the outcome will be favorable to the entity is not necessarily determinative of whether disclosure is required); (d) the experience of the entity in similar cases; (e) the experience of other entities; and (f) any decision of the entity's management as to how the entity intends to respond to the lawsuit, claim or assessment (for example, a decision to contest the case vigorously or a decision to seek an out of court settlement).

257.   The second prong of ASC Topic 450 – *reasonable estimation* – is satisfied when information that is available to GM indicates that the estimated amount of loss is within a range of amounts specified within ASC Topic 450. ASC Topic 450 further provides, "The[s]e conditions [] are not intended to be so rigid that they require virtual certainty before a loss is accrued."[291]

258.   GAAP also prescribes that certain information must be disclosed to public company investors. With respect to product warranties and recalls, ASC Topic 460, formerly known as FASB Interpretation No. 45 ("ASC Topic 460"), provides that companies such as GM must make additional specific disclosures of

---

[291] GAAP also contains specific rules regarding disclosures that companies such as GM must make when they determine that a loss is probable. Generally, ASC Topic 450 provides that a disclosure of probable loss must include the nature of the accrual made, and in some circumstances, the amount accrued. ASC-450-20-50-1.

the following information:

(a)    Disclosures about a guarantor's obligation;

(b)    The guarantor's accounting policy and methodology used in determining its liability for product warranties; and

(c)    A tabular reconciliation of the changes in the guarantor's aggregate product warranty liability for the reporting period, including specified amounts.[292]

259.    In addition to GAAP, professional audit standards established by the Public Company Accounting Oversight Board ("PCAOB") provide that GM was responsible for the preparation of accounting estimates, including the Liabilities, Costs, and Contingencies at issue in this action.  Specifically, the PCAOB provides that a company's management "is responsible for establishing a process for preparing accounting estimates."[293]   That process must include the following key steps:

- "Identifying situations for which accounting estimates are required";

- "Identifying relevant factors that may affect accounting estimates";

- "Accumulating the relevant, sufficient, and reliable data on which to base the estimate";

- "Developing assumptions that represent management's judgment of the most likely circumstances and events with respect to the relevant factors";

- "Determining the estimated amount based on the assumptions and other relevant factors"; and

- "Determining that the accounting estimate is presented in conformity with applicable accounting principles and that disclosure is

---

[292] ASC 460-10-50-8.
[293] PCAOB Auditing Standard AU §342.05.

adequate."[294]

260.   For example, an article in the industry publication, *Warranty Week*, co-authored by PricewaterhouseCoopers LLP's Midwest Actuarial Practice Leader, describes how to estimate warranty losses, including the importance of "capturing the right data, including transactional level data."[295]  Specifically, the authors advise companies to consider the following types of data and analysis in estimating warranty losses:

- "Product information, which may include make, model, model year, component pairing, build location (including country), build date and in-service date";

- "Claim information, [which] provides a means for tracking warranty performance …";

- "Data segmentation," *i.e.*, data that is "available at the transactional level …"; and

- Time lags "between the date a claim is made, the date a repair is completed, and the date the claim is processed by the manufacturer."[296]

### (b)   GM's Internal Accounting Policies

261.   Companies must have accounting policies and procedures in place to ensure that their financial reporting complies with GAAP.  In this regard, GM was obligated to ensure that information relevant to its accounting for the Company's

---

[294] *Id.*

[295] Chris Walker & Scott Cederburg, *Challenges of Manufacturer Warranties*, WARRANTY WEEK, Jan. 31, 2013, http://www.warrantyweek.com/archive/ww20130131.html.

[296] *Id.*

Liabilities, Costs, and Contingencies was communicated by the individuals who obtained the initial knowledge of the relevant information to those individuals responsible for setting and approving those Liabilities, Costs, and Contingencies on a timely basis. On the front end, this included, among others, the GM employees charged with identifying and cataloguing safety defects, warranty claims, and customer complaints related to GM products. On the back end, particularly in light of the significance of the matters at issue, this included, among others, GM's officers, including the CEO, the CFO, and the Chief Accounting Officer; GM senior management, including the General Counsel; and members of GM's internal audit and litigation departments, including the Audit Committee of GM's Board of Directors (hereinafter, the "Audit Committee"), as well as GM attorneys primarily responsible for safety and/or warranty issues, such as Kemp and Buonomo.[297]

262. During the Class Period, GM disclosed its own internal accounting policy related to product warranties which, consistent with GAAP, publicly claimed that GM was carefully monitoring warranty claims on its products. This policy provided that:

> The estimated costs related to … product warranties are accrued at the time the products are sold. … These estimates are established using historical information on the nature, frequency and average cost of claims of each vehicle line or each model year of the vehicle line and assumptions about future activity and events. … These estimates are re-evaluated on an ongoing basis. ***We actively study trends of claims***

---

[297] *See* Valukas, *supra* note 15, at 85.

and take action to improve vehicle quality and minimize claims."[298]

263.   Pursuant to SEC requirements, GM designated its product warranty accounting policy as *"critical"* to GM's business.  Financial Reporting Release No. 60 defines "accounting policies that management believes are most 'critical'" as "most important to the portrayal of the company's financial conditions and results…."  GM further confirmed that it "discusse[s] the development, selection and disclosures of our critical accounting estimates with the Audit Committee of the Board of Directors," and that the Audit Committee reviews those disclosures.[299]

264.   Throughout the Class Period, GM repeatedly represented that its policy with respect to recalls was to accrue those estimated costs "when they are deemed to be probable and can be reasonably estimated," as described below in ¶¶654, 664, 719, 760, and 798.  Therefore, GM investors would have expected and understood that such probable and reasonably estimable recall expenses were disclosed in its financial statements.  However, at the end of the Class Period, GM suddenly clarified that it did not "typically" recognize costs associated with recalls until a recall

---

[298] *See* Gen. Motors Co., Annual Report (Form 10-K) (Mar. 1, 2011), at 132; Gen. Motors Co., Annual Report (Form 10-K) (Feb. 27, 2012), at 82; Gen. Motors Co., Annual Report (Form 10-K) (Feb. 15, 2013), at 69; Gen. Motors Co., Annual Report (Form 10-K) (Feb. 6, 2014), at 57.
[299] Gen. Motors Co., Annual Report (Form 10-K) (Mar. 1, 2011), at 118; Gen. Motors Co., Annual Report (Form 10-K) (Feb. 27, 2012), at 75; Gen. Motors Co., Annual Report (Form 10-K) (Feb. 15, 2013), at 64; Gen. Motors Co., Annual Report (Form 10-K) (Feb. 6, 2014), at 54.

campaign was *both* deemed needed *and* announced.  Thus, even if a recall was otherwise probable and reasonably estimable, but its announcement was inordinately delayed as was the case here, GM did not recognize the costs associated with the recall.  Specifically, in its Form 10-Q for the second quarter of 2014, GM stated, "We have historically accrued estimated costs related to recall campaigns in GM [North America] when they are probable and reasonably estimable, *which typically occurs once it is determined a specific recall campaign is needed and announced.*"[300]

265.   Significantly, after GM was forced to recognize the massive costs it incurred due to the long-belated ignition switch recalls at issue in this action, GM also determined to *change* its recall reserve policy.  GM did so in recognition of the material impact of the long-belated *$1.3 billion increase* in its Liabilities, Costs, and Contingencies related to product warranties and recalls, resulting in substantial part from the ignition switch recalls.  Specifically, in its Form 10-Q for the second quarter of 2014, GM stated: "*we now accrue at the time of vehicle sale* in GM [North America] *the costs for recall campaigns*," as detailed further below at ¶¶293-94 and 636.[301] This change resulted in an $874 million upward adjustment for future recall costs in the second quarter of 2014.[302]

---

[300] Gen. Motors Co., Quarterly Report (Form 10-Q) (July 24, 2014), at 6.
[301] *Id.*
[302] *Id.*

266.   However, because GM should have recalled these vehicles by no later than the start of the Class Period, its recall reserve was materially understated throughout the Class Period even under its prior policy.

### 2.   GM's Obligation To Maintain Effective Internal Controls Over Financial Reporting

267.   In addition to GM's obligation to investigate and accurately report losses and liabilities detailed above at ¶¶247-66, GM was also obligated under Section 404 of the Sarbanes Oxley Act of 2002 (defined above as "SOX") to maintain effective internal controls.  Specifically, SOX Section 404 requires GM to assess its internal controls over financial reporting, and disclose whether or not such controls are effective, including the identification of any "material weaknesses" in those controls.   SOX Section 404 further requires GM's CEO and principal accounting officer to personally certify the effectiveness of GM's internal controls each quarter.

268.   A "material weakness" is a deficiency or a combination of deficiencies in a company's internal control over financial reporting, which creates a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.[303]   A company's internal control over financial reporting cannot be considered effective if one or

---

[303] PCAOB Auditing Standard No. 5, "An Audit of Internal Control over Financial Reporting that is Integrated with an Audit of Financial Statements," at A7.

more material weaknesses exist.[304]    Internal controls that impact significant accounting estimates or critical accounting policies are generally considered to be higher risk.[305]

269.  Company management is further required to ensure that testing procedures are performed to assess the operating effectiveness of the company's internal controls.[306]  If management is aware or determines that the design or operation of a control does not allow management or company employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis, this means that a control deficiency exists.[307] Management is then required to evaluate the control deficiency to ascertain the likelihood that the deficiency or a combination of deficiencies could result in a significant deficiency or a material weakness.[308]

270.  All significant deficiencies and material weaknesses must be reported to the company's audit committee.  Moreover, a single material weakness renders the company's internal controls ineffective, and any material weakness must be

---

[304] *Id.*

[305] Mgmt.'s Report on Internal Control, Exchange Act Release No. 33-8810, 72 FR 35324-01 (June 20, 2007), §II.A.2.a, at 26.

[306] *Id.* at 21.

[307] *Id.* ¶8.

[308] Mgmt.'s Report on Internal Control, Exchange Act Release No. 33-8238, 80 SEC Docket 1014 (June 5, 2003), §II.F.1.

publicly disclosed.[309]  Significantly, the SEC has observed that disclosures regarding management's remediation efforts "may call into question the validity and completeness of the material weaknesses disclosed."[310]

### 3.   GM's Primary Enforcement Mechanism:   The Audit Committee

271.  At all relevant times, GM's Audit Committee was responsible for overseeing GM's entire financial reporting process and systems of disclosure, including GM's internal controls.   As noted, these responsibilities included reviewing every material weakness and significant deficiency identified by the Company, as well as reviewing all "critical" accounting estimates. The Audit Committee was also charged with overseeing all of GM's external and internal auditors, including GM's outside audit firm, Deloitte & Touche, as well as the Company's risk management process as a whole.[311]

272.  During the Class Period, the Chairman of the Audit Committee was Philip A. Laskawy through February 13, 2013, when he was succeeded by Thomas M. Schoewe.  The other members of the Audit Committee during the Class Period were Errol B. Davis Jr., Robert D. Krebs (until his retirement effective June 10,

---

[309] *Id*. §II.B.3.c.

[310] Speech by SEC Staff: Remarks before the 2008 AICPA National Conference on Current SEC and PCAOB Developments (Dec. 8, 2008), http://www.sec.gov/news/speech/2008/spch120808mp.htm.

[311] Valukas, *supra* note 15, at 242.

2014), Kathryn V. Marinello, Theodore M. Solso (from April 25, 2013 through April 25, 2014), and Michael G. Mullen (beginning on April 25, 2014).

273.   According to the Valukas Report, "the Audit Committee's work provided two oversight mechanisms for the Audit Committee to receive information about processes that related to vehicle safety."[312]   Specifically, the Audit Committee was charged with reviewing GM's annual internal audit plan.[313]   That plan was prepared by individuals in GM's audit group, as well as GM senior management.[314] The Chairman of the Audit Committee was principally responsible for reviewing the audit plan prior to providing that plan to the Audit Committee.[315]   The Chairman's personal review of the internal audit plan took place during a yearly meeting with GM senior internal audit staff, which lasted for about half a day.[316]   During the Class Period, the Audit Committee conducted two internal audits of GM's process for evaluating safety-related defects and conducting recalls, one in 2006, and one in 2013.[317]   The Audit Committee was charged with overseeing both of these internal audits, and therefore, was apprised of GM's internal findings with respect to those processes.

---

[312] *Id.*
[313] *Id.*
[314] *Id.*
[315] *Id.* at 242-43.
[316] *Id.* at 243.
[317] *Id.*

274.   Moreover, as noted, the Audit Committee also oversaw GM's entire risk management process, which included conducting a review of GM's disclosed "risk factors" in its public filings, and meeting regularly with GM's Chief Risk Officer during the Class Period, Brian D. Thelen.[318]   In the past few years, GM's "Enterprise Risk Management" (ERM) process identified "quality" as an important risk for the Company.[319]   ERM defined this risk as arising when ***"[m]ajor or chronic product problems could occur, resulting in negative public image, large product recall campaigns and/or significant, unexpected increases in warranty expenses."***[320]   The ignition switch defects presented a definite, quantifiable, and massive risk to the Company, as detailed further below at ¶¶816-34.

### 4.   GM's Consistent Failure To Adequately Investigate Liabilities And Maintain Effective Internal Controls

275.   GM has a long history of failing to maintain effective internal controls, and failing to adequately investigate and report its liabilities, including costs related to warranties and recalls.   Indeed, over the past decade alone, GM has been forced to disclose multiple material weaknesses, and has been sued by the SEC.   Moreover, during the same time frame, GM has been forced to restate its reported financial results for three years.   GM's accounting misstatements have resulted in repeated

---

[318] *Id.*

[319] *Id.* at 244.

[320] *Id.*

admissions by Company insiders that GM's internal controls were inadequate and ineffective. These prior violations were significant "red flags" that alerted GM and the Individual Defendants to the need for proper internal controls and the consequences of failing to ensure that such controls were in place.

276. GM knew that its internal controls suffered from material weaknesses by the early 2000s. Specifically, in 2002, McAleer wrote to each member of GM's Board of Directors, including then-CEO Rick Wagoner, to alert them of serious, systemic problems with GM's internal controls which had resulted in millions of unsafe cars being put on the road. Among other problems, McAleer detailed how GM's process for detecting and addressing safety hazards had broken down and been overridden by cost-cutting concerns. In sum, McAleer alerted the Board that GM's *"internal control systems" were "corrupt."*

277. As detailed in McAleer's 2002 letter to the Board, of the 25 million vehicles that GM had shipped since 1997, there "are *hundreds of thousands of vehicles that can kill, maim, or burn alive the occupants and surrounding motorists or passengers*." McAleer urged the Board to "(1) [s]top the continued shipments of unsafe vehicles; (2) [r]ecall suspect vehicles already in customers' hands; and (3) [r]eplace the current quality flow chart to make that organization independent of corporate politics and cost-cutting concerns."

278. Accordingly, by at least 2002, GM was aware of severely deficient and

"corrupt" internal controls, as well as systemic safety and quality control problems with the vehicles manufactured and sold by GM. Nonetheless, GM represented to investors in its 2002 Annual Report, dated March 13, 2003, that there were no material weaknesses in the Company's internal controls.[321]

279. GM was finally forced to disclose material weaknesses with its internal controls in its 2005 Annual Report on Form 10-K, dated March 28, 2006, and its 2006 Annual Report on Form 10-K, dated March 14, 2007. Specifically, in the 2006 Annual Report, GM stated that the Company lacked competent accounting personnel who knew how to apply GAAP:

> ***The Corporation did not maintain a sufficient complement of personnel with an appropriate level of technical accounting knowledge, experience, and training in the application of generally accepted accounting principles*** commensurate with the Corporation's complex financial accounting and reporting requirements and low materiality thresholds. This was evidenced by a significant number of out-of-period adjustments during the year-end closing process.[322]

280. In the same Annual Report, GM further admitted that it lacked adequate controls to ensure that accounting estimates and adjustments were monitored and

---

[321] Moreover, information revealed to the public for the first time in 2006 confirmed that GM was engaged in accounting manipulations and improper practices. Specifically, on October 30, 2006, the SEC filed a complaint against Delphi, a former subsidiary of GM, alleging that at a September 5, 2000 meeting attended by GM senior officers, GM suggested to Delphi that Delphi use improper "asymmetrical" accounting to account for certain warranty expenses. Compl. ¶36, *SEC v. Delphi Corp.*, 2006 WL 3146703 (E.D. Mich. Oct. 30, 2006) (No. 06-14891).
[322] Gen. Motors Co., Annual Report (Form 10-K) (Mar. 14, 2007), at 197.

reviewed. GM stated, ***"controls were not effective to ensure that significant non-routine transactions, accounting estimates, and other adjustments were appropriately reviewed, analyzed, and monitored on a timely basis."***[323]

281.   In an effort to address these systemic problems, the Company reported that it had hired a new Controller and Corporate Chief Accounting Officer, a new Chief Accounting Officer for GM North America, and a new Director of Accounting Policy, Research, and SEC Reporting.[324]   Among other remedial measures, GM further stated that it had determined to "reorganize and restructure Corporate Accounting" and enact various improvements to period-end closing procedures.[325]

282.   The serious defects in GM's internal controls did not improve in 2007 or 2008.  In its 2007 Annual Report on Form 10-K, dated February 28, 2008, GM admitted that its internal controls were still "not effective to ensure that significant non-routine transactions, accounting estimates, and other adjustments were appropriately reviewed and monitored by competent accounting staff on a timely basis."[326]  In its 2008 Annual Report on Form 10-K, dated March 5, 2009, GM again admitted that its internal controls were "not effective to ensure that accounting estimates and other adjustments were appropriately reviewed, analyzed and

---

[323] *Id*. at 197.
[324] *Id*. at 199.
[325] *Id.*
[326] Gen. Motors Co., Annual Report (Form 10-K) (Feb. 28, 2008), at 197.

monitored by competent accounting staff on a timely basis."[327]

283.   "Additionally," the Company disclosed in both its 2007 Annual Report on Form 10-K and its 2008 Annual Report on Form 10-K, "some of the adjustments that have been recorded relate to account reconciliations not being performed effectively."[328]   The Company's 2007 and 2008 Annual Reports further detailed extensive remedial efforts that the Company purportedly put in place to address these widespread problems.[329]

284.   On January 22, 2009, the SEC brought a civil action against GM, which detailed significant additional material weaknesses in GM's internal controls, as well as GM's inclusion of material misstatements or omissions in its financial statements. Among other violations, the SEC alleged:

- "To provide its employees with broad exposure to financial and accounting activities, GM often rotated employees through departments.  GM did not ensure that its accounting employees gained the necessary technical expertise for each new area."[330]

- "GM infrequently updated and insufficiently observed written policies" and "GM did not adequately monitor compliance with policies."[331]

- "GM's internal structure and division of responsibilities caused confusion among GM employees about which group within GM was

---

[327] Gen. Motors Co., Annual Report (Form 10-K) (Mar. 4, 2009), at 197.

[328] Gen. Motors Co., Annual Report (Form 10-K) (Feb. 28, 2008), at 188; Gen. Motors Co., Annual Report (Form 10-K) (Mar. 4, 2009), at 254.

[329] *See* Gen. Motors Co., Annual Report (Form 10-K) (Feb. 28, 2008), at 197; Gen. Motors Co., Annual Report (Form 10-K) (Mar. 4, 2009), at 254-55.

[330] SEC Compl. ¶109.

[331] *Id*. ¶110.

responsible for accounting for certain transactions."[332]

- "GM's structure and division of responsibilities also resulted in operations personnel knowing information about GM's transactions but not the applicable accounting guidance, and accounting personnel knowing the applicable accounting guidance but not sufficient information about GM's transactions."[333]

- "In addition, GM did not have any specific procedures about the circumstances in which personnel had to seek accounting guidance from persons with appropriate accounting expertise."[334]

GM signed a Consent Order in connection with the SEC's civil action, filed on January 27, 2009.[335]

285.   Just before the beginning of the Class Period, GM was ultimately forced to disclose that its internal controls *as a whole* were not effective.  Specifically, in its 2009 Annual Report on Form 10-K, dated April 7, 2010, GM stated:

> *We have determined that our disclosure controls and procedures and our internal control over financial reporting are currently not effective.*  The lack of effective internal controls could materially adversely affect our financial condition and ability to carry out our business plan.[336]

GM further identified its internal control over financial reporting as *"an integral part of our disclosure controls and procedures."*[337]

---

[332] *Id*. ¶80.

[333] *Id.*

[334] *Id.*

[335] Consent to Entry of Final Judgment by Defendant General Motors Corp., *SEC v. General Motors Corp*., 1:09-cv-00119-PLF (D.D.C. Jan. 22, 2009), Doc. No. 2, filed Jan. 1, 2009, entered Jan. 28, 2009.

[336] Gen. Motors Co., Annual Report (Form 10-K) (Apr. 7, 2010), at 31.

[337] *Id*. at 285.

286.   In the same 2009 Annual Report on Form 10-K, GM also identified its

inability to test the effectiveness of its remediated internal controls, stating:

> At December 31, 2009, because of the ***inability to sufficiently test the
> effectiveness of remediated internal controls***, [GM's management
> team for financial reporting, under the supervision and with the
> participation of its CEO and CFO] concluded that our disclosure
> controls and procedures and our internal controls over financial
> reporting were not effective."[338]

GM further identified various remedial measures that it planned to implement to

address these problems.[339]

287.   Throughout 2010, GM continued to disclose material weaknesses in its

internal controls and the SEC continued to express concern regarding GM's internal

controls and accounting practices.  For example, in GM's Registration Statement,

dated August 18, 2010, filed on Form S-1 for its then-upcoming initial public stock

offering, GM disclosed that as of June 30, 2010, its ***"disclosures and procedures
were [still] not effective at a reasonable assurance level because of the material
weakness in our internal control over financial reporting that continues to
exist."***[340]

288.   In the same Registration Statement, GM disclosed the "ability of our

new executive management team to quickly learn the automotive industry and lead

---

[338] *Id*. at 31.

[339] *Id*. at 286-87.

[340] Gen. Motors Co., Registration Statement (Amendment No. 6 to Form S-1) (Nov.
10, 2010), at 25.

our company" as a risk factor.[341]  GM further stated that it had elected a new CEO, Defendant Akerson, effective September 1, 2010, and a new CFO, Defendant Stevens, effective January 1, 2010, **"both of whom have no outside automotive experience."**[342] The SEC was troubled by this statement, specifically asking GM to balance this disclosure with its discussion elsewhere in the same document regarding its "strong leadership team."[343]

289.   The SEC further questioned the Company regarding its accounting for reserves, and particularly how its litigation reserves complied with ASC Topic 450.[344]  The SEC stated: "Although you indicate that litigation reserves have been established regarding matters for which you believe losses are probable and can be reasonably estimated, it is not clear how your related disclosures comply with the requirements set forth in ASC 450-20-50.[345]

290.   In response, the Company falsely assured the SEC that its disclosures complied with ASC Topic 450, and that GM had adequately disclosed its litigation-related exposures.[346]  GM stated in relevant part:

> The Company also assesses matters for which it has not recorded an
> accrual to determine whether it is reasonably possible that the exposure

---

[341] *Id*.

[342] *Id*.

[343] SEC Comment Letter, ¶24.

[344] *Id*. ¶68.

[345] *Id*. ¶68.

[346] Jenner & Block LLP, Response Letter, at 36, http://www.sec.gov/Archives/edgar/data/1467858/000119312510215195/filename1.htm.

relating to an individual matter could be material to its consolidated financial statements, thus requiring disclosure. ***At June 30, 2010 and December 31, 2009, there were no such individual matters where the Company believes it is reasonably possible that its exposure to loss would be material to its consolidated financial statements.***[347]

291.   In truth, by this time, GM had failed to accurately disclose numerous existing and probable lawsuits and claims arising from the ignition switch defects at issue in this action, and further lacked the internal controls necessary to properly account for the safety risks caused by that defect, as detailed below at ¶¶460-77.

292.   Moreover, beginning with its 2010 Annual Report on Form 10-K, dated March 1, 2011, GM falsely assured investors that its "internal control over financial reporting was effective at December 31, 2010."[348]   As set forth in ¶¶725, 766, and 804 below, GM repeatedly continued to do so throughout the remainder of the Class Period, including on February 6, 2014, just one day before the First Recall Wave (defined below) began.   In actuality, GM's internal controls continued to suffer from severe and systemic problems which resulted in GM's failure to accurately account for and disclose the ignition switch defects and associated Liabilities, Costs, and Contingencies in its financial statements, as detailed below.

293.   Only after the ignition switch recalls caused a devastating and material impact to the Company's finances did GM finally determine to change its accounting

---

[347] *Id.* at 37.
[348] Gen. Motors Co., Annual Report (Form 10-K) (Mar. 1, 2011), at 309.

practice with respect to estimating recall cost liabilities.  Specifically, in its Form

10-Q for the second quarter of 2014, filed on July 24, 2014, GM stated:

> During the three months ended June 30, 2014, following the significant increase in the number of vehicles subject to recall in GM [North America], the results of our ongoing comprehensive safety review, additional engineering analysis, the creation of a new Global Product Integrity organization, the appointment of a new Global Vice President of Vehicle Safety responsible for the safety development of our vehicle systems and our overall commitment to customer satisfaction, we accumulated sufficient historical data in GM [North America] to support the use of an actuarial-based estimation technique for recall campaigns.  As such, *we now accrue at the time of vehicle sale in GM [North America] the costs for recall campaigns.*[349]

294.    As a result of this change, GM recorded "*a catch-up adjustment of $874 million* in Automotive cost of sales in the three months ended June 30, 2014 to adjust the estimate for recall costs for previously sold vehicles."[350]

295.    GM's decision to change its accounting practice for recall reserves was the result of the Company's desire to avoid recognizing such sizeable losses in the future and the impact of such belated revelations on its share price.

296.    Similarly, in the aftermath of the ignition switch recalls, GM senior executives belatedly ***admitted*** on numerous occasions and in numerous different ways that the Company lacked adequate internal controls during the Class Period.

297.    For example, on February 25, 2014, in GM's first public statement

---

[349] Gen. Motors Co., Quarterly Report (Form 10-Q) (July 24, 2014), at 6.
[350] *Id.*

regarding the ignition switch recalls, GMNA President Alan Batey admitted, ***"The process employed to examine this phenomenon [the ignition switch defect] was not as robust as it should have been."***[351]

298.   On March 5, 2014, GM CEO Barra admitted in a message posted to the Company's website that GM would ***"improve our processes so our customers do not experience this [the ignition switch recalls] again."***[352]

299.   On March 17, 2014, CEO Barra further ***admitted*** in an internal GM video broadcast to employees, ***"Something went very wrong in our processes in this instance, and terrible things happened."***[353]   CEO Barra further admitted that GM was in the process of revising its internal controls on recalls and safety issues, stating, ***"Our system of deciding and managing recalls is going to change."***[354] On March 18, 2014, GM's Product Development Chief, Mark Reuss, told reporters that GM's appointment of a new safety chief, Jeff Boyer, was ***"the first change of things***

---

[351] Press Release, Gen. Motors Co., *GM Expands Ignition Switch Recall* (Feb. 25, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Feb/0225-ion.html.

[352] Nathan Bomey, *GM CEO Mary Barra order internal report on recall over faulty ignition switches*, DETROIT FREE PRESS, Mar. 5, 2014, http://archive.freep.com/article/20140304/BUSINESS0101/303040116/GM-General-Motors-recall-Chevrolet-Cobalt-Mary-Barra-Pontiac-G5-ignition-switch-recall.

[353] Bill Vlasic & Christopher Jensen, *Something Went 'Very Wrong' at G.M., Chief Says*, N.Y. TIMES, Mar. 17, 2014, http://www.nytimes.com/2014/03/18/business/gm-chief-barra-releases-video-on-recalls.html?_r=0.

[354] *Id.*

*that need to change."*[355]

300.   On April 1, 2014, GM CEO Barra further admitted in her testimony before the House Energy and Commerce Committee that "there were points in time where one part of the organization had information that wasn't shared across to the other side of the organization.  You can call it a silo….  we've already made changes to the structure and to the responsibilities of people so that won't happen again." CEO Barra further admitted in her April 1, 2014 testimony that GM was previously focused on costs, not safety, testifying "we in the past had more of a cost culture, and we are going to a customer culture that focuses on safety and quality."

301.   During her testimony before the House Energy and Commerce Committee on April 2, 2014, Barra similarly **admitted** that **"within General Motors, there were silos….  That's something I've already corrected today."**  During the same April 2, 2014 testimony, Barra further **admitted** that during the time that the defective ignition switches at issue in this case were designed and went into production (from the late 90's until 2011), **"the culture of the company at that time had more of a cost-culture focus."**

302.   On May 16, 2014, GM signed a Consent Order with NHTSA in which

---

[355] Tom Krisher, *GM CEO apologizes for deaths tied to recalled cars*, ASSOCIATED PRESS, Mar. 19, 2014, http://www.bostonglobe.com/business/2014/03/18/chief-executive-barra-apologizes-for-deaths-tied-recalledcars/H7UxdKeioBwOUYp M6XEDJM/story.html.

it admitted to additional internal control failures during the Class Period. Specifically, GM "admit[ted] that it violated the Safety Act" and agreed to "pay the United States a maximum civil penalty" of $35 million for those violations.[356]  GM further admitted that its internal controls during the Class Period were not adequate in the following critical respects:

- "GM's *ability to analyze data to identify potential safety-related defects*" was inadequate;[357]

- GM had failed to "encourage[e]" and needed to "improv[e] *information-sharing across functional areas and disciplines*";[358]

- GM's *recall decision-making process was inadequate*, necessitating the need for GM to "increas[e] the speed with which recall decisions are made (including by clarifying the recall decision-making process to decrease the number of steps prior to making the final decision of whether to conduct a recall)";[359] and

- GM's "*ability to identify safety consequences and the severity of those consequences*, as well as to assess the number or rate of allegations, complaints, incidents, reports and/or warranty claims relating to potential safety-related defects" was "*inadequate.*"[360]

303.    In the Consent Order, GM further identified its failure to "*conduct a safety recall because GM has not yet identified the precise cause of the defect*"[361]

---

[356] Consent Order, National Highway Traffic Safety Administration, In re TQ14-001 NHTSA Recall No. 14V-047 (May 16, 2014), at 4, http://www.nhtsa.gov/staticfiles/communications/pdf/May-16-2014-TQ14-001-Consent-Order.pdf.
[357] *Id.* at 8.
[358] *Id.*
[359] *Id.*
[360] *Id.*
[361] *Id.* at 10.

among other reasons, as an additional internal control failure, along with deficiencies in "GM's corporate structure" which prevented safety-related issues from being brought "to the attention of committees and individuals with authority to make safety recall decisions."[362]

304.   As the result of the internal control failures detailed above, GM determined to implement material process changes to address these insufficiencies. Specifically, GM agreed to meet with NHTSA no later than 120 days after the execution of the Consent Order to conduct various tests in order to "assess[] the effectiveness of the improvements" implemented to address these inadequacies in GM's internal controls.[363]

305.   In GM's press release announcing the maximum fine and its signing of the Consent Order, Jeff Boyer, Vice President of Global Vehicle Safety, further admitted that GM's internal controls were inadequate during the Class Period, stating that GM was only now "working hard to ***improve our ability to identify and respond to safety issues.***"[364]

306.   In addition, NHTSA held a press conference to address the Consent

---

[362] *Id*.

[363] *Id*. at 9.

[364] Press Release, Gen. Motors Co., *GM Signs Consent Order with National Highway Traffic Safety Administration* (May 16, 2014), http://media.gm.com /media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/May/0516-consent.html.

Order on May 16, 2014.  At the press conference, Acting NHTSA Administrator

David Friedman further detailed the internal control deficiencies that NHTSA had

identified during its investigation leading up to the Consent Order.  Friedman stated

with respect to "GM's admission that it failed to report a safety-related defect in a

timely manner," that ***"the evidence we found behind that failure was deeply

disturbing."***[365]  Friedman further summarized NHTSA's findings, as follows:

- ***"GM's decision-making, structure, and process stood in the way of safety at a time when airbags were failing to work properly in millions of GM products"***;[366]

- ***"GM has known for many years that the ignition switch in the Cobalt and related models can be inadvertently turned to off or to the accessory position, especially in cases where the driver's knee may make contact with the key or key fob"***;[367]

- "[A] supplier notified GM ***as early as 2009 that the air bags in the Cobalt would not work unless the key was in the run position.***  This notification came in the form of a report explicitly exploring the issue and a block diagram that made the relationship clear";[368] and

- "NHTSA's investigation further revealed that ***at least by 2012, GM staff was very explicit about an unreasonable risk to safety.***  In a September 2012 email, a GM engineer investigating the Cobalt defect explained that GM had found that quote 'the driver's knee may contact the key or key fob and turn the ignition off.  With the ignition in that position, the airbags will not deploy.'  Similar information was made

---

[365] GM Consent Order Press Release Conference (May 16, 2014) (Statement of David Friedman, Acting Adm'r for NHTSA), http://www.nhtsa.gov/ staticfiles/administration/pdf/presentations_speeches/2014/DF-GM-consent-order- news_05162014.pdf.

[366] *Id*.

[367] *Id*.

[368] *Id*.

clear in a legal deposition in 2012.  In this same timeframe, ***senior GM executives received detailed briefings about this safety-related defect.***"[369]

307.   Friedman further detailed that in December 2013, when the Field Performance Evaluation Recommendation Committee finally agreed to recommend a safety recall to the EFADC, "even then, GM executives delayed.  One GM [employee] question[ed] what the rush was to discuss further the ignition switch defect."[370]  GM did not agree to report the safety-related defect to NHTSA until a meeting on January 31, 2014.[371]

308.   Friedman concluded based on NHTSA's investigation, "So, GM engineers knew about the defect.  GM investigators knew about the defect.  GM lawyers knew about the defect.  But GM did not act to protect Americans from that defect."***[372]***  Moreover, "[t]he fact that GM took so long to report this defect says something was very wrong with the company's values."[373]  Indeed, Friedman similarly stated before the House Energy and Commerce Committee on April 2, 2014, ***"GM had critical information that would have helped identify this defect."***[374]

---

[369] *Id.*

[370] *Id.* at 2.

[371] *Id.*

[372] *Id.* at 1.

[373] *Id.* at 2.

[374] *Examining the GM Recall and NHTSA's Defect Investigation Process: Hearing Before S. Subcomm. Consumer Protection, Product Safety, & Insurance of the S. Comm. on Commerce, Sci., & Transp., 113th Cong.* (Apr. 2, 2014) (Statement of David Friedman, Acting Adm'r for NHTSA).

Friedman explained:

> In February 2014, GM submitted information to NHTSA that, for the first time, acknowledged a link between the ignition switch to the airbag non-deployment, as well as key information regarding parts changes, discussions with suppliers, and other efforts currently under consideration in our Timeliness Query. Had the information newly provided to NHTSA by GM been available before now, it would have better informed the agency's prior reviews of airbag non-deployment in GM vehicles and likely would have changed NHTSA's approach to this issue.[375]

309.   Friedman further stated in a *New York Times* article dated May 16, 2014 regarding the breakdown of GM's internal controls, ***"Their process was broken, and they need to fix it."***[376]

310.   GM CEO Barra again ***admitted*** to internal control failures after receiving the Valukas Report and announcing GM's implementation of the Compensation Facility Protocol, detailed further below.   On June 5, 2014, CEO Barra ***admitted*** that even the (limited) conclusions of the Valukas Report were "brutally tough, and deeply troubling…. I was deeply saddened ***and disturbed*** as I read the report."[377]   Barra further described the Valukas Report as detailing a "history

---

[375] *Id.*

[376] Matthew L. Wald & Danielle Ivory, *G.M. Is Fined Over Safety and Called a Lawbreaker,* N.Y. TIMES, May 16, 2014, http://www.nytimes.com/2014/ 05/17 /business/us-fines-general-motors-35-million-for-lapses-on-ignition-switch-defect.html.

[377] Press Release, Gen. Motors Co., *GM Receives Extremely 'Thorough,', 'Brutally Tough' and 'Deeply Troubling' Valukas Report* (June 5, 2014), http://media.gm. com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jun/060514-ignition-report.html.

of failures."[378]

311.   Also on June 5, 2014, Barra reiterated that the Company was divided into "silos," which caused the Company's internal controls to break down.[379]  Barra further ***admitted*** on June 5, 2014 with respect to GM's internal controls, "This is not just another business crisis for GM.  We aren't simply going to fix this and move on. ***We are going to fix the failures in our system*** – that I promise."[380]

312.   On June 5, 2014, Barra further ***admitted*** in connection with the Company's announcement of the Compensation Facility Protocol, ***"We made serious mistakes in the past*** and as a result ***we're making significant changes in our company*** to ensure they never happen again."[381]  Solso, Chairman of GM's Board of Directors, similarly stated on June 6, 2014, "The Board, like management, is committed to ***changing the company's*** culture and ***processes*** to ensure that the problems described in the Valukas report never happen again." [382]

---

[378] Meghan Drake, *Barra Blames 'History of Failures' for GM Safety Crisis*, WASH. TIMES, June 6, 2014, http://www.washingtontimes.com/news/2014/jun/5/barra-blames-history-failures-gm-safety-crisis/.

[379] Michael Ide, *Barra Says No Conspiracy in GM Scandal, Blames Incompetence and Neglect*, VALUE WALK, June 5, 2014.

[380] Pete Bigelow, *GM's Barra Discusses Results of Ignition Switch Investigation*, AUTOBLOG (June 5, 2014. 10:01AM), http://carmeetsroad.com/top100/2014/06/05/gms-barra-discusses-results-of-ignition-switch-investigation-pete-bigelow/.

[381] Press Release, Gen. Motors Co., *GM to Implement Compensation Program for Ignition Switch Recall* (June 5, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jun/060514-ignition-recall.html.

[382] Press Release, Gen. Motors Co., *GM Receives Extremely 'Thorough,' 'Brutally Tough' and 'Deeply Troubling' Valukas Report* (June 6, 2014), http://media.gm.

313.    During CEO Barra's testimony before the House Committee of Energy and Commerce on June 18, 2014, Senator Ron Johnson questioned whether problems arising from the ignition switch defect were included in risk and compliance shareholder disclosure reports mandated by the SEC, asking CEO Barra, "How does it break down that bad in a company that is, you know, publicly traded?"[383] Barra admitted, ***"it is unacceptable the way things broke down, and that is why we have made dramatic process changes."***[384]

314.    Barra further admitted during her June 18, 2014 testimony that the Valukas Report "paints a picture of an organization that failed to handle a complex safety issue in a responsible way… There is no way to minimize the seriousness of what Mr. Valukas and his investigations uncovered."[385]   CEO Barra further admitted that "deep underlying cultural problems [were] uncovered in this report."[386]   During the same hearing, CEO Barra testified, "We have restructured our safety decision-making process to raise it to the highest levels of the company."[387]

315.    On July 16, 2014, when asked for comment in connection with a *New*

---

com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jun/060514-ignition-report.html.

[383] *The GM Ignition Switch Recall: Investigation Update Before the Subcomm. on Oversight and Investigations Comm. on Energy and Commerce, 113th Cong.* (June 18, 2014) (Preliminary Transcript, at 2713-14).

[384] *Id.* at 119:2716-18.

[385] *Id*. at 24:491-98.

[386] *Id.*at 27:569-70.

[387] *Id.* at 24-25:506-08.

*York Times* article entitled "Documents Show G.M. Kept Silent on Fatal Crashes," Friedman, Acting NHTSA Administrator, again reiterated, ***"G.M.'s decision-making, structure, process and corporate structure stood in the way of safety."***[388]

316.   On July 17, 2014, CEO Barra again admitted to a failure of GM's internal controls during her testimony at a town hall meeting held by U.S. Senator Claire McCaskill, Chairman of the Senate Consumer Protection Subcommittee, and 10 of her colleagues.  CEO Barra admitted, ***"we accepted responsibility for what went wrong."***[389]   CEO Barra further admitted that the Compensation Facility Protocol was created "as an exceptional response to a ***unique set of mistakes that were made over an extended period of time.***"[390]   During the same hearing, GM General Counsel Millikin admitted, ***"We had lawyers at GM who didn't do their jobs; didn't do what was expected of them."***[391]

317.   As Defendant Barra's prepared remarks for the July 17, 2014 hearing

---

[388] Rebecca R. Ruiz & Danielle Ivory, *Documents Show G.M. Kept Silent On Fatal Crashes*, N.Y. TIMES, July 15, 2014, http://www.nytimes.com/2014/07/16/business/documents-show-general-motors-kept-silent-on-fatal-crashes.html?module=Search&mabReward=relbias%3Aw%2C%7B%22%22%3A%22RI%3A1%2%22%7D.

[389] Press Release, Gen. Motors Co., *Barra Prepared Testimony to U.S. Senate Subcommittee* (July 17, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jul/0717-barra-testimony.html.

[390] *Id.*

[391] Press Release, Gen. Motors Co., *Millikin Prepared Testimony to U.S. Senate Subcommittee* (July 17, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jul/0717-millikin-testimony.html.

stated, she contrasted what she planned to do at GM going forward to the Company's culture during the time period covered by the Valukas Report: "I will use the report's findings and recommendations to attack and remove information silos wherever we find them and to create an organization that is accountable and focused on the customer."[392]

318.   Moreover, as Defendant Barra's prepared remarks for the July 17, 2014 hearing reiterated: "We removed fifteen employees from the company… **some for misconduct** or incompetence, others because they didn't take responsibility or act with a sense of urgency."[393]

319.   As Mr. Valukas' prepared comments for the July 17, 2014 town hall hearing acknowledged, "The story of the Cobalt is one of a series of **individual and organizational failures** that led to devastating consequences."[394]

320.   Defendant Akerson also admitted that GM's internal controls were ineffective during the Class Period.  As reported by *The Detroit News* on July 28, 2014, Akerson admitted, ***"I think we all – including the new and the old part of the***

---

[392] Press Release, Gen. Motors Co., *Barra Prepared Testimony to U.S. Senate Subcommittee* (July 17, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jul/0717-barra-testimony.html.
[393] *Id.*
[394] *Examining Accountability and Corporate Culture in the Wake of the GM Recalls: Hearing Before the S. Subcomm. Consumer Prot., Prod. Safety, & Ins. of the S. Committee on Commerce, Sci., & Transp., 113th Cong.* (July 17, 2014) (testimony of Anton R. Valukas, Jenner & Block LLP), http://archive.freep.com/assets/freep/pdf/C4222295717.PDF.

*management team – didn't fully realize how deep some of the problems ran."*[395]

321.  On September 8, 2014, Chairman of GM's Board of Directors, Theodore M. Solso, similarly admitted with respect to GM's internal controls, *"Yes, we should have known earlier.  The way I look at it, G.M. has not been well run for a long period of time."*  Solso further stated that he was *"shocked"* and *"stunned"* by the findings of the Valukas Report that GM employees had refused to repair the ignition switch defect in the face of "mounting evidence that the problem put drivers and passengers at risk of death and serious injury."[396]

322.  As NHTSA's David Friedman's prepared remarks for the September 16, 2014 hearing stated:  "GM clearly had information available that should have prompted the company to announce the recall much sooner than it did.  We collected the maximum civil penalty of $35 million from GM for its failure to meet its timeliness obligations.  *The company also had a fundamentally flawed process and culture, requiring wide-ranging internal changes to improve its ability to address potential safety-related defects*."[397]  Friedman's prepared remarks further stated,

---

[395] David Shepardson, *Akerson: 'We all' Misread Problems in GM's Recall Crisis: Ex-CEO Dubs Recall Crisis 'Clarion Call' for Change at Automaker*, DETROIT NEWS, July 28, 2014, http://www.detroitnews.com/article/20140728/AUTO0103/307280021.

[396] Bill Vlasic, *G.M.'s Board Is Seen as Slow in Reacting to Safety Crisis*, N.Y. TIMES, Sept. 7, 2014, http://www.nytimes.com/2014/09/08/business/gms-board-is-seen-as-slow-in-reacting-to-safety-crisis.html.

[397] *Oversight of and Policy considerations for the National Highway Traffic Safety Administration: Hearing Before S. Comm. on Commerce, Sci., & Transp., Subcomm.*

*"Instead of fostering a culture of safety, G.M. encouraged one of denial and delay that caused [sic] lives and endangered the American public."* [398]

323.   Friedman similarly testified on September 16, 2014 before the Senate Committee on Commerce, Science and Transportation, Subcommittee on Consumer Protection, Product Safety and Insurance:

> *General Motors was actively trying to hide the ball.  It wasn't simply incompetence on their part.  They had policies in place to not mention the word defect in order to shield information from NHTSA.  They were actively trying to hide the ball.  NHTSA* was working hard to find the ball and *was missing critical information.*[399]

324.   In an apparent contrast to how GM conducted its business during the Class Period, Defendant Barra stated on GM's October 1, 2014 conference call with investors that, "[W]hen I think about how do I start changing a culture, creating the ultimate culture that we want, it starts today with the behaviors that we demonstrate.  And we've been very clear with our leadership team and as we've rolled out the core values to every employee, that *we need to change behaviors, and that includes me*."[400]

325.   GM spokesperson Adler further admitted to *Bloomberg* on November

*on Consumer Protection, Product Safety, & Insurance,113th Cong*. (Sept. 16, 2014) (Statement of David Friedman, NHTSA Deputy Administrator).
[398] *Id.*
[399] *Id.*
[400] Conference Call, Gen. Motors Co., *Gen. Motors 2014 Global Bus. Conference Call* (Segment 1) (Oct. 1, 2014) at 6.

11, 2014 that the recent release of GM internal emails dated December 2013 demonstrating that GM had decided to conduct a recall three months before it actually did so, described below, "*are further confirmation that our system needed reform,* and we have done so.  *We have reorganized our entire safety investigation and decision process* and have more investigators, move issues more quickly and make better decisions with better data."[401]

326.  On November 11, 2014, Defendant GM President Dan Ammann, similarly *admitted* to *The Wall Street Journal*:

> It [the ignition switch recall] reinforced the need for ongoing change. We needed to break down our internal silos, integrate and require transparency across the business so that everyone is sharing information.  We want what we are calling a zero-defect mentality.  The customer is expecting a zero-defect vehicle and that is the expectation we need to meet.[402]

327.  On January 8, 2015, at a media roundtable, Defendant CEO Barra further *admitted* regarding the ignition switch recalls and GM's internal controls, *"It was clearly a tragedy, and it was deeply troubling.  But we quickly acknowledged our shortcomings and set about addressing them."*[403]

---

[401] David Welch, *GM Order Shows Work to Fix Ignition Months Before Recall*, BLOOMBERG, Nov. 11, 2011, http://www.bloomberg.com/news/2014-11-11/gm-switch-order-shows-failure-to-disclose-under-ceo-barra.html.

[402] Jeff Bennett, *GM's Ammann Drives for Change*, WALL ST. J., Nov. 11, 2014, http://www.wsj.com/articles/gms-ammann-pushes-for-change-1415751611.

[403] Bill Vlasic, *General Motors Chief Pledges to Move Beyond Recalls*, N.Y. TIMES, Jan. 8, 2015, http://www.nytimes.com/2015/01/09/business/gm-chief-mary-barra-vows-to-move-beyond-recalls.html?_r=1.

328.   In sum, GM's repeated admissions following its long-belated safety recalls of millions of cars further demonstrate that its internal controls during the Class Period were not effective, contradicting the repeated statements detailed below made by Defendants certifying the purported adequacy of GM's internal controls during the Class Period.

## V.    DEFENDANTS' FRAUDULENT SCHEME

### A.    GM Loses Focus On Safety

329.   Beginning in the late 1990's, the culture at GM dramatically shifted from one focused on safety and quality, to one focused on decreasing expenses and maintaining large executive pay packages at any cost.

330.   GM cannot credibly deny that such a shift occurred or that its effects were known within the Company.  A high-ranking GM whistleblower alerted GM's most-senior executives and Board of Directors to the problems arising from the shift from safety and quality to cost cutting by 2002.  In a July 25, 2002 letter, McAleer, the head of GM's corporate quality audit department from 1988 through 1998 and a GM employee for over 34 years, informed GM's Board that beginning in the late 1990's, GM was releasing 800 to 5,000 vehicles per month with severe safety defects.  As McAleer explained, the sheer number of vehicles with safety defects that GM was releasing for sale to consumers illustrates that GM had determined to prioritize cost-cutting over safety, and that GM's quality control process had

completely broken down.

331. McAleer was extremely knowledgeable about these issues. As noted, McAleer was in charge of GM's corporate quality audit Global Delivery Service ("GDS"), which consists of an audit of GM cars in plants, distribution centers, and rail yards immediately prior to delivery to dealers. The purpose of the GDS audit was to spot check GM vehicles before they are sent to dealers for sale to consumers.[404] McAleer further explained that between 1985 and 1995, the audit expanded from electrical testing to conducting a stationary check of each vehicle. In 1996, the audit expanded even further to include a driving test, whereby the vehicles were driven over an 80 foot bump track. The original purpose of the drive test was to detect irritating sounds, such as squeaks or rattles, which could constitute an annoyance to GM customers. However, the new drive test conducted by McAleer and his GDS audit team revealed serious safety defects in GM vehicles, all of which had been previously approved by GM for sale to consumers.

332. Among other problems, McAleer and his audit team identified serious

---

[404] *See* Tim Higgins & Nick Summers, *GM Recalls: How General Motors Silenced a Whistleblower*, BLOOMBERG BUSINESS WEEK, June 18, 2014, http://www.businessweek.com/articles/2014-06-18/gm-recalls-whistle-blower-was-ignored-mary-barra-faces-congress.

safety defects with tie rods;[405] the control arm;[406] steering gear; loose or disconnected steering wheels; and multiple fuel leaks. As McAleer stated in his letter to the Board, the GDS audit team was "shocked" by these findings, which they attributed to mistakes made during the quality control process at GM assembly plants.

333. Through the corporate quality audit process, McAleer also discovered that GM had failed to maintain any internal data on fasteners. McAleer requested that the corporate quality control audit be expanded to include an inspection of critical fasteners. In addition, McAleer requested that improvements be implemented to the final vehicle checks conducted at the assembly plants in order to make sure that the serious defects described above would be detected.

334. In response, McAleer ***"was repeatedly told to drop the issue."*** Nonetheless, McAleer felt a professional obligation to follow up, as his audit team identified more and more defects, indicating that GM had failed to take any action to address the problem. McAleer's insistence was met with "a hostile reaction," which ultimately culminated in McAleer being removed as the head of corporate quality audit, as detailed below. Nonetheless, as a GM employee, a member of management, and a GM shareholder, McAleer felt compelled to alert GM's Board

---

[405] A "tie rod" is a rod that holds the vehicle's steering apparatus in place by attaching the steering arm to the wheel.

[406] The "control arm" is part of the vehicle's front suspension, which attaches the steering wheel hub and assembly to the frame of the vehicle.

of Directors to these serious safety issues.

335.   The alarming facts observed by McAleer and others as part of the corporate quality audit process, including GM's hostile response to those who reported the problems internally, are indicative of a company culture that punished those who raised concerns about safety, and refused to address serious safety issues for fear of increasing costs.  For example, in approximately 1998, McAleer, along with Roland Hill ("Hill"), McAleer's direct superior who oversaw the GDS Group, and Ronald Haas ("Haas"), former Vice President, Quality, Reliability & Competitive Operations Implementation for GM North America who reported directly to former GM CEO Rick Wagoner, prepared a list of the serious safety defects they had identified but that GM had failed to address.  Both Haas and Hill were engineers, which meant that they had the requisite training and expertise to accurately detect such problems.  Their list included issues pertaining to gas leaks, suspension failures, brake [fluid] leaks, engine mount issues, and other serious safety risks.  The list pertained to all of GM's vehicles, including Cobalt's predecessor, the Cavalier.  The purpose of this list was to communicate to GM executives that GM's quality control process no longer ensured that defects would be identified and addressed before GM vehicles were put on the road.

336.   Haas and Hill presented the list of known safety defects they had prepared to GM's "Strategy Board" in approximately 1998.  The Strategy Board was

comprised of high-level executives, including then-CEO Rick Wagoner; various Executive Vice Presidents; Don Hackworth, former head of GM's North American Car group who was in charge of passenger car production; and Guy Briggs, former Vice President and General Manager of the GM Truck Group who was in charge of truck production. During the Strategy Board meeting where Haas and Hill presented the serious safety defects they had identified, they were expressly told that these issues were not of their concern and they should not get involved. As retribution for their presentation to senior management, Haas and Hill were both fired, and McAleer was put on paid leave for nearly a decade.

337. As another example of a whistleblower who was punished by GM, Courtland Kelley, a third-generation GM employee who worked with McAleer on the corporate quality audit, and took over for McAleer after McAleer was removed from his position, also attempted to raise safety defects and the failure of GM's quality control process with GM senior management.[407] In 2000, Kelley elevated his concerns regarding the number of safety defects detected during the corporate quality audit process to his direct supervisor, George Kingston ("Kingston"), Director of Lean Manufacturing Systems.[408] Kingston wasn't surprised and took no

---

[407] Tim Higgins & Nick Summers, *GM Recalls: How General Motors Silenced a Whistleblower*, BLOOMBERG BUSINESS WEEK, June 18, 2014, http://www.businessweek.com/articles/2014-06-18/gm-recalls-whistle-blower-was-ignored-mary-barra-faces-congress.
[408] *Id.*

action.  Kelley was eventually replaced, as discussed below.[409]

338.   The actions taken by GM describe a company that punished whistleblowers who attempted to elevate safety issues, acted in complete disregard of the safety of consumers of GM vehicles, and prioritized profits above safety and quality issues.  As described in McAleer's 2002 letter to the Board, in March 1998, GM officially "united its cost-cutting and quality departments" when Thomas LaSorda ("LaSorda") replaced Haas as Vice President, Quality, Reliability & Competitive Operations Implementation for GM North America, a position he held until 2000.  As detailed in McAleer's 2002 letter to the Board, at the first meeting of the quality department after LaSorda's appointment, LaSorda identified as one of his top priorities to eliminate the GDS audit program.

339.   Under LaSorda's leadership, GM continued to prioritize cost-cutting over safety and quality.  For example, in late 1999 to 2000, LaSorda implemented a new process for documenting life-threatening defects found during GM audits called the "significant quality incident" (SQI) system, which was significantly cheaper, but which made it more difficult for individuals at GM to identify system-wide problems.  McAleer warned the Board, ***"As a stand-alone system, SQI exemplifies a callous disregard for public safety, a total lack of due care, and willful ignorance that is quite simply beyond comprehension."***  In sum, McAleer stated, ***"The cost-***

---

[409] *Id.*

*cutting measures taken over the last few years ha[ve] obviously cut too deeply into the quality control area."*

340.   In his letter to the Board, McAleer described additional quality control failures, which resulted in vehicles with serious safety defects being released for sale to consumers.   For example, McAleer detailed a problem with a line of GM fuel connectors that resulted in GM plant manufacturers being unable to tell whether fuel lines on vehicles distributed for sale were properly connected.   As a result, fuel would leak into the ignition of the vehicle, resulting in a serious and hazardous risk of fire or explosion to the driver and passengers in the car.   GM knew about the problem, but largely took no action.   As McAleer stated in his letter to the Board, ***"I have described the internal control systems of GM as 'corrupt.'   While some car lines released corrections for this problem, most did nothing, despite a flood of warnings from multiple sources."*** In sum, Mr. McAleer told the Board, ***"I hope the above is enough for you to begin to understand the current situation."***

341.   McAleer's description of the fuel connector problem, and GM's failure to address the issue, is corroborated by Kelley's account of the same events.   In a *BloombergBusinessWeek* article, entitled "GM Recalls: How GM Silenced a Whistleblower," dated June 18, 2014, Kelley reported that he was personally aware of police reports which recounted incidents of failed fuel connectors and warned that had a spark occurred and set the fuel on fire, the people in these vehicles would have

been injured or killed.  Kelley also was personally aware of fire departments getting involved in addressing these fuel leaks.[410]  Still, GM refused to contact NHTSA or address the problem.[411]  Indeed, Kelley testified during a deposition regarding this issue, **"I heard them [GM engineers] have many discussions about not wanting to notify the government, not putting voice mails out to dealers, because the government could get them."**[412]  By December 2001, Kelley thought he had identified the cause of the fuel connector problem, but when he shared his conclusions with C.J. Martin, a GM product investigator, she asked "what do you want us to do, **recall** all the cars?"  When Kelley responded, "'If that's what needs to be done, [], yes, that's what we should do.'  She said that would be **way too expensive**."[413]

342.   As with McAleer, Kelley was **removed** from the corporate quality audit in 2002, and transferred to a different role as brand quality manager for the Cobalt's predecessor, the Cavalier.[414]  Still, he continued to hear troubling reports of fuel leaks, confirming that the issue had still not been addressed.  Kelley felt compelled to take action.  In June 17, 2002, he wrote a memo to Keith McKenzie, GM's director of car brand quality, stating, "**It is my belief that General Motors is violating the**

---

[410] *Id.*

[411] *Id.*

[412] *Id.*

[413] *Id.*

[414] *Id.*

***law by not properly dealing with safety issues that are persistent and ongoing.*** I have spent several years trying to work through the system at General Motors to address these concerns with a goal of protecting our customers and stockholders."[415] In response, McKenzie warned Kelley about another GM employee who had attempted to elevate safety issues, and whose career was ended as a result.[416]

343.  Two and a half months after Kelley sent his June 17, 2002 memo to McKenzie, McKenzie called a meeting with Kelley and Ron Porter, a GM product litigation attorney who was actively involved in GM decisions regarding the ignition switch defect at issue in this action, as described below.  At the meeting, "Kelley was told he shouldn't concern himself with defects on models other than the Cavalier."[417]   Kelley was eventually transferred to a new role with no job responsibilities, and replaced by Steven Oakley.[418]   As set forth below, Steven Oakley, who was in place at the time of the defective ignition switches, reported that he was reluctant to push hard on safety issues given what happened to his predecessor, yet, he felt obliged to do so when faced with the ignition switch defects, but he was overruled in any event.

344.  In his 2002 letter to GM's Board of Directors, McAleer further warned

---

[415] *Id.*
[416] *Id.*
[417] *Id.*
[418] *Id.*

the Board of the danger that disregard of safety issues, and a failure of internal controls presented to GM's reputation, stating, ***"Knowingly shipping a defective product to a consumer is the worst thing a corporation can do to destroy its public image. Knowingly shipping a vehicle that can injure a customer is the worst thing to have a public or jury believe."***

345.   McAleer concluded his 2002 letter to the Board by urging GM to take the following corrective actions:

- "Stop the continued shipment of unsafe vehicles";

- "Recall suspect vehicles in customers' hands"; and

- "Replace the current quality flow chart to make that organization independent of corporate politics and cost-cutting concerns."

McAleer warned the Board, ***"The public can forgive a mistake, but a cover-up is fatal."*** McAleer further urged the Board to take action, stating ***"You and your fellow Board members are the only hope this company has."***

346.   The warnings of McAleer and his GM colleagues fell on deaf ears. Instead, throughout the 2000s, GM continued to prioritize cost-cutting and profits at the expense of safety and quality.  Among other issues, GM began to increasingly rely on customer complaints – and not its internal safety systems – to alert the Company to safety issues.  When safety defects were identified, GM consistently took no corrective steps for fear of incurring additional costs.

347.   On June 28, 2014, *CNN* asked the parents of Brooke Melton (who, as

174

discussed herein, died in a crash while driving a Cobalt) if they believed that if Mr. McAleer's concerns about GM's corporate culture from his letter to the GM Board in 2002 had been properly addressed at that time, their daughter would still be alive.[419]  Ms. Melton responded, "I do.  It's heartbreaking to me that his concerns were ignored."  Mr. Melton also said that Mr. McAleer's letter "shines light on the fact that G.M. as a corporate culture wantonly ignored safety issues, even when alerted by their own employees."[420]

348.   As another example, in the early 2000s, Lori Queen ("Queen"), GM Vehicle Line Executive of small cars, including the Cobalt/Delta platform, introduced a set of cost-cutting principles at GM referred to internally as the "Big 4."[421]  As reported by *Automotive News*, the Big 4's guiding principles were that "GM project managers serve as strict taskmasters to make sure suppliers adhere to vehicle launch schedules and keep part design changes to a minimum."[422]  In other words, "Big 4 emphasized timing over quality."[423]  Indeed, as one engineer put it,

---

[419] Interview by Michael Smerconish with Beth Melton & Ken Melton (June 28, 2014), http://edition.cnn.com/TRANSCRIPTS/1406/28/smer.02.html.
[420] *Id*.
[421] Lindsay Chappell, *SAE Congress: GM Tries New Discipline in Launches*, AUTOMOTIVE NEWS, Apr. 11, 2005, http://www.autonews.com/article/20050411/SUB/504110792; *see also* Valukas, *supra* note 15, at 250.
[422] Lindsay Chappell, *SAE Congress: GM Tries New Discipline in Launches*, AUTOMOTIVE NEWS, Apr. 11, 2005, http://www.autonews.com/article/20050411/SUB/504110792.
[423] Valukas, *supra* note 15, at 250.

GM's emphasis on ***cost-cutting "permeates the fabric of the whole culture,"***[424] as detailed below at ¶¶352-65, 404-05,429-31, and 453-59.

349.  With respect to GM's de-emphasis on safety, GM employees also were formally trained in how to write about safety issues – and specifically, which ***words not to use***.[425]  A PowerPoint presentation given to GM employees in 2008 warned: write "smart," and do not use "judgmental adjectives and speculation."[426] Employees were instructed to avoid the following words, and use the below "smarter" replacements:

- "***Problem*** = Issue, Condition, Matter";

- "***Safety*** = Has Potential Safety Implications"; and

- "***Defect*** = Does not perform to design."[427]

350.  Employees also were instructed ***not to use certain sentences***.  For example, employees were told not to use the phrase "Dangerous … almost caused accident" and tellingly, not to state ***"This is a safety and security issue."***[428]

351.  In a press release issued on May 16, 2014 in connection with the Consent Order that GM entered into with NHTSA, NHTSA's Acting Administrator

---

[424] *Id*.

[425] *Id*. at 253-54.

[426] *Id*.

[427] *Id*.  Similarly, McAleer reports that he was instructed not to use the word "defect" in his reports and to use "discrepancy" instead.

[428] Valukas, *supra* note 15, at 254.

David Friedman similarly detailed GM's instruction to its employees not to use certain words that would elevate safety issues within the Company, stating: ***"GM desperately needs to rethink the corporate philosophy reflected in the documents we reviewed – including training materials that explicitly discouraged employees from using words like defect, dangerous, safety related, and many more essential for engineers and investigators to clearly communicate up the chain when they suspect a problem."***[429]

352.   In the aftermath of the ignition switch recalls at issue in this action, numerous GM employees, including senior executives, have acknowledged GM's cost-cutting culture which prioritized profits over safety.   For example, in her testimony before the House Energy and Commerce Committee on April 1, 2014, Defendant Barra explained that GM's failure to implement the ignition switch "fix" that it identified in 2005 was the result of the Company's fear of incurring additional costs, or as GM concluded, "not an acceptable business case [decision]."   Indeed, Barra ***admitted*** that GM had a ***"cost culture" instead of a "customer culture."***

353.   This cost-cutting culture had a severe systemic effect on the Company's handling of the ignition switch defects at issue in this action.   A vehicle recall is one

_____

[429] GM Consent Order Press Release Conference (May 16, 2014) (Statement of David Friedman, Acting Adm'r for NHTSA), at 1, http://www.nhtsa.gov/staticfiles/administration/pdf/presentations_speeches/2014/DF-GM-consent-order-news_05162014.pdf.

method for GM to reduce or eliminate vehicle defects.  However, like warranty claims, recalls impose significant costs on GM, including the costs to notify consumers of the recalls, the costs of the repairs, and any costs of courtesy transportation while vehicles are repaired.  As discussed in detail below, in the years between 2004 and 2014, GM faced significant warranty costs from the defective vehicles at issue, but there was an overall lull in the number of GM's recalls because of GM's anti-recall culture.  For example, as detailed below at ¶¶435-39, instead of implementing the "fix" which was an actual solution to the ignition switch problems, GM issued a Technical Service Bulletin ("TSB") in December 2005, warning dealers but not consumers of the impacted vehicles to remove heavy items from their key rings – *i.e.*, the cheaper but far more ineffective option.[430]  Indeed, the TSB was completely ineffective, at least in part due to the fact that GM determined to remove the word "stalling" from the bulletin for fear of alerting NHTSA to this serious safety concern, and potentially incurring even more costs in a large safety recall.[431]

354.   In fact, even though Steven Oakley, a GM Brand Quality Manager and the author of the draft TSB, "was reluctant to push hard on safety issues because of his perception that his predecessor [Kelley] had been pushed out of the job for doing just that,"[432] he still intentionally inserted the word "stall" into the bulletin, as a "hot"

---

[430] Valukas, *supra* note 15, at 8.
[431] *Id.* at 93.
[432] *Id.*

word which he hoped would attract attention within GM to this serious safety concern.[433]  Still, GM did not treat the issue as a safety defect warranting remedial action such as a recall, in order to avoid incurring significant costs.  Instead, GM removed the word "stall" from the bulletin prior to circulating it to GM dealers, as detailed below at ¶437.

355.   The impact of GM's internal decision-making is reflected in the number of vehicles that GM recalled.  The number of GM vehicles recalled in 2014, when the truth first began to emerge about the defective ignition switches, was the largest number of vehicles that GM had recalled in a single year since 2004, when GM recalled 10.4 million vehicles.  GM's total number of U.S. recalls through mid-May 2014 was also more than the amount the Company recalled during the ***previous six years combined***.[434]  As *MarketWatch* reported:  "it's the change in the number of cars recalled from previous years — up more than ***3,300%*** from 2013 and ***140%*** from 2004, which had the highest value for GM in the past decade — that's striking."[435]

---

[433] *Id.*

[434] Tim Higgins, Jeff Plungis & Jeff Green, *GM Recalls Drive U.S. to Most Since 2004 Before June*, Bloomberg, May 20, 2014, http://www. bloomberg.com/news/2014-05-20/gm-recalls-2-42-million-vehicles-in-u-s-safety-actions.html.

[435]  Sarah Squire, *GM recalls: The numbers tell a surprising story; A MarketWatch analysis shows General Motors had an unusual run of statistical good luck before the recall crisis of 2014*, MarketWatch, Aug. 6, 2014, http://projects. marketwatch.com/2014/gm-recalls-the-numbers-tell-a-surprising-story/.

356.   In the wake of GM's "flurry" of recalls in 2004, GM issued a remarkably low number of recalls compared to GM's percentage share of the market. Specifically, as *MarketWatch* reported on August 6, 2014, "[f]rom 2004 to 2014, 24% of all vehicles potentially affected by recalls were manufactured by GM," but "from 2004 to 2013, GM represented a relatively low 16% of all recalled vehicles."[436]

357.   Below are graphs reflecting how, for the six years prior to 2014, unlike other major car manufacturers, GM's percentage of all recalled vehicles was consistently below GM's percentage of all vehicles on the road.  The gray bars reflect the manufacturers' percentages of vehicles in operation, and the green bars reflect manufacturers' percentages of all recalled vehicles[437]:



---

[436] *Id.*
[437] *Id.*

As these graphs show, GM is the only major vehicle manufacturer who, from 2008 through 2013, did not recall the same or higher percentage of vehicles as its percentage of vehicles on the road, demonstrating GM's anti-recall culture.

### B.    Mid-2000s:  GM Launches New Small Car Brands In The Midst Of Massive Cost Cutting Efforts

358.   GM launched the Saturn Ion for model year 2003 and the Chevrolet Cobalt for model year 2005 at a time when GM faced significant competitive pressures, a historically low U.S. market share, and massive financial losses.  As a result of these intense financial pressures and GM's corporate culture that stressed cost cutting to the detriment of vehicle safety, GM, as discussed herein, avoided making necessary changes to these new vehicle designs that could have saved drivers' lives simply because those changes were perceived to have increased per-vehicle costs only slightly.

359.   In 2005, the model year of the Cobalt launch, amid competition from Japanese automakers, GM's U.S. market share slid to just over 26%, the Company's lowest market share since 1925.[438]   In the years prior, in order to compete with companies like Toyota which had dramatically increased their share of the U.S. market, GM had been forced to offer steep discounts on its vehicles, including

---

[438] *GM Board Gives Seat to Critic; Aide to Billionaire Investor Expected to Push Automaker on Cost-cutting Fronts*, GRAND RAPIDS PRESS, Feb. 7, 2006, at C1.

rebates of up to $4,000 per vehicle in 2003.[439]    Overall, these efforts proved ineffective and, by 2005, GM reported a consolidated net loss of $8.6 billion, the Company's largest loss since 1992.[440]    However, while GM originally reported a 2005 loss of $8.6 billion, in March 2006 (while under investigation by the SEC for flawed accounting practices), the Company increased that amount by $2 billion to $10.6 billion, and disclosed its intention to restate GM's earnings from the year 2000 through the first quarter of 2005 as a result of accounting errors.[441]

360.    In the face of these challenges, GM engaged in efforts to further reduce costs by cutting production, pressuring suppliers to lower costs, reducing health care and pension spending, and reducing its workforce.  As a cost-cutting measure, in 2004, GM decreased its engineering headcount by consolidating 11 engineering centers in the United States into one unit and adding to the responsibilities of its engineering personnel.[442]    This created an environment in which GM's engineers were overworked, one person was required to do the job of many, and the quality of

---

[439] Rick Popely, *GM, Ford Post Solid Sales Gains; Japanese Brands Increase Share of U.S. Market*, CHICAGO TRIBUNE, Oct. 2, 2003, http://articles.chicago tribune.com/2003-10-02/business/0310020339_1_parts-plants-domestic-automakers-market-share.

[440] Gen. Motors Co., Annual Report (Form 10-K) (Mar. 28, 2006), at 42; *GM Board Gives Seat to Critic; Aide to Billionaire Investor Expected to Push Automaker on Cost-cutting Fronts*, GRAND RAPIDS PRESS, Feb. 7, 2006, at C1.

[441] Jeremy W. Peters, *G.M. Loss for 2005 Is Steeper*, N.Y. TIMES, Mar. 17, 2006, http://www.nytimes.com/2006/03/17/business/17auto.html?pagewanted=print.

[442] Gen. Motors Co., Annual Report (Form 10-K) (Mar. 15, 2005), at 5.

the engineers' work suffered accordingly.[443]

361.   Thereafter, on November 21, 2005, GM announced further major cost-cutting plans to cease operations at twelve U.S. facilities by 2008, eliminating more than 30,000 jobs.[444]  GM also again pushed its suppliers to reduce costs and its cost-cutting plans included reducing material costs by $1 billion by 2008.[445]  Keeping projects on time because of impact on cost was of paramount concern.[446]  As GM's current Executive Vice President, Global Product Development, Purchasing & Supply Chain, Mark Reuss has expressed, the cost-cutting and time-cutting principles called the "Big 4" that GM implemented in the early 2000s emphasized timing over quality.[447]

362.   As a reflection of the financial "crisis" that GM faced, major shareholders publicly criticized even these efforts as insufficient.  In January 2006, Jerome B. York ("York"), who had recently joined the GM Board and who worked for GM's largest shareholder at the time (Kirk Kerkorian), called for GM to "go into crisis mode" and find more ways to close non-core businesses and assets.  GM's then-CFO, Fritz Henderson, responded to York in a *Reuters* news article on January 11, 2006, stating that, "I understand crisis mode and I am in it and have been for a

---

[443] Valukas, *supra* note 15, at 250-51.
[444] Gen. Motors Co., Annual Report (Form 10-K) (Mar. 28, 2006), at 5.
[445] *Id*. at 6.
[446] Valukas, *supra* note 15, at 250.
[447] *Id*.

while."[448]

363.   Matters only got worse for GM.  By 2007, when high gasoline prices were pushing consumers to buy small cars (and primarily small car models made by Toyota, Honda and Nissan) over the trucks and SUVs that GM had come to rely on for its revenues, GM reportedly lost $729 per each vehicle it built in North America.[449]

364.   Not only were GM's cost-cutting measures making it increasingly less likely for GM to produce safe vehicles, but GM also reduced its ability to track and record accidents and other safety failures of GM vehicles.  Specifically, since 2003, "TREAD" was the principal database at GM used by the Company to track incidents related to its vehicles.[450]   From 2003 to 2007 or 2008, GM had a team of eight employees responsible for TREAD data.  However, in around 2007-2008, this team was cut to three, and GM eliminated the resources to be able to mine its internal data effectively.[451]

365.   Part of GM's cost-cutting plans to deal with these harsh economic circumstances was to reduce development costs "through the use of common vehicle

---

[448] David Bailey, *GM Slashes Prices in Attempt to Avoid Rebates; Kerkorian Wants Dividend Cut, Sale of Saab,* NATIONAL POST, Jan. 11, 2006, at FP5.
[449] Neal E. Boudette, *Detroit Levels Productivity Playing Field:  Auto Makers Slash Labor-Cost Advantage Of Japanese Rivals*, WALL ST. J., June 6, 2008, http://www.wsj.com/news/articles/SB121271232158750557?mod=_newsreel_2.
[450] Valukas, *supra* note 15, at 306.
[451] *Id*. at 307.

architecture that could be used on a global basis."[452]  As part of this effort, vehicles from the same platform would share certain base design elements.  For example, the Cobalt, Ion, Chevrolet HHR and Pontiac G5, which were cost-conscious vehicles produced on slim margins,[453] shared GM's "Delta" platform.  The Saturn Sky and Pontiac Solstice shared GM's "Kappa" platform.[454]

### C.   GM Develops And Installs Defective Ignition Switches In Millions Of Its Vehicles[455]

366.   This case concerns the defective ignition switches that GM built into its vehicles that caused the vehicles to shut down while driving, often leading to very serious injury or death.  Despite the fact that from day one the switches did not meet the Company's own specifications and the numerous complaints which followed, GM waited more than a decade (until it had no choice) to issue the safety recalls that finally pulled those vehicles from the road to fix the problems.  This section discusses the general design of the ignition switches, the specific manner in which GM and its supplier designed defective switches, and how GM launched its cars, and marketed them to very young, inexperienced drivers, regardless of these defects.

367.   As discussed in more detail below, an ignition switch is critically

---

[452] Gen. Motors Co., Annual Report (Form 10-K) (Mar. 28, 2006), at 50.
[453] Valukas, *supra* note 15, at 22.
[454] *Id*. at 18.
[455] Although the facts described herein predate the GM bankruptcy, they are all still relevant to Lead Plaintiff's claims, and GM's bankruptcy has no effect on the relevance of these facts to Defendants' scienter in this action.

important to a vehicle's safety because – quite simply – turning off the switch turns off the engine, disables the power steering and power brakes, and shuts off the car's airbags.  Any single one of those events is a serious safety hazard to anyone riding in the vehicle, as detailed above.

368.   The ignition switches at issue in this case were defective because they were built with an insufficient amount of resistance to being switched between positions.  This allowed the switches to inadvertently rotate between positions and move from being in the "Run" position to either "Accessory" or "Off," with disastrous consequences.

369.   By way of background, the ignition switches at issue here have four different positions:  "Off," "Accessory," "Run," and "Start" (or "Crank").[456]  To start the vehicle, from the "Off" position, the driver turns the key in the ignition to "Accessory."   In this mode, certain limited electrical functions are turned on and active in the vehicle, such as the radio, but not the airbag's sensing system.[457]   In other words, GM vehicles are intentionally designed so that when the vehicle is in Accessory mode (or Off), the airbags will not deploy, to avoid situations of airbag deployment where a person is sitting stationary in the vehicle or repairing it and may not be wearing a seatbelt.[458]

---

[456] Valukas, *supra* note 15, at 26.
[457] *Id.* at 25
[458] *Id.* at 26

370.   To continue with the starting cycle from the Accessory position, the driver rotates the ignition switch first to Run, and then to Crank.   In the Crank position, once the engine "turns over" and starts, the driver allows the key to rotate back to Run and stay in that position until the car is turned off.   In the Run mode, the vehicle's electrical systems, including its power brakes, power steering, and airbag deployment sensing system, are turned on and active.

371.   It is critically important to the safe functioning of the vehicle that the switch adequately "catch" at the Run position because if it does not, the switch can rotate unintentionally from Run to Accessory or Off without warning, which turns the vehicle off while the car is in motion.   The adequacy of the switch to "catch" at each position is determined by the amount of torque (or rotational force) that is required to move the switch from one position to another.[459]   If the switch has an inadequately low torque rating, that means it may easily rotate between the Off, Accessory, Run and Crank positions.   As detailed herein, the torque rating in the defective ignition switches was so defectively low that they could switch out of the Run position with a mere bump in the road or a "graze" of the driver's knee.

372.   To take advantage of economies in purchasing, vehicles built on global architecture had identical parts and connecting points.   For example, the ignition switch for the Delta platform vehicles (the "Delta Ignition Switch") was a "corporate

---

[459] *Id.* at 26

187

common" part that GM used in multiple vehicles to reduce costs.[460]  It was a new ignition switch design that was developed to be less expensive.[461]  As shown in the figure below, and along the lines discussed above, turning the key within the Delta Ignition Switch rotates a plastic disc inside the switch.  The plastic disc contains notches, or "detents."  A detent is a catch in the switch that prevents motion between positions until sufficient force is exerted to move the switch to a different catch.

373.   After the plastic disc rotates into the "Run" position, for example, a small spring-loaded metal part called the "detent plunger" slides into the detent in order to catch the plastic disc, and keep the disc from rotating out of a given position. The detent plunger is what should hold the switch in either the "Run" or "Accessory" position, as shown in Figure 1 below:

---

[460] *Id.* at 19, 35.
[461] *Id.* at 35.



**Figure 1**[462]

In early models of the Delta Vehicles (which includes the Cobalt and other brands

listed below), the ignition switch's detent plunger was too short and had a spring in

it that was too weak to prevent the plastic disc from slipping out of position, as shown

in Figure 2 below.  In that dangerously defective design, the torque specification of

the switch was too low, even below the guidelines established by GM itself, and this

allowed for extremely low amounts of torque on the key to rotate the switch and the

dangerous consequences which followed.

---

[462] Guilbert Gates, *The Fault in the Cobalt Ignition Switch*, N.Y. TIMES, June 5, 2014, http://www.nytimes.com/interactive/2014/06/05/business/The-Fault-in-the-Cobalt-Ignition switch.html.



**Figure 2**[463]

Consequently, normal operation of the vehicle, such as road vibration, inadvertent contact with the key or shaft housing – for instance, accidentally jostling the shaft housing or a key chain with one's knee – could cause the plastic disc to rotate out of the "Run" position into "Accessory" or "Off," thus causing the car to turn off while in motion.

374.   Although the Delta Vehicles were first launched for model year 2003, the design of the Delta Ignition Switches began years earlier.  To build the Delta Ignition Switch, GM solicited bids from its suppliers, a process known as "sourcing," and selected from among them Eaton Corporation to develop and produce the switch.[464]  On October 2, 1997, GM Project Engineer Thomas Utter ("Utter") drafted the initial Component Technical Specification ("CTS") for the Delta Ignition Switch that communicated to Eaton (and later Delphi), which acquired Eaton's business in 2001) GM's precise requirements for how the Delta Ignition

---

[463]  *Id.*
[464]  Valukas, *supra* note 15, at 35.

Switch needed to operate (including its torque rating), as pictured below:



375.   The lines in the above figure, called a "force displacement curve," show the amount of torque, or rotational force, that GM initially planned to require for drivers to rotate the Delta Ignition Switch between, for example, the "ACC" (or Accessory) and "RUN" positions.  This curve was found in Section 3.2.2.3 of GM's Specification, which governed the "Tactile Characteristics" of the switch.  The above figure represents GM's "TARGET" force displacement curve and specified 20 Newton-centimeters ("N-cm") as the torque that would be required for a driver to turn the ignition from Run to Accessory.  The target curve indicated that the "actual curve [was] to be furnished by [the] supplier after GM Engineering approval" – indicating that GM still needed to provide Eaton/Delphi with further approval.[465]

---

[465] *Id.* at 35-36.

376.    Sometime in 1998, Utter transferred responsibility for the CTS of the Delta Ignition Switch to Calvin Wolf, a GM Design Release Engineer ("DRE").[466] Raymond DeGiorgio, a GM Engineer ("DeGiorgio"), then later took over responsibility of the Delta Ignition Switch sometime between October 1999 and March 2001.[467]  On March 22, 2001, DeGiorgio "finalized" the Specification for the Ignition Switch.[468]    Section 3.2.2.3 of the 2001 version of the Specification maintained the original 1997 Specification's force displacement curve and specified a required rotational torque of 20 N-cm to turn the Ignition Switch from Run to Accessory.[469]    DeGiorgio also removed the notation indicating that this was a "TARGET curve only."  This meant that the force displacement curve was no longer simply a target, but was instead GM's actual, final torque requirement for the switch. DeGiorgio also specified that "Torque Curve allowable tolerance shall not exceed +/- 5 N-cm."[470]  Thus, the torque necessary to move the Ignition Switch from Run to Accessory was, pursuant to the Specification, ***required*** by GM to fall somewhere

---

[466] GM's Design Release Engineers ("DREs") had responsibility for working with GM's suppliers to develop specific vehicle components for use in particular GM vehicles and to ensure those components satisfied GM's requirements and specifications before approving the part for use in a vehicle.  Valukas, *supra* note 15, at 37, 293.
[467] *Id*. at 37.
[468] Component Technical Specification, Mar. 22, 2001 [GMHEC000139324].
[469] Component Technical Specification, Mar. 22, 2001 [GMHEC000139341].
[470] Component Technical Specification, Mar. 22, 2001 [GMHEC000139342].

between 15 N-cm and 25 N-cm.[471]

377.   On January 10, 2002, however, Delphi noted that its tests revealed that the Delta Ignition Switch it had built fell below the specified minimum torque requirement of 15 N-cm.[472]   That day, Delphi prepared an Analysis/Development/Validation Plan & Report ("ADVP&R") that documented the results of component-level validation tests required by GM's Specification.[473]

378.   These tests, conducted in the fall of 2001, included a test to determine whether the torque required to rotate the switch from Run to Accessory complied with the Specification.   Every sample set tested included switches for which the torque measurement fell below the Specification's minimum requirement of 15 N-cm.[474]   The January 10, 2002 report denoted this by stating "Not OK" next to each result, as shown below:

| 3.2.2.3 | Torque-Angle | Actuation Torque Off-ACC ACC-RUN Max Travel Return Torque RUN-ACC ACC-OFF | All In N-cm 25/15 25/15 65/55 15 Min 25/15 25/15 | Delp hi | DV | 12 | D | 10-26-2001 | 10-31-2001 | 12 | D | Beta | Not OK Not OK Not OK OK Not OK Not OK |

These results were not found in GM's files, but there is every reason to believe GM

---

[471] *Id.*

[472] Delphi Analysis/Development/Validation Plan & Report, Jan. 10, 2002, at SC-000005.

[473] *Id.*

[474] *Id.*

reviewed them.[475]

379.   On February 18, 2002, Delphi product engineer Erik Mattson e-mailed GM that the Accessory detent was at "9.5 [N-cm]," well below the "15 [N-cm] +\- 2 [N-cm]" specification that Mattson stated GM had requested based on "Talc samples" in order to achieve the desired "detent feel."[476]   At that time, GM acknowledged that the torque value of the switch was "still too soft of a detent" and did not meet the requirements of GM's own Specification.[477]   Mattson explained to GM that the torque in the switch "can be increased," and that the cost of changing the switch was "nominal," but that it would take time to test and validate the switch.[478]

380.   From April through May 21, 2002, Delphi conducted additional torque tests of the switch and prepared another report for GM that showed even worse results:  torque values to rotate from Run to Accessory ranged from as low as 4 N-cm or 5 N-cm up to only 11 N-cm.  Like the January 2002 report, the May 2002 report states "Not OK" next to each of the results.[479]

---

[475] Valukas, *supra* note 15, at 46.

[476] E-mail from Erik Mattson, Delphi Mechatronics Systems, to Raymond DeGiorgio, Gen. Motors, Co. (Feb. 18, 2002, 16:11) [GMHEC000444038-39].

[477] E-mail from Raymond DeGiorgio, Gen. Motors, Co., to Erik Mattson, Delphi Mechatronics Systems (Feb. 19, 2002, 11:39) [GMHEC000444038].

[478] E-mail from Erik Mattson, Delphi Mechatronics Systems, to Raymond DeGiorgio, Gen. Motors, Co. (Feb. 19, 2002, 14:32) [GMHEC000444039].

[479] GM Analysis/Development/Validation Plan & Report (ADVP&R) For Suppliers (May 21, 2002) at SC-000021.

381.   On May 3, 2002, GM personnel, aware that the ignition switch was far below minimum specifications, nonetheless approved shipment of the switch through GM's Production Part Approval Process, known as the "PPAP."[480]  PPAP is the process through which parts are tested, validated, and officially released for production.   The PPAP package should contain, among other things, two key authorizations:   one from the supplier and one from GM.   The Commodity Validation Sign Off, GM Form 3660, signifies GM engineering's approval for a part to ship, and the Part Submission Warrant ("PSW") represents the supplier's confirmation that the parts being shipped comply with GM's requirements.[481]

382.   Ultimately, the dangerously defective Delta Ignition Switch went into production in the Delta Platform vehicles, as well as the Saturn Sky and Pontiac Solstice, millions of cars, although the switch's torque rating was well below the requirements of GM's own Specification.

### D.   GM Launches The Ion And Cobalt Car Brands, Markets Them To Very Young Drivers, And Sells Them To Rental Car Companies – Two Demographics Whose Drivers Would Be Inexperienced With The Vehicles In Emergency Situations

383.   In October 2002, GM launched the Saturn Ion into production, for model year 2003.[482]  At the time the Ion went into production, it was the first small

---

[480] Valukas, *supra* note 15, at 50-51.

[481] *Id*. at 51.

[482] *Id*. at 54.

sedan from GM's Delta platform, which would later include the Chevrolet Cobalt and other vehicles equipped with the defective ignition switches.[483]   The Ignition Switch used in the Delta Platform was also later used in certain model years of Kappa Platform vehicles - the Saturn Sky and Pontiac Solstice.[484]

384.   GM marketed both the Ion and the Cobalt to younger drivers, who tragically are the persons least experienced or equipped to deal with the vehicles suddenly shutting down without warning while driving due to the defective ignition switch, as detailed above at ¶¶168-720.   For the Saturn Ion, GM hosted marketing events for young people at nightclubs, including one in 2002 in Times Square.[485]   As the Marketing Manager for the Ion told the *AutoChannel* on April 2, 2002:  "This high-profile New York launch party will help the Ion make an immediate and powerful impact and will draw young car buyers to Saturn's all-new products."

385.   GM's marketing materials for the Ion portrayed young drivers exploring the world with friends, while also claiming that the Ion was exceedingly safe.   The image of a young woman below is from the 2006 Saturn Ion brochure, which also claimed that "***Safety is all around you***...[t]hanks to meticulously

---

[483] Tony Swan, *Preview: Saturn Ion: Cool? Yes. Electrifying? We'll See*, CAR AND DRIVER, vol. 48, no. 2, Oct. 2002, http://www.caranddriver.com/ reviews/saturn-ion-first-drive-review.

[484] Valukas, *supra* note 15, at 18.

[485] *Saturn Invites Young New Yorkers to Celebration for ION Launch*, AUTO CHANNEL, Apr. 2, 2002, http://www.theautochannel.com/news/2002/04/02/038119.html.

engineered safety tools," including the Ion's "dual-stage front air bags, which use sensors to instantaneously measure collision conditions and determine how the air bags should be deployed."  The Ion's airbags, however, would not deploy if a crash occurred due to or during a shutdown caused by the defective ignition switches.



386.   GM also wanted the Cobalt to be an "aspirational vehicle" and specifically directed marketing efforts for the Cobalt at young drivers.[486]  During the launch of the Cobalt brand, GM held promotional events at several popular spring break locationsbecause, as the marketing group that hosted the Cobalt events, stated: *"The prime target demo[graphic] for the Cobalt is young adult drivers (18-24)."*[487] GM's marketing efforts bore fruit:  the Cobalt, for example, enjoyed substantial

---

[486] Valukas, *supra* note 15, at 20.
[487] Revolver Marketing Group, *General Motors/Chevrolet National "Cobalt" Brand Launch,* http://www.revolvermarketinggroup.com/project/general-motors chevrolet-national-launch-of-the-cobalt-brand/.

sales, including to younger drivers.  By the end of 2005, the Cobalt was GM's second-best-selling car even though truck and SUV sales had until 2004 represented 60% of its overall sales.[488]  And, by the end of 2008, 40 percent of Cobalt Coupe sales were to drivers under 30.[489]

387.   In order to boost Cobalt and other Delta platform car sales, GM also offered steep discounts on these vehicles and sold them in large volumes to fleet buyers, including daily rental car companies.[490]  In 2005 and 2006, GM sold more than 60,000 Cobalts – over 30 percent of all Cobalts sold in those years – to rental car companies.[491]  During this time period, the four largest rental car companies in the United States[492] – Enterprise, Hertz, Vanguard and Avis – all had Cobalts in their respective fleets.[493]  However, just as young drivers were the worst possible demographic to drive the defective GM vehicles, so were rental car drivers, who

---

[488] Staff/Wire Reports, *Cobalt Ranks Second in Sales*, VINDY.COM, Jan. 5, 2006, http:www4.vindy.com/content/business_tech/372311088812641.php; Gen. Motors Co., Annual Report (Form 10-K) (Mar. 15, 2005), at 47; Gen. Motors Co., Annual Report (Form 10-K) (Mar. 28, 2006), at 5, 45, 48.

[489] Valukas, *supra* note 15, at 20.

[490] *Id*. at 22.

[491] *Id*.

[492] *2005 U.S. Car Rental Market*, AUTO RENTAL NEWS (Jan.-Feb. 2006), http://www.autorentalnews.com/fc_resources/2005uscarrentalmarket.pdf.;   *2006 U.S. Car Rental Market*, AUTO RENTAL NEWS, http://www.autorentalnews. com/fc_resources/2006uscarrentalmarket.pdf.

[493] Jeff Plungis & Tim Higgins, *GM Misses Red Flags From Rental Car Canaries on Crashes*, BLOOMBERG, July 31, 2014, http://www.bloomberg.com/ news/print/2014-07-31/rental-car-firms-pushed-gm-on-fatal-crashes-before-recall.html.

would be unfamiliar with the layout and handling of the cars, and therefore at even a greater risk of injury or death if they shut down while driving them. As *Bloomberg* reported on July 31, 2014:

> Rental cars tend to be driven a lot of miles. They're used by different drivers all the time, many of whom are unfamiliar with the vehicle. ***That can be the difference in surviving and perishing in an emergency situation***, said Clarence Ditlow, executive director of the Washington-based research group Center for Auto Safety.[494]

388.  As set forth below, among other sources of information, GM's sales of its Delta Vehicles to rental car companies quickly revealed to GM the serious safety risks associated with the defective cars, as complaints and highly suspicious accidents quickly began to mount.

**E.   GM Becomes Aware Of The Tendency Of Its Cars To Shut Down From Numerous Sources, But Knowingly Or Recklessly Fails To Recall Its Cars Or Record A Sufficient Financial Reserve For Over 9 Years, Exposing The Corporation To Massive Liabilities And Criminal Investigation Exposure**

389.  Not long after the Cobalt and other GM vehicles with the defective ignition switches reached the market, drivers of these vehicles began experiencing moving shutdowns, with the cars' engines shutting off in the middle of driving. The underlying reason for these moving shutdowns was that the defective ignition switches failed to stay in the Run position after the car was started. Despite the dangers of moving shutdowns, these defects were not addressed by GM for nearly a

---

[494] *Id.*

decade.

390.   As discussed above, the amount of effort required to rotate the ignition switch out of Run was below GM's specifications, and consequently during normal driving, a mere bump in the road or even slight unintentional contact with the key or steering column could cause the ignition switch to rotate out of position from Run back to the Accessory or Off positions and cause a moving shutdown.  Given this defect, GM was obligated to not sell the vehicles containing the defective switches, to recall any cars it had sold with the defective switches, and to properly account for any costs to the Company from such repairs (including warranty costs) and the costs of the recalls as Liabilities and Contingencies.  For nearly a decade, however, GM refused to do so, notwithstanding the serious safety risks of moving shutdowns, even as the evidence also showed that the switch was causing life-threatening and fatal crashes.

### 1.    GM Receives Hundreds Of Complaints About The Ion's Defective Ignition Switch And Ergonomic Placement

391.   Throughout 2003, after the October 2002 launch of the Ion, GM's Saturn division received *hundreds of customer complaints and warranty claims* related to the MY 2003 Ion ignition switch,[495] which included numerous reports of moving shutdowns.[496]

---

[495] Valukas, *supra* note 15, at 54.

[496] *Id.*

392.   On October 9, 2003, a GM Field Performance Report was opened to address hundreds of customers' comments of stalls while driving.  The report attached a list of 65 Ion stalls, some attributed to heavy key chains whose weight had rotated the ignition switch from Run to Accessory or Off.[497]  However, the report was cancelled/closed in January 2004 under the false assertion that another report had resolved the issue.[498]  But, in fact, the other report did not address stalls and only addressed a "no crank/no start" problem, which happens when a parked vehicle will not start when the ignition switch is turned to the Crank position.[499]

393.   Numerous reports also emerged showing that the problem was not limited to the design of the switch, but also related to the ergonomic design of where the switch was located on the steering wheel column.  Data from GM's Captured Test Fleet ("CTF") – *i.e.*, vehicles driven and evaluated by GM employees before the models are sold to public consumers – collected for the Ion and Cobalt pre-production vehicles included numerous reports of engine shutdowns due to ignition switch issues caused by the low placement of the switch on the steering column near a driver's knee.[500]  For example:

- A December 5, 2002 report from the CTF relating to a 2003 Saturn Ion reads:  "The position of the ignition key leaves it vulnerable to being bumped by your knee while driving and shutting off the engine.  ***I've***

---

[497] *Id.*

[498] *Id.* at 54-55.

[499] *Id.* at 55.

[500] *Id.* at 59.

***accidently done this twice while driving on the expressway.***  I'm concerned the steering wheel may lock up too.  There should be a finger lock on the key to keep it from accidently turning."[501]

- A January 9, 2004 report received from GM employee Gerald A. Young relating to a MY 2004 Ion stated:  "The ignition switch is too low.  All other keys and the key fob hit on the driver's right knee.  The switch should be raised at least one inch toward the wiper stalk," and characterized this problem as "a basic design flaw [that] should be corrected if we want repeat sales."[502]

- In a February 19, 2004 Report also relating to a MY 2004 Ion, GM employee Onassis Matthews stated:  "The location of the ignition key was in the general location where my knee would rest (I am 6' 3" tall, not many places to put my knee).  ***On several occasions, I inadvertently tum [sic] the ignition key off with my knee while driving down the road***.  For a tall person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position."[503]

- In an April 15, 2004 Report also relating to a MY 2004 Ion, GM employee Raymond P. Smith reported experiencing a one-time inadvertent shut-off:  ***"I thought that my knee had inadvertently turned the key to the off position."***[504]

394.  Faced with these real-world accounts from its own employees of a material safety defect with the Ion, instead of fixing the problem before public consumers would start driving the cars, GM knowingly or recklessly continued to bring them to market anyway.

---

[501] *Id*. at 59, 310.

[502] *Id*. at 57, n.219.

[503] *Id*.

[504] *Id*.

### 2.   GM Launches The Cobalt And Immediately Learns Of Moving Shutdowns Tied To Its Defective Ignition Switch

395.   In August 2004, GM started mass production on the Cobalt[505] for the 2005 Model Year and, despite the above reports of problems with the Ion, nevertheless manufactured the Cobalt with the defective ignition switch.[506]

396.   At the time of the Cobalt's launch, reports also quickly surfaced of moving shutdowns caused by drivers bumping the key fob or key chain with his or her knee, causing the Cobalts to shut down:

- At a summer or fall 2004 press event associated with the initial launch of the Cobalt in Santa Barbara, California, a journalist informed Doug Parks, GM's Cobalt Chief Engineer ("Parks"), that while adjusting his seat in the Cobalt he was driving, the journalist had ***turned off the car by hitting his knee against the key fob or chain***.[507]

- After the Cobalt press event, in November 2004, Gary Altman, GM Program Engineering Manager ("PEM") ("Altman"), and another GM engineer, test drove a Cobalt at the Milford Proving Grounds and ***replicated the incident described by the journalist***.[508]

- One engineer at GM's Milford Proving Grounds believed that he had heard a discussion among the Ion or Cobalt program team about an "executive test drive" event at which then-CEO Rick Wagoner also had "kneed off" the ignition switch while driving.[509]

397.   On November 19, 2004, GM personnel opened a Problem Resolution

---

[505] *Id*. at 57.

[506] *Id*.

[507] *Id*. at 59-60.

[508] *Id*. at 60.

[509] *Id*. at 60, n.234.

Tracking System (defined above as "PRTS") report number N172404 to address the complaint at the press event that the Cobalt could be ***"keyed off with knee while driving."***[510]   As discussed above, the PRTS is a database used by GM to document and track engineering problems identified in testing or through warranty data or customer feedback.[511]

398.   On November 22, 2004, engineers in GM's High Performance Vehicle Operations ("HPVO") group also repeatedly experienced a moving shutdown during a track test of the Cobalt SS (the high-performance version of the Cobalt) when the driver's knee or hand ***"slightly graze[d]"*** the key fob while downshifting, ***"the ignition switch will rotate backwards one detent to the acc'y run position which shuts the car off."***[512]   Thus, by the fall of 2004, GM employees had noted that even a "slight graze" of the key fob would move the ignition out of the Run position causing a moving shutdown.   Those same employees questioned if the ignition switch was meeting torque specifications and suggested a stronger spring to increase torque.[513]

399.   As an internal GM slide deck stated, "It has been reported that the

---

[510] Gen. Motors Co., Part-Location: Ignition Key Cylinder Assembly-Column-Steering, Complaint: vehicle can be keyed off with knee while driving, N172404 (Jan. 7 2005) [GMHEC000001727-41].

[511] Valukas, *supra* note 15, at 54.

[512] E-mail from Andrew Brenz to Raymond DeGiorgio, Gen. Motors Co. (Nov. 22, 2004) [GMHEC000330211].

[513] Valukas, *supra* note 15, at 62.

driver's knee can hit the key and fob in the ignition switch and turn off the engine during heel/toe – brake/throttle actuation used for spirited driving maneuvers." Using a modeling tool, GM was able to show a condition where the driver's knee was within less than 10 mm from the key in the ignition switch:



400. On February 28, 2005, GM recognized the problems associated with the vehicles' potential to suffer moving shutdowns and issued a Preliminary Information on the matter. GM Preliminary Information communications are sent to dealers (and not directly to consumers) to alert the dealers of problems with a vehicle by describing issues of which GM has become aware, even before engineers have devised a solution to them.[514] GM's February 2005 Preliminary Information explained the potential for drivers to inadvertently turn off the ignition, explained

---

[514] *Id.* at 66.

the cause to be the low torque of the ignition switch, and specifically noted the potential for a "stall."[515]  The February 2005 Preliminary Information also explained that "[t]he customer should be advised of this potential and to take steps, such as removing unessential items from their key chain, to prevent it."[516]  This recommendation, which was not provided directly to consumers, demonstrated GM's recognition of the problem but also the Company's refusal to take true corrective action to address it – nine years before the recalls finally began.

### 3. Winter 2004 Through March 2005:  While More Reports Of Cobalt Shutdowns Mount, GM Closes The November 2004 PRTS With No Solution

401.  After the Cobalt Program opened the November 19, 2004 PRTS, additional complaints of Cobalt shutdowns continued to come to GM's attention, including through reports from GM's own CTF that identified the problem as "low torque" and a "key detent" that is "too low":[517]

- On December 3, 2004, a GM driver of a MY 2005 Cobalt in the CTF reported:  "While on the highway, the engine shut off with accessories still on. . . .  After further review, my knee had hit the GM Brown leather key holder and caused the ignition to rotate ccw [counter-clockwise] past the ignition detent but not past the accessory.  I am able to repeat this condition.  *Feel the ignition key detent is too low allowing for movement ccw and shutoff the engine*."[518]

---

[515] Gen. Motors Co., Preliminary Information, *Engine Stalls, Loss of Electrical Systems, and No DTCs* (Feb. 28, 2005).

[516] *Id*.

[517] Valukas, *supra* note 15, at 75.

[518] *Id*. at 312.

- On December 22, 2004, a GM driver of a MY 2005 Cobalt in the CTF reported:   "Inadvertent engine shut off when driving - key switch is easily turned from run to off when you[r] knee touches the key ring. This has occur[r]ed twice, once at freeway speeds [on] I75 when I went to brake in traffic and then when I was making a low speed RH [right-hand] turn in my subdivision approx. 20mph when I went to brake. ***Possible low torque on lock cylinder rotation***.  Key ring 1fob, 6house keys, 1 car,+4small."[519]

- On March 9, 2005, a GM engineer reported that, while driving a Cobalt SS with manual transmission, his knee contacted the key fob and key ring which caused "pulling on the key to move it to the 'Off' position."[520]  The engineer also noted that the key fob "levered around the steering column cover and turned the ignition off."[521]

- On March 21, 2005, a GM driver of a MY 2005 Cobalt in the CTF reported:   "Intermittent stall at freeway speeds.  This was due to my knee/leg ***lightly touching*** my key rings when braking.  11 keys on double key ring in addition to the vehicle key and one key fob.  I didn't even feel myself contact the keys during this braking maneuver where I lifted my right foot off the gas to apply the brake.   Tachometer and speedo went to zero."[522]

402.   By March 2005, GM engineers internally recognized that they were faced with a problem that required a solution.  The engineers thus internally prepared proposed solutions in presentations to the Current Production Improvement Team

---

[519] *Id.* at 311.

[520] *Id*. at 76.

[521] *Id*.

[522] *Id*. at 311-12.

("CPIT")[523] and the Vehicle and Process Integration Review ("VAPIR") team.[524]

403.   A document concerning the March 1, 2005 VAPIR meeting states that, with respect to the "Ignition Key Cylinder assembly, Column – Steering," the ***"vehicle can be keyed off with knees while driving."***[525]   A presentation provided to the VAPIR committee on March 1, 2005 listed two possible "Best Solutions," yet neither involved improving the ignition switch itself.[526]   The engineers also included in their presentation "Ruled Out" solutions, which focused on the possibility that it was the design of the Cobalt and Ion keys that was partially causing the problem because the keys had a longer slot rather than a smaller hole in them.   The proposals thus "ruled out" changing the key design from a slot to a hole, as shown in the figure below.[527]

---

[523] The CPIT included a cross-section of business people and engineers, including the Program Engineering Managers for the vehicle.   The CPIT was chaired by the Vehicle Line Director who reports to the Vehicle Line Executive (in this case, Lori Queen); Valukas, *supra* note 15, at 64.

[524] The VAPIR team includes a cross-section of Vehicle System Engineers who are supposed to be able to recognize whether an issue impacts other functions within the vehicle; Valukas, *supra* note 15, at 66.

[525] GMX001 Program Notebook: VAPIR 3-1-05 [GMHEC000228076].

[526] Those two proposals involved modifying the lock housing cam shaft and adding a plastic sleeve to the lock housing-to-cylinder interface.   GMX001 Lock Module Detent in RUN Presentation, at 9.   http://docs.house.gov/meetings/IF/IF02/20140618/102345/HHRG-113-IF02-20140618-SD018.pdf.

[527] Valukas, *supra* note 15, at 67.



404.    As this slide explained, with a slot design (on the left), the key ring could move up and down in the slot.  If the key ring contained extra weight, that movement within the slot could create a "lever arm" that exerted torque on the ignition switch and moved the switch from Run to Accessory or Off.[528]  Keeping the key ring in the center of the key (through a smaller hole design) might help prevent such movements.[529]  However, the slide above shows that GM "ruled out" that proposed solution because "the lever arm [was] still present due to the fob ring."  In other words, the key ring at the end of the key could still act as a lever and turn off the vehicle, so changing the key design would not solve the problem.  The estimated cost to make the key change from a slot to a hole was $70,000 for tooling for a new

---

[528] *Id.*

[529] *Id.*

key head, $400,000 to modify production assembly equipment, and a piece price increase of $0.50 per vehicle.[530] The presentation to the CPIT also described a "Sure Solution" to fix the problem: change the location of the Ignition Switch on the steering column from a low-mount to a higher one.[531] According to David Trush, the GM Lead Design Engineer on the ignition cylinder, that "sure" solution was not seriously considered because it would have been too expensive.[532] Likely due to the time and costs associated with doing so, none of the solutions proposed at the March 1, 2005 meeting included changing the mechanics of the switch itself to increase the rotational torque required to turn the key from the "Run" to the "Accessory" position.

405. Despite the mounting reports of vehicle shutdowns from GM's own employees, including those discussed above from December 2004 through March 2005, on March 9, 2005, GM closed the November 19, 2004 PRTS "with no action."[533] According to the PRTS report, one principle reason for closing the PRTS was that "none of the solutions represents *an acceptable business case*."[534] Specifically, "tooling cost and piece price" were "too high" and "none of the

---

[530] *Id.*
[531] PRTS NI72404 (Nov. 19, 2004), Attached Presentation Slides, at 3 [GMHEC000001741].
[532] Valukas, *supra* note 15, at 67-68.
[533] PRTS NI72404 (Nov. 19, 2004) [GMHEC000001735].
[534] *Id.*

solutions seems to fully countermeasure the possibility of the key being turned (ignition turn off) during driving."[535]  To present an "acceptable business case" for GM, a solution needed to solve the issue and be cost effective.[536]  More sensitive to cost than to the safety of its vehicles, GM closed the November 19, 2004 PRTS without action.

### 4.   Spring 2005:  GM Receives Requests From Consumers That The Company Buy Back Their Defective Vehicles

406.   In the spring of 2005, Oakley, a GM Brand Quality Manager described in ¶¶343 and 354 above, understood that inadvertent vehicle shutdowns were necessarily a safety issue.[537]   On May 2, 2005, Oakley internally forwarded a previously-filed customer demand that GM repurchase the customer's Cobalt.[538] The customer's complaint was that the ignition switch shut off during normal driving conditions.[539]   When forwarding the customer complaint internally, Oakley stated that the switch "goes to the off position too easily shutting the car off."[540]   Oakley added in a subsequent email to a colleague that the GM representative in the field felt that the problem existed across the population of Cobalts, where that person told

---

[535] *Id*.
[536] Valukas, *supra* note 15, at 69.
[537] *Id.* at 76.
[538] E-mail from Steven Oakley to Arnaud Dessirieix (May 2, 2005) [GMHEC000337787].
[539] *Id*.
[540] *Id*.

Oakley that "several stock cars at the dealership have about the same level of effort for the switch."[541]

407.   On May 4, 2005, in response to the May 2, 2005 email concerning the customer's buy back demand, Parks suggested "coming up with a plug" to go into the key head in order to reduce the weight, and prevent the switch from slipping out of "Run."[542]

408.   By May 2005, GM thus was in possession of numerous reports of moving shutdowns and was receiving buyback requests for Cobalts following complaints that consumers made to dealers, and knew that the problem occurred across vehicles.  As a service director at a GM dealership in Georgia from 1995 until 2008 stated, a customer's request for repurchase of a vehicle would be handled by GM directly (and never handled by the dealership employees), and that, if a customer ever mentioned a repurchase, the customer was referred directly to GM for resolution.  As a result, GM opened a second PRTS report on or about May 17, 2005 (the "May 17, 2005 PRTS") with the identifying number N182276.[543]  The May 17, 2005 PRTS states under the "Incident Description" field:  "Customer concern that

---

[541]   E-mail from Steven Oakley to Joseph Joshua (May 4, 2005) [GMHEC000337786].

[542] Jeff Bennett, *GM Documents Show Senior Executive Had Role In Switch' Emails Raise Questions About Internal Investigation And Role of Engineering Manager*, WALL ST. J., June 26, 2014, http://www.wsj.com/articles/gm-ceo-says-recalls-likely-to-continue-1403785852.

[543] PRTS NI82276 (May 24, 2005) [GMHEC000001743].

the vehicle ignition will turn off while driving.  This issue was also addressed in PRTS N172404 [the November 19, 2004 PRTS], which was closed as business case unacceptable.  ***Due to the level of buyback activity that is developing in the field***, Brand Quality requests the issue be reopened."[544]  GM was thus experiencing a high level of customer requests that the Company buy back their defective vehicles, as further detailed in paragraphs 73, 76, 78-81, 87, 88, 90, 92, 95-97, 99, 101, 106, 111, 113, 116, 120, 129, and 163 above.

409.  The large number of complaints and buy back requests that GM received from customers for the Cobalt was not the first time that GM received large numbers of requests from customers to repurchase GM vehicles for defective ignition switches.  Indeed, GM had already received numerous complaints and buy back requests for other vehicles that GM also belatedly recalled in 2014 for defective ignition switches, such as the Chevrolet Impala, Malibu and Monte Carlo.  As a former Warranty Administrator at Chevrolet dealerships in Pennsylvania and Delaware from 1992 through 2012 stated:

- He first noticed ignition stalling problems in Chevrolet vehicles in 1999, and ignition issues in the Impala, Malibu and Monte Carlo were a problem as far back as that time;

- Customers asked the dealerships or GM to buy back their cars because of the problems with the ignition switch turning them off, and Chevrolet did buy vehicles back.  According to the former Warranty Administrator:  "I remember cars being bought back because . . . [the

---

[544] *Id.*

car] would quit while [customers] were driving; it was unreliable. ***People became afraid to drive it***";

- According to him, buy backs related to the ignition issue "happened with more frequency" than with other issues; he estimated that ***25-30% of buybacks were due to the ignition switch problem***; and

- The Cobalt in particular came to have a very high frequency of repairs for this issue. According to the former Warranty Administrator, "As far as repair frequency, the Cobalt ranks way up there with the most troublesome cars I can recall."

### 5.    The June 14, 2005 VAPIR Meeting

410.   GM engineers discussed possible solutions to the ignition switch problem at a June 14, 2005 VAPIR meeting. VAPIR weekly meetings include the Vehicle Program Manager, the Vehicle Architecture Manager, the Business Manager and Vehicle System Engineers for various components of the vehicle.[545] The purpose of the VAPIR meetings is to discuss engineering solutions and to overcome engineering roadblocks.[546]

411.   As they had done with the November 2004 PRTS, GM engineers once again considered changing the key head design from a slot to a hole and using a smaller key ring to minimize the number of keys on the ring.[547] The engineers also considered a "long-term" solution of either improving or replacing the ignition switch in the future.[548] The specific "Long Term" solutions were for GM to:  (i)

---

[545] Valukas, *supra* note 15, at 286.
[546] *Id.*
[547] GMX001 VAPIR Meeting (June 7, 2005), [GMHEC000552113].
[548] *Id.*

214

"Increase camshaft load to cylinder module" with timing of 50 weeks and a cost of "$0.57/veh[icle]"; or (ii) "Revise Ignition Switch . . . to increase shut off effort from 3lbs to 6lbs," with timing of "2008," and a cost of "$1.00/veh[icle]."[549]

412.   Also discussed at this meeting was a May 26, 2005 article from the *Sunbury Daily Item* which reviewed a test drive of the Cobalt.  In the article, the reviewer reported that "unplanned engine shutdowns happened *four times* during a hard-driving test last week. . .  *I never encountered anything like this in 37 years of driving and I hope I never do again.*"[550]  As documents prepared for the June 14, 2005 meeting show, GM was also aware at the time that *The New York Times* reporter Jeff Sabatini was working on a story concerning moving shutdowns with the Cobalt based on "his wife's experience" of experiencing a moving shutdown.[551] A draft of GM's official public relations response to this news was discussed at the June 14, 2005 meeting that GM would later use to emphasize that shutdowns purportedly occurred "in rare cases," with the Cobalt still remaining "controllable."[552]  As discussed below, when contacted by *The New York Times* about the ignition switch issue, GM's public spokesperson Adler stated that GM did not consider this situation a safety issue because when the stalling occurs, the Cobalt

---

[549] *Id.*

[550] GMX001 Program Notebook, Wider Distribution (Core Team and Functional Support) (June 14, 2005) [GMHEC000552116].

[551] *Id.* at GMHEC000552114.

[552] *Id.* at GMHEC000552115.

could still be controlled and restarted.[553]

413.   At this time, it was becoming even more widely known within GM, and to Delphi, that the ignition switch was a significant safety issue.  At the same time as the VAPIR meeting, on June 14, 2005, Delphi noted in an internal email that the "Cobalt is blowing up in their [GM's] face in regards to turning the car off with the driver's knee."[554]

414.   Also on June 14, 2005, similar complaints of "inadvertent ignition shut-offs" in the Pontiac Solstice – which used the same defective ignition switch as the Cobalt – surfaced.[555]  The engineer who reviewed the Solstice testing noted that the Solstice's stalling problem "was very similar to the ones on the Cobolts [sic]" and suggested taking "preventative measures" against future stalls.[556]

## 6.   June 17, 2005 Ignition Switch Experiments at GM's Milford Proving Grounds

415.   On June 17, 2005, GM engineer Alberto Manzor ("Manzor") conducted tests on the defective Delta Ignition Switch at GM's Milford Proving Grounds to evaluate how the switches performed.[557]  Results from these tests demonstrated that

---

[553] Alan Adler, Manager, Prod. Safety Commc'n., *GM Statement on Chevrolet Cobalt Inadvertent Shutoffs* [GMHEC000143093].

[554] E-mail from John B. Coniff to Thomas E. Suoboda and George J. Lin (June 14, 2005) [SC-000084].

[555] E-mail from Devin Newell to others at GM (June 14, 2005) [GMHEC000276944].

[556] *Id.*

[557] Valukas, *supra* note 15, at 81.

the rotational torque required to move the key out of the Run position to Accessory was only 10 N-cm – a rotational torque level far below the specifications of 15 to 25 N-cm that GM had originally set for the switch.[558]

416.   Based on the June 17, 2005 tests of the ignition switch conducted by Manzor at the Milford Proving Grounds, he believed and said at the time that the ignition switch issue should have been considered ***a safety issue***.[559]  Manzor recalls discussing the ignition switch problem as a safety issue with Parks, Altman, and a GM safety engineer, Naveen Ramachandrappa Nagapola.[560]

417.   Following these tests, and despite the internal conclusion that turning the slot in the Cobalt key into a hole did not prevent it from becoming a "lever arm" that could turn the ignition, in June 2005, the VAPIR approved a supposed fix for existing customers:  a small plastic "plug" that could be inserted into keys when customers reporting a problem came to dealers to reduce the size of the current key slot and a change for future key production (which in fact was not implemented).[561]  The key change (and the insert) did not, however, address the core problem of the low torque of the ignition switches; it was, as GM engineers described it, merely a

---

[558] E-mail from Alberto Manzor, Eng'r, Gen. Motors, Co., to Gen. Motors, Co. Eng'r Team (June 24, 2005, 21:54) [GMHEC000219085].
[559] Valukas, *supra* note 15, at 83.
[560] *Id.*
[561] *Id.* at 82.

"***band-aid***."[562]  Presentation materials noted that use of a different switch that would improve the switch's rotational torque requirements by "***200%***" could allow GM to transition back to a slotted key by 2007/2008.[563]

### 7.   June 19, 2005:  GM Receives Negative Media Coverage From *The New York Times*, But GM Publicly Denies Any Safety Concern

418.   Nearly simultaneously as GM engineers were trying to develop a fix for the problem of moving shutdowns in vehicles with the Delta Ignition Switch, GM was dealing with negative press about the very same problem.  On June 19, 2005, *The New York Times* reported that Chevrolet dealers were telling Cobalt owners to remove items from heavy key rings so they would not bump the ignition into the Off position while driving.[564]  *The New York Times* reporter, Jeff Sabatini, noted that his own wife had knocked a Cobalt's steering column with her knee while driving on the freeway and the engine "just went dead."[565]

419.   When contacted by *The New York Times* for the Company's comment, GM corporate spokesperson Adler publicly downplayed the safety issue, stating:

> In ***rare cases*** when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the

---

[562] *Id*. at 83.

[563] E-mail from Alberto Manzor, Eng'r, Gen. Motors, Co., to Gen. Motors, Co. Eng'r Team (June 24, 2005, 21:54) [GMHEC000219085].

[564] Jeff Sabatini, *Making a Case for Keyless Ignitions*, N.Y. TIMES, June 19, 2005, http://query.nytimes.com/gst/fullpage.html?res=9B07E3DB153BF93AA25755C0 A9639C8B63.

[565] *Id*.

ignition key to the accessory or off position while the car is running. Service advisers are telling customers they can ***virtually eliminate this possibility*** by taking several steps, including removing nonessential material from their key rings.[566]

Adler further stated that GM did not consider this situation a safety issue because when the stalling occurs, the Cobalt could still be controlled and restarted.[567] In Adler's words: "When this happens, the Cobalt is still controllable. . . . The engine can be restarted after shifting to neutral. Ignition systems are designed to have on and off positions, and ***practically any vehicle*** can have power to a running engine cut off by inadvertently bumping the ignition from the run to accessory or off position."[568]

420. On June 26, 2005, the *Cleveland Plain Dealer* challenged this response as a "knee-slapper, suggesting that an engine that can be inadvertently turned off is not a safety problem  . . . So, if you're whisking along at 65 mph or trying to pull across an intersection and the engine stops, [you restart the engine after shifting to netural].  Only a gutless ninny would worry about such a problem.  Real men are not afraid of temporary reductions in forward momentum."[569]

---

[566] *Id*.

[567] *Id*.

[568] *Id*.

[569] Christopher Jensen, *Salamis, key rings, and GM's ongoing sense of humor*, CLEVELAND PLAIN DEALER, June 26, 2005, http://democrats.energycommerce. house.gov/sites/default/files/documents/Article-Cleveland-Plain-Dealer-2005-6-26.pdf.

421.   GM's legal staff learned of the *Cleveland Plain Dealer* article before it was published.[570]   Kemp, a GM senior attorney who worked closely with the engineering groups and who had principal responsibility for safety issues in the legal department, intended to refute the columnist's claims and wanted to provide "a videotape demonstration showing the remoteness of this risk"[571] – but he was convinced by another GM attorney that such a demonstration was not possible.  That attorney stated that "she was not optimistic we can come up with something compelling."[572]  In response, instead of focusing on safety for which he was responsible, Kemp said, "***We can't stand hearing, after the article is published, that we didn't do enough to defend a brand new launch***."[573]

422.   At or around June 28, 2005, GM Product Investigations and Internal Investigations Manager Doug Wachtel ("Wachtel") assigned GM's Product Investigations ("PI") unit employee Elizabeth Kiihr to investigate the issue of the Cobalt ignition switch shut-off.[574]  Product Investigations, a group of GM engineers focused on internal investigations,[575] was charged with solving significant engineering problems and is the primary unit charged with investigating and

---

[570] Valukas, *supra* note 15, at 85.

[571] *Id*. at 85-86.

[572] *Id*. at 86.

[573] *Id*.

[574] *Id*.

[575] *Id*. at 289.

resolving potential safety defects.[576]

**8.    GM Continues To Receive Customer Complaints During 2005, And A GM Design Engineer And Two Other GM Executives Each Personally Experience The Problem**

423.   Throughout 2005, customer complaints concerning moving shutdowns continued to mount as set forth in detail in ¶¶74-109 above.  For example, on June 29, 2005, a GM customer filed a complaint with the Company concerning a 2005 Cobalt.[577]  The complaint stated:  "2005 Chevrolet Cobalt experienced problems with total loss of the electrical system and the vehicle stalling. . .  The consumer stated the ignition switch was poorly installed.  ***Even with the slightest touch the vehicle will shut off in motion.***"[578]  A letter from the customer to GM was attached to the complaint and stated:

> ***This is a safety/recall issue if ever there was one***.  Forget the bulletin…
> I don't have to list to you the safety problems that may happen, besides
> an accident or death, a car turning off while doing a high speed must
> cause engine and other problems in the long haul.  I am forwarding this
> letter to [NHTSA] as I firmly believe that ***this ignition switch needs to
> be recalled***, reexamined and corrected.[579]

424.   Notwithstanding the wealth of customer complaints, media criticism, and GM's own testing results concerning the moving shutdowns, GM, rather than

---

[576] *Id*. at 3, 10.
[577] *Id*. at 89.
[578] *Id*.
[579] *Id*.

issuing a recall, issued another Preliminary Information to dealers (but not to consumers) on July 12, 2005.[580]  The Preliminary Information advised dealers of the plastic insert for the key ring and the replacement of the previous key ring to a smaller one.[581]

425.   Immediately thereafter, GM received another serious report from one of its own employees who reported the ignition switch problem.  In August 2005, Laura Andres, a GM Design Engineer, sent an email describing ignition switch issues that she experienced while operating a 2006 Chevrolet Impala.  Andres' email stated: "While driving home from work on my usual route… the car shut off.  I took the car in for repairs.  The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off."[582]  Then on August 30, 2005, Andres sent another email to GM employees, stating:

> I picked up the vehicle from repair. No repairs were done… The technician said there is nothing they can do to repair it.  ***He said it is just the design of the switch***.  He said other switches, like on the trucks, have a stronger detent and don't experience this… ***I think this is a serious safety problem***, especially if this switch is on multiple programs.  ***I'm thinking big recall.***  I was driving 45 mph when I hit the pothole and the car shut off and I had a car driving behind me that swerved around me.  I don't like to imagine a customer driving with their kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic.  I think you should seriously consider changing this part to a

---

[580] *Id*. at 82-83.

[581] *Id*.

[582] E-mail from Larry S. Dickerson, Jr. to Steve Bernard, Donald J. Armstrong and Richard A. McCarthy (Aug. 25, 2005, 13:20) [GMHEC000442220 – 21].

switch with a stronger detent.[583]

426.   Similarly, while investigating the shut-off problem, GM executives Wachtel and Defendant Kent obtained a Cobalt.  Kent, having a long heavy key chain, was able to knock the ignition from Run to Accessory merely by moving her leg so that her jeans caused friction against the fob.[584]  Wachtel was able to replicate the problem even more easily; all he needed to do was simply contact the key chain while driving the Cobalt.[585]

### 9.    August And September 2005:  GM Takes Steps To Close The May 17, 2005 PRTS And Internally Acknowledges "Inadvertent Ignition Shutoffs"

427.   Entries in the file for the May 17, 2005 PRTS indicate that GM made attempts to close the PRTS although only a partial "band-aid" solution to the ignition switch problem had been identified.  One entry dated August 18, 2005 reads, "[a]dditional solution set(s) were rejected previously due to *unacceptable business case*" and requested that the PTRS be moved to "closed status."[586]

428.   However, on September 13, 2005, another entry in the PRTS states:

Detent efforts on ignition switch are too low allowing key to be cycled to off position inadvertently.

Changes to key can be made to reduce the moment [i.e., the product of

---

[583] *Id.* at GMHEC000442219.

[584] Valukas, *supra* note 15, at 87.

[585] *Id.*

[586] Gen. Motors Co., Part-Location: Ignition Lock Module, Complaint: Ignition cylinder effort to[o] low, allows vehicle to shut off while driving (Sept. 13, 2005) [GMHEC000001748].

a force and its distance from an axis, which causes rotation about that axis] which can be applied to key by key ring/keys.  This will assist in limiting the issue but *will not completely eliminate it*.  Changes to switch will not be forthcoming from electrical group until MY07.[587]

429.   At around this time, GM's Program Execution Team ("PET") was considering the costs of increasing the detent resistance on the Ion and Cobalt ignition switches.[588]  A PET "Deep Dive" analysis of the costs of modifying the switch dated September 6, 2005 proposed changing the switch to have a "double detent to *prevent accident[al] turn offs*."[589]

430.   Meeting minutes for GM's September 20, 2005 VAPIR meeting also provide an "Ignition Update" that "*Purchasing* wants to global source new switch" but that it "cannot obtain it for [20]07."[590]  The possibility of GM finding a permanent solution by globally replacing the switch itself, however, was challenged by GM management based on whether or not the Cobalt team could show that it would be associated with a "*possible cost reduction*."[591]

---

[587] *Id.*

[588] The PET is above the CPIT in the vehicle program hierarchy.  Valukas, *supra* note 15, at 288.  The PET would consider platform-wide business decisions and included representatives from marketing and planning, as well as leadership from the CPIT and VAPIR processes. The PET made commercial decisions and brought a marketing perspective to engineering issues.

[589] GMX-002/001 Material Deep Dive-Product Engineering, 9-06-05 Deep Dive – FINAL PET APPROVAL.xls., http://docs.house.gov/meetings/IF/IF02/20140618/102345/HHRG-113-IF02-20140618-SD033.pdf.

[590] GMX001 Program Notebook, Wider Distribution (Core Team and Functional Support), Sept. 20, 2005 [GMHEC000228097].

[591] *Id.*

431.   GM senior executives who participated in the September 20, 2005 meeting and subsequent communications acknowledged widespread awareness within GM that the ignition switch defect was causing moving shutdowns but failed to either recall the vehicles or replace the defective switch based on the very modest increase in costs that GM would incur.   On September 28, 2005, John Hendler ("Hendler"), GM Vehicle Systems Engineer ("VSE") for electrical systems, wrote an email to *16* GM employees that read:

> *As the VSE for the Cobalt launch I was very aware of an issue with "inadvertent ignition offs" due to the low mounted ignition switch in the steering column and the low efforts to rotate the ignition*.  A new, more robust increased effort design is currently being implemented on the GMT 191 program for MY 07.  My intention was to bring this part number common design to Delta/Kappa vehicles for MY08.  I attended an X Vapir [meeting] with the Delta team to review pros/cons of this change.  The con of the change is that the piece cost of the ignition switch went up around $0.90 and would require $400K in tooling to add the almost 500K in volume.  *At the X Vapir my team was challenged to offset the piece cost with warranty savings and/or reduced PC/Inv.*  The warranty offset for the new switch is in the $0.10-0.15 range.  It was felt by the Delta team that the revision of the slot in the ignition key would significantly reduce the inadvertent offs and make any additional changes unnecessary.  Consequently, *the ignition switch for the Deltas and Kappas will remain the carryover single detent switch until the piece cost hit can be eliminated or significantly reduced.*  My plan is to resource this switch for MY 09 and make it available for the Deltas, Kappas, and 19X families.[592]

432.   In response to this email, GM executive Queen wrote to the entire list

---

[592] E-mail from John R. Hendler to Lori Queen and others (Sept. 28, 2005) [GMHEC000219123].

of 16 recipients that, "***I'm not sure its ok to wait***.  I want to discuss at pet[.] thanks."[593]

> **10.   GM Fails To Address Its Own Executives' Experiences And Continues To Place Short Term Revenue And Costs Concerns Over Customer Safety And Long Term Financial Impact**

433.   Given the experiences of GM employees through the year 2005, including their recommendations that GM issue a "big recall," this is precisely the time when GM should have issued its recalls and fully accounted for the costs of these issues to its shareholders, rather than wait another ***nine years*** until 2014 to do so.  As a result of the Company not issuing any safety recall during this period, GM understated, and failed to disclose, the Company's true Liabilities, Costs and Contingencies because GM knew or recklessly disregarded that safety problems existed in connection with the ignition switch, and the Company's senior management had taken steps to inform dealers but not consumers directly of these safety problems through the distribution of TSBs, as described below.  As a result of the Company's failure to issue a recall, GM allowed millions of unsafe cars to remain on the road,[594] leading to several deaths, a significant number of life-threatening accidents and exposing the Company to government investigations and massive criminal and civil liabilities.  But instead of protecting its customers, GM

---

[593] E-mail from Lori Queen to John R. Hendler and others (Sept. 28, 2005).
[594] Valukas, *supra* note 15, at 15.

was more interested in, as Kemp had stated, "defend[ing] a brand new launch," and avoiding any incremental cost increases associated with changing or modifying the defective ignition switches.[595]

434.   GM could have, and should have, issued a safety recall on all of the vehicles that contained defective ignition switches by the start of the Class Period. As detailed above, in 2010, GM issued a power steering recall for MY 2005-2010 Cobalts for a power-steering defect alone.[596]   In contrast, GM failed to recall the vehicles containing the defective ignition switches at issue in this case for moving shutdowns that involved a loss of acceleration, a loss of power steering, a loss of power brakes, and a loss of airbags.[597]

> **11.   GM Issues Technical Service Bulletins To Dealers Regarding "Information on Inadvertent Turning of Key Cylinder, Loss of Electric System and No DTCs"**

435.   Instead of a recall, GM sent out a TSB in December 2005 to its dealers.[598]   As noted above, a TSB is a communication to dealers, as opposed to consumers, and generally purports to provide information both about a problem and

---

[595] *Id*. at 86, n. 361.

[596] Letter from Gay P. Kent, Director of Product Investigations & Safety Regulations, Gen. Motors Co., to Daniel C. Smith, Assoc. Adm'r for Enforcement, NHTSA (Mar. 1, 2010), http://docs.house.gov/meetings/IF/IF02/ 20140618/ 102345/HHRG-113-IF02-20140618-SD090.pdf.

[597] *Id*.

[598] Gen. Motors Co. Service Bulletin, *Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs, No. 05-02-35-007* (Dec. 2005), http://www.cbc.ca/news2/pdf/2005%20GM%20Service%20Bulletin.pdf.

a potential solution.[599]  As a matter of GM protocol, Product Investigations personnel

review TSBs prior to their distribution.[600]

436.   GM's December 2005 TSB was entitled "Information on Inadvertent

Turning of Key Cylinder, Loss of Electrical System and NO DTCs."[601]  Using similar

language as the Company had in its prior Preliminary Information bulletins, the

December 2005 TSB described a "potential for the driver to inadvertently turn off

the ignition due to low ignition key cylinder torque/effort."[602]  The TSB also warned

dealers that drivers should "remov[e] unessential items from their key chain"[603] and

explained that GM had developed a small plastic insert for the key head designed to

change the slot to a hole with a new and smaller 13 mm key ring, noting that GM

would be providing these smaller key rings.[604]  The TSB covered five different GM

car models:  (1) 2005-2006 Chevrolet Cobalts; (2) 2006 Chevrolet HHRs; (3) 2005-

2006 Pontiac Pursuits; (4) 2006 Pontiac Solstices; and (5) 2003-2006 Saturn Ions.[605]

Notably, the TSB covered more models of cars than GM's much later initial

February 7, 2014 recall, which only included MY 2005-2007 Cobalts and MY 2007

---

[599] Valukas, *supra* note 15, at 91.

[600] *Id*. at 93.

[601] *Id*. at 91.

[602] Gen. Motors Co. Technical *Service Bulletin, Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs*, No. 05-02-35-007 (Dec. 2005), http://www.cbc.ca/news2/pdf/2005%20GM%20Service%20Bulletin.pdf.

[603] *Id*.

[604] *Id*.

[605] *Id*.

Pontiac G5s.[606]

437.   Significantly, GM's December 2005 TSB, unlike the Preliminary Information that preceded it,[607] did ***not*** describe the problem as involving a "stall," as the word "stall" was, according to GM, a "hot" word that the Company generally did not use in TSBs because it might raise a concern about vehicle safety and otherwise suggest that GM should recall the defective model rather than issue a TSB, as noted above.[608]  GM also avoided using the word "stall" in its TSBs because such language might draw the attention of NHTSA.

438.   In order for a GM customer to learn of GM's suggested service fix outlined in the December 2005 TSB (which at this point only was to remove excess weight from the key chain and to obtain a key insert plug and smaller key ring), the customer had to be first placed in the dangerous category of experiencing a moving shutdown; the customer had to visit the dealership to complain about the problem; the technician at the dealership had to diagnose the issue properly; and the technician had to search GM's bulletin database to identify the applicable bulletin, without using the term "stall" as that word would not appear in the December 2005 TSB as

---

[606] Letter from Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (Feb. 7, 2014) (GM 573 Report).

[607] Gen. Motors Co. Preliminary Information, *Engine Stalls, Loss of Electrical Systems, and No DTCs* (Feb. 28, 2005); Valukas, *supra* note 15, at 92.

[608] *Id.*

issued.[609]  The completely ineffective nature of GM's proposed solution for this life-threatening defect is evidenced by the fact that although GM created over 10,000 key plug inserts as part of the TSB, only approximately 430 were ever requested by customers.[610]

439.   Moreover, as the victim accounts set forth in ¶¶550-59 below make clear, despite the hurdles that GM's customers had to overcome to receive this inadequate remedy, the GM customers who experienced a moving shutdown (and were able to complain about it) were far more fortunate than the people who crashed GM vehicles as a result of the defect – suffering significant injuries or deaths.  Many of those victims were young drivers with less experience or strength to handle the emergency situation presented by a moving shutdown.  Indeed, as discussed above, the Cobalt, a modestly price economy car, was marketed for the very type of driver who would be less able to avoid a crash in the event of a moving shutdown:  young, less-experienced drivers.

### 12.   GM Abandons The "Band-Aid" Fix To The Key And Then Issues Updated Technical Service Bulletins

440.   In 2005, GM was in the midst of an unrelated price dispute with its parts supplier, Ortech, which was delaying other unrelated changes to the key cylinder.[611]

---

[609] *Id*. at 93-94.

[610] *Id*. at 94.

[611] *Id*.

Although in 2005 GM made the small plastic key insert "band-aid" fix available to consumers of previously purchased vehicles who complained of a moving shutdown, it did not change the key for cars that were then being manufactured and those yet to be produced.[612] Rather than pursue further, more meaningful changes to the engineering of the defective ignition switches, GM personnel believed handling its unrelated pricing dispute with Ortech was more important, and, in September 2006, GM abandoned the change to the key head.[613] Thus, even the "band-aid" that GM engineers thought they were applying was not implemented for new cars in the 2005-2009 time period.[614]

441. On October 25, 2006, GM issued an updated TSB on "Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" in the Cobalt and other vehicles, this time extending the December 2005 TSB to include MY 2007 for all models previously included and also adding the 2007 Saturn Sky.[615] In all other aspects, the October 2006 TSB was identical to the December 2005 TSB.[616] Similarly, as GM had done with the December 2005 TSB, the Company intentionally omitted any mention of the word "stall."[617]

---

[612] *Id.*

[613] *Id.*

[614] *Id.*

[615] Gen. Motors Co. Technical Service Bulletin, *Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs* (Oct. 25, 2006).

[616] *Id.*

[617] *Id.*

442.   In March through April 2007, GM's technical bulletin group proposed publishing a revised version of the TSB that would change the subject line to include the word "stalls."[618] The proposed title was:  "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System, Hesitation, Stalls and No DTCs Set."[619] And, on April 24, 2007, Wachtel provided his approval to "go ahead and add the word 'stall' to the symptoms section of the bulletin" and forwarded his approval to Defendant Kent.[620]  Wachtel added, "Once you have done so, *the bulletin will make the approval rounds*, and be issued."[621]  Despite Wachtel's approval, the April 2007 TSB was never published.[622]

### 13.   2006: GM Learns Of Crashes And Airbag Non-Deployments In GM Vehicles Used In Rental Car Company Fleets

443.   As discussed above, rental car drivers are particularly unfamiliar with the layout and handling of their rental cars, and therefore at even greater risk of injury or death than other drivers if the vehicles shut down while they are driving them.   A *Bloomberg* article entitled "GM Misses Red Flags from Rental Car Canaries on Crashes," published on July 31, 2014, discussed how rental car

---

[618] Valukas, *supra* note 15, at 120.

[619] *Id.*

[620] E-mail from Douglas Wachtel, Senior Manager, Gen. Motors Co., to Dan Fernandez and Thomas D. Russell, Gen. Motors Co. (Apr, 24, 2007) [GMHEC000383832].

[621] *Id.*

[622] Valukas, *supra* note 15, at 120.

companies informed GM of highly suspicious crashes that occurred when their customers drove GM vehicles – and highlighted the existence of a likely "defect" in the cars – more than seven years before GM first recalled the vehicles in 2014.[623]

444.  As the *Bloomberg* article reported, an investigator for Vanguard Car Rental USA Inc. (which operates National Car Rental and Alamo Rent A Car) contacted GM after a customer crashed a Cobalt that he or she had rented from Alamo.[624]  In September 2006, in Barstow, California, the driver of the new Cobalt lost control of the car on a warm, dry and clear day, and although traffic had been light, the sedan drifted across lanes, was caught in a gravel median and rolled over.[625] The driver's seat belt was buckled, the air bag did not deploy, and the driver was killed.  A Vanguard claims adjuster wrote to GM after the crash that, although the cause of the crash was not immediately known, "due to the serious nature of this accident we feel that it is ***imperative*** that you open a claim and inspect this vehicle for possible ***defects***."[626]

445.  Rental car company Enterprise Holdings Inc., also urged GM to investigate a potential defect in GM vehicles because air bags failed to deploy in

---

[623] Jeff Plungis and Tim Higgins, *GM Misses Red Flags From Rental Car Canaries on Crashes*, Bloomberg, July 31, 2014, http://www.bloomberg.com/news/print/2014-07-31/rental-car-firms-pushed-gm-on-fatal-crashes-before-recall.html.
[624] *Id*.
[625] *Id.*
[626] *Id*.

crashes with the cars.  For example, Enterprise asked GM to investigate a suspicious crash of a Saturn Ion in March 2005.  In that crash, a woman and her ex-husband were killed while driving an Ion on a rural road in Bee Cave, Texas, and their daughter, riding in the backseat, suffered serious injuries, including brain damage, as a result of the crash.  A police officer on the scene attributed the crash to a braking and steering defect.  A Saturn customer-assistance center summary also shows that Enterprise asked GM for an investigation of the crash, including an inspection of the car.[627]

446.   In January 2006, an Enterprise rental car customer driving a 2006 Cobalt died in a crash in Bucks County, Pennsylvania.  After the Cobalt went off the road and hit a tree, the airbags did not deploy.  In connection with this crash, according to call transcripts from GM, an Enterprise claims adjuster asked GM to "set up a claim for a possible *defect* in the 2006 Chevrolet Cobalt that they rented to a customer," and that the "[p]arty of deceased wants vehicle inspected for *defects*" because "[t]he air bags did not deploy and the police report states the deceased hit tree for unknown reason."[628]

447.   Other rental car companies, including Avis Budget Group Inc. and Hertz Global Holdings Inc. also had Cobalts in their rental car fleets that crashed.

---

[627] *Id.*

[628] *Id.*

448.    A former Dollar Thrifty Automotive Group Inc. Director from 2000 to 2012, Maryann Keller, was quoted in the *Bloomberg* article as stating that warnings like these from the rental car companies should have been red flags to GM.  As Ms. Keller stated, "[rental cars] put a lot of miles on very quick, and any initial defects on the car rise to the surface, and, in fact, that's the way auto companies were supposed to use this.  They were supposed to be able to detect defects very early."[629] In the case of the defective GM vehicles, this failed to occur.

### 14.    May 27, 2006:  GM Makes Surreptitious Changes To Its Ignition Switch Design For At Least The Second Time

449.    On May 27, 2006, GM changed the design of the Delta Platform Ignition Switch by putting a stronger spring and plunger into the switch without changing the part number.[630]  The improved ignition switch was incorporated into certain Delta Platform vehicles beginning in model year 2007.  GM has described this change to the Delta Platform Ignition Switch without a change to its part number as an out-of-the ordinary breach of GM's protocol to assign new part numbers to all new or modified parts.  However, the ***same occurrence*** of GM changing a defective ignition switch without changing the part number also occurred with the defective ignition switch for millions of other vehicles subject to GM's second wave recalls issued in July 2014.

---

[629] *Id.*
[630] Valukas, *supra* note 15, at 100-102.

450.   As GM informed NHTSA on July 16, 2014, GM learned in 2003 of a customer complaint of intermittent vehicle shut offs in a MY 2003 Grand Am from a Michigan dealership.[631]   In response to the complaint, GM's Brand Quality Manager for the Grand Am personally visited the dealership and requested that the customer demonstrate the problem which arose from the customer having a large key ring that could shut off the Grand Am upon driving over a speed bump at approximately 30-35 mph.[632]  GM's response was to issue a May 22, 2003 voicemail to dealerships describing the condition and identifying the relevant population of vehicles as 1999 through 2003 MY Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am cars.[633]  The notice also directed dealers to pay attention to the key size and mass of a customer's key ring in order to better diagnose the customer's complaint.[634]

451.   In further response to this report, on July 24, 2003, GM Engineering Work Order (EWO) 211722 was initiated to increase the detent plunger force on the defective ignition switch replacing part number 22688239 with part number 22737173.[635]  On March 17, 2004, EWO 317693 was initiated to increase the detent

---

[631] Letter from Brian Latouf, Dir., Field Prod. Investigations & Evaluations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (July 16, 2014) (GM 573 Report).
[632] *Id.*
[633] *Id.*
[634] *Id.*
[635] *Id.*

plunger force on the defective ignition switch on another GM vehicle, the Pontiac Grand Prix, in order to maintain commonality between the Grand Prix and the Malibu, Grand Am and the Alero.[636]  However, as GM later admitted to NHTSA in 2014, *the old Grand Prix part number, P/N10310896, was not changed to a new part number when the detent plunger force was changed, rather part number 10310896 remained the part number for the new ignition switch*.[637]

### 15.   August 2007:  GM And Delphi Settle Claims Concerning The Defective Ignition Switches In Resolving Delphi's Bankruptcy Liabilities To GM

452.   On August 14, 2007, senior GM counsel executed a Warranty, Settlement and Release Agreement and Covenant Not to Sue ("Warranty Settlement Agreement") with Delphi in connection with Delphi's bankruptcy.[638]  The purpose of the Warranty Settlement Agreement was to identify all known issues with Delphi parts where the estimated warranty cost recovery exceeded $1 million.[639]  Included as part of the Warranty Settlement Agreement are entries regarding "ignition switch failure" on the MY 2003-2004 Saturn Ion and MY 2005-2006 Chevy Cobalt.[640]  The

---

[636] *Id.*

[637] *Id.*

[638] Motion for Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 and 9019 Authorizing and Approving Entry Into and Performance of Warranty, Settlement, and Release Agreement and Covenant Not To Sue with Gen. Motors Corp., at 21, *In re Delphi Corp. et al.* (No. 05-44481), 2008 WL 3486615.

[639] *Id.* § 1.10.

[640] *Id.* at 22-27.

Warranty Settlement Agreement was signed by senior in-house GM attorneys Lee

A. Schutzman ("Schutzman") and Buonomo on behalf of GM and acknowledges the

Company's awareness of significant warranty liabilities associated with the Delta

Ignition Switch.

### 16.    March 2009:  GM's CEO Wagoner Reviews Information Reflecting High Cobalt Warranty Expenses That Motivate GM To Belatedly Change The Cobalt Key Design, Returning To The "Band-aid" Solution

453.   In 2009, GM finally implemented the "band-aid" key head design

change for new vehicles because it had received a large number of warranty claims

on the Cobalt.[641]  When drivers of the vehicles with the defective ignition switches

brought their cars into dealerships after experiencing a shutdown, even if the

dealership did not replace the ignition switch or was otherwise unable to diagnose

or address the problem, the customer's visit to the dealership still imposed costs on

the dealership, and dealers could pass those costs as warranty costs on to GM.  An

automotive technician who worked at GM dealerships in Chicago, Illinois from 1992

through 2012 stated that if a customer brought a vehicle into the dealership under

warranty, and the dealership could not fix the problem, the dealership still charged

a service fee to GM under the "unable to duplicate" category.  And, as a former

Warranty Administrator at Chevrolet dealerships in Pennsylvania and Delaware

---

[641] Valukas, *supra* note 15, at 132-33.

from 1992 through 2012 also stated, GM bore the costs associated with repairs for customers whose ignition switches inadvertently turned their cars off. In that regard, GM paid the dealerships for any parts, repairs and associated costs including rental car or shuttle fees, which could amount to $500-600 per incident. He also estimated that ***20-35% of repairs in his dealerships were for vehicles that stalled due to the ignition switch problem***. According to him: "It seemed like a lot of those cars were coming back for the same problem."

454.   Moreover, as reported by McAleer and confirmed by GM's filings with the SEC, GM's senior officers were highly motivated to reduce warranty costs as warranty costs factored into GM's officers own personal annual compensation. *See* 2006 Proxy Statement, filed with the SEC on April 28, 2006 (Annual Incentive Plan payouts for 2005 take into account "market share, quality improvement, and ***warranty cost***"); 2007 Proxy Statement, filed with the SEC on June 5, 2007 (Annual Incentive Plan payouts for 2006 take into account "market share, external quality measures, and ***warranty performance***"); 2008 Proxy Statement, filed with the SEC on June 3, 2008 (same regarding payouts for 2007).[642]

455.   Thus, in January 2009, GM internally analyzed the warranty expenses

---

[642] Gen. Motors Co., Definitive Proxy Statement (Schedule 14A) (Apr. 29, 2005) (Annual Incentive Plans for 2004 take into account "market share and quality"); Gen. Motors Co., Definitive Proxy Statement (Schedule 14A) (Apr. 25, 2014) (citing "warranty experience" as one of the criteria of the GM Compensation Committee's performance-based compensation formula).

associated with the defective ignition switches.  Specifically, on January 27, 2009, David Trush (the Lead Design Engineer of the ignition cylinder) emailed another GM employee a slide deck analyzing the warranty costs associated with the Cobalt and proposed methods to reduce those costs.[643]  The slide deck included a list of warranty costs for all vehicles in GM North America, sorted by vehicles with the largest number of incidents per thousand vehicles ("IPTVs").[644]  At the top of the list are the "G5-Global Compact Vehicles," followed by the "Cobalt-Global Compact Vehicles," and then "HHR-Global Compact Vehicles."[645]  The next page of the slide deck also described the ignition system for the "Cobalt-Global Compact Vehicles" as a "Bad System, Bad Cylinder."[646]  That same slide also stated that, based on an evaluation of Cobalt's after 6 months in service, there had been 899 reports of issues with the Cobalt ignition system.[647]

456.   The next page of the slide deck proposed "Solutions to Decrease Cobalt E700 Warranty" expenses in a table that included the following entries: [648]

---

[643] E-mail from David M. Trush, Eng'r, Gen. Motors Co., to Laura A. Decker, Eng'r, Gen. Motors. Co. (Jan. 27, 2009, 3:02 PM) [GMHEC000409008].
[644] *Id.*
[645] *Id.*
[646] *Id.*
[647] *Id.*
[648] *Id.*

| Item | IPTV (12 MIS) Improve-ment | Warranty Savings/ veh (12 MIS) | piece price impact/ veh | Total Savings /Veh | Tooling cost | Timing (after approved EWO) | Payback (yr) |
|---|---|---|---|---|---|---|---|
| Change Ign Switch to higher detent force | 5.02 | $0.944 | $2.000 | $0.000 | $300,000 | 30 weeks | *Never* |
| Change Ign cylinder on auto trans vehicles to Lambda design (all trans if lockbolt removed) | 1.92 | $0.361 | ($0.050) | $0.411 | $90,000 | 6 weeks | 0.529 |
| Retooling steering column shroud to add location feature by ignition cylinder – also change/retool lock housing to to add pin for location feature | 3.96 | $0.744 | $0.000 | $0.744 | $500,000 | 60 weeks | 1.624 |
| Column lockbolt removal | 1 | $0.188 | ($0.900) | $1.080 | $30,000 | 8 weeks | 0.067 |
| Change Key from slot to hole | 3.5 | $0.658 | $0.000 | $0.658 | $40,000 | 7 weeks | 0.147 |

457. The above table sets forth the callous cost/benefit analysis that GM performed to determine in 2009 whether it should implement the various solutions to the defective ignition switches that would have significantly reduced the number of incidents of defective ignitions per thousand vehicles. The solution that would have reduced the number of incidents by the greatest amount (5.02 IPTVs) – and, by extension, prevented the most number of injuries and deaths – was to change the ignition switch so that it had a "higher detent force."[649] However, as the above table

---

[649] *Id.*

sets forth, the $2.00 per vehicle cost of that solution was not justified by the amount of assumed warranty savings that it presented to GM.  As a result, GM came to the conclusion that this solution would "***Never***" pay GM back in terms of warranty savings and GM did not adopt it at the time.[650]  Nor did GM consider a safety recall at the time of the millions of unsafe cars already on the road.

458.   In February 2009, GM opened a new PRTS report and the issue was identified as a continuation of the problems noted in earlier PRTSs (the November 19, 2004 PRTS and May 17, 2005 PRTS).[651]  As one GM engineer wrote to Trush on February 18, 2009 in an email with the subject line "URGENT Request! PRTS 1078137:   PWO 1070202 Cobalt Key Hole Change to Address Customer Complaint":  ***"This issue has been around since man first lumbered out of [the] sea and stood on two feet.  In fact, I think Darwin wrote the first PRTS on this and included as an attachment as part of his Theory of Evolution."***[652]  Trush, who was an engineer working on the Cobalt key head change, said that he believed in 2005 and in 2009 that the change to the Cobalt key head was only a ***"band-aid"*** because the complete solution was to change the Ignition Switch.[653]  Nonetheless, the key change design was applied to forthcoming MY 2010 Cobalts to reduce warranty

---

[650] *Id*.
[651] Valukas, *supra* note 15, at 133.
[652] E-mail from David M. Trush to John Dobish & Joe Baaki (Feb. 18, 2009, 6:49 PM) [GMHEC000282093].
[653] Valukas, *supra* note 15, at 133.

costs.[654]

459.   Demonstrating the close attention GM's senior executives paid to warranty costs, the key change was presented to the highest executive level in GM. On March 5, 2009, a 72-page slide deck was opened on GM CEO Rick Wagoner's computer, one slide of which referred to the Cobalt's inadvertent shut-off issue.[655] The slide deck also described the then-recent change in the Cobalt's key design from a slot to a hole and was in the context of how this would help GM reduce warranty costs from the ignition switch problem.[656]   Moreover, Defendant Akerson also admitted on January 10, 2012 that GM was actively monitoring its own warranty costs, as well as those of its competitors, in order to gauge its performance against other top automakers, as described below in ¶¶716-17.   The Cobalt's growing warranty costs and ignition switch problems were thus material enough to reach the highest levels of GM almost two years before the start of and continuing throughout the Class Period, yet they only led to a *"band-aid"* solution and no meaningful disclosure to shareholders or safety recalls until 2014.

---

[654] *Id.*

[655] *Id.* at 245.

[656] *Id.*

**F.    As A Result Of Litigation Against The Company, By 2005 Senior GM Lawyers And Engineers Knew That Turning A Vehicle To Accessory Or Off Also Turned Off Its Airbags, Increasing Safety Concerns**

460.   In all of the Delta and Kappa Platform vehicles from 2003-2010, if the ignition switch is turned to Accessory or Off, the vehicle's Sensing Diagnostic Module ("SDM"), which is an onboard electronic module in airbag systems that determines when and whether airbags should deploy, ***powers down*** unless and until the ignition is returned to Run.[657] This intentional programming design by GM helps to minimize the risk of unintended airbag deployments to the driver or a passenger when he or she is not sitting in the proper, restrained position – for example, if a child is in the front seat when the vehicle is stationary, or if an owner is servicing the car.[658]

461.   But, if the vehicle is running and power is lost at the moment of impact during a crash, including if the key is turned to Accessory or Off ***during*** the crash, the SDM's crash sensing protection would continue (and airbags would deploy) for 150 milliseconds after the power loss.[659]   Cobalt's SDM also recorded whether the ignition switch was in Run, Accessory, or Off position during a crash.[660]   The Ion's,

---

[657] *Id*. at 28.

[658] *Id*.

[659] *Id*.

[660] *Id*. at 29.

on the other hand, did not.[661]

462.   Cases concerning the non-deployment of Cobalt and Ion airbags began reaching GM's legal staff in early 2004 and continued throughout the Class Period.[662] During this period, the GM lawyers in charge of safety issues and the GM lawyers in charge of product litigation reported to the General Counsel of GM North America ("GC North America").[663]   During this period, the GC North America was Chris Johnson until October 2008.   Johnson was succeeded by Michael Robinson, who held the position from October 2008 to September 2009.   Robinson was succeeded by Fred Fromm from 2009 to 2011, and then by Lucy Clark Dougherty ("Clark Dougherty") from March 2011 through the present.

463.   Two of Clark Dougherty's direct reports were Kemp and Buonomo.[664] As noted, Kemp, Counsel for Global Engineering Organization, was purportedly GM's most experienced safety lawyer and had been with GM for decades.[665]   During this time, Kemp also sat on one of the two committees that determined whether and at what price to settle product liability lawsuits brought against GM.[666]

---

[661] *Id.*

[662] *Id.* at 103.   GM's Legal Department received notice of the first Ion non-deployment claim in January 2004 for a 2004 Ion.   The claim was ultimately denied. *Id.* at 103, n.419.

[663] *Id.* at 104.

[664] *Id.*

[665] *Id.*

[666] *Id.* at 105.

464.   In the event that an accident claim is brought against GM, the Company has a structured process by which GM decides whether and for how much a case should settle.[667]  At the lowest monetary level, GM product litigation attorneys were vested with the authority to settle claims of up to $100,000.[668]  Settlements between $100,000 and $1.5 million (a limit which was eventually increased to $2 million) required approval at a committee known as the "Roundtable."[669]  Settlement offers between $2 and $5 million required approval of a senior group called the Settlement Review Committee ("SRC"), which met monthly and was chaired by the head of global litigation.[670]  Kemp was a member of the SRC.[671]

465.   One function of the Roundtable and the SRC was to spot potential safety issues and refer them to engineers.[672]  As the Valukas Report found, "the mechanism for getting safety issues from GM Legal to GM Engineering was through Bill Kemp."[673]  GM lawyers were expected to raise safety issues – usually through Kemp – who would, in turn, raise them with engineers.[674]

466.   Given these expectations, it is not credible, as has been reported, that

---

[667] *Id.* at 106.
[668] *Id.* at 106-07.
[669] *Id.* at 107.
[670] *Id.*
[671] *Id.*
[672] *Id.* at 108.
[673] *Id.*
[674] *Id.* at 109.

GM lawyers did not make the connection between the ignition switch turning off and the non-deployment of airbags until as late as April 2013 – nearly a decade after the first reported accidents concerning the non-deployment of airbags.  This is especially true in light of the fact that others outside of GM quickly and correctly identified the problem years before the start of the Class Period.[675]

### 1.   The Connection Between Airbag Failures And The Ignition Switch Is Discovered By Others Outside Of GM

467.  Individuals outside the Company with far less detailed knowledge of how GM's vehicles operate and the numerous complaints of the cars at issue in this litigation, were able to independently come to the same accurate conclusion.  Those individuals include Trooper Young in his "Collision Analysis & Reconstruction Report" ("the Wisconsin State Patrol Report") in February 2007, and The Indiana University Transportation Research Center in its report commission by the NHTSA in April 2007 (the "Indiana University Report").[676]

468.  Trooper Young's Wisconsin State Patrol Report concerns the crash of a single 2005 Cobalt driven by 17-year-old Megan Phillips in which her two passengers, Amy Rademaker (who would have turned 16 on the day of her funeral) and 18-year-old Natasha Weigel died after none of the Cobalt airbags deployed. Below is a crash diagram of the accident.  It shows how the 17 year-old driver was

---

[675] *Id.* at 24.
[676] *Id.* at 115.

unable to wrestle control of her Cobalt after a moving shutdown, as the car left the

roadway, vaulted up the edge of a driveway, became airborne for 59 feet, then landed

and struck a telephone utility box and a group of large trees:



469.    In his report on the crash, Trooper Young pieced together three facts:

(i) "The ignition switch on the vehicle appears to have been in the accessory position

when it impacted the trees ***preventing the airbags from deploying***"; (ii) "A search

of [the NHTSA] website indicates five complaints of 2005 Chevrolet Cobalt ignition

switches turning off while the vehicle was being driven," three of which "talk about the knee or leg touching the ignition or key chain causing the engine to turn off";[677] and (iii) GM's October 2006 TSB "discussed the potential for the driver to inadvertently turn off the ignition due to low key cylinder torque/effort."[678]  Based on this information, Trooper Young was able to conclude, "It appears likely that the vehicle's key turned to Accessory as a result of the low key cylinder torque/effort" and that "The two front seat airbags did not deploy" because "It appears that the ignition switch had somehow been turned from the run position to accessory prior to the collision with the trees." [679]

470.   Trooper Young was not alone in determining that the Cobalt ignition switch caused the non-deployment of airbags.  On April 25, 2007, Indiana University issued its Report on the same crash, commissioned by NHTSA, entitled "On-Site Air Bag Non-Deployment Investigation."  The Indiana University Report confirmed Trooper Young's conclusion, and stated:  "It is possible the ignition switch could have been knocked to the 'Accessory' position by the driver's leg or knee at the time of the vault.  The investigation revealed that inadvertent contact with the ignition

---

[677] Keith A. Young, *Collision Analysis & Reconstruction Report*, Technical Reconstruction Unit, Wisconsin State Patrol Academy, at 9 (Feb. 14, 2007), http://docs.house.gov/meetings/IF/IF02/20140618/102345/HHRG-113-IF02-20140618-SD055.pdf.

[678] *Id.*

[679] *Id.*

switch or a key chain in the 2005 Chevrolet Cobalt can in fact result in engine shut-down and loss of power."[680]

471.   The Indiana University Report further noted that according to GM's own October 2006 TSB:  "[T]here is a potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort."[681]   Moreover, the Report stated that its researchers had identified "at least"[682] six complaints on the NHTSA website relating to the engine shutting off and loss of power when the ignition switch or key chain was contacted by the driver.  Some complaints reported a simple "brushing" of the key chain or touching of the ignition switch was all that was required for the engine to shut off.[683]

472.   Moreover, in June 2012, in another airbag non-deployment case, Erin Shipp, the plaintiff's expert in the matter, was able to locate the Indiana University study and cited it in her expert report.[684]  Shipp concluded what by this point was likely clear to those individuals with specialized knowledge at GM tasked with engineering safe vehicles:  airbag non-deployments in the Delta Vehicles were being

---

[680] Transportation Research Center, *On-Site Air Bag Non-Deployment Investigation*, School of Public and Environmental Affairs, Indiana University, at 7 (last revised Mar. 31, 2008), http://www.autosafety.org/sites/default/files/imce_staff_uploads/ SCI%20Report%202005%20Cobalt%20WI.pdf.
[681] *Id.*
[682] *Id.*
[683] *Id.*
[684] Valukas, *supra* note 15, at 161.

caused by the low torque of the ignition switch.[685]

473.  NHTSA also expressed an interest in the Cobalt airbag non-deployments when, on March 29, 2007, a group of GM engineers, including Defendant Kent and Brian Everest ("Everest") (the GM Field Performance Assessment ("FPA") supervisor) attended a Quarterly Review meeting at NHTSA's headquarters.[686]  That day, NHTSA reported that it had observed a number of airbag non-deployments in Cobalts and Ions.[687]   Keith Schultz, then-GM Manager of Internal Investigation in Product Investigations, directed Everest and John Sprague, an FPA airbag engineer, to compile information on Cobalt and Ion non-deployments.[688]  Accordingly, Sprague began compiling an Excel spreadsheet listing the various Cobalt accidents and non-deployments.[689]

474.   Prior to and during the Class Period, however, GM's investors were not made aware of the connection between the defective ignition switch moving shutdowns and consumer safety and GM repeatedly understated its liability as set forth below.  Indeed, GM failed to publicly report these facts until years later, and

---

[685] *Id.*
[686] E-mail from Douglas Wachtel, Gen. Motors Co., to Christopher Janik, Gen. Motors Co., et al. (Mar. 27, 2007); Valukas, *supra* note 15, at 118.  At this point in time, GM held quarterly meetings with NHTSA where they would have roundtable discussions in which they worked through trends that NHTSA was seeing in GM vehicles and reviewed open investigations.
[687] Valukas, *supra* note 15, at 118.
[688] *Id.*
[689] *Id.* at 118-19.

millions of defective GM vehicles remained on the road, un-recalled, for years without the ignition switches being repaired.  Even if GM were unable to identify with complete certainty the "root cause" of the airbag non-deployment problem, GM should have recalled the vehicles as soon as manifestations of the moving shutdowns were observed rather than waiting until GM had identified the "precise cause" of the airbag non-deployment as related to the ignition switch defect, as NHTSA and GM eventually agreed in the Consent Order.[690]

### 2.   Numerous Accidents Involving Airbag Non-Deployments Result From The Ignition Switch Defects

475.   The human cost of GM's inaction was immense, as the Company's failure to issue a timely recall took a toll on drivers who suffered grave hardships resulting from having accidents in their GM vehicles, and their families.  All of the following tragic events and many more were caused by airbag non-deployments that occurred in the many years before GM issued its recalls in 2014:

> a.   On November 15, 2004, while *21-year-old* Candice Anderson was driving her 2004 Saturn Ion, her *25-year-old* boyfriend Gene Mikale Erickson was in the front passenger seat.  The vehicle went off the road, traveled through a brush line, and struck a tree head-on.  Despite the severity of the impact, the front airbags did not deploy.  Mr. Erickson was killed and Mrs. Anderson was severely injured.  In GM's May 4, 2007 case evaluation of the accident, assigned to Manuel Peace (the FPA engineer) ("Peace") and Doug Brown (the GM lawyer), it was

---

[690] Consent Order, National Highway Traffic Safety Administration, In re TQ14-001 NHTSA Recall No. 14V-047 (May 16, 2014), at 4, http://www.nhtsa.gov/staticfiles/communications/pdf/May-16-2014-TQ14-001-Consent-Order.pdf.

reported that the matter was "unusual."[691]  According to the evaluation, Peace concluded both that ***the airbags should have deployed*** and the SDM failed to record the fatal crash.[692]  Peace's best explanation for this was that ***the vehicle lost power***.[693]  Because there was no evidence of skid marks (as the power brakes likely failed), Ms. Anderson was indicted for manslaughter for the crash.  GM's recent admission that publicly linked Mr. Erickson's death to the defect in the ignition switch led to Ms. Anderson being cleared of the death of her boyfriend ten years later.[694]  As *The New York Times* reported on November 24, 2014: "G.M. did not disclose the switch's role when federal safety regulators asked about the cause of the crash in a so-called death inquiry.  Instead, ***in June 2007, the automaker wrote to the National Highway Traffic Safety Administration that it had not assessed the cause of the crash when, in fact, it had***:  A G.M. engineer had found just a month earlier that power to the vehicle had most likely shut off."  Specifically, GM reported to NHTSA in June 2007 that:  "To date, General Motors' investigation of the alleged defect has not included an assessment of the cause(s) of each incident responsive to this request.  Some incident reports may not contain sufficient reliable information to accurately assess cause.  Assessments of other incidents (from lawsuits and claims) may be attorney work product and/or privileged.  Therefore, information and documents provided in this response, if any, consist only of non-attorney work product and/or non-privileged material for incidents that have been investigated and assessed."[695]

b.  On July 26, 2007, Siemens Continental ("Continental"), the manufacturer of the SDM unit for the Cobalt, provided GM with a

---

[691]  Gen. Motors Co., Case Evaluation Report, May 4, 2007, at 4 [GMNHTSA000295538]; Valukas, *supra* note 15, at 125.

[692]  Gen. Motors Co., Case Evaluation Report, May 4, 2007, at 4 [GMNHTSA000295538]; Valukas, *supra* note 15, at 125.

[693]  Gen. Motors. Co., Case Evaluation Report, May 4, 2007, at 4 [GMNHTSA000295538]; Valukas, *supra* note 15, at 125.

[694] Rebecca R. Ruiz, *Woman Cleared in Death Tied to G.M.'s Faulty Ignition Switch*, N.Y. TIMES, Nov. 25, 2014, http://www.nytimes.com/2014/11/25/business/ woman-cleared-in-death-caused-by-gms-faulty-ignition-switch.html.

[695] Letter from Gay P. Kent, Dir. Prod. Investigations, Gen. Motors. Co., to Christina Morgan, Chief, Early Warning Div., NHTSA (June 7, 2007) [GMHEC000198413-14].

report with respect to a Cobalt crash with non-deployed airbags, concluding that, "The SDM experienced loss of battery at some point prior to the Non-Deploy event; the loss of battery qualified and ***the front and side algorithms were disabled*** until the SDM eventually depleted its energy reserve and shut down."[696]

c.   On September 18, 2007, a case evaluation concerning the non-deployment of airbags in an accident of a 2005 Saturn Ion that occurred on June 26, 2005, Peace again determined that the accident was caused by ***"power loss."***[697]

d.   On January 28, 2008, GM reviewed another accident concerning the non-deployment of airbags in a 2004 Saturn Ion, with Peace again determining that, in such a case, "there should be a deployment event."[698]

e.   On July 8, 2008, GM reviewed another accident involving a 2005 Cobalt that occurred on December 29, 2006, in which the Cobalt's airbags failed to deploy after colliding with a tree head-on.[699]

f.   In late 2008 or early 2009, GM FPA engineers learned about a September 13, 2008 Cobalt crash in Stevensville, Michigan which resulted in two fatalities and no airbag deployment.[700]   Continental reported on May 15, 2009 that there was a loss of battery or power mode was Off.   GM FPA engineer Lisa Stacey reviewed the publicly available information, examined the vehicle, visited the crash site and determined that this was an incident where deployment should have occurred.[701]   On May 15, 2009, Everest, Sprague, Stacey, James Churchwell (GM engineer), William Hohnstadt (GM Engineering Group Manager), John Dolan (head of GM's Global Subsystem Leader Team on Passive Safety Control), Jaclyn Palmer (a GM product litigation attorney) and Eric Buddrius (a GM engineer), all attended a meeting with Continental to discuss Continental's findings concerning

---

[696] Valukas, *supra* note 15, at 127.

[697] *Id*. at 126.

[698] *Id*. at 130.

[699] *Id*.

[700] *Id*. at 132.

[701] *Id*.

the September 13, 2008 accident.[702]   Continental's report for the accident stated that:  "The Sensing and Diagnostic Module (SDM) did not deploy [the airbag] because the algorithms were disabled at the start of the event."[703]   The report identified two possible causes for the disabled algorithm:  (1) the vehicle experienced "loss of battery" or (2) the SDM received a power mode status of Off from the BCM [the vehicle's body control module, which broadcasts the vehicle's power mode].[704]  After that report, Sprague collected information on vehicles' power mode status and discovered that, in fact, power mode status was recorded as "Off" or "Accessory" in a number of accidents.[705]

### 3.   GM Is Warned In October 2010 That The Ignition Switch Defects Could Result In Punitive Damages

476.   On October 7, 2010, GM was warned by its outside counsel King & Spalding that it faced potential punitive damages based on the non-deployment of airbags in a Cobalt after the driver died when her MY 2006 Cobalt hit a tree head-on on December 31, 2009, and she was wearing a seat belt.[706]  According to the SDM data, the vehicle's power mode status was in the Off position at the time of the accident.[707]  John Sprague was one of the FPA engineers assigned to the case.[708] King & Spalding warned GM that the existence of prior instances of non-deployment could lead to punitive damages against GM.[709]

---

[702] *Id*. at 134.

[703] *Id*.

[704] *Id*.

[705] *Id*. at 135.

[706] *Id*. at 140.

[707] *Id*. at 141.

[708] *Id*.

[709] *Id*. at 142.

477.   On January 11, 2011, the Settlement Review Committee, including Buonomo, Legal Global Process Leader and Practice Area Manager-Product Development Deborah Nowak-Vanderhoef ("Nowak-Vanderhoef") and Kemp reviewed the case.  On January 14, 2011, Nowak-Vanderhoef asked for additional information about the airbag non-deployment after the case was settled.[710] Thereafter, their new superior, Clark Dougherty, gave Kemp directions to further investigate the issue of the ignition switch potentially resulting in airbag non-deployment, but it took until July 2011 to schedule the meeting.[711]

### 4.    July 2011:  Senior GM Executives Meet And Acknowledge That The Ignition Switch Problems Are The "Root Cause" Of The Cobalt Airbag Non-Deployments

478.   On July 27, 2011, in an "unusual" meeting, GM lawyers met with the Products Investigation ("PI") team concerning Cobalt airbag non-deployment.[712] Jaclyn Palmer, Benavides, Nowak-Vanderhoef, Kemp, Wachtel, Matthew Jerinsky, James Churchwell, Everest, Sprague and Jennifer Sevigny (head of FPA) all received invitations to the meeting.[713]  While it was unusual to gather together that many people for such a meeting, Kemp said that he "***wanted to make sure senior management had eyeballs on this and not let it flow through the normal***

---

[710]  *Id*. at 146-47.
[711]  *Id*. at 147-48.
[712]  *Id*. at 150.
[713]  *Id*. at 150-51.

*process*."[714]   FPA Supervisor Everest said he understood the purpose of the meeting was for GM's legal department to express to the PI department that certain Cobalt non-deployment cases represented a safety concern and that PI urgently needed to determine the "root cause" of the problem.[715]

479.   GM's purported need to identify the root cause of a defect before taking action has been criticized by NHTSA through the Consent Order NHTSA entered into with GM on May 16, 2014, following GM's long belated recall of cars at issue in this litigation.  As the Consent Order states, GM agreed that:

> **GM shall not delay** holding any meeting—including any meeting of GM's Executive Field Action Decision Committee (EFADC), Field Performance Evaluation Recommendation Committee (FPERC), or other body charged with the responsibility of determining the existence of a safety-related defect—*to decide whether or not to recommend or conduct a safety recall because GM has not yet identified the precise cause of a defect, a remedy for the defect, or prepared a plan for remedying the defect*.  GM shall ensure that any committee or individual responsible for decision-making on safety recalls is informed of safety-related concerns in a reasonably expeditious manner, including by ensuring that GM's corporate structure enables its safety organization to promptly bring safety-related issues to the attention of committees and individuals with authority to make safety recall decisions.[716]

480.   Three different cases were presented at the July 27, 2011 meeting,

---

[714] *Id*. at 150.

[715] *Id*.

[716] Consent Order, National Highway Traffic Safety Administration, In re TQ14-001 NHTSA Recall No. 14V-047 (May 16, 2014), at ¶24, http://www.nhtsa.gov/staticfiles/communications/pdf/May-16-2014-TQ14-001-Consent-Order.pdf.

including cases involving fatalities, and an incident that NHTSA had brought to GM's attention in March 2007 because an airbag deployment would have been expected.[717]  Sprague explained that airbag non-deployment would be connected to the SDM receiving a message that the vehicle power mode was in Accessory or Off and Sprague further explained that he thought it could be connected to the ignition switch.[718]  Even though only three cases were discussed, Wachtel and Kemp each said *they would have placed little emphasis on the low incident rate because of the seriousness of the crashes*.[719]  Kemp has also said that de-emphasizing the seriousness of a problem because of a low incidence rate was "inconsistent with my view at the time plus the direction I had been given," which was a reference to his direction from Clark Dougherty for him to have PI investigate the issue.[720]

481.  On July 26, 2011, outside counsel King & Spalding again warned GM about the likelihood that GM would be subject to punitive damages in a new airbag non-deployment case.  The accident occurred on February 13, 2011, in a MY 2007 Cobalt running into a tree, and Sprague was one of the FPA supervisors assigned to the case.  In its analysis sent to GM, King & Spalding wrote about how Sprague had seen this problem before in "some Cobalt vehicles" and further noted that "the fact

---

[717] Valukas, *supra* note 15, at 152.

[718] *Id*. at 152.

[719] *Id*. at 152, n.684.

[720] *Id*. at 152, n.684.

that the SDM data indicated that ***the car was in accessory mode at the time of the accident*** is clearly the most challenging aspect of this case."[721]

482.   An August 3, 2011 Roundtable summary similarly made the connection between the vehicle being in Accessory mode and the airbags not deploying.  The summary read:  "The vehicle power mode status was recorded as Accessory ***which indicates the sensing algorithm could have been disabled from deploying the airbags***."[722]

483.   Also in August 2011, Sprague met with Brian Stouffer, a GM Product Investigation Unit investigator, and told him that he had been tracking airbag non-deployment cases and that a working belief was that the non-deployments were caused by the SDM receiving a power mode message of Off or Accessory before or during a crash.[723]  Wachtel also gave Stouffer a file from Kiihr from 2005 that contained the negative press at the Cobalt launch of the moving shutdowns (including the 2005 articles discussed above from *The New York Times*, *Cleveland Plain Dealer* and *Sunbury Times*,[724] customer complaints, and a copy of the February 2005 Preliminary Information on engine stall in the Cobalt).[725]  Stouffer now knew that:  (i) the Cobalt had a history of the ignition switch being turned accidentally to

---

[721] *Id*. at 149.
[722] *Id*. at 10, 149.
[723] *Id*. at 155.
[724] *Id*. at 164.
[725] *Id*. at 156.

Accessory because of low torque; and (ii) airbags do not deploy when the ignition switch is in Accessory.[726]

### G. From Late 2011 Into 2012, GM Continues To Accumulate More Information And Acknowledges The Problem But Still Fails To Take Any Action

484. On November 17, 2011, Stouffer completed his first analysis of the vehicle safety data that GM had collected pursuant to the TREAD Act, and he updated that data collection on March 12, 2012.[727] Stouffer located approximately 50 additional reports that he believed might be related to airbag non-deployments.[728] Kemp repeatedly spoke to Wachtel about the investigation.[729]

485. On February 24, 2012, King & Spalding submitted to GM its evaluation of a two car crash on March 10, 2010 in Georgia involving a 2005 Cobalt driven by 29-year-old Brooke Melton with an airbag non-deployment and the ignition switch in Accessory mode.[730] Ms. Melton was struck in the passenger side of her Cobalt by a car driven by a 26-year-old man (with his two-year-old daughter in the back of his car) after Ms. Melton's car shut down and she lost control of it.[731]

---

[726] *Id*. at 211, 257.

[727] *Id*. at 160.

[728] *Id*.

[729] *Id*. at 160-61.

[730] *Id*. at 162.

[731] Adam L. Penenberg, *GM's hit and run: How a lawyer, mechanic, and engineer blew open the worst auto scandal in history*, PANDO DAILY (Oct. 18, 2014), http://pando.com/2014/10/18/gms-hit-and-run-how-a-lawyer-mechanic-and-engineer-blew -the-lid-off-the-worst-auto-scandal-in-history/.

486.   On March 8, 2012, Palmer emailed Nowak-Vanderhoef and Kemp, along with GM engineering and PI employees, to schedule a "meeting so that Product Investigations can update Legal, regarding the status of the investigation into Cobalt airbag nondeployments."[732]

487.   On March 15, 2012, Palmer met with Stouffer, Kemp, Nowak-Vanderhoef, Wachtel, Everest, Sprague and Benavides.[733]  After the meeting, Kemp notified Palmer that he would seek out an "executive champion" to oversee the Field Performance Evaluation ("FPE") process.[734]  The FPE is a dedicated investigation process used to evaluate safety, compliance, emissions and customer satisfaction issues and to determine whether a field action is necessary.[735]

## H.   In 2012, GM Confirms The Obvious Connection Between The Ignition Defect And Airbag Failures, But More Delays Follow

488.   On March 28, 2012, Sprague organized a trip to the Auto Salvage Auction in Davison, Michigan, with GM electrical engineers John Dolan, David Carey and Vipul Modi.  On that trip, they found that a Cobalt ignition turned extraordinarily easily.[736]  They bought a fish scale and recorded the results, which suggested that a driver simply hitting a pothole could move the ignition switch out

---

[732] Valukas, *supra* note 15, at 164.

[733] *Id*.

[734] *Id*. at 165.

[735] *Id*. at 289.

[736] *Id*. at 165.

of the Run position.[737]   Dolan checked warranty data the next day and discovered

many customer complaints and also the TSB describing the low torque and how

drivers could knock the key out of the Run position into Accessory, and elevated the

matter to Dolan's supervisor David Carey.[738]  Carey informed Wachtel.[739]  They also

sent the information to Stouffer.[740]

489.   On April 18, 2012, the law firm of Eckert Seamans submitted a case

evaluation to GM lawyer Jaclyn Palmer concerning a December 13, 2009 crash of a

MY 2005 Cobalt.[741]  The airbags in the vehicle failed to deploy and the vehicle was

in Accessory mode. [742]   The FPA on the case was Sprague.[743]   The law firm's

evaluation linked the airbag non-deployment and the defective ignition switch low

torque issue, writing:  "Since the Cobalt was in the Accessory Mode, instead of Run

Mode at the time of the crash, the algorithm that the SDM runs to determine whether

to deploy the airbags was disabled.  Therefore, the SDM was incapable of deploying

the airbags, regardless of the severity of the impact."[744]  Eckert Seamens added that:

"It will be difficult to explain why the ignition switch toggled to Accessory Mode

---

[737] *Id*. at 166.

[738] *Id*.

[739] *Id*.

[740] *Id*.

[741] *Id*. at 167.

[742] *Id*.

[743] *Id.* at 167-68.

[744] *Id*. at 168.

simply from running off-road.   GM will also be forced to contend with other incidents, some of which resulted in deaths, due to the non-deployment of the frontal airbags in the 2005-07 Cobalt.  ***Those other incidents put GM at risk for imposition of punitive damages in West Virginia.***"[745]

490.   The firm also noted the existence of GM's prior TSB, writing that:

GM issued [a Service Bulletin] to address the problem of the driver inadvertently turning off ignition by bumping the key chain with his/her knee while turning the steering wheel if the steering wheel was adjusted too low.  This Bulletin addresses a similar problem as that seen in the field where the key in the ignition switch in in the 2005 Cobalt could toggle from the Run mode to the Accessory mode by traveling off-road or even over rough terrain." [746]

491.   On April 22, 2012, current GM CEO Barra was one of two recipients of an email from a former GM employee reporting a moving shutdown in his Buick that he described as attributable to the key design and suggesting that the company investigate and perhaps issue a service bulletin.[747]   Barra forwarded the email to Terry Woychowski ("Woychowski"), GM Vice President of Global Quality and Vehicle Launch, and a member of the committee in charge of recalls (the Executive Field Action Decision Committee ("EFADC")).[748]

492.   On April 25, 2012, GM lawyer Jaclyn Palmer presented the case

---

[745] *Id*.

[746] *Id*.

[747] *Id*. at 229.

[748] *Id*.

evaluated by Eckert Seamans to the Roundtable.[749]   Attendees included Buonomo and Nabeel Peracha, a newly-hired GM lawyer.[750]   At the meeting, Palmer explained that the airbags could not deploy because the Cobalt was in Accessory mode.  Palmer also wrote that GM's PI group had been investigating the Cobalt issue for the past year and that "there is a service bulletin related to the potential for the driver to inadvertently turn off the ignition (by contacting a large and/or heavy key chain with the knee) due to low ignition torque/effort, which is one theory being pursued."[751]

493.   GM considered a potential field solution of allowing airbag deployment when the car was in Accessory, but rejected it.[752]   On May 2, 2012, Benavides sent Kemp an email saying "can we discuss the attached.  I was unaware that a decision was made to not support."[753]

494.   At this time, Kemp asked Woychowski to "champion" the Cobalt non-deployment issue.[754]   On May 15, 2012, Kemp organized a meeting of high-level managers, directors and PI and engineering personnel regarding the "Cobalt Airbag Issue" (the "May 15 Meeting").[755]   Among the attendees were Kemp, Benavides,

---

[749] *Id*. at 169.

[750] *Id*.

[751] *Id*. at 170.

[752] *Id*. at 171.

[753] *Id*.

[754] *Id*. "[A] 'champion' is an executive who helps a team remove roadblocks and obtain resources."

[755] *Id*. at 171-72.

Wachtel, Woychowski, John Dolan and Vipul Modi.[756]   Dolan prepared a PowerPoint presentation to convey that the low torque of the ignition switch could cause a bump or jolt to move the key out of the Run position prior to a crash, shutting off power and thus preventing the Colbalt's airbag from deploying.[757]   Dolan based his analysis on how easy it was to turn keys in the Cobalts at the Davison Salvage Yard, the TSB and his review of SDM records of crash data and other crash records.[758]   Dolan believed that even cars recorded as in Run probably went from Run to Accessory and back to Run, but not in time for the airbags to reactivate.[759]

495.   Dolan's slide stated:

The SDM indicates that the vehicle power mode is ACC or OFF in the majority of reported incidents.

In the vehicles where EDR recorded RUN power mode have the crash sensing algorithm recorded as being inactive.  The crash algorithm is inactive during the initial 3 seconds after transitioning from power mode OFF/ACC to RUN to run self diagnostics. . . .

If a crash event [the car hitting something] has started while in power mode RUN, any transition from power mode RUN is ignored until the crash event is completed – and the power mode is recorded as RUN in EDR.[760]

In other words, Dolan believed that a pre-impact event, potentially less than one second before a crash event, would cause the Ignition Switch to rotate from Run to

---

[756] *Id*. at 172.

[757] *Id*.

[758] *Id*.

[759] *Id*. at 173.

[760] *Id*.

Accessory, thereby preventing the airbags from deploying in a crash.[761]

496.  Wachtel's notes from the May 15 Meeting, sent to Stouffer the following day, reflect an understanding that ***the ignition switch could be the root cause of the airbag non-deployment issue***.[762]  GM's engineers were subsequently tasked with determining a means by which the SDM could remain active for some period of time after the vehicle's power mode status moved out of Run to Accessory or Off, thus permitting airbag deployment even after a loss of power.[763]

497.  A week after the May 15 Meeting, on May 22, 2012, Stouffer, Sprague and David Caples ("Caples") returned to the Davison Junk Yard to measure ignition switch torque in 40 Cobalt, G5, HHR and Ion vehicles.[764]  The following day, after the team had completed their measurements, Caples reported in an email that there "is a noticeable dip in the torque for Model Years 2005 and 2006."[765]  However, because the 2005 and 2006 vehicles' torque measurements were fairly similar to those of 2007 and 2008 vehicles, Stouffer was unable to identify a breakpoint after which it was apparent that GM had installed ignition switches with higher torque values.[766]  Later, Stouffer believed that MY 2007 vehicles were a "mixed stock" –

---

[761] *Id.* at 174.

[762] *Id.* at 176.

[763] *Id.*

[764] *Id.* at 176-77.

[765] *Id.* at 177.

[766] *Id.* at 177, n.810.

i.e., that the group of MY 2007 vehicles measured may have contained both deficient switches and up-to-specification switches.[767]

498.    Two weeks after the May 15 Meeting, Wachtel emailed Kemp, copying Benavides and Stouffer, and stated that "[t]he action items that were identified at [the May 15 Meeting] have been completed, and we are ready for a follow-up meeting."[768]  The follow-up meeting was scheduled for June 21, 2012.[769]

499.    In early June 2012, following Woychowski's retirement, Kemp asked Jim Federico, Executive Director for Global Vehicle Integration ("Federico"), in his capacity as Chief Engineer to replace Woychowski as "champion" for the Cobalt airbag non-deployment issue.[770]

500.    In June 2012, Erin Shipp, a plaintiff's expert in a West Virginia Cobalt crash and airbag non-deployment case ("Shipp"), concluded that the low torque of the ignition switch was the cause of airbag non-deployment in the Cobalt.[771]  As discussed above, Shipp had located the Indiana University study and cited it in her report, along with GM's December 2005 TSB.[772]  In her report, issued in June 2012 (the "Shipp Report"), Shipp stated:

General Motors knew that the design of the ignition switch was

---

[767] *Id.*

[768] *Id.* at 178.

[769] *Id.*

[770] *Id.*

[771] *Id.* at 161.

[772] *Id.* at 161 & 180-81.

improper and could cause power interruption during [driving]. This would include the event as described in the bulletin [a knee striking the key or keychain], but also during events where the vehicle is subject to very rough terrain such as pre-crash events, it is likely that the driver will move within the cabin and those movements would include impact with interior components including the ignition key that is inserted in the ignition switch.

I reviewed 2005 Chevrolet Cobalt wiring diagrams and have found the air bag system active in the start/run and crank/run positions but not active in the accessory position.

[The data] indicates that between 2 and 1 seconds before the start of the impact the key was turned to the accessories position in the ignition switch. These indicators are in agreement with the data from the crash report from the NHTSA database by Indiana University.[773]

501.   On July 6, 2012, outside counsel sent Shipp's expert report to Palmer and on July 9, 2012, to Sprague.[774]

502.   On July 25, 2012, there was a Roundtable discussion at GM (the "July 25 Roundtable").[775]  Ron Porter, Palmer, Paul Widzinksi and Buonomo were among the attendees.[776]  In her subsequent Roundtable case summary, Palmer reported on the Shipp Report and its implications:  "[GM's defense counsel] believes that if the case is tried, GM will lose and that, although the demand is high, as time goes, and the Cobalt investigation remains unsolved, the verdict exposure will increase and the defense of the case will become more complicated.  I agree."[777]

---

[773] *Id.* at 181-82.
[774] *Id.* at 182.
[775] *Id.* at 183.
[776] *Id.*
[777] *Id.*

503.   Nabeel Peracha, a relatively junior in-house attorney for GM ("Peracha"), was also a participant at the July 25 Roundtable.[778]  Peracha had only been working at GM since April, and in the course of the July 25 Roundtable's discussions, he asked why GM had not issued a recall.[779]

504.   Several months later, on September 4, 2012, Federico hosted a meeting at which Stouffer gave an update on the state of the issue.[780]  Wachtel, Sprague, Dolan, Benavides, Carey, Capp and Kemp were among the meeting's attendees.[781]  In conjunction with the meeting, possible solutions were also discussed.[782]  These included changing the ignition switch to increase torque, changing the ignition switch's key slot to a closer-fitting centered hole and modifications that would keep the BCM and SDM active even after the car lost power.[783]

505.   Following the meeting on September 4, 2012, Stouffer also initiated a Red X investigation.[784]  Red X is a standard engineering diagnostic in which GM engineers with relevant experience and expertise in problem solving make a focused effort to diagnose the root cause for different performance between identical

---

[778] *Id.* at 184.

[779] *Id.* at 108, 169 & 184.

[780] *Id.* at 185-86.

[781] *Id.* at 186 & 186, n.855.

[782] *Id.* at 186.

[783] E-mail from Raymond DeGiorgio, Eng'r, Gen. Motors Co., to Brian Stouffer, Eng'r, Gen. Motors Co. (Oct. 5, 2012, 2:10 PM) [GMHEC000221541].

[784] Valukas, *supra* note 15, at 186.

vehicles.[785]  The process involves comparing two ostensibly identical but differently performing vehicles – the Best of the Best and the Worst of the Worst – to isolate the root cause.[786]

506.   The Red X investigation commenced on September 6, 2012, when Stouffer contacted Bill Merrill ("Merrill"), Red X North America manager, to request assistance.[787]  Merrill assigned the matter to Dan Davis ("Davis"), Red X Global Lead.[788]

507.   In order to complete the diagnostic, Davis needed to examine a Worst of the Worst sample.[789]  However, Davis never obtained one:  according to Davis, he requested a Worst of the Worst sample from Stouffer, who indicated that he would need to check with GM's legal department; for his part, Stouffer does not recall Davis's request.[790]  In any event, Davis did not obtain a Worst of the Worst sample, could not compare ignition switches without one, took no further action and eventually closed the Red X project.[791]

---

[785] *Id*. at 186-87.

[786] *Id*.

[787] *Id*. at 187.

[788] *Id*.

[789] *Id.*

[790] *Id.* at 187-88.

[791] *Id*. at 188.

**I.     In The Fall Of 2012 And 2013, GM Receives Additional Evidence That The Defective Ignition Switches Pose Serious Safety Risks**

508.   On October 31, 2012, outside counsel Eckert Seamans submitted to Palmer a case evaluation for an August 12, 2012 crash of a 2005 Cobalt in which the airbag failed to deploy.[792]   According to SDM data, the vehicle had been in Accessory mode at the time of the crash.[793]   Eckert Seamans informed Palmer:

> It is pretty straightforward on the non-deployment of the air bag. It is a deployment level event but the Vehicle Power Mode Status was in "Accessory" when AE occurred. It normally would be in the "Run" position.
>
> Somehow the key cylinder put the vehicle into "Accessory" mode which would cause the air bags not to deploy. GM has seen this in a few other matters. The NTHSA has also commented on the type of situation in a Cobalt. GM has worked/is working on a fix for it.[794]

509.   On December 12, 2012, Palmer presented this case to the Roundtable, including Porter, and the case settled.[795]   Buonomo signed the settlement authorization.[796]

510.   In March 2013, Defendant Kent, then in charge of the PI group, replaced Federico as the "champion" of the issue.[797]   She had replicated the moving shutdown back in 2005.[798]

---

[792] *Id*. at 190.

[793] *Id*.

[794] *Id*. at 190-91.

[795] *Id*. at 191.

[796] *Id*.

[797] *Id*. at 198.

[798] *Id*.

511.  On May 15, 2013, GM attorneys again reviewed what is likely the *Melton* lawsuit at a Roundtable.[799]  (The references to the identity of the plaintiff in this case are redacted in the Valukas Report.)  GM Product Litigation attorney Ron Porter prepared a summary of the Roundtable, including a description of the lawsuit.[800]  That summary stated, in relevant part:  "Plaintiff claims the engine turned off because the ignition switch moved from the run to the accessory position.  The [REDACTED] switch requires about 8 N/cm to turn from Run to Accessory.  The torque curve on the drawing works out to about 20 N/cm."[801]  While the Roundtable authorized a settlement of the lawsuit at this time, the case did not settle and discovery in the suit continued.[802]

512.  On July 22, 2013, King & Spalding submitted to GM a second case evaluation for the same litigation.[803]   In the evaluation, lead King & Spalding attorney Holladay concluded that the "case was a very poor trial candidate," and a jury would almost "certainly" conclude that the ignition switch was "***unreasonably dangerous*** because the torque effort required to move the key from run to accessory is too low, which leads ***to inadvertent key movement and the engine shutting off***

---

[799] *Id*. at 203.

[800] *Id*.

[801] *Id*.

[802] *Id*.

[803] *Id.*

*with little to no warning.*"[804]

513.   King & Spalding's evaluation further warned that this "unreasonably

dangerous" condition was known to GM since the 2005 Cobalts were launched,

stating:

> This phenomena was identified almost immediately after the 2005
> Cobalt went into production and there were several newspaper and
> trade publication articles shortly after the car's launch that flagged the
> issue.  As discussed in more detail below, the issue was assessed
> internally in a series of investigations conducted as part of the Product
> Resolution Tracking System and ultimately addressed by issuing an
> Information Service Bulletin in the Fall of 2005 that provided a field
> service fix for customers who experienced an incident involving
> inadvertent key movement….[805]

514.   The King & Spalding report further addressed recent incidents

involving the failure of airbags to deploy in 2005-2007 Cobalts, stating:

> In more than half of those incidents, it appears the reason that the air
> bag did not deploy was because the car's ignition was in the accessory
> rather than the run position.  While there is no allegation here that
> [REDACTED] frontal air bags should have deployed, the on-going
> investigation ties nicely into plaintiffs' expected theme that the original
> Information Service Bulletin was an inadequate "band-aid fix" for a
> significant safety issue that should have been addressed through a recall
> and design change.[806]

515.   Again, Holladay warned of an adverse jury verdict in this case.[807]

Among other problems, he observed that "the ignition switch and key cylinder used

---

[804] *Id.*

[805] *Id.*

[806] *Id.* at 204.

[807] *Id.*

273

on the 2005 Cobalt were problematic from the outset and plaintiffs will have little problem convincing most jurors that these components were substandard and defective."[808]   Indeed, Holladay explained, the plaintiff would argue that GM had known of the defect from the time that the Cobalts first "rolled off the assembly line" and yet it has "essentially done nothing to correct the problem for the last nine years."[809]   The report stated:

> [T]here is little doubt that a jury here will find the ignition switch used on [REDACTED] 2005 Cobalt was defective and unreasonably dangerous, and that it did not meet GM's own torque specifications. ***In addition, the PRTS documents referenced above and the on-going FPE investigation have enabled plaintiffs' counsel to develop a record from which he can compellingly argue that GM has known about this safety defect from the time the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to correct the problem for the last nine years.***  He specifically will criticize GM for not doing more than implementing the field service campaign back in 2005, and point to GM's failure to take any action in the on-going FPE investigation that has now been dragging on for almost two years as proof positive of GM's conscience indifference and willful misconduct when it comes to the safety of its vehicles' occupants.[810]

In sum, Holladay concluded, "***This case needs to be settled.***"[811]

516.   At this same time, on July 23, 2013, Frank Borris from NHTSA's ODI sent an email to Carmen Benavides, GM Director of Product Investigations, Safety Regulations, Field Performance Assessment, and TREAD, about an upcoming July

---

[808] *Id.*

[809] *Id.*

[810] *Id.* at 204-05.

[811] *Id.*

25, 2013 meeting between GM and NHTSA.[812]  Borris provided Benavides with a list of issues he wished to discuss with GM concerning GM's delays to take action on safety issues, and wrote to Benavides that *"[t]he general perception is that GM is slow to communicate, slow to act, and, at times, requires additional effort of ODI that we do not feel is necessary with some of your peers."*[813]  Borris added that *"There is a general perception in ODI that GM is one of, if not the worst offender of the regional recall policy" – i.e., only instituting recalls in regions of the country (or the world) rather than instituting a nationwide (or worldwide) recall.*[814]

517.    On August 7, 2013, Porter presented what is likely the *Melton* case to the SRC.[815]    Buonomo, Gruskin, Kemp and Nowak-Vanderhoef attended the meeting.[816]  Porter's summary included a report that there were 20 known cases of airbag non-deployment, and in half of the crashes, the ignition was in the Accessory position.[817]  The summary further concluded that "[i]n the Cobalt, the airbag will not deploy with the key in Acc."[818]

518.    The SRC authorized settlement, which was approved by Buonomo, and

---

[812] E-mail from Michael J. Robinson, Vice President, Sustainability and Global Regulatory Affairs, Gen. Motors Co., to Gay P. Kent, Dir. Of Vehicle Safety and Crashworthiness, Gen. Motors Co. (July 24, 2013, 11:21 AM).
[813] *Id.*
[814] *Id.*
[815] Valukas, *supra* note 15, at 206.
[816] *Id.*
[817] *Id.*
[818] *Id.*

the case settled in September 2013 for $5 million, the maximum the SRC could authorize.[819]

519.   On November 5, 2013, GM held an Investigation Status Review meeting, attended by Stouffer, Benavides, and others.[820]   At the meeting, Stouffer presented findings indicating a relationship between the low torque in the Cobalt ignition switch and airbag non-deployment.[821]   "The hypothesis is that during the off road event the driver's knee is interacting with the keys and/or mass of the keys is causing the ignition to rotate."[822]   However, as detailed above, GM knew by this point in time that the rotation of the ignition switch and resulting engine shut off can themselves be the cause of a crash.   As noted, Benavides was present at the Investigation Status Review meeting, and she believed at the time that there should be a recall, but did not disclose her views to NHTSA at a meeting with NHTSA two days later on November 7, 2013.[823]

520.   On November 19, 2013, GM Director of FPE Maureen Foley-Gardner ("Foley-Gardner") emailed Alicia Boler-Davis ("Boler-Davis"), GM's Senior Vice-President of Global Quality and Customer Experience, to inform her of the issue with the Cobalt ignition switch, and GM finally began its internal formal process to

---

[819] *Id*. at 207.
[820] *Id*. at 209, n.978.
[821] *Id*. at 210.
[822] *Id*.
[823] *Id*. at 209, n.978.

commence a recall given that the personal injury litigation, including Shipp's expert report, eliminated GM's ability to delay a recall any further.[824]

521.   On December 2, 2013, a small group of the Field Performance Evaluation Recommendation Committee ("FPERC"), an executive committee that reviews the details of a FPE investigation and makes a recommendation to the EFADC, the GM committee that considers recalls, held a meeting to discuss the Cobalt ignition switch defect.[825]   Stouffer, Benavides, Foley-Gardner, Kemp, Defendant Kent, Wachtel and John Murawa attended the meeting.[826]  Stouffer retired on December 4, 2013, and Wachtel left GM on December 20, 2013, leaving Murawa, who had less than two weeks to get up to speed on the FPE investigation.[827]

### J.   Defendant Akerson "Retires" Under Suspicious Circumstances And Defendant Ammann Is Effectively Removed From His Role As CFO

522.   On December 10, 2013, GM announced that Defendant Akerson would step down as CEO and Chairman of the Board, effective on January 15, 2014.[828] According to GM, Akerson had previously expected to retire in mid or late 2014,

---

[824] *Id*. at 211.

[825] *Id*. at 215.

[826] *Id.*

[827] *Id*. at 216.

[828] Press Release, Gen. Motors Co., *Dan Akerson to Retire as GM CEO in January 2014* (Dec. 10, 2013), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/emergency_news/2013/1210-gm-execs.html.

but there was no set date for his retirement.[829] Defendant Barra was named to replace Defendant Akerson as CEO.[830]

523.   Akerson publicly attributed his sudden retirement to wanting to spend more time with his family and his wife, who had become ill with late stage advanced cancer, stating,   *"It was not my intention for my days at GM to end this way*, but when you think about life's priorities, my family and my wife rank No. 1."[831] However, Akerson's actions following his retirement from GM are not consistent with a desire to cease working in order to spend more time with family.  Indeed, on February 27, 2014, a mere six weeks after Defendant Akerson stepped down as GM CEO and Chairman, Akerson joined the Board of Directors of Lockheed Martin.[832] Two weeks later, on March 14, 2014, Defendant Akerson rejoined The Carlyle Group as Vice Chairman and Special Advisor to the Board of Directors of Carlyle.[833] At some point thereafter, Akerson also became a member of The Carlyle Group's

---

[829] *Id.*

[830] *Id.*

[831] Nathan Bomey, *GM CEO Dan Akerson retiring; Mary Barra to become first female CEO of major automaker*, DETROIT FREE PRESS, Dec. 10, 2013, http://archive.freep.com/article/20131210/BUSINESS0101/312100068/gm-CEO-Dan-Akerson-GM-Mary-Barra.

[832] Press Release, Lockheed Martin, *Lockheed Martin Elects Daniel F. Akerson To Board Of Directors* (Feb. 27, 2014), http://www.lockheedmartin.com/us/news/press-releases/2014/february/0227hq-akerson-board-of-directors.html.

[833] *Former GM chief Akerson rejoins Carlyle Group*, BLOOMBERG BUSINESSWEEK, Mar. 14, 2014, http://www.businessweek.com/ap/2014-03-14/former-gm-chief-akerson-rejoins-carlyle-group.

Management Committee.[834]

524.   The suspicious timing of Akerson's "retirement" from GM shortly before the recalls began and his attribution of that retirement to spending time with family and his new employment position which followed shortly thereafter, have been questioned in the press.  For example, on April 8, 2014, *Forbes* reported that John McElroy, a renowned authority on the Detroit automotive industry, asked whether Akerson's abrupt departure indicated that he knew by late 2013 "about the coming cataclysmic recall."[835]  McElroy asked,  **"So [Akerson] doesn't have time to be chairman of General Motors, but he does have time to be vice chairman of Carlyle?"** [836]

525.   In addition to GM's December 10, 2013 announcement of Akerson's retirement, GM also announced on December 10, 2013 that Defendant Ammann would be promoted to GM President, effectively ending his tenure as CFO after "the release of the company's fourth quarter and full-year results in early February 2014."[837]

---

[834]   The Carlyle Group, *Daniel F. Akerson*, About Carlyle, http://thecarlylegroup.com/about-carlyle/team/daniel-f-akerson (last visited Jan. 14, 2015).

[835]   *Id.*

[836]   *Id.*

[837]   *Id.*

**K.    GM Urgently Orders 500,000 Replacement Ignition Switches On A Rush Basis Almost Two Months Before Publicly Announcing Its First Recall**

526.   On December 17, 2013, the Cobalt ignition switch reached the EFADC (the GM Committee that decides whether or not GM will issue recalls).[838]  The three GM executive decision-makers who sit on this Committee are Calabrese, Boler-Davis, and Gerald Johnson, Vice President of Manufacturing.[839]  Other attendees included Benavides, Foley-Gardner, Kemp, Defendant Kent, Wachtel, and Jeffrey Wrona, GM Executive Director of Powertrain and Vehicle Engineering Quality.[840] A PowerPoint presentation given at the December 17, 2013 meeting included slides that set forth information about *five fatalities and other serious injuries that had resulted from the defective ignition switch*.  According to John Murawa (a Field Performance Evaluation investigator), he presented the slides discussing the fatalities to the group at the December 17, 2013 EFADC meeting.  Also, according to Wrona, he was aware that fatalities had occurred due to the defective ignition switch at the time of the EFADC meeting.  Notwithstanding the conclusions of those throughout GM that a recall was warranted, the first EFADC meeting ended with a request for yet another follow-up analysis to determine the "root cause" of airbag

---

[838] *See* Valukas, *supra* note 15, at 194, 214 & 217.

[839] *Id.* at 217.

[840] *Id.* at 218.

non-deployments.[841]   Nonetheless, Calabrese admits that he told Barra in late December 2013 at least that the EFADC was in fact considering a possible recall.[842]

527.   However, as *The New York Times* later reported on November 10, 2014,[843] GM placed an urgent order with Delphi for 500,000 replacement switches on December 18, 2013, the day after the EFADC adjourned.   Specifically, on December 18, 2013, almost two months before GM first publicly announced in February 2014 that it was recalling Chevy Cobalts and Pontiac G5s due to the defective ignition switches, GM internally placed an "urgent" parts order with its ignition switch supplier, Delphi, for 500,000 ignition switches that would be used as the replacements in the eventual recalls.[844]

528.   GM's December 18, 2013 email to Delphi requesting the replacement ignition switches bore the subject line "PN 10392423, Ign Switch – FIELD ACTION" and stated that GM was "looking for a build and ship plan for a large volume of this part [PN 10392423, Ign Switch] to support an urgent Field Action for our customers" and that GM "will need to secure a total of 500,000 pcs, at this

---

[841] *Id.* at 214 & 219.

[842] *Id*. at 221.

[843] Hilary Stout & Bill Vlasic, *G.M. Ordered a Half-Million Replacement Switches 2 Months Before Recall*, N.Y. TIMES, Nov. 10, 2014, http://www.nytimes.com/2014/11/11/business/gm-ordered-replacement-ignition-switches-months-before-recall.html.

[844] Jeff Bennett, *GM Ordered New Switches Long Before Recall*, WALL ST. J., Nov. 10, 2014, http://www.wsj.com/articles/gm-ordered-new-switches-long-before-recall-1415584224.

time."[845]  The author added that she was "not sure if you [Dephi] have any stock you can provide prior to the holiday break or not, please let me know so I can make the manual adds to the system to accommodate."[846]

529.   The next day, December 19, 2013, Delphi wrote in an email to GM that the Company's request would be a "huge increase" to Delphi's prior shipment plans for the switch and asked GM in what "time frame" GM expected to receive the 500,000 switches.  GM emailed Delphi back 15 minutes later that:  "Yes, it is a huge increase.  It is to support a Field Action for large vehicle population. . .  I would need to start seeing shipments <u>ASAP</u>.  Please put together an aggressive plan and I can adjust the schedule accordingly."[847]   On December 20, 2013, Susan Dowling of Delphi forwarded that email from GM to other Delphi employees and wrote:

> You may have gotten this note already but can you help me gather the key folks we will need to manage this ***huge quantity of parts GM CCA is looking for***?  It is for Ignition Switch GM p/n 10392423, Delphi p/n NME74176307S and is ***part of a field fix***.  Not our issue, but part of the solution.  ***I do not know why we are just finding out about this*** but the potential revenue is significant.  Current price is around $5 and they are thinking they will need upwards of 500,000 units, possibly more.  ***They will take units at any time, even before the end of the year***.[848]

---

[845] A vehicle recall is an example of a "field action." Valukas, *supra* note 15, at 86.
[846] *Id.* at 86.
[847] E-mail from Sarah Missentzis, C/O Gen. Motors Co. Customer Care & After Sales, to Lisa M. Augustine, Delphi Mechatronic Sys. (Dec. 19, 2013, 3:43 PM) [DLPH MDL 0004239].
[848] E-mail from Susan M. Dowling, Delphi Mechatronic Sys., & Jose G. Casas, Delphi Mechatronics Sys. (Dec. 20, 2013, 2:43 PM).

530.   Another internal Delphi email dated December 20, 2013 estimated that the cost to GM of the order of 500,000 switches was $2.6 million, and that GM had indicated that "over 700K vehicles could be impacted by this field fix."[849]

531.   Despite the size and expense of the order, and the fact that it was placed with Delphi the day after the December 17, 2013 EFADC meeting, GM CEO Mary Barra, then an executive responsible for purchasing and the supply chain, has claimed she first became aware of the ignition switch defect no earlier than January 31, 2014.[850]

532.   On January 31, 2014, the EFADC met again and issued a recall of MY 2005-2007 Chevrolet Cobalts and Pontiac G5s.[851]   The Saturn Ion and Chevrolet HHR were discussed but not recalled.[852]   Calabrese, Boler-Davis, Murawa, Altman, Benavides, Foley-Gardner, Federico, Kemp, Defendant Kent, and Brian Thompson (Engineering Group Manager of Switches and Controls) attended this meeting.[853] Murawa again presented evidence of GM's investigation into the ignition switch

---

[849] E-mail from Anthony J. Simonton, Account Manager, Delphi Mechatronic Sys., to Susan M. Dowling, Delphi Mechatronic Sys. (Dec. 20, 2013, 8:33 AM).

[850] Hilary Stout & Bill Vlasic, *G.M. Ordered a Half-Million Replacement Switches 2 Months Before Recall*, N.Y. TIMES, Nov. 10, 2014, http://www.nytimes.com/2014/11/11/business/gm-ordered-replacement-ignition-switches-months-before-recall.html.

[851] Valukas, *supra* note 15, at 214.

[852] *Id.*

[853] *Id.* at 222.

defect.[854]  Calabrese concluded that the FPE had sufficiently established root cause (difference in torque and keys could turn off ignition in rough driving conditions).[855]

533.   On February 7, 2014, GM submitted its 573 Report to NHTSA, informing the agency that it had determined to conduct a safety recall for MY 2005-2007 Cobalts and 2007 Pontiac G5s, for a total of 780,000 vehicles.[856]  All MY 2007 Cobalts were included in the recall because the Company could not identify the "break point" during MY 2007 when GM had begun to install the redesigned switch in new cars.[857]

534.   However, consistent with GM's anti-recall culture and desire to keep the scope of any recall as small as possible, GM did not include in the February 7, 2014 recall a number of other model vehicles cited in the TSBs addressing the ignition switch defect.[858]  The media picked up on this discrepancy and pressured GM to eventually expand the recall to millions of additional cars.  For example, on February 17, 2014, a journalist sent a series of questions to Adler asking why other model vehicles cited in the TSBs were not recalled.[859]  As reported by *The New York*

---

[854] *Id.*

[855] *Id.*

[856] Letter from Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (Feb. 7, 2014) (GM 573 Report).

[857] Valukas, *supra* note 15, at 224.

[858] *See id.* at 224-25.

[859] *Id.* at 224.

*Times* on February 20, 2014, Adler responded only in an email that "G.M. has devoted significant time and resources to evaluating this issue, and has concluded that the 2005-07 Chevrolet Cobalt and the 2007 G5 should be recalled."[860] According to *The New York Times*, Adler "declined to answer additional questions."[861]

535.   On February 19, 2014, Calabrese was asked about the Solstice and Sky and why they had not been included in the initial recall.[862]

536.   Also on February 19, 2014, Lance Cooper, the lawyer representing the plaintiffs in the *Melton* case, submitted a Timeliness Query to NHTSA asking about GM's disclosures to the agency regarding the defective ignition switches.[863] As reported by *USA Today* on February 19, 2014 in an article entitled "Lawyer Asks Feds to Force GM to Explain Recall Timing," the purpose of the Timeliness Query was to request that NHTSA force GM to explain the timing behind the initial recalls in the First Recall Wave (defined below).[864] Cooper's February 19, 2014 letter to

---

[860] Christopher Jensen, *GM Recalls Some Cars, But Not All, With Ignition Switch Problem*, N.Y. TIMES, Feb. 20, 2014, http://www.nytimes.com/2014/02/21/automobiles/gm-recalls-some-cars-but-not-all-with-ignition-switch-problem.html.
[861] *Id.*
[862] Valukas, *supra* note 15, at 225.
[863] Letter from Lance A. Cooper, Esq., The Cooper Firm, to David J. Friedman, Acting Adm'r, NHTSA (Feb. 19, 2014), http://www.safetyresearch.net/ Library/2-19-14Friedman_TQ.pdf.
[864] James R. Healey, *Lawyer Asks Feds to Force GM to Explain Recall Timing*, U.S.A. TODAY, Feb. 19, 2014, http://www.usatoday.com/story/money/cars/2014/02/19/gm-recall-airbags-switches-fatalities-nhtsa/5621405/.

NHTSA stated, "***testimony of GM engineers and documents produced in Melton v. General Motors, et. al. show that the automaker actually knew about the defective ignition switch in these vehicles in 2004 before it began selling the MY 2004 Cobalt***," which vehicles were subject to the ignition switch recall.[865]

537.   Moreover, Cooper's February 19, 2014 letter expressly questioned whether "***all*** affected vehicles" (emphasis in original) had been recalled, stating, "***the 2006-2007 Chevrolet HHR; 2005-2006 Pontiac Pursuit (Canada only); 2006-2007 Pontiac Solstice; 2003-2008 Saturn Ion; and 2007 Saturn Sky) [sic] also had the same defective ignition switches.***"[866]

538.   The Meltons had believed that their case was behind them when they settled with GM in September 2013, but revelations emerging from the 2014 recalls changed their understanding.  According to their lawyer, Lance Cooper, "Not only did General Motors' defect cause their daughters' death, but then (GM) withheld evidence" which resulted in the Meltons not having "all of the information that was necessary before they settled their case" and that GM "fraudulently entered into" a

---

[865] *Id*.

[866] Letter from Lance A. Cooper, Esq., The Cooper Firm, to David J. Friedman, Acting Adm'r, NHTSA (Feb. 19, 2014) , http://www.safetyresearch.net/Library/2-19-14Friedman_TQ.pdf; *see* James R. Healey, *Lawyer Asks Feds to Force GM to Explain Recall Timing*, U.S.A. TODAY, Feb. 19, 2014, http://www.usatoday.com/story/money/cars/2014/02/19/gm-recall-airbags-switches-fatalities-nhtsa/5621405/.

settlement with the Meltons.[867]  GM's fraud on the Meltons includes GM's apparent production of relevant documents to Congress in 2014 that were requested by Melton but which GM did not produce to the Meltons during the pendency of their case.[868]

539.   On February 20, 2014, *The New York Times* published an article entitled "GM Recalls Some Cars, But Not All, With Ignition Switch Problem," criticizing GM for not recalling all of the Delta and Kappa platform vehicles included in the 2005/06 TSBs.[869]   The article included an interview with Michael Brownlee, a former associate administrator for enforcement at NHTSA, who stated that there was a "strong presumption" that all of the vehicles listed in the TSB should be recalled.[870] Moreover, Joan Claybrook, chief of NHTSA from 1977 to 1981 concluded based on the TSB that GM knew about the safety defect years ago, and should have recalled all of the vehicles.[871]   Ms. Claybrook wrote in an email to *The New York Times*: "This defect is not rocket science.  General Motors and its executives should be fined the maximum penalties under civil and criminal law for their reckless disregard to

---

[867] Gregory Wallace, Poppy Harlow & Amanda Hobor, CNN MONEY (June 4, 2014, 2:57 PM), http://money.cnn.com/2014/06/04/autos/general-motors-melton-crash/.
[868] *Ignition Switch Case Keeps Haunting GM; Family of Nurse Who Died Presses Reopening Of Case After Allegations Of Perjury*, ASSOCIATED PRESS, July 2, 2014.
[869] *See* Christopher Jensen, *GM Recalls Some Cars, But Not All, With Ignition Switch Problem*, N.Y. TIMES, Feb. 20, 2014, http://www.nytimes.com/2014/02/21/automobiles/gm-recalls-some-cars-but-not-all-with-ignition-switch-problem.html.
[870] *Id.*
[871] *Id.*

the safety of their customers."[872]   Indeed, "[i]n approximately the second half of February 2014, New GM learned that the United States Department of Justice opened a criminal investigation relating to certain recalls."  Declaration of Michael P. Millikin, dated November 25, 2014, Millikin Decl. ¶4.

540.   In response to the criminal, litigation and media pressure described above, on February 21, 2014, Calabrese met to review full TREAD data for Delta and Kappa vehicles and a PRTS search, and identified 22 incidents on airbag non-deployment in Ions and six for the HHR.[873]

541.   On February 24, 2014, Calabrese called an emergency EFADC meeting and expanded the recall to MY 2003 through MY 2007 Ion, HHR, Solstice and Sky vehicles.[874]   Attendees included Calabrese, Boler-Davis, Johnson and Foley-Gardner.[875]  This expanded the recall by 842,000 vehicles.[876]

542.   Also on February 24, 2014, GM submitted a more detailed 573 Report to NHTSA, which purported to outline the chronology of events leading up to its decision to conduct the ignition switch recalls.[877]

---

[872] *Id.*

[873] Valukas, *supra* note 15, at 225.

[874] *Id.* at 215 & 225.

[875] *Id.* at 226.

[876] *Id.*

[877] Office of Defects Investigation, Timeliness Query 14-001 (Feb. 26, 2014), http://www.nhtsa.gov/staticfiles/communications/pdf/2014-02-26_TQ_Opening_Resume.pdf.

543.  On February 25, 2014, GM notified NHTSA that it had determined to recall the additional Ion, HHR, Solstice, and Sky vehicles discussed in ¶537 above, due to the ignition switch defect.[878]

544.  On February 26, 2014, NHTSA announced that it was going to open a Timeliness Query, which is an investigation "to evaluate the timing of GM's defect decision-making and reporting of the safety defect to NHTSA."[879]  NHTSA's action ultimately resulted in a fine of $35 million, the maximum fine permitted by law, as detailed below.[880]

545.  On March 28, 2014, GM extended the recalls yet again to include 970,808 additional vehicles based on GM's conclusion that the original ignition switch may have been used to repair certain MY 2008-11 Cobalt, G5, Ion, HHR, Solstice and Sky vehicles.[881]

546.  In summary, between February 7, 2014 and March 28, 2014, GM issued a first wave of recalls concerning the defective ignition switches in the Delta and Kappa platform vehicles (the "First Recall Wave"):[882]

---

[878] *Id.*

[879] *Id.*

[880] *See* Christopher Jensen, *Citing Long-Delayed G.M. Recall, Senator Calls for Change in Safety Agency's Process*, N.Y. TIMES, Feb. 26, 2014, http://www.nytimes.com/2014/02/27/automobiles/citing-long-delayed-gm-recall-senator-calls-for-change-in-safety-agencys-process.html?_r=0.

[881] Valukas, *supra* note 15, at 226.

[882] GM's First Recall Wave was made pursuant to an initial recall and 2 subsequent increases in recall, subject to NHTSA Recall 14V-047.

- On February 7, 2014, GM recalled MY 2005-2007 Chevrolet Cobalts and 2007 Pontiac G5s, pursuant to recall number 14V-047.[883]

- On February 25, 2014, GM recalled MY 2006-2007 Chevrolet HHRs; 2006-2007 Pontiac Solstices; 2003-2007 Saturn Ions; and 2007 Saturn Skys, also pursuant to recall number 14V-047,[884] as well as 2006-2007 Pontiac Pursuits (the Canadian version of the Pontiac G5), 2007 Opel/Vauxhall GTs (GM's Opel and Vauxhall versions of the Saturn Sky) and 2007 Daewoo G2Xs (GM's Daewoo version of the Saturn Sky).[885]

- On March 28, 2014, GM announced that it would be recalling MY 2008-2010 Chevrolet Cobalts; 2008-2010 Saturn Skys; 2008-2010 Pontiac G5s; 2008-2011 Chevrolet HHRs; and 2008-2010 Pontiac Solstices, also pursuant to recall number 14V-047,[886] as well as 2008-2010 Opel GTs and 2008-2009 Daewoo G2Xs.[887]

---

[883] Letter from Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (Feb. 7, 2014) (GM 573 Recall Letter for Recall 14V-047).

[884] Letter from Carmen Benavides, Dir., Prod. Investigation & Safety Regulations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (Feb. 25, 2014) (GM 573 Recall Letter for Recall 14V-047).

[885] Press Release, Gen. Motors Co., *GM Moves to Secure Recalled Ignition Switches* (Mar. 28, 2014), http://media.gm.com/media/us/en/gm/help.detail.html/ content/Pages/news/us/en/2014/mar/0328-ignition-service.html; Letter from Carmen Benavides, Dir., Prod. Investigation & Safety Regulations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (Apr. 11, 2014) (GM 573 Recall Letter for Recall 14V-047).

[886] Press Release, Gen. Motors Co., *GM Moves to Secure Recalled Ignition Switches* (Mar. 28, 2014), http://media.gm.com/media/us/en/gm/help.detail.html/ content/Pages/news/us/en/2014/mar/0328-ignition-service.html; Letter from Carmen Benavides, Dir., Prod. Investigation & Safety Regulations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (Apr. 11, 2014) (GM 573 Recall Letter for Recall 14V-047).

[887] Gen. Motors. Co., http://media.gm.com/content/dam/Media/images/ US/Release_Images/2014/05-2014/recalls/Recalls-Running-Total.jpg.

547.   In total, GM recalled 2,591,496 vehicles in its First Recall Wave.[888]

548.   Between June 13, 2014 and June 30, 2014, GM issued a second wave of recalls concerning the defective ignition switches in vehicles like the Chevy Impala that was driven by Laura Andres, and the Pontiac Grand Am and other vehicles that were the subject of GM's May 22, 2003 voicemail warning to dealers *over ten years earlier* (the "Second Recall Wave"):

- On June 13, 2014, GM announced that it would recall MY 2010-2014 Chevrolet Camaros, pursuant to recall number 14V-346.[889]

- On June 16, 2014, GM announced that it would recall MY 2005-2009 Buick LaCrosses; 2006-2011 Buick Lucernes; 2000-2005 Cadillac DeVilles; 2006-2011 Cadillac DTSs; 2006-2014 Chevrolet Impalas; and 2006-2007 Chevrolet Monte Carlos, pursuant to recall number 14V-355,[890] as well as 2005-2009 Buick Allures (the Canadian version of the LaCrosse).[891]

- On June 30, 2014, GM recalled MY 2003-2014 Cadillac CTSs and

---

[888]   Paul Lienert, *GM expands ignition switch recall to 2.6 million cars*, REUTERS, Mar. 29, 2014, http://www.reuters.com/article/2014/03/29/us-gm-recall-expanded-idUSBREA2R1Y920140329.

[889]   Letter from Brian Latouf, Dir. Field Prod. Investigations and Evaluations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (June 19, 2014) (GM 573 Recall Letter for Recall 14V-346).

[890]   Press Release, Gen. Motors Co., *GM Will Rework or Replace Keys on 3.16 Million U.S. Cars* (June 16, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jun/0616-recalls.html; Letter from Brian Latouf, Dir. Field Prod. Investigations and Evaluations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (June 20, 2014) (GM 573 Recall Letter for Recall 14V-355).

[891]   Gen. Motors. Co., http://media.gm.com/content/dam/Media/images/US/Release_Images/2014/05-2014/recalls/Recalls-Running-Total.jpg.

2004-2006 Cadillac SRXs, pursuant to recall number 14V-394.[892]

- On June 30, 2014, GM recalled MY 2000-2005 Chevrolet Impalas; 2000-2005 Chevrolet Monte Carlos; 1997-2005 Chevrolet Malibus; 1999-2004 Oldsmobile Aleros; 1998-2002 Oldsmobile Intrigues; 1999-2005 Pontiac Grand Ams; and 2004-2008 Pontiac Grand Prixs, pursuant to recall number 14V-400.[893]

549.    In total, GM recalled 12,079,124 vehicles pursuant to its Second Recall Wave.[894]    Together, in 2014, GM recalled approximately 14,670,530 vehicles because of their defective ignition switches.  A chart reflecting these recalls, as well as numerous additional recalls conducted by GM in 2014, is set forth below:

---

[892] Press Release, Gen. Motors Co., *GM Announces Six Safety Recalls* (June 30, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/ news/ us/en/2014/Jun/0630-recall.html; Letter from Carmen Benavides, Dir., Prod. Investigation & Safety Regulations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (July 2, 2014) (GM 573 Recall Letter for Recall 14V-394).

[893] Press Release, Gen. Motors Co., *GM Announces Six Safety Recalls* (June 30, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jun/0630-recall.html; Letter from Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (July 3, 2014) (GM 573 Recall Letter for Recall 14V-400).

[894] Gen. Motors Co., Quarterly Report (Form 10-Q) (July 24, 2014).



**L.   Numerous Deaths And Mounting Litigation Pressure Must Occur Before GM Finally Announced The Recalls And Increased Its Reported Liabilities**

550.   Before GM finally took action to issue its recall of vehicles with the defective ignition switches, numerous deaths occurred as a direct result of the defect. Indeed, it was only because GM faced mounting litigation pressure from its personal injury cases that it finally agreed to recall its cars with the defective ignition switches.  Further, GM's initial recall was not broad enough, and GM was forced to

widen it after further litigation pressure and pressure from the media.

551.   Below are some of the stories of the tragic deaths that GM initially linked to the defective ignition switch (though that death count has risen considerably to at least 45 officially linked deaths).  The deaths and crashes occurred all over the country at various times of day in various driving conditions.  The victims are disproportionately very young or senior citizens and women drivers.  Most involve a head-on collision with a large object, usually a tree, after the car veered off the road, and bystanders usually reported that the car did not appear to steer or try to maneuver out of the way, indicative of a loss of power steering and power brakes after the engines shut off in a moving shutdown.  In addition, most of the air bags did not deploy.  The common theme is driving a GM vehicle with a defective ignition switch that lead to death or very serious injury.

- In 2004, as also discussed above, *25-year-old* Gene Mikale Erickson and his *21-year-old girlfriend*, Candice Anderson, who was behind the wheel, were driving on a "peaceful Texas country road" just before noon when Candice lost control of her Saturn Ion and crashed into a tree.  Mr. Erickson was killed and Ms. Anderson survived, and, as *The New York Times* reported, "[f]or most of the last decade, [she] has carried unspeakable guilt over the death of her boyfriend…  At one point, Ms. Anderson, who had a trace of Xanax in her blood, even faced a manslaughter charge."  Ms. Anderson said to *The New York Times*, "It's torn me up," and "I've always wondered, was it really my fault?"  In May 2014, she learned it was not her fault when Mr. Erickson's mother received an email from NHTSA that her son's death was linked to the defective ignition switch.  A state trooper, Mr. Asplund, who arrived at the scene after the crash, had blamed Ms. Anderson when he saw no skid marks on the road as a sign that "no evasive action was taken by the driver[.]"  Later, after finding out about the defective

ignition switch, he told *The New York Times*, "I'm glad she didn't do any time in prison," but that "[t]he intentional cover-up of the ignition, that upsets me."

- On July 4, 2004, 37-year-old Shara Lynn Towne, mother of five was driving her 2004 Saturn Ion in Visalia, California when her car ran off the road and crashed into a utility pole. "My mother was a light switch in any dark room," said Aaron Burdge, Ms. Towne's youngest son. "She was radiant and beautiful, full of life and laughter." Ms. Towne was wearing a seatbelt. The Ion's air bag did not deploy and investigators could not determine a cause of the accident. The family settled with GM.

- On July 29, 2005, *16-year-old* Amber Marie Rose was driving her 2005 Chevrolet Cobalt and crashed into a tree in Dentsville, Maryland. *The New York Times* reported that "[d]espite the impact to the front of Amber's Chevrolet Cobalt, the air bag did not deploy. Amber hit the steering column with such force that she broke it." The article also reported that "the crash should not necessarily have killed her," and a few days after the accident, a police officer called Amber Rose's adoptive mother, Terry DiBattista and said, "If I were you, I would dig a little deeper." The family settled with GM for an undisclosed sum. As Amber's mother told *PBS NewsHour* on April 1, 2014: "Our daughters, sons, sisters, brothers, mothers, fathers, wives, and husbands are gone because they were a cost of doing business GM-style. Corporate executives made a decision that fighting the problem was cheaper and easier than fixing the problem."[895]

- On October 24, 2006, as discussed above in the context of Trooper Young's report, *17-year-old* Megan Phillips was driving a 2005 Chevrolet Cobalt in St. Croix County, Wisconsin with her two friends, *15-year-old* Amy Rademaker, who was riding in the front passenger seat, and *18-year-old* Natasha Weigel, who rode in the backseat. The ignition turned off suddenly, and the car veered off the road and slammed into some trees. The airbags did not deploy. The only survivor was Megan Phillips. GM counts Amy Rademaker's death

---

[895] *Disavowing GM Decisions of the Past, CEO Barra Offers Apology and Further Investigation*, PBS NEWSHOUR, Apr. 1, 2014, http://www.pbs.org/newshour/bb/ gm-ceo-offers-apology-no-explanation-yet-recall-lag/.

among those tied to the defective ignition switch but does not include Natasha Weigel's because she was in the back seat where there are no air bags.

- On September 13, 2008, *two 19-year-old friends*, Zachary Schoenbach and Joseph Harding, borrowed a GM car from a friend in Baroda, Michigan, and lost control of the car, crashing into a tree. The airbags did not deploy. Both teenagers were killed. Joseph Harding's parents told *The Detroit News* in 2014 about GM: "They knew. They knew. That's what hurts so bad. . . . I lost my son for a measly part."[896]

- On December 31, 2009, *25-year-old* nursing student Seyde Chansuthus was driving her Chevrolet Cobalt on the interstate highway in Murfreesboro, Tennessee when the car lost power, and smashed into a tree. Ms. Chansuthus's seatbelt did not lock, her airbags did not deploy, and she was thrown into the steering column and died instantly. After the family settled with GM, the black box data showed that the car's path to the tree was straight and there was no evidence of trying to steer out of the hydroplane that affected the car. *The New York Times* reported that it also showed, "that the car had lost its power just before the crash — a breakdown that would have impeded Ms. Chansuthus's power steering and brakes." *The New York Times* further reported that GM had failed to respond to a NHTSA death inquiry regarding Ms. Chansuthus's accident, even though "there had already been a thorough review of Ms. Chansuthus' accident within GM."[897]

- On April 2, 2009, Esther Matthews, *73-years-old*, was picking up her great-grandson, who was a week away from his first birthday, and 13-year-old relative, Grace Elliott in her Chevrolet Cobalt in Knox, Pennsylvania when another car swerved into their lane and crashed head-on into her Cobalt. The other driver was drunk but the airbags in Ms. Matthew's Cobalt did not deploy. Grace Elliott and Ms. Matthews

---

[896] Christine MacDonald, Jim Lynch & Melissa Burden, *As Victims Are Identified in Crashes Tied to GM Recall, Families Want Info*, DETROIT NEWS, Apr. 11, 2014, http://www.detroitnews.com/article/20140411/AUTO0103/304110092.

[897] Rebecca R. Ruiz & Danielle Ivory, *Documents Show General Motors Kept Silent On Fatal Crashes,* N.Y. TIMES, July 16, 2014, http://www.nytimes.com/2014/07/16/business/documents-show-general-motors-kept-silent-on-fatal-crashes.html.

both died at the scene of the crash and the one-year-old who was in the car seat is today a six-year-old paraplegic.

- On February 4, 2009, Marie Sasche, *81-years-old*, was driving alone on her way back from playing the slot machines at a casino when her 2004 Saturn Ion careened off the road and into a tree, outside St. Louis. She died at the hospital. *The New York Times* reported that the "circumstances [of her crash] were similar to other Cobalt and Ion crashes in which the switch suddenly turned off."

- On June 22, 2013, *23-year-old* Dany Dubuc-Marquis was driving in his Chevrolet Cobalt in Roxton Pond, Quebec when the car veered off the road and hit some trees. The car's key positon was turned to the "accessory" position. *The New York Times* reported that Mr. Dubuc-Marquis had just completed his final semester of junior college at the time of the crash and had been working as a camp counselor. He had decided to pursue a career in special education and had planned to intern in Belgium for four months with his school group. His father wound up taking the trip in his stead.

552. GM has identified at least 54 frontal-impact crashes and deaths of over 40 people where airbags did not deploy. As a result of GM's egregious failure to recall its defective cars well before the start of the Class Period, the Company is exposed to significant personal injury liability, large civil damages and an ongoing criminal investigation.

553. As *Reuters* reported on Monday, June 2, 2014, based on an independent analysis of government data, at least 74 people have died in GM cars resulting from crashes similar to those 45 deaths that GM has specifically linked to the defective ignition switches. Specifically, *Reuters* conducted a search of the Fatality Analysis Reporting System (FARS), a national database of crash information submitted by

297

local law-enforcement agencies, for all single-car frontal collisions where there were no front air bags deployed and the driver or front-seat passenger was killed. Moreover, an analysis of this volume of accidents was compared to the accident rate of cars that are considered similar to the GM cars at issue here, the Ford Focus, Honda Civic and Toyota Corolla. The frequency of this type of fatal crash was **nearly six times more likely driving an Ion** than such a crash driving a Corolla and similarly, the frequency of such a fatal crash in connection with driving a Cobalt was **four times more likely** than such a crash driving a Corolla.

554. According to an Insurance Institute for Highway Safety report from 2011, the Chevrolet Cobalt model years 2005 through 2008 have **the highest driver death rate** of any four door car in its class of small cars.[898] The overall death rate of the Cobalt MY 2005-2008 was fourth overall among all classes of cars with the highest rates of driver deaths, a statistical measure classified as those cars with more than 75 driver deaths per million registered vehicles. The Cobalt had 117 overall drivers deaths per million registered vehicles, 63 driver deaths per million in multiple vehicle crashes, 54 driver deaths per million in single-vehicle crashes and 23 driver deaths per million in single-vehicle rollovers.

555. Moreover, the crash statistics from GM generally do not include side

---

[898] *Insurance Institute for Highway Safety, Status Report*, vol. 46, no. 5 (2011), at 3, http://www.iihs.org/externaldata/srdata/docs/sr4605.pdf.

impact crashes or other types of crashes in which airbags were not expected to deploy but where the defective ignition switch may have still caused, contributed or worsened the accident.  For example, GM does not count in its crash statistics the gruesome accident of Brooke Melton, detailed above, because that was a "side impact" as opposed to a "frontal impact" crash.[899]

556.  On August 1, 2014, GM's Compensation Facility for those persons injured in vehicles containing the Delta Ignition Switches became effective.  The Compensation Facility provides a means for individual claimants to submit claims alleging that the ignition switch defect caused a death or physical injury in an automobile accident in certain model year vehicles, including the Chevrolet Cobalt MY 2005-2007, and to receive compensation.  The program is administered by Feinberg, GM's expert retained for this purpose.

557.  As of January 9, 2015, GM has reported that a total of 2,710 claims have been received by the Compensation Facility.  Of the 2,710 claims received, 112 have been deemed eligible to date under the protocol and will receive compensation.  The 2,710 submitted claims were classified in three groups:  (1) 303 are death claims; (2) 202 claims were Category One claims, defined as physical injuries resulting in Quadriplegia, Paraplegia, Double Amputation, Permanent Brain

---

[899] Katie Lobosco, *'Doing the Right Thing' for GM Victims*, CNN MONEY (June 5, 2014, 1:57 PM), http://money.cnn.com/2014/06/05/news/companies/gm-victim-options/.

Damage or Pervasive Burns; and (3) 2,205 claims were Category Two claims, defined as physical injuries requiring hospitalization (or outpatient medical treatment) within 48 hours of the accident. As set forth above, 45 approved claims to date are for deaths. The remaining approved claims of the 67 that are not death claims include seven Category One claims, and 60 Category Two claims.

558.   Of the 2,710 claims received to date, 738 claims are still under review and 783 were submitted without sufficient documentation. The deadline to submit claims is January 31, 2015. Of the 112 approved claims, the death tally has risen from the 13 deaths GM initially acknowledged to 45 deaths. Thus, as of January 9, 2015, Feinberg has determined there were at least *45 deaths* in connection with the defective ignition switches. Nonetheless, lawmakers have suggested that the actual death toll may be closer to 100. The Compensation Protocol has been widely criticized for its narrow scope for compensable crashes and its method of identified victims of the defective ignition switch. For instance, approximately 10 million cars that had ignition switch problems, most of which have been recalled, do not currently qualify as an affected vehicle for which a compensable claim may be filed under the Feinberg protocol.

559.   Another example is that not everyone affected, injured or even killed in connection with the defective ignition switches is eligible to submit a claim. For instance, on July 17, 2014, during the Senate Committee on Commerce, Science,

and Transportation hearing to examine the GM recalls, Senator Jay Rockefeller discussed the case of Sam and Belinda Spencer of West Virginia who lost their son, Leslie, in a crash along US-460 in a 2007 Chevrolet Cobalt, one of the models subject to GM's recalls because of the defective ignition switch.  According to the Spencer family, Leslie's Cobalt lost power because of the defective ignition switch, and it appears his airbag failed to deploy upon impact.  However, the airbag in his vehicle did eventually deploy, but likely did so after the initial deadly impact.  Under the terms of the Protocol, if any airbag in a car deploys at any time, victims are ineligible for financial redress.  Consequently, Feinberg, who testified at the hearing and operates the Compensation Fund, said it was unlikely that the Spencers would be eligible for financial redress from the fund.

## VI.   GM'S IGNITION SWITCH DEFECTS, RECKLESS DISREGARD OF CONSUMER SAFETY, INTERNAL CONTROL DEFICIENCIES AND SUBSTANTIAL LIABILITY EXPOSURES ARE SLOWLY REVEALED

560.   As a result of external forces, including primarily personal injury litigation exposure, in 2014 the true facts concerning the ignition switch defects, as well as GM's reckless disregard of consumer safety, internal control deficiencies, and substantial liability exposures finally began to be revealed to investors and the public.

### A.   In February 2014, The First Recall Waves Begin And GM's Past Conduct Comes Into Question

561.   On February 7, 2014, GM submitted its 573 Report to NHTSA, informing the agency that it had determined it would conduct a safety recall for MY 2005-2007 Chevrolet Cobalts and MY 2007 Pontiac G5s, for a total of 780,000 vehicles, which was identified as NHTSA Recall 14V-047.[900]  All MY 2007 Cobalts were included in the recall because, according to GM, the Company could not identify the "break point" during MY 2007 when GM had begun to install the redesigned ignition switch in new cars.[901]

562.   According to GM's February 7, 2014 573 Report:

> General Motors has decided that a defect, **which relates to motor vehicle safety**, exists in 2005-2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles.  The ignition switch torque performance may not meet General Motors' specification. If the torque performance is not to specification, and the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the "run" position. The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

563.   GM did not issue a contemporaneous press release or filing with the SEC in connection with the February 7, 2014 recall.  The February 7 recall was first

---

[900] Letter from Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (Feb. 7, 2014) (GM 573 Recall Letter for Recall 14V-047).
[901] Valukas, *supra* note 15, at 224.

reported in the media beginning on February 13, 2014. Thereafter, personal injury counsel and the media began to question the limited nature of GM's recall, as detailed above in ¶¶534-41. For example, as reported by *USA Today*, on February 19, 2014, plaintiff's attorney Lance Cooper requested that NHTSA issue a timeliness query to GM regarding the timing of GM's decision to conduct the ignition switch recalls, GM's knowledge of the defect, the completeness of the chronology that GM had submitted to NHTSA, and whether "*all* affected vehicles" had in fact been recalled. As another example, on February 20, 2014, *The New York Times* reported on the February 7, 2014 recall, and questioned why more cars were not recalled even though they were subject to the Company's earlier 2005-2006 TSB, calling for removal of heavy items from key rings. In response, GM's spokesman Alan Adler attempted to falsely reassure the market, stating that the earlier service bulletin "was based on the facts as understood at the time. Safety of our consumers is paramount to GM; given our present understanding of the 2005-2007 Cobalt ignition switch torque capabilities, we have announced a recall."[902]

564. On February 24, 2014, GM supplemented its 573 Report for recall number 14V-047, when it sent NHTSA a chronology indicating that the ignition switch problems dated back to 2004, "around the time of the launch of the 2005

---

[902] Christopher Jensen, *G.M. Recalls Some Cars, But Not All, With Ignition Switch Problem*, N.Y. TIMES, Feb. 20, 2014, http://www.nytimes.com/2014/02/21/automobiles/gm-recalls-some-cars-but-not-all-with-ignition-switch-prob.lem.html.

Chevrolet Cobalt." The chronology disclosed, in part, that in 2004, "GM learned of at least one incident in which a Cobalt lost engine power because the key moved out of the 'run' position when the driver inadvertently contacted the key or steering column" and that "GM employees were able to replicate this phenomenon during test drives." The chronology had no entries between the end of 2007 until 2009, when it indicated that "another PRTS was opened" which resulted in a change to the key from a "slot" to a "hole" design.[903]

565.   After further questions were raised in connection with litigation and by the media, on February 25, 2014, GM expanded the February 7 recall 14V-047 to include MY 2006-2007 Chevrolet HHRs; 2006-2007 Pontiac Solstices; 2003-2007 Saturn Ions; and 2007 Saturn Skys. This expanded the recall by 842,000 vehicles to a total of approximately 1.62 million vehicles. As with GM's February 7, 2014 573 Report, this update stated that "[t]he ignition switch torque performance may not meet General Motors' specification….the key movement out of the 'run' position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes."[904]

---

[903] Letter from Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (Feb. 24, 2014) (573 Report 14V-047).
[904] Letter from Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for  Enforcement, NHTSA (Feb.

566.   Thereafter, on February 25, 2014, GM North American President Alan Batey admitted, "***The process employed to examine this phenomenon [the ignition switch defect] was not as robust as it should have been.***"[905]

567.   On February 26, 2014, ODI opened a Timeliness Query (known as "TQ 14-001"), an investigation into the timeliness of General Motors' recall of faulty ignition switches, specifically into "GM's defect decision-making and reporting of the safety defect to NHTSA."[906]

568.   TQ 14-001 summarized the February 7, 2014 GM recall, GM's February 24, 2014 573 Report with its chronology, and GM's February 25, 2014 573 Report, covering additional models/model year vehicles due to the same safety defect.

569.   On March 4, 2014, the U.S. Secretary of Transportation directed a Special Order to GM in connection with NHTSA's investigation of the timeliness of GM's recall of its vehicles with ignition switch defects. The Special Order requested responses from GM on 107 specific questions about the recall by April 3, 2014.

25, 2014) (573 Report 14V-047); Press Release, Gen. Motors Co., *GM Expands Ignition Switch Recall* (Feb. 25, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Feb/0225-ion.html.

[905] Press Release, Gen. Motors Co., *GM Expands Ignition Switch Recall* (Feb. 25, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Feb/0225-ion.html.

[906] Office of Defects Investigation, Timeliness Query 14-001 (Feb. 26, 2014), http://www.nhtsa.gov/staticfiles/communications/pdf/2014-02-26_TQ_Opening_Resume.pdf.

Among the 107 questions were, for example:

- "Is GM's remedy for this recall the same 're-designed ignition switch' that 'GM believes that [Delphi Mechatronics] began providing…to GM at some point during the 2007 model year?"

- "Provide all documents related to the reasons that GM opened and closed the PRTS inquiries referenced by GM's chronology";

- "Describe each of the referenced 'potential solutions' that GM considered, including the 'lead time required, costs, and effectiveness' of each of the solutions"; and

- "Why did GM decide not to update the Service Bulletin in July 2011?"

570. The Special Order stated that failure by GM to respond fully or truthfully could result in a referral to the U.S. Department of Justice for a civil action to compel responses, and may subject GM to civil penalties of up to $7,000 per day, up to a maximum penalty of $35 million.[907]

571. On March 5, 2014, the media reported that GM CEO Barra announced on a company blog in a letter to employees dated March 4, 2014 that the Company would be launching an internal investigation into GM's response to the defective ignition switches and that the investigation will produce an "unvarnished report" of

---

[907] Special Order, National Highway Traffic Safety Administration, in re TQ14-001 NHSTA Recall No. 14V-047 (Mar. 4, 2014), http://webcache. googleusercontent.com/search?q=cache:EqVRG3mkBHsJ:www.nhtsa.gov/staticfil es/communications/pdf/2014-03-04_Special_Order_Directed_GM_LLC.pdf+&cd= 1&hl=en&ct=clnk&gl=us.

what happened.[908]   In the same message posted to the Company's website, Barra stated that GM would *"improve our processes so our customers do not experience this [the ignition switch recalls] again."*[909]

572.   On March 10, 2014, General Motors announced that this internal investigation would be led by Anton R. Valukas, an attorney at the law firm Jenner & Block.[910]

## B.   From March 10-11, 2014, GM Comes Under Close Scrutiny From NHTSA, Congress And The DOJ

573.   The Company's long belated ignition switch recalls caused a negative reaction by Congress that exposed GM to governmental scrutiny and substantial liability.   Specifically, on March 10, 2014, in a press release reported to investors after the close of trading, House Committee of Energy and Commerce Chairman Fred Upton announced that *"the Committee has opened an investigation into the General Motors Company's (GM) and National Highway Traffic Safety Administration's (NHTSA) response to consumer complaints related to problems with ignition switches in certain vehicles."*   The press release, issued by the House

---

[908] Jeff Bennett, *Recall Is First Big Test for GM Chief Barra*, WALL ST. J., Mar. 5, 2014, http://www.wsj.com/articles/SB1000142405270230436070457941949419121658.

[909] Nathan Bomey, *Barra Orders Review of Recall Over Switches*, DETROIT FREE PRESS, Mar. 5, 2014, at A8.

[910] Peter Valdes-Dapena, *GM appoints team to investigate recall*, CNN MONEY (Mar. 10, 2014, 12:24 PM), http://money.cnn.com/2014/03/10/autos/gm-recall-investigation/index.html.

Committee of Energy and Commerce, noted, "General Motors has announced the recalls of six vehicle models to correct the problems and stated that the defects may have been linked to 31 frontal crashes and 13 fatalities." The announcement further referenced that "NHTSA has received a large number of complaints expressing safety concerns and describing these problems spanning over the past 10 years." In relevant part, Chairman Upton stated as follows:

> To better protect the public, I sponsored the TREAD Act back in 2000 so that regulators and companies could better identify safety defects in vehicles before they escalated into an ongoing problem. Congress passed this bipartisan solution with the intention of exposing flaws and preventing accidents and fatalities. Yet, here we are over decade later, faced with accidents and tragedies, and ***significant questions need to be answered. Did the company or regulators miss something that could have flagged these problems sooner?*** If the answer is yes, we must learn how and why this happened, and then determine whether this system of reporting and analyzing complaints that Congress created to save lives is being implemented and working as the law intended. ***Americans deserve to have the peace of mind that they are safe behind the wheel.***

574. In addition, Chairman Upton stated that the Committee would be requesting ***"detailed information from both NHTSA and GM and will hold a hearing in the coming weeks."***

575. On March 11, 2014, GM submitted a Supplemental 573 Report to NHTSA, Recall 14V-047, with a chronology, updating its February 24, 2014 573

Report.[911] The chronology began in 2005 and disclosed, in part, the following:

**2005**. GM employees received field reports of Chevrolet Cobalt vehicles losing engine power, including instances in which the key moved out of the "run" position when a driver inadvertently contacted the key or steering column…. During the course of a PRTS opened in May 2005 [in response to those complaints], an engineer proposed that GM redesign the key head from a "slotted" to a "hole" configuration. That proposal was initially approved but later cancelled.

**2006**. On April 26, 2006, the GM design engineer responsible for the ignition switch installed in all of the vehicles subject to the Cobalt and G5 recall and the Ion, HHR, Solstice and Sky recall signed a document approving changes to the ignition switch proposed by the supplier. This document referred to the "GMX 357" vehicle platform, which was GM's internal designation for the Saturn Ion. The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch.

**2007**. A GM investigating engineer was tasked with tracking crashes in which Cobalts were involved in frontal impacts and the airbags did not deploy, in order to try to identify common characteristics of these crashes.

**2011**. In late July 2011, a meeting was held at GM involving Legal Staff, Field Performance Assessment ("FPA") and Product Investigations personnel who would be involved in the Field Performance Evaluation ("FPE") process. Soon thereafter, in August 2011, a Field Performance Assessment Engineer ("FPAE") was assigned to move forward with an FPE investigation of a group of crashes in which airbags in 2005-2007 model year Chevrolet Cobalts and a 2007 Pontiac G5 had not deployed during frontal impacts, which also included a review of information related to the Ion, HHR and Solstice vehicles….

During the course of the FPE investigation, the FPAE's analyses included the following: reviewing data relating to complaints of stalling

---

[911] Letter from Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (Mar. 11, 2014) (573 Report 14V-047).

in the Ion for all model years; reviewing data relating to crashes involving Ions from certain model years in which airbags had not deployed; testing the torque performance of ignition switches from salvage yard vehicles, including Ions, HHRs, Cobalts and G5s (but not Solstice or Sky vehicles); measuring the difference among a wide variety of GM vehicles in the distance between a driver's knee and the ignition; and studying vehicles' different steering columns and shrouds, including those of the Ion and the Cobalt.

**2012**.  The FPAE collected some data relating to certain Saturn Ion crashes in which airbags did not deploy and where injuries occurred, and discussed the data with at least one other investigator to evaluate whether the ignition switch in Ion vehicles may have caused or contributed to airbag nondeployment.  This analysis identified two crashes involving Ion vehicles-from model years 2005 and 2007 in which the FPAE concluded that the ignition switch torque performance could potentially have resulted in airbag non-deployment upon frontal impact.

**2013**.  GM retained outside engineering resources to conduct a comprehensive ignition switch survey and assessment.  That investigation included torque performance testing, ignition switch teardowns, and x-ray analyses of ignition switches in used production vehicles both before and after the 2007 model year. The data gathered by GM's outside technical expert showed that the ignition switches that he tested that had been installed in early-model Ion and Cobalt vehicles did not meet GM's torque specification.

576.  Additionally, on March 11, 2014, pursuant to Rules X and XI of the U.S. House of Representatives, leaders of the House Energy and Commerce Committee sent letters to GM CEO Mary Barra and NHTSA's Acting Administrator David Friedman requesting extensive documents related to customer complaints regarding the ignition switch problem, and both GM's and NHTSA's knowledge and handling of the matter.  The letter requested, among other things:

- All analyses of field reports, incident reports, defect petitions,

310

consumer complaints, warranty reports, and/or reports of injury, death or property damage that refer or relate to stalls, airbags, and/or ignition switches in the GM vehicles subject to the recall, including documents that relate to decisions to investigate such matters.

- All documents that refer or relate to proposals, corrective actions, changes, or service campaigns to address problems with stalls, airbags, and/or ignition switches.

- All documents submitted to NHTSA, or created or prepared for NHTSA, referring or relating to stalls, airbags, and/or ignition switches in the GM vehicles subject to the recall.

- A detailed timeline of all interactions and communications between GM and NHTSA relating or referring to problems with stalls, airbags, and/or ignition switches.

- All communications to or from GM relating or referring to problems with stalls, airbags, and/or ignition switches.

577. The March 11, 2014 letter further requested a "briefing on this matter" with GM, and asked GM to address the following matters at the briefing:

- GM's response to reports of incidents since 2003 involving problems with stalls, airbags, and/or ignition switches.

- GM's interaction with NHTSA since 2003 relating to problems with stalls, airbags, and/or ignition switches.

578. In connection with the March 11, 2014 letter, the House Energy and Commerce Committee issued another press release on March 11, 2014. In the announcement, Chairman Upton stated, ***"There are several questions surrounding this latest recall, and right now we are just looking for answers to determine what the company and NHTSA knew about these problems, when they knew it, and what they did about it."*** In the same press release, Congressman Henry Waxman,

the Ranking Member of the House Energy and Commerce Committee, stated: ***"The Committee will examine whether GM knowingly allowed faulty and dangerous cars to remain on the road.  We will be assessing whether NHTSA has all the tools the agency needs to keep drivers safe."***

579.  On March 11, 2014, *Bloomberg* further reported that "The U.S. Justice Department has started a preliminary investigation into how General Motors Co. handled the recall of 1.6 million vehicles with faulty ignition switches linked to at least 13 deaths."  As the story added, ***"The inquiry is focusing on whether GM might have violated criminal or civil laws by failing to notify regulators in a timely fashion about the switch failures."***[912]

580.  Also on March 11, 2014, it was reported during the trading day that Senator Jay Rockefeller of West Virginia requested that a hearing on the matter of GM's recall of vehicles for the ignition switch defect be convened by Senator Claire McCaskill of Missouri, who chairs a subcommittee on product safety.[913]  On March 13, 2014, the media reported that Transport Canada, a Canadian transportation regulator, was investigating a fatal car crash that may be related to GM's defective

---

[912] Del Quentin Wilmber, Jeff Plungis & Jeff Green, *Justice Starts probe Into GM's Handling of Fatal Switch Recall*, BLOOMBERG, Mar. 11, 2014, http://www.bloomberg.com/news/2014-03-11/justice-starts-probe-into-gm-s-handling-of-switch-recall.html.

[913] Jeff Plungis & Jeff Green, *House Panel to Probe GM Recall of Models for Faulty Switches*, BLOOMBERG, Mar. 11, 2014, http://www.bloomberg.com/news/ 2014-03-11/house-panel-to-probe-gm-handling-of-recall-over-switches.html.

ignition switch.   GM Canada spokeswoman Adria MacKenzie said the "investigation into the ignition switch issue is ongoing and we are working diligently to reach affected customers."[914]   *The New York Times* also reported that Sandra Boudreau, a spokeswoman for Transport Canada, said that the crash, which occurred in June in Quebec, Canada, killed the driver of one of the car models GM recalled when the car went off the road and hit several trees.   Boudreau said the crash, "appears to relate to the defect."[915]

### C.   As Media and Governmental Scrutiny Intensify During March 2014, The Scope And Impact Of The First Recall Wave Expands

581.   On March 17, 2014, GM issued a press release disclosing that it expected to take a charge of $300 million in the First Quarter of 2014 "primarily for the cost of the repairs for the three safety actions and the previously announced ignition switch recall."[916]   In an internal video broadcast to GM employees on the same day, GM CEO Barra **admitted, "Something went very wrong in our processes**

---

[914] Greg Keenan, *Fatal crash in Canada may be related to GM recall*, GLOBE AND MAIL, Mar. 13, 2014, http://www.theglobeandmail.com/report-on-business/international-business/us-business/fatal-crash-in-canada-may-be-related-to-gm-recall/article17488190/.

[915] Ian Austin, *Canada Explores G.M. Link to Accidents*, N.Y. TIMES, Mar. 17, 2014, http://www.nytimes.com/2014/03/17/business/canada-explores-gm-link-to-accidents.html.

[916] Press Release, Gen. Motors Co., *GM Redoubles Safety Efforts, Announces New Recalls* (Mar. 17, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/mar/0317-gm.html.

*in this instance, and terrible things happened.*"[917]  Barra further admitted that GM was in the process of revising its internal controls on recalls and safety issues, stating, *"Our system of deciding and managing recalls is going to change."*[918] On March 18, 2014, GM's Product Development Chief, Mark Reuss, told reporters that GM's appointment of a new safety chief, Jeff Boyer, was *"the first change of things that need to change."*[919]

582.   On March 28, 2014, GM further expanded the ignition switch recall when it issued a press release and informed NHTSA that it would be recalling MY 2008-2010 Chevrolet Cobalts; 2008-2010 Saturn Skys; 2008-2010 Pontiac G5s; 2008-2011 Chevrolet HHRs; and 2008-2010 Pontiac Solstices, subject to NHTSA Recall 14V-047.[920] This expansion added 970,808 additional vehicles, and was based on the same conclusion that the original Delta ignition switch, which GM has

---

[917] Bill Vlasic & Christopher Jensen, *Something Went 'Very Wrong' at G.M., Chief Says*, N.Y. TIMES, Mar. 17, 2014, http://www.nytimes.com/2014/03/18/business/gm-chief-barra-releases-video-on-recalls.html.

[918] *Id.*

[919] Tom Krisher, *GM CEO apologizes for deaths tied to recalled cars*, Associated Press, Mar. 19, 2014, http://www.bostonglobe.com/business/2014/03/18/chief-executive-barra-apologizes-for-deaths-tied-recalled-cars/H7UxdKeioBwOUYpM6XEDJM/story.html.

[920] Press Release, Gen. Motors Co., *GM Moves to Secure Recalled Ignition Switches* (Mar. 28, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/mar/0328-ignition-service.html;  Letter  from  Carmen Benavides,  Dir.,  Prod.  Investigations  &  Safety  Regulations,  Gen.  Motors,  Co.,  to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA (Mar. 28, 2014) (573 Report 14V-047).

used in the Cobalt, may have been used to repair certain MY 2008-11 Cobalt, G5, Ion, HHR, Solstice and Sky vehicles.  As it had in connection with the prior recalls, GM admitted in its 573 Report that it had "decided that a defect **which relates to motor vehicle safety**" in the ignition switches and that they "may unintentionally move from the 'run' position to the 'accessory' or 'off' position with a corresponding reduction or loss of power.…The timing of the key movement out of the 'run' position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes."

583.   All told, with the March 28, 2014 expansion, the First Recall Wave affected 2.6 million vehicles in the Delta and Kappa platform vehicles.

**D.    On March 31 and April 1, 2014, Governmental Pressure Increases Further And GM Updates Its Estimated Recall Costs**

584.   Faced with the substantial volume of 2.6 million cars that had been subject to the First Recall Wave, GM was forced to belatedly disclose a portion of the financial impact of this long-hidden safety problem.  On March 31, 2014, GM issued a press release announcing that it expected to take a charge of up to approximately $750 million in the First Quarter of 2014, "primarily for the cost of recall-related repairs announced in the quarter," which includes "a previously disclosed $300 million charge for three safety actions announced on March 17 and

the ignition switch recall announced Feb. 25."[921]

585.   On April 1, 2014, the U.S. House of Representatives Subcommittee on Oversight and Investigations conducted a hearing entitled "The GM Ignition Switch Recall: Why Did It Take So Long?" to investigate "the GM ignition switch recall and why it took over a decade to announce the recall after red flags and warning signs first surfaced."[922] GM CEO Barra and the NHTSA Acting Administrator David Friedman testified.  During the hearing, Defendant Barra ***admitted*** that ***"there were points in time where one part of the organization had information that wasn't shared across to the other side of the organization.  You can call it a silo…. we've already made changes to the structure and to the responsibilities of people so that won't happen again."***  Barra further admitted in her April 1, 2014 testimony that GM was focused on costs, not safety, testifying ***"we in the past had more of a cost culture, and we are going to a customer culture that focuses on safety and quality."***

586.   The Energy and Commerce Committee's press release on the hearing stated that its findings "suggest there were many missed opportunities over the years to identify the defect and protect drivers." As Subcommittee Chair Rep. Tim Murphy

---

[921] Press Release, Gen. Motors Co., *GM Recalls Older Model Vehicles to Fix Power Steering* (Mar. 31, 2014), http://media.gm.com/media/us/en/gm/news. detail.html/content/Pages/news/us/en/2014/mar/0331-power-steering.html.

[922] Press Release, Energy & Commerce Committee, *GM, NHTSA Testify on Ignition Switch Recall; Members Demand Answers on Why Safety Process Failed* (Apr. 1, 2014), http://energycommerce.house.gov/press-release/gm-nhtsa-testify-ignition-switch-recall-members-demand-answers-why-safety-process.

(R-PA) said, "[w]e know this: the red flags were there for GM and NHTSA to take action — but they didn't."

587.   Also on April 1, 2014, the House Committee on Energy and Commerce Democratic Staff sent a Supplemental Memorandum to the Subcommittee on Oversight and Investigations Democratic Staff reporting that the minority staff had conducted an analysis of GM's warranty claims database for the recalled vehicles to determine "the extent to which GM may have been aware of problems with these vehicles and whether the company appropriately reported information to federal authorities[.]"[923] The memorandum reported that the Staff had found at least 133 warranty claim reports in the Company's warranty claims database for the recalled vehicles relating to the defective ignition switches between June 2003 and June 2012.   These complaints reflected consumers directly telling GM dealers, who passed this information on to GM, about vehicles that were unexpectedly experiencing moving shutdowns after going over bumps or when the key was contacted.   Many of the claims reviewed reflected that either the consumers or GM had identified the ignition switch as the likely cause of the problems.   The report

---

[923] *GM Warranty Claims for Ignition Switch Defects on Recalled Vehicles Before the Subcomm. On Oversight and Investigations Democratic Members and Staff, 113th Cong.* (Apr. 1, 2014) (Supp. Mem. of Comm. on Energy and Commerce Democratic Staff); Press Release, Committee on Energy & Commerce Democrats, *Ranking Member Waxman Releases New GM Warranty Claims Data on Recalled Vehicles* (Apr. 1, 2014).

found, "GM has not reported the vast majority of these claims to federal safety officials or to the public."

588.   Finally, on April 1, 2014, GM announced that it had retained consultant Feinberg, who is well known for his handling of compensation issues related to 9/11, the BP oil spill in the Gulf of Mexico and the Boston marathon bombing, "to explore and evaluate options in its response to families of accident victims whose vehicles are being recalled for possible ignition switch defects."[924]

589.   On April 2, 2014, the U.S. Senate Committee on Commerce, Science, and Transportation's Subcommittee on Consumer Protection, Product Safety, and Insurance held a hearing entitled, "Examining the GM Recall and NHTSA's Defect Investigation Process," chaired by Consumer Protection Subcommittee Chair Senator Claire McCaskill (D-MO).[925] GM CEO Barra, NHTSA's David Friedman and Calvin L. Scovel III, Inspector General of the U.S. Department of Transportation, testified at the hearing. The media reported that Republican Senator Kelly Ayotte of New Hampshire stated that based on what was reviewed before and during the hearing, including internal GM documents, GM's conduct "goes beyond

---

[924] Press Release, Gen. Motors Co., *GM Retains Kenneth Feinberg on Recall Response* (Apr. 1, 2014), http://media.gm.com/media/us/en/gm/news. detail.html/content/Pages/news/us/en/2014/Apr/0401-retains.html.

[925] *Examining the GM Recall and NHTSA's Defect Investigation Process, Democratic Press Office* (Apr. 2, 2014), http://www.c-span.org/video/?85955-1/examining-gm-recall-nhtsas-defect-investigation-process.

unacceptable. ***I believe this is criminal***."[926]

590.   During the April 2, 2014 hearing, NHTSA testified that GM withheld critical information from it.  David Friedman, NHTSA's Acting Administrator's, prepared statements for the April 2, 2014 hearing read, "GM had critical information that would have helped identify this defect."[927]  Friedman elaborated that:

> In February 2014, GM submitted information to NHTSA that, for the first time, acknowledged a link between the ignition switch to the airbag non-deployment, as well as key information regarding parts changes, discussions with suppliers, and other efforts currently under consideration in our Timeliness Query.  Had the information newly provided to NHTSA by GM been available before now, it would have better informed the agency's prior reviews of airbag non-deployment in GM vehicles and ***likely would have changed NHTSA's approach to this issue***.[928]

591.   During the same April 2, 2014 hearing, Defendant Barra admitted to the failure of internal controls at the Company, testifying that ***"within General Motors, there were silos…. That's something I've already corrected today."***[929]  At

---

[926] *Senator McCaskill: GM Has 'Culture of Cover-Up' in Recall Case*, Reuters, Apr. 2, 2014, http://www.newsweek.com/senator-mccaskill-gm-has-culture-cover-recall-case-239255.

[927] *Examining the GM Recall and NHTSA's Defect Investigation Process: Hearing Before S. Subcomm. Consumer Protection, Product Safety, & Insurance of the S. Committee on Commerce, Sci. & Transp., 113th Cong.* (Apr. 2, 2014) (Statement of David Friedman, Acting Adm'r for NHTSA), http://www.nhtsa.gov/Testimony?presentationYear=2014.

[928] *Id.*

[929] *GM Recall and NHSTA's Defect Investigation Process, Panel One: Hearing Before S. Comm. on Commerce, Science and Transportation, Subcomm. on Consumer Protection, Product Safety, and Insurance, 113th Cong.* (Apr. 2, 2014) (testimony of Mary Barra, CEO, Gen. Motors Co.).

the same hearing, Barra further **admitted** that during the time that the defective ignition switches at issue in this case were designed and went into production (from the late 90's until 2011), **"the culture of the company at that time had more of a cost-culture focus."**[930]

### E. On April 9 and 11, 2014, NHTSA Imposes Its Maximum Fine On GM And GM's Recall Charges Increase To $1.3 Billion

592. Prior to the opening of the financial markets on April 9, 2014, substantial new information regarding the financial impact of the First Recall Waves and GM's related liabilities were disclosed to investors. In a letter reported in the press on the evening of April 8, 2014, NHTSA informed GM Vice President & General Counsel, Lucy Clark Dougherty that NHTSA had determined to impose **its maximum allowable fine of $7,000 per day on GM because GM had not provided a complete or satisfactory response to the Special Order by the April 3, 2014 deadline**.[931]  The letter stated, in relevant part:

> GM's response to that Special Order was due by April 3, 2014. GM has not fully responded and therefore is in violation of the Special Order. **As stated in the Special Order, failure to respond fully or truthfully to the Special Order is subject to a civil penalty of up to $7,000 per day.** See 49 U.S.C. § 30165(a)(3); 49 C.F.R. § 578.6(a)(3).
>
> **GM did not respond to over a third of the requests in the Special Order**

---

[930] *Id.*

[931] Letter from O. Kevin Vincent, Chief Counsel, NHSTA, to Lucy Clark Dougherty, Gen. Motors North America Vice President & General Counsel (Apr. 8, 2014), http://www.nhtsa.gov/staticfiles/communications/pdf/2014-04 08_Letter_to_L._ Dougherty.pdf.

***by the April 3 deadline***…. On April 4, 2014, you acknowledged that GM had not fully responded to the Special Order. You explained that GM did not fully respond because an investigation by Anton Valukas and his team was in progress. This was the first time GM had ever raised Mr. Valukas' work as a reason GM could not fully provide information to NHTSA in this timeliness investigation. In a supplemental response from April 7, GM failed to respond to numerous questions by answering only with a reference to Mr. Valukas' investigation. ***Mr. Valukas' investigation is irrelevant to GM's legal obligation to timely respond to the Special Order and fully cooperate with NHTSA.***[932]

593.   With respect to GM's additional excuse that it needed "additional time to respond to technical engineering questions," the April 8, 2014 NHTSA letter stated, in relevant part:

[M]any of the requests to which GM failed to respond by the April 3 deadline are not "technical engineering questions" at all. For example, GM's chronology indicated that a GM engineer approved changes to the ignition switch on April 26, 2006 and that Delphi began providing GM with the redesigned switch during the 2007 model year. ***Requests 63 and 64 asked GM whether it approved a change to the ignition switch at any other time***….   GM failed to respond to these requests. ***These are basic questions concerning information that is surely readily available to GM at this time.  Moreover, it is deeply troubling that two months after recalling the vehicles, GM is unwilling or unable to tell NHTSA whether the design of the switch changed at any other time.***

594.   The April 8, 2014 letter concluded by threatening civil action against GM if GM failed to comply with the Special Order, stating:

If GM does not fully respond to the Special Order immediately and pay all civil penalties accrued as of the date on which it does so, ***NHTSA may refer this matter to the U.S. Department of Justice to commence a civil action in Federal court to compel GM to fully respond to the***

---

[932] *Id.*

***Special Order and for civil penalties.*** *See* 49 U.S.C. §§ 30163(a)(l); 30166(h).[933]

595.   Also on April 8, 2014, after the close of the market, in an article entitled "Gov't: GM missed deadline for faulty switch data," *Associated Press* reported the following:

> ***Federal safety investigators say General Motors failed to respond to more than one-third of its requests for information about a faulty ignition switch linked to 13 deaths by an April 3 deadline.***
>
> In a letter to GM's top lawyer sent Tuesday, the National Highway Traffic Safety Administration ***imposed its maximum allowable fine for the delay of $7,000 per day.*** That adds up to $28,000 so far, and the fines will continue to accrue until GM responds.
>
> According to the letter, GM was granted extra time to answer "technical engineering questions" posed by the agency. ***But NHTSA contends many of the questions GM failed to answer are not engineering ones, and should have been answered by the deadline.***[934]

596.   On April 9, 2014, during the trading day, *Dow Jones Institutional News* reported in an article entitled "GM Downgraded: '***It's Cheap for a Reason,***'" "Federal regulators fined GM this week for failing to answer questions about the switch recall, and warned that the company could face stiffer penalties through federal courts."[935]

---

[933] *Id.*

[934] *Gov't: GM missed deadline for faulty switch data*, ASSOCIATED PRESS, Apr. 8, 2014, http://www.salon.com/2014/04/08/govt_gm_missed_deadline_for_faulty_switch_data/.

[935] Steven Russolillo, *GM Downgraded: "It's Cheap for a Reason'*, WALL ST. J., Apr. 9, 2014, http://blogs.wsj.com/moneybeat/2014/04/09/gm-downgraded-its-cheap-for-a-reason/.

597.   Additional adverse news was disclosed prior to the opening of the financial markets on April 11, 2014.  On April 10, 2014, after the close of the market, GM further revealed the impact of the First Recall Wave on its finances. Specifically, GM issued a press release on Form 8-K announcing that the Company expected to record a ***$1.3 billion recall charge*** for the three months ended March 31, 2014.  GM stated:

> GM [] announced Thursday that ***the company expects to take a charge of approximately $1.3 billion in the first quarter, primarily for the cost of recall-related repairs announced in the 2014 calendar year to date and related courtesy transportation.***[936]

598.   Also on April 10, 2014, after the close of the market, *Dow Jones Institutional News* reported in an article entitled, "GM Recall Costs to Hit $1.3 Billion":

> ***The fallout from General Motors Co.'s troubled recalls escalated on Thursday with the auto maker raising its estimated costs to $1.3 billion and suspending two engineers involved in fateful early decisions.***
>
> The Detroit company's latest cost estimate for a series of recalls, including those covering faulty ignition switches linked to 13 deaths, has it preparing to ***post its first quarterly net loss since emerging from bankruptcy in 2009, analysts said.***
>
> ***The charge – more than three times GM's original estimate*** [of $300,000 on March 17, 2014] ***– is greater than the company's year-ago first quarter profit, and more than the consensus forecast among***

---

[936] Gen. Motors. Co., Current Report (Exhibit 99.1 to Form 8-K) (Apr. 10, 2014).

*Wall Street analysts for the quarter ended March 31.*[937]

**F.    From April Through June 2014, GM Slowly Attempts To Clean Up Its Mess ‑ Firings, Admissions, Fines, The Valukas Report And Compensation For Some Victims**

599.    Following the adverse market reactions on April 9 and 11, 2014 (further detailed below), GM attempted to foster the appearance that it was remorseful and would address the problems reflected in the First Recall Waves.  On April 22, 2014, John Calabrese, GM's Global Engineering Chief, who had been with GM for more than 33 years and had been Vice President of Global Vehicle Engineering since April 2011, "elected to retire" as part of GM's restructuring of the department in order to "address functional safety and compliance of its vehicles." In connection with the restructuring, Global Vehicle Engineering was restructured to form two new organizations: Global Product Integrity and Global Vehicle Components and Subsystems.[938]

600.    On May 5, 2014, 56-year-old Jim Federico, GM's Chief Engineer of Global Company Cars, announced his sudden retirement from GM. Federico had been with GM for nearly 36 years.  As set forth above, Federico had been one of the many GM team leaders responsible for the Cobalt ignition switch issue.  He joined

---

[937] Jeff Bennett & Joann S. Lublin, *GM Recall Costs to Hit $1.3 Billion*, DOW JONES, Apr. 10, 2014, at B1.
[938] Press Release, Gen. Motors Co., *GM Restructures Global Engineering for Cross-System Integration* (Apr. 22, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Apr/0422-global-eng.html.

Calabrese as the second engineering executive connected to the defective ignition switch to retire in two weeks.  The media reported that Federico had high level engineering positions involving certain Chevrolet cars and the Cadillac CTS.[939]  GM did not release an official statement at the time of his departure, but GM spokesman Jim Cain told *Reuters* his retirement was not related to the switch recall.[940]

601.   On April 24, 2014, GM filed with the SEC its Form 10-Q for the period ended March 31, 2014, which further quantified the financial impact of the First Recall Wave.[941]  In this disclosure, GM detailed each component of the $1.3 billion increase to its reserves for policy, product warranty, and recall campaigns.  GM stated:

> In the three months ended March 31, 2014, we recorded charges of approximately $1.3 billion comprising: *(1) approximately $680 million for 2.6 million vehicles to repair ignition switches that could result in a loss of electrical power under certain circumstances that may prevent front airbags from deploying in the event of a crash; to fix ignition lock cylinders that could allow removal of the ignition key while the engine is running, leading to possible rollaway or crash; and to provide courtesy transportation to owners of affected vehicles.*[942]

---

[939] Chris Bruce, *Former GM Engineer Jim Federico Lands at Harley-Davidson*, Autoblog (May 12, 2014, 7:15 PM), http://www.autoblog.com/2014/05/12/former-gm-engineer-jim-federico-lands-harley-davidson/.

[940] Ben Klayman, *Another GM Engineer Linked to Defective Ignition Switch Retires*, Reuters, May 5, 2014, http://www.reuters.com/article/2014/05/05/us-gm-recall-exec-idUSBREA440OI20140505.

[941] Gen. Motors Co., Quarterly Report (Form 10-Q) (Apr. 24, 2014), at 14.

[942] *Id.*

602. In the same Form 10-Q, GM summarized the lawsuits and investigations against the Company and/or officers and directors following its long belated First Wave safety recalls:

- Through April 22, 2014 the Company was aware of 55 putative class actions that have been filed against GM in various U.S. District Courts since the recall announcement alleging that consumers have been economically harmed by the recall and/or the underlying vehicle condition. In the aggregate, these cases seek recovery for compensatory damages, including for alleged diminution in value of the vehicles, punitive damages and injunctive and other relief. Additionally, through April 22, 2014, five putative class actions were filed in various Provincial Courts in Canada seeking similar relief;

- Four shareholder derivative actions initiated on March 28, April 8, April 16 and April 23, 2014 against the company and certain current and former GM directors alleging breach of fiduciary duty of GM's directors in connection with monitoring, remediation and disclosure of the issues underlying the ignition switch recall and alleging breach of fiduciary duty and waste of corporate assets by reason of failure to exercise oversight with respect to vehicle safety generally and in connection with the ignition switch recall specifically;

- On or about April 11, 2014, an action was filed in the U.S. District Court for the Northern District of Georgia alleging a motor vehicle accident on July 22, 2009 involving a 2003 Saturn ION which resulted in catastrophic injuries to the driver. The complaint asserts causes of action based on strict products liability, negligence, breach of implied warranty, fraud and fraudulent concealment, and the Federal and Georgia Racketeer Influenced and Corrupt Organizations Act;

- The Company is also the subject of various inquiries, investigations, subpoenas and requests for information from the U.S. Attorney's Office for the Southern District of New York, Congress, NHTSA, the SEC, and a state attorney general in connection with its recent recalls. It is investigating these matters internally and believes it is cooperating fully with all requests, notwithstanding NHTSA's recent fines for failure to

respond. Such investigations could in the future result in the imposition of damages, fines or civil and criminal penalties; and

- The Company stated that "the resolution of these matters could have a material adverse effect on our financial position, results of operations or cash flows."[943]

603. As anticipated based on NHTSA's prior communication to GM about the timeliness of its recall, on May 16, 2014, GM signed a Consent Order with NHTSA in which GM admitted that it violated the Safety Act and agreed to pay the **maximum $35 million fine** to the U.S. government in connection with its failure to report the ignition switch defect in a timely manner.[944]   GM also agreed to pay a **prospective** fine of $7,000 each day until delivery of the Valukas Report.[945]   As the Consent Order read:

> **GM admits that it violated the Safety Act by failing to provide notice to NHTSA of the safety-related defect that is the subject of Recall No. 14V-047 within five working days as required by 49 U.S.C. § 30118(c)(l), 49 U.S.C. § 30119(c)(2), and 49 C.F.R. § 573.6(b).**
>
> GM shall pay the United States a **maximum civil penalty** for a related series of violations in the sum of thirty-five million dollars ($35,000,000) for its failure to provide notice to NHTSA of the safety-related defect that is the subject of Recall No. 14V-047 within five working days.
>
> \*       \*       \*
>
> Additionally, GM shall pay a civil penalty in the sum of seven thousand

---

[943] *Id.* at 17.
[944] Consent Order, National Highway Traffic Safety Administration, In re TQ14-001 NHTSA Recall No. 14V-047 (May 16, 2014), http://www.nhtsa.gov/staticfiles/communications/pdf/May-16-2014-TQ14-001-Consent-Order.pdf.
[945] *Id.*

dollars ($7,000) for each day including April 4, 2014, and each day thereafter up to and including the date on which GM provides the written factual report to NHTSA regarding the investigation conducted by Anton Valukas, as required by Paragraph 15 below, for GM's failure to fully respond to NHTSA's March 4, 2014 Special Order in TQ14-001 by the due date of April 3, 2014.[946]

604.   The $35 million fine levied against GM in May 2014 is more than 40% of the $85 million in fines that all automakers had paid NHTSA between 2009 and April 2014 for their lack of timeliness in reporting vehicle safety defect issues to NHTSA.[947]

605.   In GM's press release announcing the maximum fine and signing of the Consent Order, CEO Barra stated, "[w]e have learned a great deal from this recall. We will now focus on the goal of becoming an industry leader in safety."[948]  Jeff Boyer, vice president of Global Vehicle Safety, who is assigned to aggregate safety policies across the company, said, "[w]e are working hard to *improve our ability to identify and respond to safety issues*," and " [a]mong other efforts, GM has created a new group, the Global Product Integrity unit, to innovate our safety oversight; we

---

[946] *Id.*

[947] *Examining the GM Recall and NHTSA's Defect Investigation Process: Hearing Before S. Subcomm. Consumer Protection, Product Safety, & Insurance of the S. Committee on Commerce, Sci. & Transp.*, 113th Cong. (Apr. 2, 2014) (Statement of David Friedman, Acting Adm'r for NHTSA), http://www.nhtsa.gov/Testimony?presentationYear=2014.

[948] Press Release, Gen. Motors Co., *GM Signs Consent Order with National Highway Traffic Safety Administration* (May 16, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/May/0516-consent.html.

are encouraging and empowering our employees to raise their hands to address safety concerns through our Speak Up for Safety initiative, and we have set new requirements for our engineers to attain Black Belt certification through Design for Six Sigma."[949]

606.   In addition, NHTSA held a press conference to address the Consent Order on May 16, 2014.  At the press conference, Acting NHTSA Administrator Friedman detailed NHTSA's findings regarding the deficiencies in GM's internal controls, stating, *inter alia*, with respect to "GM's admission that it failed to report a safety-related defect in a timely manner," that ***"the evidence we found behind that failure was deeply disturbing."***[950]   Friedman further summarized NHTSA's findings, as follows:

- ***"GM's decision-making, structure, and process stood in the way of safety at a time when airbags were failing to work properly in millions of vehicles"***;

- ***"GM has known for many years that the ignition switch in the Cobalt and related models can be inadvertently turned to off or accessory position, especially in cases where the driver's knee may make contact with the key or key fob"***;

- "[A] supplier notified GM ***as early as 2009 that the air bags in the Cobalt would not work unless the key was in the run position.***  This notification came in the form of a report explicitly exploring the issue

---

[949] *Id.*

[950] GM Consent Order Press Release Conference (May 16, 2014) (Statement of David Friedman, Acting Adm'r for NHTSA), http://www.nhtsa.gov/ staticfiles/administration/pdf/presentations_speeches/2014/DF-GM-consent-order-news_05162014.pdf at 1.

and a block diagram that made that relationship clear"; and

- "NHTSA's investigation further revealed that *at least by 2012, GM staff was very explicit about an unreasonable risk to safety.* In a September 2012 email, a GM engineer investigating the Cobalt defect explained that GM had found that quote 'the driver's knee may contact the key or key fob and turn the ignition off. With the ignition in that position, the airbags will not deploy.' Similar information was made clear in a legal deposition in 2012. In this same timeframe, *senior GM executives received detailed briefings about this safety-related defect.*"[951]

607.   Friedman further detailed that in December 2013, when the Field Performance Evaluation Recommendation Committee finally agreed to recommend a safety recall to the EFADC, "even then, GM executives delayed. One GM [sic] question[ed] what the rush was to discuss further the ignition switch defect."[952] GM did not agree to report the safety-related defect to NHTSA until a meeting on January 31, 2014.[953]

608.   Friedman concluded based on NHTSA's investigation, "So, GM engineers knew about the defect. GM investigators knew about the defect. GM lawyers knew about the defect. But GM did not act to protect Americans from that defect." [954] Moreover, "[t]he fact that GM took so long to report this defect says something was very wrong with the company's values."[955] Friedman similarly stated

---

[951] *Id.* 1-2.
[952] *Id.* at 2.
[953] *Id.*
[954] *Id.* at 1.
[955] *Id.* at 2.

in a *New York Times* article dated May 16, 2014 regarding the breakdown of GM's internal controls, "Their process was broken, and they need to fix it."[956]

609. As discussed at length herein, on June 5, 2014, the NHTSA released on its website the findings of GM's investigation into the Cobalt ignition switch recall by Anton Valukas ("Valukas Report").[957]   GM shared the Valukas Report with NHTSA as it was obligated to do under its Consent Order with NHTSA.  GM also issued a press release on June 5, 2014 on receiving the Valukas Report, in which CEO Barra described it as "brutally tough, and deeply troubling…. I was deeply saddened and disturbed as I read the report."[958]   Barra also reiterated that the Company was divided into "silos," which caused the Company's internal controls to break down.[959]   During a "town hall" meeting on June 5, 2014, Barra further admitted to internal control failures at the Company, stating, "This is not just another business crisis for GM.  We aren't simply going to fix this and move on.  ***We are***

---

[956] Matthew L.Wald & Danielle Ivory, *G.M. Is Fined Over Safety and Called a Lawbreaker,* N.Y. Times, May 16, 2014, http://www.nytimes.com/2014/05/17/business/us-fines-general-motors-35-million-for-lapses-on-ignition-switch-defect.html.

[957] Jennifer Preston, *Video and Updates on G.M. Internal Recall Investigation*, N.Y. Times, June 5, 2014, http://news.blogs.nytimes.com/2014/06/05/live-video-and-updates-on-gm-internal-recall-investigation/.

[958] Press Release, Gen. Motors Co., *GM Receives Extremely Thorough,' 'Brutally Tough' and 'Deeply Troubling' Valukas Report* (June 5, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jun/060514-ignition-report.html.

[959] *See* Michael Ide, *Barra Says No Conspiracy in GM Scandal, Blames Incompetence and Neglect*, ValueWalk, June 5, 2014.

*going to fix the failures in our system* – that I promise."[960]  At the same meeting,

Barra similarly described the Valukas Report as detailing a "history of failures." [961]

610.    Nonetheless, there was substantial adverse reaction to the pro-GM

conclusions of the Valukas Report (which are not incorporated into this Complaint).

For instance, the media reported on June 5, 2014, that Democratic Senator Richard

Blumenthal of Connecticut said the Valukas Report "seems like the best report

money can buy. It absolves upper management, denies deliberate wrongdoing and

dismisses corporate culpability."[962]

611.    Also on June 5, 2014, GM announced that it would implement a

compensation program for those injured or killed as a result of the ignition switch

failure in the First Recall Wave vehicles.  CEO Barra stated that "*[w]e made serious

mistakes in the past* and as a result *we're making significant changes* in our

company to ensure they never happen again."  The announcement described the

program as follows:

> The program will be independently administered by Kenneth Feinberg,
> who is highly regarded for his handling of other significant

---

[960] Pete Bigelow, *GM's Barra Discusses Results of Ignition Switch Investigation*, AUTOBLOG (June 5, 2014. 10:01AM), http://carmeetsroad.com/top100/2014/06/05/gms-barra-discusses-results-of-ignition-switch-investigation-pete-bigelow/.

[961] Meghan Drake, *Barra Blames 'History of Failures' for GM Safety Crisis*, WASH. TIMES, June 6, 2014, http://www.washingtontimes.com/news/2014/jun/5/barra-blames-history-failures-gm-safety-crisis/?page=all.

[962] Ben Klayman, *GM top executives spared in internal report on safety failure*, REUTERS, June 5, 2014, http://www.reuters.com/article/2014/06/06/us-gm-recall-idUSKBN0EG1KI20140606.

compensation programs.

The program is expected to cover approximately 1.6 million model-year 2003-2007 recalled vehicles manufactured with an ignition switch defect and approximately 1 million model year 2008-2011 recalled vehicles that may have been repaired with a recalled ignition switch.

Pending the independent administrator's development of final guidelines for the compensation program, GM currently expects the program will begin to accept claims on Aug. 1, 2014. It is GM's understanding that the administrator's final compensation program guidelines will be developed in the coming weeks and will include details on where and how to apply for compensation.[963]

612.   During a "town hall" meeting at GM also on June 5, 2014, CEO Barra announced that GM had dismissed 15 executives and disciplined five others due to their roles in failing to prevent the manufacture or effectuate a timely of the defective ignition switches:

Fifteen individuals, who we determined to have acted inappropriately, are no longer with the company.  Some were removed because of what we consider misconduct or incompetence. Others have been relieved because they simply didn't do enough: They didn't take responsibility; didn't act with any sense of urgency. Disciplinary actions have been taken against five additional people as well.[964]

613.   GM also confirmed the 15 dismissals and five disciplinary actions in its press release on June 5, 2014.  Barra told reporters that most of the individuals

---

[963] Press Release, Gen. Motors Co., *GM to Implement Compensation Program for Ignition Switch Recall* (June 5, 2014), http://media.gm.com/media/us/en/gm/news. detail.html/content/Pages/news/us/en/2014/Jun/060514-ignition-recall.html.

[964] Press Release, Gen. Motors Co., *GM CEO Mary Barra's Remarks to Employees on Valukas Report Findings* (June 5, 2014), http://media.gm.com/media/us/en/gm/ news.detail.html/content/Pages/news /us/en/2014/Jun/060514-mary-remarks.html.

dismissed were in "senior or executive roles" and ***"reached the highest levels of the company."***[965]   That same day, the media began to report the individuals who were dismissed, which include: Ray DeGiorgio, a design release engineer; Gary Altman, Chief Development Engineer; Ron Porter and Jaclyn Palmer, both product litigation attorneys; Jennifer Sevigny, an attorney who led the Company's field product assessment group; William Kemp, Counsel for Global Engineering Organization, GM's top safety lawyer; Lawrence Buonomo, Practice Area Manager, Global Process & Litigation, who had chaired the Roundtable Committee and Settlement Review Committee since March 2012; Michael Robinson, Vice President of Sustainability and Global Regulatory Affairs and the former North American general counsel; Defendant Kent, General Director of Safety and Vehicle Crashworthiness; Carmen Benavides, Director of Product Investigations; and Maureen Foley-Gardener, Director of Field Performance.[966]

---

[965] Gabe Gutierrez, Phil LeBeau & Erin McClam, *GM Sacks 15 Workers in Fallout Over Faulty Ignition Switches*, NBC NEWS, June 5, 2014, http://www.nbcnews.com/storyline/gm-recall/gm-sacks-15-workers-fallout-over-faulty-ignition-switches-n123331.

[966] James R. Healy, *These heads rolled at GM over switch fiasco*, U.S.A. TODAY, June 6, 2014, http://www.usatoday.com/story/money/cars/2014/06/06/gm-recall-switches-fired/10100339/; Ben Klayman, *Two GM lawyers, quality control executive among those pushed out over switch*, REUTERS, June 9, 2014, http://www.reuters.com/article/2014/06/09/us-gm-recall-dismissed-idUSKBN0EK1XY20140609; Martha Neil, *6 attorneys fired by GM after law firm ignition switch probe are reportedly identified*, ABA JOURNAL, June 10, 2014, http://www.abajournal.com/news/article/attorneys_fired_by_gm_after_law_firm_ignition-switch_probe_are_reporte1.

614.   On June 6, 2014, Solso, Chairman of GM's Board of Directors, similarly confirmed the need to "change" the Company's internal controls in response to the Valukas Report, stating, "The Board, like management, is committed to *changing the company's* culture and *processes* to ensure that the problems described in the Valukas report never happen again."[967]

615.   On June 10, 2014, *The Wall Street Journal* reported that the Executive Director of the Center for Auto Safety, Clarence Ditlow, also criticized NHTSA for failing to take action against GM even though tens of thousands of Cobalts and other vehicles were experiencing moving shutdowns.   Ditlow stated, *"People died because GM concealed the defect and NHTSA failed to act."*[968]

616.   On June 12, 2014, it was reported that at least nine state attorneys general were investigating GM's defective ignition switch recall delay: Florida, Connecticut, Indiana, Arkansas, Illinois, Iowa, Kentucky, Louisiana and Utah.   The media reported that the attorneys general investigating GM are a bi-partisan group

---

[967] Press Release, Gen. Motors Co., *GM Receives Extremely 'Thorough,' 'Brutally Tough' and 'Deeply Troubling' Valukas Report* (June 6, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jun/060514-ignition-report.html.

[968] Jeff Bennett, *GM Developing Financial Fallout Estimate; Auto Maker to Begin Accepting Claims Aug. 1 For Victims Injured or Killed*, WALL ST. J., June 10, 2014, http://www.wsj.com/articles/gm-to-give-ignition-switch-financial-fallout-estimate-in-august-1402407999.

and want to see unsafe cars taken off the road.[969]

### G.    The Second Recall Wave Begins On June 13, 2014

617.    On June 13, 2014, GM began the Second Recall Wave by describing the problem underlying the recall as identical to the problem identified in the First Recall Waves.  On June 13, 2014, GM announced that it would recall MY 2010-2014 Chevrolet Camaros, which was identified as NHTSA recall 14V346.[970] According to GM's 573 Report:

> There is a risk, under certain conditions, that some drivers may bump the ignition key with their knee and unintentionally move the key away from the "run" position. If this occurs, engine power, and power braking will be affected and power steering may be affected, increasing the risk of a crash. The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

618.    On June 16, 2014, GM announced that it would recall M Y 2005-2009 Buick Allures; 2005-2009 Buick LaCrosses; 2006-2011 Buick Lucernes; 2000-2005 Cadillac DeVilles; 2006-2011 Cadillac DTSs; 2006-2014 Chevrolet Impalas; and 2006-2007 Chevrolet Monte Carlos, which were categorized as NHTSA recall 14V-

---

[969] Andrew Harris & Christie Smythe, *GM Defect Recall Delay Investigated by Nine U.S. States*, BLOOMBERG, June 12, 2014, http://www.bloomberg.com/news/2014-06-12/gm-defect-recall-delay-investigated-by-nine-u-s-states.html.

[970] Letter from Brian Latouf, Dir., Field Prod. Investigations and Evaluations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r. for Enforcement, NHTSA, GM 573 Report 14V-355 (June 19, 2014).

355.[971]  According to GM's 573 Report, it was recalling these vehicles for the same unintended ignition key rotation issue as the prior recalls, which could result in airbags not deploying.

### H.   As The Second Recall Wave Expands, Congress Holds Further Hearings On The GM Ignition Switch Recalls

619.   On June 18, 2014, the U.S. House of Representatives Commerce Subcommittee on Oversight and Investigations held a hearing entitled, "The GM Ignition Switch Recall: Investigation Update."[972]   The hearing focused on the findings of the Valukas Report.[973]   At the hearing, GM CEO Barra testified that, "[w]e have restructured our safety decision-making process to raise it to the highest levels of the company" and in response to a question about compliance and risk reporting to the SEC, she admitted, ***"it is unacceptable the way things broke down, and that is why we have made dramatic process changes."***[974]

---

[971] Press Release, Gen. Motors Co., *GM Will Rework or Replace Keys on 3.16 Million U.S. Cars* (June 16, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jun/0616-recalls.html; 573 Report 14V-355 (June 20, 2014).

[972] *The GM Ignition Switch Recall: Investigation Update, Hearing Before the S. Comm. On Oversight and Investigations of the H. Comm. on Energy and Commerce, 113th Cong.* (June 18, 2014).

[973] *The GM Ignition Switch Recall: Investigation Update*, *Hearing Before the Subcomm. on Oversight and Investigations Comm. on Energy and Commerce, 113th Cong.* (June 17, 2014) (Mem. of Henry A. Waxman, Ranking Member, Democratic Members of the S. Comm. On Oversight and Investigations).

[974] *The GM Ignition Switch Recall: Investigation Update*, *Hearing Before the Subcomm. on Oversight and Investigations Comm. on Energy and Commerce, 113th Cong.* (June 18, 2014) (Preliminary Transcript, at 2716-17).

620.   Barra further admitted during her June 18, 2014 testimony that the Valukas Report "paints a picture of an organization that failed to handle a complex safety issue in a responsible way….There is no way to minimize the seriousness of what Mr. Valukas and his investigations uncovered."[975]   Barra further **admitted** that ***"deep underlying cultural problems [were] uncovered in this report."[976]***   During the same hearing, Barra testified, "We have restructured our safety decision-making process to raise it to the highest levels of the company."

621.   On June 30, 2014, the Second Wave Recall again expanded, when GM recalled MY 2003-2014 Cadillac CTSs and 2004-2006 Cadillac SRXs, which were identified as NHTSA recall 14V-394.[977] Also on June 30, 2014, GM recalled MY 2000-2005 Chevrolet Impalas; 2000-2005 Chevrolet Monte Carlos; 1997-2005 Chevrolet Malibus; 1999-2004 Oldsmobile Aleros; 1998-2002 Oldsmobile Intrigues; 1999-2005 Pontiac Grand Ams; and 2004-2008 Pontiac Grand Prixs, which were identified as NHTSA recall 14V-400.[978] According to GM's 573 Reports

---

[975] *Id*. at 24:491-98.

[976] *Id.* at 119:2716-18.

[977] Press Release, Gen. Motors Co., *GM Announces Six Safety Recalls* (June 30, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jun/0630-recall.html; Letter from Brian Latouf, Dir., Field Prod. Investigations and Evaluations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA, GM 573 Report 14V-355 (July 2, 2014).

[978] Press Release, Gen. Motors Co., *GM Announces Six Safety Recalls* (June 30, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jun/0630-recall.html; Letter from Brian Latouf, Dir., Field Prod.

for these two recalls, it was recalling these vehicles for the same unintended ignition key rotation issue as the prior First and Second Recall Waves.

622.   On June 30, 2014, GM announced additional charges of $300 million it expected to take in the second quarter of 2014, which included costs associated with additional recalls: "GM expects to take a charge of up to approximately $700 million in the second quarter for the cost of recall-related repairs announced in the quarter. This amount includes a previously disclosed $400 million charge for recalls announced May 15 and May 20."[979]

623.   In sum, between June 13, 2014 and June 30, 2014, GM issued a second wave of recalls concerning defective ignition switches in vehicles like the Chevy Impala that was driven by GM Design Engineer Laura Andres when she submitted her complaint to GM discussed in ¶425 above, and the Pontiac Grand Am that was the subject of GM's May 22, 2003 voicemail warning to dealers described above in ¶450.   GM recalled a massive additional **12.05 million** vehicles pursuant to its Second Recall Wave tied to defective ignition switches, which followed a similar pattern of GM being on notice of a safety problem with its vehicles and changing the defective part in later-sold vehicles but not changing the part number.   Together, in 2014, GM recalled approximately **14.65 million vehicles** because of their

Investigations and Evaluations, Gen. Motors Co., to Nancy Lewis, Assoc. Adm'r for Enforcement, NHTSA, GM 573 Report 14V-400 (July 3, 2014).
[979] Gen. Motors Co., Current Report (Form 8-K) (June 30, 2014), at 3.

defective ignition switches.

624.   Also on June 30, 2014, Feinberg issued his Final Protocol for the Ignition Switch Compensation Program, effective August 1, 2014.[980] The Final Protocol governs how Feinberg will pay out funds to individuals who demonstrate eligible death or physical injuries resulting from the ignition switch defect in the First Recall Waves.  No claims for economic or other damages are subject to the Final Protocol, but there is no cap for death or physical injury liabilities.  Moreover, as Mr. Feinberg stated on July 17, 2014:

> The previous GM bankruptcy will not pose a legal barrier to any claimant submitting a claim for death or physical injury pursuant to this Program.  ***Whether the unfortunate accident occurred before or after the GM bankruptcy is irrelevant***.  The claim will be considered on its own merits without regard to any GM bankruptcy date.[981]

Feinberg went on to state that: "Individual claimants who previously settled their claims with GM before learning of the defective ignition switch problem will

---

[980] Gen. Motors Co., *GM Ignition Compensation Claims Resolution Facility Final Protocol for Compensation of Certain Death and Physical Injury Claims Pertaining to the GM Ignition Switch Recall* (June 30, 2014), http://www.gmignitioncompensation.com/docs/FINAL%20PROTOCOL%20June%2030%20%202014.pdf.; Press Release, Gen. Motors Co., *GM Statement on Ignition Switch Compensation Program* (June 30, 2014), http://media.gm.com/media/ca/en/gm/news.detail.html/content/Pages/news/ca/en/2014/Jun/0630-compensation.html.

[981] *Examining Accountability and Corporate Culture in the Wake of the GM Recalls: Hearing Before the S. Subcomm. Consumer Prot., Prod. Safety, & Ins. of the S. Committee on Commerce, Sci., & Transp., 113th Cong.* (July 17, 2014) (testimony of Kenneth R. Feinberg, Founder and Managing Partner, Feinberg Rozen LLP), http://archive.freep.com/assets/freep/pdf/C4222297717.PDF.

be permitted to **reopen their claims**, and seek additional compensation from this new Program if the calculated amount under the Program exceeds the earlier settlement amount."[982]

625.   GM's expansion of the ignition switch recalls was widely reported in the press.  For example, on June 30, 2014, *The New York Times* reported in an article entitled "As Recalls Expand, G.M. Offers Plan for Victims of Faulty Ignition Switch,"  "General Motors on Monday became consumed once again by the safety crisis it cannot seem to shake, announcing the recall of 8.4 million more vehicles worldwide – most of them for an ignition defect similar to the flaw that the company failed to disclose in other models for more than a decade."[983]  *The New York Times* further observed that this additional recall "seemed to deflate whatever good will G.M. had generated with the news of Mr. Feinberg's plan."[984]  In addition, *The New York Times* pointed to the same failures in GM's handling of the Second Recall Wave, as well as NHTSA's knowledge of the ignition switch defects, as the media had observed in connection with the First Recall Wave, stating:

> The details of the new recall sounded familiar.  Keys could inadvertently shift while the cars were running, shutting off the engine and disabling air bags and other important power safety features.  The vehicles were older, this time dating as far back as the 1997 model year.

---

[982] *Id.*

[983] Hilary Stout, *As Recalls Expand, G.M. Offers Plan for Victims of Faulty Ignition Switch*, N.Y. TIMES, June 30, 2014, http://www.nytimes.com/2014/07/01/business/gms-payout-formula-for-the-dead-1-million-and-up.html.

[984] *Id.*

There was a toll linked to the recall – seven crashes, eight injuries and three fatalities.

And the National Highway Traffic Safety Administration had been receiving dozens of complaints about the ignition issues in the cars for years.[985]

According to *The New York Times*, "Even by G.M.'s recent standards, the announcement of the latest recall was stunning."[986]

626.   On July 3, 2014, *Reuters* also reported on GM's expansion of the ignition switch recall in an article entitled, "GM switch complaints began 17 years ago, long before Cobalt."[987] Based on its own review of complaints filed with NHTSA, *Reuters* concluded that "GM dealers were told of [ignition] switch-related defects almost as soon as the Malibu was on the market, and that many could not fix the defects."[988]  *Reuters* further observed that, as GM had with respect to the First Recall Wave, "GM advised dealers about ignition [switch] issues on [the Malibu and the Impala] in 2001…."[989]

627.   On July 16, 2014, in an article entitled "Documents Show G.M. Kept Silent On Fatal Crashes," *The New York Times* reported that the NHTSA "death

---

[985] *Id*.

[986] *Id*.

[987] Paul Lienert, *GM switch complaints began 17 years ago, long before Cobalt*, REUTERS, July 3, 2014, http://www.reuters.com/article/2014/07/03/us-gm-recall-ignition-idUSKBN0F82F420140703.

[988] *Id*.

[989] *Id*.

inquiries" that it had obtained from the agency regarding the ignition switch defect revealed a pattern of evasiveness on the part of GM.[990]  For example, according to *The New York Times*, in some instances, GM simply responded, "G.M. opts not to respond."[991]  When asked for comment, Friedman, Acting NHTSA Administrator, stated ***"G.M.'s decision-making, structure, process and corporate structure stood in the way of safety."***[992]

628.   On July 17, 2014, U.S. Senator Claire McCaskill, Chairman of the Senate Consumer Protection Subcommittee, and 10 of her colleagues, including the subcommittee's top Republican, Senator Dean Heller of Nevada, held a second hearing to examine recent developments and the policy implications following GM's recalls earlier this year for Chevy Cobalts and other vehicles with defective ignition switches.  Among others, GM CEO Mary Barra, GM Chief Counsel and Executive Vice President Michael P. Millikin and Anton Valukas testified.[993]  Barra testified

---

[990] Rebecca R. Ruiz & Danielle Ivory, *Documents Show G.M. Kept Silent On Fatal Crashes*, N.Y. TIMES, July 15, 2014, http://www.nytimes.com/2014/07/16/business/documents-show-general-motors-kept-silent-on-fatal-crashes.html?module=Search&mabReward=relbias%3Aw%2C%7B%2.

[991] *Id.*

[992] *Id.*

[993] Press Release, Gen. Motors Co., *Barra Prepared Testimony to U.S. Senate Subcommittee* (July 17, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jul/0717-barra-testimony.html; Press Release, Gen. Motors Co., *Millikin Prepared Testimony to U.S. Senate Subcommittee* (July 17, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jul/0717-millikin-testimony.html; *Examining Accountability and Corporate Culture in the Wake of the GM Recalls: Hearing Before S. Subcomm.*

that "at a town hall meeting before thousands of GM employees — and several thousand more around the world via satellite — *we accepted responsibility for what went wrong.*"[994]   She admitted that, "[y]es, we've recalled large volumes of past models — a result of our exhaustive review coming out of the ignition switch recall" and also observed that the Feinberg Compensation Program was created "as an exceptional response to a *unique set of mistakes that were made over an extended period of time.*"[995]   When questioned by Senator Dean Heller whether Barra "believe[d] that Delphi [the ignition switch supplier] shoulders any responsibility of the 13 deaths," Barra responded, "*[w]e're the OEM. We're the, you know, company that's responsible to integrate the parts into the vehicle. So it's our responsibility*."[996]

629.   Millikin testified that "[w]e had lawyers at GM who didn't do their jobs; didn't do what was expected of them. Those lawyers are no longer with the company" and "[a]s general counsel, I am ultimately responsible for the legal affairs of the company."

---

*Consumer Protection, Product Safety, & Insurance of the S. Committee on Commerce, Sci., & Transp., 113th Cong*., Sess. 2 (July 17, 2014) (Statement of Anton R. Valukas), http://archive.freep.com/assets/freep/pdf/C4222295717.PDF.
[994] Press Release, Gen. Motors Co., *Barra Prepared Testimony to U.S. Senate Subcommittee* (July 17, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Jul/0717-barra-testimony.html.
[995] *Id*.
[996] General Motors Ignition Switch Recall, C-SPAN, July 17, 2014, http://www.c-span.org/video/?320418-1/hearing-gm-recalls-corporate-culture-resumes-shortly.

630.   Senator McCaskill's press release on the hearing stated that she told "General Motors' CEO that the *"failure of [GM's] legal department is stunning."*[997]

631.   During the July 17, 2014 hearing, Senator Richard Blumenthal of Connecticut stated that "In this instance, the lawyers [at GM] enabled purposeful concealment and cover-up, possible criminal action that is the subject right now of an investigation."[998]

## I.   July 24, 2014: GM Discloses An Additional $400-$600 Million Charge For Victim Compensation, Another Increase In Its Recall Reserve, And A Change To Its Accounting Practices For Future Recall Reserves

632.   Before trading opened on July 24, 2014, GM issued a press release and filed a Form 8-K, which revealed additional new information about the financial impact of the First Recall Wave and the Second Recall Wave.  In the Form 8-K, GM disclosed a special charge of $400 million in connection with the Compensation Facility Protocol.  GM stated:

> *A special charge of $0.4 billion was taken for the GM ignition switch compensation program.* There is no cap on this program, but this

[997] Press Release, U.S. Senator Claire McCaskill of Missouri, *McCaskill Questions Why GM CEO Didn't Fire Top Lawyer: Failure of legal department is 'stunning,'* (July 17, 2014), http://www.mccaskill.senate.gov/media-center/news-releases/gm-hearing.

[998] *CEO Mary Barra defends GM's top lawyer, blames fired employees for deadly defect failures*, PBS NEWSHOUR (July 17, 2014, 6:31 PM), http://www.pbs.org/newshour/bb/ceo-mary-barra-defends-gms-top-lawyer-blames-fired-employees-deadly-defect-failures/.

charge is the company's best estimate of the amounts that may be paid to claimants. Due to the unique nature of the program, this estimate contains significant uncertainty and *it is possible the total cost could increase by approximately $0.2 billion.*

633.   In the same July 24, 2014 Form 8-K, GM announced that it had determined to change its policy regarding accounting for future recalls, and as a result of that change, would incur a $900 million special charge. GM stated:

> *The company is changing how it estimates future recall expense and will now accrue at the time of vehicle sale an amount that represents management's best estimate of future recall costs in North America.* As a consequence of this change, GM is taking a *$0.9 billion non-cash pretax special charge* in the second quarter for the estimated costs of future possible recalls for up to the next 10 years on 30 million GM vehicles on the road today.

634.   Also on July 24, 2014, during the trading day, GM issued a Form 10-Q for the quarter ended June 30, 2014. In its Form 10-Q, GM further described the special charge of $400 million related to the Feinberg Ignition Switch Recall Compensation Program. GM stated:

**Ignition Switch Recall Compensation Program**

In the three months ended June 30, 2014 we announced the creation of a compensation program (the Program) to compensate accident victims who died or suffered physical injury (or their families) as a result of a faulty ignition switch related to the 2.6 million vehicles recalled as more fully described in Note 8. It is important to our company that we reach everyone through this Program who has been impacted. The Program is being administered by an independent program administrator. The independent administrator has established a protocol that defines the eligibility requirements to participate in the Program. *There is no cap on the amount of payments that can be made to claimants under the Program.*

346

> ***At June 30, 2014 we have an accrual of $400 million recorded in Corporate which represents our best estimate of amounts that may be paid under the Program.*** However, it is reasonably possible that the liability could exceed our recorded amount by approximately $200 million. The most significant estimates affecting the amount recorded include the number of participants that have eligible claims related to death and physical injury, which also contemplates the severity of injury, the length of hospital stays and related compensation amounts and the number of people who actually elect to participate in the Program.

635.   In the same Form 10-Q, GM also disclosed that it had taken an additional ***$325 million charge*** to its reserves for policy, product warranty, and recall campaigns, for the 12.1 million vehicles subject to the Second Recall Wave. GM stated:

> In the six months ended June 30, 2014 we recorded charges of approximately $2.5 billion in Automotive cost of sales relating to recall campaigns and courtesy transportation, of which over 90% was recorded in GMNA.  The recorded charges primarily comprised: … ***(7) approximately $325 million for 12.1 million vehicles to rework or replace ignition keys because the ignition switch may move out of the 'run' position which may impact power steering and power braking and, depending on the timing of the key movement relative to the activation of the sensing algorithm of a crash event, may result in airbags not deploying.***

636.   The Form 10-Q further disclosed that GM had determined to change its accounting methodology for future recalls.  GM stated:

> ***We have historically accrued estimated costs related to recall campaigns in GMNA when they are probable and reasonably estimable, which typically occurs once it is determined a specific recall campaign is needed and announced***. During the three months ended June 30, 2014, ***following the significant increase in the number of vehicles subject to recall in GMNA,*** the results of our ongoing

comprehensive safety review, additional engineering analysis, the creation of a new Global Product Integrity organization, the appointment of a new Global Vice President of Vehicle Safety responsible for the safety development of our vehicle systems and our overall commitment to customer satisfaction, we accumulated sufficient historical data in GMNA to support the use of an actuarial-based estimation technique for recall campaigns. *As such, we now accrue at the time of vehicle sale in GMNA the costs for recall campaigns. Based on expanded historical data, we recorded a catch-up adjustment of $874 million in Automotive cost of sales in the three months ended June 30, 2014 to adjust the estimate for recall costs for previously sold vehicles*.

637.   On July 24, 2014, in an article entitled "WRAPUP 1-Ford's Profit Tops Expectations, Recall-Hit GM Misses" released prior to the close of trading, *Reuters* reported:

Including the charges and costs in the second quarter, GM's recalls have accounted for about *$3.8 billion in total costs so far this year.*

*One-time items in the second quarter for GM included a charge for establishing a victims' compensation fund of at least $400 million for those killed or injured by the faulty ignition switch*. Since GM has said there is no cap on that fund, which administrator Kenneth Feinberg will independently control, it said *that figure could rise another $200 million*.

*GM also changed the way it is accounting for recalls going forward, resulting in another charge of $874 million.*  That figure is part of the $3.8 billion total.

## VII.  POST-CLASS PERIOD DEVELOPMENTS

### A.  GM Senior Executives Further Admit To Failures In The Company's Internal Controls During The Class Period, And GM Conducts Additional Ignition Switch Recalls

638.  As set forth above, in Defendant Barra's prepared remarks for the July 17, 2014 town hall hearing before the Senate Consumer Protection Subcommittee, she contrasted what she planned to do at GM going forward, to the Company's culture during the time period covered by the Valukas Report: "I will use the report's findings and recommendations to attack and remove information silos wherever we find them and to create an organization that is accountable and focused on the customer."[999]

639.  Moreover, as Defendant Barra's prepared remarks for the July 17, 2014 hearing reiterated: "We removed fifteen employees from the company… *some for misconduct* or incompetence, others because they didn't take responsibility or act with a sense of urgency."[1000]

640.  Similarly, as Mr. Valukas' prepared comments for the July 17, 2014 town hall hearing acknowledged, "The story of the Cobalt is one of a series of

---

[999] Press Release, Gen. Motors Co., *Barra Prepared Testimony to U.S. Senate Subcommittee* (July 17, 2014), http://media.gm.com/media/us/en/gm/news. detail.html/content/Pages/news/us/en/2014/Jul/0717-barra-testimony.html.
[1000] *Id.*

***individual and organizational failures*** that led to devastating consequences."[1001]

641.  On July 28, 2014, Defendant Akerson further admitted that GM's internal controls were ineffective during the Class Period, stating, "I think we all – including the new and the old part of the management team – didn't fully realize how deep some of the problems ran."[1002]

642.  On September 8, 2014, Chairman of GM's Board of Directors, Theodore M. Solso, similarly admitted with respect to GM's internal controls, ***"Yes, we should have known earlier.  The way I look at it, G.M. has not been well run for a long period of time."***  Solso further stated that he was ***"shocked"*** and ***"stunned"*** by the findings of the Valukas Report that GM employees had refused to repair the ignition switch defect in the face of "mounting evidence that the problem put drivers and passengers at risk of death and serious injury."[1003]

643.  As NHTSA's David Friedman's prepared remarks for the September

---

[1001] *Examining Accountability and Corporate Culture in the Wake of the GM Recalls: Hearing Before S. Subcomm. Consumer Protection, Product Safety, & Insurance of the S. Committee on Commerce, Sci., & Transp.*, *113th Cong.*, Sess. 2 (July 17, 2014) (Testimony of Anton R. Valukas), http://archive.freep.com/assets/freep/pdf/C4222295717.PDF.

[1002] David Shepardson, *Akerson: 'We all' Misread Problems in GM's Recall Crisis: Ex-CEO Dubs Recall Crisis 'Clarion Call' for Change at Automaker*, DETROIT NEWS, July 28, 2014, http://www.detroitnews.com/article/20140728/AUTO0103/307280021.

[1003] Bill Vlasic, *G.M.'s Board Is Seen as Slow in Reacting to Safety Crisis*, N.Y. TIMES, Sept. 8, 2014, http://www.nytimes.com/2014/09/08/business/gms-board-is-seen-as-slow-in-reacting-to-safety-crisis.html.

16, 2014 hearing stated:  "GM clearly had information available that should have prompted the company to announce the recall much sooner than it did.  We collected the maximum civil penalty of $35 million from GM for its failure to meet its timeliness obligations.  ***The company also had a fundamentally flawed process and culture, requiring wide-ranging internal changes to improve its ability to address potential safety-related defects***."[1004]

644.   In his September 16, 2014 testimony before the Senate Committee on Commerce, Science and Transportation, Subcommittee on Consumer Protection, Product Safety and Insurance, Acting NHTSA Administrator Friedman similarly testified:

> ***General Motors was actively trying to hide the ball.  It wasn't simply incompetence on their part.  They had policies in place to not mention the word defect in order to shield information from NHTSA.  They were actively trying to hide the ball.  NHTSA*** was working hard to find the ball and ***was missing critical information.***

645.   In an apparent contrast to how GM conducted its business during the Class Period, Defendant Barra further stated on GM's October 1, 2014 conference call with investors that, "[W]hen I think about how do I start changing a culture, creating the ultimate culture that we want, it starts today with the behaviors that we

---

[1004] *Oversight of the Policy Considerations for the National Highway Traffic Safety Administration: Hearing Before S. Subcomm. Consumer Protection, Product Safety, & Insurance of the S. Committee on Commerce, Sci. & Transp., 113th Cong.* (2014) (Statement of David Friedman, Acting Adm'r for NHTSA).

demonstrate. And we've been very clear with our leadership team and as we've rolled out the core values to every employee, that **we need to change behaviors, and that includes me**."[1005]

646. On October 6, 2014, GM issued three additional recalls for the ignition switch defects, covering 60,575 vehicles. The recalled vehicles included Pontiac G8 and Chevrolet Caprice police patrol cars.[1006]

647. On October 17, 2014, GM announced that 66-year-old Michael Millikin, GM's General Counsel had informed the Company of his decision to retire early in early 2015 after more than 40 years at GM. Millikin joined the ranks as the third GM executive with a connection to the ignition switch defects to announce a retirement during 2014.[1007]

648. On November 11, 2014, GM spokesperson Adler admitted to *Bloomberg* that the recent release of GM internal emails dated December 2013 demonstrating that GM had decided to conduct its First Wave recall three months before it actually did so, described above in ¶¶527-30, "**are further confirmation**

---

[1005] Conference Call, Gen. Motors Co., *Gen. Motors 2014 Global Bus. Conference Call* (Segment 1) (Oct. 1, 2014) at 6.
[1006] Jeff Bennett, *GM's Latest Recall Dragnet Pulls in Police Cars*, WALL ST. J., Oct. 6, 2014, http://www.wsj.com/articles/SB2275351971796213403850458019 4361714723790.
[1007] Press Release, Gen. Motors Co., *Millikin to Retire as GM General Counsel* (Oct, 17, 2014), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/ news/us/en/2014/Oct/1017-millikin.html.

***that our system needed reform,*** and we have done so.  ***We have reorganized our entire safety investigation and decision process*** and have more investigators, move issues more quickly and make better decisions with better data."[1008]

649.  On November 11, 2014, Defendant GM President Dan Ammann, similarly admitted to *The Wall Street Journal*:

> It [the ignition switch recall] reinforced the need for ongoing change. We needed to break down our internal silos, integrate and require transparency across the business so that everyone is sharing information.  We want what we are calling a zero-defect mentality.  The customer is expecting a zero-defect vehicle and that is the expectation we need to meet.

650.  On January 8, 2015, at a media roundtable, Defendant CEO Barra further admitted regarding the ignition switch recalls and GM's internal controls, "It was clearly a tragedy, and it was deeply troubling.  But we quickly acknowledged our shortcomings and set about addressing them."[1009]

---

[1008] David Welch, *GM Order Shows Work to Fix Ignition Months Before Recall*, BLOOMBERG, Nov. 11, 2014, http://www.bloomberg.com/news/2014-11-11/gm-switch-order-shows-failure-to-disclose-under-ceo-barra.html.
[1009] Bill Vlasic, *General Motors Chief Pledges to Move Beyond Recalls*, N.Y. TIMES, Jan. 8, 2015, http://www.nytimes.com/2015/01/09/business/gm-chief-mary-barra-vows-to-move-beyond-recalls.html?_r=1.

## VIII.  MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD[1010]

651.   Throughout the Class Period, beginning from the date of the "new" GM's IPO, November 17, 2010 through July 24, 2014, Defendants each made materially false and misleading statements and omissions concerning:  (i) GM's liabilities, including the costs and liabilities of GM's product warranty and recall campaigns for the defective vehicles, as well as the costs of claims against the Company that GM incurred, or reasonably expected to incur, as a result of the Company's manufacture and sale of the defective vehicles (including those eventually paid for by the Compensation Facility Protocol); (ii) the effectiveness of the Company's internal controls over financial reporting; and (iii) the safety of GM vehicles.

### A.    The Fourth Quarter Of 2010 And Full Year 2010

#### 1.    Adequacy Of Reserves For Product Warranties And Recalls

652.   During the Class Period, GM purported to disclose to investors the

---

[1010] In this section of the Complaint, Lead Plaintiff has included all of the alleged false and misleading statements at issue in this action and pleaded them in the context in which they were made, grouping them by fiscal quarter.  For each alleged false and misleading statement, Lead Plaintiff then explains, after the statements from the quarter are presented in the context in which they were made, why each statement was materially false and misleading when made.  Corporate Defendant GM is sued for all statements included in this section, and the Individual Defendants are sued for only those statements in this section which the Individual Defendants made or signed and as a control person of GM during their respective tenures at the Company.

Company's costs and liabilities, including GM's costs and liabilities due to GM's vehicle warranties and recalls, as well as the methods the Company purportedly used to determine those costs and liabilities, and GM's purported compliance with GAAP. However, the amounts of GM's costs and liabilities reported during the Class Period were materially understated in violation of GAAP, and GM's statements about the process that GM purportedly followed to quantify them, and GM's purported compliance with GAAP were materially false and misleading. In violation of GAAP, GM failed to account for the warranty and recall costs and liabilities associated with the defective vehicles at a time when they were probable and reasonably estimable. GM should have issued the recalls of its defective vehicles (and incurred the significant costs associated with them) as early as 2005, and by no later than the start of the Class Period, instead of for the first time in 2014. GM's failure to do so, and the Company's failure to disclose its true costs and liabilities during the Class Period when they were both probable and reasonably estimated, rendered the Company's Class Period statements on those issues materially false and misleading.

653.　On November 17, 2010, the first day of the Class Period and the day of the "new" GM's IPO, GM filed with the SEC the final amendment to its Form S-1 Registration Statement in connection with the IPO (the "November 17, 2010 Registration Statement"). The November 17, 2010 Registration Statement was

signed by Defendants Akerson, Liddell and Cyprus.  In the November 17, 2010 Registration Statement, the Company, Akerson, Liddell and Cyprus falsely and misleadingly described the process GM claimed to follow to determine GM's costs and liabilities for vehicle warranties and recall campaigns.  The Company, Akerson, Liddell and Cyprus falsely and misleadingly claimed that GM recognized such costs and liabilities "when they are deemed to be probable and can be reasonably estimated" based on historical information about the "nature, frequency, and average costs of claims."  GM also falsely and misleadingly stated that such costs and related liabilities are "re-evaluated on an ongoing basis."  Specifically, the November 17, 2010 Registration Statement falsely and misleadingly claimed that:

> The estimated costs related to policy and product warranties are accrued at the time products are sold, and the estimated costs related to product recalls based on a formal campaign soliciting return of that product are accrued **when they are deemed to be probable and can be reasonably estimated**.  These estimates are established using historical information on the nature, frequency, and average cost of claims of each vehicle line or each model year of the vehicle line.  However, where little or no claims experience exists for a model year or a vehicle line, the estimate is based on long-term historical averages.  Revisions are made when necessary, based on changes in these factors.  **These estimates are re-evaluated on an ongoing basis**.  We actively study trends of claims and take action to improve vehicle quality and minimize claims.

654.   In the same Registration Statement, the Company, Akerson, Liddell and Cyprus also falsely and misleadingly claimed that, "The estimated costs related to product recalls based on a formal campaign soliciting return of that product are accrued **when they are deemed to be probable and can be reasonably estimated**."

655.   The foregoing statements by Defendants GM, Akerson, Liddell and Cyprus concerning the process that GM purportedly followed to determine its costs and liabilities for vehicle warranties and recall campaigns were materially false and misleading because:  (i) GM did not recognize and report the costs and liabilities of its warranty claims and recall campaigns for the defective vehicles when they were probable and reasonably estimable based on historical information about the "nature, frequency, and average costs of claims or all other available evidence, because GM was in possession of substantial information that would have caused higher reported costs and liabilities for warranty claims and recalls, but GM did not recall the vehicles or properly account for the costs of their repairs (*see* ¶¶329-650); (ii) as GM suddenly clarified at the end of the Class Period, it did not typically recognize costs associated with recalls until a recall campaign was ***both*** deemed needed ***and*** announced; (iii) GM did not make revisions to or re-evaluations of, the costs and liabilities of its warranty claims and recall campaigns when necessary and did not re-evaluate them on an ongoing basis in a manner that properly accounted for GM's true warranty and recall costs; and (iv) GM did not timely take action to improve vehicle quality and minimize claims because GM understood, as early as 2005, and by no later than the start of the Class Period, that the Company needed to replace its defective ignition switches, but only implemented a "band aid" solution of changing the key head design that did not solve the problem of moving shutdowns.

656.   In addition to misstating how GM reported the costs and liabilities of its warranty claims and recall campaigns, GM, Akerson, Liddell and Cyprus also materially understated the dollar amounts of GM's actual costs and liabilities during the Class Period in violation of GAAP.   In the November 17, 2010 Registration Statement, GM, Akerson, Liddell and Cyprus falsely and misleadingly materially understated GM's costs and liabilities, including the costs for "policy, product warranty and recall campaigns," and GM's costs of "warranties issued and assumed in period."   Specifically, GM, Akerson, Liddell and Cyprus reported in the November 17, 2010 Registration Statement that the Company's "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities" totaled $7.030 billion as of December 31, 2009, including $1.388 billion for "Warranties issued and assumed in period," as set forth in the below table from the November 17, 2010 Registration Statement:[1011]

|                                                    | July 10, 2009 Through December 31, 2009 |
| -------------------------------------------------- | --------------------------------------- |
| Beginning balance                                  | $7,193                                  |
| Warranties issued and assumed in period            | 1,388                                   |
| Payments                                           | (1,797)                                 |
| Adjustments to pre-existing warranties             | 66                                      |
| *    *    *                                        | *    *    *                             |
| Ending balance                                     | 7,030                                   |

---

[1011]  The amounts in each of the tables in this section of the Complaint are in millions of dollars.

657.   Defendants  GM,  Akerson,  Liddell  and  Cyprus  also  falsely  and misleadingly claimed in the November 17, 2010 Registration Statement that the Company's "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities" totaled $6.756 billion as of September 30, 2010, including $2.312 billion for "Warranties issued and assumed in period," as set forth in the table below from the November 17, 2010 Registration Statement under "Note 14.  Product Warranty Liability":

|  | Nine Months Ended September 30, 2010 |
| --- | --- |
| Beginning balance | $7,030 |
| Warranties issued and assumed in period | 2,312 |
| Payments | (2,680) |
| Adjustments to pre-existing warranties | 100 |
| *    *    * | *    *    * |
| Ending balance | 6,756 |

658.   In the November 17, 2010 Registration Statement, GM, Akerson, Liddell and Cyprus also repeatedly falsely and misleadingly claimed that GM's financial statements were prepared in conformity with GAAP.  Under the headings "Use of Estimates in the Preparation of the Financial Statements" and "Critical Accounting Estimates," GM, Akerson, Liddell and Cyprus falsely and misleadingly claimed that "*The audited consolidated financial statements and unaudited*

*condensed consolidated interim financial statements are prepared in conformity with U.S. GAAP.*"

659.   In the November 17, 2010 Registration Statement, under the heading "Use of Estimates in the Preparation of the Financial Statements," GM, Akerson, Liddell and Cyprus also falsely and misleadingly claimed that "*The condensed consolidated financial statements are prepared in conformity with U.S. GAAP.*"

660.   The November 17, 2010 Registration Statement signed by Defendants Akerson, Liddell and Cyprus also falsely certified the accuracy of GM's financial statements and that they contained "no material inaccuracies or omissions." Specifically, in the November 17, 2010 Registration Statement, the Company, Akerson, Liddell and Cyprus falsely and misleadingly claimed that:

> Corporate Accounting and other key departments augmented their resources by utilizing external resources and performing additional closing and bankruptcy related procedures in the year ended 2009 and additional closing procedures in the first nine months of 2010. *As a result, we believe that there are no material inaccuracies or omissions of material fact and, to the best of our knowledge, believe that our consolidated financial statements at and for the period July 10, 2009 through December 31, 2009 and for the nine months ended September 30, 2010 and Old GM's consolidated financial statements at and for the period January 1, 2009 through July 9, 2009, fairly present in all material respects the financial condition and results of operations in conformity with U.S. GAAP.*

661.   GM's reported liabilities, including the amounts of GM's reported liabilities for "Warranties issued and assumed in period," as well as the claims that GM's financial statements were prepared in conformity with U.S. GAAP, were

materially false and misleading, because GM's reported liabilities materially understated GM's true costs and liabilities in violation of GAAP.  The reported costs and liabilities failed to recognize the actual costs and liabilities associated with GM's warranties and recalls related to its ignition switch defects through December 31, 2010, including with respect to the following:

a.   As GM announced on April 10, 2014, the Company "expect[ed] to take a charge of approximately *$1.3 billion* in the first quarter, primarily for the cost of recall-related repairs announced in the 2014 calendar year to date and related courtesy transportation," of which *at least $680 million* was allocated to ignition switch recalls at issue which should have been recognized from the start of the Class Period in this action;

b.   As GM announced on July 24, 2014, it had taken an additional *$325 million* charge to its Product, Warranty, and Recall Reserve for 12.1 million vehicles subject to GM's Second Recall Wave which also should have been recognized from the start of the Class Period. In this regard, GM stated that, of an approximately $2.5 billion Automotive cost of sales relating to recall campaigns and courtesy transportation that it was taking, "approximately $325 million [of it was] for 12.1 million vehicles to rework or replace ignition keys because the ignition switch may move out of the 'run' position which may impact power steering and power braking and, depending on the timing of the key movement relative to the activation of the sensing algorithm of a crash event, may result in airbags not deploying"; and

c.   During the quarter ended June 30, 2014, the Company recognized a special charge of *$400 million* related to the Feinberg Ignition Switch Recall Compensation Program. As first disclosed in GM's July 24, 2014 Form 10-Q, the $400 million charge and accrued liability represented GM's "best estimate of amounts that may be paid under the Program" and that it was "reasonably possible" that the liability could exceed GM's recorded amount "by approximately $200 million" and reach a total of *$600 million*.  GM included these financial statement disclosures under "Commitments and Contingencies."   Had GM acted appropriately to compensate victims who suffered injury as a result of

361

the defective ignition switch, a similar compensation program should have existed by the start of the Class Period.  Using acknowledged estimates of loss under the Feinberg Ignition Switch Recall Compensation Program, these same accrued liabilities and related losses should been recognized by the start of the Class Period.  GM failed to do so.

662.   GM was, at all times relevant hereto, responsible for such losses, costs and expenses, which were probable and estimable at the time of GM's statements above because at the time:  (i) GM had millions of vehicles on the road that were unsafe and subject to repair, repurchase and/or recall; (ii) GM knew or recklessly disregarded that these cars needed to be repaired, repurchased or recalled based on information available to GM at the time; (iii) repairing, repurchasing or recalling these vehicles would significantly increase the liabilities and level of reserves that GM needed to accrue for product warranties and recall campaigns; and (iv) given GM's extensive delays in taking required action, civil and criminal liability and penalties associated with these cars would significantly increase the liabilities and level of reserves that GM needed to accrue even by the start of the Class Period.  However, Defendants failed to properly account for these costs and liabilities in GM's financial statements and related public filings in violation of GAAP.

663.   In its Form 10-K for the year ended December 31, 2010, filed with the SEC on March 1, 2011, and signed by Defendants Akerson, Cyprus, and Liddell, the Company, Akerson, Cyprus and Liddell again described the process GM purportedly followed to determine GM's costs of repairs and recalls pursuant to GM's vehicle

warranties and recall campaigns.[1012]  GM, Akerson, Cyprus, and Liddell falsely and misleadingly claimed that GM recognized these costs and related liabilities "when they are deemed to be probable and can be reasonably estimated" based on historical information about the "nature, frequency, and average costs of claims."  GM, Akerson, Cyprus, and Liddell further falsely and misleadingly claimed that such costs and related liabilities are "evaluated on an ongoing basis."  Specifically, GM's 2010 Form 10-K falsely and misleadingly claimed:

> The estimated costs related to policy and product warranties are accrued at the time products are sold, and the estimated costs related to product recalls based on a formal campaign soliciting return of that product are accrued *when they are deemed to be probable and can be reasonably estimated*.  These estimates are established using historical information on the nature, frequency, and average cost of claims of each vehicle line or each model year of the vehicle line.  However, where little or no claims experience exists for a model year or a vehicle line, the estimate is based on long-term historical averages. Revisions are made when necessary, based on changes in these factors. *These estimates are re-evaluated on an ongoing basis*. We actively study trends of claims and take action to improve vehicle quality and minimize claims.

664.   In the 2010 Form 10-K, GM, Akerson, Cyprus, and Liddell also falsely and misleadingly claimed that:  "The estimated costs related to product recalls based on a formal campaign soliciting return of that product are accrued *when they are deemed to be probable and can be reasonably estimated*."

---

[1012]   GM's 2010 Form 10-K was also signed by GM Directors at the time David Bonderman, Erroll B. Davis, Jr., Stephen J. Girsky, E. Neville Isdell, Robert D. Krebs, Philip A. Laskawy, Kathryn V. Marinello, Patricia F. Russo, Carol M. Stephenson and Dr. Cynthia A. Telles.

665.  In the 2010 Form 10-K, under the heading "Use of Estimates and Assumptions," GM, Akerson, Cyprus, and Liddell also falsely and misleadingly claimed that:

> The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and that affect income and expenses during the reporting period and related disclosures.  In developing the estimates and assumptions, ***management uses all available evidence***.

666.  The foregoing statements concerning the process that GM purportedly followed to determine its costs and liabilities for vehicle warranties and recall campaigns, and otherwise prepare its financial statements purportedly in conformity with GAAP, identified in ¶¶663-65 above were materially false and misleading for the reasons identified in ¶655 above.

667.  In the 2010 Form 10-K, GM, Akerson, Cyprus, and Liddell also falsely and misleadingly materially understated GM's costs and liabilities, including the amounts of GM liabilities for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities," and "warranties issued and assumed in period."  Specifically, GM, Akerson, Cyprus, and Liddell falsely and misleadingly reported in the 2010 Form 10-K that the Company's liabilities for policy, product warranty, recall campaigns and certified used vehicle warranty liabilities totaled $6.789 billion as of December 31, 2010, including $3.204 billion for "Warranties issued and assumed in period," as set forth in the table below from the 2010 Form

10-K:

|  | Year Ended December 31, 2010 |
|---|---|
| Beginning balance | $7,030 |
| Warranties issued and assumed in period | 3,204 |
| Payments | (3,662) |
| Adjustments to pre-existing warranties | 210 |
| *   *   * | |
| Ending balance | 6,789 |

668.   In the 2010 Form 10-K, GM, Akerson, Cyprus, and Liddell broke out the Company's purported $6.789 billion in liabilities for policy, product warranty and recall campaigns into $2.587 billion that GM expected to be paid by December 31, 2011, and $4.202 billion that GM expected to be paid sometime after December 31, 2011:

|  | Year Ended December 31, 2010 |
|---|---|
| **Current** [Expected to be paid by 12/31/11] | |
| Policy, product warranty and recall campaigns | $2,587 |
| *   *   * | |
| **Non-current** [Expected to be paid after 12/31/11] | |
| Policy, product warranty and recall campaigns | 4,202 |

669.   In the 2010 Form 10-K, GM, Akerson, Liddell and Cyprus also

repeatedly falsely and misleadingly claimed that GM's financial statements were prepared in conformity with GAAP. Under the headings "Use of Estimates in the Preparation of the Financial Statements" and "Critical Accounting Estimates," GM, Akerson, Liddell and Cyprus falsely and misleadingly claimed that, "***The consolidated financial statements are prepared in conformity with U.S. GAAP.***"

670. In the 2010 Form 10-K, under the heading "Consolidation and Basis of Presentation," GM, Akerson, Liddell and Cyprus also falsely and misleadingly claimed that "***Our accounting and reporting policies conform to accounting principles generally accepted in the United States of America (GAAP).***"

671. GM's reported costs and liabilities as of December 31, 2010, including the foregoing amounts of GM's purported costs and liabilities for the Company's product warranty and recall campaigns identified in ¶¶667-68 above, were materially understated in violation of GAAP and false and misleading for the reasons identified in ¶¶661-62 above. In addition, the claims by GM, Akerson, Liddell and Cyprus that GM's financial statements were prepared in accordance with GAAP were also materially false and misleading for the reasons identified in ¶¶661-62 above.

## 2. Effectiveness Of Internal Controls

672. Throughout the Class Period, GM falsely and misleadingly represented itself as a Company with effective internal controls for financial reporting, such that it properly and timely identified, resolved, and accounted for financial risks to the

Company, with its officers personally certifying to the efficacy of GM's internal

controls in each and every quarter of the Class Period. In reality, GM's internal

controls were ineffective because the Company failed to account for and timely

report material costs and liabilities, namely the costs and liabilities from product

warranty and recall campaigns of over 14.6 million defective GM vehicles, as well

as claims pertaining to serious injury or death resulting from these defective

vehicles, which already had materialized.

673. On February 24, 2011, on a conference call with investors to discuss

GM's earnings in the fourth quarter of 2010, Defendant Liddell falsely and

misleadingly claimed that GM's extended prior history of material weaknesses in its

internal controls was over and that the Company's internal controls were effective.

In Defendant Liddell's words:

> This morning, I am very pleased to tell you that after [assessing] the
> effectiveness of the remediation actions put in place to address the
> Company's material weakness regarding the financial reporting
> process, the management team, the audit committee, and the Board of
> Directors have both concluded that ***the material weakness no longer
> exists as at December 31, 2010. Disclosure controls and procedures
> are, therefore, as well as internal control over financial reporting, are
> effective at December 31, 2010.*** This marks an important milestone for
> the Company as it has been an issue for several years and reflects a lot
> of hard work by everyone involved.

674. In GM's Form 10-K for the year ended December 31, 2010, filed with

the SEC on March 1, 2011 and signed by Defendants Akerson, Liddell and Cyprus,

GM, Akerson, Liddell and Cyprus also falsely and misleadingly claimed that GM's

prior material weaknesses in its internal controls had been corrected – even though as of the date of the Company's IPO, numerous material weaknesses continued to exist. Specifically, GM, Akerson, Liddell and Cyprus made the following materially false and misleading claims:

> In our 2009 Annual Report on Form 10-K, we identified a material weakness because we did not maintain effective controls over the period-end financial reporting process. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

> In 2009, significant activities were performed in remediating the material weakness. However, we were not able to sufficiently test the operating effectiveness of certain remediated internal controls given the limited time that controls were in operation. During 2010, management led various initiatives to further enhance our controls over period-end financial reporting, including training and enhanced procedures related to the preparation of the statement of cash flows, to help ensure controls over the period-end financial reporting process would operate as they had been designed and deployed during the 2009 material weakness remediation efforts. Based upon the actions taken and our testing and evaluation of the effectiveness of our internal controls, *we have concluded the material weakness related to controls over the period-end financial reporting process no longer existed as of December 31, 2010.*

675. In the 2010 Form 10-K, GM, Akerson, Liddell and Cyprus also made the materially false and misleading claims that:

> We maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended (Exchange Act) is recorded, processed, summarized and reported within the specified time periods and accumulated and communicated

to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chairman and CEO and our Vice Chairman and CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) promulgated under the Exchange Act) at December 31, 2010. ***Based on these evaluations, our CEO and CFO concluded that our disclosure controls and procedures required by paragraph (b) of Rules 13a-15 or 15d-15 were effective as of December 31, 2010.***

676.   In the 2010 Form 10-K, GM, Akerson, Liddell and Cyprus also made

the materially false and misleading claims that:

Our management is responsible for establishing and maintaining effective internal control over financial reporting.  This system is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with U.S. GAAP.

Our internal control over financial reporting includes those policies and procedures that:  (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect our transactions and dispositions of our assets; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with U.S. GAAP, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on the consolidated financial statements.

Our management performed an assessment of the effectiveness of our internal control over financial reporting at December 31, 2010, utilizing the criteria discussed in the "Internal Control—Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission. The objective of this assessment was to determine whether our internal control over financial reporting was effective at

December 31, 2010.

***Based on management's assessment, we have concluded that our internal control over financial reporting was effective at December 31, 2010.***

677.   In addition, in the Company's 2010 Form 10-K, filed with the SEC on March 1, 2011, Defendants Akerson and Liddell each personally certified in GM's Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") that they had evaluated the effectiveness of GM's internal controls and disclosed any deficiencies or material weaknesses in them, falsely and misleadingly claiming that:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or

370

caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

678.    The text of the Certification in the preceding paragraph is hereinafter

referred to as the "SOX §302 Certification."

679.    Moreover, in the Company's 2010 Form 10-K, filed on March 1, 2011,

Defendants Akerson and Liddell each personally certified that GM's financial reporting in the "Report" (i.e., GM's 2010 Form 10-K) was in compliance with the requirements of the federal securities laws, pursuant to Section 906 of SOX, and falsely and misleadingly claimed that:

1. The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

680.   The text of the Certification in the preceding paragraph is hereinafter referred to as the "SOX §906 Certification."

681.   The above-referenced statements about GM's internal controls in ¶¶673-79 were materially false and omitted to state material facts necessary in order to make them not misleading when made because, as set forth above in Sections IV.D.2-4. and V-VII, throughout the entire Class Period, GM lacked effective internal controls and accounting practices to properly account for the massive warranty, recall, litigation, and personal injury liabilities GM and the Individual Defendants knew of, or recklessly disregarded, and should have resolved prior to GM's long-belated recalls in 2014 of millions of its vehicles, which placed the Company at further risk by no later than the start of the Class Period for additional civil and criminal litigation and penalties.

682.   In addition, the Company's processes for identifying and estimating

GAAP liabilities were materially deficient because, among other things, GM failed to employ adequate procedures necessary to consider and properly disclose relevant known or knowable information during its estimation process for determining losses associated with vehicle warranties and recalls. GM also failed to employ adequate procedures necessary to consider and properly disclose relevant known or knowable information within its estimation process for determining liabilities associated with loss contingencies, including litigation claims and those pertaining to injury or death claims resulting from defective vehicles. These deficiencies in internal controls created more than a remote possibility that a material misstatement of GM's annual or interim financial statements would not be prevented or detected on a timely basis. By definition, these deficiencies constituted a material weakness in internal controls, warranting disclosure under SOX.

### 3.    Commitment To Safety

683.    Throughout the Class Period, GM also repeatedly described itself as a Company that was committed to safety. However, at the time of Defendants' misrepresentations about safety, identified below, millions of GM cars already included severe defects with their ignition switches that rendered them prone to shut down while in operation, also resulting in the vehicles losing power steering, losing power brakes, and causing seat belts and airbags to stop functioning. Accordingly, drivers and passengers in these cars, as well as passengers in other vehicles on the

road, were placed at serious risk of injury and death because the vehicles could not be properly controlled.  Defendants' repeated claims of prioritizing safety were thus materially false and misleading when made due to the Company's failure to disclose and address these and other material adverse facts.

684.   GM's November 17, 2010 Registration Statement falsely represented that the quality, safety and reliability of the Company's cars were top priorities for GM.   Specifically, Defendants GM, Akerson, Liddell and Cyprus stated in the Registration Statement that GM is "**committed to** leadership in vehicle design, quality, reliability… and **safety**."  Indeed, these Defendants stated that GM "seek[s] to distinguish" its vehicles through "superior design, quality, reliability… **and safety** within their respective vehicle segments."

685.   In GM's Form 10-K for the year ended December 31, 2010, filed with the SEC on March 1, 2011, GM, Akerson, Liddell and Cyprus falsely and misleading claimed that "**We are committed to** leadership in vehicle design, quality, reliability, telematics and infotainment and **safety**."

686.   In GM's 2010 Annual Report, dated March 1, 2011 and signed by Defendant Akerson, the Company and Akerson falsely and misleadingly claimed to investors that, following GM's November 2010 IPO, GM was a new and improved company committed to innovation, safety, and maintaining a strong brand.  Indeed, on the cover, the Annual Report claimed that "This is the New GM."

687.   In the 2010 Annual Report, GM and Akerson falsely and misleadingly claimed that GM's products "*improve safety* and enhance the overall driving experience for our customers."

688.   In addition, in the 2010 Annual Report, GM and Akerson falsely and misleadingly claimed that it will "*never forget what's most important: our customers*."

689.   The above-referenced statements in ¶¶684-88 about the purported safety of GM's vehicles and the Company's purported focus on the safety of its customers were materially false and omitted material facts necessary to make the statements therein not misleading when made because, among other things, as set forth above in Sections IV.C.3 and V-VII:  (i) millions of GM cars already were suffering from severe defects with their ignition switches that rendered them prone to shut down while in operation, also resulting in cars losing power steering, losing power brakes, and causing seat belts and airbags to stop functioning, and accordingly, drivers and passengers were placed in serious risk of injury and death because the cars could not be properly controlled; and (ii) GM's and Akerson's statements about creating a culture that prioritized GM's customers and safety were directly contrary to the culture that actually existed at GM, where cost-cutting and profits were consistently prioritized over customer safety.  In addition, GM's and Akerson's statements about creating a "New GM," a new entity purportedly

distinguished from "Old GM," were false as "New GM" was plagued by the same reckless disregard for the safety of its vehicles as "Old GM," where no single individual took personal ownership of the steps to fix what was a severe and life-threatening problem – the moving shutdowns of GM vehicles due to the ignition switch defect.

**B.    The First Quarter Of 2011**

**1.    Adequacy Of Reserves For Product Warranties And Recalls**

690.    In the Company's Form 10-Q for first quarter of 2011, filed with the SEC on May 6, 2011, and signed by Defendant Cyprus, GM and Cyprus falsely and misleadingly materially understated GM's costs and liabilities, including the Company's costs and liabilities for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities," and the costs of "Warranties issued and assumed in period."  Specifically, GM and Cyprus reported in GM's Form 10-Q for the first quarter of 2011 that the Company's liabilities for policy, product warranty, recall campaigns and certified used vehicle warranty liabilities totaled $6.768 billion, including $725 million for "Warranties issued and assumed in period," as set forth in the table below from the first quarter 2011 Form 10-Q under "Note 14. Product Warranty Liability":

|  | Three Months Ended March 31, 2011 | Three Months Ended March 31, 2010 |
|---|---|---|
| Balance at beginning of period | $6,789 | $7,030 |
| Warranties issued and assumed in period | 725 | 614 |
| Payments | (941) | (821) |
| Adjustments to pre-existing warranties | 117 | (19) |
| *   *   * | *   *   * | *   *   * |
| Balance at end of period | $6,768 | $6,770 |

691.   In GM's Form 10-Q for first quarter of 2011, under the heading "Use of Estimates in the Preparation of the Financial Statements," GM and Cyprus also made the materially false and misleading claim that "***The condensed consolidated financial statements are prepared in conformity with U.S. GAAP***."

692.   GM's reported costs and liabilities as of March 31, 2011, including the foregoing amounts of GM's purported costs and liabilities for the Company's product warranty and recall campaigns identified in ¶690 above, were materially understated in violation of GAAP, and false and misleading for the reasons identified in ¶¶661-62 above.  In addition, the claims by GM and Cyprus that GM's financial statements were prepared in accordance with GAAP were materially false and misleading for the reasons identified in ¶¶661-62 above.

## 2.    Effectiveness Of Internal Controls

693.    In the Company's Form 10-Q for the first quarter of 2011, filed with the SEC on May 6, 2011, Defendants Akerson and Ammann each personally certified in GM's SOX §302 Certification that they had evaluated the effectiveness of GM's internal controls and disclosed any deficiencies or material weaknesses in them, and specifically made the following materially false and misleading claims:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

>> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

>> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with

378

generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

694.   In the first quarter 2011 Form 10-Q, filed on May 6, 2011, Defendants Akerson and Ammann also each personally certified in GM's SOX §906 Certifications that GM's financial reporting in GM's first quarter 2011 Form 10-Q "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the Report [the first

quarter 2011 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

695.   The above-referenced statements about GM's internal controls in ¶¶693-94 were materially false and omitted to state material facts necessary in order to make them not misleading when made for the reasons set forth in ¶¶681-82 above.

### 3.    Commitment To Safety

696.   In a GM Form 8-K filed with the SEC on February 3, 2011 and signed by Defendant Cyprus, GM and Cyprus falsely and misleadingly claimed that, "Chevrolet provides consumers with fuel-efficient, *safe and reliable* vehicles that deliver high quality, expressive design, spirited performance and value."  Similarly, in a Form 8-K filed with the SEC on March 3, 2011 and signed by Defendant Cyprus, the Company and Cyprus repeated this identical statement concerning the purported safety of GM's Chevrolet vehicles.

697.   The above-referenced statements about the purported safety of GM's vehicles were materially false and omitted material facts necessary to make the statements therein not misleading when made because, among other things, as set forth above in Sections IV.C.3 and V-VII, millions of GM cars (including millions of Chevrolet cars) already were suffering from severe defects with their ignition switches that rendered them prone to shut down while in operation, also resulting in the vehicles losing power steering, losing power brakes, and causing seat belts and

airbags to stop functioning, and accordingly, drivers and passengers were placed in serious risk of injury and death because the cars could not be properly controlled.

### C.   The Second Quarter Of 2011

#### 1.   Adequacy Of Reserves For Product Warranties And Recalls

698.   In the Company's Form 10-Q for the second quarter of 2011, filed with the SEC on August 5, 2011, and signed by Defendant Cyprus, GM and Cyprus falsely and misleadingly materially understated GM's costs and liabilities, including the costs and liabilities for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities," and the costs of "Warranties issued and assumed in period."   Specifically, GM and Cyprus reported in GM's Form 10-Q for the second quarter of 2011 that the Company's liabilities for policy, product warranty, recall campaigns and certified used vehicle warranty liabilities totaled $6.926 billion as of June 30, 2011, including $1.552 billion for "Warranties issued and assumed in period," as set forth in the table below from the second quarter 2011 Form 10-Q under "Note 14. Product Warranty Liability":

|  | Six Months Ended June 30, | |
| --- | --- | --- |
|  | **2011** | **2010** |
| Balance at beginning of period | $6,789 | $7,030 |
| Warranties issued and assumed in period | 1,552 | 1,534 |
| Payments | (1,902) | (1,711) |

| Adjustments to pre-existing warranties | 366 | 67 |
|---|---|---|
| *  *  * | *  *  * | *  *  * |
| Balance at end of period | $6,926 | $6,760 |

699.   In the Company's Form 10-Q for the second quarter of 2011, under the headings "Use of Estimates in the Preparation of the Financial Statements" and "Critical Accounting Estimates," GM and Cyprus made the following materially false and misleading claim that "***The condensed consolidated financial statements are prepared in conformity with U.S. GAAP***."

700.   GM's reported costs and liabilities as of June 30, 2011, including the foregoing amounts of GM's purported costs and liabilities for the Company's product warranty and recall campaigns identified in ¶698 above were materially understated in violation of GAAP and false and misleading for the reasons identified in ¶¶661-62.   In addition, the claims by GM and Cyprus that GM's financial statements were prepared in accordance with GAAP were also materially false and misleading for the reasons identified in ¶¶661-62 above.

## 2.   Effectiveness Of Internal Controls

701.   In the Company's Form 10-Q for the second quarter of 2011, filed with the SEC on August 5, 2011, Defendants Akerson and Ammann each personally certified in GM's SOX §302 Certification that they had evaluated the effectiveness of GM's internal controls and disclosed any deficiencies or material weaknesses in

them, and specifically made the following materially false and misleading claims:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the

registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

702. In the second quarter 2011 Form 10-Q, filed on August 5, 2011, Akerson and Ammann also each personally certified in GM's SOX §906 Certifications that GM's financial reporting in GM's third quarter 2011 Form 10-Q "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the Report [the second quarter 2011 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

703. The above-referenced statements about GM's internal controls in ¶¶701-02 were materially false and omitted to state material facts necessary in order to make them not misleading when made for the reasons set forth in ¶¶681-82 above.

### 3.   Commitment To Safety

704.   In a GM Form 8-K filed with the SEC on April 6, 2011 and signed by Defendant Cyprus, the Company and Cyprus falsely and misleadingly claimed that: "Chevrolet provides consumers with fuel-efficient, *safe and reliable* vehicles that deliver high quality, expressive design, spirited performance and value."   The Company and Cyprus repeated this claim in GM Form 8-Ks filed with the SEC on May 6, 2011 and June 6, 2011.

705.   The above-referenced statements about the purported safety of GM's vehicles were materially false and omitted material facts necessary to make the statements therein not misleading when made because, among other things, as set forth above in Sections IV.C.3 and V-VII,  millions of GM cars (including millions of Chevrolet cars) already were suffering from severe defects with their ignition switches that rendered the vehicles prone to shut down while in operation, also resulting in the cars losing power steering, losing power brakes, and causing seat belts and airbags to stop functioning, and accordingly, drivers and passengers were placed in serious risk of injury and death because the cars could not be properly controlled.

### D.   The Third Quarter Of 2011

#### 1.   Adequacy Of Reserves For Product Warranties And Recalls

706.   In the Company's Form 10-Q for the third quarter of 2011, filed with

the SEC on November 9, 2011, and signed by Defendant Cyprus, GM and Cyprus falsely and misleadingly materially understated GM's costs and liabilities, including the costs and liabilities for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities," and the costs of "Warranties issued and assumed in period." Specifically, GM and Cyprus reported in GM's Form 10-Q for the third quarter of 2011 that the Company's liabilities for policy, product warranty, recall campaigns and certified used vehicle warranty liabilities totaled $6.633 billion as of September 30, 2011, as set forth in the table below from the third quarter 2011 Form 10-Q under "Note 14. Product Warranty Liability":

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | **2011** | **2010** |
| Balance at beginning of period | $6,789 | $7,030 |
| Warranties issued and assumed in period | 2,290 | 2,312 |
| Payments | (2,862) | (2,680) |
| Adjustments to pre-existing warranties | 468 | 100 |
| *   *   * | *   *   * | *   *   * |
| Balance at end of period | $6,633 | $6,756 |

707. In the Company's Form 10-Q for the third quarter of 2011, under the headings "Use of Estimates in the Preparation of the Financial Statements" and "Critical Accounting Estimates," GM and Cyprus made the materially false and

386

misleading claim that "*The condensed consolidated financial statements are prepared in conformity with U.S. GAAP*."

708.   GM's reported costs and liabilities as of September 30, 2011, including the foregoing amounts of GM's purported costs and liabilities for the Company's product warranty and recall campaigns identified in ¶706 above, were materially understated in violation of GAAP and false and misleading for the reasons identified in ¶¶681-82.   In addition, the claims by GM and Cyprus that GM's financial statements were prepared in accordance with GAAP were also materially false and misleading for the reasons identified in ¶¶681-82 above.

### 2.   Effectiveness Of Internal Controls

709.   In the Company's Form 10-Q for the third quarter of 2011, filed with the SEC on November 9, 2011, Defendants Akerson and Ammann each personally certified in GM's SOX §302 Certification that they had evaluated the effectiveness of GM's internal controls and disclosed any deficiencies or material weaknesses in them, and specifically made the following materially false and misleading claims:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting

which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

710.   In the third quarter 2011 Form 10-Q, filed on November 9, 2011, Akerson and Ammann also each personally certified in GM's SOX §906 Certifications that GM's financial reporting in GM's third quarter 2011 Form 10-Q "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the Report [the third quarter 2011 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

711.   The above-referenced statements about GM's internal controls in ¶¶709-10 were materially false and omitted to state material facts necessary in order to make them not misleading when made for the reasons set forth in ¶¶681-82 above.

### 3.   Commitment To Safety

712.   In the GM Form 8-K filed with the SEC on July 7, 2011, and signed by Defendant Cyprus, the Company and Cyprus falsely and misleadingly claimed that: "Chevrolet provides consumers with fuel-efficient, *safe and reliable* vehicles that deliver high quality, expressive design, spirited performance and value."  GM and Cyprus repeated this materially false and misleading claim in GM's Form 8-K filed with the SEC on August 4, 2011.

389

713.   On August 9, 2011, at General Motors' Second Annual Global Business Conference, Defendant Akerson, then GM Chairman and CEO, spoke about how the Company was "known for safety," and falsely and misleadingly claimed that:

> Let me talk first about product. We want compelling designs. We want flawless quality, reliability and durability.  And I think we've made good progress in this area. And almost everything I talk about I still think we have a lot of opportunity and with opportunity comes the inevitable challenges of execution.  But we're off to a pretty good start here.  J.D. Powers, for example, our numbers are above average, well above average.  We lead in fuel economy in many of our segments. *We are known for safety.*

714.   On August 29, 2011, GM's website made the materially false and misleading claim that, "Chevrolet provides consumers with fuel-efficient, *safe and reliable* vehicles that deliver high quality, expressive design, spirited performance and value."[1013]

715.   The above-referenced statements about the purported safety of GM's vehicles were materially false and omitted material facts necessary to make the statements therein not misleading when made because, among other things, as set forth above in Sections IV.C.3 and V-VII, millions of GM cars (including millions of Chevrolet cars) already were suffering from severe defects with their ignition switches that rendered the vehicles prone to shut down while in operation, also

---

[1013] Press Release, Gen. Motors Co.,
*Chevrolet Sonic Safety: Ultra-Strength Steel and 10 Air Bags* (Aug. 29, 2011), https://media.gm.com/media/us/en/gm/news.detail/content/Pages/news/us/en/2014/Jul/0731-mpg.

resulting in the cars losing power steering, losing power brakes, and causing seat belts and airbags to stop functioning, and accordingly, drivers and passengers were placed in serious risk of injury and death because the cars could not be properly controlled.

**E.      The Fourth Quarter Of 2011 And Full
          Year 2011**

**1.      Adequacy Of Reserves For Product Warranties And
          Recalls**

716.   On January 10, 2012, at an automotive industry conference hosted by Deutsche Bank, Defendant Akerson, then GM's Chairman and CEO, made the following materially false and misleading claims that GM had a favorable amount of warranty costs, and a low number of vehicle recalls, in comparison to the Company's competitors:

> Just to give you an idea, we know as a broad gauge roughly what our competitors do in terms of warranty. ***We are right on top or better than most,*** but we saw an interesting pronouncement of the NHTSA just the other day.   There were roughly 15.5 million cars recalled last year. That's a lot of cars.  That is down from 20 million the year before. ***We represented about 3% of those***.
>
> Two of our worthy competitors -- I won't name them -- had 3.9 million and 3.5 million.  That's over half of the 15.5 million came from two, and the third-place guys were at 3 million. ***We were way down in the league tables where we want to be, at about 3%.  But think about that -- the top three had 9 million plus of the 15.  This is good for General Motors because it reaffirms the attention to detail, the quality that we're trying to infuse from conception through delivery to the customer and post sales is starting to get traction.***

391

717.   This statement was materially false and misleading because it materially understated GM's true warranty costs in violation of GAAP, and its true numbers of required vehicle recalls, including in comparison to the Company's competitors, and falsely portrayed those materially false and misleading warranty and recall numbers as "reaffirming" consumers' positive views of GM's "attention to detail" and the "quality" of GM vehicles "through delivery to the customer and post sales."   GM in fact did not have the "attention to detail" and "quality" of its vehicles that the above statements falsely claimed it had.  If GM had recalled in 2011 the millions of GM vehicles for defective ignition switches that only later comprised the First and Second Recall Waves (and had been sold as of 2011), as GM could and should have done (if not earlier), the Company would have almost doubled the number of all vehicle recalls in 2011 and been responsible for approximately half of the recalls that year, rather than only the 3% of all recalls in 2011 that it falsely represented.

718.   In its Form 10-K for the year ended December 31, 2011, filed with the SEC on February 27, 2012, and signed by Defendants Akerson, Cyprus, and Ammann,[1014] GM, Akerson, Cyprus and Ammann falsely and misleading claimed

---

[1014] GM's 2011 Form 10-K was also signed by GM Directors at the time David Bonderman, Erroll B. Davis, Jr., Stephen J. Girsky, E. Neville Isdell, Robert D. Krebs, Philip A. Laskawy, Kathryn V. Marinello, Patricia F. Russo, Thomas M. Schoewe, Carol M. Stephenson and Dr. Cynthia A. Telles.

with respect to the process GM purportedly followed to determine its reserves for product warranty and recall campaigns that:

> The estimated costs related to policy and product warranties are accrued at the time products are sold, and the estimated costs related to product recalls based on a formal campaign soliciting return of that product are accrued **when they are deemed to be probable and can be reasonably estimated**.  These estimates are established using historical information on the nature, frequency, and average cost of claims of each vehicle line or each model year of the vehicle line and assumptions about future activity and events.  However, where little or no claims experience exists for a model year or a vehicle line, the estimate is based on long-term historical averages.  Revisions are made when necessary, based on changes in these factors.  **These estimates are re-evaluated on an ongoing basis**.  We actively study trends of claims and take action to improve vehicle quality and minimize claims.

719.   In the 2011 Form 10-K, and with respect to the process the Company purportedly followed to determine the costs of repairs pursuant to its recall campaigns in particular, the Company, Akerson, Cyprus and Ammann also falsely and misleadingly claimed that: "The estimated costs related to product recalls based on a formal campaign soliciting return of that product are accrued **when they are deemed to be probable and can be reasonably estimated**."

720.   The foregoing statements concerning the process that GM purportedly followed to determine its costs and liabilities for vehicle warranties and recall campaigns, and otherwise prepare its financial statements purportedly in conformity with GAAP, identified in ¶¶718-19 above were materially false and misleading for the reasons identified in ¶655 above.

721.   In the 2011 Form 10-K, GM, Akerson, Cyprus and Ammann also falsely and misleading materially understated GM's costs and liabilities, including the amounts of GM liabilities for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities" and "Warranties issued and assumed in period."  Specifically, in the 2011 Form 10-K, GM, Akerson, Cyprus and Ammann falsely and misleadingly reported that the costs of the Company's "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities" totaled $6.600 billion as of December 31, 2011, including $3.062 billion for "Warranties issued and assumed in period," as set forth in the table below from the 2011 Form 10-K:

|                                            | Year Ended December 31, 2011 | Year Ended December 31, 2010 |
| ------------------------------------------ | :--------------------------: | :--------------------------: |
| Beginning balance                          | $6,789                       | $7,030                       |
| Warranties issued and assumed in period    | 3,062                        | 3,204                        |
| Payments                                   | (3,740)                      | (3,662)                      |
| Adjustments to pre-existing warranties     | 565                          | 210                          |
| *    *    *                                | *    *    *                  | *    *    *                  |
| Ending balance                             | $6,600                       | $6,789                       |

722.   In the 2011 Form 10-K, GM, Akerson, Cyprus and Ammann also broke out the Company's purported $6.600 billion in liabilities for policy, product

warranty and recall campaigns into $3.061 billion that GM expected to be paid by December 31, 2012, and $3.539 billion that GM expected to be paid sometime after December 31, 2012:

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
| **Current** [Expected to be paid by 12/31/12] | | |
| Policy, product warranty and recall campaigns | 3,061 | 2,587 |
| *     *     * | | |
| **Non-current** [Expected to be paid after 12/31/12] | | |
| Policy, product warranty and recall campaigns | 3,539 | 4,202 |

723.    In the 2011 Form 10-K, under the headings "Use of Estimates in the Preparation of the Financial Statements," "Critical Accounting Estimates," and "Use of Estimates in the Preparation of the Financial Statements," GM, Akerson, Cyprus and Ammann repeatedly falsely and misleadingly claimed that "*The consolidated financial statements are prepared in conformity with U.S. GAAP*."

724.    GM's reported costs and liabilities as of December 31, 2011, including the foregoing amounts of GM's purported costs and liabilities for the Company's product warranty and recall campaigns identified in ¶¶721-22 above, were materially understated in violation of GAAP and false and misleading for the reasons identified in ¶¶661-62.  In addition, the claims by GM, Akerson, Cyprus and Ammann that GM's financial statements were prepared in accordance with GAAP were also materially false and misleading for the reasons identified in ¶¶661-62 above.

## 2.   Effectiveness Of Internal Controls

725.   In the Company's Form 10-K for year ended December 31, 2011, filed with the SEC on February 27, 2012, signed by Defendants Akerson, Cyprus and Ammann, the Company, Akerson, Cyprus and Ammann falsely and misleadingly claimed with respect to the effectiveness of GM's internal controls for financial reporting:

> Our management is responsible for establishing and maintaining effective internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act.   This system is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with U.S. GAAP. . . .

> Our management performed an assessment of the effectiveness of our internal control over financial reporting at December 31, 2011, utilizing the criteria discussed in the "Internal Control - Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission.   The objective of this assessment was to determine whether our internal control over financial reporting was effective at December 31, 2011.   ***Based on management's assessment, we have concluded that our internal control over financial reporting was effective at December 31, 2011.***

726.   GM, Akerson, Cyprus and Ammann further falsely and misleadingly claimed in the 2011 Form 10-K that:   "There have not been any changes in our internal control over financial reporting during the three months ended December 31, 2011 that have materially affected, or are reasonably likely to materially affect, our internal control over financial report."

727.   In the Company's 2011 Form 10-K, filed with the SEC on February 27,

2012, Defendants Akerson and Ammann each personally certified in GM's SOX §302 Certification that they had evaluated the effectiveness of GM's internal controls and disclosed any deficiencies or material weaknesses in them, and specifically made the following materially false and misleading claims:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

>> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

>> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

>> c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our

conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

728.   In the 2011 Form 10-K, filed with the SEC on February 27, 2012, Akerson and Ammann each personally certified in GM's SOX §906 Certifications that GM's financial reporting in GM's 2011 Form 10-K "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the Report [the 2011 Form 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

729.   In the Company's 2011 Annual Report, dated February 27, 2012 and signed by Defendant Akerson, the Company and Akerson continued to falsely and misleadingly claim that GM had changed its corporate culture, stating that:

> Each day the cultural change underway at GM becomes more striking. The old internally focused, consensus-driven and overly complicated GM is being reinvented brick by brick, by truly accountable executives who know how to take calculated risks and lead global teams that are committed to building the best vehicles in the world as efficiently as was can.

730.   The above-referenced statements about GM's internal controls in ¶¶725-29 were materially false and omitted to state material facts necessary in order to make them not misleading when made for the reasons set forth in ¶¶681-82 above. In addition, the statements in GM's 2011 Annual Report quoted above were materially false and misleading because, post-bankruptcy, GM remained "internally focused, consensus-driven and overly complicated," and its executives were not being held "truly accountable" for GM's failures to fix the problems associated with the defective ignition switches.

### 3.   Commitment To Safety

731.   During a November 28, 2011 GM conference call, in response to NHTSA's investigation of Chevy Volt battery packs, Mark Reuss, then Vice President of GM North America falsely and misleadingly claimed that GM's "primary focus is and always will be on the confidence and the concerns of our paying customers… ***Our customers' peace of mind is the most important thing***."

732.   On December 27, 2011, Defendant Gay Kent, then GM's Executive Director of Vehicle Safety and Crashworthiness, was quoted in an interview on GM's website as falsely and misleadingly claiming that: "Our safety strategy is about providing continuous protection for our customers before, during and after a crash."

733.   As reported by *ENP Newswire* on December 28, 2011, Defendant Gay Kent further commented on GM's commitment to safety by falsely and misleadingly claiming that: "Our safety strategy is about providing continuous protection for our customers before, during and after a crash… ***We believe our approach to vehicle safety and occupant protection is one of the most comprehensive in the industry***."

734.   When asked in the same article about the use of front center airbags, Defendant Kent falsely and misleadingly claimed that, "GM is focused on the customer… ***How a vehicle performs in the real world is an important source of information for driving continuous improvement and innovation in vehicle safety***."

735.   In the 2011 Form 10-K filed with the SEC on February 27, 2012 and signed by Defendants Akerson, Ammann and Cyprus, the Company, Akerson, Ammann and Cyprus also falsely and misleadingly claimed that "We are committed to leadership in vehicle design, quality, reliability, telematics and infotainment and ***safety***."

736.   In the Company's 2011 Annual Report, dated February 27, 2012 and signed by Defendant Akerson, GM and Akerson again falsely and misleadingly claimed that GM was putting its customers first, stating that "Every driver of a GM car … is a driver of our growth.  We're putting our vision in motion by *putting our customers first* – executing our strategy to attract and delight more of them every day, all over the world."

737.   In the 2011 Annual Report, GM and Akerson also announced that GM was dedicated to leadership in vehicle safety, stating that "*We are committed to* leadership in vehicle design, quality, reliability, telematics and infotainment and *safety*."

738.   The above-referenced statements in ¶¶731-37 about the purported safety of GM's vehicles and the Company's focus on customer safety (including based on car performance in the real world) were materially false and omitted material facts necessary to make the statements therein not misleading when made because, among other things, as set forth above in Sections IV.C.3 and V-VII:  (i) millions of GM cars already were suffering from severe defects with their ignition switches that rendered the vehicles prone to shut down while in operation, also resulting in the cars losing power steering, losing power brakes, and causing seat belts and airbags to stop functioning, and accordingly, drivers and passengers were placed in serious risk of injury and death because the cars could not be properly

controlled; (ii) with respect to the vehicles with defective ignition switches, GM had failed to use "how a vehicle performs in the real world" as "an important source of information for driving continuous improvement and innovation in vehicle safety" because the evidence of the moving shutdowns in the vehicles with the defective ignition switches in GM's possession was not used by the Company as a source of information to timely replace the defective ignition switches; and (iii) Defendant Kent (whom GM terminated after the Valukas Report was issued) personally replicated the ignition switch defect and personally knew of the moving shutdowns and lack of sufficient action by GM as set forth in ¶¶426, 442, 473, 510, 516, 521, 526, and 532 above.

### F.   The First Quarter Of 2012

#### 1.   Adequacy Of Reserves For Product Warranties And Recalls

739.   In GM's Form 10-Q for first quarter of 2012, filed with the SEC on May 3, 2012, and signed by Defendant Cyprus, GM and Cyprus falsely and misleadingly materially understated GM's costs and liabilities, including GM's costs and liabilities for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities," and the costs of "Warranties issued and assumed in period."  Specifically, GM and Cyprus falsely and misleadingly reported in GM's Form 10-Q for the first quarter of 2012 that the Company's liabilities for policy, product warranty, recall campaigns and certified used vehicle warranty liabilities

totaled $6.841 billion as of March 31, 2012, including $864 million for "Warranties issued and assumed in period," as set forth in the table below from the first quarter 2012 Form 10-Q under "Note 14. Product Warranty Liability":

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | **2012** | **2011** |
| Balance at beginning of period | $6,600 | $6,789 |
| Warranties issued and assumed in period | 864 | 725 |
| Payments | (916) | (941) |
| Adjustments to pre-existing warranties | 233 | 117 |
| *   *   * | *   *   * | *   *   * |
| Balance at end of period | $6,841 | $6,768 |

740.   In GM's Form 10-Q for first quarter of 2012, under the headings "Use of Estimates in the Preparation of the Financial Statements" and "Critical Accounting Estimates," GM and Cyprus made the materially false and misleading claim that "***The condensed consolidated financial statements are prepared in conformity with U.S. GAAP***."

741.   GM's reported costs and liabilities as of March 31, 2012, including the foregoing amounts of GM's purported costs and liabilities for the Company's product warranty and recall campaigns identified in ¶739 above were materially understated in violation of GAAP and false and misleading for the reasons identified

in ¶¶661-62 above.  In addition, the claims by GM and Cyprus that GM's financial statements were prepared in accordance with GAAP were also materially false and misleading for the reasons identified in ¶¶661-62 above.

### 2.    Effectiveness Of Internal Controls

742.    In the Company's Form 10-Q for the first quarter of 2012, filed with the SEC on May 3, 2012, Defendants Akerson and Ammann each personally certified in GM's SOX §302 Certification that they had evaluated the effectiveness of GM's internal controls and disclosed any deficiencies or material weaknesses in them, and specifically made the following materially false and misleading claims:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

743. In the same first quarter 2012 Form 10-Q, filed with the SEC on May 3, 2012, Akerson and Ammann each personally certified in GM's SOX §906 Certifications that GM's financial reporting in the first quarter 2012 Form 10-Q

"fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the Report [the first quarter 2012 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

744.   The above-referenced statements about GM's internal controls in ¶¶742-43 were materially false and omitted to state material facts necessary in order to make them not misleading when made for the reasons set forth in ¶¶681-82 above.

### 3.   Commitment To Safety

745.   As early as January 8, 2012, with respect to the purported safety of its vehicles, GM falsely and misleadingly claimed on its website that:

> At the new General Motors, we are passionate about designing, building and selling the world's best vehicles. This vision unites us as a team each and every day and is the hallmark of our customer-driven culture.
>
> *          *          *
>
> Leading the way is our seasoned leadership team who set high standards for our company so that we can give you the best cars and trucks. This means that we are committed to delivering vehicles with compelling designs, flawless quality and reliability, ***and leading safety***, fuel economy and infotainment features. All are intended to create that special bond that can only happen between a driver and their vehicle.
>
> *          *          *
>
> At the new GM, we make a strong commitment to our customers, employees, partners and other important stakeholders. We state proudly our five principles that guide us in everything we do:
>
> ***Safety and Quality First: Safety will always be a priority at GM. We***

*continue to emphasize our safety-first culture in our facilities, and as we grow our business in new markets. Our safety philosophy is at the heart of the development of each vehicle.* In addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers. *That is why our vehicles go through extreme testing procedures in the lab, on the road and in our production facilities prior to being offered to customers.*

746.   The above-referenced statements in ¶745 about the purported safety-first priority for GM's vehicles and the Company's commitment to safety and safety testing were materially false and omitted material facts necessary to make the statements therein not misleading when made because, among other things, as set forth above in Sections IV.C.3 and V-VII, millions of GM cars already were suffering from severe defects with their ignition switches that rendered the vehicles prone to shut down while in operation, also resulting in the cars losing power steering, losing power brakes, and causing seat belts and airbags to stop functioning, and accordingly, drivers and passengers were placed in serious risk of injury and death because the cars could not be properly controlled. Moreover, GM's statements about creating a safety-first culture were directly contrary to the culture that actually existed at GM, where cost-cutting and profits were consistently prioritized over customer safety. The claim that GM performed on its vehicles "extreme testing procedures in the lab, on the road and in our production facilities prior to being offered to customers" was also materially false and misleading because GM did not perform such testing on the vehicles in the First and Second Recall Waves, and GM

knowingly or recklessly disregarded what it learned about the defects in such vehicles.

### G.   The Second Quarter Of 2012

#### 1.   Adequacy Of Reserves For Product Warranties And Recalls

747.   In the Company's Form 10-Q for the second quarter of 2012, filed with the SEC on August 3, 2012, and signed by Defendant Cyprus, GM and Cyprus falsely and misleadingly materially understated GM's costs and liabilities, including GM's costs and liabilities for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities," and GM's costs of "Warranties issued and assumed in period." Specifically, GM and Cyprus reported in GM's Form 10-Q for the second quarter of 2012 that the Company's "Product Warranty Liability" totaled $6.837 billion as of June 30, 2012, including $1.675 billion for "Warranties issued and assumed in period," as set forth in the table below from the second quarter 2012 Form 10-Q under "Note 14. Product Warranty Liability":

|  | **Six Months Ended** | |
|---|---|---|
|  | **June 30, 2012** | **June 30, 2011** |
| Balance at beginning of period | $6,600 | $6,789 |
| Warranties issued and assumed in period | 1,675 | 1,552 |
| Payments | (1,758) | (1,902) |
| *   *   * | *   *   * | *   *   * |

| Balance at end of period | $6,837 | $6,926 |
|---|---|---|

748.   In the Company's Form 10-Q for the second quarter of 2012, under the heading "Use of Estimates in the Preparation of the Financial Statements" and "Critical Accounting Estimates," GM and Cyprus made the materially false and misleading claim that "***The condensed consolidated financial statements are prepared in conformity with U.S. GAAP***."

749.   GM's reported costs and liabilities as of June 30, 2012, including the foregoing amounts of GM's purported costs and liabilities for the Company's product warranty and recall campaigns identified in ¶747 above, were materially understated in violation of GAAP and false and misleading for the reasons identified in ¶¶681-82.   In addition, the claims by GM and Cyprus that GM's financial statements were prepared in accordance with GAAP were also materially false and misleading for the reasons identified in ¶¶681-82 above.

## 2.   Effectiveness Of Internal Controls

750.   In the Company's Form 10-Q for the second quarter of 2012, filed with the SEC on August 3, 2012, Defendants Akerson and Ammann each personally certified in GM's SOX §302 Certification that they had evaluated the effectiveness of GM's internal controls and disclosed any deficiencies or material weaknesses in them, and specifically made the following materially false and misleading claims:

2. Based on my knowledge, this report does not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the

registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

751.   In the same second quarter 2012 Form 10-Q, filed with the SEC on August 3, 2012, Akerson and Ammann each personally certified in GM's SOX §906 Certifications that GM's financial reporting in GM's second quarter 2012 Form 10-Q "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the Report [the second quarter 2012 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

752.   The above-referenced statements about GM's internal controls in ¶¶750-51 were materially false and omitted to state material facts necessary in order to make them not misleading when made for the reasons set forth in ¶681-82 above.

### H.    The Third Quarter Of 2012

#### 1.    Adequacy Of Reserves For Product Warranties And Recalls

753.   In the Company's Form 10-Q for the third quarter of 2012, filed with the SEC on October 31, 2012, and signed by Defendant Cyprus, GM and Cyprus falsely and misleadingly materially understated GM's costs and liabilities, including GM's costs and liabilities for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities," and GM's costs of "Warranties issued and assumed in period."  Specifically, GM and Cyprus reported in GM's Form 10-Q for the third quarter of 2012 that the Company's liability for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities" totaled $7.168 billion as of September 30, 2012, including $2.594 billion for "Warranties issued and assumed in period," as set forth in the table below from the third quarter 2012 Form 10-Q under "Note 14. Product Warranty Liability":

|  | Nine Months Ended | |
|---|---|---|
|  | September 30, 2012 | September 30, 2011 |
| Balance at beginning of period | $6,600 | $6,789 |
| Warranties issued and assumed in period | 2,594 | 2,290 |
| Payments | (2,583) | (2,862) |
| Adjustments to pre-existing warranties | 510 | 468 |
| *    *    * | *    *    * | *    *    * |

Balance at end of period                $7,168                    $6,633

754.   In the Company's Form 10-Q for the third quarter of 2012, under the headings "Use of Estimates in the Preparation of the Financial Statements" and "Critical Accounting Estimates," GM and Cyprus made the materially false and misleading claim that "***The condensed consolidated financial statements are prepared in conformity with U.S. GAAP***."

755.   GM's reported costs and liabilities as of September 30, 2012, including the foregoing amounts of GM's purported costs and liabilities for the Company's product warranty and recall campaigns identified in ¶753 above, were materially understated in violation of GAAP and false and misleading for the reasons identified in ¶¶661-62.   In addition, the claims by GM and Cyprus that GM's financial statements were prepared in accordance with GAAP were also materially false and misleading for the reasons identified in ¶¶661-62 above.

## 2.   Effectiveness Of Internal Controls

756.   In the Company's Form 10-Q for the third quarter of 2012, filed with the SEC on October 31, 2012, Defendants Akerson and Ammann each personally certified in GM's SOX §302 Certification that they had evaluated the effectiveness of GM's internal controls and disclosed any deficiencies or material weaknesses in them, and specifically made the following materially false and misleading claims:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to

413

make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

757. In the same third quarter 2012 Form 10-Q, filed with the SEC on October 31, 2012, Akerson and Ammann each personally certified in GM's SOX §906 Certifications that GM's financial reporting in GM's third quarter 2012 Form 10-Q "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the Report [the third quarter 2012 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

758. The above-referenced statements about GM's internal controls in ¶¶756-57 were materially false and omitted to state material facts necessary in order to make them not misleading when made for the reasons set forth in ¶681-82 above.

I.    **The Fourth Quarter Of 2012 And Full Year 2012**

    1.    **Adequacy Of Reserves For Product Warranties And Recalls**

759.  In its Form 10-K for the year ended December 31, 2012, filed with the SEC on February 15, 2013, and signed by Defendants Akerson, Cyprus, and Ammann,[1015] GM, Akerson, Cyprus and Ammann again falsely and misleadingly described the process that GM claimed to follow to determine its costs and liabilities for vehicle warranties and recall campaigns. Specifically, the 2012 Form 10-K falsely and misleadingly claimed that:

> The estimated costs related to policy and product warranties are accrued at the time products are sold. Estimated costs related to product recalls based on a formal campaign soliciting return of that product are accrued **when they are deemed to be probable and can be reasonably estimated**. These estimates are established using historical information on the nature, frequency, and average cost of claims of each vehicle line or each model year of the vehicle line and assumptions about future activity and events. However, where little or no claims experience exists for a model year or a vehicle line, the estimate is based on comparable models. Revisions are made when necessary, based on changes in these factors. **These estimates are re-evaluated on an ongoing basis**. We actively study trends of claims and take action to improve vehicle quality and minimize claims.

760.  In GM's 2012 Form 10-K, the Company, Akerson, Cyprus, and

---

[1015] GM's 2012 Form 10-K was also signed by GM Directors at the time David Bonderman, Erroll B. Davis, Jr., Stephen J. Girsky, E. Neville Isdell, Robert D. Krebs, Philip A. Laskawy, Kathryn V. Marinello, James J. Mulva, Patricia F. Russo, Thomas M. Schoewe, Theodore M. Solso, Carol M. Stephenson and Dr. Cynthia A. Telles.

Ammann also falsely and misleadingly claimed, with respect to the process the Company purportedly followed to determine the costs of its warranty repairs and recall campaigns, that: "The estimated costs related to product recalls based on a formal campaign soliciting return of that product are accrued **when they are deemed to be probable and can be reasonably estimated**."

761.   The foregoing statements concerning the process that GM purportedly followed to determine its costs and liabilities for vehicle warranties and recall campaigns, and otherwise prepare its financial statements purportedly in conformity with GAAP, identified in ¶¶759-60 above were materially false and misleading for the reasons identified in ¶655 above.

762.   In the 2012 Form 10-K, GM, Akerson, Cyprus, and Ammann falsely and misleadingly materially understated GM's costs and liabilities, including GM's costs and liabilities for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities," and GM's costs and liabilities of "Warranties issued and assumed in period." Specifically, GM, Akerson, Cyprus, and Ammann reported in the 2012 Form 10-K that the Company's liabilities for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities" totaled $7.204 billion as of December 31, 2012, including $3.394 billion for "Warranties issued and assumed in period," as set forth in the table below from the 2012 Form 10-K:

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2012** | **2011** | **2010** |
| Beginning balance | $6,600 | $6,789 | $7,030 |
| Warranties issued and assumed in period | 3,394 | 3,062 | 3,204 |
| Payments | (3,393) | (3,740) | (3,662) |
| Adjustments to pre-existing warranties | 539 | 565 | 210 |
| *   *   * | *   *   * | *   *   * | *   *   * |
| Ending balance | $7,204 | $6,600 | $6,789 |

763.   In the 2012 Form 10-K, GM, Akerson, Cyprus, and Ammann broke out the Company's purported $7.204 billion in liabilities for policy, product warranty and recall campaigns into $2.919 billion that GM expected to be paid by December 31, 2013, and $4.285 billion expected to be paid sometime after December 31, 2013:

|  | December 31, 2012 | December 31, 2011 |
| --- | --- | --- |
| **Current** [Expected to be paid by 12/31/13] | | |
| Policy, product warranty and recall campaigns | 2,919 | 3,061 |
| *   *   * | *   *   * | *   *   * |
| **Non-current** [Expected to be paid after 12/31/13] | | |
| Policy, product warranty and recall campaigns | 4,285 | 3,539 |

764.   In the 2012 Form 10-K, under the headings "Use of Estimates in the Preparation of the Financial Statements" and "Critical Accounting Estimates," GM, Akerson, Cyprus, and Ammann made the materially false and misleading claim that "*The consolidated financial statements are prepared in conformity with U.S.*

418

*GAAP*."

765.   GM's reported costs and liabilities as of December 31, 2012, including

the foregoing amounts of GM's purported costs and liabilities for the Company's

product warranty and recall campaigns identified in ¶¶762-63 above, were materially

understated in violation of GAAP and false and misleading for the reasons identified

in ¶¶661-62.   In addition, the claims by GM, Akerson, Cyprus, and Ammann that

GM's financial statements were prepared in accordance with GAAP were also

materially false and misleading for the reasons identified in ¶¶661-62 above.

## 2.   Effectiveness Of Internal Controls

766.   In the Company's Form 10-K for the year ended December 31, 2012,

filed with the SEC on February 15, 2013 and signed by Defendants Akerson,

Ammann and Cyprus, GM, Akerson, Ammann and Cyprus made the following

materially false and misleading claims concerning the purported effectiveness of the

Company's internal controls:

> Our management is responsible for establishing and maintaining
> effective internal control over financial reporting as defined in Rules
> 13a-15(f) and 15d-15(f) under the Exchange Act.   This system is
> designed to provide reasonable assurance regarding the reliability of
> financial reporting and the preparation of consolidated financial
> statements for external purposes in accordance with U.S. GAAP. . . .
>
> Our management performed an assessment of the effectiveness of our
> internal control over financial reporting at December 31, 2012, utilizing
> the criteria discussed in the "Internal Control - Integrated Framework"
> issued by the Committee of Sponsoring Organizations of the Treadway
> Commission. The objective of this assessment was to determine

whether our internal control over financial reporting was effective at December 31, 2012. ***Based on management's assessment, we have concluded that our internal control over financial reporting was effective at December 31, 2012.***

767.   In the 2012 Form 10-K, the Company, Akerson, Ammann and Cyprus also falsely and misleadingly claimed that: "There have not been any changes in our internal control over financial reporting during the three months ended December 31, 2012 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

768.   In the 2012 Form 10-K, Defendants Akerson and Ammann also each personally certified in GM's SOX §302 Certification that they had evaluated the effectiveness of GM's internal controls and disclosed any deficiencies or material weaknesses in them, and specifically made the following materially false and misleading claims:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's

internal control over financial reporting.

769.   In the 2012 Form 10-K, Akerson and Ammann each personally certified in GM's SOX §906 Certifications that GM's financial reporting in GM's 2012 Form 10-K "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the Report [the 2012 Form 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

770.   The above-referenced statements about GM's internal controls in ¶¶766-69 were materially false and omitted to state material facts necessary in order to make them not misleading when made for the reasons set forth in ¶¶681-82 above.

### 3.   Commitment To Safety

771.   In the 2012 Form 10-K, the Company, Akerson, Ammann and Cyprus falsely and misleadingly claimed that "We are committed to leadership in vehicle design, quality, reliability, telematics and infotainment and *safety."*

772.   In GM's 2012 Annual Report dated April 25, 2013 and signed by Defendant Akerson, GM and Akerson falsely and misleadingly claimed it had a "focus on the customer," stating that "What is immutable is our *focus on the customer*, which requires us to go from 'good' today to 'great' in everything we do, *including product design, initial quality, durability, and service after the sale*."  In the 2012 Annual Report, GM and Akerson also falsely and misleadingly claimed

that: "More than anything else, *we now put customers at the center of every decision*, because we know that the only way to stay in business for generations to come is to earn their loyalty."

773.   The above-referenced statements about GM's purported commitment to safety and focus on the customer were materially false and omitted material facts necessary to make the statements therein not misleading when made because, among other things, as set forth above in Sections IV.C.3 and V-VII:  (i) millions of GM cars already were suffering from severe defects with their ignition switches that rendered the vehicles prone to shut down while in operation, also resulting in the vehicles losing power steering, losing power brakes, and causing seat belts and airbags to stop functioning, and accordingly, drivers and passengers were placed in serious risk of injury and death because the cars could not be properly controlled; and (ii) GM did not focus on the initial quality, durability and service after the sale of the defective vehicles and did not "put customers at the center of every decision" because the Company failed to timely recall the vehicles with the defective ignition switches.  GM's and Akerson's statements about creating a culture that prioritized customers were directly contrary to the culture that actually existed at GM, where cost-cutting and profits were consistently prioritized over customer safety.

**J.      The First Quarter Of 2013**

**1.      Adequacy Of Reserves For Product Warranties And Recalls**

774.   In the Company's Form 10-Q for first quarter of 2013, filed with the SEC on May 2, 2013 and signed by Defendant Timko, GM and Timko falsely and misleadingly materially understated GM's costs and liabilities, including GM's costs and liabilities for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities," and GM's costs of "Warranties issued and assumed in period."   Specifically, GM and Timko reported in GM's Form 10-Q for the first quarter of 2013 that the Company's "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities" totaled $7.152 billion as of March 31, 2013, including $802 million for "Warranties issued and assumed in period," as set forth in the table below from the first quarter 2013 Form 10-Q under "Note 14. Product Warranty Liability":

|  | Three Months Ended | |
| --- | :---: | :---: |
|  | **March 31, 2013** | **March 31, 2012** |
| Balance at beginning of period | $7,204 | $6,600 |
| Warranties issued and assumed in period | 802 | 864 |
| Payments | (777) | (916) |
| Adjustments to pre-existing warranties | (14) | 233 |
| *    *    * | *    *    * | *    *    * |
| Balance at end of period | $7,152 | $6,841 |

775.   In the Company's Form 10-Q for first quarter of 2013, under the headings "Use of Estimates in the Preparation of the Financial Statements" and "Critical Accounting Estimates," GM and Timko made the materially false and misleading claim that "***The condensed consolidated financial statements are prepared in conformity with U.S. GAAP***."

776.   GM's reported costs and liabilities as of December 31, 2012, including the foregoing amounts of GM's purported costs and liabilities for the Company's product warranty and recall campaigns identified in ¶774 above, were materially understated in violation of GAAP and false and misleading for the reasons identified in ¶¶661-62.   In addition, the claims by GM and Timko that GM's financial statements were prepared in accordance with GAAP were also materially false and misleading for the reasons identified in ¶¶661-62 above.

## 2.   Effectiveness Of Internal Controls

777.   In the Company's Form 10-Q for the first quarter of 2013, filed with the SEC on May 2, 2013, Defendants Akerson and Ammann each personally certified in GM's SOX §302 Certification that they had evaluated the effectiveness of GM's internal controls and disclosed any deficiencies or material weaknesses in them, and specifically made the following materially false and misleading claims:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which

425

such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based

on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

778.   In the same first quarter 2013 Form 10-Q, Akerson and Ammann each personally certified in GM's SOX §906 Certifications that GM's financial reporting in GM's first quarter 2013 Form 10-Q "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the Report [the first quarter 2013 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

779.   The above-referenced statements about GM's internal controls in ¶¶777-78 were materially false and omitted to state material facts necessary in order to make them not misleading when made for the reasons set forth in ¶¶681-82 above.

### 3.   Commitment To Safety

780.   On January 31, 2013, in an interview with CSPAN, Defendant Gay Kent, then GM's Executive Director of Vehicle Safety and Crashworthiness, made

the following materially false and misleading claims about the safety of GM's vehicles:

> ***We're focused on the customer.  We're focused on vehicle safety, reducing fatalities, injuries, crashes***.  And so all of that plays into what we're doing and how we focus on our products, in terms of how we tune them for safety performance.  If you think about consumer metrics - and that is really a way to give our customers an indication of how out vehicles perform.  So things like the new car assessment program that NHTSA publishes, the Insurance Institute for Highway Safety - their Top Safety Pick, those are the kinds of consumer metrics that we translate into product requirements.  And that's what we do to design our products and to tune our products to do well in those areas.[1016]

781.  The above-referenced statements in ¶780 about GM's purported commitment to customer safety; reducing fatalities, injuries and crashes; and "tuning" its vehicles for safety performance, were materially false and omitted material facts necessary to make the statements therein not misleading when made because, among other things, as set forth above in Sections IV.C.3 and V-VII:  (i) millions of GM cars already were suffering from severe defects with their ignition switches that rendered the vehicles prone to shut down while in operation, also resulting in the cars losing power steering, losing power brakes, and causing seat belts and airbags to stop functioning, and accordingly, drivers and passengers were placed in serious risk of injury and death because the cars could not be properly

---

[1016]  Interview by Pedro Echevarria with Gay Kent, Exec. Dir. of Vehicle Safety & Crashworthiness, Gen. Motors Co., C-SPAN (Jan. 31, 2013), http://www.c-span.org/video/?310717-6/gay-kent-vehicle-safety.

controlled; (ii) GM did not focus on "vehicle safety, reducing fatalities, injuries, crashes" or other "consumer metrics" to properly "tune" or timely recall the vehicles with defective ignition switches in them; and (iii) Defendant Kent (whom GM terminated after the Valukas Report was issued) personally replicated the ignition switch defect and personally knew of the moving shutdowns and lack of sufficient action by GM as set forth in paragraphs ¶¶426, 442, 473, 510, 516, 521, 526, and 532 above.

### K.    The Second Quarter Of 2013

#### 1.    Adequacy Of Reserves For Product Warranties And Recalls

782.   In the Company's Form 10-Q for the second quarter of 2013, filed with the SEC on July 25, 2013, and signed by Defendant Timko, GM and Timko falsely and misleadingly materially understated its costs and liabilities, including the costs and liabilities for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities," and the costs of "Warranties issued and assumed in period."  Specifically, GM and Timko reported in GM's Form 10-Q for the second quarter of 2013 that the Company's liabilities for "policy, product warranty, recall campaigns and certified used vehicle warranty liabilities" totaled $7.093 billion as of June 30, 2013, including $1.6 billion for "Warranties issued and assumed in period," as set forth in the table below from the second quarter 2013 Form 10-Q under "Note 13. Product Warranty Liability":

|  | Six Months Ended | |
|---|---|---|
|  | **June 30, 2013** | **June 30, 2012** |
| Balance at beginning of period | $7,204 | $6,600 |
| Warranties issued and assumed in period | 1,600 | 1,675 |
| Payments | (1,570) | (1,758) |
| Adjustments to pre-existing warranties | (4) | 339 |
| *   *   * | *   *   * | *   *   * |
| Balance at end of period | $7,093 | $6,837 |

783.   In the Company's Form 10-Q for the second quarter of 2013, under the headings "Use of Estimates in the Preparation of the Financial Statements" and "Critical Accounting Estimates," GM and Timko made the materially false and misleading claim that "***The condensed consolidated financial statements are prepared in conformity with U.S. GAAP***."

784.   GM's reported costs and liabilities as of December 31, 2012, including the foregoing amounts of GM's purported costs and liabilities for the Company's product warranty and recall campaigns identified in ¶782 above, were materially understated in violation of GAAP and false and misleading for the reasons identified in ¶¶661-62   In addition, the claims by GM and Timko that GM's financial statements were prepared in accordance with GAAP were also materially false and misleading for the reasons identified in ¶¶661-62 above.

## 2.    Effectiveness Of Internal Controls

785.   In the Company's Form 10-Q for the second quarter of 2013, filed with the SEC on July 25, 2013, Defendants Akerson and Ammann each personally certified in GM's SOX §302 Certification that they had evaluated the effectiveness of GM's internal controls and disclosed any deficiencies or material weaknesses in them, and specifically made the following materially false and misleading claims:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with

generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

786. In the same second quarter 2013 Form 10-Q, Defendants Akerson and Ammann each personally certified in GM's SOX §906 Certifications that GM's financial reporting in GM's second quarter 2013 Form 10-Q "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the Report [the second quarter 2013 Form

432

10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

787.    The above-referenced statements about GM's internal controls in ¶¶785-86 were materially false and omitted to state material facts necessary in order to make them not misleading when made for the reasons set forth in ¶¶681-82 above.

**L.    The Third Quarter Of 2013**

**1.    Adequacy Of Reserves For Product Warranties And Recalls**

788.    In GM's Form 10-Q for the third quarter of 2013, filed with the SEC on October 30, 2013 and signed by Defendant Timko, the Company and Timko falsely and misleadingly materially understated GM's costs and liabilities, including GM's costs and liabilities for "policy, product warranty, and recall campaigns," and GM's costs of "Warranties issued and assumed in period." Specifically, GM and Timko reported that the Company's liabilities for policy, product warranty and recall campaigns totaled $7.198 billion as of September 30, 2013, including $2.409 billion for "Warranties issued and assumed in period," as set forth in the table below from the third quarter 2013 Form 10-Q under "Note 11. Product Warranty Liability":

|  | **Nine Months Ended** | |
|  | September 30, 2013 | September 30, 2012 |
| Balance at beginning of period | $7,204 | $6,600 |
| Warranties issued and assumed in period | 2,409 | 2,594 |
| Payments | (2,304) | (2,583) |
| Adjustments to pre-existing warranties | 75 | 510 |
| *   *   * | *   *   * | *   *   * |
| Balance at end of period | $7,198 | $7,168 |

789.   In GM's Form 10-Q for the third quarter of 2013, under the heading "Basis of Presentation," GM and Timko made the materially false and misleading claim that:

> **The accompanying condensed consolidated financial statements have been prepared in conformity with U.S. GAAP** pursuant to the rules and regulations of the Securities and Exchange Commission (SEC) for interim financial information.

790.   In GM's Form 10-Q for the third quarter of 2013, under the heading "Critical Accounting Estimates," GM and Timko made the materially false and misleading claim that "**The condensed consolidated financial statements are prepared in conformity with U.S. GAAP**."

791.   GM's reported costs and liabilities as of September 30, 2013, including the foregoing amounts of GM's purported costs and liabilities for the Company's

product warranty and recall campaigns identified in ¶788 above, were materially understated in violation of GAAP and false and misleading for the reasons identified in ¶¶661-62.  In addition, the claims by GM and Timko that GM's condensed consolidated financial statements were prepared in accordance with GAAP were also materially false and misleading for the reasons identified in ¶¶661-62 above.

## 2.   Effectiveness Of Internal Controls

792.   In the Company's Form 10-Q for the third quarter of 2013, filed with the SEC on October 30, 2013, Defendants Akerson and Ammann each personally certified in GM's SOX §302 Certification that they had evaluated the effectiveness of GM's internal controls and disclosed any deficiencies or material weaknesses in them, and specifically made the following materially false and misleading claims:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

793. In the same third quarter 2013 Form 10-Q, Akerson and Ammann each

personally certified in GM's SOX §906 Certifications that GM's financial reporting in GM's third quarter 2013 Form 10-Q "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the Report [the third quarter 2013 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

794.   The above-referenced statements about GM's internal controls in ¶¶792-93 were materially false and omitted to state material facts necessary in order to make them not misleading when made for the reasons set forth in ¶¶681-82 above.

### 3.   Commitment To Safety

795.   As reported by *ENP Newswire* on September 23, 2013, Defendant Gay Kent, GM's General Director of Vehicle Safety and Crashworthiness, falsely and misleadingly claimed that, "***We design safety and crashworthiness into our vehicles very early in development***.   We are committed to offering advanced safety technology on a broad range of models, not just on the most expensive vehicles. ***All of our vehicles are designed to provide continuous protection for customers before, during and after a crash.***"

796.   The above-referenced statements in ¶795 about the purported safety of GM's vehicles and the Company's focus on customer protection were materially false and omitted material facts necessary to make the statements therein not

misleading when made because, among other things, as set forth above in Sections IV.C.3 and V-VII, (i) millions of GM vehicles already were suffering from severe defects with their ignition switches that rendered the vehicles prone to shut down while in operation, also resulting in the vehicles losing power steering, losing power brakes, and causing seat belts and airbags to stop functioning, and accordingly, drivers and passengers were placed in serious risk of injury and death because the cars could not be properly controlled; and (ii) Defendant Kent (whom GM terminated after the Valukas report was issued) personally replicated the ignition switch defect and personally knew of the moving shutdowns and lack of sufficient action by GM as set forth in ¶¶426, 442, 473, 510, 516, 521, 526, and 532 above.

**M.    The Fourth Quarter Of 2013 And Full Year 2013**

**1.    Adequacy Of Reserves For Product Warranties And Recalls**

797.    In its Form 10-K for year ended December 31, 2013, filed with the SEC on February 6, 2014, and signed by Defendants Barra (GM CEO at the time), Charles K. Stevens III (GM Executive Vice President and CFO) and Thomas S, Timko (GM Vice President, Controller and Chief Accounting Officer),[1017] GM, Barra, Stevens

---

[1017] GM's 2013 Form 10-K was also signed by GM Directors at the time Theodore M. Solso, David Bonderman, Erroll B. Davis, Jr., Stephen J. Girsky, E. Neville Isdell, Robert D. Krebs, Kathryn V. Marinello, Admiral Michael G. Mullen, USN (Ret.), James J. Mulva, Patricia F. Russo, Thomas M. Schoewe, Carol M. Stephenson and Dr. Cynthia A. Telles.

and Timko falsely and misleadingly claimed, with respect to the process GM claimed to follow to determine its reserves for policy, product warranty and recall campaigns, that:

> The estimated costs related to policy and product warranties are accrued at the time products are sold. Estimated costs related to product recalls based on a formal campaign soliciting return of that product are accrued *when they are deemed to be probable and can be reasonably estimated*. These estimates are established using historical information on the nature, frequency, and average cost of claims of each vehicle line or each model year of the vehicle line and assumptions about future activity and events. However, where little or no claims experience exists for a model year or a vehicle line, the estimate is based on comparable models. Revisions are made when necessary, based on changes in these factors. *These estimates are re-evaluated on an ongoing basis*. We actively study trends of claims and take action to improve vehicle quality and minimize claims.

798.   In the 2013 Form 10-K, and with respect to the process the Company purportedly followed to determine the costs of repairs pursuant to its recall campaigns in particular, the Company, Barra, Stevens and Timko also falsely and misleadingly claimed that:  "The estimated costs related to product recalls based on a formal campaign soliciting return of that product are accrued *when they are deemed to be probable and can be reasonably estimated*."

799.   The foregoing statements in ¶¶797-98 concerning the process that GM purportedly followed to determine its costs and liabilities for vehicle warranties and recall campaigns were materially false and misleading for the reasons set forth in ¶655 above.

800.   In the 2013 Form 10-K, GM, Barra, Stevens and Timko falsely and misleadingly materially understated GM's costs and liabilities, including GM's costs and liabilities for "policy, product warranty and recall campaigns," and the costs of "Warranties issued and assumed in period."   Specifically, GM, Barra, Stevens and Timko reported in the 2013 Form 10-K that the Company's liabilities for policy, product warranty and recall campaigns totaled $7.214 billion as of December 31, 2013, including $3.181 billion for "Warranties issued and assumed in period," as set forth in the table below from the 2013 Form 10-K:

|  | Years Ended December 31, | | |
|  | 2013 | 2012 | 2011 |
| Beginning balance | $7,204 | $6,600 | $6,789 |
| Warranties issued and assumed in period | 3,181 | 3,394 | 3,062 |
| Payments | (3,063) | (3,393) | (3,740) |
| Adjustments to pre-existing warranties | 123 | 539 | 565 |
| *   *   * | *   *   * | *   *   * | *   *   * |
| Ending balance | $7,214 | $7,204 | $6,600 |

801.   In the 2013 Form 10-K, GM, Barra, Stevens and Timko broke out the Company's purported $7.214 billion in liabilities for policy, product warranty and recall campaigns into $2.559 billion that GM expected to be paid by December 31, 2014, and $4.655 billion expected to be paid sometime after December 31, 2014:

|  | December 31, 2013 | December 31, 2012 |
|---|---|---|
| **Current** [Expected to be paid by 12/31/14] | | |
| Policy, product warranty and recall campaigns | 2,559 | 2,919 |
| *   *   * | *   *   * | *   *   * |
| **Non-current** [Expected to be paid after 12/31/14] | | |
| Policy, product warranty and recall campaigns | 4,655 | 4,285 |

802.   In GM's 2013 Form 10-K, under the headings "Critical Accounting Estimates" and "Use of Estimates in the Preparation of the Financial Statements," GM, Barra, Stevens and Timko made the materially false and misleading claim that "***The consolidated financial statements are prepared in conformity with U.S. GAAP***.""

803.   GM's reported costs and liabilities as of December 31, 2013, including the foregoing amounts of GM's purported costs and liabilities for the Company's product warranty and recall campaigns identified in ¶¶800-01 above, were materially understated in violation of GAAP and false and misleading for the reasons identified in ¶¶661-62.  Indeed, by the time this Form 10-K had been filed, GM's recalls of its millions of dangerously defective cards already had begun, but GM's reported costs and liabilities did not reflect that reality.  In addition, the claims by GM, Barra, Stevens and Timko that GM's financial statements were prepared in accordance with GAAP were also materially false and misleading for the reasons identified in ¶¶661-

62 above.

## 2. Effectiveness Of Internal Controls

804.   In GM's Form 10-K for the year ended December 31, 2013, filed with

the SEC on February 6, 2014 and signed by Defendants Barra, Stevens and Timko,

the Company, Barra, Stevens and Timko falsely and misleadingly claimed with

respect to the effectiveness of GM's internal controls:

> Our management is responsible for establishing and maintaining effective internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. This system is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with U.S. GAAP. . . .

> Our management performed an assessment of the effectiveness of our internal control over financial reporting at December 31, 2013, utilizing the criteria discussed in the "Internal Control - Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission. The objective of this assessment was to determine whether our internal control over financial reporting was effective at December 31, 2013. ***Based on management's assessment, we have concluded that our internal control over financial reporting was effective at December 31, 2013.***

805.   In the 2013 Form 10-K, the Company, Barra, Stevens and Timko also

falsely and misleadingly claimed that: "There have not been any changes in our

internal control over financial reporting during the three months ended December

31, 2013 that have materially affected, or are reasonably likely to materially affect,

our internal control over financial reporting."

806.   In the 2013 Form 10-K, filed with the SEC on February 6, 2014,

Defendants Barra and Stevens each personally certified in GM's SOX §302 Certification that they had evaluated the effectiveness of GM's internal controls and disclosed any deficiencies or material weaknesses in them, and specifically made the following materially false and misleading claims:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our

conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

807. In the 2013 Form 10-K, Barra and Stevens also each personally certified in GM's SOX §906 Certifications that GM's financial reporting in GM's 2013 Form 10-K "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the Report [the 2013 Form 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

808. The above-referenced statements about GM's internal controls in

444

¶¶804-07 were materially false and omitted to state material facts necessary in order to make them not misleading when made for the reasons set forth in ¶¶681-82 above. Moreover, the above referenced statements about GM's internal controls in ¶¶804-07 were materially false and omitted to state material facts necessary in order to make them not misleading when made because they were made notwithstanding the fact that the ten-year delayed recall was already underway, as the First Recall Wave was finally approved on January 31, 2014 pursuant to the EFADC meeting, and GM's 573 Report to NHTSA on February 7, 2014, informing the agency that the Company had determined to conduct a safety recall, was sent the next day after these internal control certifications were made.

### 3.   Commitment To Safety

809.   As reported by *ENP Newswire* on October 25, 2013, Michael Robinson (then GM Vice President of Sustainability and Global Regulatory Affairs, and whom GM terminated after the Valukas Report was issued), falsely and misleadingly claimed that, "Keeping drivers and passengers safe in and around vehicles is a ***top priority for our company***."

810.   On November 12, 2013, at Barclays Global Automotive Conference, Mary Chan, then GM President of Global Connected Customer, discussed GM's Onstar System and falsely and misleadingly claimed that, "As we look at the need and the demand of a driver who is on the road, ***it's really about safety and security.***"

445

811.   On January 15, 2014, at a Deutsche Bank Global Auto Industry Conference, Defendant Ammann, President of GM, falsely and misleadingly claimed that: "From a product point of view, we are in tremendous shape. It's really just the greatest time that we have had in the recent history of General Motors … *We couldn't be in a better place from a product perspective and that's just a really tremendous way to be going into 2014*."

812.   As reported in *Auto Business News* on January 24, 2014, Defendant Gay Kent, the Company's General Director of Vehicle Safety and Crashworthiness falsely and misleadingly claimed that:  "The customer is at the center of our day-to-day operations and when we design vehicles, *it's their safety that we have in mind.*"

813.   In the 2013 Form 10-K, filed with the SEC on February 6, 2014 and signed by Defendants Barra, Stevens and Timko, the Company, Barra, Stevens and Timko also falsely and misleadingly claimed that "We are committed to leadership in vehicle design, quality, reliability, telematics and infotainment and *safety*."

814.   The above-referenced statements in ¶¶809-13 about the purported safety of GM's vehicles and GM's focus on driver safety were materially false and omitted material facts necessary to make the statements therein not misleading when made because, among other things, as set forth above in Sections IV.C.3 and V-VII, (i) millions of GM cars already were suffering from severe defects with their ignition switches that rendered the vehicles prone to shut down while in operation, resulting

446

in the cars losing power steering, losing power brakes, and causing seat belts and airbags to stop functioning, and accordingly, drivers and passengers were placed in serious risk of injury and death because the cars could not be properly controlled; and (ii) Defendant Kent (whom GM terminated after the Valukas Report was issued) personally replicated the ignition switch defect and personally knew of the moving shutdowns and lack of sufficient action by GM as set forth in ¶¶426, 442, 473, 510, 516, 521, 526, and 532 above.

*   *   *

815.   The foregoing statements were also materially false and misleading for their failure to disclose material, non-public facts whose non-disclosure rendered GM's statements materially misleading.  Those facts included that (i) millions of GM vehicles suffered from significant safety defects that rendered the vehicles unsafe and life-threatening; (ii) GM materially understated its costs and liabilities, including its warranty reserves and recall liability as a result of the undisclosed vehicles' defects; and (iii) GM lacked effective internal controls as the Company admitted after the Class Period.  During the Class Period, the Defendants failed to disclose the material adverse facts below that were in existence at the time each of the foregoing materially false and misleading statements was made, the disclosure of which would have led to GM's vehicle recalls and the imposition of significant costs on GM at an earlier date:

- On January 10, 2002, Delphi advised GM that the Delta Ignition Switch fell below the specified minimum torque requirements and that such results were "Not Ok" (¶¶377-78);

- On February 18, 2002, GM acknowledged that the torque value of the switch was "still too soft of a detent" and did not meet GM's own requirements (¶379);

- From April through May 21, 2002, Delphi conducted additional torque tests of the switch and prepared another report for GM that showed even worse results (¶380);

- Throughout 2003, after the October 2002 launch of the Ion, Saturn received hundreds of customer complaints and warranty claims related to the MY 2003 Ion ignition switch, including numerous reports of moving shutdowns (¶391);

- On October 9, 2003, a GM Field Performance Report was opened to address hundreds of customers' comments of stalls while driving, attaching a list of 65 Ion stalls, many involving the ignition switch rotating from Run to Accessory or Off (¶392);

- Numerous reports emerged showing that the ignition switch problem also related to the ergonomic design of the switch's location on the steering wheel column, including on December 5, 2002, January 9, 2004, February 19, 2004 and April 15, 2004 (¶393);

- At the time of the Cobalt's launch in 2004, reports quickly surfaced of moving shutdowns caused by a driver bumping the key fob or key chain with his or her knee, including a report from a Cobalt press event in 2004 and subsequent test drive of the Cobalt (¶396);

- On November 19, 2004, GM opened a PRTS report number N172404 to address the complaint that the Cobalt could be ***"keyed off with knee while driving"*** (¶397);

- On November 22, 2004, engineers in GM's High Performance Vehicle Operations group repeatedly experienced moving shutdowns during a track test of the high-performance version of the Cobalt when the driver's knee or hand ***"slightly graze[d]"*** the key fob while downshifting (¶398);

448

- Reports of ignition problems from GM's Captured Test Fleet identified the problem as "low torque" and a "key detent" that is "too low," including reports from December 3, 2004, December 22, 2004, March 9, 2005 and March 21, 2005 (¶401);

- Despite the mounting reports of vehicle shutdowns, on March 9, 2005, GM closed the November 19, 2004 PRTS "with no action" because none of the solutions represents "***an acceptable business case***" (¶405);

- In response to multiple reports of moving shutdowns and customers' requests that GM buy back their Cobalts, GM opened a second PRTS report on or about May 17, 2005, because of a "Customer concern that the vehicle ignition will turn off while driving" (¶408);[1018]

- On June 14, 2005, complaints of "inadvertent ignition shut-offs" in the Pontiac Solstice surfaced, with a GM engineer noting that the problem "was very similar to the ones on the Cobolts [sic]," and suggested taking "preventative measures" (¶414);

- On June 17, 2005, a GM engineer's tests on the defective Delta Ignition Switch at GM's Milford Proving Grounds demonstrated that the switch's rotational torque was far below specification, and the engineer said at the time that this should have been considered ***a safety issue*** (¶¶415-16);

- In June 2005, the VAPIR approved a supposed fix for existing customers: a small plastic "plug" that could be inserted into keys when customers reported a problem to dealers, but GM engineers understood this remedy to be merely a "***band-aid***" (¶417);

- In response to a June 26, 2005 article by the *Cleveland Plain Dealer* challenging GM's statements that the moving shutdowns were not a safety issue, Kemp intended to refute those claims by putting together "a videotape demonstration showing the remoteness of this risk," but he was convinced by another GM attorney that it was not possible because GM could not "come up with something compelling." ¶421. Kemp nonetheless insisted internally that "We can't stand hearing, after

---

[1018] GM also received numerous complaints and buy back requests for other vehicles that GM belatedly recalled in 2014 for defective ignition switches, such as the Chevrolet Impala, Malibu and Monte Carlo dating back to 1999. ¶409.

the article is published, that we didn't do enough to defend a brand new launch" (*id.*);

- On June 25, 2009, GM received a customer complaint of a moving shutdown which stated that, "This is a safety/recall issue if there ever was one. . . . [T]his ignition switch needs to be recalled" (¶423);

- On August 30, 2005, Laura Andres, a GM Design Engineer, sent an email describing ignition switch issues that she experienced while operating a 2006 Chevrolet Impala, stating that she was told by the GM technician that "there is nothing they can do to repair it" and that "*it is just the design of the switch*."  ¶425.  Andres wrote that, "*I think this is a serious safety problem*, especially if this switch is on multiple programs.  *I'm thinking big recall*" (*id.*);

- GM executives Wachtel and Defendant Kent obtained a Cobalt and were able to replicate the problem of inadvertent shutoffs (¶426);

- The Program Execution Team's "Deep Dive" analysis of the costs of modifying the switch dated September 6, 2005 proposed changing the switch to have a "double detent to *prevent accident[al] turn offs*" (¶429);

- Meeting minutes for GM's September 20, 2005 VAPIR meeting stated that GM management challenged the possibility of GM finding a permanent solution to the ignition switch problem by globally replacing the switch based on whether the Cobalt team could show the change would be associated with a "*possible cost reduction*" (¶430);

- On September 28, 2005, GM Vehicle Systems Engineer Hendler wrote an email to 16 GM employees admitting that he "was very aware of an issue with 'inadvertent ignition offs' due to the low mounted ignition switch in the steering column and the low efforts to rotate the ignition… At the X Vapir my team was challenged to offset the piece cost with warranty savings and/or reduced PC/Inv… Consequently, the ignition switch for the Deltas and Kappas will remain the carryover single detent switch until the piece cost hit can be eliminated or significantly reduced" (¶431);

- GM had the word "stall" in the initial draft of its December 2005 TSB warning dealers to remove heavy items from customers' key rings, but GM removed the word "stall" from the TSB prior to circulating it to

GM dealers because "stall" was a GM "hot" word that could cause regulatory scrutiny (¶¶435-37);

- In March through April 2007, GM's technical bulletin group and Wachtel proposed and approved publishing a revised version of the TSB that would change the subject line to include the word "stalls," but the revised April 2007 TSB was never issued (¶¶441-42);

- In 2006, GM learned of serious crashes in Cobalts and Ions in rental car fleets, including a September 2006 crash in a Cobalt in Barstow, California (¶444), the suspicious crash of a Saturn Ion in March 2005 near Bee Cave, Texas (¶445), and the January 2006 crash of a 2006 Cobalt in Bucks County, Pennsylvania (¶446);

- On May 27, 2006, GM surreptitiously changed the design of the Delta platform ignition switch for new model years only without changing the part number (¶449);

- In February 2009, GM opened a new PRTS report as a continuation of the problems noted in earlier PRTSs.  ¶458.  As one GM engineer wrote to David Trush, GM's Lead Design Engineer on the ignition cylinder, on February 18, 2009:  *"This issue has been around since man first lumbered out of [the] sea and stood on two feet.  In fact, I think Darwin wrote the first PRTS on this and included as an attachment as part of his Theory of Evolution"* (*id.*);

- On March 5, 2009, a 72-page slide deck was opened on then-CEO Rick Wagoner's computer, with one slide of the deck referring to the Cobalt's inadvertent shutdown issue, the then-recent change in the Cobalt's key design from a slot to a hole, and GM warranty costs (¶459);

- In June 2012, in an airbag non-deployment case, Erin Shipp, the plaintiff's expert in the matter, concluded that airbag non-deployments in the vehicles with the Delta Ignition Switch were being caused by the low torque of the ignition switch (¶472);

- On March 29, 2007, NHTSA reported to GM that it had observed a number of airbag non-deployments in Cobalts and Ions, and Keith Schultz, then-GM Manager of Internal Investigation in Product Investigations, directed Everest and Sprague to compile information on Cobalt and Ion non-deployments (¶473);

- From 2007 through 2009, GM became aware of numerous crashes involving airbag non-deployments occurring in vehicles that had suffered power loss before the non-deployment. ¶475. After one such report on May 15, 2009, Sprague collected information on vehicles' power mode status and discovered that, in fact, power mode status was recorded as "Off" or "Accessory" in a number of crashes (*id.*);

- On October 7, 2010, GM's outside counsel King & Spalding warned GM that it faced potential punitive damages based on airbag non-deployments after a driver died when her MY 2006 Cobalt hit a tree head-on on December 31, 2009, and she was wearing a seat belt and the vehicle's power mode status was in the Off position (¶476);

- On July 26, 2011, GM outside counsel King & Spalding again warned GM about the likelihood that GM would be subject to punitive damages in another airbag non-deployment case occurring on February 13, 2011 involving a MY 2007 Cobalt running into a tree. ¶481. In its analysis, King & Spalding wrote "the fact that the SDM data indicated that *the car was in accessory mode at the time of the accident* is clearly the most challenging aspect of this case." (*id.*);

- An August 3, 2011 GM Roundtable summary read that, in one case of a crash: "The vehicle power mode status was recorded as Accessory *which indicates the sensing algorithm could have been disabled from deploying the airbags*" (¶482);

- On March 28, 2012, Sprague organized a trip to the Auto Salvage Auction in Davison, Michigan, with GM electrical engineers where they found that a Cobalt ignition turned extraordinarily easily, including that a driver simply hitting a pothole could move the ignition switch out of the Run position (¶488);

- On April 1, 2012, a GM engineer who had taken the trip to Davison checked GM warranty data and discovered many customer complaints and also the TSB describing the low torque and how drivers could knock the key out of the Run position into Accessory, and the matter was elevated to his superiors, including Wachtel and Stouffer (¶488);

- On April 18, 2012, the outside law firm of Eckert Seamans submitted a case evaluation to GM concerning a December 13, 2009 crash of a MY 2005 Cobalt, where the airbag did not deploy and the ignition switch

was in Accessory mode, and explained that: "It will be difficult to explain why the ignition switch toggled to Accessory Mode simply from running off-road.  GM will also be forced to contend with other incidents, some of which resulted in deaths, due to the non-deployment of the frontal airbags in the 2005-07 Cobalt.  ***Those other incidents put GM at risk for imposition of punitive damages in West Virginia.***" (¶489);

- On April 22, 2012, current GM CEO Barra was one of two recipients of an email from a former GM employee reporting a moving shutdown in his Buick that the employee described as attributable to the key design and suggested that the Company investigate and perhaps issue a service bulletin (¶491);

- On May 15, 2012, Kemp organized a meeting of high-level managers, directors and PI and engineering personnel regarding the "Cobalt Airbag Issue" and a presentation for the meeting conveyed that the low torque of the ignition switch could cause a bump or jolt to move the key out of the Run position prior to a crash, shutting off power and preventing the Colbalt's airbag from deploying.  ¶¶494-96.  Wachtel's notes from the May 15, 2012 meeting reflect an understanding that ***the ignition switch could be the root cause of the airbag non-deployment issue*** (¶496);

- On July 25, 2012, a summary of a GM Roundtable discussion reported on the Shipp Report and its implications and stated:  "[GM's defense counsel] believes that if the case is tried, GM will lose and that, although the demand is high, as time goes, and the Cobalt investigation remains unsolved, the verdict exposure will increase and the defense of the case will become more complicated.  I agree."  ¶502.  Nabeel Peracha, a relatively junior in-house attorney for GM was also a participant at the July 25 Roundtable asked why GM had not issued a recall of the impacted vehicles (¶503);

- In late 2012 and early 2013, GM learned of additional evidence that the defective ignition switches posed serious safety risks, including a case evaluation from outside counsel Eckert Seamans for an August 12, 2012 crash of a 2005 Cobalt in which the airbags failed to deploy (and GM subsequently settled the case) (¶¶508-09); and a July 22, 2013, King & Spalding case evaluation for another defective ignition switch litigation, concluding that the "case was a very poor trial candidate" and

that a jury would almost "certainly" conclude that the ignition switch was "***unreasonably dangerous*** because the torque effort required to move the key from run to accessory is too low, which leads ***to inadvertent key movement and the engine shutting off with little to no warning***." ¶512.  The July 22, 2013 King & Spalding evaluation contained other warnings that the "unreasonably dangerous" ignition switch condition was known to GM since the 2005 Cobalts were launched, including that GM's own documents would "enable plaintiffs' counsel to develop a record from which he can compellingly argue that GM has known about this safety defect from the time the first 2005 Cobalts rolled off the assembly line and essentially has done nothing to correct the problem for the last nine years" (¶¶513-15);

- On November 5, 2013, GM held an Investigation Status Review meeting, attended by Benavides and others, discussing the relationship between the low torque in the Cobalt ignition switch and airbag non-deployments.  (¶519).  At this time, Benavides believed there should be a recall, but did not disclose her views to NHTSA at a meeting with NHTSA two days later (¶*id.*);

- On November 19, 2013, Foley-Gardner emailed Boler-Davis to inform her of the issue with the Cobalt ignition switch, and GM finally began its internal formal process to commence a recall (¶520);

- During a December 17, 2013 EFADC meeting, a PowerPoint presentation included slides that set forth information about ***five fatalities and other serious injuries that had resulted from the defective ignition switch***, yet the meeting ended with a request for yet another follow-up analysis to determine the "root cause" of airbag non-deployments (¶526);

- Just one day later, on December 18, 2013, GM placed an urgent order with Delphi for 500,000 replacement switches that would be used in the 2014 recalls (¶527); and

- On January 31, 2014, the EFADC issued a recall of MY 2005-2007 Chevrolet Cobalts and Pontiac G5s (¶532).

## IX.    **LOSS CAUSATION**

816.    During the Class Period, as detailed herein, Defendants engaged in a course of conduct that recklessly disregarded consumer safety, misstated the adequacy of GM's internal controls, underreported GM's liabilities, including its recall-related liabilities, and therefore artificially inflated the price of GM securities.    As a result, Lead Plaintiff and members of the Class purchased GM securities at artificially-inflated prices and were damaged when the artificial inflation gradually dissipated when a series of corrective disclosures entered the market concerning the First Recall Wave, the Second Recall Wave, GM's Liabilities, Costs, and Contingencies, and internal control deficiencies.

817.    As alleged throughout this Complaint, the true facts concerning GM's undisclosed problems existed prior to the beginning of the Class Period and contradicted Defendants' repeated statements and disclosures concerning GM's reported liabilities and purported compliance with GAAP, the adequacy of its internal controls, and GM's purported commitment to safety (detailed above).    Given GM's extensive delays in revealing the serious ignition safety issues, had the true facts been disclosed at any point during the Class Period the effect of such revelations would have been the same as described below, and the artificial inflation in GM's share price would have been dissipated earlier in the Class Period.

818.    First, as discussed in ¶¶561-72 above, after GM belatedly announced

the first of the ignition switch recalls, there was an adverse reaction including by the media, Congress, litigants, and NHTSA, that put the Company at risk for expected adverse governmental sanctions and increased civil liability, given GM's long delays in recalling its dangerously unsafe cars, as the market recognized on March 11, 2014.

819.   On March 10, 2014, in a press release reported to investors after the close of trading, Chairman Fred Upton announced that given GM's long delays in recalling its cars over the past 10 years, the House Committee of Energy and Commerce "has opened an investigation into the General Motors Company's (GM) and National Highway Traffic Safety Administration's (NHTSA) response to consumer complaints related to problems with ignition switches in certain vehicles," including vehicles that were subject to the First Recall Waves.

820.   On March 11, 2014, during the trading day, leaders of the House Committee of Energy and Commerce sent letters to GM CEO Barra and NHTSA's Acting Administrator David Friedman requesting extensive documents related to customer complaints regarding the ignition switch problems over the past decade, and both GM's and NHTSA's knowledge and handling of the matter.  As discussed in ¶577 above, the March 11, 2014 letter also requested a "briefing" with GM to address GM's response to reports of engine shutdowns, airbag non-deployments, and ignition switch issues, and GM's interaction with NHTSA regarding the same issues since 2003.  Also on March 11, 2014, in a press release reported in the market

during the trading day, Congressman Henry Waxman announced with respect to the House Committee of Energy and Commerce investigation into GM: "The Committee will examine whether GM knowingly allowed faulty and dangerous cars to remain on the road," as described above at ¶578.

821.   On March 11, 2014, it was further reported during the trading day, that Senator Jay Rockefeller of West Virginia requested that a hearing on the matter of GM's belated recall of vehicles for the ignition switch defect be convened by Senator Claire McCaskill of Missouri, who chairs a subcommittee on product safety.

822.   On March 11, 2014, *Bloomberg* additionally reported during the trading day that "The U.S. Justice Department has started a preliminary investigation into how General Motors Co. handled the recall of 1.6 million vehicles with faulty ignition switches linked to at least 13 deaths."  As the story added, "The inquiry is focusing on whether GM might have violated criminal or civil laws by failing to notify regulators in a timely fashion about the switch failures."

823.   On March 11, 2014, in response to the disclosures set forth in ¶¶818-22 above, which revealed to investors, *inter alia*, an increased risk of adverse governmental action and civil and criminal exposure for GM and negative scrutiny of the Company in the media given its very long delays in addressing serious safety issues, the Company's stock price declined in a statistically-significant amount net of general market and industry trading from a closing price of $37.09 on March 10,

2014 to close at $35.18 on March 11, 2014.  This statistically significant decline caused Lead Plaintiff and Class members to suffer loss as the artificial inflation in GM's stock price was partially removed.  The Company's stock price continued to decline over the following two days, March 12, 2014 and March 13, 2014, to close on March 13 at a price of $34.09.

824.   Securities analysts following GM also reacted adversely to the March 11, 2014 news.  For example, on March 11, 2014, in a report entitled *Thoughts on GM Ignition Switch Recall*, Deutsche Bank stated, "We're getting more questions this morning on the implications of GM's recall (1.6 MM 2003-2007 vehicle) to fix faulty ignition switches, as the House Energy and Commerce Committee announced that it would launch an investigation and hold hearings."  Deutsche Bank identified "4 categories of risk to GM: 1) Recall cost; 2) Potential fines from NHTSA; 3) Consumer litigation; and 4) Impact on market share."  On the same day, RBC Capital Markets similarly stated in an analyst report entitled *GM – Our Thoughts on the Ignition Recall*, "GM stock is selling off over ~4% today (and investor questions are increasing) as the ignition switch recall has another visible day in the media."  RBC Capital Markets further observed that GM knew about the risks regarding the ignition switch well in advance of conducting the First Recall Wave, stating, "And it does appear that GM employees have known about the risk for a while, so it does seem there is a failure to act somewhere along the way."

825.   Negative responses from GM securities analysts continued throughout March 12 and March 13, 2014.  For example, on March 13, 2014, Guggenheim stated in a report entitled *GM – NEUTRAL – Putting GM's Recall into Perspective*, "Shares of GM have been under pressure since the 'volume' on the GM recall has turned up over the last several days (losing $4.5 billion in market value)."  Guggenheim further estimated that "the full economic impact of this recall could be roughly $3.8 billion to $6.4 billion in value.  This compares to $4.5 billion in market value loss since the beginning of this week."

826.   Given GM's extensive delays in recalling its dangerously unsafe cars, by the start of the Class Period, similar adverse reactions would have occurred if GM had belatedly recalled its unsafe cars at any point earlier in the Class Period.

827.   Second, on April 8, 2014, additional news further revealed, *inter alia*, GM's substantial exposure to civil liability and governmental penalties and adverse negative scrutiny in the media given its very long delays in addressing serious safety issues, and further impacted its stock price.  In a harshly critical letter reported after the close of trading, NHTSA informed GM Vice President and General Counsel, Lucy Clark Dougherty that NHTSA had determined to impose its **maximum allowable** fine of $7,000 per day on GM because GM had failed to respond to the Special Order by the deadline of April 3, 2014.  As described in ¶¶592-94 above, the letter concluded by threatening civil action against GM if GM failed to immediately

comply with the Special Order.  On April 9, 2014, during the trading day, *Dow Jones Institutional News* further reported in an article entitled "GM Downgraded: *'It's Cheap for a Reason,'*" "Federal regulators fined GM this week for failing to answer questions about the switch recall, and warned that the company could face stiffer penalties through federal courts."

828.   On April 9, 2014, in response to the disclosures set forth in ¶827 above, which further revealed to investors, *inter alia*, an increased risk of adverse governmental action and civil exposure of GM and continued negative scrutiny of the Company in the media given its very long delays in addressing serious safety issues, the Company's stock price declined in a statistically-significant amount net of general market and industry trading from a closing price of $34.53 on April 8, 2014 to close at $33.62 on April 9, 2014.  This statistically significant decline caused Lead Plaintiff and Class members to suffer further losses as the artificial inflation in GM's stock price was partially removed.

829.   Third, on April 10, 2014, after the close of the market, GM further quantified the adverse financial exposure caused by its long delayed safety recalls.  As described in ¶597 above, GM issued a press release announcing that the Company expected to record a *$1.3 billion recall charge* for the three months ended March 31, 2014, "primarily for the cost of recall-related repairs announced in the 2014 calendar year to date and related courtesy transportation."  In response, as set forth

in ¶598 above, *Dow Jones Institutional News* reported, *inter alia*, that "[t]he fallout from General Motors Co.'s troubled recalls escalated on Thursday with the auto maker raising its estimated costs to $1.3 billion… [a] charge [which was] more than three times GM's original estimate – [and] is greater than the Company's year-ago first quarter profit," and one that would lead to GM's first quarterly loss since emerging from bankruptcy. On April 11, 2014, the next day of trading, the Company's stock price declined in a statistically-significant amount net of general market and industry trading from a closing price of $33.30 on April 10, 2014 to close at $31.93 on April 11, 2014. This statistically significant decline caused Lead Plaintiff and Class members to suffer further losses as the artificial inflation in GM's stock price was partially removed and its recall-related liabilities were further quantified.

830. In sum, as news entered the market concerning the truth about GM's long-belated safety recalls, poor internal controls, reckless disregard for consumer safety, massive recall expenses, and exposure to substantial civil and criminal liabilities and penalties in connection with the First Recall Wave and the impact of the First Recall Wave on GM's finances, the Company's stock price fell by more than 13.9%, causing a loss of more than $8.2 billion in market capitalization, between the close of the market on March 10, 2014 and the close of the market on April 11, 2014.

831. Fourth, as discussed in ¶¶617-23 above, as adverse reports concerning the Company's long delayed actions and failures continued to be issued concerning the First Recall Wave, beginning in June 2014, GM began the long-belated Second Recall Wave concerning an additional 12.05 million cars. On July 24, 2014, GM issued a press release before the start of trading, and filed a Form 10-Q for the quarter ended June 30, 2014 during the trading day. These disclosures revealed additional new information about the financial impact of the First Recall Wave and the Second Recall Wave. As discussed in ¶¶632-33 above, in the July 24, 2014 press release, GM disclosed a special charge of $400 to $600 million related to the Compensation Facility Protocol (which was not capped) and GM further revealed that it had determined to change its accounting methodology for future recalls, now accruing costs for recall campaigns at the time of vehicle sale. This change resulted in a "$0.9 billion non-cash pre-tax special charge in the second quarter for the estimated costs of future possible recalls for up to the next 10 years on 30 million GM vehicles on the road today."

832. As discussed in ¶¶634-36 above, in the Form 10-Q filed with the SEC on July 24, 2014, GM disclosed the same special charge related to the Compensation Facility Protocol, as well as the $874 million "catch up adjustment" related to the change in its accounting methodology for recalls. In addition, GM disclosed in the Form 10-Q that it had taken a $325 million recall charge for the vehicles subject to

the Second Recall Wave.   As set forth in ¶637 above, in response to these disclosures, *Reuters* reported on July 24, 2014 that GM's recalls had accounted for a massive $3.8 billion in total costs so far in 2014.  In response to these disclosures, the Company's stock price dropped in a statistically-significant amount net of general market and industry trading from a closing price of $37.41 on July 23, 2014, to close at $35.74 on July 24, 2014.   This statistically significant decline caused Lead Plaintiff and Class members to suffer further losses as the artificial inflation in GM's stock price was further removed and its recall-related liabilities were further quantified.

833.   The following day, in an article entitled "Fallout From Recalls Hits Bottom Line," dated July 25, 2014, *The New York Times* reported:

> The automaker said on Thursday that its second-quarter earnings fell about 85 percent, mostly because of the financial fallout from its long-delayed recall of defective small cars that started in February.
>
> The drastic drop was caused, in part, by a $400 million charge taken to compensate those affected by faulty ignitions that can cut engine power and disable air bags.  It was the first time G.M. had put a dollar amount on the expected cost of the victims fund, though it said that amount could grow.
>
> G.M. also took an $874 million charge to cover future recall costs.  The two charges come on top of the $2.5 billion the company has already spent on recalls this year.
>
> But while the company has sought to contain much of the financial exposure from its safety problems to the first six months of the year, it still faces significant potential liabilities.
>
> In a federal filing, G.M. said that 45 state attorneys general were

investigating the company's failure for years to fix defective switches that it had tied to at least 13 deaths and 54 accidents.

In addition, more than 100 class-action lawsuits have been filed against the company in the United States and Canada and investigations by the Justice Department and Securities and Exchange Commission could prompt substantial fines and criminal charges.

'Such investigations could in the future result in the imposition of material damages, fines or civil and criminal penalties,' the company said in its quarterly filing with the S.E.C.

The article concluded, "The financial toll of the ignition switch problems, [], continues to mount."

834.   In sum, on July 24, 2014, when investors learned additional new information about the financial impact of the First Recall Wave and the Second Recall Wave, the Company's stock price fell more than 4.46%, causing an additional loss of more than $2.6 billion in market capitalization on that day alone.

## X.   SUMMARY OF SCIENTER ALLEGATIONS

835.   As alleged herein, GM and the Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company detailed in Section VIII above, were materially false or misleading and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

836.   The following allegations detailed in Sections IV and V above, viewed collectively, support a strong inference that corporate Defendant GM acted with

scienter:

(a)    GM's Prior Litigation With The Government.  As described above in ¶¶54-61, in the 1970s and 1980s, GM and other auto manufacturers litigated the issue of when a problem rises to the level of a "safety defect" under the Safety Act.  Such litigation made clear that when a car experiences a steering failure, momentary loss of control or braking, or requires the driver to even temporarily disable her vehicle, a safety defect exists.  As a result, GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or was at least reckless in not knowing) that moving shutdowns constitute a "safety defect" requiring a recall.

(b)    The Auto Industry Routinely Conducts Moving Shutdown Recalls.  As described above in ¶¶205-11, from 1979 through 2014, over 400 safety recalls have been conducted due to issues that caused shutdowns in vehicles, including moving shutdowns.  Indeed, in the past decade alone, Honda, Ford, Volkswagen, and BMW all have conducted recalls for moving shutdowns.  These facts support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or was at least reckless in not knowing) that moving shutdowns constitute a "safety defect" requiring a recall.

(c)    GM Repeatedly Punishes Whistleblowers For Reporting Safety Issues To The GM Executives And Its Board.  From 1998 through 2002, on at least three separate occasions, GM employees with responsibility for detecting safety and quality issues in the

465

Company's vehicles informed senior GM executives, including the members of GM's Board of Directors, of serious, systemic problems with GM's quality control systems, as described above in ¶¶329-47. In retaliation for their efforts, Haas and Hill were fired, and McAleer and Kelley were effectively relieved of their job responsibilities. These facts support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or was reckless in not knowing) that the Company's safety and quality internal control processes were deficient and GM employees who elevated safety issues within the Company were punished.

(d) <u>GM's Long History Of Failing To Maintain Effective Internal Controls.</u>  As described above in ¶¶275-88, prior to the start of the Class Period, GM had been forced to disclose multiple material weaknesses in its internal controls, had been sued by the SEC, and had been forced to restate its financial results for three years.  By the start of the Class Period, GM admittedly was still addressing its internal control weaknesses, as set forth in ¶¶287-88 above.  These facts support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that its internal controls needed to be improved.

(e) <u>GM Instructs Employees Not To Reference "Safety," "Defect," Or "Stalling" In Communications About Safety Issues, Including In Safety Warnings To Dealers.</u>  As described in ¶¶348-51, 354, and 437 above, throughout the 2000s, consistent with GM's emphasis on profits over safety, GM employees were formally trained to avoid "hot words," including words such as "safety," "defect," and

"stalling" when writing about safety issues because GM knew that such words would alert customers and/or NHTSA to safety concerns, and potentially cause GM to incur additional costs. For this reason, GM intentionally struck the word "stalling" from the December 2005 TSB regarding the ignition switch defect at issue in this case. This training and action with regard to the December 2005 TSB at issue supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or was reckless in not knowing) that the ignition switch defects and resultant moving shutdowns presented a serious safety issue, and GM knowingly (or at least recklessly) chose not to disclose this risk and to describe it falsely in its communications to dealers, consumers and investors to avoid regulatory scrutiny.

(f)   **GM Receives Hundreds Of Complaints And Warranty Claims Regarding The Ignition Switch Defects And Moving Shutdowns.** As described in ¶¶64-148, 160, and 162-66 above, and Exhibits A and B, from at least 2003 through 2014, GM received hundreds of customer complaints and warranty claims related to the ignition switch defects, including first-hand accounts of moving shutdowns. These complaints detailed the extreme concern for safety felt by drivers experiencing the moving shutdowns, including in many instances, resulting injuries and accidents. The warranty claims also represented a significant enough economic cost to the Company to cause it to finally implement in 2009 the previously avoided "band aid" change to the key hole design (*see* ¶¶453-59 above). Moreover, GM was required under its own accounting policies to review the warranty claims, as described above in ¶262. In addition, as described in ¶161 above, GM filed with NHTSA 2,039 separate EWR reports reflecting deaths and injuries related to the ignition switch defects in vehicles subject to the First Recall Wave. Moreover, as described above in ¶162 and detailed in Exhibit B hereto, NHTSA received hundreds of complaints detailing moving shutdowns in the vehicles subject to the Second Recall Wave. The

467

severity and magnitude of these complaints, warranty claims, and EWR reports support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that the ignition switch defects constituted a safety defect requiring a large recall, and that GM's Liabilities, Costs, and Contingencies were materially understated during the Class Period.

(g)    **GM Warns Dealers About The Ignition Switch Defect At Issue In The First And Second Recall Waves.**  As described in ¶450 above, on May 22, 2003, GM issued a voicemail warning to dealerships regarding the vehicles subject to the Second Recall Wave.  This warning acknowledged that the ignition switch could shut off while driving, causing a moving shutdown.  Similarly, as described above in ¶¶400, 424 and 436-37, beginning in February 2005, GM issued multiple warnings to dealers of the vehicles subject to the First Recall Wave, including a February 2005 Preliminary Information and a December 2005 TSB.  These warnings support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or was reckless in not knowing) about the ignition switch defects in the vehicles subject to both the First and Second Recall Waves, that this issue was a safety defect requiring a large recall, and that GM's Liabilities, Costs, and Contingencies were materially understated during the Class Period.

(h)    **GM Learns Of Increased Safety Concerns Through Litigation.**  In early 2004 through the Class Period, GM's legal staff started to become aware of incidents concerning the non-deployment of

468

Cobalt and Ion airbags.  As described in ¶¶460-483 above, in connection with product liability litigation and accident claims, GM had specific processes in place to ensure that such incidents were elevated within the Company, and that safety issues were communicated between GM's legal staff and GM engineers. Moreover, as set forth in ¶¶421 and 464-65 above, GM's senior legal staff responsible for reporting safety issues knew there was a serious safety issue and that knowledge was sufficient to report the issue, notwithstanding any purported search for the "root cause" of the problem, which was not necessary for GM to take action.  These facts support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or at least recklessly disregarded) that there was a safety issue requiring a recall that needed to be disclosed.

(i)   <u>GM Admits That Moving Shutdowns Are A Safety Defect During Meetings With NHTSA In The Summer Of 2004.</u>  In the summer of 2004, NHTSA and GM engaged in an ongoing discussion about the dangers of moving shutdowns, as described in ¶¶187-95 above.  For example, at a NHTSA/GM meeting on June 3, 2004, GM admitted that moving shutdowns "require more rigorous review."  As another example, on June 11, 2004, Defendant Kent conceded in a letter to NHTSA that over the past 20 years, GM had conducted three safety recalls and instituted 17 other field actions for engine shutdowns. These actions support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or was reckless in not knowing) that moving shutdowns constitute a safety defect warranting a recall.

(j)   <u>GM Conducts Moving Shutdown Recalls Of Other Cars In 2004-2005.</u>  As described in ¶¶191 and 196-98 above, in separate recalls on June 4, 2004, April 14, 2005, and April 19, 2005, GM recalled certain vehicles because they were experiencing moving shutdowns, which GM admittedly identified as a safety defect.  These prior recalls support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that moving shutdowns constitute a safety defect warranting a recall.

(k)   <u>GM Admits That Moving Shutdowns Are A Safety Issue In A Report To The GM Board.</u>  As described in ¶194 above, in connection with a July 2004 NHTSA fine of $1 million, GM's Board of Directors received a report dated August 3, 2004, which reported NHTSA's view that moving shutdowns in certain Saabs "posed an unreasonable risk to safety and should be recalled for that reason."  This report supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that moving shutdowns constitute a safety defect warranting a recall.

(l)   <u>GM Replicates Ignition Switch Defect In Test Studies.</u>  In November 2004 and June 2005, GM engineers responsible for safety issues successfully replicated the ignition switch defect at the Company's Milford Proving Grounds, as described above in ¶¶396 and 415-16.  Following the 2005 test, GM engineer Alberto Manzor concluded and shared with his GM colleagues that the ignition switch defect should have been considered a safety issue.  GM's

470

knowledge (or reckless disregard) of the results of these tests supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) internally identified the ignition switch issue and knew (or was reckless in not knowing) that it was a safety defect requiring a large recall and that GM's Liabilities, Costs, and Contingencies were materially understated during the Class Period.

(m)  Moving Shutdowns Constitute A Safety Defect Under Both NHTSA's And GM's Own Shutdown Framework.  As described above in ¶¶199-200, in March 2005, GM's Product Investigations Group developed a multi-factor framework called "Applying Stalling Assessment Framework," which specified that factors such as whether shutdowns occurred while the car was moving, whether the power steering and power brakes in the vehicle failed during a shutdown, and whether the driver received any warning prior to experiencing a moving shutdown should be taken into account when assessing whether a moving shutdown constituted a safety defect. As described above in ¶201, during the same time, NHTSA was simultaneously developing its own shutdown framework, which specified that factors including the speeds at which the shutdown occurred, the loss of steering and braking functions, and any accidents or other unsafe events resulting from the incident should be taken into account when assessing whether a moving shutdown constituted a safety defect.  The moving shutdowns at issue in this action satisfied all of these factors, as detailed above in ¶¶64-148, 160, and 162-66.  These facts support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after

471

they were issued) knew (or recklessly disregarded) that moving shutdowns constitute a safety defect warranting a recall.

(n)   <u>GM Receives Requests From Consumers To Buy Back Their Defective Vehicles.</u>  As described in ¶¶64-148, 160, 162-66, and 406-09 above, by at least May 2005, GM had received dozens and likely hundreds of reports of moving shutdowns and was receiving and granting buyback requests for Cobalts following complaints that consumers made to dealers and GM to avoid further adverse publicity.   Indeed, senior GM executive Parks had first-hand knowledge of a buy back request concerning the defective ignition switch, and recommended "coming up with a plug" for the key head to address this issue.  These facts support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that significant numbers of Cobalts contained defective ignition switches, that this constituted a safety defect warranting a large recall, and that GM's Liabilities, Costs, and Contingencies were materially understated.

(o)   <u>Critical First-hand Journalist Accounts Of Moving Shutdowns Resulting From The Ignition Switch Defects Are Reported In The Media.</u>  As described above in ¶¶412 and 418-19, in May and June of 2005, critical accounts of journalists experiencing moving shutdowns were reported in the media.  For example, on May 26, 2005, the *Sunbury Daily Item* reviewed a test drive of the Cobalt, and reported experiencing four "unplanned engine shutdowns," stating "I never encountered anything like this in 37 years of driving and I hope I never do again."  This article was discussed at a June 14, 2005 internal GM VAPIR meeting.   As another example, documents prepared for the same June 14, 2005 meeting show that GM was aware at this time that *The New York Times* reporter Jeff Sabatini was working on a story concerning moving shutdowns with the Cobalt based on his own wife's experience, as described above in ¶412.  These critical reports of moving shutdowns in the media

472

support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or was reckless in not knowing) that moving shutdowns in the Cobalt were a safety defect warranting a large recall, and that GM's Liabilities, Costs, and Contingencies were materially understated during the Class Period.

(p)   GM's Spokesperson Adler Acknowledges Moving Shutdowns Resulting From "Bumping" The Ignition Key In A Statement To *The New York Times.* As described above in ¶419, on June 19, 2005, Alan Adler, GM's spokesman and manager for safety communications, acknowledged that Cobalt drivers could "cut power to the engine by inadvertently bumping the ignition key," in an official statement to *The New York Times*, but falsely assured consumers that this occurred "in rare cases where a combination of factors is present," and that it was not a safety issue, and failed to disclose the ignition's low detent force. Adler also admitted that GM had warned dealers about the issue in February 2005. This carefully-worded and false and misleading statement supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that the ignition switch defect was present across multiple Cobalts and knew (or recklessly disregarded) that it was a safety defect warranting a large recall, and that GM's Liabilities, Costs, and Contingencies were materially understated during the Class Period.

(q) <u>Delphi Notes In Internal Email That Cobalt Is "Blowing Up" In GM's Face.</u>  As described above in ¶¶413-14, in June 2005, it was becoming even more widely known within GM and to GM's business partners that the ignition switch was a significant safety issue.  For example, in an internal Delphi email dated June 14, 2005, Delphi noted, "Cobalt is blowing up in their [GM's] face in regards to turning the car off with the driver's knee."  This email supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that the ignition switch defect was present across multiple Cobalts, that it was a safety defect warranting a large recall, and that GM's Liabilities, Costs, and Contingencies were materially understated during the Class Period.

(r) <u>GM's Senior Legal Staff Seeks To "Defend A New Launch" Rather Than To Focus On Safety.</u>  As described in ¶421 above, at or around June 23, 2005, senior GM legal staff, including Kemp, determined that they would not be able to convince an interested journalist that the risk of moving shutdowns in newly-launched Cobalts was "remot[e]" because they were "not optimistic we can come up with something compelling."  Nonetheless, Kemp, who was GM's senior most in-house attorney responsible for reporting safety issues, insisted in an internal email to a colleague:  "We can't stand hearing, after the article is published, that we didn't do enough to defend a brand new launch."  These emails support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that the ignition switch issue in the newly launched Cobalts was widespread, and that

senior GM legal staff believed that they needed to provide false assurances that the issue was "remot[e]" and "defend a brand new launch" rather than address safety and accurately report GM's Liabilities, Costs and Contingencies.

(s)    <u>Senior GM Executives And Other GM Employees Personally Experience The Ignition Switch Problem.</u>  As described in ¶¶425-26 above, in the summer of 2005, senior GM executives, including Wachtel and Defendant Kent, (who spoke publicly on GM's behalf during the Class Period about GM's purported commitment to safety as set forth in ¶¶732-34, 780, 795, and 812 above) were able to easily replicate the ignition switch issue in the Cobalt.  Moreover, as detailed above in ¶425, a GM design engineer described her experience of a moving shutdown due to the ignition defect in an August 30, 2005 email to fellow GM employees, stating, "I think this is a serious safety problem …. I'm thinking big recall…. I think you should seriously consider changing this part to a switch with a stronger detent."  Many other GM drivers and engineers experienced the ignition switch defect first-hand, as detailed above in ¶401.  This personal experience of GM senior executives and other GM employees supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew about (or recklessly disregarded) the ignition switch defects warranting a "big recall," and that GM's Liabilities, Costs, and Contingencies were materially understated during the Class Period.

(t)    <u>GM Acknowledges "Inadvertent Ignition Shutoffs" In Internal Reports, But Refuses To Implement A Fix Due To Costs.</u>  As described in ¶431 above, on September 20, 2005, Hendler, GM Vehicle Systems Engineer ("VSE") for electrical systems, wrote an email to 16 employees, including GM senior executive Queen, in which he stated that at the time of the Cobalt launch he was "very aware of an issue with inadvertent ignition offs' due to the low mounted ignition switch in the steering column and the low efforts

to rotate the ignition." He added that the Delta team had developed a design change that would fix the ignition switch defect in Cobalts, but the design change would not be implemented until the associated costs could be eliminated or reduced. This email supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that the ignition switch was defective, had developed a design change to address the problem, and delayed implementing that fix due to concerns about cost.

(u) <u>GM Includes Trooper Young's Report In A 2007 NHTSA Submission.</u> As described in ¶¶167 and 467-69 above, Trooper Young's "Collision and Analysis & Reconstruction Report," dated February 14, 2007, concluded with respect to a MY05 Cobalt that the airbags had failed to deploy because of the ignition switch defect. The fact that an outsider could easily make the connection between GM's ignition switch defects and airbag non-deployment demonstrated that GM's far more knowledgeable employees and executives knew about or recklessly disregarded the connection between the ignition switch defects and airbag non-deployment. GM also addressed Trooper Young's report in a report that GM submitted to NHTSA in 2007. These facts support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that the ignition switch defects raised serious safety issues warranting a large recall, including airbag non-deployment.

(v) <u>GM Is Not Forthright With NHTSA In Response To Death Inquiries.</u>  In June 2007, GM was not forthright with NHTSA about the cause of the Candice Anderson crash.  As described in ¶¶475 and 551 above, in June 2007, GM falsely told NHTSA that it had not assessed the cause of the crash.  Similarly, in response to a death inquiry regarding Seyde Chansuthus's death from the ignition switch defect in December 2009, GM did not disclose that, as reported by *The New York Times*, "there had already been a thorough review of Ms. Chansuthus's accident within GM."  These facts support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that the ignition switch was defective and did not disclose this information to regulators to avoid further scrutiny, including in response to NHTSA "death inquiries."

(w) <u>GM Acknowledges Ignition Switch Failure And Warranty Liabilities In Connection With Delphi Bankruptcy.</u>  On August 14, 2007, GM executed a Warranty Settlement Agreement with Delphi. As described above in ¶452, the Warranty Settlement Agreement included entries regarding the "ignition switch failure" on vehicles subject to the First Recall Wave, and was signed by senior GM attorneys Schultzman and Buonomo on behalf of GM.  The Warranty Settlement Agreement supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or was reckless in not knowing) of significant warranty liabilities with the defective ignition switches, which further revealed the ignition switch safety defects, and rendered GM's Liabilities, Costs, and Contingencies materially

understated during the Class Period.

(x) <u>GM Actively Tracked The Warranty Costs Resulting From The Ignition Switch Defects.</u> As described in ¶¶455-57 above, in January 2009, GM was actively assessing the cost-benefit effect that changing the ignition switch to higher detent force would have on GM's Cobalt warranty costs, and concluded in a written slide deck prepared by David Trush (the Lead Design Engineer of the ignition cylinder) that such a change would "never" result in sufficient payback to the Company. These facts support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) (i) that the ignition switch was defective, but was motivated not to address that safety defect due to concerns about cost, and (ii) of significant warranty liabilities and safety issues with the ignition switch, which rendered GM's Liabilities, Costs, and Contingencies materially understated during the Class Period.

(y) <u>GM Changes The Key Design In Response To High Warranty Claims.</u> As described in ¶¶453-59 above, in March 2009, due to a high number of warranty claims, GM finally implemented the same Cobalt key design change that it had decided not to implement in 2005. This fact supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that the ignition switch was defective, and that GM knew (or was reckless in not knowing) of significant warranty liabilities and safety issues with the ignition switch, which rendered GM's Liabilities, Costs, and Contingencies materially

478

understated during the Class Period.

(z)     <u>GM Senior Officers And Senior Management Were Monitoring Warranty Costs Resulting From The Ignition Switch Defects.</u>  As described in ¶¶453-59 above, GM's top executives were monitoring warranty costs resulting from the ignition switch defects.  For example, on March 5, 2009, a slide deck opened on then-CEO Wagoner's computer, which referenced the Cobalt's inadvertent shut-off issue, described the March 2009 Cobalt design change, and discussed how this change would help GM reduce warranty costs.  Moreover, as described above in ¶454, GM's senior officers were highly motivated to reduce warranty costs as warranty costs factored into their personal annual compensation.  In addition, as described above in ¶716, Defendant Akerson admitted on January 10, 2012, that GM was actively monitoring its own warranty costs and comparing those costs to the warranty costs of its competitors.  These facts support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) (i) that the ignition switch was defective, and (ii) of significant warranty liabilities and safety issues with the ignition switch, which rendered GM's Liabilities, Costs, and Contingencies materially understated during the Class Period.

(aa)    <u>GM Conducts A Power-Steering Recall In 2010.</u>  As described in ¶¶212-221 above, in March 2010, GM recalled certain MY 2005-2010 Cobalts and other vehicles due to a defect that caused a sudden loss of power steering.  This power-steering recall supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth

479

above after they were issued) knew (or recklessly disregarded) that the ignition switch issue, which also caused a loss of power steering as well as power brakes, was a safety defect warranting a recall.

(bb)  GM's Outside Counsel Repeatedly Warns GM Of Risk Of Punitive Damages And Loss At Trial, Resulting In High Settlement.  As described in ¶¶476-77 and 481 above, on October 7, 2010 and, again, on July 26, 2011, GM was warned by its outside counsel, King & Spalding, that it faced likely punitive damages exposure based on two different Cobalt airbag non-deployment cases.  King & Spalding further warned GM that the SDM data from both accidents showed that the cars were in "off" and "accessory" mode, respectively, at the time of the accidents. On July 22, 2013, as described in ¶¶512-15 above, King & Spalding, once again, warned GM that GM's own documents would enable counsel in a different case to convince a jury that GM knew about the ignition switch defect since the launch of the Cobalt in 2005.  The King & Spalding report for that case further addressed recent incidents involving the failure of airbags to deploy in 2005-2007 Cobalts. In September 2013, GM settled the case for $5 million, the maximum amount the SRC could authorize. These facts support a strong inference that GM  (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew about (or recklessly disregarded) the ignition switch defects, which rendered GM's Liabilities, Costs, and Contingencies materially understated during the Class Period.

(cc)  GM's Competitors Conduct Ignition Switch Defect Recalls In 2011.  As described above in ¶¶208-11, in 2011, Chrysler and Volkswagen conducted safety recalls due to those companies' vehicles' ignitions switching from "run" to "accessory" mode, and causing an engine shutdown.   These facts support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or

contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) moving shutdowns in its own cars constituted a "safety defect" warranting a recall.

(dd)   <u>Senior Management Was Closely Involved In Discussions About The Ignition Switch Defects</u>.   As described in ¶¶478-83 above, GM's senior executives were closely involved in discussions about the ignition switch defects.   For example, as described in ¶¶478 and 480 above, on July 27, 2011, GM lawyers and members of the Product Investigation team convened an "unusual" meeting regarding Cobalt airbag non-deployment issues "to make sure senior management had eyeballs on this."   Similarly as detailed above in ¶306, "senior GM executives received detailed briefings" about the ignition switch defects and its effect on airbag non-deployment in 2012.   These facts support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that the ignition switch was defective warranting a large recall, and that the ignition switch defect also caused airbag non-deployments.

(ee)   <u>GM Appoints A "Champion" To Analyze The Ignition Switch Defect In 2012.</u>   As described above in ¶¶484-99, GM acknowledged the severity of the ignition switch defects in 2012 and devoted significant resources to address the issue.   For example, on March 15, 2012, senior GM product litigation attorney Palmer and senior Product Investigations investigator Stouffer decided to appoint an "Executive champion" to lead the FPE investigation. This fact supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished

information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that there was a significant safety defect regardless of any purported search for a root cause.

(ff)   <u>A Personal Injury Plaintiff's Expert Report Concludes In 2012 That The Ignition Switch Defect Causes Cobalt Airbag Non-deployments And That GM Knew About The Defect.</u>   As described above in ¶¶500-03, plaintiff's expert Shipp concluded in June 2012 that the low torque of the defective ignition switch caused Cobalt airbag non-deployments, and that "General Motors knew that the design of the ignition switch was improper and could cause power interruption during [sic]."   The Shipp Report was discussed by senior GM employees and attorneys in meetings in July 2012.   These facts give rise to the strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that the ignition switch was defective warranting a large recall, and that the ignition switch caused Cobalt airbag non-deployments.

(gg)   <u>GM Internally Recognizes The Need For An Ignition Switch Defect Recall In November 2013.</u>   As described in ¶519 above, on November 5, 2013, GM held an Investigation Status Review meeting at which Stouffer presented findings showing the connection between the ignition switch defect and airbag non-deployment.   Senior GM employee Benavides concluded after attending that meeting that there should be a recall, but did not disclose this to NHTSA at a meeting two days later.   These facts support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for,

prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that a large recall of cars with the defective ignition switches was necessary.

(hh)   **GM Orders 500,000 Replacement Ignition Switches On A Rush Basis In December 2013.**   As described above in ¶¶526-30, on December 18, 2013, after an EFADC meeting with senior executives, GM placed an urgent order for 500,000 replacement ignition switches for Cobalts and other vehicles.  This fact supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that a large recall of Cobalts and other vehicles with defective ignition switches was necessary.

(ii)   **Millions Of Vehicles With Defective Ignition Switches Were Left On The Road For A 10-Year Period.**  As described above in ¶¶546-49, on February 7, 2014, GM announced the first of a series of recalls in the First Recall Wave, followed by another series of recalls comprising the Second Recall Wave, for a grand total of ***14,670,620 recalled cars***.  Millions of these recalled vehicles were launched in the early 1990s and 2000s, and therefore on the road, and subject to ongoing complaints and warranty claims as described above in ¶¶64-148, 160, and 162-66, for 10 years.  These facts support a strong inference that GM  (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations

set forth above after they were issued) knew about (or recklessly disregarded) the ignition switch defects, which rendered GM's Liabilities, Costs, and Contingencies materially understated during the Class Period.

(jj)   <u>GM Admits In April 2014 That Moving Shutdowns Are A Safety Defect.</u>  As described above in ¶174, in her April 1, 2014 testimony before the House Committee on Energy and Commerce, GM CEO Barra admitted that contrary to Adler's 2005 statement to *The New York Times*, moving shutdowns at highway speeds are a safety issue. This admission supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that moving shutdowns constitute a safety defect warranting a recall.

(kk)   <u>GM Admits In February 2014-January 2015 That Its Internal Controls Are Defective.</u>  As described above in ¶¶297-327, GM admitted in February 2014 through January 2015 that its internal controls were not effective during the Class Period.  For example, in her testimony before the House Committee on Energy and Commerce on April 1, 2014 and April 2, 2014, GM CEO Barra admitted that GM focused on costs in the past more than the safety of customers or quality of its vehicles.  In addition, as described above in ¶¶302-03, in a Consent Order with NHTSA dated May 16, 2014, GM admitted to numerous internal control failures, including inadequacies in its processes for identifying safety defects and reporting those defects to NHTSA, and its processes for assessing the number of warranty claims relating to safety defects.  GM further identified in the Consent Order its failure to "conduct a safety recall because GM had not yet identified the precise cause of the defect," as an additional internal control failure.

On June 5, 2014, Barra admitted in connection with the Company's announcement of the Compensation Facility Protocol, ***"We made serious mistakes in the past and as a result we're making***

*significant changes in our company to ensure they never happen again."* Barra similarly admitted to internal control failures during a "town hall" meeting on June 5, 2014, stating, *"We are going to fix the failures in our system …."* On June 6, 2014, Solso, Chairman of GM's Board of Directors, similarly stated, "The Board, like management, is committed to *changing the company's* culture and *processes* to ensure that the problems described in the Valukas report never happen again."

During another House Committee on Energy and Commerce hearing on June 18, 2014, Barra testified, *inter alia*, that *the way that GM's process "broke down" was "unacceptable."* On July 17, 2014 during the hearing before the Senate Consumer Protection Subcommittee and in connection with the findings of the Valukas Report, Defendant Barra conceded that *"I will use the report's findings and recommendations to attack and remove information silos wherever we find them and to create an organization that is accountable and focused on the customer."* Defendant Barra's prepared remarks on July 17, 2014 reiterated: "We removed fifteen employees from the company… *some for misconduct* or incompetence, others because they didn't take responsibility or act with a sense of urgency." Defendant Akerson similarly admitted on July 28, 2014, *"I think we all – including the new and the old part of the management team – didn't fully realize how deep some of the problems ran."* On September 8, 2014, Chairman of GM's Board of Directors, Solso, similarly admitted, *"Yes, we should have known earlier. The way I look at it, G.M. has not been well run for a long time."* On October 1, 2014 during a conference call with investors, Defendant Barra further admitted that the Company's internal controls were defective, stating: "[W]hen I think about how do I start changing a culture, creating the ultimate culture that we want, it starts today with the behaviors that we demonstrate. And we've been very clear with our leadership team and as we've rolled out the core values to every employee, that *we need to change behaviors, and that includes me."* GM spokesperson Adler also admitted on November 11, 2014, that *"our system needed reform, and we have done so. We have reorganized our entire safety investigation and decision process…."* Defendant GM President Ammann also admitted on November 11, 2014, *"It [the ignition switch recall] reinforced the need for ongoing change. We needed*

*to break down our internal silos, integrate and require transparency across the business so that everyone is sharing information."* Finally, Defendant Barra further admitted on January 8, 2015 concerning GM's internal controls and the ignition switch recalls, *"It was clearly a tragedy, and it was deeply troubling. But we quickly acknowledged our shortcomings and set about addressing them."*

All of these admissions support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that its internal controls were not effective when GM repeatedly certified that its internal controls deficiencies had been remedied and were effective throughout the Class Period. Given the admitted and extensive failures of GM's internal controls over such a long time period, GM's repeated certifications were either knowingly or recklessly false when made.

(ll)  <u>House Energy And Commerce Committee Investigation Concludes That GM Knew About The Ignition Switch Defect Years Before Conducting The Recalls.</u>  As described above in ¶¶159-60 and Exhibit A hereto, based on its own review of claims in GM's internal warranty claims database dated from June 2003 through June 2012, the House Committee of Energy and Commerce concluded on April 1, 2014, that GM knew from consumer complaints that the ignition switch defect caused moving shutdowns, and simultaneously denied the existence of a safety defect.  This finding supports a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth

above after they were issued) knew (or recklessly disregarded) that the ignition switch defects were a safety defect warranting a recall.

(mm) <u>NHTSA Investigation Concludes That GM Knew About The Ignition Switch Defect Years Before Conducting The Recalls.</u>  As described above in ¶¶302-08, NHTSA conducted an investigation into GM's handling of the ignition switch defect, which resulted in GM signing the Consent Order with NHTSA on May 16, 2014. NHTSA's investigation concluded that GM engineers, lawyers, investigators, and senior management responsible for reporting safety issues knew about the defect and its connection to airbag non-deployment for years prior to GM's decision to conduct the ignition switch recalls.  In the Consent Order, GM "admit[ted] that it violated the Safety Act" and agreed to "pay the United States a ***maximum civil penalty***" of $35 million for those violations.  In a May 16, 2014 press release issued in connection with the Consent Order, NHTSA Acting Administrator Friedman further summarized NHTSA's findings, stating that "the evidence we found behind [GM's failure to report a safety-related defect in a timely manner] was deeply disturbing," and concluding, *inter alia*, that ***GM had known about the ignition switch defect "for many years,"*** and that ***"senior management received detailed briefings about this safety-related defect,"*** as described above in ¶¶306-08.  These findings and admissions support a strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) knew (or recklessly disregarded) that the ignition switch failures were a safety defect warranting a recall, and that GM's internal controls were not effective during the Class Period.

(nn) <u>Numerous GM Employees Are Fired And Others Retire In The Wake Of The Ignition Switch Recalls.</u>  As described above in ¶599, on April 22, 2014, GM's Global Engineering Chief, Calabrese, "elected to retire" as part of GM's restructuring of the department in order to "address functional safety and compliance of its vehicles."

487

Moreover, as described above in ¶600, weeks later, on May 5, 2014, Federico, one of the many GM team leaders responsible for the Cobalt ignition switch issue, announced his sudden retirement from GM.  In addition, as described above in ¶¶522-25 on December 10, 2013, GM announced that Defendant Akerson would "retire" due to family reasons, yet, weeks later, Akerson took a Board of Director position at Lockheed Martin and rejoined The Carlyle Group as Vice Chairman and Special Advisor to the Carlyle Board.   Also on December 10, 2013, GM announced that Defendant Ammann would be promoted to President, effectively stepping down as CFO. Moreover, as described above in ¶613, in June 2014, 15 GM employees, including Kemp, Buonomo, Palmer, Porter, and other in house attorneys, as well as Benavides, Altman, Defendant Kent, and Robinson, were fired from GM. Barra told reporters that most of the 15 individuals dismissed were in "senior or executive roles" and ***"reached the highest levels of the company."***   In addition, as described above in ¶647 on October 17, 2014, GM announced that Millikin, GM's General Counsel, had informed the Company of his decision to retire early in 2015.

These facts support the strong inference that GM (including its individual agents who uttered or issued the misrepresentations set forth above; who authorized, requested, commanded, furnished information for, prepared, suggested or contributed language for inclusion therein or omission therefrom, reviewed, or approved the misrepresentations above; and its high managerial agents and board members who ratified, recklessly disregarded or tolerated the misrepresentations set forth above after they were issued) (i) knew (or recklessly disregarded) that the ignition switch failures were a safety defect warranting a recall; (ii) knew (or recklessly disregarded) that its internal controls were not effective during the Class Period; and (iii) suspiciously timed Akerson's and Ammann's removal as CEO and CFO so that they would not certify that the Company's internal controls were effective immediately prior to the Company's announcement of the ignition switch recall, as discussed further in ¶¶522-25 above.

837.  In addition, as described above in ¶¶534-49, even when GM did ultimately decide to conduct the ignition switch recalls at issue in this action, it did

so very slowly, with long delays, and on a piecemeal basis.  Indeed, GM's decision to expand the recalls to include additional vehicles with dangerously defective ignition switches occurred only in response to substantial media and litigation pressure.

838.   All of these facts, viewed collectively, support a strong inference of corporate Defendant GM's scienter.

839.   Moreover, the following additional allegations support a strong inference that during the Class Period, Individual Defendants Akerson, Cyprus, Liddell, Ammann, Stevens, Barra, Timko, and Kent each knew or recklessly disregarded at the time of their own statements listed above that, contrary to their repeated public statements, (i) the costs of GM's product warranty and recall campaigns for defective vehicles, as well as the costs of claims against the Company that GM incurred, or reasonably expected to incur, as a result of the Company's manufacture and sale of the defective vehicles (including those eventually paid for by the Compensation Facility Protocol), were materially understated; (ii) the Company's internal controls over financial reporting were not effective; and (iii) GM's vehicles were not safe and GM did not place consumer safety first as it repeatedly claimed.

840.   ***First,*** as detailed above at ¶¶677, 693, 701, 709, 727, 742, 750, 756, 768, 777, 785, 792, and 806, Individual Defendants Akerson, Liddell, Ammann,

Stevens and Barra each personally certified GM's internal controls as effective during the Class Period, including Barra and Stevens doing so just one day before the First Recall Wave began. Given the extensive internal control problems at GM for such a long period of time and concerning such an important safety issue, these officers' repeated personal certifications made even after the ignition switch problems were widely known within GM, were either knowingly or recklessly false when made. Contrary to these officers' repeated certifications, GM's internal controls were inadequate and not effective throughout the Class Period. Indeed, thereafter, GM, Akerson, Ammann, and Barra each <u>admitted</u> that during the Class Period, the Company's internal controls were inadequate, contrary to their own prior certifications, and NHTSA independently concluded that GM had multiple internal control failings in its ability to account for and adequately address its significant safety-related problems over such an extended period of time.

841. For example, in the Consent Order GM entered into with NHTSA on May 16, 2014, GM admitted to serious inadequacies in its internal controls, including:

- "GM's ***ability to analyze data to identify potential safety-related defects***" was inadequate;

- GM had failed to "encourag[e]" and needed to "improv[e] ***information-sharing across functional areas and disciplines***";

- GM's ***recall decision-making process was inadequate***, necessitating the need for GM to "increas[e] the speed with which recall decisions

490

are made (including by clarifying the recall decision-making process to decrease the number of steps prior to making the final decision of whether to conduct a recall)";

- GM had *failed to adequately communicate* "*with NHTSA* regarding actual or potential safety-related defects"; and

- GM's "*ability to identify safety consequences and the severity of those consequences*, as well as to assess the number or rate of allegations, complaints, incidents, reports and/or warranty claims relating to potential safety-related defects" was "inadequate."

GM further admitted in the Consent Order that it "violated the Safety Act," and agreed to pay NHTSA's *maximum fine* as punishment for those violations.

842.   Moreover, as described above in ¶¶313-14, Barra admitted in her testimony before the House Committee on Energy and Commerce on June 18, 2014 regarding GM's internal controls, *"it is unacceptable the way things broke down, and that is why we have made dramatic process changes."*  Barra further admitted during her June 18, 2014 testimony that the Valukas Report *"paints a picture of an organization that failed to handle a complex safety issue in a responsible way…."*

843.   As described above in ¶¶316-17, on July 17, 2014, CEO Barra again admitted to a failure of GM's internal controls during her testimony at a town hall meeting, stating, *"we accepted responsibility for what went wrong."*  Barra further admitted that the Compensation Facility Protocol was created "as an exceptional response to a *unique set of mistakes that were made over an extended period of time.*"  During the same hearing and in connection with the findings of the Valukas

Report, Defendant Barra admitted that *"I will use the report's findings and recommendations to attack and remove information silos wherever we find them and to create an organization that is accountable and focused on the customer."*

844.   On September 8, 2014, Solso, Chairman of GM's Board of Directors, similarly admitted with respect to GM's internal controls, *"Yes, we should have known earlier.  The way I look at it, G.M. has not been well run for a long period of time,"* as described in ¶321 above.

845.   Moreover, as described above in ¶324, on October 1, 2014, Defendant Barra conceded that the Company's internal controls had been defective, stating during a conference call with investors, "[W]hen I think about how do I start changing a culture, creating the ultimate culture that we want, it starts today with the behaviors that we demonstrate.  And we've been very clear with our leadership team and as we've rolled out the core values to every employee, that *we need to change behaviors, and that includes me*."

846.   As described above in ¶326, Defendant Ammann similarly admitted on November 11, 2014, *"It [the ignition switch recall] reinforced the need for ongoing change.  We needed to break down our internal silos…,"* Similarly, on November 11, 2014, GM spokesperson Adler admitted that the recent release of GM internal emails dated December 2013 demonstrating that GM had decided to conduct a recall three months before it actually did so, "*are further confirmation that our system*

492

*needed reform,* and we have done so.  **We have reorganized our entire safety investigation and decision process** and have more investigators, move issues more quickly and make better decisions with better data," as detailed above in ¶325.

847.  Finally, on January 8, 2015, at a media roundtable, Defendant CEO Barra further **admitted** regarding the ignition switch recalls and GM's internal controls, **"It was clearly a tragedy, and it was deeply troubling.  But we quickly acknowledged our shortcomings and set about addressing them,"** as described above in ¶327.

848.  **Second**, as detailed below, the Individual Defendants Akerson, Liddell, Ammann, Stevens, and Kent received <u>internal reports that diverged from their external statements</u> on the subjects of GM's Liabilities, Costs, and Contingencies; internal controls; and the safety of GM vehicles.

849.  As a member of GM's Board of Directors during the Class Period, Defendant Akerson received quality reports, litigation reports, regulatory reports, and reports about safety-related issues.  The quality reports contained detailed information regarding safety issues with GM vehicles, including (i) warranty claims, and costs resulting from those claims; (ii) information about recalls, including data concerning costs associated with "field actions"; and (iii) GM's rankings in buyer's guides such as *Consumer Reports* and *JD Power*, which contained evaluations of GM vehicles, including results from tests conducted on the vehicles' braking and

steering systems, defects reported in the first three months after purchase, and the dependability of the vehicles over time.[1019]

850.   Along with these quality reports, the Board often received presentations given by the Vice President of Quality or other knowledgeable executives regarding quality and safety issues.[1020]  GM's CEO and direct reports of the CEO also received similar presentations regarding quality and safety issues with GM vehicles, which were "made at the regular meetings held among the CEO and his/her direct reports." [1021]  During the Class Period, Defendants Akerson, as CEO, and Liddell, Ammann, and Stevens, as direct reports of the CEO, would have received these presentations.

851.   As described in ¶¶150-60 above, in light of the magnitude of warranty claims filed in connection with the vehicles subject to the First and Second Recall Waves, which detailed moving shutdowns caused by the ignition switch defects, Defendants Akerson, Liddell, Ammann, and Stevens knew (or recklessly disregarded) from the quality reports and/or presentations regarding quality and safety issues they received during the Class Period that their external statements regarding GM's Liabilities, Costs and Contingencies, and the safety of GM vehicles, were materially false and misleading when made.  Indeed, as set forth in ¶716 above, during a January 10, 2012 automotive industry conference hosted by Deutsche Bank,

---

[1019] Valukas, *supra* note 15, at 234-36.
[1020] *Id*. at 234-35, n.1079.
[1021] *Id.* at 235, n.1080.

Defendant Akerson admitted that GM was monitoring its warranty costs and tracking those costs against the warranty costs of its competitors.

852.   As a member of GM's Board of Directors, Defendant Akerson also received litigation reports during the Class Period.  These reports described product liability litigation that had been filed against the Company, including the number, severity, complexity and subject matter of product liability claims asserted against GM.[1022]  The litigation reports further included information about safety issues and safety-related claims at issue in the litigations.[1023]   In addition, prior to GM's bankruptcy, the Board received an Annual Report on Product Liability Litigation, describing accident cases.[1024]   As detailed in ¶¶460-83 above, numerous product liability actions concerning the non-deployment of Cobalt and Ion airbags were filed against GM beginning in early 2004.

853.   Moreover, after it emerged from Bankruptcy, GM received repeated warnings from its outside product liability litigation counsel King & Spalding in 2010, 2011, and 2013, regarding GM's exposure to punitive damages, and the risk of loss at trial, including King & Spalding's warning on July 22, 2013 that GM's own internal documents would convince a jury that GM had known about the ignition switch defect since the launch of the Cobalt in 2005, as described above in

---

[1022] *Id.* at 238.

[1023] *Id.*

[1024] *Id.*

¶¶476-66, 481, and 512-15.

854.   As a result, Defendant Akerson knew (or recklessly disregarded) from the litigation reports he received during the Class Period that his external statements regarding GM's Liabilities, Costs, and Contingencies, and the safety of GM vehicles were false when made.

855.   In addition, Defendant Akerson received regulatory reports during the Class Period, and, as discussed below, Defendant Kent was responsible for such regulatory reports.  These reports concerned GM's NHTSA obligations, responses to the passage of the TREAD Act, and proposed safety-related initiatives, as well as additional reports.[1025]   As described above in ¶52, the TREAD Act mandates that GM submit quarterly EWR reports to NHTSA, along with summaries of death or injury claims related to safety defects.  GM submitted to NHTSA a total of 2,039 death and injury reports under the EWR system concerning the vehicles that were subject to the ignition switch recalls, and submitted additional records to NHTSA regarding 17 of these deaths, as described above in ¶167.

856.   Defendant Kent, who served as GM General Director/Director of Global Safety and Vehicle Programs and Crashworthiness from June 2010 through June 2014, and as Director of Product Investigations from January 2004 through May 2010, describes her responsibilities at GM as including the following:

---

[1025] *Id*. at 239.

- Being "[r]esponsible for the occupant performance and crashworthiness of GM North America products and for global coordination of GM vehicle safety teams";

- "Manag[ing] product development for vehicle safety performance, vehicle safety and crashworthiness laboratories, global vehicle safety center and interfac[ing] with outside organizations such as: . . . the Insurance Institute for Highway Safety (IIHS), [Global New Car Assessment Programme] and [NHTSA]";

- Lead[ing] "the development of GM's global vehicle safety team including establishing regional and global vehicle safety strategies";

- Being "[r]esponsible to conduct product investigations on vehicle systems and for the interface with the National Highway Traffic Safety Administration (NHTSA): Office of Defects Investigation (ODI) and the Office of Vehicle Safety and Compliance (OVSC) regarding product investigations, GM field actions and Transportation Recall Enhancement Accountability and Documentation (TREAD) Act Early Warning Reporting"; and

- Co-leading the "development of a GM global process to address responsibility to: lead an investigation, declare a stop shipment/sale, and make decisions to conduct a field action, develop preventative actions and establish a global communication network."[1026]

857.   As part of these responsibilities, Kent prepared, reviewed or approved numerous reports related to the safety of GM's vehicles, including a June 11, 2004 report to NHTSA about the number of GM's safety recalls and other field actions that GM had conducted in the past 20 years for engine shutdowns.  Kent also signed GM recall notices to NHTSA, including GM's June 2004 573 Report for the recall of 15,000 Oldsmobile Bravadas and GMC Envoys for shutdown risk, and GM's

---

[1026] Resume of Gay P. Kent, https://www.linkedin.com/in/gaykent (last visited Jan. 15, 2015).

March 2012 573 Report for the recall of Chevy Cobalts and Pontiac G5s for loss of power steering assist.[1027]  Kent was also informed of, or prepared, the following non-public reports and attended the following meetings where instances of GM ignition switch defects or airbag non-deployments were reported on or discussed:

- In 2005, Kent learned of reports of GM ignition switch failures and, in direct response to those reports, personally replicated an instance of a GM ignition switch failure while driving a Cobalt simply by moving her jeans so that they caused friction against the fob on her key chain (¶426);

- On November 15, 2006, Kent learned of the October 24, 2006 crash of a 2005 Cobalt by 15-year-old Amy Rademaker and two of her friends after Adler emailed Kent about a TV reporter's inquiry into the case with the subject line "2005 Cobalt Air Bags – Fatal Crash; Alleged Non-Deployment."[1028]  Adler noted "Reporter asking for response from GM by the end of day Wednesday on what we know about air bag issues in '05 Cobalt."[1029]  Several of the recipients responded to the email and provided available data on Cobalt frontal airbag claims.[1030]

- On March 29, 2007, Kent attended a meeting at NHTSA's headquarters during which NHTSA reported to GM that NHTSA had observed a number of airbag non-deployments in Cobalts and Ions (¶473);

- On April 24, 2007, Wachtel forwarded to Kent an email providing his approval to add the word "stall" to a proposed April 2007 TSB on the inadvertent turning of the key cylinder in vehicles with the Delta Ignition Switch, but GM did not issue the 2007 TSB (¶442);

- In March 2013, GM appointed Kent as the "champion" of the Cobalt investigation and Kent held a series of meetings in 2013 to discuss the investigation (¶510);

---

[1027] Valukas, *supra* note 15, at 72-73.
[1028] Valukas, *supra* note 15, at 113-14.
[1029] *Id.*
[1030] *Id.*

- On July 24, 2013, Kent learned of the communication from NHTSA to GM that, from NHTSA's perspective, "[t]he general perception is that GM is slow to communicate, slow to act, and, at times, requires additional effort of ODI that we do not feel is necessary with some of your peers," and that "[t]here is a general perception in ODI that GM is one of, if not the worst offender of the regional recall policy" (¶516)[1031];

- On December 2, 2013, Kent attended the meeting of a small group of Field Performance Evaluation Recommendation Committee members, an executive committee that reviews the details of a FPE investigation and makes a recommendation to the EFADC, the GM committee that considers recalls, to discuss the Cobalt ignition switch defect (¶521);

- On December 17, 2013, Kent attended the meeting of the EFADC during which a presentation was given that included slides that set forth information about five fatalities and other serious injuries that had resulted from the defective ignition switches (¶526); and

- On January 31, 2014, Kent attended the EFADC meeting during which the recall of MY 2005-2007 Chevrolet Cobalts and Pontiac G5s was issued (¶532).

858. Moreover, as part of their core job responsibilities during their executive tenures at GM, each of the Individual Defendants Akerson, Cyprus, Liddell, Ammann, Stevens, Barra and Timko was charged with setting and/or approving GM's Liabilities, Costs, and Contingencies during the Class Period. This job responsibility included possessing knowledge of the warranty claims filed against GM, which were contained in GM's internal warranty claims database. As described above in ¶¶150-60, that warranty claims database contained at least many

---

[1031] E-mail from Michael J. Robinson, Vice President of Sustainability & Global Regulatory Affairs, Gen. Motors Co., to Gay P. Kent, Dir. of Prod. Investigations, Gen. Motors Co. (July 24, 2013, 11:21) [GMHEC000222037].

hundreds of customer complaints related to the ignition switch defects, including claims detailing the resultant moving shutdowns. The Individual Defendants therefore knew (or recklessly disregarded) from the warranty claims that were filed against GM prior to and during the Class Period that their external statements regarding GM's Liabilities, Costs, and Contingencies, internal controls, and the safety of GM vehicles were false when made.

859. In addition, as described above in ¶454, warranty costs factored into the Individual Defendants' own personal annual compensation, rendering the Individual Defendants highly motivated to reduce warranty costs and to monitor those costs on an ongoing basis.

860. **Third**, the Individual Defendants Barra, Stevens, Ammann, and Kent made fraudulent statements and omissions within close proximity of the later disclosure of inconsistent information. For example, as described above in ¶806, in the Company's Form 10-K for the year ended December 31, 2013, filed with the SEC on February 6, 2014, and signed by Individual Defendants Barra and Stevens, Barra and Stevens each personally certified the adequacy of GM's internal controls and financial reporting just one day before the First Recall Wave began with a 573 Report to NHTSA dated February 7, 2014. Under no circumstances could Barra and Stevens have certified the adequacy of GM's internal controls just one day before the First Recall Wave began without knowing or recklessly disregarding GM's

failure to recall unsafe cars for as much as ten years, demonstrating a serious breakdown in internal controls as Barra and GM admitted shortly thereafter. Indeed, at the very latest, Barra and Stevens knew of the First Recall Wave in January 2014, before the certifications were executed as set forth in ¶868 below. In the same filing, GM and the Individual Defendants falsely assured investors that GM's reserves for product warranties and recalls were adequate. A mere two months later, after the close of the market on April 10, 2014, GM disclosed that the Company expected to record a *$1.3 billion recall charge* for the three months ended March 31, 2014, as detailed above in ¶597, as a result of its long delayed safety actions.

861. Defendants Ammann, Barra, Stevens, and Kent also made false assurances regarding the Company's commitment to safety within close proximity of later inconsistent statements. For example, on January 15, 2014, Defendant Ammann stated at a Deutsche Bank Global Auto Industry Conference, "From a product point of view, we are in tremendous shape. It's really just the greatest time that we have had in the recent history of General Motors … We couldn't be in a better place from a product perspective and that's just a really tremendous way to be going into 2014." In addition, as reported in *Auto Business News* on January 24, 2014, Defendant Kent claimed that, "The customer is at the center of our day-to-day operations and when we design vehicles, *it's their safety that we have in mind.*" Similarly, in the Company's 2013 Form 10-K, filed with the SEC on February 6,

2014, and signed by Defendants Barra and Stevens, GM, Barra and Stevens falsely claimed, "We are committed to leadership in vehicle design, *quality*, reliability, telematics and infotainment and *safety.*"

862.   Just one day later, on February 7, 2014, GM submitted its 573 Report to NHTSA announcing the first ignition switch recall, which was quickly followed by the additional recalls in the First Recall Wave, and the Second Recall Wave.  On April 1, 2014, Barra *admitted* that GM was focused on costs, not safety, testifying ***"we in the past had more of a cost culture, and we are going to a customer culture that focuses on safety and quality."***

863.   *Fourth,* the Individual Defendants Akerson, Liddell, Cyprus, Ammann, Timko, and Kent were aware of lawsuits involving consumer injuries and deaths caused by the ignition switch defects, many of which were quickly settled.  As set forth in ¶¶460-83 and 512-15 above, these lawsuits charged GM with fraud in covering up the ignition switch defects and alleged that GM had known about the defects since the release of the cars at issue.  Similarly, GM acted promptly to repurchase cars to minimize adverse publicity as set forth in ¶¶406-09 above.  As described above in ¶¶852-54 as a member of the Board, Akerson received litigation reports during the Class Period detailing the complaints and product liability claims asserted against GM.  In addition, as part of their core job responsibilities, all of the Individual Defendants who signed GM filings with the SEC were responsible for

reviewing and/or approving GM's financial disclosures regarding litigation liability, the risk of loss, and whether that loss was probable or estimable during the Class Period, which meant that they had to keep apprised of product liability litigation against GM and settlements of those lawsuits. In addition, Defendant Kent's core job responsibilities as General Director of Global Safety and Vehicle Programs and Crashworthiness, and as Director of Product Investigations, were to be responsible for "occupant performance and crashworthiness" and to "conduct product investigations on vehicle systems," which included investigations of issues raised by lawsuits against GM. Moreover, product liability litigation concerning the ignition switch defect was discussed at the most senior levels of GM's settlement process with GM executives who were direct reports of Individual Defendants, including at the Roundtable and the Settlement Review Committee, as described above in ¶¶464-65, 482, 492, 502, 509, and 511.

864. Many product liability lawsuits concerning injuries and deaths resulting from the ignition switch defects were settled by GM during the Class Period, as described above in ¶¶460-83 and 512-15. Indeed, GM's outside counsel was charged with providing an "early" written evaluation of each product liability suit soon after that suit was filed for the express purpose of ascertaining its settlement potential, along with updated case evaluations throughout the litigation.[1032]

---

[1032] *Id.* at 103.

865.   *Fifth,* all of the Individual Defendants <u>disregarded the most current</u> <u>factual information before making statements.</u>   As detailed above in ¶806, Defendants Barra and Stevens certified in GM's SOX §302 Certification on February 6, 2014, that GM's internal controls were effective, notwithstanding that the First Recall Wave already had been started within GM.

866.   In addition, as part of their core job responsibilities, all of the Individual Defendants who signed GM's filings with the SEC were knowledgeable regarding the warranty claims filed against GM, which were contained in GM's internal warranty claims database, and consisted of at least hundreds of customer complaints related to the ignition switch defects.   Moreover, as described above in ¶454, warranty costs factored into the Individual Defendants' own personal annual compensation, rendering the Individual Defendants highly motivated to reduce warranty costs and to monitor those costs on an ongoing basis.   Indeed, Defendant Akerson stated during a January 10, 2012 automotive industry conference hosted by Deutsche Bank, that GM was monitoring its warranty costs and tracking those costs against the warranty costs of its competitors: "we know as a broad gauge roughly what our competitors do in terms of warranty.   We are right on top or better than most…." as described above in ¶716.

867.   Also as part of their core job responsibilities, all of the Individual Defendants kept apprised of product liability litigation concerning injuries and

deaths resulting from the ignition switch defect against GM, and settlements of those lawsuits.

868.   In addition to the sources of current factual information discussed above, Defendant Barra possessed the following specific current factual information, before she made her false and misleading statements in GM's 2013 Form 10-K filed with the SEC on February 6, 2014, including knowledge that GM had decided to begin the First Recall Wave after a very prolonged delay, demonstrating its internal control failures at the time of her personal internal control certification:

- In an email dated October 3, 2011 from Woychowski, Barra was alerted to serious safety problems related to power steering in certain Cobalts, Saturn Ions, and Pontiacs, as well as NHTSA criticism of the scope of GM's 2010 power-steering recalls.[1033]

- On April 22, 2012, Barra received an email from a former GM employee reporting a moving shutdown in his Buick, caused by the design of the key.  Barra forwarded this email to Woychowski, then Vice President for Global Quality, and asked him to investigate the issue.

- In December 2013, Calabrese told Barra that the EFADC was considering the ignition switch recall.  On December 18, 2013, GM placed an urgent order for **500,000** replacement ignition switches.  An order of such magnitude would have been brought to the attention of the CEO, along with GM's decision to conduct a recall.[1034]

---

[1033] *Id.* at 229; Hilary Stout & Bill Vlasic, *G.M. Documents Reveal Years of Talks on Defect*, N.Y. Times, Apr. 11, 2014, http://www.nytimes.com/2014/04/12/business/gm-documents-show-years-of-talks-on-flaw.html?_r=0.

[1034] Valukas, *supra* note 15, at 221; *see* Chris Isidore, *What Did Mary Barra Know About the GM Recall, and When Did She Know It?,* CNN Money (Nov. 10, 2014, 1:21 PM), http://money.cnn.com/2014/11/10/news/companies/barra-recall/.

- On January 31, 2014, the EFADC officially determined to issue the first recall of the First Recall Wave. Barra has admitted that she knew of the ignition switch defect by this date. These facts support a strong inference that Barra knew about (or recklessly disregarded) GM's decision to conduct the ignition switch recall by January 31, 2014, before her February 6, 2014 internal controls certification.

869. Defendant Kent also possessed the specific current factual information and reports of airbag non-deployments and moving shutdowns discussed above in ¶857 that had occurred as of the date of each of her false and misleading statements on December 27, 2011, December 28, 2011, January 31, 2013, September 23, 2013, and January 24, 2014.

870. *Sixth*, all of the Individual Defendants who signed GM's SEC filings disclosed accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication. Throughout the Class Period, GM, and each of the Individual Defendants who signed GM financial disclosures during the Class Period specified above in ¶¶654 and 664 (Akerson), ¶¶654, 664, 719 and 760 (Liddell), ¶¶654, 664, 719 and 760 (Cyprus), ¶¶719 and 760 (Ammann), ¶798 (Barra, Stevens, and Timko) falsely claimed that estimated costs related to product recalls were accrued by GM "when they are deemed to be probable and can be reasonably estimated," as required under GAAP. In actuality, as revealed by GM only on July 24, 2014, GM did not accrue for the estimated costs of recalls when those costs were "probable and reasonably estimable," but rather delayed accruing for estimated costs related to product recalls

until a recall was formally announced, as detailed above in ¶293. Even an individual with a high degree of sophistication in accounting matters, such as an accounting expert, could not have understood that GM and the above Individual Defendants' statements during the Class Period that estimated costs of recalls were accrued "when they are deemed to be probable and can be reasonably estimated" meant that GM improperly delayed accruing estimated costs for recalls until a recall was announced even if they were "probable and reasonably estimable," but a recall was nonetheless improperly delayed as had occurred in this case.

871. ***Seventh and Eighth,*** the Individual Defendants possessed self-interested motivation in the form of saving their salaries or jobs to make misleading statements and fail to disclose material facts necessary to make those statements not misleading when made concerning GM's costs and liabilities for the ignition switch defects, the inadequacies in the Company's internal controls over financial reporting, and the unsafe state of GM's vehicles, and Defendant Akerson engaged in suspicious trading during the Class Period. The Individual Defendants were the senior management of the Company, and thus at all times during their tenures were the individuals with principal responsibility for communicating with GM's investors about its liabilities, internal controls and purported commitment to safety. However, as detailed below, the Individual Defendants received massive salaries and other executive compensation in connection with their positions, as well as a significant

amount of prestige that motivated them not to make truthful disclosures to investors. Moreover, the source of the bulk of Individual Defendants' compensation was stock awards, whose value is tied to GM's stock price. In addition, warranty costs factored into Individual Defendants' own personal compensation, as described above in ¶454.

872.   During the Class Period, Defendant Akerson was the CEO of GM from September 1, 2010[1035] until he was succeeded by Barra as CEO on January 15, 2014, [1036] and Chairman of the Board from January 1, 2011 to January 15, 2014.[1037]  Prior to becoming the Chairman of the Board in January 2011, Akerson served as a member of the GM Board (beginning on July 24, 2009),[1038] the GM Executive Committee and the GM Executive Compensation Committee.  As GM's CEO, Akerson earned total compensation of $2.52 million in 2010, $1.76 million of which consisted of stock awards;[1039] $7.70 million in 2011, $5.94 million of which consisted of stock awards;[1040] $11.10 million in 2012, $9.33 million of which

---

[1035] Gen. Motors Co., Definitive Proxy Statement (Schedule 14A) (Apr. 21, 2011), at 6.
[1036] Gen. Motors Co., Definitive Proxy Statement (Schedule 14A) (Apr. 25, 2014), at 3.
[1037] Gen. Motors Co., Definitive Proxy Statement (Schedule 14A) (Apr. 21, 2011), at. 6; Gen. Motors Co., Definitive Proxy Statement (Schedule 14A) (Apr. 25, 2014), at 3.
[1038] Gen. Motors Co., Definitive Proxy Statement (Schedule 14A) (Apr. 21, 2011), at 6.
[1039] Gen. Motors Co., Definitive Proxy Statement (Schedule 14A) (Apr. 25, 2013), at 45.
[1040] *Id.*

consisted of stock awards; [1041] and $9.07 million in 2013, $7.30 million of which consisted of stock awards.[1042]   And, as set forth in ¶454 above, artificially underreporting GM's warranty costs and safety problems during the Class Period improved Akerson's own personal compensation at GM.  Finally, Akerson's well-timed retirement from GM, just one month before the First Wave Recall began is highly suspicious, as set forth in ¶¶522-24 above.  While Akerson claimed at the time he was leaving GM because his wife had advanced health issues, just six weeks after leaving GM, he took a board position at Lockheed Martin and just two weeks after that, resumed employment as a Vice Chairman of The Carlyle Group, a former employer of Akerson.  Thus, the timing of Akerson's departure from GM further demonstrates his personal motive in preserving his own personal income over customer safety and truthful disclosure to investors.

873.   Moreover, Akerson's abrupt departure from GM put him in a position to sell millions of dollars of his personally-held GM stock without appearing to be an insider.  Indeed, Akerson sold millions of dollars' worth of GM stock before GM issued all of the corrective disclosures at issue in this case, including disclosure of the full scope of the cars at issue:

---

[1041] *Id.*

[1042] Gen. Motors Co., Definitive Proxy Statement (Schedule 14A) (Apr. 25, 2014), at 41.

| Date of Sale | Number of Shares | Share Price | Total Proceeds |
|---|---|---|---|
| 02/19/2014 | 15,000 | $36.32 | $544,800.00 |
| 02/20/2014 | 35,000 | $36.26 | $1,268,750.00 |
| 03/04/2014 | 50,000 | $36.60 | $1,830,000.00 |
| **Total:** | **100,000** | | **$3,643,550.00** |

874.   Defendant Liddell served as GM Vice Chairman and CFO from prior to the start of the Class Period until April 1, 2011, at which time he was replaced by Ammann.   As CFO, Liddell was responsible for the accuracy of the Company's financial reporting, internal controls and public statements in its SEC filings.   As described further above, Liddell received presentations regarding quality and safety issues with GM vehicles; was knowledgeable regarding the warranty claims filed against GM, which were contained in GM's internal warranty claims database; and was kept apprised of product liability litigation against GM and the settlements of those lawsuits. In 2010, Liddell received a total compensation package of $6.22 million, $5.45 million of which consisted of stock awards.[1043]   And, as set forth in ¶454 above, artificially underreporting GM's warranty costs during the Class Period improved Liddell's own personal compensation at GM.

875.   From April 2011 through January 2014, Ammann served as GM's

---

[1043] Gen. Motors Co., Definitive Proxy Statement (Schedule 14A) (Apr. 21, 2011), at 36.

Senior Vice President and CFO.  In that capacity, Ammann was responsible for the accuracy of the Company's financial reporting, internal controls and public statements in its SEC filings.  As described further above, Ammann received presentations regarding quality and safety issues with GM vehicles; was knowledgeable regarding the warranty claims filed against GM, which were contained in GM's internal warranty claims database; and was kept apprised of product liability litigation against GM and the settlements of those lawsuits. Ammann received total compensation of $3.50 million in 2011, $2.78 million of which consisted of stock awards;[1044] $4.78 million in 2012, $4.00 million of which consisted of stock awards;[1045] and $5.26 million in 2013, $4.48 million of which consisted of stock awards.[1046]   And, as set forth in ¶454 above, artificially underreporting GM's warranty costs during the Class Period improved Ammann's own personal compensation at GM.

876.   Defendant Cyprus was named GM Vice President, Controller and Chief Accounting Officer in August 2009, and served in that position until his retirement on March 18, 2013.  As Vice President, Controller and Chief Accounting Officer, Cyprus' core responsibilities included reporting the Company's financial results and

---

[1044] Gen. Motors Co., Definitive Proxy Statement (Schedule 14A) (Apr. 25, 2014), at 41.
[1045] *Id.*
[1046] *Id.*

internal controls to the CEO, CFO and Audit Committee of the Board, and leading GM's top-down risk assessment pursuant to SOX 404, which required GM to assess the Company's internal control structure. Cyprus also oversaw external reporting, the development of accounting policies, and GM's internal controls. As described further above, Cyprus was knowledgeable regarding the warranty claims filed against GM, which were contained in GM's internal warranty claims database, and kept apprised of product liability litigation against GM and the settlements of those lawsuits. And, as set forth in ¶454 above, artificially underreporting GM's warranty costs during the Class Period improved Cyprus' own personal compensation at GM.

877. Defendant Stevens served as the CFO of GM North America from January 2010 to January 2014. On January 15, 2014, Stevens became the Executive Vice President and CFO of GM, succeeding Ammann. In all of his capacities at GM, Stevens was responsible for the accuracy of the Company's financial reporting, internal controls and public statements and SEC filings. As described further above, Stevens received presentations regarding quality and safety issues with GM vehicles; was knowledgeable regarding the warranty claims filed against GM, which were contained in GM's internal warranty claims database; and was kept apprised of product liability litigation against GM and the settlements of those lawsuits. As set forth in ¶454 above, artificially underreporting GM's warranty costs during the Class Period improved Stevens' own personal compensation at GM.

878.   Defendant Barra has been an employee or executive of GM for over 30 years,[1047] and became the CEO of GM on January 15, 2014.  Prior to that position, Barra served as Executive Vice President, Global Product Development, Purchasing & Supply Chain since August 2013, and as Senior Vice President, Global Product Development since February 2011.[1048]  The latter role has been referred to as GM's "product chief."[1049]   In that capacity, Barra was responsible for GM's global engineering function, headed by Calabrese, as well as the global quality function, headed by Woychowski.  Many individuals involved in the FPE process and also members of the EFADC were encompassed in the global engineering and global quality functions.   In addition, Barra served as the Vice President of Global Manufacturing Engineering from February 2008 through July 2009.  Barra has also been a member of the GM Board since she became CEO in January 15, 2014.  As a result of her executive roles at GM, Barra earned total compensation of $4.94 million in 2012, and $5.23 million in 2013.[1050]  And, as set forth in ¶454 above, artificially

---

[1047] Paul Lienert & Ben Klayman, *New CEO Barra a GM 'Lifer' Bent on Tearing Down Walls*, REUTERS, Jan. 12, 2014, http://www.reuters.com/article/2014/01/12/us-autoshow-gm-barra-idUSBREA0B0I920140112.

[1048] Gen. Motors Co., About GM: Mary T. Barra, http://www.gm.com/company/corporate-officers/mary-barra (last visited Jan. 15 2015).

[1049] Tim Higgins, *GM Chooses Barra as First Female CEO of Global Automaker¸* BLOOMBERG, Dec. 10, 2013, http://www.bloomberg.com/news/2013-12-10/gm-said-to-choose-barra-as-first-female-ceo-of-automaker.html.

[1050] Barra's compensation prior to her becoming a Section 16 officer at GM in 2012 is not publicly available.

underreporting GM's warranty costs during the Class Period improved Barra's own personal compensation at GM.

879.   Defendant Timko succeeded Defendant Cyprus as the Vice President, Controller, and Chief Accounting Officer of GM on March 18, 2013.[1051]   As such, Timko took over Cyprus' responsibilities, including reporting the Company's financial results and internal controls to the CEO, CFO and Audit Committee of the Board, leading GM's top-down risk assessment pursuant to SOX 404, which required GM to assess the Company's internal control structure, and overseeing external reporting, the development of accounting policies, and GM's internal controls.   As described further above, Timko was knowledgeable regarding the warranty claims filed against GM, which were contained in GM's internal warranty claims database, and kept apprised of product liability litigation against GM and the settlements of those lawsuits.   And, as set forth in ¶454 above, artificially underreporting GM's warranty costs during the Class Period improved Timko's own personal compensation at GM.

880.   Defendant Kent was also a career GM employee who joined GM in 1980.   Most recently, Kent served as GM's Director of Product Investigations from January 2004 through May 2010, and as GM's General Director/Director of Safety

---

[1051] Press Release, General Motors Co., *GM Announces Chief Accounting Officer Transition* (Feb. 13, 2013), http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2013/Feb/0213_cyprus-timko.html.

and Vehicle Programs and Crashworthiness from June 2010 through June 2014. In those roles, Kent had responsibility over the investigation of GM vehicle safety defects, GM communications with NHTSA, GM recalls, GM's TREAD and EWR reporting to NHTSA, and the overall safety and crashworthiness of GM vehicles. And, as set forth in ¶454 above, artificially underreporting GM's warranty costs during the Class Period improved Kent's own personal compensation at GM. The significant threat to Defendant Kent's career at GM posed by revelation of the ignition switch defect is shown by GM's termination of Kent in June 2014 in the wake of GM's initial recalls of defective vehicles and following issuance of the Valukas Report.

## XI.   PRESUMPTION OF RELIANCE

881.   Lead Plaintiff and Class members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

882.   Lead Plaintiff and Class members are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for GM common stock was open, efficient and well-developed for the following reasons, among others:

(a)     GM stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

(b)     The price of GM common stock reacted promptly to the dissemination of new information regarding the Company.  GM common stock was actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional investor participation.  The average daily trading volume for GM common stock during the Class Period was 15,087,486 shares and the average weekly volume as a percentage of shares outstanding was 5.00%;

(c)     As a regulated issuer, GM filed periodic reports with the SEC and NYSE;

(d)     GM regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)     GM was followed extensively by the media, and by numerous securities analysts employed by major brokerage firms who wrote at least 800 analyst reports about GM during the Class Period which were distributed to those brokerage firms' sales forces and certain customers.  Each of these reports was publicly available and entered the public market place.

883.   As a result of the foregoing, the market for GM stock promptly digested current information regarding GM from all publicly available sources and reflected such information in GM's stock price.  Under these circumstances, all purchasers of GM common stock during the Class Period suffered similar injury through their purchase of GM common stock at artificially inflated prices, and a presumption of reliance applies.

516

## XII.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

884.   The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

885.   None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about GM's reported liabilities, including the Company's warranty and recall costs and liabilities, internal controls over financial reporting, and the safety of GM vehicles.

886.   Further, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, including GM's public filings issued throughout the Class Period.

887.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding GM's reported liabilities, including the Company's reported warranty and recall costs and liabilities, claimed adequate internal controls over financial reporting, and the safety

of GM vehicles, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by GM were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

888. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those materially false and misleading forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the false and misleading forward-looking statement was authorized and/or approved by an executive officer of GM who knew that the statement was false or misleading when made.

## XIII. CLASS ACTION ALLEGATIONS

889. Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired the common stock of GM between November 17, 2010 and July 24, 2014, inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of GM at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, and any entity in which Defendants or their immediate families have or had a controlling interest. For

the avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of GM's employees.

890.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, GM shares were actively traded on the NYSE.  As of June 30, 2014, GM had approximately 1.6 billion shares of common stock issued and outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds of thousands of members of the proposed Class.  Class members who purchased GM common stock may be identified from records maintained by GM or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

891.   Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

892.   Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation.

893.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

(a)   Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   Whether the SEC filings, press releases, reports and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

(c)   Whether and to what the extent the market prices of the Company's securities were artificially inflated during the Class Period due to the non-disclosures and/or misrepresentations complained of herein;

(d)   Whether Defendants acted with scienter; and

(e)   Whether the members of the Class have sustained damages as a result of the misconduct complained of herein, and if so, the proper measure thereof.

894.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  In addition, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XIV. CLAIMS FOR RELIEF

## COUNT I

### For Violations Of Section 10(b) Of The Exchange Act And
### SEC Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

895.   Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

896.   This Count is asserted on behalf of all members of the Class against all Defendants (GM, Akerson, Cyprus, Liddell, Ammann, Stevens, Barra, Timko, and Kent) for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

897.   During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

898.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a

course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of GM common stock during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to GM's true liabilities, including its warranty and recall costs and liabilities, adequacy of internal controls, and the safety of GM's vehicles.

899.  Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above materially false and misleading statements intentionally or with reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of GM common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, GM's artificially understated liabilities (including the Company's understated warranty and recall costs and liabilities), internal controls for financial reporting, and the safety of GM's vehicles; (b) artificially inflate and maintain the market price of GM common stock; and (c)

cause Lead Plaintiff and other members of the Class to purchase GM common stock at artificially inflated prices and suffer losses when the true facts became known.

900. Defendant GM is liable for all materially false and misleading statements made during the Class Period, as alleged above, including the false and misleading statements in:

i.  GM's Form S-1 Registration Statement, filed with the SEC on November 17, 2010 (¶¶652-62 and 684);

ii.  GM's Form 8-K, filed with the SEC on February 3, 2011 (¶696);

iii.  GM's Form 10-K, filed with the SEC on March 1, 2011 (¶¶663-71, 674-80 and 685);

iv.  GM's 2010 Annual Report, dated March 1, 2011 (¶¶687-88);

v.  GM's Form 8-K, filed with the SEC on March 3, 2011 (¶696);

vi.  GM's Form 8-K, filed with the SEC on April 6, 2011 (¶704);

vii.  GM's Form 10-Q, filed with the SEC on May 6, 2011 (¶¶690-91 and 693-94);

viii.  GM's Form 8-K, filed with the SEC on June 6, 2011 (¶704);

ix.  GM's Form 8-K, filed with the SEC on July 7, 2011 (¶712);

x.  GM's Form 8-K, filed with the SEC on August 4, 2011 (¶712);

xi.  GM's Form 10-Q, filed with the SEC on August 5, 2011 (¶698-99 and 701-02);

xii.  GM's Form 10-Q, filed with the SEC on November 9, 2011 (¶¶706-07 and 709-10);

xiii.  GM's Form 10-K, filed with the SEC on February 27, 2012 (¶¶718-23, 725-28 and 735);

xiv.  GM's 2011 Annual Report, dated February 27, 2012 (¶¶729 and 736-

37);

xv.    GM's Form 10-Q, filed with the SEC on May 3, 2012 (¶¶739-40 and 742-43);

xvi.   GM's Form 10-Q, filed with the SEC on August 3, 2012 (¶¶747-48 and 750-51);

xvii.  GM's Form 10-Q, filed with the SEC on October 31, 2012 (¶¶753-54 and 756-57);

xviii. GM's Form 10-K, filed with the SEC on February 15, 2013 (¶¶759-64, 766-69 and 771);

xix.   GM's 2012 Annual Report, dated April 25, 2013 (¶772);

xx.    GM's Form 10-Q, filed with the SEC on May 2, 2013 (¶¶744-75 and 777-78);

xxi.   GM's Form 10-Q, filed with the SEC on July 25, 2013 (¶¶782-83 and 785-86);

xxii.  GM's Form 10-Q, filed with the SEC on October 30, 2013 (¶¶788-90 and 792-93); and

xxiii. GM's Form 10-K, filed with the SEC on February 6, 2014 (¶¶797-802, 804-07 and 813).

901.   Defendant GM is further liable for the false and misleading statements made by GM officers in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the makers of such statements under the principle of respondeat superior. These statements are set forth in ¶¶673, 713, 716, 731-34, 780, 795, 809, and 810-12 above.

902.   Defendant GM is also liable for false and misleading statements made on the Company's website on August 29, 2011 (¶714); and on January 8, 2012

(¶745).

903. Defendants Akerson, Cyprus, Liddell, Stevens, Ammann, Barra, Timko, and Kent, as top executive officers of the Company during their respective tenures, are liable as direct participants in the wrongs complained of herein. Defendants Akerson, Cyprus, Liddell, Ammann, Stevens, Barra, Timko, and Kent are liable for the false and misleading statements they personally made and/or signed as follows:

<u>Defendant Akerson</u>

i.  Defendant Akerson signed GM's Form S-1 Registration Statement on November 17, 2010 (¶¶652-62 and 684); GM's Forms 10-K for the years ended December 31, 2010 (¶¶663-71, 674-80 and 685), December 31, 2011 (¶¶718-23, 725-28 and 735), and December 31, 2012 (¶¶759-64, 766-69 and 771); GM's Annual Reports dated March 1, 2011 (¶¶687-88), February 27, 2012 (¶¶729 and 736-37), and April 25, 2013 (¶772); and certifications in GM's Forms 10-K and 10-Q filed with the SEC on March 1, 2011 (¶¶677-80), May 6, 2011 (¶¶693-94), August 5, 2011 (¶¶701-702), November 9, 2011 (¶¶709-10), February 27, 2012 (¶¶727-28), May 3, 2012 (¶¶742-43), August 3, 2012 (¶¶750-51), October 31, 2012 (¶¶756-57), February 15, 2013 (¶¶768-69), May 2, 2013 (¶¶774-75), July 25, 2013 (¶¶785-86), and October 30, 2013 (¶¶792-93); and

ii. Defendant Akerson made additional false statements during General Motors' Second Annual Business Conference, held on August 9, 2011 (¶713), and Deutsche Bank Securities' 2012 Global Auto Industry Conference, held on January 10, 2012 (¶716).

<u>Defendant Cyprus</u>

i.   Defendant Cyprus signed GM's Form S-1 Registration Statement on November 17, 2010 (¶¶652-62 and 684); GM's Forms 10-K for the years ended December 31, 2010 (¶¶663-71, 674-80 and 685), December 31, 2011 (¶¶718-23, 725-28 and 735), and December 31, 2012 (¶¶759-64, 766-69 and 771); and GM's Forms 10-Q filed with the SEC on May 6, 2011 (¶¶690-91 and 693-94), August 5, 2011 (¶¶698-99 and 701-02), November 9, 2011 (¶¶706-07 and 709-10), May 3, 2012 (¶¶739-40 and 742-43), August 3, 2012 (¶¶747-48 and 750-51), and October 31, 2012 (¶¶753-54 and 756-57); and

ii.  Defendant Cyprus also made statements in and was directly responsible for other statements made in GM press releases filed with the SEC as attachments to Forms 8-K, on the following dates: February 3, 2011 (¶696), March 3, 2011 (¶696), April 6, 2011 (¶704), May 6, 2011 (¶704), June 6, 2011 (¶704), July 7, 2011 (¶712), and August 4, 2011 (¶712).

<u>Defendant Liddell</u>

i.   Defendant Liddell signed GM's Form S-1 Registration Statement on November 17, 2010 (¶¶652-62 and 684); GM's Form 10-K for the year ended December 31, 2010 (¶¶663-71, 674-80 and 685); and certifications in GM's Form 10-K filed with the SEC on March 1, 2011 (¶¶677-80); and

ii.  Defendant Liddell made additional false statements during a conference call with investors discussing the Company's earnings in the fourth quarter of 2010, held on February 24, 2011 (¶673).

<u>Defendant Ammann</u>

i.   Defendant Ammann signed GM's Forms 10-K for the years ended December 31, 2011 (¶718-23, 725-28 and 735) and December 31, 2012 (¶¶759-64, 766-69 and 771), and the certifications in GM's Forms 10-K and 10-Q filed with the SEC on May 6, 2011 (¶¶693-94), August 5, 2011 (¶¶701-02), November 9, 2011 (¶¶709-10), February 27, 2012 (¶¶727-28),

May 3, 2012 (¶¶742-43), August 3, 2012 (¶¶750-51), October 31, 2012 (¶¶756-57), February 15, 2013 (¶¶768-69), May 2, 2013 (¶¶774-75), July 25, 2013 (¶¶785-86), and October 30, 2013 (¶¶792-93); and

ii.   Defendant Ammann made additional false statements during the Deutsche Bank Global Auto Industry Conference held on January 15, 2014 (¶811).

Defendant Stevens

i.   Defendant Stevens signed GM's Form 10-K for the year ended December 31, 2013 (¶¶797-802, 804-07 and 813), and the certifications in GM's Form 10-K filed with the SEC on February 6, 2014 (¶¶804-07).

Defendant Barra

i.   Defendant Barra signed GM's Form 10-K for the year ended December 31, 2013 (¶¶797-802, 804-07 and 813), and the certifications in GM's Form 10-K filed with the SEC on February 6, 2014 (¶¶804-07).

Defendant Timko

i.   Defendant Timko signed GM's Form 10-K for the year ended December 31, 2013 (¶¶797-802, 804-07 and 813) and GM Forms 10-Q filed with the SEC on May 2, 2013 (¶¶774-75 and 777-78), July 25, 2013 (¶¶782-83), and October 30, 2013 (¶¶788-90 and 792-93).

Defendant Kent

i.   Defendant Kent made false statements about GM's vehicles on GM's website and to the media on or about December 27, 2011 (¶732), December 28, 2011 (¶¶733-34), January 31, 2013 (¶780), September 23, 2013 (¶795), and January 24, 2014 (¶812).

904.   As described above, the Defendants acted with scienter throughout the

Class Period, in that they acted either with intent to deceive, manipulate, or defraud,

or with recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of GM stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

905. The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at GM, which resulted in continuous and material understatements of the Company's liabilities, including its warranty and recall costs and liabilities, and material misstatements and omissions about the adequacy of GM's internal controls, and the safety of GM's vehicles, establish a strong inference that Defendants Akerson, Cyprus, Liddell, Ammann, Stevens, Barra, Timko, and Kent acted with scienter in making the materially false and misleading statements set forth above during the Class Period.

906. Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for GM common stock, which inflation was removed from the prices of their shares when the true facts became known. Lead Plaintiff and the Class would not have purchased GM common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially false and misleading statements.

907. As a direct and proximate result of these Defendants' wrongful conduct,

Lead Plaintiff and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of GM common stock during the Class Period.

## COUNT II

**For Violations Of Section 20(a) Of The Exchange Act
(Against The Individual Defendants)**

908.   Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

909.   This Count is asserted on behalf of all members of the Class against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

910.   During their tenures as officers and/or directors of GM, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of GM, the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. Each of these Defendants was able to and did control, directly and indirectly, the content of the following public statements made by GM during their tenures at GM during the Class Period, which include GM's materially false and misleading financial statements contained therein, thereby causing the dissemination of the false

and misleading statements and omissions of material facts as alleged herein:

    (a)    <u>Defendant Akerson (who joined GM as CEO on September 1, 2010 and left GM on January 15, 2014)</u>:

        i.    **2010**:  GM's Form S-1 Registration Statement filed with the SEC on November 17, 2010 (¶¶652-62 and 684);

        ii.    **2011**:  GM's Form 8-K filed with the SEC on February 3, 2011 (¶696); GM's conference call with investors discussing the Company's fourth quarter of 2010 financial results held on February 24, 2011 (¶673); GM's Form 10-K for the year ended December 31, 2010, filed with the SEC on March 1, 2011 (¶¶663-71, 674-80 and 685); GM's 2010 Annual Report, dated March 1, 2011 (¶¶687-88); GM's Form 8-K filed with the SEC on March 3, 2011 (¶696); GM's Form 8-K filed with the SEC on April 6, 2011 (¶704); GM's Form 10-Q for the first quarter of 2011, filed with the SEC on May 6, 2011 (¶¶690-91 and 693-94); GM's Form 8-K filed with the SEC on May 6, 2011 (¶704); GM's Form 8-K filed with the SEC on June 6, 2011 (¶704); GM's Form 8-K filed with the SEC on July 7, 2011 (¶712); GM's Form 8-K filed with the SEC on August 4, 2011; GM's Form 10-Q for the second quarter of 2011, filed with the SEC on August 5, 2011 (¶¶698-99 and 701-02); GM's Second Annual Global Business Conference held on August 9, 2011 (¶713); GM's statements concerning the safety of its vehicles made on its website on August 29, 2011 (¶714); GM's Form 10-Q for the third quarter 2011, filed with the SEC on November 9, 2011 (¶¶706-07 and 709-10); GM's conference call with NHTSA discussing the safety of its vehicles held on November 28, 2011 (¶731); GM's statements concerning the safety of its vehicles made on its website on December 27, 2011 (¶732); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on December 28, 2011 (¶¶733-34);

        iii.    **2012**:  GM's statements concerning the safety of its vehicles made on its website on January 8, 2012 (¶716); GM's statements concerning warranty costs made during

the Deutsche Bank Securities' 2012 Global Auto Industry Conference held on January 10, 2012 (¶716); GM's Form 10-K for the year ended December 31, 2011, filed with the SEC on February 27, 2012 (¶¶718-23, 725-28 and 735); GM's 2011 Annual Report, dated February 27, 2012 (¶¶729 and 736-37); GM's Form 10-Q for the first quarter of 2012, filed with the SEC on May 3, 2012 (¶¶739-40 and 742-43); GM's Form 10-Q for the second quarter of 2012, filed with the SEC on August 3, 2012 (¶¶747-48 and 750-51); GM's Form 10-Q for the third quarter of 2012, filed with the SEC on October 31, 2012 (¶¶753-54 and 756-57);

iv.   **2013**:  GM's interview with *CSPAN* held on January 31, 2013 (¶780); GM's Form 10-K for the year ended December 31, 2012, filed with the SEC on February 15, 2013 (¶¶759-64, 766-69 and 771); GM's 2012 Annual Report, dated April 25, 2013 (¶772); GM's Form 10-Q for the first quarter of 2013, filed with the SEC on May 2, 2013 (¶¶774-75 and 777-78); GM's Form 10-Q for the second quarter of 2013, filed with the SEC on July 25, 2013 (¶782-83 and 785-86); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on September 23, 2013 (¶795); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on October 25, 2013 (¶809); GM's Form 10-Q for the third quarter of 2013, filed with the SEC on October 30, 2013; (¶¶788-90 and 792-93) and Barclays Global Automotive Conference held on November 12, 2013 (¶810); and

v.   **2014**:  The Deutsche Bank Global Auto Industry Conference held on January 15, 2014 (¶811).

(b)   <u>Defendant Cyprus (who joined GM as Chief Accounting Officer and Controller on December 1, 2006, and left GM on March 18, 2013):</u>

i.   **2010**:  GM's Form S-1 Registration Statement filed with the SEC on November 17, 2010 (¶¶652-62 and 684);

ii.   **2011:**  GM's Form 8-K filed with the SEC on February 3, 2011 (¶696); GM's conference call with investors discussing the Company's fourth quarter of 2010 financial

results held on February 24, 2011 (¶673); GM's Form 10-K for the year ended December 31, 2010, filed with the SEC on March 1, 2011 (¶¶663-71, 674-80 and 685); GM's 2010 Annual Report, dated March 1, 2011 (¶¶687-88); GM's Form 8-K filed with the SEC on March 3, 2011 (¶696); GM's Form 8-K filed with the SEC on April 6, 2011 (¶704); GM's Form 10-Q for the first quarter of 2011, filed with the SEC on May 6, 2011 (¶¶690-91 and 693-94); GM's Form 8-K filed with the SEC on May 6, 2011 (¶704); GM's Form 8-K filed with the SEC on June 6, 2011 (¶704); GM's Form 8-K filed with the SEC on July 7, 2011 (¶712); GM's Form 8-K filed with the SEC on August 4, 2011; GM's Form 10-Q for the second quarter of 2011, filed with the SEC on August 5, 2011 (¶¶698-99 and 701-02); GM's Second Annual Global Business Conference held on August 9, 2011 (¶713); GM's statements concerning the safety of its vehicles made on its website on August 29, 2011 (¶714); GM's Form 10-Q for the third quarter 2011, filed with the SEC on November 9, 2011 (¶¶706-07 and 709-10); GM's conference call with NHTSA discussing the safety of its vehicles held on November 28, 2011 (¶731); GM's statements concerning the safety of its vehicles made on its website on December 27, 2011 (¶732); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on December 28, 2011 (¶¶733-34);

iii.   **2012**:   GM's statements concerning the safety of its vehicles made on its website on January 8, 2012 (¶716); GM's statements concerning warranty costs made during the Deutsche Bank Securities' 2012 Global Auto Industry Conference held on January 10, 2012 (¶716); GM's Form 10-K for the year ended December 31, 2011, filed with the SEC on February 27, 2012 (¶¶718-23, 725-28 and 735); GM's 2011 Annual Report, dated February 27, 2012 (¶¶729 and 736-37); GM's Form 10-Q for the first quarter of 2012, filed with the SEC on May 3, 2012 (¶¶739-40 and 742-43); GM's Form 10-Q for the second quarter of 2012, filed with the SEC on August 3, 2012 (¶¶747-48 and 750-51); GM's Form 10-Q for the third quarter of 2012, filed

with the SEC on October 31, 2012 (¶¶753-54 and 756-57);

iv.   **2013**: GM's interview with *CSPAN* held on January 31, 2013 (¶780); GM's Form 10-K for the year ended December 31, 2012, filed with the SEC on February 15, 2013 (¶¶759-64, 766-69 and 771).

(c)   Defendant Liddell (who joined GM as CFO and Vice Chairman on January 1, 2010 and left GM on April 1, 2011):

i.    **2010**: GM's Form S-1 Registration Statement filed with the SEC on November 17, 2010 (¶¶652-62 and 684);

ii.   **2011**: GM's Form 8-K filed with the SEC on February 3, 2011 (¶696); GM's conference call with investors discussing the Company's fourth quarter of 2010 financial results held on February 24, 2011 (¶673); GM's Form 10-K for the year ended December 31, 2010, filed with the SEC on March 1, 2011 (¶¶663-71, 674-80 and 685); GM's 2010 Annual Report, dated March 1, 2011 (¶¶687-88); GM's Form 8-K filed with the SEC on March 3, 2011 (¶696).

(d)   Defendant Ammann (who joined GM as CFO and Treasurer on April 1, 2010 and currently serves as GM's President):

i.    **2010**: GM's Form S-1 Registration Statement filed with the SEC on November 17, 2010 (¶¶652-62 and 684);

ii.   **2011**: GM's Form 8-K filed with the SEC on February 3, 2011 (¶696); GM's conference call with investors discussing the Company's fourth quarter of 2010 financial results held on February 24, 2011 (¶673); GM's Form 10-K for the year ended December 31, 2010, filed with the SEC on March 1, 2011 (¶¶663-71, 674-80 and 685); GM's 2010 Annual Report, dated March 1, 2011 (¶¶687-88); GM's Form 8-K filed with the SEC on March 3, 2011 (¶696); GM's Form 8-K filed with the SEC on April 6, 2011 (¶704); GM's Form 10-Q for the first quarter of 2011, filed with the SEC on May 6, 2011 (¶¶690-91 and 693-94); GM's Form 8-K filed with the SEC on May 6, 2011 (¶704); GM's Form 8-K filed with the SEC on June

6, 2011 (¶704); GM's Form 8-K filed with the SEC on July 7, 2011 (¶712); GM's Form 8-K filed with the SEC on August 4, 2011; GM's Form 10-Q for the second quarter of 2011, filed with the SEC on August 5, 2011 (¶¶698-99 and 701-02); GM's Second Annual Global Business Conference held on August 9, 2011 (¶713); GM's statements concerning the safety of its vehicles made on its website on August 29, 2011 (¶714); GM's Form 10-Q for the third quarter 2011, filed with the SEC on November 9, 2011 (¶¶706-07 and 709-10); GM's conference call with NHTSA discussing the safety of its vehicles held on November 28, 2011 (¶731); GM's statements concerning the safety of its vehicles made on its website on December 27, 2011 (¶732); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on December 28, 2011 (¶¶733-34);

iii.   **2012**:   GM's statements concerning the safety of its vehicles made on its website on January 8, 2012 (¶716); GM's statements concerning warranty costs made during the Deutsche Bank Securities' 2012 Global Auto Industry Conference held on January 10, 2012 (¶716); GM's Form 10-K for the year ended December 31, 2011, filed with the SEC on February 27, 2012 (¶¶718-23, 725-28 and 735); GM's 2011 Annual Report, dated February 27, 2012 (¶¶729 and 736-37); GM's Form 10-Q for the first quarter of 2012, filed with the SEC on May 3, 2012 (¶¶739-40 and 742-43); GM's Form 10-Q for the second quarter of 2012, filed with the SEC on August 3, 2012 (¶¶747-48 and 750-51); GM's Form 10-Q for the third quarter of 2012, filed with the SEC on October 31, 2012 (¶¶753-54 and 756-57);

iv.   **2013**:  GM's interview with *CSPAN* held on January 31, 2013 (¶780); GM's Form 10-K for the year ended December 31, 2012, filed with the SEC on February 15, 2013 (¶¶759-64, 766-69 and 771); GM's 2012 Annual Report, dated April 25, 2013 (¶772); GM's Form 10-Q for the first quarter of 2013, filed with the SEC on May 2, 2013 (¶¶774-75 and 777-78); GM's Form 10-Q for the second quarter of 2013, filed with the SEC on July 25,

2013 (¶782-83 and 785-86); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on September 23, 2013 (¶795); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on October 25, 2013 (¶809); GM's Form 10-Q for the third quarter of 2013, filed with the SEC on October 30, 2013; (¶¶788-90 and 792-93) and Barclays Global Automotive Conference held on November 12, 2013 (¶810);

v.  **2014**:    The Deutsche Bank Global Auto Industry Conference held on January 15, 2014 (¶811); GM's statements as reported by *Auto Business News* on January 24, 2014 (¶812); and GM's Form 10-K for the year ended December 31, 2013, filed with the SEC on February 6, 2014 (¶¶797-802, 804-07, 813).

(e)   Defendant Stevens (who joined GM in 1983, became CFO of GMNA on January 2010 and currently serves as GM Executive Vice President and CFO):

i.  **2010**:  GM's Form S-1 Registration Statement filed with the SEC on November 17, 2010 (¶¶652-62 and 684);

ii.  **2011**:  GM's Form 8-K filed with the SEC on February 3, 2011 (¶696); GM's conference call with investors discussing the Company's fourth quarter of 2010 financial results held on February 24, 2011 (¶673); GM's Form 10-K for the year ended December 31, 2010, filed with the SEC on March 1, 2011 (¶¶663-71, 674-80 and 685); GM's 2010 Annual Report, dated March 1, 2011 (¶¶687-88); GM's Form 8-K filed with the SEC on March 3, 2011 (¶696); GM's Form 8-K filed with the SEC on April 6, 2011 (¶704); GM's Form 10-Q for the first quarter of 2011, filed with the SEC on May 6, 2011 (¶¶690-91 and 693-94); GM's Form 8-K filed with the SEC on May 6, 2011 (¶704); GM's Form 8-K filed with the SEC on June 6, 2011 (¶704); GM's Form 8-K filed with the SEC on July 7, 2011 (¶712); GM's Form 8-K filed with the SEC on August 4, 2011; GM's Form 10-Q for the second quarter of 2011, filed with the SEC on August 5, 2011 (¶¶698-99 and 701-02); GM's Second Annual Global Business

Conference held on August 9, 2011 (¶713); GM's statements concerning the safety of its vehicles made on its website on August 29, 2011 (¶714); GM's Form 10-Q for the third quarter 2011, filed with the SEC on November 9, 2011 (¶¶706-07 and 709-10); GM's conference call with NHTSA discussing the safety of its vehicles held on November 28, 2011 (¶731); GM's statements concerning the safety of its vehicles made on its website on December 27, 2011 (¶732); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on December 28, 2011 (¶¶733-34);

iii. **2012**: GM's statements concerning the safety of its vehicles made on its website on January 8, 2012 (¶716); GM's statements concerning warranty costs made during the Deutsche Bank Securities' 2012 Global Auto Industry Conference held on January 10, 2012 (¶716); GM's Form 10-K for the year ended December 31, 2011, filed with the SEC on February 27, 2012 (¶¶718-23, 725-28 and 735); GM's 2011 Annual Report, dated February 27, 2012 (¶¶729 and 736-37); GM's Form 10-Q for the first quarter of 2012, filed with the SEC on May 3, 2012 (¶¶739-40 and 742-43); GM's Form 10-Q for the second quarter of 2012, filed with the SEC on August 3, 2012 (¶¶747-48 and 750-51); GM's Form 10-Q for the third quarter of 2012, filed with the SEC on October 31, 2012 (¶¶753-54 and 756-57);

iv. **2013**: GM's interview with *CSPAN* held on January 31, 2013 (¶780); GM's Form 10-K for the year ended December 31, 2012, filed with the SEC on February 15, 2013 (¶¶759-64, 766-69 and 771); GM's 2012 Annual Report, dated April 25, 2013 (¶772); GM's Form 10-Q for the first quarter of 2013, filed with the SEC on May 2, 2013 (¶¶774-75 and 777-78); GM's Form 10-Q for the second quarter of 2013, filed with the SEC on July 25, 2013 (¶782-83 and 785-86); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on September 23, 2013 (¶795); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on October 25, 2013 (¶809); GM's Form 10-Q for the third

quarter of 2013, filed with the SEC on October 30, 2013; (¶¶788-90 and 792-93) and Barclays Global Automotive Conference held on November 12, 2013 (¶810);

v.   **2014**:   The Deutsche Bank Global Auto Industry Conference held on January 15, 2014 (¶811); GM's statements as reported by *Auto Business News* on January 24, 2014 (¶812); and GM's Form 10-K for the year ended December 31, 2013, filed with the SEC on February 6, 2014 (¶¶797-802, 804-07, 813).

(f)   <u>Defendant Barra (who began her career with GM in 1980, served as GM Senior Vice President, Global Product Development from 2011 to 2013, and then GM Executive Vice President, Global Product Development, Purchasing & Supply Chain from August 2013 until her January 15, 2014 appointment as GM's CEO)</u>:

i.   **2010**:  GM's Form S-1 Registration Statement filed with the SEC on November 17, 2010 (¶¶652-62 and 684);

ii.   **2011**:  GM's Form 8-K filed with the SEC on February 3, 2011 (¶696); GM's conference call with investors discussing the Company's fourth quarter of 2010 financial results held on February 24, 2011 (¶673); GM's Form 10-K for the year ended December 31, 2010, filed with the SEC on March 1, 2011 (¶¶663-71, 674-80 and 685); GM's 2010 Annual Report, dated March 1, 2011 (¶¶687-88); GM's Form 8-K filed with the SEC on March 3, 2011 (¶696); GM's Form 8-K filed with the SEC on April 6, 2011 (¶704); GM's Form 10-Q for the first quarter of 2011, filed with the SEC on May 6, 2011 (¶¶690-91 and 693-94); GM's Form 8-K filed with the SEC on May 6, 2011 (¶704); GM's Form 8-K filed with the SEC on June 6, 2011 (¶704); GM's Form 8-K filed with the SEC on July 7, 2011 (¶712); GM's Form 8-K filed with the SEC on August 4, 2011; GM's Form 10-Q for the second quarter of 2011, filed with the SEC on August 5, 2011 (¶¶698-99 and 701-02); GM's Second Annual Global Business Conference held on August 9, 2011 (¶713); GM's statements concerning the safety of its vehicles made on its website on August 29, 2011 (¶714); GM's Form 10-Q

for the third quarter 2011, filed with the SEC on November 9, 2011 (¶¶706-07 and 709-10); GM's conference call with NHTSA discussing the safety of its vehicles held on November 28, 2011 (¶731); GM's statements concerning the safety of its vehicles made on its website on December 27, 2011 (¶732); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on December 28, 2011 (¶¶733-34);

iii. **2012**:  GM's statements concerning the safety of its vehicles made on its website on January 8, 2012 (¶716); GM's statements concerning warranty costs made during the Deutsche Bank Securities' 2012 Global Auto Industry Conference held on January 10, 2012 (¶716); GM's Form 10-K for the year ended December 31, 2011, filed with the SEC on February 27, 2012 (¶¶718-23, 725-28 and 735); GM's 2011 Annual Report, dated February 27, 2012 (¶¶729 and 736-37); GM's Form 10-Q for the first quarter of 2012, filed with the SEC on May 3, 2012 (¶¶739-40 and 742-43); GM's Form 10-Q for the second quarter of 2012, filed with the SEC on August 3, 2012 (¶¶747-48 and 750-51); GM's Form 10-Q for the third quarter of 2012, filed with the SEC on October 31, 2012 (¶¶753-54 and 756-57);

iv. **2013**:  GM's interview with *CSPAN* held on January 31, 2013 (¶780); GM's Form 10-K for the year ended December 31, 2012, filed with the SEC on February 15, 2013 (¶¶759-64, 766-69 and 771); GM's 2012 Annual Report, dated April 25, 2013 (¶772); GM's Form 10-Q for the first quarter of 2013, filed with the SEC on May 2, 2013 (¶¶774-75 and 777-78); GM's Form 10-Q for the second quarter of 2013, filed with the SEC on July 25, 2013 (¶782-83 and 785-86); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on September 23, 2013 (¶795); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on October 25, 2013 (¶809); GM's Form 10-Q for the third quarter of 2013, filed with the SEC on October 30, 2013; (¶¶788-90 and 792-93) and Barclays Global Automotive Conference held on November 12, 2013 (¶810);

v. **2014**:   The Deutsche Bank Global Auto Industry Conference held on January 15, 2014 (¶811); GM's statements as reported by *Auto Business News* on January 24, 2014 (¶812); and GM's Form 10-K for the year ended December 31, 2013, filed with the SEC on February 6, 2014 (¶¶797-802, 804-07, 813).

(g)   <u>Defendant Timko (who joined GM as Vice President, Chief Accounting Officer and Controller effective March 18, 2013 and currently serves in those roles)</u>:

i. **2013**:  GM's 2012 Annual Report, dated April 25, 2013 (¶772);  GM's Form 10-Q for the first quarter of 2013, filed with the SEC on May 2, 2013 (¶¶774-75 and 777-78); GM's Form 10-Q for the second quarter of 2013, filed with the SEC on July 25, 2013 (¶782-83 and 785-86); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on September 23, 2013 (¶795); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on October 25, 2013 (¶809); GM's Form 10-Q for the third quarter of 2013, filed with the SEC on October 30, 2013; (¶¶788-90 and 792-93) and Barclays Global Automotive Conference held on November 12, 2013 (¶810);

ii. **2014**:   The Deutsche Bank Global Auto Industry Conference held on January 15, 2014 (¶811); GM's statements as reported by *Auto Business News* on January 24, 2014 (¶812); and GM's Form 10-K for the year ended December 31, 2013, filed with the SEC on February 6, 2014 (¶¶797-802, 804-07, 813).

(h)   <u>Defendant Kent (who began her career with GM in 1980, and served as GM's Director of Product Investigations from January 2004 through May 2010, and as GM's General Director/Director of Safety and Vehicle Programs and Crashworthiness from June 2010 through June 2014, at which time she was terminated by GM)</u>:

i. **2010**:  GM's Form S-1 Registration Statement filed with the SEC on November 17, 2010 (¶¶652-62 and 684);

ii.    **2011**: GM's Form 8-K filed with the SEC on February 3, 2011 (¶696); GM's conference call with investors discussing the Company's fourth quarter of 2010 financial results held on February 24, 2011 (¶673); GM's Form 10-K for the year ended December 31, 2010, filed with the SEC on March 1, 2011 (¶¶663-71, 674-80 and 685); GM's 2010 Annual Report, dated March 1, 2011 (¶¶687-88); GM's Form 8-K filed with the SEC on March 3, 2011 (¶696); GM's Form 8-K filed with the SEC on April 6, 2011 (¶704); GM's Form 10-Q for the first quarter of 2011, filed with the SEC on May 6, 2011 (¶¶690-91 and 693-94); GM's Form 8-K filed with the SEC on May 6, 2011 (¶704); GM's Form 8-K filed with the SEC on June 6, 2011 (¶704); GM's Form 8-K filed with the SEC on July 7, 2011 (¶712); GM's Form 8-K filed with the SEC on August 4, 2011; GM's Form 10-Q for the second quarter of 2011, filed with the SEC on August 5, 2011 (¶¶698-99 and 701-02); GM's Second Annual Global Business Conference held on August 9, 2011 (¶713); GM's statements concerning the safety of its vehicles made on its website on August 29, 2011 (¶714); GM's Form 10-Q for the third quarter 2011, filed with the SEC on November 9, 2011 (¶¶706-07 and 709-10); GM's conference call with NHTSA discussing the safety of its vehicles held on November 28, 2011 (¶731); GM's statements concerning the safety of its vehicles made on its website on December 27, 2011 (¶732); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on December 28, 2011 (¶¶733-34);

iii.    **2012**: GM's statements concerning the safety of its vehicles made on its website on January 8, 2012 (¶716); GM's statements concerning warranty costs made during the Deutsche Bank Securities' 2012 Global Auto Industry Conference held on January 10, 2012 (¶716); GM's Form 10-K for the year ended December 31, 2011, filed with the SEC on February 27, 2012 (¶¶718-23, 725-28 and 735); GM's 2011 Annual Report, dated February 27, 2012 (¶¶729 and 736-37); GM's Form 10-Q for the first quarter of 2012, filed with the SEC on May 3, 2012 (¶¶739-40 and

742-43); GM's Form 10-Q for the second quarter of 2012, filed with the SEC on August 3, 2012 (¶¶747-48 and 750-51); GM's Form 10-Q for the third quarter of 2012, filed with the SEC on October 31, 2012 (¶¶753-54 and 756-57);

iv.   **2013**:  GM's interview with *CSPAN* held on January 31, 2013 (¶780); GM's Form 10-K for the year ended December 31, 2012, filed with the SEC on February 15, 2013 (¶¶759-64, 766-69 and 771); GM's 2012 Annual Report, dated April 25, 2013 (¶772); GM's Form 10-Q for the first quarter of 2013, filed with the SEC on May 2, 2013 (¶¶774-75 and 777-78); GM's Form 10-Q for the second quarter of 2013, filed with the SEC on July 25, 2013 (¶782-83 and 785-86); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on September 23, 2013 (¶795); GM's statements concerning the safety of its vehicles as reported by *ENP Newswire* on October 25, 2013 (¶809); GM's Form 10-Q for the third quarter of 2013, filed with the SEC on October 30, 2013; (¶¶788-90 and 792-93) and Barclays Global Automotive Conference held on November 12, 2013 (¶810);

v.   **2014**:   The Deutsche Bank Global Auto Industry Conference held on January 15, 2014 (¶811); GM's statements as reported by *Auto Business News* on January 24, 2014 (¶812); and GM's Form 10-K for the year ended December 31, 2013, filed with the SEC on February 6, 2014 (¶¶797-802, 804-07, 813).

911.   In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its financial, regulatory and legal compliance, internal control procedures, and its accounting and reporting functions.   The Individual Defendants signed materially false and misleading GM SEC filings during the Class Period, and were directly involved in

certifying and/or approving the false statements disseminated by GM during the Class Period. As a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of GM within the meaning of Section 20(a) of the Exchange Act.

912.   As set forth above, GM violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of GM and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired GM common stock. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of GM, each of these Defendants was culpable for the material misstatements and omissions made by GM, as set forth above.

913.   As a direct and proximate result of the Individual Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of GM common stock.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a)    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff and members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expenses; and

(d)    Awarding such equitable, injunctive and other relief as the Court may deem just and proper.

## XVI. JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED: January 15, 2015          /s/ Salvatore J. Graziano
                                 Salvatore J. Graziano
                                 James A. Harrod
                                 Adam H. Wierzbowski
                                 Rebecca E. Boon
                                 **BERNSTEIN LITOWITZ
                                   BERGER & GROSSMANN LLP**
                                 1285 Avenue of the Americas
                                 New York, NY 10019
                                 Telephone: (212) 554-1400
                                 Facsimile: (212) 554-1444
                                 Salvatore@blbglaw.com
                                 Jim.Harrod@blbglaw.com
                                 Adam@blbglaw.com
                                 Rebecca.Boon@blbglaw.com

                                 *Counsel for Lead Plaintiff and for the
                                 Class*

                                 **THE MILLER LAW FIRM, P.C.**
                                 E. Powell Miller (P39487)
                                 Marc L. Newman (P51393)
                                 Sharon S. Almonrode (P33938)
                                 950 West University Drive, Suite 300
                                 Rochester, MI 48307
                                 Telephone: (248) 841-2200
                                 Facsimile: (248) 652-2852
                                 epm@millerlawpc.com
                                 mln@millerlawpc.com
                                 ssa@millerlawpc.com

                                 *Local Counsel for Lead Plaintiff and
                                 for the Class*

                                 NY/863676

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Joseph J. Indelicato, Jr. on behalf of the court-appointed Lead Plaintiff New York State Teachers' Retirement System ("New York Teachers"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the General Counsel of New York Teachers. I have reviewed the Consolidated Securities Class Action Complaint in this matter and authorize its filing by counsel.

2. New York Teachers did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. New York Teachers fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. New York Teachers' transactions in the General Motors Company securities that are the subject of this action are set forth in the chart attached hereto.

5. New York Teachers has sought to serve and was appointed as a lead plaintiff on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *New York State Teachers' Ret. Sys. v. General Motors Co., et al.,*
   No. 14-cv-11191 (E.D. Mich.)

6. New York Teachers has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

   *Smilovits v. First Solar Inc., et al.*, No. 12-cv-555 (D. Ariz.)

7. New York Teachers will not accept any payment for serving as a representative party on behalf of the Class beyond New York Teachers' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of January 2015.

Joseph J. Indelicato, Jr.
General Counsel
*New York State Teachers' Retirement System*

2

**New York State Teachers' Retirement System**
**Transactions in General Motors Company**

**Common stock: CUSIP 37045V100**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 11/18/2010 | 15,200 | 33.0000 |
| Purchase | 11/18/2010 | 20,490 | 33.0000 |
| Purchase | 11/18/2010 | 3,000 | 35.5066 |
| Purchase | 11/18/2010 | 7,100 | 34.8226 |
| Purchase | 11/18/2010 | 6,800 | 35.2558 |
| Purchase | 12/9/2010 | 8,300 | 34.0084 |
| Purchase | 12/9/2010 | 138,700 | 33.7975 |
| Purchase | 12/9/2010 | 3,000 | 33.7000 |
| Purchase | 2/25/2011 | 2,500 | 33.7232 |
| Purchase | 8/22/2011 | 3,100 | 21.4379 |
| Purchase | 3/6/2012 | 5,000 | 24.6811 |
| Purchase | 4/3/2012 | 2,500 | 25.4133 |
| Purchase | 4/3/2012 | 800 | 25.5782 |
| Purchase | 5/3/2012 | 500 | 22.4071 |
| Purchase | 5/3/2012 | 2,200 | 22.4458 |
| Purchase | 5/3/2012 | 1,100 | 22.3927 |
| Purchase | 5/10/2013 | 25,356 | 31.2903 |
| Purchase | 6/4/2013 | 19,900 | 35.0549 |
| Purchase | 6/5/2013 | 200,000 | 34.1756 |
| Purchase | 6/6/2013 | 960,636 | 34.4400 |
| Purchase | 6/6/2013 | 35,000 | 34.3229 |
| Purchase | 6/6/2013 | 216,100 | 34.1662 |
| Purchase | 6/7/2013 | 5,000 | 34.1208 |
| Purchase | 6/11/2013 | 60,000 | 34.2547 |
| Purchase | 6/21/2013 | 1,027 | 32.2100 |
| Purchase | 6/24/2013 | 82,900 | 31.5410 |
| Purchase | 7/15/2013 | 26,800 | 36.5556 |
| Purchase | 7/30/2013 | 1,600 | 36.5024 |
| Purchase | 7/30/2013 | 200 | 36.4070 |
| Purchase | 7/30/2013 | 1,200 | 36.5962 |
| Purchase | 7/30/2013 | 1,100 | 36.6428 |
| Purchase | 8/12/2013 | 2,079 | 35.8721 |
| Purchase | 8/13/2013 | 3,165 | 35.8461 |
| Purchase | 8/14/2013 | 426 | 35.6014 |
| Purchase | 8/15/2013 | 630 | 34.9000 |
| Purchase | 9/17/2013 | 1,600 | 36.5656 |
| Purchase | 9/17/2013 | 4,100 | 36.8137 |
| Purchase | 9/20/2013 | 35,992 | 36.8275 |
| Purchase | 9/23/2013 | 98,450 | 37.0931 |
| Purchase | 9/24/2013 | 49,225 | 37.5403 |
| Purchase | 9/25/2013 | 49,225 | 37.4057 |
| Purchase | 10/21/2013 | 7,788 | 35.5002 |
| Purchase | 10/22/2013 | 15,812 | 35.6544 |
| Purchase | 12/17/2013 | 3,100 | 41.6666 |
| Purchase | 12/18/2013 | 7,406 | 41.1014 |

**New York State Teachers' Retirement System**
**Transactions in General Motors Company**

**Common stock: CUSIP 37045V100**

| <u>Transaction</u> | <u>Date</u> | <u>Shares</u> | <u>Price</u> |
|---|---|---|---|
| Purchase | 12/19/2013 | 4,994 | 41.0031 |
| Purchase | 12/20/2013 | 322,229 | 40.9875 |
| Purchase | 1/21/2014 | 700 | 38.1800 |
| Purchase | 2/21/2014 | 380,414 | 36.6780 |
| Purchase | 3/24/2014 | 25,100 | 34.9672 |
| Purchase | 4/21/2014 | 5,100 | 34.0159 |
| Purchase | 6/20/2014 | 2,216 | 36.2170 |
| | | | |
| Sale | 1/6/2011 | (25,900) | 39.0395 |
| Sale | 1/26/2011 | (20,490) | 38.3387 |
| Sale | 2/16/2011 | (400) | 36.6800 |
| Sale | 3/14/2011 | (400) | 31.7200 |
| Sale | 3/21/2011 | (500) | 31.4600 |
| Sale | 6/30/2011 | (2,777) | 30.3582 |
| Sale | 7/6/2011 | (24,400) | 31.3531 |
| Sale | 7/12/2011 | (6,000) | 30.8012 |
| Sale | 7/13/2011 | (7,000) | 30.8879 |
| Sale | 7/14/2011 | (7,000) | 30.4606 |
| Sale | 9/19/2011 | (1,700) | 23.0928 |
| Sale | 12/15/2011 | (982) | 19.9860 |
| Sale | 1/9/2012 | (141) | 22.9713 |
| Sale | 1/30/2012 | (800) | 24.3300 |
| Sale | 2/10/2012 | (400) | 25.4300 |
| Sale | 2/22/2012 | (500) | 27.0100 |
| Sale | 3/1/2012 | (137) | 26.7600 |
| Sale | 3/2/2012 | (137) | 26.4900 |
| Sale | 3/16/2012 | (300) | 25.5400 |
| Sale | 3/21/2012 | (300) | 25.3900 |
| Sale | 3/26/2012 | (300) | 25.4100 |
| Sale | 4/2/2012 | (300) | 26.2800 |
| Sale | 4/9/2012 | (300) | 24.2083 |
| Sale | 4/16/2012 | (400) | 23.5500 |
| Sale | 4/20/2012 | (400) | 23.7550 |
| Sale | 4/27/2012 | (300) | 23.5750 |
| Sale | 5/7/2012 | (400) | 22.2182 |
| Sale | 5/15/2012 | (400) | 21.6400 |
| Sale | 5/21/2012 | (400) | 21.5775 |
| Sale | 6/4/2012 | (400) | 21.0250 |
| Sale | 6/11/2012 | (200) | 21.9700 |
| Sale | 6/19/2012 | (400) | 21.7175 |
| Sale | 6/22/2012 | (200) | 20.6125 |
| Sale | 7/2/2012 | (200) | 19.3400 |
| Sale | 7/9/2012 | (400) | 20.1100 |
| Sale | 7/16/2012 | (400) | 19.4400 |
| Sale | 7/23/2012 | (400) | 19.2000 |

ii

**New York State Teachers' Retirement System**
**Transactions in General Motors Company**

**Common stock: CUSIP 37045V100**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Sale | 7/30/2012 | (400) | 19.4088 |
| Sale | 8/6/2012 | (400) | 19.9700 |
| Sale | 8/13/2012 | (400) | 20.4700 |
| Sale | 8/20/2012 | (200) | 21.8025 |
| Sale | 8/27/2012 | (200) | 21.2700 |
| Sale | 9/4/2012 | (300) | 21.1700 |
| Sale | 9/10/2012 | (300) | 23.2151 |
| Sale | 9/19/2012 | (400) | 24.8550 |
| Sale | 9/21/2012 | (1,100) | 24.6886 |
| Sale | 9/24/2012 | (400) | 24.2200 |
| Sale | 10/9/2012 | (200) | 24.4000 |
| Sale | 10/16/2012 | (200) | 24.6800 |
| Sale | 11/13/2012 | (200) | 24.9300 |
| Sale | 12/11/2012 | (200) | 25.3500 |
| Sale | 2/5/2013 | (200) | 28.3900 |
| Sale | 2/11/2013 | (200) | 28.5000 |
| Sale | 2/19/2013 | (400) | 27.5225 |
| Sale | 2/25/2013 | (97) | 26.6651 |
| Sale | 3/4/2013 | (485) | 27.0200 |
| Sale | 3/18/2013 | (94) | 28.0000 |
| Sale | 3/25/2013 | (189) | 28.0400 |
| Sale | 4/1/2013 | (234) | 27.9600 |
| Sale | 4/8/2013 | (200) | 27.4600 |
| Sale | 4/16/2013 | (200) | 29.3100 |
| Sale | 4/22/2013 | (200) | 29.1600 |
| Sale | 4/29/2013 | (300) | 30.6700 |
| Sale | 5/6/2013 | (300) | 32.0500 |
| Sale | 5/13/2013 | (300) | 30.9900 |
| Sale | 5/22/2013 | (25,356) | 33.5636 |
| Sale | 6/3/2013 | (200) | 33.8500 |
| Sale | 3/10/2014 | (3,441) | 36.9827 |
| Sale | 3/11/2014 | (6,988) | 35.7725 |
| Sale | 4/30/2014 | (10,429) | 34.3374 |
| Sale | 6/16/2014 | (650) | 35.9977 |
| Sale | 6/17/2014 | (650) | 35.8900 |
| Sale | 6/18/2014 | (5,200) | 36.2561 |
| Sale | 6/19/2014 | (4,800) | 36.4271 |

## GLOSSARY OF CERTAIN TERMS AND ABBREVIATIONS

| Term/Abbreviation | Definition |
|---|---|
| 573 Report | Report required to be filed with NHTSA for each defect determined to be related to motor vehicle safety. |
| ACC | Accessory; a position of the GM Ignition Switches where engine power is deactivated along with power steering and power brakes. |
| ASC | Accounting Standards Codification; codified standards representing United States GAAP. |
| ASC Topic 450 | GAAP provision formerly known as FASB Interpretation No. 5; governs when companies such as GM are required to recognize loss contingencies, including those resulting from products sold, and the adverse outcome of litigation. |
| ASC Topic 460 | GAAP provision, formerly known as FASB Interpretation No. 45; governs disclosure obligations associated with warranty/guarantor liabilities. |
| Audit Committee | Audit Committee of GM's Board of Directors. |
| AVM | GM Area Vehicle Manager; responsible for managing CRMs. |
| Big 4 | Set of cost-cutting principles introduced at GM that emphasized timing over quality. |
| Class Period | November 17, 2010 through and inclusive of July 24, 2014. |
| Company | *See* "GM." |

1

| Term/Abbreviation | Definition |
|---|---|
| Compensation Facility | Compensation program established by GM, and administered by Feinberg, to compensate victims of certain accidents involving ignition switch defects. |
| Compensation Facility Protocol | Protocol established for determining eligibility of claims submitted to the Compensation Facility. |
| Consent Order | May 16, 2014 Consent Order between GM and NHTSA. |
| Continental | Siemens Continental; manufactured the SDM unit for the Cobalt. |
| CPIT | Current Production Improvement Team. |
| CRM | Customer Relations Manager; GM employee to whom consumer complaints are directly reported. |
| CTF | Captured Test Fleet; vehicles driven and evaluated by GM employees before the models are sold to consumers. |
| CTS | Component Technical Specification; a document that defines the design specifications and operating parameters of an automotive component. |
| Defendants | Akerson, Ammann, Barra, Cyprus, Kent, Liddell, Stevens, Timko and GM. |
| Delphi | Delphi Mechatronics; supplier and manufacturer of components in GM vehicles, including the Delta Ignition Switch. |
| Delta | Delta Platform vehicles, which include the Chevy Cobalt, Saturn Ion, Chevy HHR and Pontiac G5. |

| Term/Abbreviation | Definition |
|---|---|
| Delta Ignition Switch | Ignition switch design for the Delta platform vehicles, among others. |
| DRE | Design Release Engineer. |
| Eckert Seamans | Law firm that submitted a case evaluation to GM in April 2012 that linked airbag non-deployment with the defective ignition switches. |
| EFADC | GM's Executive Field Action Decision Committee; a committee that includes three GM vice presidents, including GM's Chief Engineer, which is charged with determining when to conduct recalls. |
| EWO | Engineering Work Order. |
| EWR | Early Warning Reports; mandatory quarterly reports manufacturers must submit to NHSTA under the TREAD Act. |
| FASB | Financial Accounting Standards Board; group to whom SEC has delegated authority to codify GAAP. |
| First Recall Wave | Recalls issued by GM on February 7, February 25, and March 28, 2014. |
| FPA | Field Performance Assessment. |
| FPAE | Field Performance Assessment Engineer. |
| FPE | Field Performance Evaluation. |
| FPERC | Field Performance Evaluation Recommendation Committee. |

3

| Term/Abbreviation | Definition |
|---|---|
| GAAP | United States Generally Accepted Accounting Principles. |
| GAO | United States Government Accountability Office. |
| GDS | Global Delivery Service. |
| GM | Defendant General Motors Company. |
| GMNA | GM North America. |
| Indiana University Report | Indiana University Transportation Research Center report commissioned by NHTSA in April 2007. |
| Individual Defendants | Akerson, Ammann, Barra, Cyprus, Kent, Liddell, Stevens and Timko. |
| IPO | GM's November 17, 2010 initial public offering. |
| IPTV | Incidents Per Thousand Vehicles. |
| Jenner & Block | GM's outside law firm; firm Chairman Valukas conducted the internal investigation into the GM ignition switch defects. |
| Kappa | Kappa Platform vehicles, which include the Saturn Sky and Pontiac Solstice. |
| King & Spalding | GM's outside law firm; warned GM about prior instances of airbag non-deployment in 2010. |
| Lead Plaintiff | New York State Teachers' Retirement System. |

| Term/Abbreviation | Definition |
|---|---|
| May 15 Meeting | May 15, 2012 meeting of high level managers, directors, PI and engineering personnel regarding the "Cobalt Airbag Issue." |
| MY | Model Year. |
| N-cm | Newton-centimeters. |
| New GM | General Motors Company, which purchased the assets of Old GM. |
| New York Teachers | *See* "Lead Plaintiff." |
| NHSTA | The National Highway Traffic Safety Administration. |
| NYSE | New York Stock Exchange. |
| ODI | Office of Defects Investigation; NHTSA department charged with administering TREAD Act requirements and investigating defects reported to NHTSA's attention. |
| Old GM | Formerly General Motors Corporation; filed for bankruptcy on June 1, 2009. |
| PCAOB | Public Company Accounting Oversight Board. |
| PI | Product Investigations. |
| Plaintiff | *See* "Lead Plaintiff." |
| Preliminary Information | Communication sent by GM to dealers to alert them of problems with a vehicle that GM has become aware of; a less formal warning than a TSB. |

| Term/Abbreviation | Definition |
|---|---|
| PRTS | Problem Resolution Tracking System; a database GM uses to document and track engineering problems. |
| Red X | GM engineering diagnostic process in which engineers make a focused effort to diagnose the root cause of performance variations. |
| Roundtable | The Roundtable Committee; GM committee that had authority to approve litigation settlements in amounts from $100,000 to $2 million. |
| Safety Act | The National Traffic and Motor Vehicle Safety Act of 1966, codified at 49 U.S. Code Chapter 31. |
| SDM | Sensing and Diagnostic Module. |
| SEC | Securities and Exchange Commission. |
| Second Recall Wave | Recalls issued by GM on June 13, June 16 and June 30, 2014. |
| Shipp Report | Expert report used in West Virginia Cobalt crash and airbag non-deployment case. |
| SOX | Sarbanes-Oxley Act of 2002. |
| SOX §302 Certification | Certification made pursuant to SOX Section 302 attesting that the individual had evaluated the effectiveness of internal controls and disclosed any deficiencies or material weaknesses in them. |
| SOX §906 Certification | Certification made pursuant to SOX Section 906 attesting that financial reporting is in compliance with federal securities laws. |

6

| Term/Abbreviation | Definition |
|---|---|
| Special Order | Order issued to GM by the U.S. Secretary of Transportation on March 4, 2014. |
| SRC | Settlement Review Committee; GM committee that had authority to approve litigation settlements in amounts from $2 million up to $5 million. |
| TQ | Timeliness Query; a NHTSA investigation to evaluate the timing of defect decision-making and reporting of a safety defect to NHTSA. |
| TREAD | Transportation Recall Enhancement, Accountability and Documentation Act; incorporated by amendment into the Safety Act. |
| TSB | Technical Service Bulletin; a message concerning an engineering problem issued by GM to dealers, as opposed to consumers directly. |
| Valukas Report | Report to Board of Directors of General Motors Company Regarding Ignition Switch Recalls, dated May 29, 2014. |
| VAPIR | Vehicle and Process Integration Review. |
| VSE | Vehicle Systems Engineer. |
| Warranty Settlement Agreement | Warranty, Settlement, and Release Agreement and Covenant Not to Sue between GM and Delphi, dated August 14, 2007; agreement reached in connection with Delphi's bankruptcy and acknowledging certain liabilities in connection with the Delta Ignition Switch. |

## GLOSSARY OF CERTAIN RELEVANT INDIVIDUALS

| Name | Role |
|---|---|
| Adler, Alan | GM Corporate Spokesperson. |
| Akerson, Daniel F. | Individual Defendant; Chairman and CEO of GM (9/2010 - 1/2014) who succeeded Edward Whitacre, Jr. as CEO of GM. Akerson assumed the Chairman of the Board position in January 2011. He was succeeded by Defendant Barra in January 2014. |
| Altman, Gary | GM Program Engineering Manager; replicated a moving shutdown that had occurred at a Cobalt press event; dismissed by GM in June 2014. |
| Ammann, Daniel | Individual Defendant; GM President (1/2014 - present); GM Senior VP and CFO (4/2011 - 1/2014); and GM VP, Finance and Treasurer (4/2010 - 4/2011). |
| Anderson, Candice | 21 year-old who was severely injured in an accident while driving a 2004 Saturn Ion; the airbags did not deploy and the accident killed Anderson's 25 year-old boyfriend Gene Mikale. |
| Andres, Laura | GM Design Engineer; sent emails in August 2005, describing a moving shutdown she experienced while driving a 2006 Chevrolet Impala and recommending a "big recall." |
| Barra, Mary T. | Individual Defendant; CEO of GM (1/2014 – present); previously Executive VP, Global Product Development, Purchasing & Supply Chain (8/2013 – 1/2014), and Senior VP, Global Product Development (2011 – 2013); over 33 year affiliation with GM. |

1

| Name | Role |
|------|------|
| Benavides, Carmen | GM Director of Product Investigations, Safety Regulations, Field Performance Assessment and TREAD; dismissed by GM in June 2014. |
| Boler-Davis, Alicia | GM Senior VP of Global Quality and Customer Experience; dismissed by GM in June 2014. |
| Buonomo, Lawrence S. | GM Practice Area Manager, Global Process & Litigation; Chairman of GM's Roundtable Committee and Settlement Review Committee; dismissed by GM in June 2014. |
| Calabrese, John | GM VP of Global Vehicle Engineering; 34 year GM veteran who retired abruptly in April 2014. |
| Clark Dougherty, Lucy | General Counsel of GMNA (3/2011 - present). |
| Cooper, Lance | Attorney for the plaintiffs in *Melton v. Gen. Motors Co.*, Civil Action 2011-A-2652 (Cobb Cnty. Ct. of Georgia). |
| Cyprus, Nicholas S. | Individual Defendant; GM VP, Controller and Chief Accounting Officer (8/2009 – 3/2013). |
| DeGiorgio, Raymond | GM Engineer who assumed responsibility for development and implementation of the Delta Ignition Switch; dismissed by GM in June 2014. |
| Dolan, John | GM Engineer and head of Global Subsystem Leader Team on Passive Safety Control. |
| Everest, Brian | GM Field Performance Assessment Supervisor; an engineer charged with tracking Cobalt and Ion airbag non-deployments. |

2

| Name | Role |
|------|------|
| Federico, Jim | Executive Director for Global Vehicle Integration; appointed to act as "executive champion" to resolve the Cobalt airbag non-deployment issue in June 2012; retired suddenly in May 2014 after 36 years at GM. |
| Feinberg, Kenneth R. | Administrator of GM's Compensation Facility for victims who experienced death or injury in accidents involving the defective Delta Ignition Switch. |
| Foley-Gardner, Maureen | GM Director of Field Performance Evaluation. |
| Friedman, David | Acting NHTSA Administrator. |
| Fromm, Fred | General Counsel of GMNA (9/2009 – 3/2011). |
| Haas, Ronald | GM VP, Quality, Reliability & Competitive Operations Implementation for GMNA; dismissed by GM (with Roland Hill) after attempting to bring problems with GM's quality control systems to the attention of the Board of Directors. |
| Hendler, John | GM Vehicle Systems Engineer; involved in 2005 process to determine whether to change ignition switch in Delta and Kappa platforms. |
| Hill, Roland | GM Head of the Global Delivery Service Group; direct superior of McAleer; dismissed by GM (with Haas) after attempting to bring problems with GM's quality control systems to the attention of the Board of Directors. |
| Johnson, Gerald | GM VP of Manufacturing; member of the EFADC. |

| Name | Role |
|---|---|
| Kelley, Courtland | GM employee responsible for GM's Corporate Quality Audit; immediate successor to McAleer in that position; after attempting to elevate safety concerns was removed from positions with any responsibility in approximately 2002. |
| Kemp, William | GM Counsel for the Global Engineering Organization; GM's senior attorney responsible for safety issues; dismissed by GM in June 2014. |
| Kent, Gay | Individual Defendant; General Director of Safety and Vehicle Programs and Crashworthiness (6/2010-6/2014), previously served in various engineering and safety positions at GM since 1980; dismissed by GM in June 2014. |
| LaSorda, Thomas | VP Quality, Reliability & Competitive Operations Implementation for GMNA (replaced Ronald Haas in 2000). |
| Liddell, Christopher P. | Individual Defendant; GM Vice Chairman and CFO (1/2010 – 3/2011). |
| Manzor, Alberto | GM Engineer who tested torque required to turn the Delta Ignition Switches from the Run to the Accessory position. |
| McAleer, William | Former head of GM's Corporate Quality Audit Global Delivery Service; wrote 2002 letter to GM Board of Directors detailing serious quality issues and asking that shipments of unsafe vehicles be stopped. |
| Melton, Brooke | 2005 Chevrolet Cobalt driver who was killed; GM failed to classify her death as ignition switch-related. |
| Millikin, Michael | GM General Counsel; resigned in 2014 after over 40 years with GM. |

4

| Name | Role |
|------|------|
| Murawa, John | GM Field Performance Evaluation investigator; became involved in FPERC/EFADC review and recall determination concerning the Delta Ignition Switch in December 2013. |
| Nowak-Vanderhoef, Deborah | Legal Global Process Leader and Practice Area Manager – Product Development; member of the Settlement Review Committee and participated in review of Cobalt airbag non-deployments. |
| Oakley, Steven | Head of Corporate Quality Audit; successor to Kelley; prepared the December 2005 draft TSB that included the word "stall," which was subsequently edited out. |
| Oldham, Scott | Journalist who inadvertently knocked the ignition switch out of the Run position while test driving a Chevrolet Cobalt in 2004. |
| Palmer, Jaclyn | GM product litigation attorney; responsible for the decision to appoint an "executive champion" to lead the FPE ignition switch investigation; dismissed by GM in June 2014. |
| Parks, Doug | Chief Engineer for GM's Cobalt. |
| Peace, Manuel | GM FPA Engineer assigned to evaluate the November 2004 Cobalt accident resulting in the death of Candice Anderson. |
| Peracha, Nabeel | GM in-house attorney; in a July 2012 meeting questioned why GM had not already initiated a recall of Delta vehicles. |
| Porter, Ron | GM in-house product litigation attorney and member of the Roundtable; presented Melton and other ignition switch defect cases to the Roundtable; dismissed by GM in June 2014. |

| Name | Role |
| --- | --- |
| Queen, Lori | GM Vehicle Line Executive for small cars (including the Delta platform). |
| Rademaker, Amy | Fifteen year-old passenger killed in the 2005 Chevrolet Cobalt that was the subject of Trooper Young's Wisconsin State Patrol Report. |
| Reuss, Mark | Executive VP, Global Product Development, Purchasing & Supply Chain; previously VP of GMNA. |
| Robinson, Michael | VP of Sustainability and Global Regulatory Affairs; previously General Counsel of GMNA (10/2008 - 9/2009); dismissed by GM in June 2014. |
| Schutzman, Lee A. | GM senior in-house attorney; executed the Warranty Settlement Agreement with Delphi. |
| Sevigny, Jennifer | GM attorney; led GM's Field Product Assessment group that reviewed Cobalt airbag non-deployments in July 2011; dismissed by GM in June 2014. |
| Shipp, Erin | Plaintiff's expert in West Virginia litigation involving a Cobalt crash where the airbags did not deploy. |
| Solso, Theodore M. | Chairman of the GM Board; served on the Audit Committee. |
| Sprague, John | GM Field Performance Assessment Engineer working on airbags; reviewed and collected information on Cobalt/Ion airbag non-deployment issues. |
| Stevens, Charles K., III | Individual Defendant; GM's Executive VP and CFO (1/2014 - present). |

6

| Name | Role |
|------|------|
| Stouffer, Brian | GM Products Investigation Unit investigator; took over in-house ignition switch investigation in 2011; retired in December 2013. |
| Timko, Thomas S. | Individual Defendant; GM's VP, Controller and Chief Accounting Officer (3/2013 - present). |
| Towne, Shara Lynn | Mother of five killed when the ignition switch in her 2004 Saturn Ion failed. |
| Trush, David | GM Lead Design Engineer; engaged in 2009 review of Delta Ignition Switch problems. |
| Utter, Thomas | GM Project Engineer responsible for drafting the initial Component Technical Specifications for the Delta Ignition Switch. |
| Valukas, Anton R. | Attorney, Jenner & Block; retained by GM to conduct an internal investigation into the ignition switch defects. |
| Wachtel, Doug | GM Product Investigations and Internal Investigations Manager; replicated the ignition switch defect while driving a Cobalt. |
| Wagoner, Rick | Former GM CEO (6/2000-3/2009) and Chairman of the Board. |
| Woychowski, Terry | GM VP of Global Quality and Vehicle Launch; member of the Executive Field Action Decision Committee and asked by Kemp in May 2012 to act as the first "executive champion" to resolve the Cobalt airbag non-deployment issue; retired in June 2012. |

| Name | Role |
|---|---|
| York, Jerome B. | GM Director and employee of Kirk Kerkorian (who was at the time GM's largest shareholder); in January 2006 called for GM to "go into crisis mode" to preserve cash through cost-cutting. |
| Young, Keith ("Trooper Young") | Wisconsin State Trooper who authored the Wisconsin State Patrol Report, which concluded that the ignition switch defect in a 2005 Chevrolet Cobalt caused the vehicle's airbags not to deploy. |