## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| NEW YORK STATE TEACHERS' RETIREMENT SYSTEM, Individually and on Behalf of All Other Persons Similarly Situated, | Civil Case No. 4:14-cv-11191 |
| Plaintiff, | Honorable Linda V. Parker |
| v. | |
| GENERAL MOTORS COMPANY, DANIEL F. AKERSON, NICHOLAS S. CYPRUS, CHRISTOPHER P. LIDDELL, DANIEL AMMANN, CHARLES K. STEVENS, III, MARY T. BARRA, THOMAS S. TIMKO, and GAY KENT | |
| Defendants. | |

## LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION

Pursuant to Federal Rule of Civil Procedure 23(e) and upon (a) the Declaration of Salvatore J. Graziano in Support of: (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, filed herewith; (b) the Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Settlement and Approval of Plan of Allocation, attached hereto; and (c) all other papers and proceedings herein, Lead Plaintiff, New York State Teachers' Retirement System, hereby moves this Court before the Honorable Linda V. Parker, on April 20, 2016 at 11:00 a.m. in Courtroom 108 of the Federal Building and U.S. Courthouse, 600 Church Street, Flint, Michigan, or at such other location and time as set by the Court, for (i) entry a judgment approving the proposed settlement as fair, reasonable and adequate; and (ii) entry of an order approving the proposed Plan of Allocation as fair and reasonable.

Dated:  March 9, 2016

Respectfully submitted,

/s/ Salvatore J. Graziano
Salvatore J. Graziano
James A. Harrod
**BERNSTEIN LITOWITZ**
  **BERGER & GROSSMANN LLP**
1251 Avenue of the Americas, 44th Fl.
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Salvatore@blbglaw.com
Jim.Harrod@blbglaw.com

*Lead Counsel for Lead Plaintiff and*
*for the Settlement Class*

**THE MILLER LAW FIRM, P.C.**
E. Powell Miller (P39487)
Marc L. Newman (P51393)
Sharon S. Almonrode (P33938)
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
mln@millerlawpc.com
ssa@millerlawpc.com

*Local Counsel for Lead Plaintiff and
for the Settlement Class*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| NEW YORK STATE TEACHERS' RETIREMENT SYSTEM, Individually and on Behalf of All Other Persons Similarly Situated, | Civil Case No. 4:14-cv-11191 |
| | Honorable Linda V. Parker |
| Plaintiff, | |
| v. | |
| GENERAL MOTORS COMPANY, DANIEL F. AKERSON, NICHOLAS S. CYPRUS, CHRISTOPHER P. LIDDELL, DANIEL AMMANN, CHARLES K. STEVENS, III, MARY T. BARRA, THOMAS S. TIMKO, and GAY KENT | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF
## <u>SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION</u>

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. ii

I.   INTRODUCTION ......................................................................1

II.  ARGUMENT ...........................................................................6

   A.   The Standards For Judicial Approval Of Class Action
        Settlements .....................................................................6

   B.   A Review Of The Sixth Circuit Factors Establishes That
        The Settlement Should Be Approved ....................................8

        1.   The Likelihood Of Success On The Merits
             Supports The Settlement ...........................................8

        2.   The Complexity, Expense, And Likely Duration
             Of The Litigation Supports The Settlement...................15

        3.   The Absence Of Collusion, Arms'-Length Nature
             Of The Settlement Negotiations, And Judgment Of
             Counsel Support The Settlement ...............................17

        4.   The Stage Of The Proceedings And Amount Of
             Discovery Completed Support The Settlement ..............17

        5.   The Reaction Of The Settlement Class.........................20

        6.   The Public Interest Favors The Settlement...................22

   C.   The Plan Of Allocation Is Fair, Reasonable, And
        Adequate......................................................................22

   D.   Notice To The Settlement Class Satisfied The
        Requirements Of Rule 23, Due Process, And The PSLRA ...............24

   E.   Certification Of The Settlement Class Remains
        Warranted .....................................................................25

III. CONCLUSION.........................................................................25

i

# TABLE OF AUTHORITIES

CASES                                                                                   PAGE(S)

*In re Am. Banknote Holographics, Inc.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001) ..............................................................22

*Bert v. AK Steel Corp.*,
    2008 WL 4693747 (S.D. Ohio Oct. 23, 2008) ...................................................20

*In re Cardizem CD Antitrust Litig.*,
    218 F.R.D. 508 (E.D. Mich. 2003) ................................................................7, 8

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981) ..........................................................................................8

*Chavarria v. N.Y. Airport Serv., LLC*,
    875 F. Supp. 2d 164 (E.D.N.Y. 2012) ..............................................................8

*Connectivity Sys. Inc. v. Nat'l City Bank*,
    No. 08-CV-1119, 2011 WL 292008 (S.D. Ohio Jan. 26, 2011).........................15

*In re Datatec Sys., Inc. Sec. Litig.*,
    No. 04-CV-525 (GEB), 2007 WL 4225828 (D.N.J. Nov. 28, 2007) ................10

*In re Delphi Corp. Securities, Derivative & ERISA Litig.*,
    248 F.R.D. 483 (E.D. Mich. 2008) ...................................................................7

*Fidel v. Farley*,
    534 F.3d 508 (6th Cir. 2008) ..........................................................................25

*In re Ford Motor Co. Sec. Litig., Class Action*,
    381 F.3d 563 (6th Cir. 2004) ..........................................................................12

*Griffin v. Flagstar Bancorp, Inc.*,
    No. 10-CV-10610, 2013 WL 6511860 (E.D. Mich. Dec. 12, 2013).............6, 22

*Hicks v. Morgan Stanley & Co.*,
    No. 01 Civ. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24,
    2005) ..............................................................................................................10

ii

*Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of*
  *Am. v. Gen. Motors Corp.*,
  497 F.3d 615 (6th Cir. 2007) ....................................................................6, 7, 8

*IUE-CWA v. Gen. Motors Corp.*,
  238 F.R.D. 583 (E.D. Mich. 2006) .......................................................8

*Kogan v. AIMCO Fox Chase, L.P.*,
  193 F.R.D. 496 (E.D. Mich. 2000) .....................................................17

*Leonhardt v. ArvinMeritor, Inc.*,
  581 F. Supp. 2d 818 (E.D. Mich. 2008) ...............................................7

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  No. 02 MDL 1484, 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007)........................10

*In re Nationwide Fin. Servs. Litig.*,
  No. 08-CV-00249, 2009 WL 8747486 (S.D. Ohio Aug. 19, 2009)...7, 15, 17, 20

*Officers for Justice v. The Civil Serv. Comm'n of San Francisco*,
  688 F.2d 615 (9th Cir. 1982) ...............................................................7

*Ohio Pub. Interest Campaign v. Fisher Foods, Inc.*,
  546 F. Supp. 1 (N.D. Ohio Apr. 27, 1982) ...........................................8

*In re Omnicare Sec. Litig.*,
  769 F.3d 455 (6th Cir. 2014) ..............................................................13

*Shane Grp., Inc. v. Blue Cross Blue Shield*,
  No. 10-CV-14360, 2015 WL 1498888 (E.D. Mich. Mar. 31, 2015).................20

*In re Telectronics Pacing Sys., Inc.*,
  137 F. Supp. 2d 985 (S.D. Ohio 2001) ...............................7, 15, 17, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................22

*In re Veeco Instruments Inc. Sec. Litig.*,
  2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)........................................22

## STATUTES & RULES

Private Securities Litigation Reform Act of 1995 ...........................................*passim*

Fed. R. Civ. P. 23(a) and (b)(3) .................................................................25

Fed. R. Civ. P. 23(e).................................................................................7

**OTHER AUTHORITIES**

4 ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS
    § 11.41 (4th ed. 2002)........................................................................6

HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS
    § 11.51 (3d ed. 1992) ........................................................................19

Lead Plaintiff, New York State Teachers' Retirement System ("Lead Plaintiff"), on behalf of itself and the Settlement Class, respectfully submits this memorandum of law in support of its motion for final approval of the proposed settlement, and for approval of the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation").[1]

## I.   **INTRODUCTION**

The proposed Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $300 million cash payment that – if approved – represents the second largest corporate settlement of a Private Securities Litigation Reform Act of 1995 ("PSLRA") case in the Sixth Circuit.  It also represents a significant portion of the likely recoverable damages in the Action as determined by Lead Plaintiff's damages expert, particularly after considering arguments that could be made by Defendants concerning loss causation issues.  As explained herein, and in the Declaration of Salvatore J. Graziano in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Graziano Declaration" or "Graziano Decl."), this is an excellent result for the Settlement Class.  In the absence of a settlement, Lead Plaintiff would have had to surmount numerous obstacles to obtain any recovery, and there was no guarantee

---

[1] Unless otherwise indicated, all capitalized terms shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated November 11, 2015 (ECF No. 94-2) (the "Stipulation").

that any such recovery would have been greater than the settlement amount.[2]  Indeed, had the Complaint survived the pending motions to dismiss, this litigation would likely have continued for many years, through class certification, fact discovery, expert discovery, summary judgment, trial, and likely appeals.  Lead Plaintiff and its counsel faced substantial obstacles in proving liability and damages from the outset, yet nevertheless reached a timely and substantial resolution for the Settlement Class.  A balancing of the significant risks of continued litigation against the certainty of a $300 million recovery makes clear that the Settlement should be approved.

This was a hard-fought case.  At the time the agreement to settle was reached, Lead Plaintiff and Lead Counsel had undertaken substantial effort and obtained a well-developed understanding of the strengths and weaknesses of the Action.  Prior to settlement, Lead Counsel:  (a) conducted a wide-ranging review and analysis of General Motors Company ("GM" or the "Company") and the allegedly fraudulent misrepresentations and omissions made during the period from November 17, 2010 through July 24, 2014, inclusive (the "Settlement Class Period" or "Class Period"); (b) engaged in rigorous factual and legal research, including the review of publicly available information published by and concerning GM (including the Valukas

---

[2] The Graziano Declaration is an integral part of this submission.  For the sake of brevity, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action; the nature of the claims asserted; the negotiations leading to the Settlement; the risks and uncertainties of continued litigation; the terms of the Plan of Allocation for the Settlement proceeds; and a description of the services that Plaintiffs' Counsel provided for the benefit of the Settlement Class.  Citations to "¶" in this memorandum refer to paragraphs in the Graziano Declaration.

Report), National Highway Traffic Safety Administration ("NHTSA") practices, prior automotive recalls and related litigation, GM's corporate history, applicable pleading and other standards in the Sixth Circuit, and interviews and meetings with numerous former employees of GM and other knowledgeable persons; (c) drafted a detailed 543-page Consolidated Class Action Complaint (the "Complaint"); (d) researched, drafted and filed a successful motion for partial modification of the PSLRA discovery stay, which permitted discovery of documents that GM had already produced, or would produce, in the related multidistrict litigation and permitted Lead Plaintiff to serve document preservation subpoenas on certain third parties; (e) researched, drafted and filed an opposition to Defendants' motions to dismiss; (f) consulted with experts and consultants in the fields of automotive safety, loss causation, damages and accounting; (g) engaged in intensive discovery over a period of months, which included the review, analysis and coding of over four million pages of documents received as a result of the lifting of the PSLRA discovery stay; and (h) negotiated with Defendants on an arm's-length basis to resolve the Action.

While Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants are meritorious, they also recognize that the Action presented a number of substantial risks with respect to establishing liability, loss causation and damages. With respect to liability, Defendants vigorously asserted that their alleged misstatements concerning GM's product warranty and recall liabilities, internal controls, and commitment to safety were not materially misleading or not made with scienter.  *See* ¶¶ 33, 67-75.  For example, regarding the statements about GM's

product warranty and recall liabilities, Defendants maintained that the statements were accurate when made and that GM had appropriately recorded recall costs when GM management determined they were probable and estimable in connection with a specific recall campaign. ¶ 69. With respect to the alleged misrepresentations concerning the adequacy of GM's internal controls, Defendants maintained that any deficiencies identified by Lead Plaintiff related to GM's operational controls, not financial controls, and as such Lead Plaintiff could not prove that GM's internal financial controls violated GAAP. ¶ 70. Finally, with respect to GM's alleged misrepresentations concerning GM's purported commitment to safety, Defendants contended that those statements were immaterial as a matter of law because they were vague, aspirational statements or puffery upon which no investor would have reasonably relied. ¶ 71.

Even if Lead Plaintiff were able to establish material misrepresentations, it also faced significant hurdles in proving scienter. Defendants had argued and would have continued to argue that the Individual Defendants lacked knowledge about the ignition-switch defect which formed the underlying basis for the allegations, and that the GM employees who were aware of the ignition-switch problem did not believe it was a safety issue and they were lower-level employees who state of mind cannot be attributed to GM for purposes of corporate scienter under applicable case law. ¶¶ 72-74.

Moreover, although loss causation and damages arguments were not before the Court on the motion to dismiss, Defendants also had many significant arguments on those issues that could have been raised at class certification, summary judgment,

trial or on appeal.  ¶¶ 76-85.  Defendants had substantial arguments that (i) the initial revelation of the ignition-switch recall did not materially affect GM's share price; (ii) subsequent declines in GM's stock price following the alleged corrective disclosures identified in the Complaint were not caused by revelations concerning GM's handling of the ignition-switch defect, and (iii) that even if some portion of the decline in GM's stock price was caused by such revelations, any resulting damages to Lead Plaintiff and the Settlement Class were extremely small.  ¶ 77.  First, Defendants would be able to point to cautionary language contained in many GM filings about the risk of recalls faced by the Company and how a recall would increase the Company's warranty costs and lower revenue, which would arguably eliminate or reduce any "correction" as a result of the recalls and related disclosures.  ¶ 79.  In support of this argument Defendants would be able to point to the fact that the Company's stock price did not decline in February 2014, when the recalls at issue were first publicly disclosed.  ¶¶ 79, 82.  With respect to the declines in GM's stock price on the specific alleged correct disclosure dates identified by Lead Plaintiff, Defendants would have contended that these declines were caused, in whole or in part, by other "confounding" information that did not correct the alleged fraud, or that the declines on certain dates were not statistically significant.  ¶¶ 79-85.  Had any of these arguments been accepted in whole or part, it could have eliminated or, at minimum, dramatically limited any potential recovery for the Settlement Class.

The $300 million cash Settlement eliminates these risks and provides a certain and immediate cash recovery for the Settlement Class.  In light of these risks, and

the substantial time and expense that continued litigation would require, Lead Plaintiff and Lead Counsel believe that the Settlement is an excellent result for the Settlement Class and should be approved. *See* ¶¶ 3, 5, 88; Declaration of the Declaration of Joseph Indelicato, Jr., General Counsel for the New York State Teachers' Retirement System ("Indelicato Decl."), attached as Exhibit 2 to the Graziano Declaration, at ¶ 12.

Lead Plaintiff also moves for approval of the proposed Plan of Allocation of the Net Settlement Fund. The Plan of Allocation was developed in conjunction with Lead Plaintiff's damages expert and is designed to fairly and equitably distribute the proceeds of the Settlement to Settlement Class Members. *See* ¶¶ 89-94. Lead Plaintiff respectfully submits that it too should be approved.

## II.   ARGUMENT

### A.   The Standards For Judicial Approval Of Class Action Settlements

The settlement of complex class action litigation is favored by public policy and strongly encouraged by the courts. The Sixth Circuit has recognized "the federal policy favoring settlement of class actions." *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.,* ("*UAW*"), 497 F.3d 615, 632 (6th Cir. 2007) (citation omitted); *see Griffin v. Flagstar Bancorp, Inc.*, No. 2:10-CV-10610, 2013 WL 6511860, at *2 (E.D. Mich. Dec. 12, 2013) ("the law favors the settlement of class action lawsuits"). "[T]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." 4 ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002).

6

Pursuant to Rule 23(e), a court should approve a class action settlement if it is fair, reasonable and adequate. *See UAW*, 497 F.3d at 631; *In re Delphi Corp. Securities, Derivative &* ERISA *Litig.,* 248 F.R.D. 483, 496 (E.D. Mich. 2008). "[W]hile courts have discretion in determining whether to approve a proposed settlement, they should be hesitant to engage in a trial on the merits or to substitute their judgment for that of the parties who negotiated the proposed settlement." *In re Nationwide Fin. Servs. Litig.*, No. 2:08-CV-00249, 2009 WL 8747486, at *2 (S.D. Ohio Aug. 19, 2009) (citing *Leonhardt v. ArvinMeritor, Inc*., 581 F. Supp. 2d 818, 831 (E.D. Mich. 2008)). "Thus, in determining the reasonableness and adequacy of a proposed settlement, the Court should ascertain whether the settlement is within a "'range of reasonableness,' . . . and in the end, the Court's determinations are no more than 'an amalgam of delicate balancing, gross approximations and rough justice.'" *Id.* (quoting *Leonhardt,* 581 F. Supp. 2d at 831 and *Officers for Justice v. The Civil Serv. Comm'n of San Francisco,* 688 F.2d 615, 625 (9th Cir. 1982)).

To determine whether a proposed settlement meets the standard for final approval, courts in the Sixth Circuit look to the following factors: (1) the plaintiffs' likelihood of ultimate success on the merits balanced against the amount and form of relief offered in the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the judgment of experienced trial counsel; (5) the nature of the negotiations and the risk of collusion; (6) the objections raised by the class members; and (7) the public interest. *See UAW*, 497 F.3d at 631; *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1009 (S.D. Ohio 2001); *see also In re Cardizem CD*

7

*Antitrust Litig.*, 218 F.R.D. 508, 522 (E.D. Mich. 2003).  While Sixth Circuit courts do not always articulate these factors using this language, the above list includes the factors commonly recognized as relevant.  The Court, moreover, "may choose to consider only those factors that are relevant to the settlement and may weigh particular factors according to the demands of the case." *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 594-95 (E.D. Mich. 2006).

As discussed below, these factors strongly favor approval of the Settlement.

**B.    A Review Of The Sixth Circuit Factors
        Establishes That The Settlement Should Be Approved**

**1.    The Likelihood Of Success On The Merits Balanced Against
        The Relief Offered In Settlement**

A key factor that courts consider in assessing approval of a class action settlement is the plaintiff's likelihood of success on the merits, balanced against the relief offered in the settlement.  *See UAW,* 497 F.3d at 631 (citing *Carson v. Am. Brands, Inc.,* 450 U.S. 79, 88 n.14 (1981)).  In applying this factor, courts recognize that "[t]he determination of a reasonable settlement 'is not susceptible to a mathematical equation yielding a particularized sum,' but turns on whether the settlement falls within a range of reasonableness." *Chavarria v. N.Y. Airport Serv., LLC*, 875 F. Supp. 2d 164, 174 (E.D.N.Y. 2012) (citation omitted); *see also Ohio Pub. Interest Campaign v. Fisher Foods, Inc.*, 546 F. Supp. 1, 6 (N.D. Ohio Apr. 27, 1982) (courts consider "the range of reasonableness of the settlement fund in light of the best possible recovery.").

Here, the Settlement is well within the range of reasonableness in light of the best possible recovery and the substantial risks presented by this litigation.  Lead

Plaintiff's damages expert has estimated that the maximum approximate total damages that could be established in the Action, assuming that Lead Plaintiff successfully established the elements of falsity and scienter, would range from $2.8 billion to $1.2 billion, depending on what assumptions are used with respect to loss causation (for example, how much of the abnormal price decline following each alleged disclosure could be attributed to disclosure of the alleged fraud).   ¶ 87. Proving the damages reflected in these estimates assumes that Lead Plaintiff would have prevailed on all of its merits arguments about falsity and that all or most aspects of the case were sustained and proven at trial.   *Id*.   Defendants, of course, would have vigorously contested these estimates, and would have maintained that Lead Plaintiff and the Settlement Class were not damaged.   At trial, even the low end of the range could have been substantially reduced based on arguments about both the substance of the disclosures that purportedly dissipated the artificial inflation in the price of GM shares and the extent to which the regression analysis Lead Plaintiff's expert would present accurately captured the amount of dissipation in GM's share price on each alleged date that it declined in connection with the truth being revealed. *Id*.   However, assuming the maximum possible damages were proven at trial, based on these estimates, the $300 million Settlement represents approximately 11% to 25% of the possible maximum damages that might have been established if Lead

Plaintiff prevailed at trial. *Id*. These levels of recovery are very favorable in a securities fraud action such as this one.[3]

The inquiry does not, however, end there; rather, the Settlement must be weighed against ***all*** the hurdles faced by Lead Plaintiff in obtaining a judgment through litigation. In this case, there were substantial risks to establishing the falsity of Defendants' statements, Defendants' scienter, and loss causation.

First, Lead Plaintiff faced significant obstacles to establishing liability. In particular, Defendants would have argued forcefully that Lead Plaintiff could not establish that their statements were materially false or that they acted with scienter. As to Defendants' alleged misrepresentations concerning GM's product warranty and recall liabilities, Defendants asserted that GM's recall costs were appropriately recorded when GM management determined they were probable and estimable in connection with a specific recall campaign. ¶ 69. Specifically, Defendants maintained that Lead Plaintiff could not establish that the recalls announced in 2014 were both probable and reasonably estimable at the time that any of GM's earlier

---

[3] *See, e.g.*, *In re Datatec Sys., Inc. Sec. Litig.*, No. 04-CV-525 (GEB), 2007 WL 4225828, at *4 (D.N.J. Nov. 28, 2007) (a settlement representing "roughly 10.87% of the possible damages" was "within the range of settlements approved in other securities cases"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (recovery of approximately 6.25% was "at the higher end of the range of reasonableness of recovery in class action[] securities litigations"); *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *7 (S.D.N.Y. Oct. 24, 2005) (settlement representing 3.8% of plaintiffs' damage calculation was "within the range of reasonableness").

financial statements during the Settlement Class Period were filed. *Id.*[4]  Notably, GM never issued a restatement of any financial statements conceding that recall and warranty liabilities recorded in past periods should have been larger and a related derivative action asserting claims for breach for fiduciary duty against GM's board relating to the Company's handling of the ignition-switch defect was dismissed. ¶ 75.

As to Defendants' alleged misrepresentations concerning the adequacy of GM's internal financial controls, Defendants maintained that Lead Plaintiff's allegations concerned GM's process for identifying operational controls, not financial controls, and as such Lead Plaintiff failed to allege that GM's internal financial controls violated GAAP.  ¶ 70.  Defendants would have also argued that Lead Plaintiff's allegations constituted inactionable "fraud by hindsight" and that any pre-Class Period material weaknesses concerning GM's internal controls were remediated by the start of the Settlement Class Period. *Id.*

With respect to the alleged misrepresentations concerning GM's commitment to safety, Defendants would have argued, as they did on their motions to dismiss, that those statements were not actionable because they were vague, aspirational statements of puffery upon which no investor would have reasonably relied.  ¶ 71.  Indeed, Courts in the Sixth Circuit, as well as across the country, have often found

---

[4]  For example, Defendants argued, and would have strenuously continued to argue, that Lead Plaintiff could not establish that the members of GM management who were responsible for ordering recalls had determined that the recalls announced in the first quarter of 2014 were estimable and reasonably probable prior to the fourth quarter of 2013.  ¶ 69.

such statements as "Safety will always be a priority at GM," and "[w]e are committed to leadership in vehicle design, quality, reliability, telematics, infotainment and safety" to be too vague to support a claim for securities fraud. *See, e.g., In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) (similar statements concerning Ford's commitment to quality and safety were found to be "either mere corporate puffery or hyperbole that a reasonable investor would not view as significantly changing the general gist of available information, and thus, are not material, even if they were misleading"). Thus, even if these alleged misstatements survived Defendants' motions to dismiss, Lead Plaintiff would have faced significant risks in proving them at trial or on appeal.

Lead Plaintiff also faced significant hurdles in proving scienter. Defendants argued on their motions to dismiss that because Lead Plaintiff alleged that Defendants misrepresented only "soft" information, Lead Plaintiff was required (and failed) to plead facts establishing that Defendants knowingly misrepresented or omitted facts to deceive, manipulate or defraud the public, as opposed to pleading that Defendants merely recklessly ignored such facts. ¶ 72. For example, Lead Plaintiff faced substantial risks concerning Defendants' argument that Lead Plaintiff did not allege facts showing that Defendants knew that the warranty claims set forth in GM's database were not accurately accounted for in GM's warranty reserves. *Id*. As another example, Lead Plaintiff also faced significant risks relating to Defendants' contention that the Individual Defendants did not know of any lawsuit alleging ignition-switch defects. *Id*.

12

With respect to scienter on the part of GM, Lead Plaintiff also faced serious risks that the Court would find that the allegations in the Complaint did not infer knowledge on the part of any individuals whose states of mind are relevant under the Sixth Circuit's decision in *Omnicare.  See In re Omnicare Sec. Litig.*, 769 F.3d 455, 470-71 (6th Cir. 2014).   In their motions to dismiss, Defendants argued persuasively, and would likely continue to argue, that the Complaint inferred, at most, knowledge on the part of low-level employees and engineers whose state of mind cannot be attributed to the defendant corporation under *Omnicare.* ¶ 73.  Even those lower level employees, however, arguably believed the issues were merely customer inconvenience and not safety issues.  *Id*.  Similarly, following resolution of the motions to dismiss, Lead Plaintiff would face substantial risks in proving at summary judgment and at trial that the Individual Defendants or other senior officers at GM were sufficiently informed about the nature and scope of the ignition-switch defect so as to make Defendants' statements about recall and warranty liabilities, internal controls and GM's commitment to safety intentionally or recklessly false.

Even assuming that Lead Plaintiff overcame each of the above risks and successfully established liability, Lead Plaintiff would still face very serious risks in proving damages and loss causation.  Indeed, while the issues of loss causation and damages were not before the Court at the motion to dismiss stage, these issues were a critical driver of the settlement value of this case.  ¶ 76.  Lead Plaintiff was well aware that the Defendants had substantial arguments that the declines in GM's stock price on the alleged correct disclosure dates were not caused by revelations of the true facts concerning GM's handling of the ignition-switch defect, or that even if

13

some portion of the declines in GM's stock price were caused by such revelations, those declines were not statistically significant. Had any of these arguments been accepted in whole or in part, it could have eliminated or drastically limited any potential recovery. ¶¶ 77-85.

Defendants would have contested each of the four corrective disclosures by pointing to statements made by Defendants in previous GM filings that provided substantial cautionary language about the risk of recalls faced by the Company and how a recall would increase the Company's warranty costs and lower revenue, thus reducing any "correction" as a result of the recall and related disclosures. In support of this argument, Defendants would argue that when the recalls at issue were first announced in February 2014, the Company's stock price did not decline. ¶¶ 79, 82.

Defendants would also have likely argued that the price declines on the alleged corrective disclosure dates were caused, in whole or in part, by "confounding information" that did not reveal the fraud. ¶¶ 79-85. Lead Plaintiff would have the burden of proving that each of the declines on the alleged corrective disclosures dates was caused by revelation of the alleged fraud. ¶ 78. Additionally, Defendants would have pointed out that the declines on certain dates were too small to be "statistically significant" after accounting for overall market and peer group returns on those dates. ¶¶ 79, 82. Had any of these arguments been accepted in whole or part, it could have eliminated or, at minimum, dramatically limited any potential recovery for the Settlement Class.

Critically, defense counsel would vigorously contest all of these issues, and the elements of falsity and loss causation would require substantial expert testimony.

14

This "battle of the experts" creates an additional litigation risk because the reaction of a jury to such expert testimony is highly unpredictable and there is no certainty that the jury might not credit the analysis of Defendants' competing experts. *See Connectivity Sys. Inc. v. Nat'l City Bank*, No. 2:08-CV-1119, 2011 WL 292008, at *2 (S.D. Ohio Jan. 26, 2011) (finding that "[a]cceptance of expert testimony is always far from certain, no matter how qualified the expert, inevitably leading to a 'battle of the experts,'" and that this uncertainty supported approval of a settlement); *Nationwide*, 2009 WL 8747486, at *3 (same).

It is also important to recognize that Lead Plaintiff's hard work has led to a relatively early settlement. Up until then, Lead Plaintiff endeavored to substantially advance the basis for its claims in the Complaint, expanding the scope and subject matters of the false statements, expanding the Class Period, and refining the theory of loss causation. ¶¶ 25-32. Had the case not settled, Lead Plaintiff would have had to prevail at multiple stages in the litigation – on the pending motions to dismiss, on motions for class certification and summary judgment, at trial and on the appeals that were likely to follow – if it were to collect anything. ¶ 86. For all these reasons, Lead Plaintiff and Lead Counsel respectfully submit that this factor strongly weighs in favor of final approval. ¶¶ 88.

### 2. The Complexity, Expense, And Likely Duration Of The Litigation Supports The Settlement

The complexity, expense, and likely duration of the litigation is another factor considered in determining the fairness of a settlement. *See Telectronics,* 137 F. Supp. 2d at 1013. The claims asserted in this Action raise many complex issues, as

evidenced by the 543-page Complaint and the briefing on Defendants' motions to dismiss. Moreover, achieving a litigated verdict in the Action for Lead Plaintiff and the class would have required substantial additional time and expense. The agreement to settle was reached before resolution of Defendants' motions to dismiss, but after the production of millions of pages of documents pursuant to the Court's order modifying the PSLRA discovery stay. ¶¶ 49-56. In the absence of the Settlement, the continued litigation of the Action would have required additional extensive fact discovery, including requests for production of documents, interrogatories and depositions; substantial expert discovery on issues such as automotive safety, accounting, loss causation and damages; a litigated motion for class certification; likely motions for summary judgment; pre-trial evidentiary motions, including concerning the admissibility of expert testimony; a trial; and post-trial motion practice. Finally, whatever the outcome at trial, it is virtually certain that appeals would be taken from any verdict. The foregoing would pose substantial expense for the Settlement Class and delay the class's ability to recover – assuming, of course, that Lead Plaintiff and the class were ultimately successful on their claims.

In contrast to costly, lengthy and uncertain litigation, the Settlement provides an immediate, significant and certain recovery of $300 million for members of the Settlement Class. Accordingly, this factor supports approval of the Settlement.

16

### 3.    The Stage Of The Proceedings And Amount
Of Discovery Completed Support The Settlement

The stage of the proceedings and the extent of discovery completed is another factor that is considered in determining the fairness of a proposed settlement. *See Telectronics*, 137 F. Supp. 2d at 1015; *Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 502 (E.D. Mich. 2000). Under this factor, the relevant inquiry is whether the plaintiff has obtained a sufficient understanding of the case to gauge the strengths and weaknesses of the claims and the adequacy of the settlement. *See Nationwide*, 2009 WL 8747486, at *5-6. The parties need not have engaged in extensive discovery as long as they have engaged in sufficient investigation of the facts to enable an intelligent appraisal of the settlement. *See id.* at *5 ("[A]lthough the parties were able to negotiate the Settlement at a relatively early stage of the proceedings, all of the parties had a 'clear view of the strengths and weaknesses of their cases.'").

Here, as set forth in greater detail in the Graziano Declaration, although the motions to dismiss were still pending when the agreement in principle to settle was reached, Lead Plaintiff and Lead Counsel nonetheless had obtained sufficient information about the facts underlying their claims to evaluate the proposed Settlement, by, among other things:

- Conducting a thorough investigation, which included an in-depth review and analysis of: (i) documents filed publicly by GM with the SEC; (ii) GM press releases and other public statements; (iii) transcripts of GM investor conference calls; (iv) research reports concerning GM by financial analysts; (v) publicly available information from other legal actions arising out of the issues related to this Action; (vi) prior automotive safety litigation concerning car safety with GM and other automobile manufacturers and the NHTSA; (vii) interviews and meetings with former

17

employees of GM and other knowledgeable persons; and (viii) the May 29, 2014 Report to Board of Directors of General Motors Company Regarding Ignition Switch Recalls by Anton R. Valukas, ¶¶ 23, 27-32;

- Drafting the detailed Complaint based on this extensive factual investigation and legal research into the applicable claims, ¶¶ 24-26;

- Preparing extensive briefing in response to Defendants' motions to dismiss, ¶¶ 34-36;

- Obtaining millions of pages of documents that GM had produced in related litigation that were produced to Lead Plaintiff pursuant to the Court's April 8 and April 21, 2015 orders modifying the PSLRA discovery stay, ¶ 54;

- Conducting an intensive, targeted review of those documents, during which time Lead Counsel analyzed and coded more than four million pages of documents, prioritized by custodian and through the use of targeted search terms, with a focus on issues such as the scope of knowledge of the ignition-switch defect and the personnel involved in and processes used to determine GM's warranty and recall liabilities, ¶¶ 55-56;

- Consulting with experts and consultants in the fields of automotive safety, accounting, loss causation, and damages, ¶¶ 4, 59;

- Drafting a mediation brief with a detailed analysis of the strengths, risks, and potential issues in the litigation in preparation for a proposed mediation in October 2015, ¶ 60; and

- Engaging in intensive settlement negotiations with Defendants' Counsel, which included discussions of the range of possible damages and potential terms of the settlement, ¶ 61.

Thus, at the time the Settlement was reached, Lead Plaintiff had obtained sufficient information to be able to intelligently assess the strengths and weaknesses of the case and appraise the merits of the Settlement. As a result, Lead Plaintiff has a well-informed basis for its belief that the Settlement is a favorable resolution for the Settlement Class, and this factor supports approval of the Settlement.

### 4. The Absence Of Collusion, Arms'-Length Nature Of The Settlement Negotiations, And Judgment Of Counsel Support The Settlement

Additional factors the Sixth Circuit has directed courts to consider in evaluating class action settlements are whether the settlement is the product of arm's-length negotiations, the risk of collusion, and the judgment of experienced counsel. Without evidence to the contrary, the court may presume that settlement negotiations were conducted in good faith and that the resulting agreements were reached without collusion. *See Telectronics*, 137 F. Supp. 2d at 1016 (citing, among other sources, HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 11.51 (3d ed. 1992) ("Courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered.")).

Here, the Settlement is the production of negotiations that were fully at arm's length. During the process of preparing for a formal mediation of the claims asserted, the Parties engaged in intensive, direct discussions of a possible resolution of the case, which lead to GM's counsel advising Lead Plaintiff that a demand should be made directly to GM's Board of Directors. Lead Counsel, after discussions with and approval from the Lead Plaintiff, and aware that any such demand might effectively serve as a "cap" on later settlement negotiations, submitted a good faith proposal to resolve the Action, which led to the $300 million Settlement. ¶ 62. The arm's-length nature of the settlement negotiations plainly supports approval of the Settlement.

In addition, Lead Plaintiff' counsel has extensive experience litigating these types of claims and, as discussed above, the Parties understood the strengths and weaknesses of the claims and defenses before the Settlement was reached. *See* Lead Counsel's firm resume, attached as Ex. 3A-3 to the Graziano Decl. Under such circumstances, Lead Counsel's opinion that the proposed settlement is fair to the Settlement Class "is entitled to considerable weight." *Bert v. AK Steel Corp.*, 2008 WL 4693747, at *3 (S.D. Ohio Oct. 23, 2008); *see also Shane Grp., Inc. v. Blue Cross Blue Shield*, No. 10-CV-14360, 2015 WL 1498888, at *12 (E.D. Mich. Mar. 31, 2015) ("Courts should defer to the judgment of experienced counsel who have evaluated the strength of the proofs.").

### 5. The Reaction Of The Settlement Class

"In considering a class action settlement, the Court should also look to the reaction of the class members." *Nationwide,* 2009 WL 8747486, at *7.

As of March 8, 2016, 1,181,701 copies of the Notice had been disseminated to potential Settlement Class Members and their nominees. *See* Declaration of Jose C. Fraga Regarding (A) Mailing of the Notice Packet; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Fraga Decl.") ¶ 8, attached as Exhibit 1 to Graziano Decl. In addition, the Summary Notice was published in the *Wall Street Journal* and *USA Today* and transmitted over the *PR Newswire* on January 5, 2016, *id.* ¶ 9, and the Notice and related settlement documents were made available on Lead Counsel's website and the website specifically created for the Settlement. *Id.* ¶ 11; Graziano Decl. ¶ 93.

The Notice sets out the essential terms of the Settlement and informs potential Settlement Class Members of, among other things, their right to opt out of the Settlement Class or object to the Settlement or Plan of Allocation, as well as the procedure for submitting Claim Forms. The March 23, 2016 deadline set by the Court for Settlement Class Members to opt out or object to the Settlement has not yet passed. To date, Lead Counsel has received only one generalized objection to the Settlement (*see* ECF No. 96)[5] and 43 requests for exclusion. The objection, any others that maybe received, and all requests for exclusion received will be addressed in Lead Plaintiff's reply papers to be filed on April 13, 2016, after the objection and opt-out deadline has passed.

The recommendation of Lead Plaintiff, a sophisticated institutional investor, also strongly supports the fairness of the Settlement. Lead Plaintiff took an active role in supervising the litigation and the settlement process, as envisioned by the PSLRA, and Lead Plaintiff endorses the Settlement. *See* Indelicato Decl., attached as Exhibit 2 to the Graziano Decl, at ¶ 12. A settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor . . . is

---

[5] The objection, filed by Mr. Stephen Schoeman, raises a number of generalized objections to the fairness of the Settlement, and the amount of attorneys' fees and expenses requested. The objection does not, however, provide any proof of Mr. Schoeman's membership in the Settlement Class or even state that he purchased GM common stock during the Settlement Class Period. Lead Plaintiff and Lead Counsel will respond to the points raised by Mr. Schoeman's objection in their reply papers. Responding to Mr. Schoeman's objections at that time will allow Lead Plaintiff and Lead Counsel to consolidate their discussion of Mr. Schoeman's objection with any other objections to the Settlement or attorneys' fee request that may be received.

'entitled to an even greater presumption of reasonableness.'" *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) (citation omitted).

### 6.     The Public Interest Favors The Settlement

The Supreme Court has recognized that private securities actions are "an essential supplement to criminal prosecutions and civil enforcement actions" brought by the SEC. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). This Settlement furthers that public policy by providing a substantial recovery to a large Settlement Class of shareholders. Moreover, the Settlement promotes judicial efficiency. It resolves at once the claims of the entire Settlement Class of aggrieved shareholders, and ends this protracted and contentious litigation, avoiding further years of litigation in this Court or in the Court of Appeals.

### C.     The Plan Of Allocation Is Fair, Reasonable, And Adequate

"Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole; the distribution plan must be fair, reasonable and adequate." *Griffin v. Flagstar Bancorp, Inc.*, 2013 WL 6511860, at *7 (E.D. Mich. Dec. 12, 2013). "An allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel." *In re Am. Banknote Holographics, Inc.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001).

Here, the proposed plan of allocation (the "Plan of Allocation"), which was developed by Lead Plaintiff's damages expert in consultation with Lead Counsel, provides a fair and reasonable method to allocate the Net Settlement Fund among

Settlement Class Members who submit valid Claim Forms.  In developing the Plan of Allocation, Lead Plaintiff's damages expert calculated the potential amount of estimated artificial inflation in the per share closing prices of GM common stock that was allegedly proximately caused by Defendants' alleged false and misleading statements.  In calculating this estimated alleged artificial inflation, Lead Plaintiff's damages expert considered price changes in GM common stock in reaction to the alleged corrective disclosures, adjusting for price changes that were attributable to market or industry forces.  ¶ 98.

Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of GM common stock during the Settlement Class Period that is listed in the Claim Form and for which adequate documentation is provided.  ¶ 99.  Claimants who sold GM shares they purchased or acquired during the Settlement Class Period before the first corrective disclosure on March 11, 2014 will have no Recognized Loss Amount on those transactions as they would after trial.  Notice ¶ 46(a).  GM shares purchased or acquired during the Settlement Class Period and sold from March 11, 2014 through July 24, 2014 will have a Recognized Loss Amount that is the lesser of (i) the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or (ii) the difference between the actual purchase price and sales price of the stock.  Notice ¶ 46(b).  This approach mirrors what would happen at trial.  For shares purchased during the Settlement Class Period that are still held as of the end of the Settlement Class Period, the Recognized Loss Amount will be the lesser of (i) the amount of artificial inflation on the date of purchase; or (ii) the purchase price minus

23

$35.07 (the closing price of GM shares on July 25, 2014, the day after the last day of the Settlement Class Period, at which point the inflation in the price of GM common stock due to the alleged fraud is alleged to have been dissipated). Notice ¶ 46(c).

The sum of a Claimant's Recognized Loss Amounts on all of his, her or its transactions is the Claimant's "Recognized Claim." The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. Notice ¶¶ 49-50.

Lead Counsel believes that the Plan of Allocation conforms with how they would have approached class member damages at trial and provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action. ¶ 102. Moreover, as of March 8, 2016, more than 1.1 million copies of the Notice, which contains the Plan of Allocation, and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Settlement Class Members and their nominees. *See* Fraga Decl. ¶ 8. To date, no objections to the proposed Plan of Allocation have been received. ¶ 103.

### D. Notice To The Settlement Class Satisfied The Requirements Of Rule 23, Due Process, And The PSLRA

As noted above, Lead Plaintiff has provided notice in accordance with the Court's Preliminary Approval Order. *See* Fraga Decl. ¶¶ 2-11; Graziano Decl. ¶¶ 89-93. The combination of individual mail to all members of the Settlement Class who could be identified with reasonable effort, supplemented by notice in

appropriate, widely-circulated publications, and set forth on Internet websites, was "the best notice . . . practicable under the circumstances" and satisfies the requirements of due process, Rule 23, and the PSLRA. *See Fidel v. Farley,* 534 F.3d 508, 513 (6th Cir. 2008) (confirming that similar notice program comported with due process and Fed. R. Civ. P. 23).

### E.  Certification Of The Settlement Class Remains Warranted

The Court's November 20, 2015 Preliminary Approval Order granted Lead Plaintiff's motion for preliminary approval of the Settlement and certified the Settlement Class for settlement purposes only, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. ECF No. 95. Nothing has changed to alter the propriety of certification for settlement purposes and, for all the reasons stated in Lead Plaintiff's Preliminary Approval Brief (ECF No. 94), and in the Court's Preliminary Approval Order, Lead Plaintiff respectfully requests that the Court grant final certification of the Settlement Class pursuant to Rules 23(a) and (b)(3).

### III.  CONCLUSION

For all the forgoing reasons, Lead Plaintiff respectfully requests that the Court grant its motion.

Dated:  March 9, 2015                                  Respectfully submitted,

/s/ Salvatore J. Graziano
Salvatore J. Graziano                          **THE MILLER LAW FIRM, P.C.**
James A. Harrod                                 E. Powell Miller (P39487)
**BERNSTEIN LITOWITZ**                Marc L. Newman (P51393)
  **BERGER & GROSSMANN LLP**    Sharon S. Almonrode (P33938)
1251 Avenue of the Americas, 44th Fl.  950 West University Drive, Suite 300
New York, NY 10020                        Rochester, MI 48307

25

Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Salvatore@blbglaw.com
Jim.Harrod@blbglaw.com

*Lead Counsel for Lead Plaintiff and for*
*the Settlement Class*

Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
mln@millerlawpc.com
ssa@millerlawpc.com

*Local Counsel for Lead Plaintiff and*
*for the Settlement Class*

#965183