# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| NEW YORK STATE TEACHERS' RETIREMENT SYSTEM, Individually and on Behalf of All Other Persons Similarly Situated,<br><br>       Plaintiff,<br><br>  v.<br><br>GENERAL MOTORS COMPANY, DANIEL F. AKERSON, NICHOLAS S. CYPRUS, CHRISTOPHER P. LIDDELL, DANIEL AMMANN, CHARLES K. STEVENS, III, MARY T. BARRA, THOMAS S. TIMKO, and GAY KENT<br><br>       Defendants. | Civil Case No. 4:14-cv-11191<br><br>Honorable Linda V. Parker |

## DECLARATION OF SALVATORE J. GRAZIANO IN SUPPORT OF
## (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF
## SETTLEMENT AND PLAN OF ALLOCATION, AND
## (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS'
## FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

## **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................1

II.   PROSECUTION OF THE ACTION.................................................5

      A.   Background ...........................................................................5

      B.   The Preparation And Filing Of The Complaint ...................7

      C.   Defendants' Motion To Dismiss And Lead Plaintiff's
           Opposition ..........................................................................15

      D.   Additional Lead Plaintiff Briefing .....................................20

      E.   Lead Plaintiff's Successful Motion For Partial Modification Of
           The PSLRA Stay .................................................................23

      F.   The Parties Commence Discovery .....................................25

      G.   The Settlement ....................................................................27

III.  RISKS OF CONTINUED LITIGATION ....................................29

      A.   Risks Of Proving Falsity And Scienter ..............................30

      B.   Risks Of Establishing Loss Causation And Damages ........35

      C.   Other Risks .........................................................................40

      D.   The Settlement Is Reasonable In Light Of The Size Of The
           Potential Recovery In The Action.......................................40

IV.   LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S
      PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE
      OF NOTICE..................................................................................42

V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ..............44

VI.   THE FEE AND LITIGATION EXPENSE APPLICATION........................48

      A.   The Fee Application ............................................................49

           1.   Lead Plaintiff Supports The Fee Application ...........49

2.      The Work And Experience Of Counsel ...................................50

3.      Standing And Caliber Of Defendants' Counsel.......................52

4.      The Risks Of Litigation And The Need To Ensure The Availability Of Competent Counsel In High-Risk Contingent Securities Cases .......................................................53

5.      The Reaction Of The Settlement Class To The Fee Application ...................................................................................55

B.      The Litigation Expense Application ..................................................56

VII.    CONCLUSION ..............................................................................................60

I, SALVATORE J. GRAZIANO, declare as follows:

## I.   INTRODUCTION

1.     I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), the Court-appointed Lead Counsel in this Action.[1] BLB&G represents the Court-appointed Lead Plaintiff, the New York State Teachers' Retirement System ("New York Teachers"). I have personal knowledge of the matters set forth herein based on my active supervision of and participation in the prosecution and settlement of the claims asserted in the Action.

2.     I respectfully submit this Declaration in support of Lead Plaintiff's motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed settlement (the "Settlement") that the Court preliminarily approved by its Order Preliminarily Approving Settlement and Providing for Notice, dated November 20, 2015 (the "Preliminary Approval Order"). ECF No. 95. This Declaration sets forth how Lead Counsel and Lead Plaintiff were able to achieve this favorable Settlement on behalf of the Settlement Class. I also respectfully submit this Declaration in support of: (a) Lead Plaintiff's motion for approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation"); and (b) Lead Counsel's

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement, dated November 11, 2015 and previously filed with the Court. *See* ECF No. 94-2.

motion, on behalf of all Plaintiffs' Counsel,[2] for an award of attorneys' fees in the amount of 7% of the Settlement Fund, reimbursement of Plaintiffs' Counsel's expenses in the amount of $775,746.12, and an award pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") in the amount of $2,903.71 for costs and expenses incurred by Lead Plaintiff in connection with its representation of the Settlement Class (the "Fee and Expense Application").[3]

3. The proposed Settlement now before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $300,000,000. As detailed herein, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement represents a very favorable result for the Settlement Class in light of the significant risks in the Action and the amount of potential recovery. As explained further below, the Settlement provides a considerable benefit to the Settlement Class by conferring a substantial, certain and immediate recovery while avoiding the significant risks and expense of continued litigation, including the risk

---

[2] Plaintiffs' Counsel means BLB&G, The Miller Law Firm, P.C., Labaton Sucharow LLP, and Motley Rice LLC.

[3] In conjunction with this Declaration, Lead Plaintiff and Lead Counsel, respectively, are also submitting the Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum") and the Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee Memorandum").

that the Settlement Class could recover nothing or substantially less than the Settlement Amount after years of additional litigation and delay.

4.    The proposed Settlement is the result of extensive efforts by Lead Counsel, which included, among other things detailed herein:  (a) conducting a wide-ranging investigation of General Motors Company ("GM" or the "Company") and the allegedly fraudulent misrepresentations and omissions made during the period from November 17, 2010 through July 24, 2014, inclusive (the "Settlement Class Period" or "Class Period"), concerning GM's product warranty and recall liabilities, internal controls and commitment to safety; (b) drafting the 543-page Consolidated Class Action Complaint (the "Complaint"), filed on January 15, 2015 (ECF No. 62); (c) researching, drafting, filing and successfully moving for partial modification of the stay of discovery under the PSLRA, which permitted discovery of documents that GM had already produced, or would produce, to private litigants in the related multidistrict litigation pending before the Honorable Jesse M. Furman of the United States District Court for the Southern District of New York, *In re General Motors LLC Ignition Switch Litig.*, No. 1:14-md-02543-JMF (the "*MDL Litigation*"), and permitted Lead Plaintiff to serve document preservation subpoenas on certain third parties; (d) researching, drafting and filing an opposition to Defendants' motions to dismiss, filed with the Court on May 15, 2015 (ECF No. 86); (e) researching, drafting, and successfully opposing the motion of Menora Mivtachim Insurance Ltd.

3

and Menora Mivtachim Pensions and Gemel Ltd. (collectively, the "Menora Group") to stay the Court's Order appointing New York Teachers as Lead Plaintiff pending the resolution of the Menora Group's petition for writ of mandamus before the United States Court of Appeals for the Sixth Circuit, No. 15-cv-1055 (ECF No. 13); (f) consulting with various automotive, accounting and economic experts and consultants; (g) engaging in intensive discovery that included the review of over four million pages of documents in a period of only four months; and (h) negotiating with Defendants on an arm's-length basis to resolve the Action.

5.     Lead Plaintiff and Lead Counsel believe that the Settlement is in the best interests of the Settlement Class.  Due to their efforts described in the foregoing paragraph, Lead Plaintiff and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and they believe the Settlement represents a very favorable outcome for the Settlement Class.

6.     As discussed in further detail below, the Plan of Allocation was developed with the assistance of Lead Plaintiff's damages expert, and provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis based on their losses attributable to the alleged fraud.

7.     With respect to the Fee and Expense Application, as discussed in the Fee Memorandum, the requested fee of 7% of the Settlement Fund for all Plaintiffs'

Counsel is requested pursuant to a retainer agreement entered into with Lead Plaintiff at the outset of the litigation and is on the low end of the range of percentage awards granted by courts in this Circuit and across the country in securities class actions. Additionally, the requested fee results in a multiplier of 1.9 on Plaintiffs' Counsel's lodestar – which is well within the range of multipliers routinely awarded by courts in this Circuit and across the country.

8.     For all of the reasons set forth herein and in the accompanying memoranda, including the quality of the result obtained and the numerous significant litigation risks discussed fully below, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable and adequate, and should be approved. In addition, Lead Counsel respectfully submits that its request for attorneys' fees and reimbursement of Litigation Expenses is also fair and reasonable, and should be approved.

## II.   PROSECUTION OF THE ACTION

### A.   Background

9.     This case involves alleged misrepresentations and omissions stemming from the failure of GM and its executives to timely recall numerous defective GM vehicle models and to properly account for the liabilities that were the product of the underlying ignition-switch defect. As alleged in the Complaint, on February 7, 2014, GM began a recall of the defective cars, which ballooned throughout 2014 to cover

approximately 14.65 million vehicles spread over more than 20 different GM models. As GM has admitted, those vehicles contained an ignition switch that did not meet GM's own internal specifications. That defect allegedly rendered the cars prone to suddenly shutting down while in operation and resulted in at least 124 deaths and hundreds of injuries. The "moving shutdowns" of GM vehicles caused by the defective switches resulted in the cars suddenly losing engine power, power steering and power brakes without any warning to the driver (and often at highway speeds), and rendered the airbags inoperative, placing drivers and passengers in grave danger.

10.    The Complaint alleges that Defendants knowingly or recklessly misrepresented: (i) that GM's product warranty and recall liabilities were accurately stated, as opposed to materially understated; (ii) that GM's product warranty and recall liabilities complied with Generally Accepted Accounting Principles ("GAAP"); (iii) that GM's internal controls over financial reporting were effective; and (iv) that GM was a company committed to customer safety.

11.    The Complaint further alleges that due to these misrepresentations and omissions, the price of GM common stock was artificially inflated, and declined when the truth was revealed through a series of corrective disclosures beginning on March 11, 2014 and ending on July 24, 2014, the last day of the Class Period.

**B.     The Preparation And Filing Of The Complaint**

12.     This litigation, initially captioned *George Pio v. General Motors Company et al.*, 14-cv-11191-RHC, was commenced on March 21, 2014, with the filing of a securities class action complaint in this District.  ECF No. 1.

13.     On May 20, 2014, New York Teachers moved the Court for appointment as lead plaintiff and approval of its selection of lead counsel, BLB&G. ECF No. 14.  New York Teachers maintained that it was the "most adequate plaintiff" on the grounds that it had the "largest financial interest" in the relief sought by the Class.

14.     The issue was heavily contested.  Also on May 20, 2014, the Menora Group moved the Court for its appointment as lead plaintiff and approval of its selection of lead counsel.  ECF No. 15.

15.      On June 6, 2014, New York Teachers filed its brief in further support of its motion for appointment as lead plaintiff and in opposition to all competing motions.  ECF No. 23.  New York Teachers maintained that under the four-factor test of *Lax v. First Merchs. Acceptance Corp.*, 1997 WL 461036 (N.D. Ill. Aug. 11, 1997) ("*Lax*"), it had the greatest financial interest in this case.

16.     Also on June 6, 2014, the Menora Group filed its brief in further support of its motion for appointment as lead plaintiff.  ECF No. 22.  The Menora Group contended that under *Lax* it was the movant that suffered the greatest financial losses,

7

that it met the typicality and adequacy requirements of Rule 23, and that there was nothing in the PSLRA prohibiting the Menora Group, as foreign investors, from serving as lead plaintiff.

17.   On June 16, 2014, New York Teachers filed a reply brief in further support of its motion for appointment as lead plaintiff, which maintained that under three of the four *Lax* factors it had the greatest financial interest in this Action – a fact which Menora Group did not contest.  ECF No. 30.  New York Teachers also noted its favorable fee agreement with its proposed Lead Counsel.  *Id.*

18.   The Menora Group also filed a reply in further support of its motion for appointment as lead plaintiff on June 16, 2014.  ECF No. 29.  The Menora Group maintained that it was the plaintiff that suffered the greatest financial loss and that New York Teachers was misapplying *Lax*.

19.   On June 20, 2014, the Court issued a notice of motion hearing, ordering New York Teachers and the Menora Group to appear before the Court on August 20, 2014 to argue their respective motions for appointment as lead plaintiff and approval of their selections of lead counsel.  ECF No. 34.

20.   On August 20, 2014, the Court held a hearing on the issue of appointing lead plaintiff and selection of lead counsel in this Action.  Pursuant to that hearing, on August 25, 2014, New York Teachers and the Menora Group each filed

supplemental submissions in further support of their motions for appointment as lead plaintiff.  ECF Nos. 42, 43.

21.    Following full briefing and oral argument and pursuant to the PSLRA, in an Opinion and Order dated October 24, 2014, the Court appointed New York Teachers to serve as Lead Plaintiff in the Action and approved New York Teachers' selection of BLB&G to serve as Lead Counsel.  ECF No. 44.

22.    In a separate Order issued that same day, the Court set a November 7, 2014 deadline (subsequently extended until January 15, 2015 (ECF No. 48)) for the filing of an amended complaint.  ECF No. 45.

23.    In preparation for filing the Complaint, Lead Counsel conducted an extensive factual and legal investigation that included, among other things, review and analysis of: (i) documents filed publicly by Defendant GM with the Securities and Exchange Commission ("SEC"); (ii) GM press releases and other public statements; (iii) transcripts of GM investor conference calls; (iv) research reports concerning GM by financial analysts; (v) publicly available information from other legal actions arising out of the issues giving rise to or related to this Action; (vi) prior automotive safety litigation concerning car safety with GM and other automobile manufacturers and the National Highway Traffic Safety Administration ("NHTSA");  (vii) interviews and meetings with former employees of GM and other knowledgeable persons; and (viii) the May 29, 2014 Report to Board of Directors of

General Motors Company Regarding Ignition Switch Recalls by Anton R. Valukas (the "Valukas Report"). Lead Counsel also conducted an exhaustive analysis of applicable Sixth Circuit case law and consulted with experts in the fields of automotive safety, loss causation, damages and accounting.

24.    On January 15, 2015, Lead Plaintiff filed and served the extremely detailed 543-page Complaint. The Complaint asserts claims against: (i) all Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; and (ii) the Individual Defendants under Section 20(a) of the Exchange Act. The Complaint alleges that in order to hide the full cost and liabilities associated with GM's defective vehicles, Defendants made materially false and misleading statements and omitted material facts about GM's liabilities, internal controls and commitment to safety. Specifically, the Complaint avers that, during the Settlement Class Period, Defendants knowingly or recklessly misrepresented that: (i) GM's product warranty and recall liabilities were accurately stated, as opposed to materially understated; (ii) GM's product warranty and recall liabilities complied with GAAP; (iii) GM's internal controls over financial reporting were effective; and (iv) GM was a company committed to customer safety. The Complaint further alleges that due to these misrepresentations and omissions, the price of GM common stock was artificially

inflated, and declined when the truth was revealed through a series of corrective disclosures beginning on March 11, 2014.

25.     After an extensive review of GM's public statements, market reaction to those statements (including hundreds of reports by securities analysts that covered GM) and discussions with consulting economic experts, Lead Plaintiff made a number of changes to the scope of the case in the Complaint, after it was appointed by the Court.  In order to more broadly assert claims covering the full extent of the harm caused by GM's public statements and material omissions concerning the ignition-switch failures, Lead Plaintiff changed the Class Period in the Complaint from November 17, 2010 to March 10, 2014 (in the initial complaint filed in this action) to November 17, 2010 to July 24, 2014.  The Complaint also amended certain of the original alleged corrective disclosures (in particular, allegations that a corrective disclosure occurred on February 7, 2014) and added several others (specifically,  March 12-13, 2014, April 8-9, 2014, April 10-11, 2014, and July 24, 2014) to account for the statistically significant changes in GM stock price that could be attributed to a corrective disclosure in this Action.

26.     In addition, the Complaint changed many of the Individual Defendants, removing Alan S. Batey and James B. DeLuca who were named in the initial complaint (based on the lack of public statements made by these individuals), and adding Nicholas S. Cyprus, Christopher P. Liddell, Thomas S. Timko, Charles K.

11

Stevens, III, and Gay P. Kent (because they made alleged misstatements during the Class Period with scienter). For example, Lead Plaintiff's extensive factual investigation revealed that Ms. Kent, a GM employee from 1980 until June 2014, when she was terminated in the wake of the ignition switch recalls, and GM's General Director/Director of Safety and Vehicle Programs and Crashworthiness during the Class Period, had personally experienced a moving shutdown due to the ignition-switch defect in 2005. Defendant Kent also personally communicated with NHTSA in connection with and participated in the decision to conduct a recall of certain GM vehicles for moving shutdowns in 2004, which the Company classified as a safety-related defect.

27.    Moreover, the Complaint reflects an exhaustive review of numerous sources of facts upon which the Complaint was based. For example, Lead Counsel studied the history of GM's 30-years of experience identifying "safety-related defects" and conducting recalls, some of which involved the same safety defects associated with the moving shutdowns at issue in this case, in order to establish that GM knew that a "moving shutdown" constituted a safety defect, warranting a recall. This exhaustive effort was necessary to respond to the conclusions of the Valukas Report which concluded that GM was not aware of the safety issues triggered by the ignition-switch defect until shortly before the recalls were commenced.

28.     Similarly, Lead Counsel reviewed hundreds of publicly available complaints to GM dealers from drivers and passengers who had experienced moving shutdowns in the vehicles that were subject to the recalls at issue in this Action.  As reflected in the Complaint, those submissions recounted, in horrifying detail, the extreme dangers resulting from a moving shutdown in the same GM vehicles that were subject to the recalls at issue.  In addition, Lead Counsel reviewed similar submissions made to directly to NHTSA that reflected the same extreme dangers caused by moving shutdowns.

29.     Lead Counsel further reviewed the complaints lodged by GM consumers to GM dealers that were made public by the House Committee of Energy and Commerce in connection with its investigation into GM and its review of GM's internal warranty claims database.  As the Complaint details and as the Committee concluded, such claims reflect that GM knew about the ignition-switch defects years before the recalls at issue was conducted, and did not disclose that information to the investing public or to regulators.

30.     Moreover, Lead Counsel's investigation included the review of NHTSA and its effectiveness as a regulator.  The results of that investigation made clear that, as detailed in the Complaint, numerous limitations at NHTSA over the course of years, including for example, serious staffing problems and pressure from

13

auto-manufacturers, exacerbated GM's cover up of the ignition-switch defects at issue in this Action.

31.     Lead Counsel reviewed the history of recalls for moving shutdowns that have been routinely conducted by GM's peer automotive companies, including, for example, Honda, Ford, Volkswagen, and Toyota.  The results of that review, as detailed in the Complaint, make clear that it was well-known in the industry that (notwithstanding the conclusions of the Valukas Report) a moving shutdown such as that at issue here was a safety defect, warranting a recall.

32.     In addition, Lead Counsel's investigation focused on the alleged decade-long devolution of GM's corporate culture to one that always prioritized cost-cutting over safety measures.  In connection with this review, Lead Counsel conducted multiple interviews with 30-year GM employee and former head of GM's corporate quality audit, Bill McAleer.  As the Complaint details, Mr. McAleer warned the GM Board as early as 2002 of the serious quality problems at GM and called upon the Company to "stop the continued shipments of unsafe vehicles," among other serious safety problems.  The same letter specifically alerted the GM Board that GM's "internal control systems" were "corrupt."

## C.   Defendants' Motion To Dismiss And Lead Plaintiff's Opposition

33.   On March 13, 2015, Defendants filed their motions to dismiss the Complaint.  ECF Nos. 70, 73.  Defendants argued that the Complaint should be dismissed on numerous grounds, including, among others, the following:

(a)   That Lead Plaintiff's allegations of materially false and misleading statements and omissions concerned "soft" and not "hard" information, thereby requiring Lead Plaintiff to allege that Defendants actually knew that the statements were false, and that the Complaint lacked sufficient detail.

(b)   Lead Plaintiff failed to allege actionable misstatements regarding GM's reserves for warranty and recall costs, including that: (i) the Complaint did not adequately allege that GM misrepresented its process for estimating future warranty and recall costs; and (ii) that the Complaint did not adequately allege that GM misrepresented its probable and estimable warranty and recall costs because Lead Plaintiff did not establish that management responsible for ordering recalls had determined that the first wave of recalls was warranted and that the costs associated with it were probable prior to late 2013, and that, aside from "anecdotal" reports, none of the allegations in the Complaint specifically concern vehicles subject to the second wave of recalls.

(c)   That Lead Plaintiff failed to allege material misstatements regarding the adequacy of GM's internal financial controls, because Lead Plaintiff's allegations concern only "operational controls," not financial controls.

(d)   That Lead Plaintiff failed to allege material misstatements regarding GM's commitment to safety, including that such statements were inactionable puffery.

(e)   That Lead Plaintiff had not established the "strong inference" of scienter required to establish liability for securities fraud. Defendants advanced a number of contentions in support of this argument, including that: (i) the Complaint did not adequately allege facts giving rise to a strong inference of GM's scienter; and (ii) the

Complaint did not adequately allege facts giving rise to a strong inference of any of the Individual Defendants' scienter, including under the 9-factor analysis of *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) ("*Helwig*").

(f)   That, because Lead Plaintiff had not sufficiently alleged a primary violation of the securities laws, it had failed to adequately plead Section 20(a) control person liability against the Individual Defendants.

34.   On May 15, 2015, Lead Plaintiff filed its memorandum in opposition to Defendants' motions to dismiss.  ECF No. 86.  Among other things, in its opposition, Lead Plaintiff contended that Defendants' alleged misstatements regarding GM's materially understated costs, liabilities and contingencies constituted "hard" information because GM established its financial statements using "historical information" and that such figures were consistently re-evaluated on an "ongoing basis."  Lead Plaintiff further asserted that GM did in fact understate its costs liabilities and contingencies, and that GM's liabilities were "reasonably estimable," based on, *inter alia*, GM's having received thousands of customer complaints and warranty claims concerning moving shutdowns, GM's own internal tests that indicated that losses from the defective vehicles were probable, GM employees' recognition that a safety recall was necessary as early as August 2005, GM's knowledge of the number of vehicles likely affected by the defect, and the August 2007 Warranty Settlement Agreement with Delphi (the manufacturer of the ignition switch) which included entries for "ignition switch failure" on GM model

16

vehicles seven years before those vehicles were first recalled. Lead Plaintiff further contended that Defendants' admitted failures in their internal "financial" controls were not "operational" in nature, because the applicable accounting literature indicates a substantial overlap between financial and operational controls, as well as the fact that the so called "operational" controls directly contributed to the understatement of GM's reported liabilities. Moreover, Lead Plaintiff maintained that that Defendants' statements concerning their "commitment to safety" were actionable, because once Defendants chose to speak about safety, they had a duty to speak truthfully about it, which they failed to do, and that GM's safety statements were neither puffery nor inactionable opinions.

35.    Lead Plaintiff further argued that the Complaint alleged a strong inference of scienter as to GM's false commitment to safety and its understatement of its reported liabilities based on the massive amount of information that was known or recklessly disregarded by Defendants. Such information known or recklessly disregarded by Defendants included: (i) customer complaints, warranty claims and warranty costs, which Defendants Akerson, Cyprus, Liddell, Ammann, Stevens, Barra and Timko knew about or recklessly disregarded and which top GM executives were actively monitoring; (ii) repeated private warnings made by GM to dealers about the affected vehicle models which admitted that the vehicles were vulnerable to moving shutdowns; (iii) internal GM emails, including

17

communications by a GM attorney responsible for overseeing safety, prioritizing a "new launch" of a car model over safety; (iv) the personal experience of senior GM executives concerning moving shutdowns, including Defendant Kent's personal experience of being in a moving shutdown in 2005; (v) numerous internal meetings and communications concerning moving shutdowns and the defective ignition switch, including a 2011 meeting convened "to make sure senior management had eyeballs on [Cobalt airbag non-deployment]"; (vi) pre-Class Period and Class Period lawsuits and settlements concerning moving shutdowns; (vii) government findings and GM's entry into a consent order with NHTSA; (viii) the forced resignation of senior GM executives; and (viii) GM's alleged anti-recall culture and the Company's extensive experience with safety litigation. Lead Plaintiff further argued that the Complaint alleged a strong inference of scienter as to the ineffectiveness of GM's internal controls based on: (i) the Company's Class Period admissions, including GM's admission as to the inadequacies in its process for identifying and reporting safety defects and assessing the number of warranty claims relating to safety defects; (ii) NHTSA's findings concerning GM's internal control failures; and (iii) that GM was on notice of its internal control failures based upon, among other things, a former GM employee contacting GM's Board of Directors and reporting that the Company's "internal control system" was "corrupt." Additionally, Lead Plaintiff further argued that the Complaint alleged a strong inference of scienter as to the

Individual Defendants, and specifically that the Complaint met the pleading standard under *Helwig* as to each Individual Defendant.

36.   Lead Plaintiff also argued that the Complaint adequately alleged control person liability against the Individual Defendants.

37.   Defendants filed their reply briefs on July 10, 2015.  ECF Nos. 89, 90. Defendants argued that the Complaint should be dismissed on numerous grounds, principally re-asserting the arguments made in their opening brief.   Defendants also argued that Lead Plaintiff had not established the "strong inference" of scienter required to establish liability for securities fraud, because, under *In re Omnicare Sec. Litig.*, 769 F.3d 455 (6th Cir. 2014), the Complaint did not adequately allege facts giving rise to a strong inference of GM's scienter in that it failed to plead that any of the Individual Defendants made materially false and misleading statements or omissions with knowledge.

38.   On August 26, 2015, Defendants (with the exception of Defendant Gay Kent) filed a notice of supplemental authority in support of their motion to dismiss the Complaint.  ECF No. 91.  Specifically, Defendants submitted the Sixth Circuit decision in *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015) ("*Yum! Brands*") in support of their argument that Lead Plaintiff had failed to allege material misstatements and that Defendants acted with scienter.

39.     On August 31, 2015, Lead Plaintiff filed its response to Defendants' notice of supplemental authority.  ECF No. 92.   Lead Plaintiff argued that *Yum! Brands* was factually inapposite to this Action because, *inter alia*, the magnitude of the fraud alleged in this case was drastically greater than that in *Yum! Brands* (that case involved just "eight batches" of chicken as opposed to millions of defective vehicles), was known to Defendants during the Class Period, and the alleged misstatements at issue here constituted "hard information" concerning GM's financial results, whereas in *Yum! Brands* they were merely aspirational, "soft" statements.

40.     Defendants (again with the exception of Defendant Gay Kent) filed a reply submission concerning their notice of supplemental authority on September 4, 2015.  ECF No. 93.

41.     Defendants' motions to dismiss were pending when the Parties reached an agreement in principle to settle the Action on September 16, 2015.

### D.     Additional Lead Plaintiff Briefing

42.     Prior to the filing of the Complaint, the Menora Group filed a motion for reconsideration of the Court's October 24, 2014 Order appointing New York Teachers as Lead Plaintiff and BLB&G as Lead Counsel, a motion for certification for interlocutory appeal, and a stay of proceedings in this Action.  ECF No. 46.  The Menora Group contended that the Court's order deciding the competing lead

plaintiff motions contained three palpable defects, including that: (i) the Court incorrectly adopted New York Teachers' analysis under *Eichenholtz v. Verifone Holdings, Inc.*, 2008 WL 3925289 (N.D. Cal Aug. 22, 2008) ("*Eichenholtz*"); (ii) the Court incorrectly elevated the first three *Lax* factors over losses; and (iii) the Court should have concluded that New York Teachers' exclusion of March 12 and 13, 2014 price declines from its analysis of losses under the fourth *Lax* factor rendered New York Teachers inadequate to represent the class and atypical of class members.

43.    On November 12, 2014, New York Teachers opposed the Menora Group's motion.  ECF No. 51.  New York Teachers maintained that the Menora Group was merely rehashing old arguments, that such arguments did not identify any palpable defect in the Court's Lead Plaintiff Order, and that the Menora Group failed to meet the standards for Section 1292(b) certification for interlocutory appeal.

44.    On November 19, 2014, the Menora Group filed a reply to its motion. ECF No. 53.

45.    On December 8, 2014, the Court issued its Order denying the Menora Group's motion for reconsideration, certification for interlocutory appeal, and stay of proceedings.  ECF No. 54.   The Court rejected the Menora Group's motion for reconsideration because it found that it did not incorrectly apply *Eichenholtz*, it did not err in evaluating the *Lax* factors, and New York Teachers did in fact satisfy the

21

adequacy and typicality requirements under Federal Rule of Civil Procedure 23. The Court denied the Menora Group's request for certification because an immediate appeal would not materially advance the ultimate termination of this litigation, nor would it avoid trial, shorten the litigation, nor save judicial or litigant resources. The Court also determined that there was no reason to grant a stay, in light of the Court's denial of the Menora Group's motion for reconsideration and interlocutory appeal.

46.    On February 3, 2015, the Menora Group then sought relief from the United States Court of Appeals for the Sixth Circuit, filing a petition for writ of mandamus vacating the Court's October 24, 2014 Order appointing New York Teachers as lead plaintiff and seeking a stay of the District Court proceedings pursuant to Federal Rule of Appellate Procedure 8(a)(1)(a). *See In re Menora Mivtachim Insurance Ltd.; Menora Mivtachim Pensions & Gemel Ltd.*, No. 15-1055 (6th Cir. Feb. 3, 2015), ECF No. 4.

47.    On February 13, 2015, Lead Plaintiff filed its opposition to the Menora Group's motion to the Sixth Circuit. Sixth Cir. No. 15-1055, ECF No. 13. Lead Plaintiff argued that the Menora Group should not prevail on its petition of writ of mandamus because the Court's October 24, 2014 Order was not "clearly erroneous," and that the Court's December 8, 2014 Order denying reconsideration did not incorporate an oft-repeated error, disregard the Federal Rules of Civil Procedure, or raise new or important issues or a matter of first impression.

22

48.    On March 17, 2015 the United States Court of Appeals for the Sixth Circuit denied the Menora Group's motion and mandamus petition.  Sixth Cir. No. 15-1055, ECF No. 15.  The Sixth Circuit determined that the Menora Group had not shown a clear abuse of discretion by this Court, had no clear and indisputable right to be appointed lead plaintiff, and had not demonstrated that the appointment of New York Teachers would cause it to suffer any substantial damage not correctable on appeal.

### E.    Lead Plaintiff's Successful Motion For Partial Modification Of The PSLRA Stay

49.    On February 4, 2015, shortly after filing the Complaint, Lead Plaintiff filed and served its motion for partial modification of the PSLRA discovery stay. ECF No. 64.  In this motion, Lead Plaintiff sought entry of an order partially modifying the PSLRA discovery stay to permit: (i) discovery of documents that Defendants had already gathered, reviewed, and produced, or would produce, to private litigants in the related *MDL Litigation*; and (ii) Lead Plaintiff to serve document preservation subpoenas on important third parties, including Deloitte & Touche (GM's auditor), Delphi (the manufacturer of the defective ignition switch), the lead underwriters of GM's initial public offering, rental car companies that had the defective GM vehicles in their fleets, and select Wall Street analysts that covered GM during the Class Period.  In support of this motion, Lead Plaintiff argued that exceptions to the PSLRA discovery stay exist because Congress did not intend the

23

PSLRA's stay to apply to cases where the fraud is apparent or when the requested discovery has already been collected and produced – as was the case here.  Lead Plaintiff further contended that its discovery requests were highly particularized, that Lead Plaintiff and the class would suffer undue prejudice if the discovery stay was not lifted, and that Defendants would suffer no prejudice if the motion was granted, as Defendants had already collected, organized and produced the documents which Lead Plaintiff sought.

50.     On February 18, 2015, Defendants filed their opposition to Lead Plaintiff's motion for partial modification of the PSLRA discovery stay.  ECF No. 65.  Defendants raised numerous arguments in opposition to Lead Plaintiff's motion, including: (i) that the PSLRA discovery stay should not be modified because such modification was not necessary to preserve evidence or prevent undue prejudice; (ii) that Lead Plaintiff's requests for documents were not particularized; (iii) that Lead Plaintiff would not be prejudiced if the documents were not produced; and (iv) that document preservation subpoenas were not necessary to preserve evidence.

51.     On February 25, 2015, Lead Plaintiff filed its reply memorandum in support of Lead Plaintiff's motion.  ECF No. 66.

52.     On April 8, 2015, the Court granted Lead Plaintiff's motion.  ECF No. 78.   The Court determined that Lead Plaintiff's discovery requests were particularized and relevant, as the requests were limited to materials that have been

24

or would be produced in the *MDL Litigation*.  The Court also found that the discovery requests were necessary to prevent undue prejudice as Lead Plaintiff would in fact suffer such prejudice as a result of Defendants having already produced these documents to governmental agencies and other parties in connection with related ignition-switch cases.

### F.    The Parties Commence Discovery

53.    Shortly after the Court's April 8, 2015 Order partially modifying the PSLRA discovery stay, the Parties entered into a stipulation and proposed order governing documents to be produced under the Court's April 8, 2015 Order, which the Court approved on April 21, 2015.  ECF No. 79.

54.    Pursuant to the Court's April 8 and April 21, 2015 Orders concerning Defendants' production of documents to Lead Plaintiff they had already produced in the *MDL Litigation*, on April 22, 2015, Defendants produced over 13 million pages of documents, constituting approximately 1.36 million documents, a massive amount of data which totaled 4.5TB (4,500GB) of information.  Subsequently, over the course of the summer of 2015 and prior to Parties' entering into the Settlement, Defendants continued to regularly produce documents.  For example:

- Between July 13 and July 24, 2015, Defendants produced approximately 200,000 additional documents;
- Between July 25 and July 31, 2015, Defendants produced approximately 53,000 additional documents;

25

- Between August 1 and August 7, 2015, Defendants produced approximately 22,000 additional documents;
- Between August 8 and August 14, 2015, Defendants produced approximately 8,000 additional documents;
- Between August 15 and August 28, 2015, Defendants produced 16,331 additional documents; and
- Between August 29 and September 11, 2015, Defendants produced 33,160 additional documents.

55.    Lead Counsel's review of these documents began immediately following production and continued through execution of the Term Sheet (defined below).  The document review was variously staffed by as many as 22 attorneys.

56.    Following the initial production, Lead Counsel was dedicated to thoroughly reviewing and analyzing the documents which Defendants had produced. During this relatively short period of time, Lead Counsel reviewed, coded and analyzed 4,033,904 million pages of documents, prioritized by custodian and through the use of targeted search terms.  The review focused on analyzing particular issues in the case, including the scope of knowledge of the ignition-switch defect and the personnel, manner and processes in connection with determining GM's warranty and recall liabilities. In connection with that review, Lead Counsel's attorney review team generally met weekly (or as needed) with certain Partners, Senior Counsel and Associates leading the litigation efforts to discuss their findings and any documents of particular importance or significance.

57.     Pursuant to the Court's April 8, 2015 Order, Lead Plaintiff also served document preservation subpoenas.  Between April 30, 2015 and June 1, 2015, Lead Plaintiff issued and served 16 document preservation subpoenas on relevant third parties, including Deloitte & Touche (GM's auditor during the Class Period), Delphi (the manufacturer of the defective ignition switch), the lead underwriters of GM's initial public offering, including J.P. Morgan Securities LLC and Morgan Stanley & Co., Inc., rental car companies that had the defective GM vehicles in their fleets such as Avis Budget Car Rental, LLC, Enterprise Holdings, Inc., and Hertz Global Holdings, Inc., and select Wall Street analysts that covered GM during the Class Period, including RBC Capital Markets, LLC and Sterne, Agee & Leach, Inc.

### G.     The Settlement

58.     In August of 2015, the Parties discussed dates and mediators to be agreed upon for a process to potentially resolve the litigation.  By late August 2015, the Parties had agreed upon a mediator and scheduled a mediation to take place on October 21, 2015.  The Parties also agreed to exchange opening mediation briefs on September 23, 2015.

59.     In connection with the contemplated mediation process, Lead Plaintiff worked with an expert to assess the aggregate damages suffered by the class and to formulate a potential settlement demand to be made to Defendants on or before the mediation.

60.    By early September of 2015, Lead Plaintiff had also substantially completed a draft of its mediation brief and an analysis of the strengths, risks, and potential issues in the litigation.  That analysis was substantially informed by the information obtained from Lead Plaintiff's review of documents that had been ongoing since April 2015 and from Lead Plaintiff's research done in connection with the preparation of the Complaint and briefing on the motions to dismiss.

61.    During the second week of September 2015, counsel for the Parties began intensive, direct discussions on a possible resolution of the case prior to formal mediation.  In connection with those discussions, Lead Counsel and counsel for Defendants discussed the range of possible damages, possible financial terms of a settlement and principal non-financial terms of a settlement.

62.    Ultimately, counsel for GM advised Lead Plaintiff that a demand should be made directly to GM's Board of Directors for consideration.  A detailed demand was prepared by Lead Counsel after discussions with and approval from the Lead Plaintiff, and transmitted to the GM Board on September 13, 2015.  An agreement to settle the litigation for $300 million was reached on September 16, 2015, and a term sheet (the "Term Sheet") reflecting the principal settlement terms was signed on that date.

63.    The Term Sheet sets forth, among other things, the Parties' agreement to settle and release all claims asserted against Defendants in the Action in return for

a cash payment by or on behalf of Defendants of $300,000,000 for the benefit of the Settlement Class, subject to certain terms and conditions, including the execution of a customary "long form" stipulation and agreement of settlement and related papers.

64.   After reaching the agreement in principle, the Parties negotiated the final terms of the Settlement and drafted the Stipulation and Agreement of Settlement and related settlement papers.  The Stipulation, executed on November 11, 2015, was submitted to the Court as part of Lead Plaintiff's November 13, 2015 motion for preliminary approval of the Settlement and certification of the Settlement Class.  ECF No. 94.

65.   On November 20, 2015, the Court entered the Order Preliminarily Approving Settlement and Providing for Notice ("Preliminary Approval Order"), which preliminarily approved the Settlement, certified the Settlement Class for settlement purposes, appointed Lead Plaintiff as class representative, and appointed Lead Counsel as class counsel.  ECF No. 95.

## III.   RISKS OF CONTINUED LITIGATION

66.   The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $300 million cash payment and represents (if approved) the second largest corporate securities class action recovery within the Sixth Circuit and significant portion of the recoverable damages in the Action as determined by Lead Plaintiff's damages expert, particularly after considering

29

arguments that could be made by Defendants concerning loss causation issues. As explained below, Defendants had substantial defenses with respect to liability, loss causation and damages in this case. These arguments created a significant risk that, after years of protracted litigation, Lead Plaintiff and the Settlement Class could achieve no recovery at all, or a lesser recovery than the Settlement Amount.

### A.   Risks Of Proving Falsity And Scienter

67.    Lead Plaintiff and the Settlement Class faced significant hurdles to establishing liability. In particular, Defendants would have argued forcefully that Lead Plaintiff could not establish that their statements were materially false or that they acted with scienter.

68.    Defendants would have vigorously contested that any of their statements were materially false or misleading. As detailed above, the core allegations in this case were that Defendants misrepresented: (i) that GM's product warranty and recall liabilities were accurately stated, as opposed to materially understated; (ii) that GM's internal controls over financial reporting were effective, when in reality the Company's internal controls over financial reporting where ineffective; and (iii) that GM was a company that was committed to customer safety, while during the Class Period, GM allegedly pursued profits at the expense of safety and promoted a cost-cutting and anti-recall culture that promoted the production of unsafe vehicles and endangered passengers. Although Lead Plaintiff and Lead

30

Counsel strongly believe that the claims asserted against Defendants have merit, they recognize that there would be substantial risks to establishing each of these allegations and prevailing on Lead Plaintiff's claims on Defendants' motions to dismiss, summary judgment, at trial and appeal. Indeed, Defendants raised numerous compelling arguments in their motions to dismiss, which were pending before the Court when the Parties entered into the Settlement, and, even if the Complaint survived Defendants' motions to dismiss, Lead Plaintiff would have faced significant risks proving their claims thereafter.

69. As to Defendants' alleged misrepresentations concerning GM's product warranty and recall liabilities, on their motions to dismiss, Defendants cogently argued that Lead Plaintiff failed to allege any facts showing it was inaccurate that recall costs were recorded when GM determined they were probable and estimable in connection with a specific recall campaign. Moreover, Defendants maintained, and would have likely continued to contend, that Lead Plaintiff failed to allege specific facts showing that the amounts GM recorded after the recalls were announced in 2014 were both probable and reasonably estimable at the time when GM's earlier Class Period financial statements were filed with the SEC as to both "First Wave" and "Second Wave" recall costs. Specifically, Defendants argued, and would have strenuously continued to argue, that Lead Plaintiff failed to alleged specific facts establishing that GM management responsible for ordering recalls had

determined that the recalls announced in the first quarter of 2014 were estimable and reasonably probable prior to the fourth quarter of 2013.

70.     As to Defendants' alleged misrepresentations concerning the adequacy of GM's internal financial controls, Defendants argued on their motions to dismiss, and would have continued to maintain, that Lead Plaintiff inappropriately relied on GM's process for identifying operational controls, not financial controls, and as such Lead Plaintiff failed to allege that GM's internal financial controls violated GAAP. Defendants would have also argued that Lead Plaintiff's allegations constitute nothing more than inactionable "fraud by hindsight" and that any pre-Class Period material weaknesses concerning GM's internal controls were remediated by the start of the Class Period.

71.     With respect to GM's alleged misrepresentations concerning the Company's purported commitment to safety, Defendants would have argued, as they did on their motions to dismiss, that those statements were immaterial as a matter of law because they were vague, aspirational statements of puffery upon which no investor would have reasonably relied.  Indeed, Courts in the Sixth Circuit, as well as across the country, have often found such statements as "Safety will always be a priority at GM," and "[w]e are committed to leadership in vehicle design, quality, reliability, telematics, infotainment and safety" to be too vague for a reasonable investor to have relied upon them.  Moreover, many of the cars in the recalls at issue

were produced by "old GM," and the alleged safety statements of "new GM" may have been found irrelevant. Thus, even if these statements survived Defendants' motions to dismiss, Lead Plaintiff would have faced significant risks in proving them at trial or on appeal.

72.   Even if Lead Plaintiff were able to establish a material misrepresentation, it faced significant hurdles in adequately pleading and proving scienter. To start, Defendants cogently argued on their motions to dismiss that because Lead Plaintiff alleged that Defendants misrepresented only "soft" information, Lead Plaintiff was required (and failed) to plead facts establishing that Defendants knowingly misrepresented or omitted facts to deceive, manipulate or defraud the public, as opposed to pleading that Defendants merely recklessly ignored such facts. For example, Lead Plaintiff faced substantial risks concerning Defendants' argument that Lead Plaintiff did not allege facts showing that Defendants knew that the warranty claims set forth in GM's database were not accurately accounted for in GM's warranty reserves. As another example, Lead Plaintiff also faced significant risks relating to Defendants' contention that the Individual Defendants did not know of any lawsuit alleging ignition switch defects.

73.   With respect to corporate scienter, or scienter on the part of GM, Lead Plaintiff also faced serious risks that the Court would find that the allegations in the Complaint did not infer knowledge on the part of any individuals whose states of

33

mind are relevant under the Sixth Circuit's decision in *Omnicare*, 769 F.3d at 470-71.  In their motions to dismiss, Defendants argued persuasively, and would likely continue to argue, that the Complaint inferred, at most, knowledge on the part of low-level employees and engineers whose state of mind cannot be attributed to the defendant corporation under *Omnicare*.  Moreover, even as to those lower-level employees, the Valukas Report concluded that they did not understand the ignition-switch defect at issue as a safety defect, but viewed it (incorrectly) at the time as a mere customer inconvenience issue.

74.   Defendants also persuasively argued that under *Helwig*'s multi-factor analysis Lead Plaintiff did not adequately allege scienter on the part of the Individual Defendants.  Specifically, Defendants strongly contended that Lead Plaintiff did not allege insider trading as any allegations of such occurred only after one of the Individual Defendants left GM; that Lead Plaintiff did not specifically allege facts supporting the assertion that any of the settled lawsuits arising out of the ignition-switch defect were known or concealed by the Individual Defendants; that any allegations concerning the certifications of the adequacy of GM's internal controls were nothing more than fraud by hindsight; and that the Individual Defendants' motivation to keep their jobs and salaries does not support a strong inference of scienter.  Given these arguments, there was a risk that the Court would dismiss Lead Plaintiff's Complaint or that a jury would find that scienter did not exist.

75.     Moreover, providing further credence to the risks Lead Plaintiff faced moving forward with this Action, a shareholder derivative suit in the Court of Chancery of the State of Delaware concerning GM's handling of the same ignition-switch defect at issue in this Action was dismissed while the motion to dismiss in this Action was pending.  *See In re Gen. Motors Company Derivative Litig.*, 2015 WL 3958724 (Del. Ch. June 26, 2015).

**B.     Risks Of Establishing Loss Causation And Damages**

76.     Even assuming that Lead Plaintiff overcame each of the above risks and successfully established liability, it faced very serious risks in proving damages and loss causation.  Indeed, while the issues of loss causation and damages were not before the Court at the motion to dismiss stage, these issues were a critical driver of the settlement value of this case.

77.     As an initial matter, a major consideration driving the calculation of a reasonable settlement amount was that the Defendants had substantial arguments that the declines in GM's stock price were not caused by revelations of the true facts concerning GM's handling of the ignition-switch defect, or that even if some portion of the declines in GM's stock price were caused by such revelations, those declines were not statistically significant, and any resulting damages to Lead Plaintiff and the Settlement Class were insignificant.  Had any of these arguments been accepted in

35

whole or in part, it could have eliminated or, at a minimum, drastically limited any potential recovery.

78.     This case involved four alleged corrective partial disclosures events: (i) March 10 to March 12, 2014; (ii) April 8 to April 9, 2014; (iii) April 10 to April 11, 2014; and (iv) July 24, 2014.  As the Court is aware, Lead Plaintiff bears the burden of establishing loss causation.  *See Frank v. Dana Corp.*, 646 F.3d 954, 958 (6th Cir. 2011); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 714 (E.D. Mich. 2010) ("a plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market.").

79.     Defendants would have contested each of the four corrective disclosures by pointing to statements Defendants made during the Class Period in which they provided substantial cautionary language about the risk of recalls faced by the Company and how a recall would increase the Company's warranty costs and lower revenue, reducing any "surprise" as a result of the recall and related disclosures.  In support of this argument, Defendants would likely demonstrate that when the recalls at issue were publicly disclosed, the Company's stock price did not decline.  As mentioned above, Defendants would have also likely argued that the declines on the alleged corrective disclosure dates were either caused, in whole or in part, by "confounding information" that did not reveal the fraud, or that the declines were not "statistically significant."

36

80.    The first alleged corrective disclosure event began after the market closed on March 10, 2014, when, in a press release, Chairman of the House Energy and Commerce Committee (the "Committee"), Fred Upton, announced that the Committee had opened an investigation into GM's response to consumer complaints about the defective ignition switches in certain vehicles, which included vehicles that were subject to the recalls at issue in this Action.  Moreover, additional information about Congressional and regulatory actions concerning GM's handling of the ignition-switch defect came out on March 11, 2014, including that the Justice Department had launched a criminal investigation into GM.

81.    As to the decline in GM's stock price experience from March 10 to March 13, 2014, and in addition to the arguments referenced above, Defendants would have likely argued that the market did not view this news as materially "correcting" any prior statements.  In support of this argument, Defendants could point to a March 11, 2014 analyst report from RBC Capital Markets which noted that the risk GM faced was "more reputational than financial," that the "immediate financial impact [was] insignificant."  Similarly, UBS, in a report dated March 13, 2014 saw the "market overreaction" as a "good buying opportunity" because "[r]epair costs are small & litigation risk is limited" and "[r]eplacing the ignition is a quick & cheap repair."

82.     Additionally, Defendants would have pointed out that the declines, particularly those on March 12 and March 13, 2014, were too small to be "statistically significant" after accounting for overall market and peer group returns on those dates.   Moreover, as noted above, Defendants would have likely demonstrated that when the recalls at issue were first announced in February 2014, the Company's stock price did not significantly decline.

83.     The April 8 and April 9, 2014 alleged partial disclosure event revealed that NHTSA had determined to impose its maximum allowable fine of $7,000 per day on GM and threatened litigation against GM due to GM's failure to timely respond to a prior Special Order issued by the U.S. Secretary of Transportation.   In response to this partial disclosure, Defendants would have had substantial arguments that news unrelated to the alleged fraud was the actual cause of GM's stock price declines over this period.   Specifically, Defendants could argue that the stock price declines over April 8 and April 9 were a result of news systemically affecting the auto industry as a whole, in particular rising costs for achieving growth, or, alternatively, other factors affecting GM.   In support of this argument, Defendants could reference an RBC Capital Markets report dated April 8, 2014, which minimized the effect of the recalls on the Company's stock price and attributed the decline to non-recall related factors when it stated "Headlines Will Pass, US Competition Won't."

38

84.     In response to the alleged April 10 and April 11, 2014 corrective disclosures, which announced that the Company expected to record a $1.3 billion recall charge for the three months ended March 31, 2014, "primarily for the cost of recall-related repairs announced in the 2014 calendar year to date and related courtesy transportation," Defendants would likely have argued that investors had already absorbed the negative news about GM's recalls and had accordingly adjusted their expectations for GM's financial performance downwards.

85.     Lastly, in response to the July 24, 2014 alleged corrective disclosure, concerning a charge of $400 million related to the Feinberg Compensation Facility, GM's changing its accounting methodology for future recalls resulting in an $874 million "catch up adjustment," and GM's taking a $325 million charge for vehicles subject to the Second Recall Wave, Defendants would have likely contested the general applicability of the "Second Recall Wave" to the case, maintaining that GM's subsequent recall of its vehicles was not related to the same ignition-switch problem as the First Recall Wave.  Moreover, Defendants would have also likely argued that news unrelated to the alleged fraud was the actual cause of the stock declines following this disclosure, pointing to, among others, a report by UBS dated July 24, 2014 that the "selloff [was] an overreaction to a slight miss" in the Company's North American profits, specifically stating that "North America margins of 9.2% (ex-recall costs) fell short of our 10.1% [estimate]."

## C.    Other Risks

86.    In addition to the risks discussed above, Lead Plaintiff faced other significant risks including that: (i) the Court might not certify the Class, a decision which would effectively dispose of the Class's claims; (ii) the record in discovery might not have supported Lead Plaintiff's allegations; (iii) some or all of Lead Plaintiff's experts, including experts on accounting, internal controls, motor vehicles and damages, would have opinions that were excluded or not accepted by the jury; and (iv) the substantial risks of costs and delays if settlement were not achieved now. Finally, even if Lead Plaintiff had succeeded in proving all elements of its case at trial and obtained a jury verdict, Defendants would almost certainly have appealed. An appeal would not only have renewed all the risks faced by Lead Plaintiff, as Defendants would have re-asserted all of their arguments summarized above, but also would have engendered significant additional delay.

## D.    The Settlement Is Reasonable In Light Of The Size Of The Potential Recovery In The Action

87.    Lead Plaintiff's damages expert has estimated that the maximum approximate total damages that could be established in the Action, assuming that Lead Plaintiff successfully established the elements of falsity and scienter, would range from $2.8 billion to $1.2 billion, depending on what assumptions are used with respect to loss causation (for example, how much of the abnormal price decline following each alleged disclosure was attributable to disclosure of the alleged fraud).

40

Proving the damages reflected in these estimates assumes that Lead Plaintiff would have prevailed on all of its merits arguments about falsity and that all or most aspects of the case would be sustained and proven at trial. Even so these estimates would be subject to substantial risk at trial, as they would be subject to a "battle of the experts." At trial, even the low end of the range could have been substantially reduced based on arguments about both the substance of the disclosures that purportedly dissipated the artificial inflation in the price of GM shares and the extent to which the regression analysis Lead Plaintiff's expert would present accurately captured the amount of dissipation in GM's share price on each alleged date that it declined in connection with the truth being revealed. However, assuming the maximum possible damages were proven at trial, based on these estimates, the $300 million Settlement represents approximately 11% to 25% of the possible maximum damages that might have been established if Lead Plaintiff prevailed at trial. In light of the substantial risks of establishing liability presented here, Lead Plaintiff and Lead Counsel believe that this recovery represents an excellent outcome for members of the Settlement Class.

88.    For all these reasons, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is fair, reasonable and adequate, and that it is in the best interests of the Settlement Class to accept the immediate and substantial benefit conferred by the Settlement, instead of incurring the significant risk that the

41

Settlement Class might recover a lesser amount, or nothing at all, after protracted and arduous litigation.

## IV.   LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

89.     The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Settlement Class. The Preliminary Approval Order also set a March 23, 2016 deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set a final approval hearing date of April 20, 2016.

90.     Pursuant to the Preliminary Approval Order, Lead Counsel instructed The Garden City Group, Inc. ("GCG"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from

the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 7% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $1 million. To disseminate the Notice, GCG obtained information from GM and from banks, brokers and other nominees regarding the names and addresses of potential Settlement Class Members. *See* Declaration of Jose C. Fraga (A) Mailing of the Notice and Proof of Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Fraga Decl."), attached hereto as Exhibit 1, at ¶¶ 2-8.

91.     On December 21, 2015, GCG disseminated 2,559 copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominees by first-class mail. *See* Fraga Decl. ¶ 5. As of March 8, 2016, GCG had disseminated 1,181,701 Notice Packets. *Id.* ¶ 8.

92.     On January 5, 2016, in accordance with the Preliminary Approval Order, GCG caused the Summary Notice to be published in the *Wall Street Journal* and *USA Today* and to be transmitted over the *PR Newswire*. *See* Fraga Decl. ¶ 9.

93.     Lead Counsel also caused GCG to establish a dedicated settlement website, www.GMSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation and

43

Preliminary Approval Order.  *See* Fraga Decl. ¶ 10.  Copies of the Notice and Claim Form are also available on Lead Counsel's website, www.blbglaw.com.

94.     As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application or to request exclusion from the Settlement Class is March 23, 2016. To date, one generalized objection to the Settlement and request for attorneys' fees and expenses has been received, and 43 requests for exclusion have been received (*see* Fraga Decl. ¶ 12).  Lead Counsel will file reply papers on April 13, 2016, after the deadline for submitting requests for exclusion and objections has passed, which will address all requests for exclusion and objections that may be received.

## V.     ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

95.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (a) any Taxes, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court, and (d) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than April 27, 2016.  As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

96.    Lead Plaintiff's damages expert developed the proposed plan of allocation (the "Plan of Allocation") in consultation with Lead Counsel.  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Complaint.

97.    The Plan of Allocation is set forth at pages 7 to 8 of the Notice.  *See* Fraga Decl. Ex. A at pp. 7-8.  As described in the Notice, calculations under the Plan of Allocation are not intended be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the plan are only a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

98.    In developing the Plan of Allocation, Lead Plaintiff's damages expert calculated the potential amount of estimated artificial inflation in the per share closing prices of GM common stock that allegedly was proximately caused by Defendants' alleged false and misleading statements and omissions.  In calculating the estimated artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Lead Plaintiff's damages expert considered price changes in GM common stock in reaction to certain public announcements regarding

GM in which such alleged misrepresentations and omissions were alleged to have been revealed to the market, adjusting for price changes that were attributable to market or industry forces.

99.     Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or other acquisition of GM common stock during the Settlement Class Period that is listed in the Claim Form and for which adequate documentation is provided.  The calculation of Recognized Loss Amounts will depend upon several factors, including (a) when the GM common stock was purchased or otherwise acquired, and at what price; and (b) whether the GM common stock was sold or held through the end of the Settlement Class Period, and if the stock was sold, when and for what amounts.  In general, the Recognized Loss Amount calculated will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sales price of the stock, whichever is less.  Notice ¶ 46.[4]

---

[4] For shares purchased during the Settlement Class Period that are still held as of the close of trading on July 24, 2014 (the end of the Settlement Class Period), the Recognized Loss Amount will be the lesser of (i) the amount of artificial inflation on the date of purchase; or (ii) the purchase price minus $35.07 (the closing price of GM shares on July 25, 2014, the day after the last day of the Settlement Class Period, at which point the inflation in the price of GM common stock due to the alleged fraud is assumed to have been completely dissipated).  Notice ¶ 46(c).  For shares purchased on July 24, 2014 and sold prior to the close of trading on July 24, 2014,

100.   Claimants who purchased and sold all their GM shares before the first corrective disclosure on March 10, 2014, or who purchased and sold all their GM shares between the various dates on which artificial inflation was allegedly removed from the price of GM stock following corrective disclosures (that is, they did not hold the shares over a date where artificial inflation was alleged removed from the stock price), will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions because the level of artificial inflation is the same between the corrective disclosures, and any loss suffered on those sales would not be the result of the alleged misstatements in the Action.

101.   The sum of a Claimant's Recognized Loss Amounts is the Claimant's "Recognized Claim" and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. Notice ¶¶ 49-50.

102.   In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in General Motors common stock that were attributable to the conduct alleged in the Complaint.  Accordingly, Lead

---

the Recognized Loss Amount shall be the lesser of: (i) $0.44; or (ii) the purchase price minus the sale price.  Notice 46(b).

Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

103.   As noted above, as of March 8 2016, more than 1.1 million copies of the Notice, which contains the Plan of Allocation, and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Settlement Class Members.  S*ee* Fraga Decl. ¶ 8.  To date, no objections to the proposed Plan of Allocation have been received.

## VI.   THE FEE AND LITIGATION EXPENSE APPLICATION

104.   In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court on behalf of Plaintiffs' Counsel for an award of attorneys' fees of 7% of the Settlement Fund, or $21,000,000, plus interest earned at the same rate as the Settlement Fund (the "Fee Application").  Lead Counsel also requests reimbursement of expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $775,746.12.  Lead Counsel further requests reimbursement to Lead Plaintiff New York Teachers of $2,903.71 in costs and expenses that New York Teachers incurred directly related to its representation of the Settlement Class pursuant to 15 U.S.C. § 78u-4(a)(4).  The legal authorities supporting the requested fee and expenses are set forth in Lead Counsel's Fee Memorandum.  The primary factual bases for the requested fee and expenses are summarized below.

48

### A.   The Fee Application

105.   For its efforts on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis. As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances and has been recognized as appropriate by the Supreme Court and Sixth Circuit for cases of this nature.

106.   Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 7% fee award is fair and reasonable for attorneys' fees in common fund cases such as this and is at the low end of the range of percentages awarded in securities class actions in this Circuit and elsewhere with comparable settlements.

### 1.   Lead Plaintiff Supports The Fee Application

107.   Lead Plaintiff New York Teachers is a sophisticated institutional investor that closely supervised and monitored the prosecution and the settlement of the Action.  As set forth in the declaration submitted by New York Teachers, New

York Teachers believes that requested fee is fair and reasonable in light of the work counsel performed and the risks of the litigation. *See* Declaration Of Joseph Indelicato, Jr., attached thereto as Exhibit 2 ("Indelicato Decl."), at ¶ 13. New York Teachers negotiated and approved the fee at the outset of the litigation pursuant to a retention agreement providing for different levels of percentage fees based on the size of the recovery and the stage of the litigation at which settlement was reached, and received quarterly reports from Lead Counsel regarding Lead Counsel's lodestar and expenses during the Action. *Id*. Following the agreement to settle the Action, New York Teachers again reviewed the proposed fee and believes it is fair and reasonable in light of the outstanding result obtained for the Settlement Class and the excellent work performed by Plaintiffs' Counsel. *Id*. Lead Plaintiff's endorsement of the requested fee demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2. The Work And Experience Of Counsel

108. Attached hereto as Exhibit 3 are declarations from all Plaintiffs' Counsel in support of an award of attorneys' fees and reimbursement of litigation expenses. The first page of Exhibit 3 contains a summary chart of the hours expended and lodestar amounts for each Plaintiffs' Counsel firm, as well as a summary of each firm's litigation expenses. Included within each supporting declaration is a schedule summarizing the hours and lodestar of each firm from the

50

inception of the case through November 11, 2015 (the date the Stipulation was signed), a summary of Litigation Expenses from inception of the case through February 15, 2016 by category, and a firm resume. No time expended in preparing the application for fees and reimbursement of expenses has been included.

109. Plaintiffs' Counsel are: (i) the Court-appointed Lead Counsel BLB&G; (ii) local counsel The Miller Law Firm, P.C.; (iii) Labaton Sucharow LLP; and (iv) Motley Rice LLC

110. As set forth in Exhibit 3, Plaintiffs' Counsel collectively expended a total of 25,527.70 hours in the investigation and prosecution of the Action from its inception through November 11, 2015, for a lodestar of $10,873,042. The requested fee of 7% of the Settlement Fund represents $21,000,000 (plus interest), and therefore represents a multiplier of approximately 1.9 of Lead Counsel's lodestar. As discussed in further detail in the Fee Memorandum, the requested multiplier is well within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

111. As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action. I maintained control of and monitored the work performed other lawyers at BLB&G and other Plaintiffs' Counsel on this case. While I personally devoted substantial time to this case, and

51

personally reviewed and edited all pleadings, court filings, and other correspondence prepared on behalf of Lead Plaintiff, other experienced attorneys at my firm were involved in Settlement negotiations and other matters. More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Plaintiffs' Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

112.   As demonstrated by the firm resume included as Exhibit 3A-3 hereto, Lead Counsel is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases. BLB&G is consistently ranked among the top plaintiffs' firms in the country. Further, BLB&G has taken complex cases such as this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions. I believe this willingness and ability added valuable leverage in the settlement negotiations.

### 3.   Standing And Caliber Of Defendants' Counsel

113.   The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Kirkland & Ellis LLP, one of the country's most prestigious and experienced defense firms, which vigorously represented its clients.

In the face of this experienced, formidable, and well-financed opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms favorable to the Settlement Class.

> ### 4.   The Risks Of Litigation And The Need To Ensure The Availability Of Competent Counsel In High-Risk Contingent Securities Cases

114.   This prosecution was undertaken by Lead Counsel entirely on a contingent-fee basis.  The risks assumed by Lead Counsel in bringing these claims to a successful conclusion are described above.  Those risks are also relevant to an award of attorneys' fees.

115.   From the outset, Lead Counsel understood that it was embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case such as this requires.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel (and the other Plaintiffs' Counsel) received no compensation during the course of the Action and

has incurred over $775,000 in litigation expenses in prosecuting the Action for the benefit of the Settlement Class.

116.   Lead Counsel also bore the risk that no recovery would be achieved. As discussed herein, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.

117.   Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

118.   Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders.  If this important public policy is to be carried out, the courts should

award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

119.  Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of the hard work and the excellent result achieved, I believe the requested fee is reasonable and should be approved.

### 5.    The Reaction Of The Settlement Class To The Fee Application

120.  As noted above, as of March 8 2016, over 1.1 million Notice Packets had been mailed to potential Settlement Class Members advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 7% of the Settlement Fund.  *See* Fraga Decl. ¶ 8.  In addition, the Court-approved Summary Notice has been published in the *Wall Street Journal* and *USA Today* and transmitted over the *PR Newswire*.  *Id.* ¶ 9.  To date, one generalized objection to the attorneys' fees set forth in the Notice has been received by someone who has failed to document that he is a member of the Settlement Class consistent with the requirements established in the Notice.  Nonetheless, all objections will be addressed in Lead Counsel's reply papers to be filed on April 13, 2016, after the deadline for submitting objections has passed.

121.   In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success.  Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that a fee award of 7%, resulting in a multiplier of 1.9 is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

## B.   The Litigation Expense Application

122.   Lead Counsel also seeks reimbursement from the Settlement Fund of $775,746.12 in litigation expenses that were reasonably incurred by Plaintiffs' Counsel in connection with commencing, litigating and settling the claims asserted in the Action.

123.   From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover any of their expenses, and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved.  Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate it for the lost use of the funds advanced by it to prosecute the Action.  Accordingly, Plaintiffs' Counsel were motivated to and did take appropriate

steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

124.   As set forth in Exhibit 4 hereto, Plaintiffs' Counsel has incurred a total of $775,746.12 in unreimbursed litigation expenses in connection with the prosecution of the Action.  The expenses are summarized in Exhibit 4, which was prepared based on the declarations submitted by each firm and identifies each category of expense, *e.g.*, expert fees, on-line research, photocopying, and postage expenses, and the amount incurred for each category.  These expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in Plaintiffs' Counsel's billing rates.

125.   Of the total amount of expenses, $431,870.35, or 56%, was expended for document management costs related to the creation and maintenance of an electronic database that enabled Plaintiffs' Counsel to efficiently and effectively search and review the over 13 million pages of documents produced to Lead Plaintiff in this litigation.

126.   Another $145,955.53, or 19%, was expended for the retention of experts and consultants.  As noted above, Lead Counsel consulted with experts in the fields of automotive safety, accounting, loss causation, and damages during its investigation and the preparation of the Complaint, and consulted further with the

damages expert during the settlement negotiations with the Defendants, and in connection with the development of the proposed Plan of Allocation.

127.    Another large component of the litigation expenses was for online legal and factual research, which was necessary to prepare the Complaint, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss, and brief other motions in the case.  The charges for on-line research amounted to $86,307.10, or 11% of the total amount of expenses.

128.    In addition, Lead Plaintiff retained specialized bankruptcy counsel to advise on matters arising from the bankruptcy and liquidation of GM's predecessor. The $39,098.00 expended in this retention represented 5% of the total amount of expenses.

129.    The other expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court fees, costs of out-of-town travel, copying costs, long distance telephone and facsimile charges, and postage and delivery expenses.

130.    All of the litigation expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Lead Plaintiff.  *See* Indelicato Decl. ¶ 14.

131.   Additionally, Lead Plaintiff seeks reimbursement of its reasonable costs and expenses incurred directly in connection with its representation of the Settlement Class, in the amount of $2,903.71.  *See* Indelicato Decl. ¶¶ 15-17.

132.   The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $1,000,000.  The total amount requested, $778,649.83, which includes $775,746.12 in reimbursement of litigation expenses incurred by Plaintiffs' Counsel and $2,903.71 in reimbursement of costs and expenses incurred by Lead Plaintiff, is significantly below the $1,000,000 that Settlement Class Members were advised could be sought.  To date, one generalized objection has been raised as to the maximum amount of expenses set forth in the Notice, which will be addressed by Lead Counsel in its reply papers.

133.   The expenses incurred by Plaintiffs' Counsel and Lead Plaintiff were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submits that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

134.   Attached hereto are true and correct copies of the following documents cited in the Fee Memorandum:

Exhibit 5:   *In re General Motors Corp. Sec. & Derivative Litig.*, No. 06-md-1749, slip op. (E.D. Mich. Jan. 6, 2009), ECF No. 139;

59

Exhibit 6:   *In re Dollar General Corp. Sec. Litig.*, No. 3:01-0388, slip op. (M.D. Tenn. May 24, 2002), ECF No. 209;

Exhibit 7:   *In re DaimlerChrysler AG Sec. Litig.*, No. 00-0993 (KAJ), slip op. (D. Del. Feb. 5, 2004), ECF No. 971;

Exhibit 8:   *New Jersey Carpenters Health Fund v. Residential Capital LLC*, No. 08-cv-8781-HB, slip op. (S.D.N.Y. July 31, 2015), ECF No. 353;

Exhibit 9:   *Wyatt v. El Paso Corp.*, No. 02-2717, slip op. (S.D. Tex. Mar. 9, 2007), ECF No. 376;

Exhibit 10:  *Nieman v. Duke Energy Corp.,* No. 3:12-cv-00456-MOC-DSC, slip op. (W.D.N.C. Nov. 2, 2015), ECF No. 112;

Exhibit 11:  *In re Satyam Computer Svc. Sec. Litig.*, No. 09-MD-2027, slip op. (S.D.N.Y. Sept. 13, 2011), ECF No. 365; and

Exhibit 12:  *In re Am. Express Fin. Advisors Sec. Litig.*,  No. 04 Civ. 1773 (DAB), slip op. (S.D.N.Y. July 18, 2007), ECF No. 170.

## VII.   CONCLUSION

135.   For all the reasons set forth above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable and adequate.  Lead Counsel further submits that the requested fee in the amount of 7% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total Litigation Expenses in the amount of $778,649.83, which includes Lead Plaintiff's costs and expenses, should also be approved.

I declare, under penalty of perjury under the laws of the United States, that the foregoing facts are true and correct.

Date: March 9, 2016
          New York, New York


                                        _/s/ Salvatore J. Graziano_____
                                        SALVATORE J. GRAZIANO


#965533