FILED

MAR 2 3 2016

CLERK'S OFFICE
U.S. DISTRICT COURT

IN THE UNITED STATE DISTRICT COURT FOR
THE EASTERN DISTRICT OF MICHIGAN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| NEW YORK RETIREMENT SYSTEMS, )<br>Individually and on Behalf of )<br>of All Others Person )<br>Similarly Situated, )<br>          Plaintiff )<br> )<br> )<br>vs. )<br> )<br>GENERAL MOTORS COMPANY, )<br>DANIEL F. AKERSON, NICHOLAS S )<br>CYPRUS, CHRISTOPHER P. )<br>LIDDELL, DANIEL AMMANN, )<br>CHARLES K. STEVENS III )<br>MARY T. BARRA, THOMAS S. )<br>TIMKO, and GAY KENT, )<br>          Defendants )  | CIVIL CASE NO. 4-14-CV-11191<br>   Honorable Linda V. Parker<br><br><br>OBJECTION BY TWO CLASS<br>MEMBERS TO SETTLEMENT<br>SET FORTH IN NOTICE. |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMES  NOW the David Wagner as Trustee of  the  Charles Francis Kayser Revocable Trust, and Charles Francis Kayser by and through its and his attorney, Larry F.  Woods,  and files objections  to the Proposed Settlement of the Class  Recovery in the above-entitled matter.  David Wagner as Trustee hereby sets for 3 separate objections as follows:

### OBJECTION I

**VALUE OF DAMAGES BEING RECOVERY AND ISSUE PRECLUSION**

The  first objection is to the amount of the  settlement and the application of issue preclusion.  On page 11 of  the Notice of Pendency of Class Action, etc.,  the amount  shown

-2-

for estimated Artificial Inflation is $6.13 for each share. The Charles Kayser Trust believes it obtained 2986 shares on or about August 13, 2013. Using an amount of even $4.00 per share, the Trust would receive over $10,000. Under the settlement, it is estimated in paragraph 3 on page 1 that the recovery per share will be about $0.29 per share. This amount of recover reflects less than a 5% recovery of the amount the Plaintiffs claim should be recovered given the date the Charles Kayser Trust acquired the shares of General Motors. This is a very low recovery for the loss. The Defendants appear to have substantial assets that would allow recovery of a substantial amount more, if a Plaintiffs verdict is obtained.

While there is always the problem of liability, the Charles Francis Kayser Trust believes that there is a strong likelihood of recovery. There are several documents showing the Defendant and its predecessor was well aware of the defect and the potential for injuries to the consuming public. The National Highway Traffic Safety Administration has assessed a fine of $35,000,000 as a result of the conduct of the Defendant in the handling of this safety issue related to the ignition problem. (See attached U.S. Transportation Statement, Marked Exhibit A). This member of the class

-3-

states that the doctrine of issue preclusion should be applicable to whether there is even an issue of liability that has to be proven on the part of the Plaintiffs as a result of this assessment, and payment by Defendant. Thus, if the only issue is damages, the settlement does seem extremely small (5%) of the amount Plaintiffs claim the Charles Kayser Trust would receive.

## OBJECTION II

## CLASS CERTIFICATION AND OTHER CLAIMS AFFECTED

The second objection to approval of this settlement lies with the certification of the class itself. The Charles Francis Kayser Trust and Charles Francis Kayser, in addition to stock, acquired 2714 General Motors Warrants - A, and 2714 General Motors Warrants - B. The value of these warrants are based on the value of the share of the General Motors stock. The warrants issued have traded in a direct relationship to the value of the General Motors stock. Thus, if the value of the stock decreased as a result of the fraud of General Motors, the value of the warrants were also decreased by a very similar amount. The purchasers and persons or entities otherwise acquiring the GM warrants were affected in almost the same direct relationship as those persons and entities who purchase or otherwise acquired the

-4-

stock. Thus, this settlement may be effective to eliminate a valid claim to all of those owners who acquired or purchased both General Motors stock and General Motors Warrants, because of the language of paragraph number 28 regarding "Unknown Claims".

### OBJECTION III

### THE ISSUE OF INSURANCE AND INFORMATION RECEIVED FROM GENERAL MOTORS LLC AND OTHER DEFENDANTS.

The Trustee, David Wagner, and Charles Francis Kayser also object to the settlement on a third ground. This ground has to do with the insurance or reinsurance that General Motors has with regard to Officers and Directors Insurances, and also insurance and reinsurance as to the defect related to the ignition switch, as well as any other product liability claims. The basis of the objection is as follows:

A. One of the named Defendants is Mary T. Barra. She is the CEO of the current General Motors LLC. Since she is one of the named Defendants, the first question is whether or not there is officers and directors insurance coverage for their actions. Nothing is contained in the Notice provided to the members of the class regarding insurance, or the policy limits of any insurance policy. Also, there is nothing contained in the Notice as to whether there is any

-5-

reservation of rights made by any insurer or reinsurer.

B.   In part, as a result of the lack of the information related to insurance or reinsurance being contained in the notice to class member. The undersigned attorney wrote a letter to the Plaintiff's counsel, Salvatore J. Graziano, Esquire, one of the Plaintiffs lead attorneys.   In said letter of February 6, 2016, this Kayser's Trust and Charles Kayser's attorney requested copies of all insurance policies that have been produced to the Plaintiffs counsel by General Motors in this litigation.   As of the date of the filing of these objections, no response has been received from the Plaintiffs law firm, and no insurance policies have been received by the counsel for Charles Kayser or the Kayser Trust.

C.   The reason that all the insurance and reinsurance policies provided by GM were requested from Plaintiffs' counsel is the suspicion of the undersigned that GM either denied the existence of any policy or stone walled on the issue of insurance.   Since no information about insurance policies have been provided to the undersigned, the following is noted to this court first, as to Officers and directors insurance.   Second, to show what GM has done in the past, the undersigned also includes facts and conclusion that have been

-6-

drawn as to products liability insurance.

D. As members of the Plaintiffs' class, David Wagner as Trustee, and Charles F. Kayser, individually are aware of certain insurance policies that both Motors Liquidation or the "Old GM" and the current General Motors has with an insurance company. On April 10, 2010, a Stipulation and Agreed Order between General Motors, LLC and Ace American Insurance Company was entered by the Bankruptcy Court. This is document 5508 in the General Motors bankruptcy proceedings. On page 2, the recitals at "A" state **"WHEREAS,** ACE provides various forms of insurance and reinsurance to the Debtors (hereinafter the **"ACE Policies"**) including but not limited to general liability, automobile liability, employer responsibility, officers and directors and umbrella/excess coverage," (A copy of this Stipulation and Agreed Order is attached to this Motion and marked as Exhibit B, and made a part hereof by this reference as though fully set forth hereat word for word.)

E. With the Plaintiffs class not having any information as to whether their attorneys are aware of insurance policies coverage, and what that coverage may be in these matters, no settlement should be approved. This lack of information related to insurance alone is sufficient for the court to

reject the proposed settlement, until such time as all relationships of both the old GM and new GM is known as to its subsidiaries, affiliates and insurance carriers. Copies of all relevant insurance policies as well as the amount of coverage for officer and directors insurance, product liability, and general insurance coverage needs to be determined before any settlement of this matter should be approved. There appears a chance that there may be fraud involved in the settlement.

F. These members of the class also want to advise the court of a situation that has occurred regarding insurance, and is at least tangentially related to this case, since it deals with insurance and the products liability problem related to the ignition switch. The first initial fact occurred during the initial meeting of creditors in the bankruptcy proceedings, General Motor was asked about insurance for products liability claims. The response that was given was there was insurance or reinsurance. The insurance began at the $35,000,000 level. Plaintiffs believe this policy was with Aspen Insurance Company.

G. General Motors filed a Motion with the Bankruptcy Court "to assume certain reinsurance contracts issued by Aspen to General International Limited, a Bermuda based

-8-

non-debtor affiliate of GM ...".

     H.    Aspen Insurance filed an objection to the Motion filed by General Motors. The object states that the insurance policy is a reinsurance policy. The owner of the policy is a non-debtor affiliate, General International Limited. (A copy of Aspen's Objection and the attachments to said Objection are attached hereto, marked Exhibit C and made a part hereof by this reference as though fully set forth hereat word for word. It is Bankruptcy document number 4209.)

     I.    General International Limited (GIL) is either an affiliate or subsidiary of General Motors. It is classified as a subsidiary by the information received by this member of the class on the County of Bermuda's web site. (A copy of the Web Site listing General International Limited as a subsidiary is attached hereto, marked Exhibit D and made a part hereof by this reference as though full set forth hereat word for word. (Note: this is only a partial list of the General Motors subsidiaries.) If GIL is a subsidiary, then its assets should have been a part of the bankruptcy estate.

     J.  As a result of this knowledge, on February 6, 2016, the undersigned attorney for the Kayser Trust wrote a letter to Mr. Salvatore J. Graziano, Esquire, one of the Plaintiffs

lead attorneys. In said letter, the Kayser's Trust attorney requested copies of all insurance policies that have been produced to the Plaintiffs counsel by General Motors in this litigation. As of the date of the filing of these objections, no response has been received from the Plaintiffs law firm, and no insurance policies have been received by the counsel for Charles Kayser or the Kayser Trust. (Note: There has now been telephone contact regarding this matter between Mr. Graziano and the undersigned attorney. No resolution has occurred at this time.)

K. There are several reasons for the request of copies of insurance policies by the Charles Francis Kayser Trust.

1. First, Mr. Kayser was involved in products liability litigation against General Motors at the time the bankruptcy was filed. In that litigation, there appears to be insurance policies that were not disclosed by General Motors at the initial meeting of creditors in the bankruptcy.

2. During the litigation after the lift of stay in the bankruptcy between Charles Kayser and Motors Liquidation, one of the requirements for the company known as Motors Liquidation to disclose if there was any insurance or reinsurance involved in the case. Motors Liquidation's attorneys told the Iowa Federal District Court that there was not any insurance coverage for Motors Liquidation.

3. At the time the bankruptcy was filed by General Motors, Charles Kayser's attorneys were aware that the Court Reporter who reported several depositions in preparation for trial had not been

-10-

        paid by General Motors for the services he had
        performed.    After the bankruptcy was filed, the
        Court Reporter was paid in full by the law firm
        that    was    representing General    Motors.    An
        Affidavit of the Court Reporter is    attached
        hereto,  marked Exhibit E,  and made a part hereof
        by this reference as though fully set forth hereat
        word for word.   This member of the class believes,
        but cannot prove that the law firm was also paid
        in full for the pre-bankruptcy services, and
        should have been a general creditor.

        L.    Returning to the General Motors Motion to pay the

reinsurance bill, shortly after the Resistance was filed by

Aspen, the Motion was withdrawn by General Motors as Moot.

(A copy of Aspen's Withdrawal of Limited Objection is

attached hereto, marked Exhibit F and made a part hereof by

this reference as though fully set forth hereat word for

word.   It is Bankruptcy document number 4263.) The attorney

for Mr. Kayser was never able to locate a Motion filed by

General Motors or Motors Liquidation to pay General

International Limited for insurance, or for GIL to pay Aspen.

        M.    The common use of the word reinsurance would mean

than in order to have a reinsurance policy, there must be

some kind of insurance policy in force and effect.    This

class member contends that General Motors did have an

insurance policy with its subsidiary, GIL.   The subsidiary,

GIL had obtained a reinsurance policy with Aspen.   Thus, a

part of the assets that should have been available in the

bankruptcy, and which may cover the acts of cover-up of board of directors or other agents of General Motors and Motors Liquidation may be covered by the policies in effect with the insured being General Motors, and the insurance carrier GIL. General Motors may have committed fraud when it told the Iowa Federal District Court that there was not any insurance or reinsurance in the Kayser vs. General Motors case. This would also be the situation if it told the persons or entities injured by the ignition switch defect, that there was not any insurance or reinsurance. It appears that the court reporter was not treated as a debtor with a claim, but was paid in full by an insurance carrier for General Motors. The undersigned submits that the law firm which was representing General Motors was also paid in full for their firm's work. Thus, without specific answers to the insurance issues present in this matter, and the reason for payments which these class members believe is a preferential transfer, this Federal District Court should not approve the Settlement as proposed in the Notice sent to the Class Members.

## SUMMARY AND CONCLUSION

David Wagner as the Trustee of Charles Francis Kayser Trust and Charles Francis Kayser requests this Court not to

-12-

approve the settlement of this class action until for three reasons. Those reasons are:

1. The settlement amount is inadequate for the reasons set forth above.

2. The class action does not include all members of the class that are affected by the action, and it may bar further proceedings by other injured parties.

3. There are numerous insurance issues that are unknown at this time, and there may very well be insurance coverage available to both those members of the class through general insurance, officers and directors insurance, or other forms of insurance. Also, the Court may be assisting other injured parties for whom there was insurance, and the fact that there was insurance was withheld from them by Motors Liquidation, the old General Motors Corporation, and the new General Motors LLC.

WHEREFORE, David Wagner as Trustee of the Charles Francis Kayser Trust, and Charles Francis Kayser pray that the Court will not approve the proposed settlement for the reasons set forth above.

## STATEMENT AS TO ORAL ARGUMENTS

David Wagner as Trustee of the Charles Francis Kayser Trust, and Charles Francis Kayser do not request oral

-13-

argument in this matter. The facts that are set out before this Court are all contained in documents. It is the conclusions that these members of the class have drawn from these documents that the court will have to decide are correct. The undersigned attorney is willing and able to appear at the hearing, if requested by either side or the Court.

Respectfully submitted,

Larry E. Woods
Attorney at Law
24 North Frederick Avenue
Oelwein, IA  50662
319/283-3204
lfwoods@trxinc.com
ATTORNEY FOR TO MEMBERS OF,
THE CLASS, THE CHARLES FRANCIS
KAYSER   TRUST,   AND   CHARLES
FRANCIS KAYSER

Original filed with Clerk of Federal District Court for
the Eastern District of Michigan.

Copies to:

Salvatore Graziano, Esq.          Kirkland & Ellis LLP
1251 Avenue of the Americas       Robert J. Kopecky, Esq.
44th Floor                        300 North LaSalle
New York, NY  10020               Chicago, IL  60654

EXHIBIT – A

# U.S. Department of Transportation Announces Record Fines, Unprecedented Oversight Requirements in GM Investigation

**_General Motors agrees to pay maximum $35 million penalty for violating federal safety laws in Chevrolet Cobalt investigation_**

WASHINGTON – The U.S. Department of Transportation's National Highway Traffic Safety Administration (NHTSA) today announced that General Motors (GM) has agreed to pay a record $35 million civil penalty and to take part in unprecedented oversight requirements as a result of findings from NHTSA's timeliness investigation regarding the Chevrolet Cobalt and the automaker's failure to report a safety defect in the vehicle to the federal government in a timely manner. The defect resulted in the non-deployment of airbags in certain Chevrolet Cobalt and other GM models. This action represents the single highest civil penalty amount ever paid as a result of a NHTSA investigation of violations stemming from a recall.

As part of today's agreement, set forth in a Consent Order signed with NHTSA, the agency also ordered GM to make significant and wide-ranging internal changes to its review of safety-related issues in the United States, and to improve its ability to take into account the possible consequences of potential safety-related defects. GM will also pay additional civil penalties for failing to respond on time to the agency's document demands during NHTSA's investigation.

"Safety is our top priority, and today's announcement puts all manufacturers on notice that they will be held accountable if they fail to quickly report and address safety-related defects," said U.S. Transportation Secretary Foxx. "While we will continue to aggressively monitor GM's efforts in this case, we also urge Congress to support our GROW AMERICA Act, which would increase the penalties we could levy in cases like this from $35 million to $300 million, sending an even stronger message that delays will not be tolerated."

Federal law requires all auto manufacturers to notify NHTSA within five business days of determining that a safety-related defect exists or that a vehicle is not in compliance with federal motor vehicle safety standards and to promptly conduct a recall. GM admits in the Consent Order that it did not do so.

Today's action is historic in that the provisions of the Consent Order will be immediately enforceable in federal court if GM does not fully comply. The Consent Order will hold GM accountable, push the automaker to make needed institutional change, and ensure that replacement parts are produced quickly and recalled vehicles are repaired promptly.

"No excuse, process, or organizational structure will be allowed to stand in the way of any company meeting their obligation to quickly find and fix safety issues in a vehicle," said NHTSA Acting Administrator David Friedman. "It's critical to the safety of the driving public that manufacturers promptly report and remedy safety-related defects that have the potential to lead to deaths or injuries on our nation's highways."

In the Consent Order, GM agreed to provide NHTSA with full access to the results of GM's internal investigation into this recall, to take steps to ensure its employees report safety-related concerns to management, and to speed up the process for GM to decide whether to recall vehicles.

The Consent Order also requires GM to notify NHTSA of changes to its schedule for completing production of repair parts by October 4.  GM must also take steps to maximize the number of vehicle owners who bring in their vehicles for repair, including targeted outreach to non-English speakers, maintaining up-to-date information on its website, and engaging with vehicle owners through the media.  The Consent Order requires GM to submit reports and meet with NHTSA so that the agency may monitor the progress of GM's recall and other actions required by the consent order.

Both in 2007 and again in 2010, NHTSA reviewed data related to the non-deployment of airbags in certain Chevy Cobalt models but each time, determined that it lacked the data necessary to open a formal investigation.  However, on February 7, 2014, GM announced it would recall certain model vehicles for a defect where the vehicle's ignition switch may unintentionally move out of the "run" position that could result in the air bag not deploying in the event of a crash.  GM had failed to advise NHTSA of this defect at the time of the agency's earlier reviews.

After review and consultation by NHTSA, GM twice expanded the recall to include a total of 2,190,934 vehicles in the United States.  The GM recall covers the 2005-2010 Chevrolet Cobalt, 2007-2010 Pontiac G5, 2003-2007 Saturn Ion, 2006-2011 Chevrolet HHR, 2006-2010 Pontiac Solstice and 2007-2010 Saturn Sky vehicles.

Over the past ten years, NHTSA defect investigations resulted in 1,299 recalls involving more than 95 million vehicles and items of motor vehicle equipment, which has helped the agency to reduce vehicle fatalities to historic, all-time lows. Including today's consent order, the agency has obtained record fines of $124.5 million in the last five years from automakers who have failed to promptly report defects to NHTSA.

Stay connected with NHTSA via: Facebook.com/NHTSA   | Twitter.com/NHTSAgov   | YouTube.com/USDOTNHTSA   | SaferCar.gov

### # # #

NHTSA 18-14

Friday, May 16, 2014

Submit Feedback >

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
                                   :

**In re**                          :       **Chapter 11 Case No.**
                                 :       **09-50026 (REG)**
                                 :       **(Jointly Administered)**

**MOTORS LIQUIDATION COMPANY,** *et al.,*   :
    **f/k/a General Motors Corp.,** *et al.*    :
                                 :

        **Debtors.**                :
-----------------------------------------------------------x

**STIPULATION AND AGREED ORDER BETWEEN**
**THE DEBTORS, GENERAL MOTORS LLC, AND ACE**
**AMERICAN INSURANCE COMPANY PURSUANT TO 11 U.S.C.**
**§ 365 AUTHORIZING DEBTORS' ASSUMPTION AND ASSIGNMENT OF**
**CERTAIN INSURANCE POLICIES AND AGREEMENTS**

           Motors Liquidation Company (f/k/a General Motors Corporation)

("**MLC**") and certain of its subsidiaries, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively with MLC, the "**Debtors**" and/or

"**Debtors/Assignors**"), General Motors, LLC (the "**Assignee**"), and ACE American

Insurance Company, on behalf of itself and its affiliated insurers and reinsurers

EXHIBIT   –   B

(collectively "**ACE**" and together with the Debtors, the "**Parties**"), hereby enter into this Stipulation and Agreed Order (the "**Stipulation**") and stipulate and agree as follows[1]:

<u>RECITALS</u>

A.    **WHEREAS**, ACE provides various forms of insurance and reinsurance to the Debtors (hereinafter, the "**ACE Policies**"), including but not limited to general liability, automobile liability, employer responsibility, officers and directors and umbrella/excess coverage; and

B.    **WHEREAS**, the ACE Policies include, but are not limited to, the policies listed on **Exhibit A** hereto.

C.    **WHEREAS**, in connection with and in addition to the ACE Policies, the Debtors and ACE have entered into numerous related agreements (hereinafter, the "**ACE Agreements**"), including but not limited to binders and a security agreement; and

D.    **WHEREAS**, the ACE Agreements include, but are not limited to, the agreements listed on **Exhibit B** hereto; and

E.    **WHEREAS**, the ACE Policies and ACE Agreements include documents comprising a Foreign Casualty Insurance Program under which ACE provides, among other things, general liability, employers responsibility liability, employee benefits liability, automobile liability, contingent automobile, and Defense Base Act insurance; and

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to them in the ACE Policies and ACE Agreements (each as defined below) as applicable.

F.     **WHEREAS**, the Foreign Casualty Insurance Program involves a series of Master Policies issued by ACE to the Debtors, as well as a series of Local Policies issued by ACE and ACE partner companies to the Debtors and/or to their foreign subsidiaries and affiliates; and

G.     **WHEREAS**, the ACE Policies and ACE Agreements remain in effect to the extent required by their terms and conditions; and

H.     **WHEREAS**, the following are representative examples of some of the Debtors' obligations under the ACE Polices and ACE Agreements, although each obligation listed below is not necessarily due under each and every Ace Policy or ACE Agreement:

a.     Payment of premiums;

b.     Reimbursement of ACE for certain claims;

c.     Provision and maintenance of collateral security;

d.     Provision and maintenance of paid loss deposit funds and similar funds for payment of claims;

e.     Cooperation in the investigation, administration, and settlement of claims in accordance with the terms of the relevant policies;

f.     Defense of claims in accordance with the terms of the relevant policies; and

g.     Maintaining primary insurance coverage in accordance with the terms of the relevant policies; and

I.     **WHEREAS**, the following are representative examples of some of ACE's continuing obligations under the ACE Policies and ACE Agreements, although each

3

obligation listed below is not necessarily due under each and every Ace Policy or ACE Agreement:

    a.    Providing insurance coverage;

    b.    Paying covered claims in accordance with the terms of the relevant policies; and

    c.    Defending the insured(s) in accordance with the terms of the relevant policies; and

J.    **WHEREAS**, under the ACE Policies and ACE Agreements, ACE has on-going and material obligations to the Debtors, and the Debtors have on-going and material obligations to ACE; and

K.    **WHEREAS**, accordingly, the ACE Policies and ACE Agreements are executory contracts within the meaning of 11 U.S.C. § 365; and

L.    **WHEREAS**, on June 1, 2009, the Debtors commenced Chapter 11 bankruptcy cases (the "**Bankruptcy Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), and

M.    **WHEREAS**, also on June 1, 2009, the Debtors filed a Motion Pursuant to 11 U.S.C. §§363(b), 503(b) and 105(a) and Fed. R. Bank. P. 6003 and 6004 (I) Authorizing Debtors To (a) Continue Their Liability, Product, Property and Other Insurance Programs and (b) Pay All Obligations in Respect Thereof (the "**Insurance Motion**") [Docket No. 72]. In the Insurance Motion, the Debtors/Assignors stated among other things that the continuation of their Insurance Programs (as defined in the Insurance Motion) and the payment of all undisputed prepetition and postpetition

Insurance Obligations (as defined in the Insurance Motion) was essential to preserve the Debtors' business and preserve the value of the Debtors' estates for all creditors; and

N.    **WHEREAS**, on June 1, 2009, the Court issued a now-final order granting the Insurance Motion (the "**Insurance Order**") [Docket No. 172]. Among other things, the Insurance Order authorized and empowered the Debtors/Assignors to maintain their Insurance Programs without interruption and authorized the Debtors/Assignors to pay all undisputed Insurance Obligations, including those that were due and payable before commencement of the Bankruptcy Cases and those that are or become due and payable after the same. The Insurance Order expressly provided that it did not constitute an assumption of any Insurance Programs; and

O.    **WHEREAS**, in connection with the Bankruptcy Cases, the Debtors/Assignors and the Assignee entered into an Amended and Restated Master Sale and Purchase Agreement, dated June 26, 2009 (the "**MSPA**"). The MSPA, among other things, effectuated the sale and transfer of substantially all of the assets of the Debtors/Assignors to the Assignee; and

P.    **WHEREAS**, on July 5, 2009, the Bankruptcy Court issued an Order (i) Authorizing Sale of Assets Pursuant to the MSPA, (ii) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in connection with the Sale and (iii) Granting Related Relief (the "**Sale Order**") [Docket No. 2968]; and

Q.    **WHEREAS**, pursuant to the MSPA, the "Purchased Assets" include all the Debtors' insurance policies and the rights to proceeds thereof, other than certain identified policies that were specifically excluded from the sale. (*See* MSPA at § 2.2(a)(xvii)); and

R.    **WHEREAS**, pursuant to the MSPA, the "Purchased Contracts" include all "Contracts" other than "Excluded Contracts."  For clarity, "Purchased Contracts" include any "Executory Contract" designated as an "Assumable Executory Contract" as of the applicable "Assumption Effective Date." (*See* MSPA at § 2.2(a)(x)); and

S.    **WHEREAS**, the ACE Policies and ACE Agreements are "Purchased Assets" and/or "Purchased Contracts" under the MSPA; and

T.    **WHEREAS**, pursuant to the MSPA, as approved by the Sale Order, the Debtors are authorized to assume all executory contracts and assign them to the Assignee subject to resolution or overruling of any objections of the counterparties to such contracts (*See* MSPA at §§ 2.2(a)(x); 2.2(b)(vii); 2.4; and 6.6)); and

U.    **WHEREAS**, in order to further effectuate and implement the transaction authorized by the Sale Order and memorialized in the MSPA, on or about September 8, 2009, the Debtors/Assignors, ACE, and Assignee entered into an Assumption and Assignment Agreement to facilitate the assumption and assignment of the ACE Policies and ACE Agreements on the terms and conditions contained therein, and with the consent of ACE; and

V.    **WHEREAS**, the Debtors/Assignors, ACE, and Assignee wish to amend and restate the terms of the Assumption and Assignment Agreement as set forth herein; and

W.    **WHEREAS**, it is the intention of the Parties that coverage available under the ACE Policies be allocated and responsive to liabilities in the manner and to the extent that such liabilities have been allocated by the Debtors/Assignors and the Assignee under the MSPA.  It is not the intention of the Parties to expand, increase, alter, or otherwise

modify the terms and conditions of any of the ACE Policies and/or the obligations of ACE under the ACE Policies and ACE Agreements; and

X.    **WHEREAS**, counsel to the Unsecured Creditors Committee in these Bankruptcy Cases has reviewed this Stipulation and does not object to its entry; and

Y.    **WHEREAS**, based on the foregoing, the Parties have determined to consensually resolve this matter by entering into this Stipulation.

**NOW, THEREFORE, IT IS STIPULATED AND AGREED,** by and between the Parties that:

## AGREEMENT

1.    Incorporation of Recitals. The foregoing Recitals are incorporated herein as if set forth in full.

2.    Effective Date. This Stipulation shall be effective as of the date on which it becomes a final order that is not subject to appeal or stay (the "**Effective Date**"), unless otherwise mutually agreed to by the Parties.  The Stipulation shall be effective immediately upon entry and the requirements of Fed. R. Bankr. P. 6006(d) are waived.

3.    Assumption of ACE Policies and ACE Agreements. Pursuant to 11 U.S.C. § 365 and the orders of the Bankruptcy Court, and to the extent one or more of them is a named insured, an additional insured, or an insured of any kind, the Debtors/Assignors, individually and collectively, subject to the terms of this Stipulation, hereby assume the ACE Policies and ACE Agreements in full as of the Effective Date. In order to effectuate this assumption, the Assignee shall cure the defaults listed on **Exhibit C** attached hereto by paying ACE the sum set forth on **Exhibit C** within five days after the Effective Date.

4.   Assignment of ACE Policies and ACE Agreements.   Pursuant to 11 U.S.C. § 365, and to the extent one or more of them is a named insured, an additional insured, or an insured of any kind, as of the Effective Date the Debtors/Assignors, individually and collectively, subject to the terms of this Stipulation, hereby assign and transfer the ACE Policies and ACE Agreements to the Assignee, and the Assignee hereby accepts the assignment of the ACE Policies and ACE Agreements.  Once this Stipulation becomes effective pursuant to the provisions of Paragraph 2 hereof, the Assignee may, upon notice to ACE and conditioned on ACE's consent, which consent shall not be unreasonably withheld, assign the ACE Policies and ACE Agreements, or any of them, to Assignee's parents, subsidiaries, or affiliates, and  ACE will cooperate with the Assignee to facilitate such assignments.

5.   Allocation of Coverage and Proceeds under ACE Policies.   The Debtors/Assignors and the Assignee, with the consent of ACE, hereby allocate coverage and proceeds otherwise available under the ACE Policies as follows:

a.   Insofar as the ACE Policies apply to the "Assumed Liabilities," as that term is defined in § 2.3(a) of the MSPA or a liability of one of Assignee's "Purchased Subsidiaries" as that term is defined in Article I of the MSPA, coverage and proceeds otherwise available under the ACE Polices shall be available to the Assignee or such covered Purchased Subsidiaries.

b.   Insofar as the ACE Policies apply to the "Retained Liabilities," as that term is defined in § 2.3(b) of the MSPA or a liability of one of the Assignor's "Retained Subsidiaries" as that term is defined in Article I of the MSPA, coverage and

8

proceeds otherwise available under the ACE Policies shall be available to the Debtors/Assignors or such covered Retained Subsidiary.

c.      In order to facilitate the allocation of coverage and proceeds between the Debtors/Assignors and the Assignee, ACE shall, as necessary, issue policy endorsements in the form attached hereto as **Exhibit D**.

d.      Except as expressly set forth herein, nothing in this Stipulation is intended to increase, expand, enhance, change, or otherwise alter the scope of coverage under the ACE Policies. Except as expressly set forth herein, all the terms and conditions of the ACE Policies remain in full force and effect. ACE shall be under no obligation whatsoever to determine the applicability of any ACE Policy, and/or the availability of coverage or proceeds thereunder, with respect to any underlying claim against the Assignors/Debtors, the Assignee, or both. Such issues shall be determined solely by and between the Assignors/Debtors and the Assignee, at their sole cost and expense. ACE shall in no event be responsible or liable for any allocation or alleged mis-allocation of coverage or proceeds. The Debtors/Assignors and Assignee hereby release and hold ACE harmless from any responsibility or liability for any loss, cost, damage, or expense incurred by Debtors/Assignors or Assignee relating to such allocation or mis-allocation as between the Assignor and Assignee.

6.      Performance of Obligations under the ACE Policies and ACE Agreements by the Assignee and Debtors/Assignors.    Upon and after the completion of the assumption and assignment described herein:

a.      Monetary Obligations. The Assignee shall perform, observe, pay, satisfy, fulfill, and discharge any and all now existing and hereafter arising monetary

duties, requirements, terms, conditions, provisions, covenants, liabilities, and other obligations under the ACE Policies and ACE Agreements (individually and collectively, the "**Monetary Obligations**"). By way of example and not of limitation, the Assignee shall be solely responsible to perform all the Monetary Obligations under (i) the Security Agreement entered into by the Debtors/Assignors and ACE on or about April 28, 2009 (the "**Security Agreement**"), which is attached as **Exhibit E** hereto; (ii) the United Kingdom Employers Liability Policies (the "**UKEL Policies**") previously issued by ACE to the Debtors/Assignors, including the obligation thereunder to reimburse to ACE the first £100,000 (one hundred thousand pounds sterling) per claim; and (iii) all other ACE Policies and ACE Agreements. The Debtors/Assignors shall have no liability for Monetary Obligations.

   b.    Non-Monetary Obligations. The Assignee shall perform, observe, satisfy, fulfill and discharge any and all now existing and hereafter arising non-monetary obligations under the ACE Policies and ACE Agreements to the extent such non-monetary obligations arise out of or relate to the Assumed Liabilities (as this term is defined in §2.3(a) of the MSPA) and/or to the ACE Foreign Casualty Insurance Program described in Paragraphs E and F of this Stipulation. The Debtors/Assignors shall perform any and all non-monetary obligations under the ACE Policies and ACE Agreements to the extent that such non-monetary obligations arise out of or relate to the Retained Liabilities (as this term is defined in §2.3(b) of the MSPA); provided, however, that nothing in this Stipulation is intended to or should be construed to impose upon the Debtors/Assignors or ACE any obligations in excess of those that would have been imposed upon them by the Bankruptcy Code if the Debtors/Assignors had not assumed

10

the ACE Policies and ACE Agreements.  All of the rights of the Debtors and ACE under the Bankruptcy Code are expressly reserved as if the ACE Policies and ACE Agreements had not been assumed.

        c.      <u>Administration and Handling of Claims.</u>  The Assignee shall perform all administration and handling of claims (directly and/or through its third-party administrator) for claims that arise out of or relate to the Assumed Liabilities (as this term is defined in § 2.3(a) and the MSPA).  The Debtors/Assignors shall perform all administration and handling of claims (directly and/or through their third-party administrator) for claims that arise out of or relate to the Retained Liabilities (as this term is defined in § 2.3(b) and the MSPA); <u>provided</u>, <u>however</u>, that the Debtors/Assignors shall be deemed to have complied with this Paragraph 6.c. by administering all claims in accordance with their rights under the Bankruptcy Code, the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) establishing the Deadline for Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(b)(9)) and Procedures Relating Thereto and Approving Form and Manner of Notices Thereof [Docket No. 4079], and the Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 3007 and 9019(b) Authorizing the Debtors to (I) File Omnibus Claims Objections and (II) Establishing Procedures for Settling Certain Claims [Docket No. 4180].  Any claims within the potential coverage of the ACE Policies shall be settled in accordance with the terms and conditions of such policies, including without limitation notice to and approval of the settlement by ACE if notice and/or approval are required by the terms of the applicable ACE Policy.  ACE shall be under no obligation whatsoever to determine whether administration or handling of an individual underlying claim is the

responsibility of the Debtors/Assignors or the Assignee. Such issues shall be determined solely by and between the Debtors/Assignors and the Assignee, at their sole cost and expense. ACE shall not be made a party to any proceeding relating to such issues. The Debtors/Assignors and Assignee hereby release and hold ACE harmless from any responsibility or liability for any loss, cost, damage, or expense incurred by Debtors/Assignors or Assignee relating to such allocation or mis-allocation as between the Assignor and Assignee.

7. <u>Substitute Letter of Credit.</u> In further implementation of the MSPA, and as authorized by §§ 6.19 and 2.2(a)(xii) thereof, the Assignee shall furnish ACE with a clean, unconditional, irrevocable, automatically renewable, evergreen substitute Letter of Credit in a form and from a financial institution acceptable to ACE. The replacement Letter of Credit shall be in the initial amount of $20,074,166.00. Assignee shall deliver the replacement Letter of Credit within the time required by the August 31, 2009 Foreign Casualty Binder, but in no event later than September 30, 2009. Unless and until ACE receives the satisfactory replacement Letter of Credit, ACE shall not be under any obligation to return any collateral currently being held by ACE.

8. <u>Addition of ACE Policies and ACE Agreements.</u> The Parties hereto acknowledge and agree that this Stipulation shall apply comprehensively to all ACE Policies and ACE Agreements identified in the future that the Parties agree should be assumed and assigned to Assignee and (i) any such newly identified Ace Policies or ACE Agreements shall be added to **Exhibit A** or **Exhibit B**, as applicable, (ii) Assignee shall promptly pay any valid cure amounts associated with such ACE Policies or ACE Agreements, and (iii) the Monetary Obligations, non-monetary obligations, and

administration and handing of the claims under any added ACE Policies or ACE Agreements will be allocated in accordance with the terms of this Stipulation regarding assumption and assignment of newly-identified policies and agreements pursuant to this paragraph shall not be unreasonably withheld.

9.     Amendment of the ACE Policies and ACE Agreements.   After this Stipulation is fully executed, entered by the Court and becomes final, and the Debtors/Assignors and the Assignee fully perform their obligations under this Stipulation, the ACE Policies shall be amended by issuance of Endorsements, as required, in the form attached as **Exhibit D** hereto and this Stipulation shall constitute an amendment to each of the ACE Agreements.

10.    Non-Executory Contracts.  In the event that any of the ACE Policies or the ACE Agreements are deemed by a court of law to be non-executory under 11 U.S.C. § 365, then, with the consent of ACE given pursuant to § 2.4(a) of the MSPA, each such ACE Policy or ACE Agreement is hereby assigned by the Debtors/Assignors to the Assignee pursuant to 11 U.S.C. § 363 and § 2.2(a)(x) of the MSPA, and the coverage and performance of the obligations thereunder is allocated by and between the Debtors/Assignors and the Assignee in accordance with the provisions in Paragraphs 5 and 6 above.

11.    No Change in Contractual Rights.  Except as expressly set forth herein, nothing in this Stipulation shall in any way directly or indirectly waive, impair, expand, or otherwise modify in any respect the legal, equitable, or contractual rights and defenses of the parties to the ACE Policies and ACE Agreements under applicable non-bankruptcy law.  By way of example and not of limitation, nothing in this Stipulation shall directly or

indirectly expand the scope of insurance coverage available under any ACE Policy or ACE Agreement, increase the amount of proceeds available under any ACE Policy or ACE Agreement, or increase the policy limits stated in any ACE Policy or ACE Agreement. The rights and obligations of the parties to the ACE Policies and ACE Agreements shall be determined solely by the terms and conditions of such policies and agreements, including any and all terms, conditions, limitations, exclusions, endorsements, and amendments thereof, which shall all remain in full force and effect as before the commencement of the Bankruptcy Cases and under applicable non-bankruptcy law.

12.   <u>Governing Law</u>. This Stipulation shall be governed and construed in accordance with the laws of the State of New York.

13.   <u>No Third Party Beneficiaries</u>. This Stipulation is for the sole benefit of the Parties thereto, namely the Debtors/Assignors, the Assignee, and ACE. It is not intended to benefit any third person or entity who is not a party hereto, and thus no third party shall be able to claim to be a beneficiary hereof.

14.   <u>No Modification</u>. As of the Effective Date, this Stipulation shall be binding on the Debtors/Assignors, the Assignee and ACE, and shall not be modified by any plan of reorganization or liquidation entered in the Bankruptcy Cases. This Stipulation may not be modified orally but only in a writing signed by all the Parties hereto and approved by the Court.

15.   <u>Construction</u>. This Stipulation is a product of arms-length negotiations between the Parties who have been represented by counsel. It shall not be construed in favor of or against any of the Parties hereto as the drafting party.

16.     NMO Expenses.   In the event that the Debtors/Assignors fail to perform their non-monetary obligations pursuant to the ACE Agreements or ACE Policies to the extent that such non-monetary obligations arise out of or relate to the Retained Liabilities (as this term is defined in §2.3(b) of the MSPA), and ACE incurs any damages, losses, fees, costs, or expenses as a result of such failure (individually and collectively, "**NMO Expenses**"), then ACE may submit a request for payment of the NMO Expenses to the Court and such request shall be resolved under Paragraph 17 below; provided, however, that nothing in this Stipulation is intended to or should be construed to impose upon the Debtors/Assignors or ACE any obligations in excess of those that would have been imposed upon them by the Bankruptcy Code and the applicable non-bankruptcy law if the Debtors/Assignors had not assumed the ACE Policies and ACE Agreements.

a.      Any request for NMO Expenses must include supporting documentation and be set for notice and a hearing in the Bankruptcy Cases.

b.      ACE reserves its right to assert that the NMO Expenses constitute administrative expenses of the Debtors' bankruptcy estates (the "**Estates**") under 11 U.S.C. §503, and the Debtors and other parties in interest reserve their rights to (A) oppose ACE's position and to deny that the NMO Expenses constitute administrative expenses of the Estates under 11 U.S.C. §503 and (B) oppose the validity of the NMO Expenses.

c.      The Debtors and ACE hereby agree that, solely for the purposes of determining whether the NMO Expenses constitute administrative expenses of the Estates under 11 U.S.C. § 503, the ACE Policies and ACE Agreements shall not be deemed assumed.

d.   ACE shall promptly notify Assignee in writing of all NMO Expense claims it asserts against the Debtors and provide Assignee with copies of all documentation in support of such claims.

e.   For the sake of clarity, "NMO Expenses," as defined in this Stipulation, do not include any sums that ACE may become obligated to pay pursuant to Paragraph 5.a. of this Stipulation; any costs, fees, or expenses ACE may incur in contesting coverage under any of the ACE Policies or ACE Agreements; or any amounts that the Assignee may become obligated to pay pursuant to Paragraph 6.a of the Stipulation.

17.   Procedure for Resolving NMO Expense Claims.

a.   To the extent the Court rules that claimed NMO Expenses are valid and constitute administrative expenses of the Debtors under 11 U.S.C. §503, ACE shall have an allowed administrative expense claim against the Debtors.

b.   To the extent the Court rules that claimed NMO Expenses are valid and constitute general unsecured claims against the Estates, ACE will have an allowed general unsecured claim against the Debtors (the "**NMO General Unsecured Claim**"). The Assignee shall pay to ACE the portion of each NMO General Unsecured Claim not paid by the Debtors to the extent the NMO General Unsecured Claims would have been paid if they were allowed administrative expense claims against the Debtors, pursuant to the following:

(i)   For purposes of this Paragraph 17(b), the term "$A" shall mean the amount that would have been paid to ACE by the Debtors had the Court ruled

that an NMO General Unsecured Claim constituted an administrative expense of the Estate under 11 U.S.C. §503.

(ii)   For the purposes of this Paragraph 17(b), the term "$D" shall mean the difference between $A and the amount actually collected by ACE from the Debtors on account of the NMO General Unsecured Claim.

(iii)   For the purposes of this Paragraph 17(b), the term "$P" shall mean the amount to be paid by the Assignee to ACE as compensation for the NMO Expenses.

(iv)   If $D is less than or equal to $150,000, then $P shall be equal to $D.

(v)   If $D is greater than $150,000, but is less than or equal to $300,000, then $P shall be equal to $150,000 + (($D-$150,000) x 0.8).

(vi)   If $D is greater than $300,000, but is less than or equal to $450,000, then $P shall be equal to $270,000 + (($D - $300,000) x 0.6).

(vii)   If $D is greater than $450,000, then $P shall be equal to $360,000 + (($D - $450,000) x 0.5), but no greater than $550,000.

c.   In the event that (x) either (i) the Estates are closed at the time that ACE incurs NMO Expenses, or (ii) no further distributions from the Estates are available, and (y) ACE notifies Assignee in writing of such NMO Expenses within five (5) years after the date of the Stipulation, ACE's claim for NMO Expenses shall be resolved as follows:

(i)   Upon ACE's written demand and within ten (10) business days thereof, ACE and the Assignee, through their authorized representatives, shall meet

17

and attempt, in good faith, to jointly determine the amount to be paid to ACE by the Assignee under the terms and conditions of this Stipulation, or as otherwise agreed to by Assignee and ACE.

(ii)    In the event that such a meeting does not result in an amicable resolution, then within ten (10) business days after such a meeting, ACE and the Assignee shall jointly appoint a neutral mediator.

(iii)   The mediator shall be a lawyer with experience in bankruptcy law. The fees and expenses of the mediator shall be shared equally by ACE and the Assignee.

(iv)   Said mediator shall determine the amount, if any, of the claimed NMO Expenses that would have been allowed as administrative expenses of the Estates under 11 U.S.C. §503, assuming the Debtors had assumed the ACE Policies and ACE Agreements.

(v)    Said mediator shall further determine the amount, if any, of the claimed NMO Expenses to be paid to ACE by the Assignee using the formulas set forth in Paragraph 17(b) above.

(vi)   For the purposes of applying the formulas set forth in Paragraph 17(b) above where the Estates are closed, "$D" shall be the amount determined by the mediator pursuant to Paragraph 17(c)(iv) above.

(vii)   ACE and the Assignee hereby agree that the decision of the mediator shall be final and binding.

d.    Assignee's aggregate payment obligations to ACE under this Paragraph 17 in connection with the NMO Expenses shall not exceed $550,000.

e.      For the purposes of determining ACE's entitlement to reimbursement from Assignee of its NMO Expenses under the terms and conditions of Paragraph 17, ACE and the Assignee shall assume that the ACE Policies and ACE Agreements constitute executory contracts that have been assumed by the Debtors/Assignors notwithstanding the proviso clauses at the end of Paragraphs 6(b) and 16(c), and that the Debtors/Assignors have failed to perform their non-monetary obligations under the ACE Policies and ACE Agreements, but this assumption shall have no effect on the obligations of Debtors/Assignors under this Stipulation.

18.     <u>Notices.</u>  All written notices that are required under the terms of this Stipulation shall be delivered via facsimile or first-class mail addressed as follows:

| | |
|---|---|
| If to ACE, then to: | Legal Department<br>The ACE Group<br>436 Walnut Street, WA04K<br>Philadelphia, PA 19106<br>Facsimile No. 215-640-1417 |
| With a copy to | Jeffrey A. Less, Esq.<br>Helen Heifets, Esq.<br>Bazelon Less & Feldman, P.C.<br>1515 Market Street, Suite 700<br>Philadelphia, PA 19102<br>Facsimile No: 215-568-9319 |
| If to General Motors LLC, then to | Alan G. Gier<br>Director, Global Risk Financing &<br>Insurance<br>482-C19-D36<br>300 Renaissance Center, P.O. Box 300<br>Detroit, MI 48265-3000<br>Facsimile No.: 313-665-0985 |
| With a copy to | Robert B. Weiss, Esq.<br>Honigman Miller Schwartz and Cohn LLP<br>2290 First National Building<br>660 Woodward Avenue |

Detroit, MI 48226
Facsimile No.: 313-465-7597

If to Debtors, then to                Joseph H. Smolinsky, Esq.
                                      Evan S. Lederman, Esq.
                                      WEIL, GOTSHAL & MANGES LLP
                                      767 Fifth Avenue
                                      New York, New York 10153
                                      Facsimile No.: 212-310-8007

19.   <u>Withdrawal of Objection.</u> Within ten (10) calendar days of the Effective

Date, ACE will withdraw its Limited Objection of ACE American Insurance Company to

Motion of Debtors, Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), (m), and 365 and Fed

R. Bankr. P. 2002, 6004 and 6006, to Approve (A) the Sale Pursuant to the Master Sale

and Purchase Agreement with Vehicle Acquisition Holdings, LLC, a U.S. Treasury-

Sponsored Purchaser, Free and Clear of Liens, Claims, and Encumbrances, and Other

Interests; (B) the Assumption and Assignment of Certain Executory Contracts and

Unexpired Leases; and (C) Other Relief [Docket No. 1999] and the Limited Objections of

ACE America Insurance Company and Affiliated Companies to Notice of (I) Debtors'

Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal

Property and Unexpired Leases of Non-Residential Real Property and (II) Cure Amounts

Related Thereto [Docket No. 3135]; and its July 13, 2009 Limited Objections [Docket

No. 3135] to Debtors' Notice of Intent To Assume and Assign Executory Contracts; and

its July 21, 2009 Motion To Compel Debtors To Assume or Reject Insurance Policies and

Related Agreements [Docket No. 3272].

20.   <u>ACE Non-NMO Claims.</u> Except with respect to NMO Expenses that may

be asserted against the Debtors pursuant to Paragraph 16 of this Stipulation, any and all

claims held by ACE against the Debtors prior to the Effective Date related to the ACE Polices and ACE Agreements shall be deemed released and withdrawn.

21.     Transfer.   Notwithstanding any other provision of this Stipulation, ACE agrees that the rights of the Debtors/Assignors hereunder in the ACE Policies and ACE Agreements, and in any insurance coverage or proceeds thereunder, may be transferred to any trusts that may be subsequently established in the Bankruptcy Cases as successors to the Debtors/Assignors with respect to their insured liabilities, and that it will not object to any such transfer.

22.     Jurisdiction.   The Bankruptcy Court shall retain jurisdiction with regard to any dispute involving the Debtors arising out of this Stipulation (including, without limitation, the Debtors' liability for any NMO Expenses).

Stipulated and Agreed to on this 31st day of March 2010.

MOTORS LIQUIDATION COMPANY (formerly known as General Motors Corporation)

MLCS, LLC (formerly known as Saturn, LLC)

BY: /s/ David Head
Name: David Head
Title: Vice President

BY: /s/ David Head
Name: David Head
Title: Vice President

MLCS DISTRIBUTION CORPORATION (formerly known as Saturn Distribution Corporation)

MLC OF HARLEM, INC. (formerly known as Chevrolet-Saturn of Harlem, Inc.)

BY:  /s/ David Head
Name: David Head
Title: Vice President

BY: /s/ David Head
Name: David Head
Title: Vice President

GENERAL MOTORS LLC

ACE AMERICAN INSURANCE COMPANY, on its own behalf and on behalf of its affiliated insurers and reinsurers

BY: /s/ Alan G. Gier
Name: Alan G. Gier
Title: Director, Global Risk Management & Insurance

BY: /s/ Clint Johnson
Name: Clint Johnson
Title: Executive Vice President

**SO ORDERED** this *15th* day *April* of 2010

*s/ Robert E. Gerber*
UNITED STATES BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————X

In re                                              :        **Chapter 11 Case No.**

                                                   :

**GENERAL MOTORS CORP.,** *et al.,*                :        **09-50026 (REG)**

                                                   :

                               **Debtors.**        :        **(Jointly Administered)**

                                                   :

———————————————————X

## LIMITED OBJECTION TO THE MOTION BY GM TO ASSUME CERTAIN REINSURANCE CONTRACTS ISSUED BY ASPEN INSURANCE UK LIMITED TO GENERAL INTERNATIONAL LIMITED

Nixon Peabody LLP represents Aspen Insurance UK Limited ("Aspen") and files this limited objection to the motion of General Motors Corporation ("GM") to assume certain reinsurance contracts issued by Aspen to General International Limited ("GIL"), a Bermuda based non-debtor affiliate of GM, in 2007 and 2008.  Aspen is a company organized and existing under English law.

### Objection

On the GM website two reinsurance policies issued by Aspen to GIL under ID #5716-01227088 and #5716-01227089 are listed as executory contracts which GM intends to assume in this bankruptcy action.  They are mistakenly referred to as GM "Excess Liability Insurance" policies.  (A copy of the website page and Reinsurance Agreement are annexed as Exhibit A.)

However, these policies, which are reinsurance policies, are not subject to assumption since the counterparty to these reinsurance policies is GIL, a non-debtor GM affiliate.  .  As set forth in the reinsurance documents , Aspen (as a reinsurer) only entered into the reinsurance contracts with GIL (its reinsured).  Also, as referenced in the reinsurance contracts, GM has its own separate insurance policies with GIL.  According to the express terms of the contracts, they

12736178.1                          EXHIBIT   -   C

cannot be assumed by GM, since GIL is the reinsurance policy owner. It was simply a mistake to refer to the reinsurance contracts as excess liability insurance policies of GM and to otherwise include them in the list of executory contracts GM intends to assume in the bankruptcy action.

For all the above reasons,, Aspen would object to any attempt by GM to assume these reinsurance policies and they should be removed from the executory contract website and that the court grant such other and further to Aspen as may be just and appropriate..

Dated:     October 8, 2009

NIXON PEABODY LLP

By: _____

Dennis Drebsky
Attorneys for Aspen
437 Madison Avenue
New York NY 10022
Tel.: (212) 940-3091



*Exhibit A*



**A S P E N**

ASPEN INSURANCE

### FACULTATIVE REINSURANCE FORM

### REINSURING AGREEMENT

Whereas the Reinsured has issued a Policy to the Original Insured named in Item 5 of the Reinsurance Declarations and in consideration of the premium stated in Item 15 of the Reinsurance Declarations, this Contract of reinsurance (hereinafter referred to as "Reinsurance") reinsures the interests of the Reinsured in the Original Policy, . referred to in Item 4 of the Reinsurance Declarations

Subject otherwise to the statements contained in the Reinsurance Declarations and any other limitation or condition set forth herein (or as may be endorsed hereto), this Reinsurance is subject to the same terms, clauses and conditions of the Original Policy referred to in Item 4 of the Reinsurance Declarations. Any changes agreed by the Reinsured after the inception date of this Policy are to be agreed by the Reinsurers. Subject in all respects, other than as amended hereon in this Reinsurance Agreement, to the same terms, clauses and conditions as the Original Policy (attached herein), Reinsurer(s) agree to indemnify the Reinsured in respect of all covered losses arising out of and in connection with the Original Policy issued to the Original Insured.

The Reinsurers shall bear their respective proportion of any expenses incurred, whether legal or otherwise, in the investigation and defense of any claim hereunder. Such respective proportion of any expenses incurred shall be payable on the same basis as the Original Policy and may therefore be included within the Limit(s) of Liability stated in Item 11 of the Reinsurance Declarations.

### CONDITIONS

**1.    CURRENCY**

All premiums shall be paid in the currency stated in Item 16 of the Reinsurance Declarations. All losses shall be paid in the currency stated in Item 16 of the Reinsurance Declarations, however, if specifically requested by the Reinsured, payment will be made in any equivalent currency at the rate of exchange prevailing on the date of settlement.

**2.    CANCELLATION**

In the event of non-payment of premium, this Reinsurance may only be cancelled by the Reinsurer pro-rata. The Reinsurer must mail (registered mail or other such like means) or deliver to the Reinsured not less than fifteen (15) days advance notice stating when the cancellation is to take effect.

**3.    SUBROGATION**

The Reinsurers will be paid or credited by the Reinsured with their proportion of the subrogation, i.e. reimbursement obtained or recovery made by the Reinsured, less the actual cost (excluding the salaries and office expenses of the Reinsured) of obtaining such reimbursement or making such recovery. Salvage shall be applied in the inverse order in which liability attaches.

**4.    INSOLVENCY**

In the event of the insolvency of the Reinsured, this reinsurance shall be payable



# ASPEN
ASPEN INSURANCE

directly to the Reinsured, or its liquidator, receiver, conservator, or statutory successor immediately upon demand on the basis of the liability of the Reinsured without diminution because of the insolvency of the Reinsured or because the liquidator, receiver, conservator, or statutory successor of the Reinsured has failed to pay all or a portion of any claim.

It is agreed, however, that the liquidator, receiver, conservator, or statutory successor of the Reinsured shall give written notice to the Reinsurer of the pendency of a claim against the Reinsured which would involve a possible liability on the part of the Reinsurer, , within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership. It is further agreed that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defense or defenses that it may deem available to the Reinsured or its liquidator, receiver, conservator, or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to approval of the Court, against the Reinsured as part of the expense of conservation or liquidation to the extent of a pro rata share of the benefit which may accrue to the Reinsured solely as a result of the defense undertaken by the Reinsurer.

Where two or more Reinsurers are involved in this reinsurance and a majority in interest elect to interpose defense to such claim, the expense shall be apportioned in accordance with the terms of this Reinsurance as though such expense had been incurred by the Reinsured.

The reinsurance shall be payable by the Reinsurer to the Reinsured or to its liquidator, receiver, conservator, or statutory successor, except (a) where this reinsurance specifically provides another payee of such reinsurance in the event of the insolvency of the Reinsured; (b) where the Reinsurer with the consent of the direct insured or insureds has voluntarily assumed such original policy obligations of the Reinsured as direct obligations of the Reinsurer to the payees under the Policy reinsured and in substitution for the obligations of the Reinsured to the payees; or (c) where provided otherwise under applicable law. Then, with the prior approval of the applicable regulatory authority, if required, the Reinsured is entirely released from its obligation and the Reinsurer shall pay any loss directly to payees under the Policy reinsured.

## Cut Through Provision

It is understood and agreed that Reinsurers will, if requested by the Original Insured, pay directly to the Original Insured the amount due by Reinsurers under this Reinsurance Agreement in respect of a claim under the Original Policy, subject to the terms, conditions and exceptions of the Original Policy, this Reinsurance Agreement and provided always that all of the following conditions are fulfilled:-

(a) The Reinsured is unable to effect payment by reason of insolvency or liquidation and payment by Reinsurers has not already been paid or credited to the Reinsured;

(b) The Reinsured is liable for the claims in question both as to liability and quantum in accordance with the terms and conditions of the Original Policy and this Reinsurance Agreement or has been required to make payment in accordance with any arbitration clause appearing therein;

(c) The Reinsured by its receiver or liquidator instructs the Reinsurers in writing to make a direct payment to the Original Insured. Such instructions shall be expressly irrevocable and shall provide that any payment made directly to the Original Insured relieves Reinsurers of any and all further liability towards the Ceding Company or its receiver or liquidator with respect to such quantum of the claim in question paid by



ASPEN
ASPEN INSURANCE

Reinsurers;

(d)     The Reinsured by its liquidator or receiver proves to Reinsurers' satisfaction that a
        direct payment to the Original Insured:

        (i)      does not violate contradict or subvert any applicable currency or
                 exchange regulations or any insolvency laws;

        (ii)     does not expose Reinsurers to any possibility of further or double
                 liability in respect of the same claim under the Original Policy.

Before making a direct payment to the Original Insured hereunder, Reinsurers shall
have the right to deduct from such payment any overdue premiums relating to the
said insurance policy owed by the Reinsured to Reinsurers.

5.      **GOVERNING LAW**

This Reinsurance shall be governed by and construed in accordance with the laws of
England and Wales, and shall not be subject to the provisions of the Law of
Construction and Interpretation condition in the Original Policy.

6.      **ARBITRATION**

(a)     Any dispute, controversy or claim arising out of or relating to this Reinsurance
        Agreement, or the breach, termination or invalidity thereof shall be finally and
        fully determined in London, England under the provisions of the Arbitration
        Acts of 1996 and/or any statutory modifications or amendments thereto, for
        the time being in force, by a Board composed of three arbitrators to be
        selected for each controversy as follows:

        Any party may, in the event of such a dispute, controversy or claim,
        notify the other party or parties to such dispute, controversy or claim
        of its desire to arbitrate the matter, and at the time of such notification
        to the party desiring arbitration shall notify any other party or parties
        of the name of the arbitrator selected by it. The other party who has
        been so notified shall within thirty (30) calendar days thereafter select
        an arbitrator and notify the party desiring arbitration of the name of
        such second arbitrator. If the party notified of a desire for arbitration
        shall fail or refuse to nominate the second arbitrator within thirty (30)
        calendar days following the receipt of such notification, the party who
        first served notice of a desire to arbitrate will, within an additional
        period of thirty (30) calendar days, apply to a judge of the High Court
        of Justice of England and Wales for the appointment of a second
        arbitrator and in such a case the arbitrator appointed by such a judge
        shall be deemed to have been nominated by the party or parties who
        failed to select the second arbitrator. The two arbitrators, chosen as
        above provided, shall within thirty (30) calendar days after the
        appointment of the second arbitrator choose a third arbitrator. In the
        event of the failure of the first two arbitrators to agree on a third
        arbitrator within said thirty (30) calendar day period, either of the
        parties within a period of thirty (30) calendar days thereafter, after
        notice to the other party or parties, apply to a judge of the High Court
        of Justice of England and Wales for the appointment of a third
        arbitrator and in such case the person so appointed shall be deemed
        and shall act as the third arbitrator. Upon acceptance of the
        appointment of said third arbitrator, the Board of Arbitration for the
        controversy in question shall be deemed fixed. All claims, demands,
        denials of claims and notices pursuant to this Arbitration Condition
        shall be given in accordance with any Notice Condition in this



## A S P E N
ASPEN INSURANCE

Reinsurance.

(b)    The Board shall, within ninety (90) calendar days following the conclusion of the hearing, render its decision on the matter or matters in controversy in writing and shall cause a copy thereof to be served on all the parties thereto. In case the Board fails to reach a unanimous decision, the decision of the majority of the members of the Board shall be deemed to be the decision of the Board and the same shall be final and binding on the parties thereto.

(c)    Any order as to the costs of arbitration shall be in the sole discretion of the Board, who may direct to whom and by whom and in what manner they shall be paid.

## 7.    ASSISTANCE AND CO-OPERATION

1)    **Notice to Reinsurers:** The Reinsured shall, as a condition precedent to its right to any indemnity under this Reinsurance, give the Reinsurer written notice of occurrences, losses and claims as required herein.

2)    **Occurrences, Losses and Claims Requiring Notice:**

All Occurrences, losses and claims which are reserved by the Adjuster (as defined in the attached Original Policy Wording) for USD 25,000,000 or greater shall be notified to the Reinsurer by the Reinsured within thirty (30) calendar days. For all such Occurrences, losses or claims notified, the Reinsured shall report, within ninety (90) calendar days, any changes in loss reserves or other significant developments which may affect the final disposition or amount of a settlement.

3)    **Reinsurer's Right of Inspection:** The Reinsured shall, at all reasonable times, place at the disposal of the Reinsurer or its authorized representatives for inspection and copying at the Reinsurer's expense all books, records and papers recorded in any form by the Reinsured. The Reinsurer's right of inspection shall exist after termination of the Policy Period as long as one of the parties hereto has a claim arising under this Reinsurance against the other.

4)    **Right to Associate:** The Reinsurer shall not be called upon to assume charge of the investigation, evaluation, settlement, defense or control of the handling of, any loss, claim or legal action, arbitration or other proceeding commenced against the Original Insured. The Reinsurer shall be afforded the opportunity to associate with the investigation, evaluation, settlement, defense and/or handling of any such loss, claim or proceeding, that has been reserved by the Adjuster for USD 25,000,000 or greater. This association shall consist of regular (not less than quarterly) conference calls, conducted by the Original Insured, with the legal staff of the Original Insured, during which the Reinsurer or its representatives may discuss any loss, claim or proceeding which may affect the Reinsurer's liability under this Reinsurance, and during which the Reinsurer may comment and advise on the investigation, evaluation, settlement, defense and/or handling of such losses, claims or proceedings.

At the Reinsurer's request, the Original Insured and the Reinsured shall arrange additional conference calls or meetings with the legal staff of the Original Insured, to respond to queries upon reasonable notice, regarding any loss, claim or proceeding which may affect the Reinsurer's liability under this Reinsurance, and to receive the Reinsurer's advice, comments and



# ASPEN

ASPEN INSURANCE

suggestions regarding such loss, claim or proceeding.

The Reinsurer's opportunity to associate with the investigation, evaluation, settlement, defense, and/or handling of any loss, claim or proceeding shall remain subject to the provisions of the Original Policy, including Insuring Agreement V. B., "Control of Defense". It is a condition precedent, notwithstanding the above, that no settlement and/or compromise in connection with a loss, claim or proceeding involving this layer of Reinsurance shall be made by the Reinsured or Original Insured, nor any liability admitted by the Reinsured or Original Insured, without the prior written approval of the Reinsurer.

5) **Recoveries:** Recoveries or payments recovered or received subsequent to loss settlement by the Reinsured shall be applied as if recovered or received prior to such settlement, and all necessary adjustments shall be made by the Reinsured and the Reinsurer.

## 8    OFF SET

Both Parties, each at its option, may offset any balance or balances whether on account of premium, claims and losses, loss expenses or salvages due from one party to the other under this Reinsurance Agreement; provided, however, that in the event of insolvency of a party hereto, offset shall only be allowed in accordance with applicable insolvency statutes and regulation

## 9    THIRD PARTY RIGHTS

Except to the extent set forth in this Reinsurance Agreement, A person who is not a party to this Agreement has no right under the Contract (Rights of Third Parties) Act 1999 to enforce any term of this Agreement but this does not affect any right or remedy of a third party which exists or is available apart from that Act

## 10    AMENDMENTS

No variation In this Reinsurance Agreement shall be effective unless evidenced in writing and duly signed on behalf of both parties. Variations sent by instantaneous means of communication are also effective provided they are capable of being shown by means of permanent or retrievable record to have been agreed by both parties.





# A S P E N

ASPEN INSURANCE

**11    REINSURANCE DECLARATIONS**

**Item 1**  **Policy No.**  K0A065C08A0FQ

**Item 2**  **Reinsured:**

General International Limited

**Item 3**  **Address of the Reinsured:**

General International Limited
29 Richmond Road  HM08
Hamilton HM, BERMUDA

**Item 4**  **Original Policy/ies No.(s):**

GIL 08-375.

**Item 5**  **Original Insured:**

General Motors Corporation, and as more fully set forth in the Original Policy.

**Item 6**  **Address of the Original Insured:**

General Motors Corporation
Corporate Risk Management
MC482-C19-C36
300 Renaissance Center,
Detroit,
Michigan 48265-3000
United States of America.

**Item 7**  **Original Hazards and/or Exposures and/or Perils and/or Interests:**

Excess Comprehensive Third Party Liability Insurance, including Workers'
Compensation Act and Employers' Liability.   Coverage in respect of
Automobile Liability, Workers' Compensation Act and Employers' Liability
shall apply on an "Occurrence" basis while all other coverages apply on a
"Claims Made" or "losses reported" basis.

**Item 8**  **Reinsured Hazards and/or Exposures and/or Perils and/or Interests:**

As stated in Item 7. above.

**Item 9**  **Original Limit(s) of Liability:**

As more fully set forth in Item 2. of the Declarations of the Original Policy

**Item 10**  **Maximum Retention as applicable to 9. above:**

As more fully set forth in Item 3. of the Declarations of the Original Policy.





**ASPEN**

ASPEN INSURANCE

**Item 11**        **Limits(s) of Liability hereunder:**

a)   USD 50,000,000 part of USD 75,000,000   each and every Occurrence / Claim as applicable

b)   USD 50,000,000 part of USD 75,000,000   annual aggregate in respect of all coverages combined

IN EXCESS OF:

a)      USD  245,000,000    each and every Occurrence / claim as applicable

b)      USD  245,000,000    annual aggregate in respect of all coverages combined

EXCESS OF THE FOLLOWING UNDERLYING AMOUNTS (WHETHER INSURED OR SELF INSURED IN PART OR WHOLE) WHICH ARE EITHER THE GREATER OF:

A)      The Underlying Policy Limits expressed as the difference between:

USD  55,000,000  each and every Occurrence and the underlying retentions listed below

(The Underlying Retentions as listed below apply before the 'Difference between' limits of liability stated above)

<u>Underlying Retentions (which include Defense Costs):</u>

USD  35,000,000  each and every Occurrence in respect of Products Liability and Completed Operations Liability combined for Claims made or suits brought within the U.S.A.

USD  25,000,000  each and every Occurrence in respect of General Liability for Claims made or suits brought within the U.S.A.

USD  25,000,000  each and every Occurrence in respect of Automobile Liability (Corporate - U.S.A., and Leasing / Rental Programs) for Claims made or suits brought within the U.S.A.

USD  25,000,000  each and every Occurrence in respect of Pollution Liability (Worldwide)

USD  25,000,000  each and every Occurrence in respect of Excess Workers' Compensation (Self-Insured States and Entities) and Employers' Liability combined, for Claims made or suits brought within the U.S.A.

USD  25,000,000  each and every Occurrence in respect of Foreign Liability (includes Products Liability, General Liability, Automobile Liability, Employers' Liability and Automobile Leasing) - for Claims made or suits brought outside the U.S.A.



# ASPEN

ASPEN INSURANCE

However, the Limits of Liability of the Policy are subject to the following annual Aggregates:

| | |
|---|---|
| 1) USD 40,000,000 | in respect of Products Liability and Completed Operations Liability combined for Claims made or suits brought in the U.S.A. |
| 2) USD 60,000,000 | All other coverages except Automobile Liability |

Maximum Retention as applicable to A) above (All amounts include defense costs):

  (a)  Per Occurrence

    (i)  USD    35,000,000   each and every Occurrence in respect of Products Liability and Completed Operations Liability combined for claims made or suits brought in the U.S.A.

    (ii)  USD    25,000,000  each and every Occurrence in respect of all other coverages combined.

Should an Occurrence involve more than one retention as stated above, the maximum retention would be USD 35,000,000 per Occurrence.

  (b)  Annual Aggregate

    Not applicable

OR

  B)  The Underlying Insurance as per Schedule B of the Insured's Application.

**Item 12 Interest:**

As the original Policy

**Item 13 Territorial Limits:**

Worldwide

**Item 14 Period of this Reinsurance:**

From: 1st September, 2008 to: 1st September, 2009

commencing and expiring at the time of day expressed in the Original Policy/ies.

**Item 15 Premium:**

USD 650,000   Gross part of USD 975,000
USD 617,500   Net part of USD926,250 Net (100% Annual)





## ASPEN
ASPEN INSURANCE

**Item 16 Currency:**

United States Dollars

**Item 17 Notice of Loss to:**

Aon Risk Services Inc of Michigan
3000 Town Center,
Suite 3000,
Southfield,
Michigan 48075,
United States of America

AND

Claims Manager,
Aspen Insurance UK Limited
Dublin Claims
Plantation Place
30 Fenchurch Street
London EC3M 3BD
dublinclaims@aspeninsurance.ie

### SEVERAL LIABILITY NOTICE

The subscribing reinsurers' obligations under contracts of reinsurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing reinsurers are not responsible for the subscription of any co-subscribing reinsurer who for any reason does not satisfy all or part of its obligations.

LSW 1001 (Reinsurance) 08/94

Seán O'Rorke
SENIOR UNDERWRITER.



| | |
|---|---|
| **Reinsured:** | General International Limited |
| **Original Insured:** | General Motors Corporation |
| **Policy Number:** | K0A065C08A0F |
| **Addendum No:** | 1 |
| **Effective Date:** | September 1, 2008 |

## KNOWN OCCURRENCE OR CLAIM EXCLUSION
## RETROACTIVE ENDORSEMENT

It is acknowledged and agreed that notwithstanding the retroactive coverage afforded to the Original Insured under the Original Policy or any other provision of the Original Policy or this reinsurance, the retroactive cover afforded by this Reinsurance is limited to the dates set forth below. The reinsurers hereon shall have no liability with respect to any loss recoverable under the Original Policy by reason of its specified retroactive date or dates being earlier than those set out below.

Furthermore, it is hereby understood and agreed that there shall be no liability under this Reinsurance in respect of any Occurrence or Claim of which the Original Insured was aware prior to 1ˢᵗ September 2008, irrespective of whether or not the Original Insured was aware that such Occurrence or Claim was likely to involve the Original Policy and irrespective of whether the Original Policy has provided coverage to the Original Insured.

For the purposes of coverage under this Reinsurance, the Original Insured shall be deemed to have been aware of an Occurrence or Claim if any executive officer, manager or equivalent level employee of its corporate risk management, insurance or law department was aware of such Occurrence or Claim.

Notwithstanding anything contained herein to the contrary, it is understood and agreed that the Original Insured's failure or omission to disclose all known occurrences within the laundry list submitted to the Reinsured and held on file by the reinsurer for the Policy year expiring 1ˢᵗ September, 2008 shall not give rise to any right to avoid or rescind this Reinsurance provided such failure or omission is not intentional.

Retroactive Date:   1ˢᵗ January 1986, except in respect of SAAB Automobile AB where Retroactive Date is 1ˢᵗ March 1990.


ALL OTHER TERMS AND CONDITIONS OF THIS REINSURANCE REMAIN UNCHANGED.


**Aspen Insurance UK Limited**

By: _Sean O'Regan_

Title: Senior Underwriter

Date: January 15, 2009



| | |
|---|---|
| **Reinsured:** | General International Limited |
| **Original Insured:** | General Motors Corporation |
| **Policy Number:** | K0A065C08A0F |
| **Addendum No:** | 2 |
| **Effective Date:** | September 1, 2008 |

## PREMIUM PAYMENT CLAUSE

The Reinsured undertakes that premium will be paid in full to the Reinsurer within forty-five (45) days of inception of this Reinsurance (or, in respect of instalment premiums, when due).

If the premium due under this Reinsurance has not been so paid to the Reinsurer by the forty-fifth (45th) day from the inception of this Reinsurance (and, in respect of installment premiums, by the date they are due) the Reinsurer shall have the right to cancel this Reinsurance by notifying the Reinsured via the broker in writing. In the event of cancellation, premium is due to the Reinsurer on a pro rata basis for the period that the Reinsurer are on risk but the full premium shall be payable to the Reinsurer in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this Reinsurance.

It is agreed that the Reinsurer shall give not less than fifteen (15) days prior notice of cancellation to the Reinsured via the broker. If premium due is paid in full to the Reinsurer before the notice period expires, notice of cancellation shall automatically be revoked. If not, this Reinsurance shall automatically terminate at the end of the notice period.

Unless otherwise agreed, the Leading Reinsurer (and Agreement Parties if appropriate) are authorised to exercise rights under this clause on their own behalf and on behalf of all the Companies participating in this contract.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

ALL OTHER TERMS AND CONDITIONS OF THIS REINSURANCE REMAIN UNCHANGED.

**Aspen Insurance UK Limited**

By: Sean O'Regan

Title: Senior Underwriter

Date: January 15, 2009



| | |
|---|---|
| **Reinsured:** | General International Limited |
| **Original Insured:** | General Motors Corporation |
| **Policy Number:** | K0A065C08A0F |
| **Addendum No:** | 3 |
| **Effective Date:** | September 1, 2008 |

## MINIMUM EARNED PREMIUM ENDORSEMENT

It is understood and agreed that in the event of cancellation of this Policy by or at the direction of the Reinsured, the Reinsurer shall retain a Minimum Earned Premium of USD 227,500 this being 35% of USD 650,000.

It is further agreed that the provision regarding cancellation by the Reinsured is amended to read:

"If the Reinsured cancels this policy, earned premium will be computed in accordance with the customary pro-rata rate table and procedure, or the Minimum Earned Premium stated herein, whichever is greater."

All other terms, conditions and exclusions of the Policy remain unchanged.

**Aspen Insurance UK Limited**

By:       Sean O'Regan

Title:    Senior Underwriter

Date     January 15, 2009



EX-21.1 3 dex211.htm LIST OF SUBSIDIARIES OF GENERAL MOTORS COMPANY

Exhibit 21.1

## GENERAL MOTORS COMPANY
## AND SUBSIDIARIES, JOINT VENTURES, AND AFFILIATES
## OF THE REGISTRANT
## AS OF JUNE 30, 2010

| Company Name | State or Sovereign Power of Incorporation |
| --- | --- |
| 06 Ormskirk Limited | England and Wales |
| 1908 Holdings Ltd. | Cayman Islands |
| 2035208 Ontario Inc. | Canada |
| 2140879 Ontario Inc. | Canada |
| 3535673 Canada Inc. | Canada |
| 4259891 Canada Inc. | Canada |
| 4501101 Canada Inc. | Canada |
| 4501110 Canada Inc. | Canada |
| 6153933 Canada Ltd. | Canada |
| Adam Opel GmbH | Germany |
| Advantage Chevrolet of Bolingbrook, Inc. | United States |
| Aftermarket (UK) Limited | England |
| Aftermarket Italia S.r.l. in liquidazione | Italy |
| AL Mansour Automotive SAE | Egypt |
| Ally Financial Inc. | United States |
| Andiamo Riverfront, LLC | United States |
| Annunciata Corporation | United States |
| Approach (UK) Limited | England and Wales |
| Argonaut Holdings, Inc. | United States |
| Athens Chevrolet, Inc. | United States |
| ATK Automotive Technology Kaiserslautern GmbH | Germany |
| Auburn Pontiac Buick GMC, Inc. | United States |
| Auto Lease Finance Corporation | Cayman Islands |
| Autohaus G.V.O. GmbH | Germany |
| Automotive Steering Korea Limited | Korea, Republic of |
| Autovision (Scotland) Limited | Scotland |
| Aviation Spectrum Resources Holdings, Incorporated | United States |
| Baker (Crewe) Limited | England and Wales |
| Ballards of Watford Limited | England and Wales |
| Baylis (Gloucester) Limited | England and Wales |
| Belmont Grampian Limited | Scotland |
| Berse Road (No. 1) Limited | England |
| Berse Road (No. 2) Limited | England |
| Bicknell (Malvern) Limited | England and Wales |
| Bill Osborne Chevrolet Ltd. | Canada |
| Blackdown Motor Company Limited | England and Wales |

EXHIBIT — D

List of Subsidiaries of General Motors Company

## GENERAL MOTORS COMPANY
## AND SUBSIDIARIES, JOINT VENTURES, AND AFFILIATES
## OF THE REGISTRANT
## AS OF JUNE 30, 2010

| Company Name | State or Sovereign Power of Incorporation |
|---|---|
| Concept Vehicles Limited | England and Wales |
| Controladora AC Delco S.A. de C.V. | Mexico |
| Controladora General Motors, S.A. de C.V. | Mexico |
| Coskata, Inc. | United States |
| Crash Avoidance Metrics Partnerships | United States |
| Crown Motors (Dagenham) Limited | England and Wales |
| CSM Holdings Limited | England and Wales |
| Curt Warner Chevrolet, Inc. | United States |
| Daewoo Motor De Puerto Rico Inc. | Puerto Rico |
| Danny Beck Chevrolet, Inc. | United States |
| Dealer Guarantee Ltd. | England |
| Dealership Liquidations, Inc. | United States |
| Delphi Automotive LLP | England and Wales |
| Delphi Energy and Engine Management Systems UK Overseas Corporation | United States |
| Desert Sun Roswell, Inc. | United States |
| Detroit Investment Fund, L.P. | United States |
| Dinuba Auto Center, Inc. | United States |
| DIP Holdco LLP | United Kingdom |
| DMAX, Ltd. | United States |
| Dobies (Carlisle) Limited | England and Wales |
| Doraville Bond Corporation | United States |
| Drive Motor Retail Limited | England and Wales |
| Eden (GM) Limited | England and Wales |
| Elasto S.A. | Ecuador |
| Espace 328 SARL | France |
| F G Barnes (Maidstone) Limited | England and Wales |
| Fabrica Nacional de Autobuses Fanabus, S.A. | Venezuela |
| Fidass II B.V. | Netherlands |
| Fiducie Carrefour 440 | Canada |
| Fredericktown Chevrolet Co., Inc. | United States |
| Fugère Pontiac Buick Inc. | Canada |
| Funcap-Comercio e Administracao de Bens Moveis e Valores Ltda. | Brazil |
| Galleria Chevrolet-Cadillac, Inc. | United States |
| Gateway Chevrolet Motor Company | United States |
| GEMA Automotive, Inc. | United States |
| General International Insurance Services Limited | Bermuda |
| General International Limited | Bermuda |

General Motors (China) Investment Company Limited        China

General Motors (Hong Kong) Company Limited               Hong Kong

IN THE DISTRICT COURT OF IOWA, IN AND FOR BLACK HAWK COUNTY

---------------------------------------------------------------

| | |
|---|---|
| NEW YORK STATE TEACHERS RETIREMENT SYSTEM, individually, and on Behalf of All Other Persons Similarly Situated, Plaintiffs, vs. GENERAL MOTORS COMPANY. DANIEL F. AKERSON, NICHOLAS S. CYPRUS, CHRISTOPHER P. LIDDELL, DANIEL AMMANN, CHARLES K. STEVENS III, MARY T. BARRA, THOMAS S. TIMKO, and GAY KENT. MOTORS CORPORATION, Defendants. | CIVIL CASE NO. 4:14-cv-11191 AFFIDAVIT OF COURT REPORTER REGARDING REINSURANCE COVERAGE OF GENERAL MOTORS |

---------------------------------------------------------------

STATE OF IOWA        )
                     ) S.S..
COUNTY OF BLACK HAWK )

I, Richard Wasenius, being first duly sworn on oath, depose and state that I was a certified Court Reporter; that I performed as a Court Reporter in the State of Iowa; that beginning in 2008 and 2009 I was requested to attend several discovery depositions to be scheduled by counsel for Plaintiff, Charles Kayser in the matter of Kayser vs. General Motors, an Iowa District Court cause of action; that such depositions were conducted in 2008 and transcripts were provided to counsel of record.

I further depose and state that my fee for service bills were thereafter paid by the parties; further depositions were taken in 2009 by counsel for GM of Plaintiff's expert witness; that I was informed that GM had filed an application for protection with the bankruptcy court and that the fee for service I had submitted to defendant's counsel would be stayed. Following that I had some limited contact with defendant's counsel with respect to exhibits identified

EXHIBIT  -  E

-2-

in the deposition of the expert witness. I was then requested to provide additional copies of all depositions taken from the inception of the litigation. This created the submission of additional fees statements.

I further depose and state that sometime following this I was contacted by a reporting firm located in the Renaissance Center building inquiring as to my schedule to do some work in the Waterloo area that they were not available to performed. I mentioned to this person that I had done a significant amount of work for a law firm in their building. I described the existing conditions imposed by the stay order. The scheduler informed me they also did work for that firm involving GM in other litigation following the application for protection and they had been paid for their services in each instance. I contacted defendant, GM's law firm about my fee statements and made them aware of my discussion with the reporting firm in their building. I was told that the law firm had a large bill for services and that GM was sending them payment for the work the law firm had performed in the Kayser litigation and that my fees would be included. I asked on what basis would payment be made inasmuch as the fees had not been paid for some month due to the stay order. I was told that GM had an arrangement with a reinsurer and payment would be made the following weeks or soon after. Such was the case and I received full payment for services rendered.

Affiant further sayeth not.

_Richard Wasenius_
Richard Wasenius

Subscribed and sworn to before me this 9th day of March, 2016.

_Larry F. Woods_
NOTARY PUBLIC - STATE OF IOWA
or MAGISTRATE

Larry Woods
Magistrate, First Judicial District

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————X
:
In re                                                              :          **Chapter 11 Case No.**
:
**GENERAL MOTORS CORP.,** *et al.,*        :          **09-50026 (REG)**
:
                                        Debtors.            :          **(Jointly Administered)**
:
———————————————————————X

## WITHDRAWAL OF LIMITED OBJECTION TO THE MOTION BY GM TO ASSUME CERTAIN REINSURANCE CONTRACTS ISSUED BY ASPEN INSURANCE UK LIMITED TO GENERAL INTERNATIONAL LIMITED AT MOOT

Nixon Peabody LLP represents Aspen Insurance UK Limited ("Aspen") and files this withdrawal of its limited objection to the motion of General Motors Corporation ("GM") to assume certain reinsurance contracts issued by Aspen to General International Limited ("GIL"), a Bermuda based non-debtor affiliate of GM.

The Debtor having removed the contracts listed in Exhibit A to the Limited Objection from the list of agreements being assumed, Aspen Insurance UK Limited hereby withdraws its objection to assumption as moot.

Dated:     October 19, 2009

                                                    NIXON PEABODY LLP

                                          By:     /s/ Dennis Drebsky
                                                    Dennis Drebsky
                                                    Attorneys for Aspen
                                                    437 Madison Avenue
                                                    New York NY 10022
                                                    Tel.: (212) 940-3091

EXHIBIT  —  F

12747735.1